# In the Matter of

Case No. 2:25-cv-04264

GONCALVES, et al.

v.

KRISTIN SHEELER DESIGNS, LLC, et al.

---

## Deposition of James Brinnen

*Friday, September 18, 2026*

---

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------x

TERESA GONCALVES and DINA KETCHAM, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

Case No. 2:25-cv-04264

KRISTIN SHEELER DESIGNS, LLC, KRISTIN SHEELER and JAMES "JIM" BRINNEN,

Defendants.

-------------------------------------x

September 18, 2026
10:06 a.m.

REMOTE DEPOSITION of the DEFENDANT JAMES BRINNEN, taken by Plaintiffs, in the above-entitled action, held via Zoom on the above date and time pursuant to Notice, before Lisa Hiesiger, a Stenographic Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

SAGE LEGAL, LLC
Attorneys for Plaintiffs
182-11 Jamaica Avenue
Jamaica, New York 11423

BY: EMANUEL KATAEV, ESQ.
EMANUEL@SAGELEGAL.NYC

BOWLES & JOHNSON, PLLC
Attorneys for Defendants
14 Wall Street, 20th Floor
New York, New York 10005

BY: DAVID BOWLES, ESQ.
DAVID@BOJO.LAW

Also Present:

BENJAMIN GRUSHKOVKIY, Paralegal
SAGE LEGAL

OLIVIA COONEY, Paralegal
SAGE LEGAL

TAMMY ARONBAYEV, Paralegal
SAGE LEGAL

~ oOo ~

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

~ oOo ~

JAMES BRINNEN

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. KATAEV: Emanuel Kataev, Sage Legal for the plaintiffs, we consent.

MR. BOWLES: David Bowles, Bowles and Johnson for the defendants, and I agree.

J A M E S B R I N N E N,

having been first duly sworn by Lisa Hiesiger, a Notary Public, was called as a witness and testified as follows:

THE COURT REPORTER: Mr. Bowles, will

you be purchasing a copy of the transcript?

MR. BOWLES: Yes, regular delivery.

EXAMINATION BY MR. KATAEV:

Q. Good morning, Mr. Brinnen, my name is Emanuel Kataev and I represent the plaintiffs, Teresa Goncalves, and Dina Ketcham, K-E-T-C-H-A-M. I will use the term of "the company" to refer to Kristin Sheeler Designs, LLC and/or NIBI-MTK, do you understand that?

A. Yes.

Q. Before we begin today's deposition, have you ever been deposed before?

A. No.

Q. Since it's your first time conducting a deposition, I want to make sure you understand the rules. I first want you to confirm that you understand the oath that you just took to testify truthfully as having the same force and effect as if you were testifying in court in front of a judge.

A. Excuse me, you're breaking up quite a bit. I don't know if it's my network or your network, and there's a lot of messaging pings

JAMES BRINNEN

going on. I'm not sure if anyone sees that or not, but it's quite distracting.

Q. I'll have to check. I'm going to switch to audio to see if that helps.

A. Is there any messaging in the chat that's making it?

Q. All I see is two messages.

(Discussion off the record)

(Record read)

Q. Do you understand that?

A. That was to me?

Q. Yes.

A. Yes, I understand that.

Q. We're going to be discussing events today that took place over the course of a number of years. While I don't want you to guess at the answers, I want you to understand that I'm entitled to your best recollection of the events. Do you understand that?

A. Yes.

Q. Third rule, please answer all questions aloud so that the court reporter can write down. Body gestures, mumbling, uh-huh, uh-uhs, is not something that is going to work

for today's deposition. Do you understand that?

A. Yes.

Q. And you're doing a good job of this, but just to put it on the record, please let me finish my question before you answer even if you know what my question is going to be. That way there's only one speaker at a time and the court reporter can write down what both of us are saying, okay?

A. Yes.

Q. Another rule is that if you don't understand a question I ask, tell me, and I will rephrase it; however, if you answer the question I will assume that you understood it. Do you understand that?

A. Yes.

Q. When you're answering questions if the basis for your knowledge is other than your own personal knowledge I would like for you to tell me how you know, other than from your own personal knowledge, okay?

A. Understood.

Q. We can take a break at any time today. My depositions tend to go long, if not

JAMES BRINNEN

for any other reason other than the fact that I have a long deposition outline and some exhibits to cover. So if you need to take a break at any time, it's okay, but I ask that you answer any pending question before going for a break, okay?

A. Yes.

Q. What's your full name for the record?

A. James Scott Brinnen.

Q. And you understand all of the ground rules that we just covered, correct?

A. Yes.

Q. What is your present occupation?

A. I am head of delivery for a consulting company.

Q. What is the name of the company?

A. QueBIT, Consulting, LLC.

Q. Is that human, H-U-M-A-N?

A. No, QueBIT, Q-u-e-B-I-T.

Q. Got it. What relationship -- withdrawn. How long have you worked at that consulting company?

A. Almost nine years presently.

Q. What relationship, if any, do you have to Kristin Sheeler Designs, LLC?

JAMES BRINNEN

A. I don't understand the context of relationship.
Q. Well, do you have any role at Kristin Sheeler Designs, LLC?
A. Not formally.
Q. So you're not an officer of the LLC? In other words, the president, the vice president, treasurer, secretary, you don't have any of those roles at the company, right?
A. No.
Q. Are you a formal member of Kristin Sheeler Designs, LLC?
A. No.
Q. Do you know who is?
A. Yes.
Q. Who is it?
A. Kristin Sheeler.
Q. Is she the sole member?
A. Yes.
Q. Notwithstanding the fact that you are not a member nor an officer of Kristin Sheeler Designs, LLC, is it fair to say that you performed work there?
A. Yes.

JAMES BRINNEN

Q. When did that first begin? When did you first begin to perform any work there?
A. I can't recall exactly.
Q. Do you know when the LLC was formed?
A. Approximately.
Q. When was that?
A. I believe 2005.
Q. Have you ever at anytime been an owner of the LLC?
A. No.
Q. And you're married to Kristin Sheeler, correct?
A. Yes.
Q. When did you get married to Kristin Sheeler?
A. 2007.
Q. If I recall correctly you believe the LLC was opened in 2005, two years prior to your marriage, correct?
A. I believe so.
Q. And you were assisting Kristin Sheeler with the company prior to your marriage to her in 2007, correct?
A. No.

JAMES BRINNEN

Q. You only started assisting her after the marriage?

A. Yes.

Q. To your knowledge, has anyone else ever had any ownership interest in Kristin Sheeler Designs, LLC?

A. Not to my knowledge.

Q. To your knowledge, how many stores or locations does Kristin Sheeler Designs, LLC have?

A. Could I clarify? Are you asking about stores she manages or stores that carry her clothes?

Q. I'll represent to you that my understanding is that there are three stores that she has, they're all in Montauk and I'm referring to those three stores.

A. There are not three stores.

Q. How many stores does Kristin Sheeler operate?

A. She has two brick-and-mortar locations.

Q. What is the address for the first one?

A. 88 South Euclid Avenue/Street -- I

JAMES BRINNEN

can't remember if it's street or avenue -- Montauk, New York.

Q. What about the second one?

A. 2450 Main Street, Bridgehampton, New York.

Q. And prior to today's date there was a third one, but it closed down due to a fire, correct?

A. Correct.

Q. What was the address for that one?

A. 127 Main Street, Westhampton Beach, New York.

Q. To your knowledge, are those the only three stores that the company had?

A. To my knowledge, yes.

Q. Now, to your knowledge do all three of those stores when they operated function under the same company name Kristin Sheeler Designs, LLC or did they have separate corporate entities set up per location?

A. One under Kristin Sheeler Designs.

Q. It's fair to say that you were not involved in organizing Kristin Sheeler Designs, LLC, correct?

JAMES BRINNEN

A. Correct.

Q. When did the location that suffered a fire officially close down?

A. Could you clarify "close"?

Q. It's a fair question. I would like for you to give me two dates. I guess the date of the fire and the date that the company no longer had a lease to use space.

A. As best I recall, the fire was on October 24th. It's possible it was October 25th, I don't remember exactly, of 2024. We held the lease in a holding pattern waiting for the landlord to confirm a reoccupancy date, until approximately -- I actually don't recall. I'm not going to guess. I don't recall what the final date when we said let's terminate.

Q. Do you know approximately the number of months when the final decision was made to leave the space, since the fire how many months after?

A. It would be a guess, so I'm not sure.

Q. Do you know if it was more than a year after?

A. It was not more than a year.

JAMES BRINNEN

Q. Do you know whether it was more than six months after?

A. I don't, I think it was less than six months but I don't know for sure.

Q. Fair enough. Do you have any knowledge or information that you obtained about the cause of the fire?

A. No.

Q. Did the company have any insurance policy that provided any payment under the policy because of the fire?

A. Yes.

Q. Did the company benefit from any insurance payment or did it have to go to the landlord or something else?

MR. BOWLES: Objection to the form. Go ahead.

A. I'm not sure I understand.

Q. You testified earlier that you were waiting for the landlord to figure out what to do after the fire occurred. And my question is under the company's lease agreement, was there any obligation by the company to reimburse or pay to the landlord whatever monies you received

under the policy, whatever money the company received under the policy?

MR. BOWLES: Object to the form.

A. I don't think I understand what you're asking.

Q. So the insurance company made a payment to the company under the policy because of the fire, correct?

A. Yes.

Q. Did any of that money have to go to the landlord, for any reason?

A. No.

Q. It's fair to say that whatever money you got from the policy that the company got to keep, correct?

A. Yes.

Q. To your knowledge, who makes the final decisions concerning the operation of the stores, the two that currently exist and the one that had the fire before it shut down?

A. I'm not sure I understand. Operations is broad, could you be more clear?

Q. Operations is meaningfully broad and I'm asking the question in the broad frame.

JAMES BRINNEN

Anything to do with operations who makes the final decision then?

MR. BOWLES: Object to the form.

A. It would be a blend. The store managers have latitude to make decisions of their stores, and the general policy is set by Kristin Sheeler.

Q. What are the identities of the general managers in late 2024?

A. Could you clarify which store?

Q. I'm asking for all of them.

A. And could you clarify the time period?

Q. I did in my question, it was late 2024.

A. Are you talking before the store in Westhampton closed?

Q. Sure.

A. So Westhampton would be Dina Ketcham. Bridgehampton would be Kathy Marin. Katherine, I guess, officially. If you want, I think her W-2 says Katherine. And Montauk at that point would not have had a manager. The store would have been about to close for the season.

JAMES BRINNEN

Q. Who was the manager during the season?

A. I don't recall.

Q. Going back to the location that closed due to the fire. Ever since the fire occurred, did the store reopen at any point where the customers were able to walk in and buy anything?

A. No.

Q. Going back to the managers' question. As of today who are the managers of the remaining two locations?

A. Bridgehampton, Katherine Marin. Montauk is out of season, so there's no manager there.

Q. Who was the manager in Montauk, prior to the end of the season, this past season?

A. Kristin Sheeler.

Q. Other than Kristin Sheeler Designs and NIBI-MTK, are there any other names that the company goes by?

A. Not to my knowledge.

Q. Do you go by any other name other than James or Jim?

JAMES BRINNEN

A. No.
Q. Have you ever had a last name that was different from the last name Brinnen?
A. No.
Q. Generally speaking, what is your educational background?
A. I have a bachelor's degree.
Q. Where from?
A. SUNY Fredonia.
Q. When did you obtain it?
A. 1988.
Q. Do you have any licenses of any kind other than a driver's license?
A. No.
Q. Do you have any training as it pertains to payroll?
A. No.
Q. What about accounting?
A. No.
Q. Any training in retail management?
A. No.
Q. Were you ever the owner of any business before?
A. You broke up. Any business of what?

JAMES BRINNEN

Q. Were you the owner of any business before?
A. No.
Q. Were you ever a manager of any business who oversaw employees, other than at Kristin Sheeler Designs?
A. No.
Q. Have you ever testified in court before?
A. No.
Q. Were you ever a party, I mean plaintiff or defendant, in any other lawsuit before?
A. I don't think so. There -- I don't think so.
Q. Have you ever been arrested for any crime?
A. No.
Q. It's almost silly to ask, but for the sake of completeness you've never been convicted of any crime, right?
A. Correct.
Q. Did you prepare for today's deposition?

JAMES BRINNEN

A. Yes.

Q. What did you do to prepare?

A. Talked with my attorney.

Q. I'm going to ask you a series of conversations about your discussion with your attorney. When I ask you those questions I implore you not to share with me anything that you actually discussed.

The first question I have about it is when did you speak with your attorney in connection with the preparation of today's deposition?

A. Yesterday.

Q. And in what manner did you speak to your attorney, meaning telephone, virtual meeting, in person, some other manner?

A. Virtual meeting.

Q. How long did the virtual meeting last?

A. Approximately 30 minutes.

Q. Other than you and your attorney who else, if anyone, was present during the virtual meeting?

A. Kristin Sheeler for part of the call.

JAMES BRINNEN

Q. Other than her, anyone else?
A. No.
Q. During the meeting did you review any documents?
A. No.
Q. During the meeting was any system reviewed --
A. No.
Q. -- like an electronic system?
A. No.
Q. Other than that half an hour virtual meeting to prepare for today's deposition, was there ever any other meeting, phone call or any other way to prepare for that meeting -- to prepare for the deposition?
A. One prior phone call.
Q. When was that?
A. I can't say a specific date. It was, I believe, last week early.
Q. Going back to the virtual meeting, the attorney that you met with was Mr. Bowles, correct?
A. Correct.
Q. And the attorney that you spoke with

by phone last week was also Mr. Bowles, correct?
A. Correct.
Q. How long was that phone call?
A. I believe that was approximately 45 minutes.
Q. Was anyone else present during that phone call?
A. Yes.
Q. Who else was present?
A. Kristin Sheeler.
Q. Was she present with you in person?
A. Yes, actually I cannot remember if we were together or if she was -- I actually cannot remember if we were together or if she was at the store location, I -- actually, I cannot remember.
Q. Okay. When the virtual meeting took place yesterday, were you present at the store location?
A. No.
Q. When the phone call occurred last week were you present at the store location?
A. No.
Q. Generally speaking, nowadays, how often are you present at the store location?

JAMES BRINNEN

A. You broke up in the middle, generally speaking?

Q. Generally speaking, nowadays, how often are you present at the store location?

A. Very rarely.

Q. Generally speaking in late 2024 how often were you present at any of the store locations?

A. Same answer, rarely.

Q. So consistently from an inception of your involvement with Kristin Sheeler Designs, LLC through the present, it was not a common thing for you to be present at the store, right, at any store?

A. Not a common thing, no.

Q. Generally speaking, how often are you ever present at any of the stores?

A. It's hard to define, I don't have a role at the stores.

Q. What, if anything, compels your presence to come to the store?

A. Typically if, um, there's a broken rack or something needs addressing that is within my control, racks, furniture fixtures, that kind

JAMES BRINNEN

of thing. If there is, every now and again, I'll be asked to help reboot the WiFi. General things like that.

Q. Is it fair to say that you're handy?

A. Sure.

Q. During the time that you were preparing for the deposition, did you review any of the pleadings in this case -- pleadings is defined as the complaint -- answer, counterclaims, things of that nature?

A. No.

Q. Separate and apart from preparing for today's deposition, have you ever reviewed the pleadings in this case?

A. Yes.

Q. What about the discovery responses, have you ever reviewed those? I'm going to clarify, the defendants' responses to the plaintiffs' discovery, have you ever reviewed those?

A. I don't recall if I read all of those.

Q. Certainly you did not read them in connection with your preparation for today's

deposition, correct?

A. Correct.

Q. Generally speaking what, if anything, else do you recall ever reviewing in connection with this case?

A. Materials shared by -- actually, not so much materials shared by Mr. Bowles, but more requests for information.

MR. KATAEV: Let the record reflect that Benjamin Grushovskiy joined. That's G-R-U-S-H-K-O-V-S-K-I-Y. He's the office manager/paralegal at my firm observing. He aspires to go to law school. Maybe after this deposition, he will change his mind.

Q. The name Phyllis O'Leary, do you know who that is?

A. Yes.

Q. Who is that?

A. Bookkeeper.

Q. When you say bookkeeper, is that a bookkeeper that is employed directly by the company and works exclusively for the company?

A. No.

JAMES BRINNEN

Q. Is it fair to say that Phyllis O'Leary is independent of the company?

A. Yes.

Q. And Phyllis O'Leary has customers that she does bookkeeping for other than Kristin Sheeler Designs, LLC?

A. I do not know.

Q. To your knowledge, is Phyllis O'Leary sort of a freelanceer, who does this solo, works for a company, has her own business, which one of those, if any?

A. I don't know.

Q. In the course of your providing assistance to the company, was it a regular part of your duties to interact with Ms. O'Leary?

A. No.

Q. How do you know her?

A. She's the bookkeeper at my accounting firm. When I say my accounting firm, she's the bookkeeper at the accounting firm that files our taxes.

Q. And when you say files our taxes, you're referring to your individual taxes?

A. Yes.

JAMES BRINNEN

Q. And what is the name of the accounting firm?

A. Orest Baransky -- there are some letters I can't recall -- CPA.

Q. To your knowledge is Ms. O'Leary an employee of that accounting firm?

A. I don't know if she's an employee or a freelancer.

Q. Have you ever visited that accounting firm's offices?

A. Maybe once a long time ago.

Q. During that visit did you observe if Ms. O'Leary was sitting at a desk there?

A. No.

Q. Who is Orest, O-R-E-S-T, middle name initial P, Baransky, B-A-R-A-N-S-K-Y?

A. That's the accountant, Orest Baransky, CPA.

Q. So earlier when you were referring to Boris Baransky, I heard the term "Boris." I just want to clarify that it's Orest, O-R-E-S-T, correct?

A. Correct.

Q. There is no one named Boris in the

JAMES BRINNEN

accounting firm that you are aware of, correct?
A. I have no idea.
Q. To your knowledge, was the Baransky accounting firm the exclusive accountant for Kristin Sheeler Designs, LLC from its inception until the present?
A. I don't know.
Q. Do you recall ever -- withdrawn.
Do you recall there ever being any other accounting firm that handled taxes for Kristin Sheeler Designs, LLC?
A. Again, I don't know.
Q. From the time that you first got involved with Kristin Sheeler Designs, LLC in 2007, after your marriage to Kristin Sheeler, have you ever had occasion to know of any other accounting firm who assisted Kristin Sheeler Designs, LLC with its taxes?
A. I do not know from that early inception.
Q. Since when do you know that the Baransky accounting firm has been the firm to handle all of the company's taxes?
A. I can't say, specifically, I cannot

say specifically when they became the firm that took care of everything.

Q. Setting aside that you may not know the name of any other accounting firm that may have assisted the company with its taxes, do you know whether any other accounting firm ever did so?

A. No.

Q. In other words, you cannot identify any other accounting firm that did so, correct?

A. I can't.

Q. Are you familiar with the term "interrogatories"?

A. Yes.

Q. Were you involved in any way, shape or form in answering interrogatories that were propounded by the plaintiffs in this case?

A. Was ever propounded?

Q. It's a fancy word for saying served or provided by?

A. I'm not sure I understand the question.

Q. Were you involved in any way in answering interrogatories served by the

JAMES BRINNEN

plaintiffs in this case on defendants?

A. I don't recall.

Q. Are you familiar with the term "initial disclosures"?

A. Yes.

Q. Are you involved in any way in providing information contained within the initial disclosures that the defendants served upon the plaintiffs in this case?

A. Yes.

Q. Are you familiar with the answer with counterclaims that were filed in this case against the plaintiffs by the defendants?

A. Again, I couldn't hear clearly "Am I familiar with."

Q. The answer with counterclaims filed by the defendants against the plaintiffs?

A. I don't think I understand what you're asking. Am I familiar with the answer with counterclaims?

Q. The document is called the answer with counterclaims. Let me rephrase it.

Are you familiar with the fact that there were counterclaims filed by the defendants

JAMES BRINNEN

against the plaintiffs in this case?

A. Yes.

Q. And my question is, were you involved in providing information to permit your attorneys to file those counterclaims?

A. Yes.

Q. Were you the only person involved?

A. No.

Q. Was Ms. Kristin Sheeler involved?

A. Yes.

Q. Other than yourself and Ms. Sheeler, was anyone else involved, other than your attorney as well?

A. I don't know.

Q. In other words, whenever it was that you provided information, no one other than Ms. Sheeler and your attorneys were involved, correct?

A. In what I provided, correct.

Q. Did you create any records in connection with this case?

MR. BOWLES: Object to the form.

A. I don't understand how to answer the word "create."

JAMES BRINNEN

Q. Broadly speaking, did you prepare a summary of information, create a spreadsheet, anything along those lines, create any document or a piece of information or electronic information concerning this case?

A. Yes.

Q. What is it that you created in connection with this case?

A. There are many many components that I sent.

Q. Identify them to the best of your ability.

A. I sent downloads of timekeeping entries, I shared e-mails. That's about it.

Q. Can you remember anything else other than those? Sorry?

A. Apologies, those would be the bulk of my memory would be spreadsheets and e-mails.

Q. There may be other things, but you don't remember offhand?

A. I don't think there is -- yes, correct, if there is anything else I don't recall.

Q. Tell me about the timekeeping

JAMES BRINNEN

information that you downloaded? Where did you download it from?

A. Our point of sales system which also acts as a clock in/clock out function.

Q. And I may be wrong but is that Lightspeed or something else?

A. It is Lightspeed.

Q. When did the company first start using Lightspeed?

A. I don't recall a specific date.

Q. Do you know whether Lightspeed was being used by the company from when you first started working there or providing assistance there?

A. Could you clarify the time frame?

Q. I mean my understanding is that you got married in 2007, started helping there shortly after, so my question starts from 2007.

A. With that in mind, could you reask the question, please?

Q. Sure, at the time that you first started assisting at Kristin Sheeler Designs, LLC, was Lightspeed being used at that point?

A. No.

JAMES BRINNEN

Q. How long after that did Lightspeed first start being used?

A. There were no stores until 2015. So at least eight years after that 2007 date inception would be a minimum. Specifically, when Lightspeed was installed, I don't recall. We had different systems at different times.

Q. Were you involved in originating the use of Lightspeed at any of the stores?

A. Could you define originating?

Q. Being the catalyst that started the process of contacting Lightspeed, negotiating with them, signing a contract, getting the devices, so on and so forth?

A. I don't recall.

Q. Do you know if Kristin Sheeler was involved in contacting Lightspeed and getting it set up?

A. I don't recall in that context.

Q. When do you first recall that Lightspeed was being used at any of the stores?

A. It would be a guess the 2020 -- I actually don't recall. I don't recall when Lightspeed was first installed.

JAMES BRINNEN

Q. It certainly wasn't at the inception of the brick-and-mortar stores, correct?

A. Not at the inception of the brick-and-mortar stores as well.

Q. Is Lightspeed still the system being used today?

A. Lightspeed is still the point of sale system.

Q. Prior to Lightspeed being used, what other point of sale systems, if any, did the company use?

A. To my knowledge prior to Lightspeed was ShopKeep, which was bought, purchased, absorbed, whatever the correct term would be, by Lightspeed, and less, possibly Square.

Q. Is Square still being used as of today?

A. No.

Q. So if I understood your answer about Lightspeed correctly, other than Square there was another company that you used prior to Lightspeed, but it became Lightspeed or Lightspeed bought them, right?

A. Correct.

JAMES BRINNEN

Q. What is the name of the company that existed prior to Lightspeed?
A. ShopKeep.
Q. And is it fair to say that from the inception of using ShopKeep through the time that you are now using Lightspeed, that was the only way that you tracked employee hours?
A. I believe so.
Q. Just, generally speaking, how does the timekeeping function work on that device?
A. Could you clarify device?
Q. Whenever the interface is that someone enters their time.
A. The people would come into the store, they had a code or a pin code, they would clock -- they were supposed to clock in when they got there and clock out when they left.
Q. And they entered the pin code on the touch screen, right?
A. Yes.
Q. And that would be the way that it was done with ShopKeep and that remains the way that it is done with Lightspeed, correct?
A. Correct.

JAMES BRINNEN

Q. Is it fair to say, that the business of Kristin Sheeler Designs, LLC is retail sales?

A. Yes.

Q. Is there any other line of business that Kristin Sheeler Designs, LLC is engaged in other than retail sales?

A. Yes.

Q. What else does the company do?

A. Wholesale.

Q. Anything else other than retail and wholesale?

A. No.

Q. Can you describe in more detail what exactly it is that the company does to generate revenue?

A. The company sells clothing, accessories, some home goods, small things, candles. That's pretty much it.

Q. The company is not involved in for lack of a better term, manufacturing or creating the items that it sells, correct?

A. No, not correct.

Q. Can you explain that aspect of the business?

JAMES BRINNEN

A. The company manufactures clothes sold under the NIBI-MTK label.

Q. And where are the clothes manufactured?

A. India.

Q. And the factory or warehouse or establishment in India that it's based in, is that owned by the company or is it a separate company?

A. Separate.

Q. And is that separate company owned by Kristin Sheeler or someone else?

A. Someone else.

Q. What is that individual's identity?

A. There have been multiple over the years.

Q. Is there any relationship between the owner of that entity or owners of that entity and Ms. Sheeler other than an arm's length transaction?

A. Not that I'm aware of.

Q. The individual that owns the manufacturing company in India is not someone that's related to Ms. Sheeler or anything like

that, right?

A. Correct.

Q. The company makes online sales in addition to serving as a brick-and-mortar store, correct?

A. Yes.

Q. And what marketplaces does the company sell its products in? And in your answer include any information about the existence of any website that Kristin Sheeler itself as a company operates?

A. Could you clarify marketplace?

Q. Examples that come to mind are, you know, The RealReal, Ebay, Amazon, and so forth.

A. To my knowledge, the only E-commerce site is the website owned or managed by Kristin Sheeler Designs.

Q. What is that website?

A. Www.NIBIMTK.com.

Q. Fair to say that the customers of the company include individuals outside of the State of New York, correct?

A. I don't know.

Q. You're not involved in the sales at

all?

A. No.

Q. But you do know that the company made online sales through its website, correct?

A. Yes.

Q. And you fairly infer that the website makes sales to customers outside the State of New York, correct?

A. I don't have a list of the people that purchase through the website, so I don't know.

Q. Were you ever involved in anything to do with shipping merchandise?

A. Would you clarify shipping?

Q. Did you have any involvement, whatsoever, in shipping be it from packing it yourself or dealing with the invoices, anything?

A. Are you referring to online sales?

Q. Retail, online, everything.

A. Not involved.

Q. Other than the three stores that you identified earlier in your testimony from 2015 when the company first opened the brick-and-mortar store, did it ever have any

JAMES BRINNEN

other brick-and-mortar store?

A. Other than the three addresses we discussed earlier?

Q. Correct.

A. Yes.

Q. Tell me the address of those or that store.

A. I don't know that I can give you exact addresses. There were, I believe, two hotel locations prior to 88 South Euclid opening that were seasonal.

Q. You said two what locations?

A. Boutiques inside the hotel.

Q. Oh, hotel locations, do you know which hotels?

A. Yes.

Q. What are the identities of the hotels?

A. One was the Atlantic Terrace in Montauk and one was Sole in Montauk.

Q. Other than those locations, you're not aware of any other locations that the company was ever involved in or operated from, correct?

A. Correct.

JAMES BRINNEN

Q. How long did the company operate from either hotel?

A. I don't recall specifically.

Q. Do you know the number of years that it operated out of those hotels?

A. Same answer. I don't recall specifically.

Q. Do you know whether it was more than a year or just one season?

A. More than one season.

Q. And at the time that the company operated from those hotels, were any brick-and-mortar locations then existing?

A. I don't recall if there was an overlap.

Q. And at the time that those hotels were used as operating locations, do you know whether either Ms. Goncalves or Ms. Ketcham worked at any of them?

A. I know they did not.

Q. You're involved in the preparation and/or filing of the company tax returns?

A. Yes.

Q. Generally speaking, was there ever a

JAMES BRINNEN

tax year in which the company made less than $500,000 in gross revenue?

A. I have no idea.

Q. What was the annual gross revenue for Kristin Sheeler Designs, LLC in 2025?

A. I don't know.

MR. KATAEV: Plaintiffs call for the production of company tax returns for 2019, 2020, 2021, 2022, 2023, 2024 and 2025. We'll follow up in writing.

MR. BOWLES: And I will ask that you put those sorts of requests in writing, thank you.

MR. KATAEV: That's why I said we'll follow up in writing.

Q. Other than Kristin Sheeler Designs, LLC is there any other corporate entity that is involved in the retail and wholesale operations of Kristin Sheeler's business?

A. Not that I'm aware.

Q. And the Atlantic Terrace hotel location operated since 2015, correct?

A. Could you clarify?

Q. The hotel location in Atlantic

JAMES BRINNEN

Terrace had operated in the beginning of 2015, correct?

A. It was there before the store boutique was there.

Q. I'm referring to when Kristin Sheeler Designs, LLC set up there.

A. It was Atlantic Terrace the entire time she was there as far as I know, yes.

Q. And the Montauk location first started operating in 2018, correct?

A. I believe so.

Q. And the Bridgehampton location started operating from 2019, correct?

A. I believe so.

Q. Meanwhile, the Westhampton location started operating from 2021 until the fire in October of '24, correct?

A. I believe so.

Q. Is it fair to say that the sales of each location are aggregated for purposes of accounting and taxes, right?

A. Correct.

Q. It's fair to say that the clothing that the company retails and wholesales comes

JAMES BRINNEN

from overseas, correct?

A. I can't attest to the entire set of clothing, only to what we manufacture.

Q. At least some of the clothing comes from overseas, correct?

A. Correct.

Q. When it came to the two or three locations that the company operated or operates from, to your knowledge were employees from one location ever transferred to another location for the day, week or permanently at any time?

A. Can you define transfer?

Q. An individual that regularly worked at the Westhampton location would be directed to work from the Montauk location, and vice versa?

A. I don't know if directed is the correct description there.

Q. Okay. You could clarify in your answer what it is that occurred?

MR. BOWLES: Object to the form.

A. I believe employees from different occasions occasionally worked in other locations to backfill if someone was out or taking vacation, et cetera.

JAMES BRINNEN

Q. And was there a decision-maker involved in approving these requests or making these requests from time to time when they occurred?

A. I can't attest to a single decision-maker, I don't know how those decisions would have been made, whether jointly or individually.

Q. Were you ever privy to any conversations that Kristin Sheeler had concerning these discussions?

A. I don't recall.

Q. Do you have authority to hire employees at the company?

A. I have no authority.

Q. Have you ever hired any employees for the company?

A. I'm sorry, did you say at a company or at the company?

Q. The, the company, Kristin Sheeler Designs, LLC?

A. No.

Q. Have you ever interviewed any prospective employee at the company?

JAMES BRINNEN

A. No.

Q. Do you have the authority to terminate any employee of the company?

A. No.

Q. Have you ever terminated any employee of the company?

A. No.

Q. Do you have authority to discipline employees of the company?

A. No.

Q. Have you ever disciplined any employees of the company?

A. Not that I know of.

Q. Did you ever determine any employee's salary or compensation?

A. Could you define determine?

Q. Decide on?

A. I did not.

Q. Have you ever informed any employee how much he or she would be getting paid?

A. Yes. To clarify, only in clarifying what was set during their interviews or reviews with Ms. Sheeler.

Q. In other words, you're saying you

JAMES BRINNEN

just informed people what was the salary?
A. Correct.
Q. Did any employee ever come to you for a raise while you assisted at the company?
A. Not that I can recall.
Q. Do you have discretionary authority to issue raises to anyone that asks you?
A. No.
Q. Who would you have to go to, if any employee ever came to you for a raise?
A. Ms. Sheeler.
Q. Did you determine commissions for any employee?
A. Yes.
Q. Did you determine schedules for any employee?
A. No.
Q. Who determined the schedules?
A. That answer would vary depending on the employee.
Q. Identify all the people that could determine the schedules?
A. The managers are, as far as I understand, the managers self-determine with

JAMES BRINNEN

confirmation and communication with Ms. Sheeler. The employees at the stores' scheduling was set by the managers, as far as I know.

Q. You testified that the manager at the Montauk location was Kristin Sheeler, correct?

A. I testified that the manager at the location during a certain period you asked about was Ms. Sheeler. So in October, of whatever date you asked it was Ms. Sheeler, but that's not consistent.

Q. During that time she was the one who made the schedules at the store, right?

A. If you define the time period, I can answer clearly.

Q. At any point in time did she decide the schedules?

A. Again, as far as I understand, the managers set their schedules and confirmed their schedules with Ms. Sheeler.

Q. Okay. Ms. Sheeler would have the ultimate decisionmaking authority over it, right?

A. I don't know how you would define it. To me she reviewed them and it was a joint decision, but I'm not sure I can define

JAMES BRINNEN

specifically how they did that decisionmaking.

Q. Okay, moving on to the number of hours that an employee works, did you personally have authority to increase or decrease an employee's hours whether it was at your request or the employee's request?

A. No, I had no functional operation in that regard.

Q. Did Ms. Sheeler ever exercise that authority?

A. I'm not sure I know how to answer that.

Q. To your knowledge did she ever -- was she ever involved in increasing or decreasing an employee's hours?

A. Again, I don't know how to answer, it's very broad. She reviewed their schedules with them, as I testified. She reviewed their schedules with them. So in that review she would see how many hours a week they were working. I don't know how else to answer that.

Q. Did you inform employees concerning what work they were required to perform?

A. To a degree, I suppose.

JAMES BRINNEN

Q. Did you ever assign any employee to work at a particular store?

A. No.

Q. Did you ever ask an employee to perform work outside of his or her scheduled shift?

A. No.

Q. In the course of performing your duties for the company, from time to time did you approve or reject an employee's purported hours?

A. I don't know how to answer that. Could you define approve or reject?

Q. In other words, let's say an employee reports they worked X amount of hours, but you have reason to believe otherwise. Did you ever exercise the power to, I guess, modify the hours based on what you knew?

A. No, there's a lot there, the employees didn't -- the way you framed that question the answer is no. There was no reporting. Hours were pulled from the system.

Q. In reviewing the hours pulled from the system, did there ever come a time where you knew for a fact that the hours reported were

JAMES BRINNEN

wrong and yo had to make corrections?
A. Yes.
Q. Okay, so that's what I'm referring to. You did, right?
A. I did inform employees when the hours were incorrect.
Q. And you have access and had access through the relevant time period to the employees' time records, correct?
A. Correct.
Q. And you also had access to the payroll records of the company, correct?
A. Yes.
Q. Did you communicate with the payroll processor?
A. Yes.
Q. Who was the payroll processor?
A. I ran the payroll records.
Q. So there was no company like ADP, Paychex or some other payroll company that you used?
A. Could you define a time period?
Q. At any point in time during the existence of Kristin Sheeler Designs, LLC?

JAMES BRINNEN

A. That is incorrect.
Q. Can you tell me about the existence of any payroll processor and when, possibly?
A. Yes.
Q. Okay, go ahead.
A. There was a payroll processor named Gusto that has been in function during 2026.
Q. Prior to that none, right?
A. Correct.
Q. And prior to the existence of Gusto, you reviewed the payroll before employees were paid, correct?
A. Correct.
Q. And you also had the authority to correct any employee's paycheck in the event there was any error going one way or the other, correct?
A. Correct.
Q. Did you have to check with anyone before exercising that authority?
A. Could you clarify, the authority to make adjustments?
Q. Yes. With anyone else, did you have to check with them?

JAMES BRINNEN

A. Only the employee if there was a question to their hours.

Q. You did not have to check with Kristin Sheeler, correct?

A. I would inform her.

Q. But you were able to inform her after the fact, right?

A. After the fact of what?

Q. Figuring out any discrepancy with payroll, handling it, finalizing it and then telling her after it's been done?

A. I can't recall the timing of every incidence, most likely I would coordinate with her to ensure that the requested correction or identified correction was accurate.

Q. Was there ever a period of time where you were absent or unavailable to perform these payroll functions?

A. I don't know, that's a broad question, over many years.

Q. Fair enough. But to your recollection if you were unavailable to process payroll, who did it?

A. There wouldn't be anyone, if I was

unavailable.

Q. It would just be something you would handle when you got to it, right?

A. Correct.

Q. What bank does the company utilize for managing the company's revenue?

A. You broke up again. What days does the company utilize for what?

Q. What bank?

A. Oh, what bank, Chase Bank.

Q. Does the company utilize any other bank?

A. No.

Q. Has it ever in the past?

A. Not that I know of.

Q. Going back to Lightspeed and ShopKeep. Prior to Lightspeed, is it fair to say that you have administrator access?

A. Yes.

Q. Are you the only individual with administrator access?

A. Unfortunately, no.

Q. Why do you say it's unfortunate?

A. The way that the store logins worked,

JAMES BRINNEN

the iPad that was used for point of sales and time entry, also used to be logged in as an administrator. So any of the managers or employees, if they were curious, could dig into the administrative functions of the system.

Q. Okay. And to your knowledge did any individual who accessed those functions get logged in and obtain information about it?

A. I wouldn't be able to answer that, the iPad has that capability so it's logged in as a store. So as far as I know you would not be able to see if a particular person was doing something.

Q. Who else had administrative access to Lightspeed?

A. Outside of what we just talked about, I don't recall the login authorizations of every user.

Q. Did Kristin Sheeler have administrative access?

A. She has access to the login as an administrator, yes.

Q. As far as you know, though, you were the only individual that used administrator

JAMES BRINNEN

access in connection with timekeeping, right?
A. That's hard to say. Again, the stores could use the store login to go to the time records.
Q. In the event that the company did not have enough funds to make payroll, in other words pay employees for their wages, did Ms. Sheeler or you ever fund payroll personally?
MR. BOWLES: Object to the form.
A. Not that I know of.
Q. Are you familiar with the term "distributions"?
A. It's a broad term, and I could think of it in many contexts.
Q. My question is, to your knowledge did Kristin Sheeler, individually, give herself distributions from the company from time to time?
A. You broke up in the middle. Did you ask did Kristin Sheeler take distributions from the company?
Q. From time to time, yes.
A. Not that I know of.
Q. You never took any distributions, right?

JAMES BRINNEN

A. None.
Q. Did you ever get paid from the company for any work that you did?
A. No.
Q. Who is Kathy Marin?
A. She's the Bridgehampton manager.
Q. She's the manager to the present day, correct?
A. Correct.
Q. When did she first start working at the company?
A. I believe 2019, close to the opening of the store.
Q. She always served as manager from the inception of her employment?
A. Yes.
Q. Did you discuss this lawsuit with her, you yourself, personally?
A. I have not.
Q. To your knowledge did Kristin Sheeler individually discuss this lawsuit with Kathy Marin?
A. Not to my knowledge.
Q. Who is Natalie Cummings?

JAMES BRINNEN

A. An employee.
Q. Do you know when she first started working for the company?
A. I don't recall the date.
Q. Do you recall what year, approximately?
A. It was either 2021 or 2022, I believe.
Q. Is she still working at the company?
A. Yes.
Q. Is she an employee or a manager?
A. She's an employee, not a manager.
Q. Did you ever have any discussions with her about this case?
A. I have not.
Q. Do you know whether Kristin Sheeler individually did?
A. I don't know.
Q. Who is Kate Quimby?
A. I'm sorry, you broke up. Did you say Kate Quimby?
Q. I did.
A. She was an employee.
Q. So she's no longer an employee,

correct?

A. Correct.

Q. When did that come to pass?

A. I don't recall her exact dates.

Q. Do you know how long ago she stopped working?

A. I could guess. I don't know her exact dates.

Q. To the best of your memory and recollection, when would you say is the last time she worked at the company?

A. 2024, possibly 2023 but I think it was 2024.

Q. To your knowledge and recollection what were the circumstances concerning her separation from employment with the company?

A. I don't recall if she got another job, or decided to not work at that point. I don't know.

Q. To your knowledge and recollection, did she leave employment with the company on good terms?

A. To my knowledge, yes.

Q. What about Deborah Quimby who is she?

A. Deborah Quimby?
Q. D-E-B-O-R-A-H, yes.
A. Quimby, the same last name?
Q. Yes.
A. That's Kate. Kate went by Kate. But her e-mail was Deborah, so that's one person.
Q. Who is Rachel Hoffmann?
A. She was a store manager.
Q. When did she stop serving as a store manager?
A. I don't recall her year either.
Q. Did you ever have any discussions with her concerning this lawsuit?
A. No.
Q. Do you know whether Kristin Sheeler did?
A. No, I don't know.
Q. Can you approximate a time frame when she left the employment of Kristin Sheeler?
A. I don't recall her dates.
Q. To your knowledge, did she leave or separate from employment with the company on good terms?
A. I believe so.

JAMES BRINNEN

Q. What about Erin Reda, R-E-D-A, who is she?
A. An employee.
Q. Is she still working for the company?
A. No.
Q. When did she leave?
A. I don't recall her dates.
Q. Do you know whether it was this year, '25, '24, some other year?
A. It might have been 2024. I don't recall.
Q. Who is Bridget Lopez?
A. An employee.
Q. Is she still working for the company?
A. No.
Q. Do you know when she left?
A. No.
Q. Do you know if she left on good terms?
A. I don't.
Q. What about Gisela, G-I-S-E-L-A, do you know who that is?
A. Say it again, Gisela?
Q. G-I-S-E-L-A.

JAMES BRINNEN

A. I don't know. There may have been more than one person with that name, I don't recall.
Q. Who is Hannah Mancuso, H-A-N-N-A?
A. Ex-employee.
Q. When did that employee leave?
A. I don't recall her dates.
Q. What about Juliet Clarke, C-L-A-R-K-E?
A. Ex-employee.
Q. Do you know when she left?
A. I do not.
Q. How about Juliet McNamara, M-C-N-A-M-A-R-A?
A. Did you say McNamara?
Q. Yes.
A. Ex-employee.
Q. Do you know when she left?
A. No.
Q. How about Catalina McBride?
A. Same.
Q. When you say same that means it's an employee that no longer works there?
A. Correct.

JAMES BRINNEN

Q. Do you know when she left?

A. No.

Q. All of these employees that we just discussed Mancuso, Clarke, McNamara, McBride, they were all regular employees and not managers, correct?

MR. BOWLES: Object to the form.

A. As far as I know, correct.

Q. Is it fair to say that the person primarily responsible for running the company was Kristin Sheeler herself?

A. Hard to say when you say responsible for running. The managers had autonomy or I believe a degree of autonomy.

Q. Is it fair to say that Kristin Sheeler was the highest-ranking person involved in the day-to-day retail operations?

A. I don't know how to answer that to the degree of running the operations. She hired managers to run her day-to-day stores.

Q. Did any of them outrank her?

A. No.

Q. It's fair to say, though, that employees ordinarily communicated directly with

JAMES BRINNEN

you regarding schedules?

A. No.

Q. Who would they communicate about that?

A. As noted earlier, the managers, I believe, would set their schedules, coordinate those with Ms. Sheeler. And the store employees' schedules were set by the store managers.

MR. KATAEV: Let the record reflect that Tammy Aronbayev just joined. She's a paralegal at my firm. She is still in law school also learning, and she'll be observing.

Q. Is it fair to say that Ms. Sheeler had operational control over the company?

A. I believe we've discussed that the store managers had autonomy over their day-to-day operations.

Q. If employees wanted to have discussions about their compensation, would they address that to Ms. Sheeler or you?

A. I would believe Ms. Sheeler. I don't know if there was any instance where they came directly to me.

JAMES BRINNEN

Q. Same question as to commissions?

A. Same answer, I believe they would ask -- I guess it depends on the employee where they would go.

Q. Depending on the employee where can they go?

A. If it was a store employee I believe they would go to their manager, who was informed of the commission program and should have been answering questions like that. If they couldn't answer the question, they could have communicated to Ms. Sheeler or to me.

Q. Same question as to any workplace complaints?

A. I would say the same answer. An employee should go to their manager. And the manager should, if unsure, would go to Ms. Sheeler or potentially to me.

Q. Is it fair to say then that Ms. Goncalves reported directly to you?

A. No.

Q. Would it be fair to say that she reported directly to Ms. Sheeler?

A. Yes.

JAMES BRINNEN

Q. What about Ms. Ketcham, same question?

A. I believe Ms. Ketcham started while Ms. Goncalves was still the store manager so she would have reported directly to Ms. Goncalves.

Q. To your knowledge, did they work in the same store?

A. Yes.

Q. To your knowledge was Ms. Goncalves paid $23 per hour?

A. I can't recall her salary structure.

Q. Regardless of what the structure was, is it fair to say that you personally set her rate of pay?

A. No, we discussed that. The rates of pay were discussed and set during interviews or other processes with Ms. Sheeler.

Q. Were you involved in approving any rate of pay?

A. Not approving, no.

Q. Are you familiar with the fact that Ms. Ketcham received a rate at of 3 dollars per hour?

A. I can only say that I know that Ms.

JAMES BRINNEN

Ketcham received raises. I couldn't tell you the amounts or the time periods.

Q. Were you involved in approving any such raises?

A. Not at all in approvals, no.

Q. Over the course of your approvals for the company, did you have authority to issue checks?

A. Yes.

Q. Did you have authority to issue funds?

A. Yes.

Q. Did you participate in deciding which bills would be paid?

A. Yes, I guess.

Q. Was it your exclusive authority or you shared that with Ms. Sheeler?

A. It would be shared, I suppose.

Q. Is it fair to say that you had the primary authority and only let her know or did you have to check with her?

A. Could you define bills?

Q. Any obligations of the company whatsoever. Rent, vendors?

JAMES BRINNEN

A. That's superbroad. So I think it would depend on what entity we're talking about.

Q. You wouldn't discuss any of those types of issues with the store managers, right?

A. Could you clarify those issues?

Q. Who to pay and when in terms of vendors, all that stuff?

A. No.

Q. Clearly you participated in payroll decisions, right?

A. Could you clarify decisions?

Q. Any decision that comes as a matter of course in getting payroll done every week.

A. There were no decisions in making payroll every week, it just was done every week.

Q. Did you review payroll reports?

A. Could you define reports?

Q. A schedule of hours worked, a schedule of wages and/or commissions to be paid, something like that.

A. Yes.

Q. Did you generate those reports from Lightspeed, I guess, both for commissions and hours, right?

JAMES BRINNEN

A. Correct.

Q. In terms of commissions, did you rely exclusively on Lightspeed to figure that out?

A. Yes, while Lightspeed was there, and before that ShopKeep.

Q. And, presumably, when a sale is made there's some sort of field that gets filled out as to who is making the transaction so that that individual gets the commission, right?

A. Incorrect.

Q. Tell me how.

A. Tell you how what works?

Q. Well, presumably, to pay someone commissions you need to identify who made each particular sale, right?

A. No.

Q. How do commissions work?

A. So we only had identified salesperson for a brief period of time. It created a somewhat competitive not friendly environment in the store. So that was changed very quickly after which a pooling process was instituted. So during a commission period every employee worked a certain amount of hours and those hours were

JAMES BRINNEN

weighed against the total hours worked to identify your contribution percentage. The sales during that time period were then computed. Your contribution percentage was applied to the sales during that period and then your commission rate was applied to your contribution.

Q. How long of a period of time was it that the commissions were determined by the individual making the sale before this system that you just described?

A. I don't recall. I think it was only a one-month period.

Q. One-month period?

A. I believe so. Again, I don't recall it was quite a while ago.

Q. And then is it fair to say that this system that you just described has been the system for since it was implemented until the present?

A. Yes.

Q. Are you aware of any occasions during the entire course of your involvement with the company where employees were paid late?

A. I can't recall, specifically. It's

possible there was a time or two when something happened.

Q. Only one or two times?

A. I couldn't attest to any number. Again, it's nothing that I can recall and say back to your rule about not guessing, I would be guessing.

Q. To your knowledge and recollection, why was a wage payment late?

A. I just said I can't recall if there was one, so I can't recall a why.

Q. So you couldn't tell me when you first became aware of such a complaint?

A. Not specifically.

Q. To the extent you do recall any such wage payments being late, does that mean that there was a lack of cash?

A. No.

Q. Do you recall ever having to make a decision between making a payment of some company expense versus making payroll?

A. No.

Q. Do you recall the existence of any unpaid utility bills at any company location?

JAMES BRINNEN

A. That was part of why I asked you about clarifying paying things. Utility bills, Lightspeed service used to set her all up with autopay. So there weren't individual decisions on paying those bills.

Q. Fair enough. But did it ever come to pass that an autopay payment failed because a funding source was unavailable or some other reason?

A. So I can't tell you a specific reason. I believe there were a couple of times when a payment didn't go through.

Q. Is it fair to say that in those circumstances you would be responsible for figuring it out?

A. I would be asked to figure it out, yes.

Q. To your knowledge and recollection, were any utilities ever shut off or unavailable because of company bills that had not been paid?

A. I don't know. I can't say specifically.

Q. To your knowledge or recollection, did the company ever have insufficient funds to

pay both payroll and other creditors?
A. No, not that I know of.
Q. To your knowledge or recollection, did you ever make any decisions on prioritizing paying payroll over any expense?
A. No, I did not.
MR. KATAEV: Let's go off the record for a second.
(Discussion off the record)
(Recess taken from 11:50 to 12:09 p.m.)
BY MR. KATAEV:
Q. You testified about the fact that you've used the Lightspeed and/or ShopKeep to keep track of employees' hours, correct?
A. Correct.
Q. What about Clover, is that a system that the store used or the company used?
A. Clover is a system that was in place, yes.
Q. And Clover is separate and apart from Lightspeed, right and/or ShopKeep?
A. I think that's a fair way to describe it.

JAMES BRINNEN

Q. It's a different device, different system, different, right?

A. Yes, it's a different device and a different purpose.

Q. What is the purpose?

A. Credit card processing.

Q. Does it integrate with Lightspeed?

A. Yes.

Q. It is not used, it being Clover, for timekeeping purposes, correct?

A. Correct.

Q. Going back to ShopKeep and Lightspeed, that is the exclusive manner in which the company kept track of employees' time for payroll purposes, correct?

A. Yes.

Q. Now, do you have knowledge as to whether from time to time any employee would sometimes be asked to perform work outside of their scheduled start time and/or after their scheduled end time?

A. No.

Q. You never personally asked any employee to do something for work prior to their

JAMES BRINNEN

scheduled start time and/or after their scheduled end time, correct?

A. Absolutely not.

Q. You were not involved in the routine day-to-day operations of the company, correct?

A. I was not.

Q. You were more of an administrative back-end support individual, correct?

A. I believe that's a fair description.

Q. And the reason for that is because you worked for another company and that's your full-time job, correct?

A. That's a majority of the reason, yes.

Q. Without going into too much detail, can you explain sort of the time commitment involved with that job that you testified about at the beginning of the deposition?

A. My actual Monday to Friday 9 to 5 job, air quotes, 9 to 5.

Q. Is that what it is, are you expected to be at work at 9 and it ends at 5 at that job?

A. Yeah, I mean 9 to 5 is a loose term. I'm not like an hourly clock employee. So my job is defined, I would have to go back to my

onboarding paper. My job might actually be defined as 8:30 to 6 of availability. But it is a full-time commitment depending on client load and projects that could be, you know, 40 hours a week, it could be 60 or 70 hours a week. It just really depends on responsibilities.

Q. Does that job require you to be physically present anywhere?

A. Could you define physically present?

Q. For example, to go to that company's office location or headquarters to perform work from there or to visit customers and/or leads?

A. It can.

Q. But, generally speaking, it's fair to say that you work from wherever you'd like including your own home or elsewhere, right?

A. It's highly dependent on the client load and the client project.

Q. To your knowledge, is it possible for any employee to remotely clock in and/or remotely clock out with Lightspeed and/or ShopKeep?

A. It is possible.

Q. How is it possible to do that?

A. A person could use their phone or

home computer to log in to the Lightspeed application using their e-mail and password and access the timekeeping system.

Q. So what you're telling me is there exists an iPhone and/or Android application called Lightspeed?

A. I'm not saying that.

Q. What you're telling me is that there's an ability to access the web browser on a mobile device in order to log into Lightspeed and clock in and clock out?

A. Correct.

Q. Have you ever informed any employee about the existence or ability to do that?

A. I can't recall if anyone was specifically shown that capability or not.

Q. I don't have the ability to present this on the screen, but I would like to show you my current telephone screen and have you observe something.

I'll represent to you that it is a page from the iPhone Apple app store for an app called Lightspeed eCom (E-series), and it has a logo. I want to present it to you and ask you if

JAMES BRINNEN

you recognize this screen and logo?

A. The logo yes. The E-series is not us.

Q. So the logo, based on your knowledge and recollection, is the same logo that the company uses for its timekeeping and retail sales operations, correct?

A. That logo is Lightspeed, yes.

Q. And E-series is just some other type of application or product that they have that the company is not using, correct?

A. Correct.

Q. Do you know the name of the particular iPhone application?

A. I don't know if I understand that question.

Q. Do you know the name of the application that is available on the iPhone Apple IP with respect to E-series?

A. I was informed early that there was no application. Well, there is the Lightspeed app that goes onto the iPad. So, yes. There is -- so the application goes onto the Lightspeed app. The iPad, I suppose, it could be loaded to

your phone as well, there could be a memory issue I'm not sure. But that is how the store interface works or can work.

Q. I guess your hesitation in answering the question deals probably with the fact that the app that you're referring to is for the business owner and not necessarily the employee, correct?

A. No, not correct. My hesitation was early on I believe there was a question as to whether certain reporting could be available through an app, and the answer was no. I'm trying to remember, I don't recall exactly the context of that but when I thought about it for a second, the app is downloadable to the iPad. And the iPad that we used in the store ran the Lightspeed -- or runs the Lightspeed app.

Q. All right, understood. In this withdrawn. Have you ever told Teresa Goncalves that she has the ability to record her time worked on the mobile website interface on her phone?

A. Not specifically in that context. It would have been expected for her to install

JAMES BRINNEN

Lightspeed on her phone.

Q. Same question for Dina Ketcham?

A. Same answer.

Q. Did you have the ability to edit any employee's time entry?

A. Yes.

Q. Did you ever actually edit any employee's time entry?

A. Yes.

Q. When you did so. You typically did so to reduce the number of hours reported, correct?

A. It would depend situationally on what was driving the need to adjust it.

Q. Do you recall having any instance in which you ever increased the number of hours reported?

A. There have been many instances of employees failing to clock in and clock out. So adjustments were made in that regard especially with the two plaintiffs.

Q. When an employee came to you and said, hey, this system does not include all of my hours worked that I actually worked these hours.

Did you just take their word for it or was any investigation undertaken to determine whether what they're saying was true?

MR. BOWLES: Object to the form.

A. If someone said to me "This is incorrect," I would typically ask -- it would depend on the person. I would either ask Ms. Sheeler or I would ask the store manager.

Q. So you would take some steps to verify it?

A. Correct.

Q. What would happen if the person that you sought to verify it was unable to do so?

A. I don't understand. What would happen in the event of what?

Q. If the manager that you sought to verify with was unable to verify? Did not say no that's not true this employee did not work those hours that the employee is claiming but couldn't tell you specifically whether the employee didn't?

A. I don't recall a situation like that ever happening.

Q. In the event that any such situation

occurred, how would you handle it?

A. It would be a guess or a hypothetical on my part. If that situation arose, I would probably ask Ms. Sheeler or potentially ask Ms. Sheeler and the manager to hop on a phone call and discuss that situation. Most likely, we would if someone said, hey, I think I accidentally clocked out when I rang a sale, I actually was there until 5 o'clock last night, we would typically give someone the benefit of the doubt, if it wasn't a pattern of them, obviously, trying to work the system.

So most of the time -- actually, I would say hypothetically we would probably default to the employee, we tried to always give people the benefit of the doubt and do the fairest thing possible for them.

Q. Do you recall a situation like that ever occurring in all of the time that you've been at the company?

A. No. As I said, I don't recall a specific occasion like that.

Q. Whenever the hours of any employee were edited, do you have any knowledge as to

JAMES BRINNEN

whether the employee was automatically notified of such a change?

A. Could you clarify automatically notified?

Q. Was any electronic communication to the employee through the Lightspeed and/or ShopKeep application notifying them your hours have been edited or changed?

A. I don't know. I don't know whether that application would notify or not.

Q. No employee ever came to you and said, hey, I got notified that my hours were changed, what's this about, or anything like that?

A. Correct, never.

Q. Now, whenever you edited an employee's hours, did you undertake any effort to notify the employee that the hours were changed, whether one way or the other, lower or higher?

A. Yes, absolutely.

Q. Always?

A. Yes, as far as I can remember. There's many years, but yes.

Q. How would you go about notifying

JAMES BRINNEN

employees of such changes?

A. Typically, I wouldn't make an adjustment to someone's time without communicating with them first. I guess with the two plaintiffs, I would text or e-mail them an image of the screen showing a failed clock-out, for instance, and say this shows you were here from Monday until Wednesday can you clarify what times you actually worked in that period and get them to correspond and confirm their time, would be how I typically would do it.

Q. Were you involved in producing documents to your attorney to produce to us in this case?

A. You broke up again. Through my attorney to do what?

Q. To produce to us documents in this case.

A. Yes, some of them.

Q. And to your knowledge were any such copies of text messages and/or e-mails included with the information you provided to your attorneys?

A. I can't recall if I personally sent

JAMES BRINNEN

any texts. I believe I sent e-mails.
MR. KATAEV: To the extent they have not been produced I am asking your attorney and calling for the production of any such communications to the plaintiffs and/or any other employee about notifications concerning edits to hours. I will follow up in writing.
Q. Are you familiar with the term "audit trail" or "electronic data"?
A. Yes.
Q. Are you familiar and/or do you have knowledge of the existence of any audit trail for the editing of any hours in the Lightspeed and/or ShopKeep system?
A. I cannot attest to how their audit trail and data logging works.
Q. You've never seen one, right?
A. No.
Q. It's fair to say that you were the individual who reviewed all employees' hours before payroll was processed, correct?
A. Yes.
Q. And you were the only one that did

JAMES BRINNEN

so, correct?

A. Unless I had questions.

Q. You were the individual who reviewed the employees' hours at all locations, right?

A. Correct.

Q. Did employees clock out for lunch?

A. Did you say clock out?

Q. Yes.

A. Only for a very brief period, they never remembered to -- I'm overgeneralizing. Most of the time people did not remember to clock back in and it became a nuisance. So we stopped asking people to clock in -- rather, clock out at lunch.

Q. Did you automatically deduct for lunch breaks?

A. Yes.

Q. How much did you automatically deduct?

A. 30 minutes per day per shift unless the shift -- let me clarify. If someone only worked two hours, there was no automatic deduction. If someone worked four hours, they would deduct a quarter of an hour. If they

worked for more than four or five hours, I would deduct a half hour. I mean they were told what they have the right to do which was to take either two 15-minute breaks or one 30-minute break.

Q. In the event an employee did not actually take the break, for whatever reason, was there any procedure in place for them to report that so that they could be paid for the full amount of time they worked?

A. Yes.

Q. What was that procedure, how were you supposed to be notified about that?

A. They were told to either notify their manager and have their manager let me know or to communicate to me directly.

Q. Was that policy ever in writing in anyplace?

A. I can't recall.

Q. What would happen if an employee performed work before clocking in at the store?

A. I wouldn't know of any occasion where an employee worked before clocking in. They shouldn't be.

JAMES BRINNEN

Q. Do you dispute the notion of sometimes employees were asked to pick something up along the way or to stop by a customer along the way?

MR. BOWLES: I'll object to form. Go ahead.

A. I can dispute part of that, yes.

Q. Tell me your knowledge about the facts and circumstances surrounding my question, generally speaking?

A. Generally speaking, I don't believe there was ever any ask or mandates or even indication to meet with a customer outside of store hours. Indeed, I would say they should not be doing that for multiple reasons.

I do understand that someone who if someone was driving past say the Bridgehampton store, they could be asked to stop and pick up a box and bring it to Montauk if they were doing that or potentially vice versa.

So there were store transfers that were facilitated by people during their commute. Or potentially they would leave early and do that. And we would tell them to either notify me

JAMES BRINNEN

and I would add either an hour to their day or they would just not clock out or clock out 30 minutes. We had mechanisms in place to make sure that was tracked as work.

Q. Okay. So let's unpack that a little bit. First, with respect to this sort of premise that employees should not be visiting customers homes or visiting customers outside of the store. Was there any directive made in writing to any employees not to do that?

A. I don't know.

Q. And the second part of your answer in terms of inter-location transfers between stores, you acknowledge that those requests to stop by somewhere on the way -- one of the stores on the way and go to another store those were authorized by the company, right?

A. I believe there were instances where people did transfer materials for us, yes.

Q. And if I understand your testimony correctly, the employees weren't necessarily told log in, clock in using the mobile web interface on your phone but rather to just tell you and you would do it, right?

JAMES BRINNEN

A. I can't tell you exactly what they were told but that would be my guess of how the communication would go.

Q. Well, focusing your answer on your personal involvement and what you may have told or not told any of these employees, what's your answer?

A. I was never involved in making decisions or requests to transfer goods. I told anybody that was involved in potentially doing that to make sure they let me know, so I could include time for that.

Q. Implicit in your answer is the fact that when after the fact that someone else directed them to do that work and they reported their hours to you, you did not tell them, hey, just clock in yourself using the mobile web interface, right?

A. I can't recall exactly what people were told in those instances.

Q. But do you recall ever saying that to someone or not saying that?

A. Not specifically. I know there were conversations about making sure I knew if there

JAMES BRINNEN

was time spent.

Q. So that you could edit the app, correct?

A. I wouldn't edit the app. I would add time into the payroll record.

Q. But that's an instance in which you performed that act and not the employee, correct?

A. In that particular scenario, again, I don't know if there are other instances, for instance, where they may have been asked to transfer something say from Bridgehampton to Westhampton. So leave Bridgehampton and don't clock out until you get to Westhampton, I can hypothesize that could have been a case. I wouldn't have been involved in that. I don't know. But I could hypothesize that could have been an instruction. I think there are various answers to that.

Q. It's fair to say that you never notified an employee when they contacted you and said, hey, I need to add an hour or 30 minutes because I spent time traveling to this location first before going to my regular location? You never told them you could clock in yourself using

the application or the website on your mobile phone --

MR. BOWLES: Object to the form.

Q. -- right?

A. I can't recall.

Q. Same question in terms of anyone that stayed after clocking out to perform any work or went somewhere to perform some task or errand for the company after clocking out?

MR. BOWLES: Object to the form.

Q. Are you aware of any such circumstance occurring, generally speaking, with any employee?

MR. BOWLES: Object to the form.

A. I'm not aware of anyone clocking out, and then doing more work.

Q. Are you saying that no employee ever contacted you saying, hey, I had to do some stuff after clocking out, I worked this many minutes or this many hours can you add my time?

A. No, not that I recall.

Q. Do you have any knowledge as to whether any employee ever communicated with you and Sheeler or any customer of the company after

work hours, like phone, text, e-mail or otherwise?

A. Can you be more specific, that's a pretty broad group?

MR. KATAEV: Madam Court Reporter, can you read back the question.

(Record read)

Q. I'll unpack the question. Many employees of the company were retail salespeople, correct?

A. Correct.

Q. And concomitant with their duties to sell and the commissions, they developed relationships with customers and communicated with them, correct?

A. I can't attest to any relationships they created or communications they may have done.

Q. Are you aware of any such relationships being formed?

A. No.

Q. Are you testifying that you had absolutely no knowledge of any employee ever having any communications with you after clocking

out for the day about anything to do with their employment?

A. I am not saying that.

Q. So communications like that have occurred directly with you, correct?

MR. BOWLES: Object to the form.

A. There was no restriction on when someone could e-mail, phone or text me. If they had a question they were free to communicate at anytime or in any way.

Q. What about the converse, what if you had a question and you reached out to an employee after work hours?

A. I would use common sense and try not to do that at an inappropriate time or in an inappropriate manner.

Q. Fair enough. So when you refer to common sense you wouldn't reach out to an employee if you had a question after 10 or 11 p.m. But had there ever been a circumstance after the store closed before 10 p.m., for example, where you did reach out to an employee to ask something or go over something that had to do with their duties?

MR. BOWLES: Object to the form.

A. I would say no. Not in the form of that question.

Q. Okay, to your knowledge were employees ever instructed not to record their time worked performing certain work?

A. Absolutely not.

Q. To your knowledge, were employees ever instructed to clock out and continue working?

A. Absolutely not.

Q. Was there any system in place for employees to report any omitted time?

A. As discussed, if they worked through lunch and didn't take a lunch they were instructed to let me know or let Ms. Sheeler know.

Q. Is that the only instance?

A. I can't think of another instance where they would have time off record.

Q. We spoke about and you testified about Lightspeed and Clover. Are you familiar with the application called WhenIWork?

A. Yes.

JAMES BRINNEN

Q. What is that system?
A. That is an online scheduling system.
Q. Scheduling for what?
A. Employee shifts.
Q. Is WhenIWork something that the company still uses to this day?
A. Yes.
Q. And when did WhenIWork first start being used by the company?
A. I don't know.
Q. Was it being used in 2023 and/or 2024?
A. I believe so.
Q. How do you access the WhenIWork application in your system?
A. It's a website. Someone would go to WhenIWork and log in.
Q. And you have a user name and password for WhenIWork?
A. Yes.
Q. And all employees of the company also have a user name and password?
A. Yes.
Q. And WhenIWork is distinguished from

JAMES BRINNEN

Lightspeed in that WhenIWork covers scheduling, but Lightspeed and ShopKeep covers the actual hours they work?

A. Correct.

Q. How often is it the case then that the information contained in WhenIWork that a schedule differs from the actual hours worked by the employees?

A. I have no idea.

Q. In performing your payroll functions that you described earlier today in your testimony, do you utilize WhenIWork?

A. No.

Q. You said you have a user name and password for WhenIWork. In what circumstances do you use the application WhenIWork?

A. I don't typically use WhenIWork at all.

Q. What was the reason, if any, for you obtaining access to that application by having a user name and password?

A. If it was late and inappropriate to contact an employee who had failed to clock out, I would log into WhenIWork to see what the shift

was supposed to be and communicate to them that this is when you clocked out and this is when your shift indicated, can you please clarify.

Q. Right. So what you're saying is you didn't regularly access it for purposes of payroll, but if circumstances arose where you needed to verify something you would sometimes use it?

A. Correct.

Q. Just skipping through some stuff. Now we've covered some testimony from you about the ability to edit hours in Lightspeed and/or ShopKeep. Were you the only individual that could do so?

A. No.

Q. Who else was permitted to or had access to edit hours worked?

A. I would answer that jointly because it's a joint description. Permitted to would be nobody. Access to, as described, the iPads in the stores -- and actually there were store computers had logins -- and the iPad in particular was logged in with an admin account. So anybody in the store, managers in particular,

JAMES BRINNEN

could go in to the time system.

Q. Are you aware of any instance in which Teresa Goncalves edited the time for herself or any employee?

A. I believe there may have been a conversation or two where she alerted that employees forgot to clock out, so she quote/unquote adjusted their time.

Q. Same question for Dina Ketcham?

A. I don't recall that kind of conversation with her ever.

Q. Did you receive any notifications when anyone other than you edited time or if anyone other than you edited time?

A. Could you define notification?

Q. Any type of electronic communication.

A. Do you mean autogenerated by the system or say the scenario I just described where Teresa said someone reported they forgot to clock out, so she modified the time? If the latter, then yes. Hence me saying that I believe she did that. If the former. No, I never got a communication from the system alerting me to an edit.

JAMES BRINNEN

Q. Is it fair to say that the timekeeping system utilized by Lightspeed and/or ShopKeep implemented rounding?

A. I don't know how they do the time calculation.

Q. Did you ever notice that all of the hours totaled were rounded to the nearest quarter?

A. No, I never noticed.

Q. Were you involved in implementing any settings concerning rounding?

A. No, I don't know any settings that do that.

Q. Are you aware of the existence of any setting on Lightspeed and/or ShopKeep that permits you to do rounding?

A. None that I'm aware of.

Q. Was there ever any circumstance in which the devices used to clock in and out with Lightspeed and/or ShopKeep were broken, down, and under maintenance, had IT issues such that they could not be used?

A. Again, a broad set of scenarios. In the course of business there have been very

JAMES BRINNEN

infrequent WiFi outages where the system could be down. So if there's a WiFi outage, it's a cloud-based system and the system could be unavailable. If that concurred with someone's clock in or clock out, I wouldn't attest to.

Q. Switching gears. How would the company determine whether any individual employee actually took a meal break?

A. I don't know that the company could determine someone's meal break.

Q. To your knowledge during any employee's meal break were they required to stop if a customer came in and help them even if they were having a meal?

A. I cannot attest to whether they did or didn't. Whether they were taking a break in the store, outside the store, I have no idea.

Q. Are there any circumstances where a particular employee is alone in any store?

A. Yes.

Q. In those circumstances is it fair to say that an employee could not be fully relieved to take a meal break?

A. I don't think it's fair to say that,

JAMES BRINNEN

no.

Q. You don't think it's fair?

A. No.

Q. If an employee is alone in the store and enjoying a meal and a customer walks in, are you saying that the employee should continue enjoying their meal and ignore the customer?

A. I believe the communication was to clarify that would only happen in the off season, during season there was never fewer than one person in the store. In the seasons when the store was very lightly busy, I believe the managers or the person running the store that day was told to feel free to close the store, lock it up and take the break.

Q. So there would be some sign that would say closed for lunch be back in an hour, or be back in 30 minutes, right?

A. I have no idea how they would do that. I believe there was a communication.

Q. Was that communication made in writing?

A. I don't know.

Q. Who made that communication?

JAMES BRINNEN

A. I believe Ms. Sheeler to the managers.

Q. What was the basis for your knowledge that Ms. Sheeler made that communication?

A. I recall a conversation about it.

Q. A conversation directly with Sheeler after the fact?

A. Yes.

Q. So in other words you were not present when Ms. Sheeler made any such statement?

A. I can't recall.

Q. With respect to the two 15-minute breaks that you testified about, those were separate and apart from the meal break, right?

A. No.

Q. No?

A. No. As I said to you, the store managers would work with the employees. If they wanted to take a 15-minute break midmorning and a 15-minute break midafternoon versus taking a 30-minute break as, quote/unquote, "a lunch," the store managers had autonomy to make those decisions in coordination with the employees. That worked best with their needs.

JAMES BRINNEN

Q. In other words it was one or the other, they could take two 15-minute breaks or one 30-minute break?

A. Again, the store manager had autonomy and they could do it however they wanted.

Q. Are you saying that the store manager had the autonomy to say you can have two 15-minute breaks and a 30-minute meal break?

A. No.

Q. It was one or the other, correct?

A. Well, I guess I'm hanging up on the specificity of two at 15 minutes and one at 30 minutes. If they said, hey, listen, I've got an errand to run. Can I take 20 minutes now and potentially 10 later, they could do that. I can't attest to specificity but the net was 30 minutes per day.

Q. Okay. Thank you very much. I appreciate that qualification. Do you know how Teresa Goncalves utilized her breaks? Do you know whether she did a single 30-minute break or two 15-minute breaks, generally speaking?

A. No idea.

Q. Same question for Dina Ketcham?

JAMES BRINNEN

A. No idea.

Q. So we know that you don't know because you weren't physically present in the store most of the time, right?

A. Correct.

Q. And what you're saying is neither of the two plaintiffs ever told you which of the two they were doing, correct?

A. No, no communication that way.

Q. And it's fair to say that any issues with hours that any employee worked were exclusively directed to you, correct?

A. No, I can't say that explicitly or exclusively, I don't know. Again, my expectation would be that if an employee had an issue they would go to their manager and the manager to me or the manager to Kristin. So explicitly, I cannot attest to it.

Q. Fair enough, but the buck stopped with you for any issues, is that fair to say?

A. I would say the buck rolls up. It would have rolled up to me to make any needed adjustments.

Q. To your knowledge, what was the

JAMES BRINNEN

company's policy, if any, concerning employees who worked more than 40 hours a week?

A. There were multiple communications that employees should not work more than 40 hours a week, that managers should not schedule employees for more than 40 hours a week. And if there was a situation where someone felt there was a need to, either they themselves work more than 40 or have an employee work more than 40, they needed to communicate and request that ahead of time to get an approval. So that could be tracked and compensated correctly.

Q. So there was some sort of policy that said, look, overtime is not something we want and it's frowned upon and we need authorization for it before it's incurred, right?

MR. BOWLES: Object to the form.

A. I would exclude, quote/unquote, frowned upon, but there was communication that we did not want to have people burn out and work too many hours.

Q. Okay, fair enough. And did there ever come a situation with any employee where they worked overtime without authorization,

JAMES BRINNEN

without getting it in advance?

A. I don't know of any.

Q. I mean, generally speaking, in the course of performing your duties for the company and reviewing payroll every week, did you observe instances where someone worked more than 40 hours?

A. I can't recall. There's a lot of data points in that.

Q. To your knowledge, was Ms. Goncalves eligible to receive overtime. In other words was she eligible to work more than 40 hours a week?

A. I guess I'm struggling with the word "eligible." Could you be more specific?

Q. Was she ever authorized to work more than 40 hours a week?

A. I don't recall if she was ever in a process where she requested and was approved to work more than 40.

Q. Do you know whether she was ever paid for working for more than 40 hours a week? I'm asking did you ever see that she worked more than 40 hours and was paid for more than 40 hours in any given week?

JAMES BRINNEN

A. I can't recall a specific incident, that was quite a while ago and too many clock ins and clock outs.

Q. If any employee did work more than 40 hours in a week, would there be an overtime premium paid for hours in excess of 40 for that week?

A. Yes.

Q. What was the formula for the amount of the overtime premium?

A. The overtime hours would have been paid at time-and-a-half.

Q. Of what amount?

A. Of their base rate.

Q. To your knowledge did any employee ever get classified as exempt from overtime?

A. Um, I don't know. Specifically, I believe there are certain rates that automatically make a person exempt and I believe there are some full-time employees that would have been beyond that threshold, yes.

Q. Without getting into the details of what those numbers are, are you aware of anyone that fit that criteria and was classified in that

JAMES BRINNEN

way, exempt from overtime?
A. I believe so, yes.
Q. Was Dina Ketcham one of those individuals?
A. I don't believe so, but I can't recall all of her different rates she got paid. She may have achieved a rate where she would have been considered exempt, but I don't know for sure.
Q. And what rate would that be, to your knowledge?
A. I don't know. I believe it changes every year.
Q. And do you know whether Ms. Ketcham was paid on an hourly basis or some other basis?
A. Hourly.
Q. Same question for Ms. Goncalves, was she paid on an hourly basis or some other basis?
A. I believe both. I believe at some point during her tenure she was elevated from hourly to annualized.
Q. When you say annualized, you mean like a weekly salary?
A. Yes.

JAMES BRINNEN

Q. Do you remember the amount of that weekly salary?

A. I do not specifically. Again, I think she received a couple of raises. I don't remember which one converted her from hourly to annualized.

Q. Are you familiar, generally speaking, with the classifications of exemptions from overtime?

A. Could you be more clear?

Q. Are you familiar with the fact that there are typically not exclusively three exemptions from overtime: Administrative, professional and executive. Are you familiar with those terms?

A. No.

Q. Is it fair to say that in the course of performing your duties for the company, you did not consult with any attorney about paying employees and their requirements for same?

A. I don't recall who I consulted with on those matters.

Q. Who, if anyone, made determinations about who would be exempt from overtime at the

JAMES BRINNEN

company?

A. I guess that would be me.

Q. And I know you can't recall whether you sought guidance from an attorney, but did you or anyone at the company ever seek guidance from anyone else on the overtime classifications?

A. Yes.

Q. From anywhere?

A. Yes.

Q. And who was guidance sought from on that issue?

A. I called the New York State Department of Labor several times.

Q. When you say you called, how did you go about doing that?

A. How did I go about calling them?

Q. Yes.

A. I don't understand the question, I called them.

Q. Do you know the number for the New York State Department of Labor by heart that you just called from your memory?

A. No.

Q. So how did you get the phone number?

JAMES BRINNEN

A. From their website.

Q. And prior to calling anyone, did you review any materials from the Department of Labor's website on the subject?

A. I believe so, yes.

Q. Tell me what you recall reviewing in that regard?

A. I can't tell you what I recall, I don't recall. I remember going to their website to look for materials to define different aspects of pay.

Q. Did you print, download or save any materials from the Department of Labor website?

A. I don't recall.

Q. When did you first do that?

A. I can't give you a specific time. I recall doing it as we started getting into doing payroll.

Q. So you're saying in the beginning of, in or about 2015 when you first opened up a brick-and-mortar store?

A. I don't recall specific dates.

Q. Are you saying certainly not recently that you sought guidance from the Department of

JAMES BRINNEN

Labor between 2020 and the present?
A. I can't remember if I called them during that period or not. I suspect it's possible. I called them frequently.
Q. You did call them frequently?
A. If I had a question about how to handle something, I would use that as a resource, I can't say if I called them ten times or a hundred times or when I called them, but I would consult their guidance if I had a question.
Q. How many times have you ever called the Department of Labor?
A. I can't recall.
Q. Other than contacting the Department of Labor, how if in any other way, did you take steps to seek guidance on overtime classification?
A. I can't recall if I did other research or not.
Q. Did you understand that any employee that was not exempt was required to be paid overtime for hours worked in excess of 40 in a week?
A. I believe so.

JAMES BRINNEN

Q. If any employee worked overtime, but was not authorized, did the company not pay for it?

A. I can't think of a situation where that would have occurred, but we would not have withheld pay, that would be inappropriate.

Q. How do you know that would be inappropriate?

A. As a person I wouldn't say I'm not paying you because you weren't supposed to do that. I would say, don't do it again. But I can't recall any situation where that happened.

Q. What if an employee kept doing it even if you told them not to?

MR. BOWLES: Object to the form.

A. I can't recall any scenario like that.

Q. If it happened, what would you do?

A. It would be speculation, I don't know what I would do. It would be situational.

Q. Were managers informed to watch payroll and not have employees exceed a certain amount of hours for the week?

A. A manager wouldn't be watching

payroll. Maybe you can change your question, I don't know what you mean by that.

Q. Did you ever do so?

A. Did I ever do so what?

Q. Inform employees to -- withdrawn. Did you ever instruct managers to watch payroll and make sure no employee worked more than 40 hours?

A. No, based on your payroll description, managers weren't involved in payroll.

Q. Some employees were paid commissions on top of their hourly wages, correct?

A. Yes.

Q. For those employees -- withdrawn. How often were commissions paid?

A. It changed over the course of doing them. I believe for a period of time it was every other week and then we shifted to monthly.

Q. It was never weekly, right?

A. I don't believe so.

Q. Whenever an employee was paid commissions, did the company roll in that compensation with the hourly rate that determined

JAMES BRINNEN

the new base rate for overtime purposes?
A. I don't think I understand your question.
Q. You testified before that you would determine the overtime premium by multiplying one-and-a-half of the base rate, right?
A. Uh-huh.
Q. I need a verbal.
A. Oh, I'm sorry, yes.
Q. My question is, did you account for the fact that the commissions paid effectively increased the regular rate for those hours worked and multiplied one-and-a-half times the new base rate with the commissions included?
MR. BOWLES: Object to the form.
A. No, commissions were not lumped with working hours.
Q. Do you have any knowledge as to whether an employer is required to do that to determine the overtime premium or the proper overtime premium being paid?
A. I have no knowledge of that.
Q. And when you spoke to the Department of Labor any number of times, was that ever a

topic of discussion that was raised by you or the Department of Labor?

A. I don't recall.

Q. Are you familiar with the retail sales exemption or the inside salesperson deduction?

A. I'm not.

Q. Was the commission scheme or commission formula the same across all locations or did it vary depending on location?

A. Same across all.

Q. Who determined prices for items sold at the brick-and-mortar stores?

A. I believe that was a team effort with Ms. Sheeler and her merchandiser.

Q. Same question -- withdrawn. You said merchandiser?

A. Yes.

Q. Is that an outside company?

A. No.

Q. It's an individual?

A. Yes.

Q. What is the name of the merchandiser?

A. Natalie Cummings.

JAMES BRINNEN

Q. I think we --

A. I couldn't hear you, did you ask a question?

Q. Yes. Spell the last name, please?

A. C-U-M-M-I-N-G-S.

Q. Do you recall whether we discussed her previously or talked about her hourly pay?

A. No.

Q. Same question about setting prices but for the website, do you know who made that determination?

A. No.

Q. What about staffing levels? I understand from your prior testimony that there's peak season, shoulder season, on season. Who determines how many staff members to have at each store for each season?

A. I couldn't say specifically.

Q. You were not responsible for that, were you?

A. No.

MR. KATAEV: Let's go off the record.

(Discussion off the record)

(Luncheon recess taken at 1:18 p.m.)

JAMES BRINNEN

AFTERNOON SESSION

1:40 p.m.

J A M E S B R I N N E N,

the Witness herein, was examined and testified as follows:

EXAMINATION (Cont'd) BY MR. KATAEV:

Q. Probably a silly question, but just for the record do you know Teresa Goncalves?
A. Yes.
Q. Who hired her?
A. I believe my wife hired her.
Q. I can't hear you.
A. I believe Kristin Sheeler hired her.
Q. And were you involved in her hiring?
A. No.
Q. When did Ms. Goncalves begin working for the company?
A. I don't remember the exact date.
Q. Do you remember the year?
A. I believe it was 2021.
Q. Do you remember the month?
A. Not specifically. I would say May or June.
Q. To your knowledge and recollection

JAMES BRINNEN

what position was she hired for?

A. I believe she was hired to be the store manager.

Q. It was only for that one particular location, right?

A. Could you be more clear? Meaning being the manager of that one location?

Q. Yes.

A. Yes.

Q. Did she ever work at any other locations?

A. I can't recall specifics.

Q. What was her hourly rate when she was hired?

A. I don't recall.

Q. If I represented to you $23 an hour, does that ring a bell?

A. I can't recall.

Q. What was the last date that Ms. Goncalves worked?

A. I can't recall a specific date.

Q. Do you recall any incident that led to her separation from the employment with the company?

JAMES BRINNEN

A. I recall an incident with a customer directly before she resigned.

Q. And what happened?

A. I believe she got into a big fight with a customer.

Q. And what happened as a result of that?

A. I can't talk to you specifics of the fallout from that.

Q. Is there anything that you contend that she did wrong in connection with that dispute with that customer?

A. It's a vague question with did wrong, so I'm not sure how to answer that for you.

Q. Did anything she do in connection with that customer that you're aware of, constitute some sort of wrongful activity, something that she did that she wasn't supposed to do?

A. I wasn't involved with the discussions with her about what happened. So I can't attest to things she may have done correctly or incorrectly.

Q. In other words, you don't know?

JAMES BRINNEN

A. I don't know.

Q. To your knowledge and recollection was her commission 4 percent?

A. I don't recall her commission rate.

Q. Did that rate fall in line with in terms of what the company was doing in terms of commission with other employees?

A. Managers typically receive a different commission rate than the typical employees. As far as a manager's rate, it's possible she was receiving that.

Q. And if I understand your commission policy correctly, it was 4 percent on eligible sales -- emphasis on the word "eligible" -- are you familiar with that?

A. Yes.

Q. What constitutes an eligible sale?

A. As I explained earlier, you weren't just commissioned on the total net sales for the month, because you would have been commissioned on time when you weren't there participating. So eligible sales would have been sales while you were there participating. And I don't recall if there were other components of that eligibility.

JAMES BRINNEN

There may have been a couple of other components that I can't recall.

Q. What were her duties as a branch manager?

A. I can't speak to her operational duties that would not be my purview.

Q. Are you familiar with an agreement and compensation acknowledgment that she signed or was presented with?

A. Yes.

Q. And did you present it to her?

A. I would have e-mailed her a package, an onboarding package when Kristin informed me of being hired.

Q. Did you create that document?

A. I would have filled the specifics into that document, yes. It was a template.

Q. I'm sorry, repeat that?

A. It was a template, so I would have filled in the specifics of her compensation to the template.

Q. I understood. So you didn't create the template, but you completed it and sent it to her?

JAMES BRINNEN

A. I can't remember where the original template came from, but yes, I would have completed it and sent it to her.

Q. Regardless of where it came from, you did not create it, right?

A. I don't recall.

Q. Do you recall who first gave you that template?

A. No, as I said I don't recall how it was created.

Q. Could it have come from Kristin Sheeler?

A. Doubtful.

Q. To your knowledge, what does the duties of the store branch manager actually mean?

A. Again, I didn't have operational responsibilities nor personnel, you know, a definition of personnel responsibilities, I could only answer in the general sense of what I feel a retail manager would do, not specific though.

Q. Are you familiar with the terms of in that acknowledgment that she was asked to sign?

MR. KATAEV: Let the record reflect that the witness was frozen. To the

extent you provided an answer, please repeat it.

THE WITNESS: I could not hear your question you froze, and I do not know what you were asking me.

MR. KATAEV: Please Madam Court Reporter, kindly read back.

(Record read)

A. The compensation acknowledgment?

Q. Yes.

A. I don't believe there are terms in a compensation acknowledgment.

Q. Are you familiar with what the term "restrictive covenant" means?

A. No.

Q. Are you familiar with the term "non-compete" or "non-solicit"?

A. Yes.

Q. Do you recall whether Teresa Goncalves at the time or Teresa Sullivan signed an acknowledgment containing a non-compete and other non-solicit?

A. Yes.

Q. Did there come a time when you

JAMES BRINNEN

believed that Ms. Goncalves and/or Ms. Sullivan violated that non-complete and/or non-solicit?

A. Yes.

Q. Were you involved in the decision to pursue a claim against Ms. Goncalves and/or Ms. Sullivan for violating that restrictive covenant?

THE WITNESS: I'm sorry. Before I answer, did someone new just join the call?

MS. COONEY: It's me, I just switched devices.

MR. KATAEV: Let the record reflect that Olivia Cooney joined.

Q. Please answer the question.

A. Can you repeat the question?

MR. KATAEV: Madam Court Reporter, read it back, please.

(Record read)

A. No.

Q. Are you aware that a decision has been made to pursue a claim against her for that?

A. Yes.

Q. When did you first become aware of a claim, not necessarily the lawsuit?

JAMES BRINNEN

A. I don't recall the time frame. I believe it was in conjunction with her departure or shortly thereafter.
Q. Are you aware that there was a lawsuit filed in conjunction with that claim?
A. Yes.
Q. And when did you first become aware of the lawsuit, was it before it was filed or after it was filed?
A. I don't recall the timing.
Q. Are you aware of the outcome of that lawsuit?
A. Of the lawsuit?
Q. The outcome of it, yes?
A. I believe so, yes.
Q. What is your understanding of the outcome?
A. I believe it was dismissed.
Q. Did you read the decision?
A. I don't recall that, no, I don't think so.
Q. Switching gears, what were the normal operating hours of the store where Ms. Goncalves worked?

JAMES BRINNEN

A. 10 a.m. to 6 p.m.

Q. What time was Ms. Goncalves expected to arrive there before the store opened?

A. I don't know.

Q. To your knowledge what work had to be performed before opening?

A. To my knowledge what work what?

Q. Had to be performed by the manager before opening?

A. Again, I was not privy to the structure of responsibilities, so I would be guessing at what has to be done before the store opening.

Q. To your knowledge, what work had to be performed before closing or after closing?

A. Same answer, I was not part of that operational component.

Q. To your knowledge, was Ms. Goncalves expected to open the store?

A. I don't know because the store was open seven days, and employees weren't working seven days. So I don't know specifically what her opening days, times, responsibilities were.

Q. Same question about closing, was she

expected to close?

A. Same answer.

Q. How many days per week did Ms. Goncalves ordinarily work?

A. I don't know.

Q. What was her typical schedule?

A. Could you be more clear?

Q. What was her typical schedule when she worked?

A. I don't know, I was not part of her scheduling. I don't know if she had a typical schedule. I can't answer that question, as I don't know, because I wasn't part of scheduling.

Q. Based on your review of payroll time sheets, did she routinely work more than 40 hours per week?

A. No. Again, if she was routinely working more than 40 hours a week, we would have discussed that that was inappropriate and schedule adjustments. So from my purview of the payroll, the clock downloads, there was no regular over 40 hours a week occurrence.

Q. Are you aware of any instance in which she worked approximately 60 hours per week?

JAMES BRINNEN

A. No, not at all.

Q. Are you contending that she never worked 60 to 70 hours in any week?

A. Yes, it would be -- A, she wouldn't be able to do it without me seeing it because she should have been clocking in and clocking out. And B that would have been she was seven days a week at ten hours a day which is not possible.

Q. When you say you would have seen it, do you mean in the documents not that you would have personally observed her working, right?

A. I would have seen it in the clock in/clock out records.

Q. Did you ever contact Ms. Goncalves on the days that she was not scheduled to work?

A. I can't recall, but I doubt it.

Q. Did the hours vary between peak season, off season, shoulder season and holiday weeks?

A. Can you clarify which hours you're asking about?

Q. Store hours.

A. So the store open and close hours?

Q. Yes.

JAMES BRINNEN

A. I, again, that would be more of an operational decision that I wasn't privy to; so I can't attest to what the store hours were during one season or the next.

Q. But do you know whether they varied according to the season?

A. I don't know.

Q. Did there ever come a time where there was a Zoom meeting that was required to be conducted amongst the employees at the company?

A. I don't know. It's pretty broad. What kind of zoom meeting.

Q. Any company meeting where the store operations were discussed?

A. There might have been. I believe we had a seasonal kickoff to inform employees of policies that I would have been invited to.

Q. That would be the Zoom meetings that would occur after hours, right after the regular store hours?

A. I don't recall.

Q. Were you present for those kind of meetings?

A. I remember being at one maybe two.

JAMES BRINNEN

But again, I wasn't operational so I wouldn't typically be involved in that stuff.

Q. Do you recall Ms. Goncalves purchasing a driftwood table for the company?

A. No.

Q. Are you saying you don't remember one way or the other or are you denying that she ever purchased one?

A. I'm saying I don't know one way or the other. That's not something I would have been involved in.

Q. What about in connection with her request to be reimbursed?

A. If there was a request to be reimbursed, it depends, it could have come to me or it could have just been something that was requested of Kristin.

Q. Separate and apart from reimbursement for a driftwood table, did you ever field any requests by Ms. Goncalves to be reimbursed for other expenses that she paid for out-of-pocket?

A. I don't recall.

Q. What do you know, if anything, about cash register withdrawals to make purchases for

the company?

A. Could you narrow the scope of the question?

Q. To your knowledge, were there ever any cash register withdrawals to pay for things for the company?

A. Yes.

Q. To your knowledge was Ms. Goncalves ever an individual that did so?

A. Yes.

Q. And to your knowledge was she authorized to do so?

A. I can't attest to how authorizations would have been requested or made.

Q. You would not have been the individual asking her to take money from the register and pay for something, correct?

A. No, I mean correct.

Q. Are you aware of who would be the individual that would make such a request?

A. I don't know that there was a request associated or if it was part of that autonomous, you know, I believe to run their store.

Q. Do you have any knowledge of any

alleged impropriety by Ms. Goncalves in connection with any cash register withdrawals?

A. Yes, I'm going to say yes.

Q. Tell me about it.

A. The daily cash envelopes that were collected and brought to me or that I collected would on occasion not tie out. They didn't have receipts for things that were purchased, for instance. And then the cash in the envelope would not tie to the drawer receipts so there were instances where there were questions.

Q. Let's take a step back. You referred to a daily cash envelope, can you describe everything about that?

A. Yes. The daily -- at the end of every day the drawer got counted and was supposed to be brought back to the starting amounts and everything over that was put into a cash deposit envelope -- not a cash deposit envelope just a cash envelope that was to be sealed with the day-end report that came out of the system when you closed the register, to be collected by me.

Q. When you say collected by you, did you physically go to the store every single day

to do that?

A. No, it was not possible to do that.

Q. Sorry?

A. No, it would not be possible for me to go to the stores every day.

Q. How would it work?

A. Well, we had a small cash box in each store, envelopes are supposed to be put in the cash box. The manager had the key to the cash box. I had a key to the cash box. So I would collect them when I was in the area or I would make a trip to collect them.

Q. Okay. Is it fair to say that if you were not present at the store for the three days to collect the envelopes that when you arrived to do so, there would be three separate envelopes for you?

A. There should have been, yes.

Q. Once you pick up the cash envelopes, what do you do with them?

A. I would have brought them home and counted them and reconciled them.

Q. And then what happens to the cash afterwards?

JAMES BRINNEN

A. It ultimately got deposited.
Q. Probably?
A. Ultimately it got deposited.
Q. Always the case or was sometimes cash not deposited?
A. I can't attest to the frequency or the outcomes.
Q. Who made the deposit?
A. I made some, I believe Kristin made some.
Q. Besides you two, did anyone else make any?
A. I'm not aware of anyone else making a deposit for us, no.
Q. How would you decide whether it was you or Kristin that made the deposit?
A. It was just mostly the one who had the availability to get to the bank in Montauk, based on our schedule.
Q. And you reside in Montauk --
A. Yes.
Q. -- all year round?
A. Yes.
Q. How far is the bank from where you

JAMES BRINNEN

reside?

A. A mile and a half.

Q. How far is the flagship Montauk location from where you reside?

A. Same, Montauk is small.

Q. Is the bank on the way to the store or something else?

A. I mean they're a quarter of a mile from each other, but you don't pass one to get to the other.

Q. But the bank and the store are closer to each other than your residence?

A. Yes.

Q. I hate to ask silly questions, but for the sake of the record, you reside together with Ms. Sheeler, correct?

A. Yes.

Q. Is there any other residence that you own and/or sometimes reside in other than the Montauk residence?

A. Not that I own, but I have an apartment in Manhattan that I go to occasionally.

Q. What is a typical or average amount of cash inside a daily envelope?

JAMES BRINNEN

A. I couldn't attest to a typical or average amount.

Q. Is it ever the case that there are days where there are no cash envelopes because there's no cash?

A. It's possible.

Q. Do you receive any reports from any individual working at any of the locations concerning the amount of cash contained in a daily cash envelope?

A. Could you more clearly, like if someone was concerned how much was there or if the amounts were wrong; I'm not sure what you're asking?

Q. How much was there?

A. No, I don't recall any kind of communication like that.

Q. You didn't have the manager send an e-mail saying "Dear Jim: Today's cash envelope consisted of of X amount"?

MR. BOWLES: Object to the form.

A. No, not that I recall.

Q. How would you reconcile?

A. The envelope was supposed to contain

a transaction log printout. It was automatically printed out. When you close the register, it automatically prints out, and it shows you the types of sales or I should say the types of transactions. And it shows you a beginning and -- I think it just shows an ending cash, cash in drawer total. So you can reconcile the amount in the envelope to what that slip said, and then you could tie that slip to the Lightspeed transaction log, if you needed to.

Q. What do you do with those printed out let's call them ledgers that are contained inside the daily cash envelopes, where are they?

A. They, I mean various, most of them were held for a period and then thrown away.

Q. Are you still in possession of any of them?

A. I would have to look in my safe, but they can be regenerated from Lightspeed. I can look in Lightspeed to see anything I needed.

Q. You anticipated my next question, thank you. Let's move on.

Was there ever any clerical overpayments of wages to employees?

JAMES BRINNEN

A. Did you say clerical overpayment?

Q. Yes. Or overpayments in general?

A. I can't recall.

Q. What do you know, if anything, about a summer commission program?

A. A summer commission program?

Q. Yes.

A. It's just a commission program. I mean that's the commissions. I believe, the summer associates were given an overview of commission called "The Summer Commission Program" because they were summer associates, but it's just the commissions.

Q. Was it the same as the regular commissions or was it different?

A. There is only one type of commission. Everyone's commission was computed the exact same.

Q. Do you recall having kickoff calls in April for the season?

A. As we discussed earlier, I believe they had a preseason meeting. I believe I attended one or possibly two.

Q. To your knowledge were those kickoff

JAMES BRINNEN

calls counted towards employees' hours worked for payroll purposes?

A. As far as I know they were, yes.

Q. Did Ms. Goncalves ever complain that she was missing wages?

A. Not that I can recall.

Q. Did the company ever perform an audit of her hours worked?

A. I'm trying to think if one was ever done. When you say audit, do you mean a particular time of the day or do you mean a particular day of the week to make sure the week was correct?

Q. I would go broader irrespective of the term "audit" was there ever any other effort to verify her hours worked for any particular time period; so you can answer that question broadly?

A. Yes.

Q. Were those only week by week situations or did it involve a period of time of greater than one week at any point?

A. I can't attest specifically, but I would have audited or looked at her hours when

JAMES BRINNEN

she had misclock-in or misclock-out activity. So that would have been done weekly to ensure that it was correct.

Q. To your knowledge did Ms. Goncalves ever perform work that did not appear on her time records?

A. No.

Q. How do you know that?

A. If someone did work they would have or should have communicated they did something. I don't have any communications that I can ever recall saying I did X, Y or Z outside of work.

Q. Did she ever complain about unpaid wages before she left?

A. Not that I recall.

Q. Was she ever disciplined in any way, shape or form in connection with her employment at the company?

A. Again, I wasn't operational but not from my perspective, I never did.

Q. To your knowledge did she ever receive any written warning or get a performance evaluation?

A. Not that I'm aware of.

Q. Going back to the lawsuit filed against Ms. Goncalves, are you aware of any confidential information that she actually used when she left?
A. I was not part of the construction of the lawsuit, so I don't know if confidentiality was a part of that lawsuit.
Q. Moving on to Ms. Ketcham, do you know her?
A. Yes.
Q. Do you know who hired her?
A. No.
Q. Do you know when she began working?
A. I don't recall a specific date.
Q. Do you recall any specific year in which she started working?
A. I don't, I can't remember the year she started.
Q. What about in connection or in reference to Ms. Goncalves's employment, who started first?
A. Goncalves.
Q. What was Ms. Ketcham's original position when she was first hired?

JAMES BRINNEN

A. I don't know.

Q. What was her initial hourly rate of compensation?

A. I don't know.

Q. Was it $20 an hour, does that ring a bell?

A. Again, I don't know. I just send the communication out.

Q. Do you know if she was promised any commission when she was first hired?

A. I do recall that she was not being given commission at first and her compensation statement stated that, no commission.

Q. To your knowledge why was Ms. Ketcham not receiving commissions?

A. As I recall she was going to be limited hours, just filling in as needed. So not really spending enough time in the store in a consistent basis to make a measurable contribution.

Q. So it's because she was part-time at least in the beginning?

A. That's my recollection, yes.

Q. Did she complain about not receiving

JAMES BRINNEN

commissions?

A. I don't recall a complaint. I believe she asked about it at some point.

Q. What happened after she asked about it?

A. I don't recall timings. I do remember sending her communication that should be included in the commission structure. I don't know if that was related to a request or just a natural progression of her taking on more responsibility and more contribution.

Q. In terms of her first starting to work there, does September 2022 ring a bell?

A. It's possible. It doesn't ring a bell, it's possible. Although, I don't know.

Q. Were there any issues with respect to her receiving her first payment of wages due to onboarding?

A. I couldn't tell you, it was a long time ago, so I don't recall that specific detail.

Q. I think there was some allegations or discussions at her deposition about her residing in your home in Montauk for some period of time. Do you have any knowledge of that?

JAMES BRINNEN

A. Residing in my home, I don't know that she resided in my home. To me resided indicates a duration of time. She did stay here several times.

Q. What was the reason that occurred?

A. That would have been, I believe, those were off season times when she was covering hours in the Montauk store. Since she lived in Westhampton the offer was that she could stay in our I won't call it apartment but we have a separated area where she could have her own personal space, and that would save her an hour-and-a-half each way trip.

Q. Was there any deductions taken from her pay for lodging?

A. None that I'm aware of.

Q. I'm sorry, I couldn't hear you?

A. None that I'm aware of.

Q. To your knowledge how often did Ms. Ketcham lodge in your home in Montauk?

A. I couldn't give you a quantified number, I don't know the number.

Q. Do you have a range of how many possible times she stayed?

JAMES BRINNEN

A. It would be a guess, per your rules early on to not guess. No, I can't guess at it.

Q. Is anyone staying in that home now?

A. Excuse me, is anyone staying in the home?

Q. Yes, in that separate --

A. Oh, no.

Q. Is that home placed on the short-term rental market?

A. No. It's not a home. It's an area of my house that is -- it's a basement that's sort of sectioned off so it has its own little space.

Q. Is it made available for short-term rentals?

A. No, absolutely not.

Q. Do you recall Ms. Ketcham ever asking for reimbursement for decorations that she purchased?

A. No.

Q. To your knowledge, did the company provide holiday gifts or bonuses?

A. Yes.

Q. Everyone received it or it was

JAMES BRINNEN

discretionary based on who would?

A. It's a little bit of both, I suppose. At the holidays the term "everyone" is very broad. So at the holiday you only would have had -- let's say you're assuming holidays, Christmas. At Christmas we wouldn't have had the full contingent of summer staff so they wouldn't have received anything, but the current employees at that time of year would have received things.

Q. Do you recall if Ms. Ketcham received a $3 per hour raise?

A. I recall she received raises, I don't know what the amounts or periodicity was.

Q. Who to your knowledge approved any such raises or raise?

A. I believe it would be Ms. Sheeler.

Q. Why was to your knowledge any such raise given to her?

A. Again, I wouldn't have been part of the decision or part of the discussion, just told to make the adjustment.

Q. Was there ever any concern that she would quit from her employment?

A. I don't know.

JAMES BRINNEN

Q. What was her beginning role when she first started?

A. I don't know role classification. Again, all I know is she was described as being part-time, a fill-in.

Q. To your knowledge did she, Ms. Ketcham, interview prospective employees?

A. Did you say "interview prospective employees"?

Q. Yes.

A. I don't know.

Q. To your knowledge did Ms. Ketcham ever complain about her compensation at the company?

A. Not that I'm aware of, of a complaint about her compensation.

Q. Did Ms. Ketcham ever complain about the fact that she was performing additional duties such that she should be paid more for doing any additional duties generally?

A. Not that I'm aware of, but I don't know.

Q. Did you independently verify whether all of the time she spent interviewing applicants

appear on payroll?

A. Again, I don't know if she ever interviewed anybody, so I wouldn't be able to verify if it was on or off payroll. My assumption is that anything she did was off payroll.

Q. Did you ever receive complaints from any employees about late wages?

A. About late wages?

Q. Yes.

A. I don't know. That's a pretty broad question over a very long period of time.

Q. Are you saying you don't know?

A. I don't know.

Q. Were you aware that Ms. Ketcham was transporting merchandise between locations?

A. I don't know specifics of whether -- you know, how transportations were done. I said earlier I think it was possible that a pickup could have been made like en route. But again, it's sort of an operational aspect of the role that I wasn't a part of.

Q. Did you take any steps to verify that she was paid for any such time doing that?

JAMES BRINNEN

A. If there was time spent doing that, she should have, you know, let me or let Kristin know to communicate to me. I'm not aware of any of it, or I don't recall there being any.

Q. Are you aware of any complaints concerning wages by Kathy Marin and Natalie Cummings?

A. I'm not aware of any.

Q. Did Ms. Ketcham complain during the summer of 2023 that she had not been paid for several weeks?

A. There's no complaint that I recall, and there's not a possibility that she wouldn't have been paid for several weeks. I mean if she didn't work she wouldn't get paid. But if she worked, she got paid.

Q. Do you recall ever investigating any wage complaints in general?

A. No.

MR. BOWLES: Object to the form. Go ahead.

A. No, I don't recall.

Q. Was there ever a determination made by you that wages were missing or unpaid due to

JAMES BRINNEN

some misunderstanding or some other reason?

A. I don't recall specifics. But over the course of the years I do know I've made one or two adjustments for people where a communication -- like an example, a communication was missing. I didn't take lunch the other day, I didn't see it. So I would have adjusted it the next week and would have given them back the half hour, for instance. I do know there were a couple of instances like that.

Q. To your knowledge were any complaints about wages documented in e-mails or other writings or text messages?

A. None that I'm aware of, no, I don't know.

Q. I'm just skipping through stuff to get done faster.

After the fire were any of the employees from that location placed in different locations to work?

A. Miss Ketcham came to Montauk a few times after that for a period of time. I don't think there was -- I don't recall if there was another. There might have been one other person

JAMES BRINNEN

a college student, that was working at the time. I don't recall. I know for sure Ms. Ketcham came up to Montauk.

Q. Why was it the case if there was any reason that she did not continue to work at the other location?

A. At the burned location? I'm not sure I understand the question.

Q. Well, she worked at the location where the fire occurred, right?

A. Correct.

Q. After that from time to time she worked at the Montauk location, right?

A. Correct.

Q. My question is, why did she not continue to work at the Montauk location?

A. The Montauk location does not stay open all year long. So she would have worked as long as there was work to be done there.

Q. What about the Westhampton location, did that location remain open all year round?

A. Before the fire, it remained open all yearlong.

Q. But why was it that she was not

JAMES BRINNEN

offered to work there?

A. The store burned, it was not available.

Q. I'm sorry, the third location, was it closed for the winter?

A. Could you clarify which location you're talking about?

Q. The Montauk location you said closes for the winter. The Westhampton location had a fire. Was it the Bridgehampton location that remains?

A. Yes, there's a Bridgehampton. Yes, by the third location, you mean the Bridgehampton location?

Q. Yes.

A. Yes. I, again, operational decisions I'm not privy to. I can't explain why she wouldn't have -- A, I can't say that she wasn't offered to work there. And B, I can't explain why she would not have been working there.

Q. But was it open all year round?

A. It is open -- there's a period of time in February and March where, I believe, unless we have a backfill it closes for a couple

JAMES BRINNEN

of weeks, when the manager takes her kind of like midwinter break.

Q. So what reason, if any, was there that she was not offered to work there?

A. I just said I don't know. And to be clear, I don't know that she wasn't offered. Just to clarify what I said to you prior, I don't know if she was offered and didn't want it or she was not offered. Your question leads me to believe she was not offered, but I don't know if that's the case.

Q. Okay, fair enough. I appreciate that. After the fire occurred in Westhampton, did Dina perform work or was requested to do anything at the Westhampton location?

A. She helped to clear the store after we were given permission to come in and get the stuff out of the store.

Q. And was she paid on payroll for those hours worked?

A. She was paid on payroll for those hours worked. She was also paid for the time period in between when the store couldn't be open but she was scheduled to work, I believe. I

JAMES BRINNEN

would have to look back at the payroll record.

Q. Did there come a point in time when discussions were had or a decision was made that Ms. Ketcham's employment would no longer continue?

A. The same as before. That's an operational discussion that I wouldn't have been part of, so I don't know.

Q. At the time that Ms. Ketcham stopped working were any new hires, new employees hired?

A. No, I don't believe so. That would have been in the winter period between, you know, say the end of October and I don't know like February or March, so we're not in a hiring mode at that point.

Q. Was there any promise made that any insurance money you received as a result of the fire in Westhampton would be used to pay in part employees' wages?

A. I don't know. I don't believe so. I certainly wouldn't have made that kind of commitment because I had no idea how long the insurance process would take.

Q. To your knowledge were any insurance

proceeds, in fact, used to pay any employees after it was received?

A. We didn't receive the insurance money until this year.

Q. To your knowledge who asked Dina to photograph or video the damage at the Westhampton store?

A. I don't know. I remember talking to Dina the day of the fire. She sent me pictures from outside. I don't recall her taking anything else because there was no access to the building until I came the next day. I don't know that she took any other pictures, I'm not aware of her taking any other pictures or if she did I don't recall.

Q. Let the record reflect that I previously showed you an image of an application from the app store on my phone screen. I will now screen shot that and mark that as Plaintiffs' 1.

(Plaintiffs' Exhibit 1, Screenshot image of an application from the app store, marked for identification, as of this date.)

JAMES BRINNEN

MR. KATAEV: I now want to mark for identification Plaintiffs' 2, which I will represent to you is a blank notice and acknowledgment of pay rate and pay date form, which I will share on my screen.

(Plaintiffs' Exhibit 2, Blank notice and acknowledgment of pay rate and pay date form, marked for identification, as of this date.)

Q. Do you see a notice and acknowledgment of pay rate and pay date form on my screen?
A. I do.
Q. Have you ever seen this document before today?
A. I don't believe so.
Q. Have you ever completed any such document for any employee of the company?
A. Have I ever what any such document?
Q. Completed.
A. Not as detailed as this.
Q. This is the first time you've ever seen such a document, correct?
A. In relationship to NIBI-MTK, yes.

JAMES BRINNEN

Q. Have you ever seen this document outside of the company with respect to another employer or another situation?

A. Not this document.

Q. Are you aware of the requirement to provide employees with such a document?

MR. BOWLES: Object to the form.

A. I was aware to communicate to employees at their starting, what they were being compensated for.

Q. I know you testified that you've never done it but do you know if anyone else at the company that may have completed this form and provided it to an employee?

A. I don't know.

Q. You've never seen such a document for any employee of the company, correct?

A. This specific format, no.

Q. Were there ever any signed documents containing -- withdrawn.

Do you remember discussing a compensation and acknowledgment form with respect to Ms. Goncalves?

A. Do I remember us discussing a

compensation acknowledgment form with Ms. Goncalves?

Q. Yes.

A. I think you brought it up. I don't remember what the questions were.

Q. My question is we discussed one concerning Ms. Goncalves, do you know if there was a compensation acknowledgment form for Ms. Ketcham?

A. Yes, everyone would have gotten the same onboarding package specific to them, but the same contents.

Q. And that document was given to each of them and any employee at the beginning of their employment, correct?

A. Correct.

Q. Now after the employee started working and received that compensation acknowledgment form, if they're pay increased or decreased or changed in any way was a new compensation acknowledgment form given?

A. I can't recall.

Q. Was any document given to employees concerning commissions and how it worked?

JAMES BRINNEN

A. Yes.

Q. Was that part of the same form or a different document?

A. Different document.

MR. KATAEV: To the extent that that different document was not produced in connection with the plaintiffs, Goncalves and Ketcham, we're going to call for the production of those documents. We'll follow up in writing.

Q. From time to time you would send employee pay for the week or pay period by Zelle, correct?

A. Correct.

Q. And when you did so, did you Zelle them the net amount of their pay, the gross amount of their pay or some other number?

A. Can you define what you mean by the net amount?

Q. Standard payroll deductions such as FICA, withholding and the like?

A. Net.

Q. Net amount, correct?

A. Net amount.

JAMES BRINNEN

Q. Now, did you interface with the Baransky accounting firm every quarter in connection with filing of employment tax returns for the federal and state government?
A. Not every quarter.
Q. Repeat that, please?
A. Not every quarter.
Q. If you weren't handling it for a particular quarter, who would?
A. That was a misunderstanding. So I did not communicate with them on a quarterly basis, I did it annually.
Q. Okay. Are you familiar with the employment tax returns, generally speaking?
A. I am now.
Q. Do you know what a 941 is?
A. Yes. I mean content-wise, no. Form, yes.
Q. When did you first become familiar with form 941?
A. I guess last -- early last year.
Q. So prior to that time, is it fair to say that the company did not prepare and file quarterly 941s?

JAMES BRINNEN

A. It was -- yes, it's fair to say that because there was a misunderstanding about procedures.

Q. What was the misunderstanding?

A. I believe that by handing over all the records for the year at the end of the year for calculations of W-2s that all the annualized processing got done the same time. I was not aware they needed to be done quarterly.

Q. I mean the Baransky accounting firm, when was the first time you ever worked with them to do any tax work related to the company, like what year?

A. I don't recall.

Q. Did you work with the Baransky accounting firm for more than one year?

A. Yes.

Q. Did you work with the Baransky accounting firm for more than five years?

A. Again, I don't recall when they started. I had a prior relationship with them, so that's why I'm not sure when they started helping with the company.

Q. In order to work with the Baransky

JAMES BRINNEN

accounting firm, you would send to them and receive from them e-mails, correct?

A. One form of communication would have been by e-mail, certainly.

Q. What was your primary method of communicating with the Baransky firm?

A. I couldn't say it was a primary. Phone calls and e-mails they're probably equally as frequent.

Q. And do you have any text messages with the individuals or principals of the firm?

A. Did you say text messages?

Q. Did you exchange text messages with any employee or principal of the firm?

A. No.

Q. How many annual returns have they done for the company?

A. Again, I can't answer because I don't know. I don't recall when they specifically started working for the company.

Q. Based on your answers to my questions, it's my understanding that you are now filing quarterly employment returns, and accepting that premise are you filing them

prospectively or are you also going back in time and filing them for prior quarters?

A. All prior quarters were submitted through -- when we found out there was, again, a misunderstanding of process, we began a process to reconcile and to submit everything. So that has all been done. I can't recall when that process -- when the refilings or the filings started, but I can tell you that it is done. And this year I provided monthly figures for the first two quarters. The first -- I can't remember if I did it monthly for the first quarter, and then I submitted everything else through Gusto to have them do quarter 2 or if Baransky took care of Q1, Q2 and Gusto takes it from there forward. But either way, Gusto is doing it now.

Q. Are you aware that the federal and state taxing authority are likely going to impose penalty fees and interests for failure to earlier filE those employment returns, are you aware of that?

MR. BOWLES: Objection to the form.

A. I'm aware that there are repayments

JAMES BRINNEN

that need to be made that will have interest, and there are I think nuances to the penalty.

Q. Are you relying on the accounting firm exclusively to handle that aspect of things or are you seeking legal counsel in connection with that as well?

A. As of right now we're working with the accounting firm.

Q. And you have not reached out to any legal counsel in connection with dealing with the federal and state taxing authorities concerning penalties, fees and interest, correct?

A. I have not.

Q. Has the Baransky firm filed more than one annual tax return for the company?

A. Yes.

Q. The first time that the Baransky firm ever completed an annual tax return for you, did they have any discussions with you about quarterly employment tax filings?

A. None that I recall.

Q. Is it fair to say that -- let me just ask you this, before the misunderstanding came to light about the failure to file quarterly

JAMES BRINNEN

employment taxes, you were filing a form W-3 which contained all the form W-2s?

A. The W-2 filing was handed off to Baransky to file for us. I don't know what forms are a part of creating a W-2, but that information was all handed off to Baransky so they can create W-2s.

Q. Do you have any knowledge as to whether they needed the quarterly employment returns in order to file the W-3 and W-2 -- the W-2s?

A. I don't know that.

Q. Are you aware that as a result of the failure to timely file the quarterly employment tax returns that the plaintiffs, Ms. Goncalves and Ms. Ketcham, were affected by that?

A. No, I was not aware.

Q. Are you aware that as a result of failure to file those employment quarterly employment returns that they were unable to obtain unemployment insurance benefits?

A. I was not aware.

Q. Are you aware that as a result of failing to file the quarterly employment tax

JAMES BRINNEN

returns that both employees did not receive service credit in terms of their Social Security benefits?

A. I was not aware.

Q. Other than paying employees through Zelle is there ever any other method through which employees were paid?

A. Yes.

Q. What are those methods?

A. ACH. And on one or two occasions Venmo, because the employee requested not to incur ACH, that was an exception case, so primarily it was Zelle and ACH.

Q. And now Gusto?

A. Correct.

MR. KATAEV: If you'd like, we could take a break now for five minutes. We've been going for some time, I'm happy to proceed, if you'd like.

THE WITNESS: That's fine, I could use some water.

(Recess taken from 3:03 to 3:10 p.m.)

Q. So it's fair to say that there were deductions taken from employees' pay, employees

JAMES BRINNEN

Ms. Goncalves and Ms. Ketcham, that were not remitted to the Federal Government, correct?

A. I don't think it's fair to say. It's time period based. There were deductions made that we thought were being -- deductions taken that we thought were being paid and that are now being paid.

Q. Who was responsible for ensuring that those amounts were remitted to the appropriate taxes authorities at the appropriate time?

A. As I stated, it was a misunderstanding between myself and the accountant. I think they thought I was doing it, and I thought they were doing it.

Q. Did the company ever receive any correspondence from any of the taxing authorities about the failure to file any quarterly employment returns?

A. None that I ever saw.

Q. So does the company regularly receive mail?

A. Yes.

Q. Is there a central location that all mail is directed to?

JAMES BRINNEN

A. Yes.

Q. Did the company ever lack sufficient funds to remit the payroll taxes?

A. No.

Q. The employment returns that were recently filed for prior periods who signed them on behalf of the company?

A. I believe those all were signed by Ms. Sheeler.

Q. How did you come to learn about the failure to file the quarterly employment returns?

A. Um, I believe early in 2025, an employee told us that she had gotten a letter from the IRS to confirm her employment. And concurrently a second employee, I believe, a similar time frame anyways, said that she had gotten a report from Social Security that showed zero contributions. So we took that and started running with it. And I can't recall if that was late 2024 or early 2025, but it was I would say within a two or three-month period there.

Q. Prior to the Baransky firm, who handled the accounting for the company?

A. That's what I was saying, I don't

JAMES BRINNEN

recall the early days. By the time Kristin started the business, it was most likely Baransky was doing everything to start with. And I don't know -- again, I don't recall specifically but by the time just guessing based on time -- you said not to guess -- judging, based on timelines of the start of the business, I would have to go back and look, but I believe Baransky probably filed everything from -- restricting this to the companies and maybe MTK -- would have filed everything.

Again, for Kristin's LLC, as we discussed earlier, there may have been another accounting firm that she was working with, as a matter of fact I am almost positive there was another accounting firm she was working with when I first met her and the LLC was incorporated or created. As far as NIBI-MTK is concerned, I would believe it is only Baransky. I would have to confirm that with my records, though.

Q. But is it fair to say that as far as you know the only employee tax returns that were ever filed were filed by Baransky for the company?

JAMES BRINNEN

A. I think that is fair to say.
Q. How did you first meet Ms. Sheeler?
A. It was online.
Q. Is it fair to say that in connection with -- hold on a second.
(Pause)
Q. Are you aware of the fact that Ms. Goncalves made a complaint with the Social Security Administration in connection to her employment at the company?
MR. BOWLES: Object to the form.
A. I was not.
Q. Did you ever receive any correspondence from the Social Security Administration in connection with any such complaint?
A. No.
Q. Are you aware of any application for employment insurance benefits filed by Dina Ketcham in connection with her unemployment with the company?
A. No, I'm not aware.
Q. Did the company receive any request for communication from the New York State

JAMES BRINNEN

Department of Labor in connection with any such application for unemployment insurance benefits?

A. No.

Q. We previously discussed that you had never prior to this time filed federal form 941. Is the same true for the state form NYS 45?

MR. BOWLES: Object to the form.

A. The same would be true, the same misunderstanding.

Q. Was there ever any written policy concerning complaints in connection with an employee's employment at the company?

A. I'm not sure I understand the question.

Q. Was there ever any policy concerning how employment complaints are handled?

A. I don't know of any written policy like that.

Q. Does the company have an employee handbook?

A. I believe so. Again, I'm not so involved in the operation side of things but I believe there is.

Q. Moving on to the counterclaims filed

JAMES BRINNEN

by at least one of the defendants, do you have any knowledge as to whether it is just the company that is pursuing those claims as opposed to you and/or Ms. Sheeler individually?

A. I am not aware of the specifics of the filing in that regard.

Q. Do you have any knowledge as to when each alleged wrong was first suspected or discovered?

A. Can you clarify the question, please?

Q. Do you understand the counterclaims to assert that Ms. Goncalves and Ms. Ketcham engaged in some wrongdoing that harmed one of the defendants or at least one of the defendants?

A. Your question is broad, I guess broadly speaking I know -- actually, you know, I cannot speak to the details of the counterclaim. So I'm struggling to give you an answer that's useful beyond me making some assumptions, so I'd prefer not to do that.

Q. The answer is you don't know a lot of details or any real details about the counterclaims and the basis for them, right?

A. That's correct.

JAMES BRINNEN

Q. Are you aware of the allegation that Ms. Goncalves took cash from the store or from the company?

A. I'm aware of the concern that that was happening.

Q. Do you have any information in support of these allegations or this one?

A. Going back to those cash envelopes, there was in hindsight there was a reasonable enough frequency of discrepancies in those envelopes to make one conclude that something was going on.

Q. What was the average discrepancy per daily envelope?

A. I couldn't say, I don't have a number like that in front of me.

Q. To your knowledge prior to the submission of cash envelopes to you who, if anyone, had access to the daily cash envelopes?

A. It's hard for me to say because I wasn't in the store on a daily basis. If the managers were doing what they're supposed to be doing, which is counting out the register, whether it's a manager or, quote/unquote "a key

holder," that should have been very limited because the envelopes should have been put into the lockboxes.

Q. So is it fair to say that you cannot definitively state that only a particular manager had access to the daily cash envelopes?

A. Since the manager did not work seven days a week there was obviously another person that would have handled cash on those non-manager days.

Q. And that's especially the case because you were not always available to come every day to pick up the envelopes, right?

A. I was not available to pick up envelopes every day, correct.

Q. Are you aware of any allegations that Ms. Goncalves and/or Ms. Ketcham inflated their alleged -- not alleged, purported hours worked?

A. You kind of broke up three-quarters. Am I aware of them inflating their hours worked?

Q. Yes, any allegations of them inflating their reported hours?

A. In what manner?

Q. I suppose, based on an allegation

JAMES BRINNEN

I've seen, remaining clocked in while no longer working.

A. There are many, many instances of both of them being clocked in during closures of the store. I can't attest to that being purposeful or an act of omission, but I'm aware of them doing that many, many, many times.

Q. But your awareness of those that you're referring to are ones that they basically forgot to clock out and they remained clocked in for a period of 24 hours or something, right?

A. I can't attest to whether they forgot or chose not to, but that's the basis of my answer is that they were clocked in for multiple hours after they were done, the store was closed, et cetera.

Q. And those instances you're not asserting, based on your knowledge and experience dealing with them, that that was some purposeful attempt to receive payment for hours unworked, right?

A. I don't know the intent. I can't attest to someone else's intent.

Q. Well, after it happened presumably

JAMES BRINNEN

you would contact them to discuss, hey, you forgot to clock out, right, and what time did you leave?

A. Correct.

Q. And they didn't respond to you and say no, no, I worked all night here and I expect to be paid for these 24 hours, correct?

A. Correct.

Q. So based on those circumstances and the passage of those events, it's fair to infer that there was no purposeful attempt to inflate their hours worked in order to receive money and wages for hours not worked, correct?

MR. BOWLES: Object to the form.

A. In that regard, however, in the complaint stating that they worked 60 or 70 hours, to me is an attempt to inflate the hours they worked.

Q. Thank you for clarifying. Is that the sole basis to your knowledge for which the company claims that the plaintiffs inflated their alleged hours worked?

A. I can't attest to what the company feels, I can tell that you from my perspective

JAMES BRINNEN

that's what I feel.

Q. Okay, but accepting your premise is true, would you acknowledge that their claim of working 60 to 70 hours does not involve the company's payments to them for those inflated hours?

MR. BOWLES: Objection.

A. I'm not sure I know how to answer that, I don't quite follow your question.

Q. It's fair. It's hard to put together I'm going to try to unpackage it.

The company is asserting they're inflating their alleged hours worked based on the allegations in the complaint, correct?

A. I don't know -- if you're talking about the counterclaim, I was not part of the construction of that so I can't tell you what the company thinks about that.

Q. Fair enough. I'll move on. To your knowledge -- last question on this. To your knowledge, did the company ever pay Ms. Goncalves or Ms. Ketcham for any allegedly inflated time worked?

MR. BOWLES: I'll object to the form.

JAMES BRINNEN

Go ahead.

A. I mean it's hard to answer because at the time of payment I can't think of an instance where I suspected that there were inflated hours, but we're talking about a period of several years of weekly pays. So I am not 100 percent positive if there was a time period here or there where I was thinking oh, this seems high. But it's possible.

Q. Are you aware of allegations that Ms. Ketcham engaged in theft of inventory or of abusing employee discounts?

A. Yes.

Q. Do you have any personal knowledge about those allegations, and the basis for them.

A. I can recall a conversation with her, I think, about buying jeans for her daughter on the employee discount plan which is outside the rules of the employee discount plan.

Q. If I understand your answer correctly you're saying she asked you for permission to do so?

A. No, she just told me.

Q. After she informed you that she

JAMES BRINNEN

utilized an employee discount plan for that circumstance, did you inform her that it's not okay or indicate to her in any way that it's not acceptable?

A. In the instant I'm thinking about no, because I assumed that she would have communicated that with Ms. Sheeler, you know, that that's her policy and her operational aspect to deal with, so I would have made the assumption that this was okay, I thought it was curious.

Q. Did the conversation about that incident occur at the -- sorry, did the conversation about those circumstances occur by Ms. Ketcham initiating it to inform you about it or did you ask her about it?

A. I don't remember the scenario that ended up there, I just remembered I believe standing in the store in Westhampton and I remember her mentioning about the jeans. I don't know if we were having a conversation or if someone else was there and they said oh, these jeans are great and she was like oh, yeah I bought them for my daughter's. I don't remember the exact specifics of the conversation. I do

JAMES BRINNEN

remember the reference though.

Q. Can you describe to me what the policy is with employee discounts and how it works, what is allowed and what isn't?

A. To a degree, again, this is more operational but an employee is entitled with approval to purchase fully priced merchandise at a, with approval, at a 30 percent discount. Again, only fully priced non-discounted items. So they would need to get approval and say I want to buy this dress. They can get a dress that's on the floor at full price at a 30 percent discount but only, I believe -- I believe the way that was supposed to work was if it was a dress that we had plenty of inventory on, the approval would be given. If it was a dress that -- I'm just using a dress as an example. If it was a dress that was low on inventory and a hot item, I believe that approval could be not be given. But, again, I was not part of that whole approval process. I was just aware that there was a process like that.

Q. Was that policy in writing anywhere?

A. Yes, I think that was part of -- yes,

JAMES BRINNEN

I'm going to say yes it was in writing. Sorry, to add to that, the policy also stipulated this was for employees only not for friends, not for family. But I believe it was in writing and I think it was -- I can't remember if it was distributed part and parcel with another document or if it was distributed on its own, but I do know there was a written policy. I believe I recall a written policy.

MR. KATAEV: We'll call for the production of all such policies, and we'll follow up in writing.

Q. Was there ever any accusation made to Ms. Ketcham directly to her by the company about abuse of the policy?

A. I don't know.

Q. Is it fair to say to your knowledge the first time it was raised was in connection with this lawsuit?

A. Again, I don't know.

MR. KATAEV: Hold on.

(Pause)

MR. KATAEV: Can I have the last question read back?

JAMES BRINNEN

(Record read)

Q. Moving on to the next topic, are you aware of any allegations that Ms. Goncalves and/or Ms. Ketcham defamed the company?

A. I didn't hear the last part that they did what?

Q. Defamed.

A. Can you define defamed for me?

Q. Made disparaging statements that are not true.

A. I'm not sure, I don't want to guess. I have thoughts and suspicions, but I am not sure.

Q. Okay, fair enough. Let me ask you this, to your knowledge is it fair to say that any alleged defamatory statements by either Ms. Goncalves or Ms. Ketcham were made in the complaint in this case?

A. I can't qualify or quantify. Again, I believe you're asking about the countersuit that I wasn't part of the construction of, so I'm not sure.

Q. I'm just going to ask one more question and if you don't know that's okay, but I

JAMES BRINNEN

have to ask. Are you aware of any allegedly defamatory statement made by either Ms. Goncalves or Ms. Ketcham that was made outside the course of this case in the complaint and about the lawsuit in general?

A. I'm not sure.

Q. Are you aware of any false statement made -- withdrawn.

Are you aware of any allegedly false statement made by either Ms. Goncalves or Ms. Ketcham about the company?

A. In that complaint against us it alleges things or they're stating things that are untrue, yes.

Q. But separate from that you don't know of any other allegedly false statement that they made, either of them made?

A. I mean it's kind of hard to define that, so I'm going to say I don't know.

Q. Okay. Are you familiar at all with Google reviews or other reviews of the company made by customers? Was that anything that was ever brought to your attention in general in the course of your assisting the company?

JAMES BRINNEN

A. Not in my course of assisting the company. But yes, I'm aware of there being reviews.

Q. To your knowledge which, if any, such negative reviews do you attribute to either Ms. Goncalves or Ms. Ketcham, if you could do so?

A. I mean I don't know if you're asking for specific reviews; so if you could clarify that, I can answer your question. Is there a review you're specifically thinking about?

Q. There are. I'm asking you generally. Time permitting maybe I'll show you some of those reviews, but right now my question is very general do you attribute any negative review to Ms. Goncalves or Ms. Ketcham?

A. Yes, I do.

Q. Sorry?

A. Yes, I do.

Q. Tell me what you know about any such review and circumstances surrounding them.

A. What I know is that the only negative reviews that I've seen of the company were related to the Westhampton store -- the Westhampton Beach store. And I believe they were

JAMES BRINNEN

geared towards -- they were geared towards unfriendly staff, unhelpful staff, which is the remit of the manager which over the course of time was, I believe, both Ms. Ketcham and Ms. Goncalves.

Q. To your knowledge what specifically are any of the defendants contending that the employee did that was wrong in connection with that review?

A. I can't name a specific, I can say that the review said the staff was unfriendly, using my words not the review, I'm obviously not trying to quote something I don't have in front of me. As I recall the reviews I think there was more than one stated unfriendly, unhelpful and I believe the word "rude" was used more than once.

Q. And the review did not identify any particular employee, correct?

A. I don't recall.

Q. Is there any other review that you're aware of connected to either Ms. Ketcham or Ms. Goncalves?

A. As stated, I believe there were several that were over the course of time that

were shared.
Q. Do you have any specific knowledge about them?
A. Could you define specific knowledge?
Q. Knowledge of the circumstances or details that you can provide me.
A. That led to the generation of the negative review is that what you're asking? I'm sorry, I don't know if you heard. I was asking, are you saying if I had knowledge of the incident that led to the negative reviews or review?
Q. Yes, anything in connection with either Ms. Ketcham or Ms. Goncalves are accused of wrongdoing in relation thereto?
A. You're asking specifically about the reviews, though, I believe. So no, I don't have detailed knowledge of a triggering incident other than the incident we discussed earlier related to or that occurred around the time of Ms. Goncalves leaving. That incident generated massive negative social media.
Q. Do you have any knowledge as to whether any investigation was done to determine whether those reviews that generally said that

JAMES BRINNEN

service was horrible, that an employee were inattentive or unfriendly, whether those reviews dealt with time periods or days in which Ms. Goncalves and Ms. Ketcham were actually working on that day?

A. I do not know.

Q. Are you aware of a claim by the company against Ms. Goncalves and/or Ms. Ketcham that they inappropriately interfered with staff and customers, customer relationships of the company?

A. I missed a word that they inappropriately interfered with what? I thought I heard you say tasks, but I don't think that's what you said.

Q. Staff, staff and customer relationships.

A. That they inappropriately interfered with staff and customer relationships. I don't quite understand so I'm not sure how to answer.

Q. Do you have any knowledge that Ms. Goncalves and/or Ms. Ketcham actually interfered with any staff relationship of the company or customer relationship of the company, generally

JAMES BRINNEN

speaking?

A. I would say yes, actually.

Q. Tell me what you know about that.

A. So as far as interference with the customer I would say, you know, primarily in my head first and foremost is the incident right before Ms. Goncalves left. Again, massive social media negativity. It cost the company a fair amount of money related to that both in returns and, I believe, in follow-up activity.

I was also made aware that Ms. Goncalves fostered an atmosphere of negativity amongst the staff that caused quite a bit of challenges, so much so that Ms. Sheeler had to go there, I believe, on a day that Ms. Goncalves wasn't working to have a meeting to try to sort out the problems which amounted to favoritism by Ms. Goncalves over providing hours. And it upset people because it impacted their ability to earn money during the summer and also earn commissions.

Q. Starting with the first part of your answer, you said that you had to deal with other issues concerning the customer right before she

left. Was there any lawsuit that resulted?

A. There was no lawsuit that I know of.

Q. So what other issues are you referring to?

A. I can't recall specifically but, that's why I said I think. I believe Ms. Sheeler contacted Mr. Bowles to ask about a cease and desist letter.

MR. BOWLES: At this point I'll just interject and say, of course, don't divulge any content of any conversation that you or Ms. Sheeler had with me or any other counsel.

THE WITNESS: Understood.

MR. KATAEV: That's okay I don't need anything more than that. Okay.

Q. And the second part of your answer, the issue with Ms. Goncalves's management of the staff was only during the time that she was working, correct?

A. In that instance I described, yes.

Q. You don't have any knowledge about any interference with the staff after she left, right?

JAMES BRINNEN

A. Personally, I do not.

Q. Can you identify, if you know, who Linda Pambino, P-A-M-B-I-N-O, is?

A. I do not recognize that name.

Q. What about Anja Groth? A-N-J-A, G-R-O-T-H?

A. Not that I recognize.

Q. Are you aware of an allegation in the counterclaims that Ms. Goncalves and/or Ms. Ketcham caused the loss of revenue of $840,000?

A. I'm aware of -- I don't know how to answer it. I'm aware that there was a summary of -- I'm aware of something I was asked to put together of some aspect of store sales and revenues. I don't recall. That was quite a while ago. I don't know if it was specifically attributed to the counterclaim.

Q. Understood. Did the number $840,000 ring a bell for you? Is it something you recall recently or in connection with the counterclaims?

A. It may be, but I can't say 100 percent.

MR. KATAEV: We're going to call for production of any compilations of data

JAMES BRINNEN

that you were responsible for putting together in connection with that, and we'll follow up in writing.

Q. Is it fair to say that whatever your timekeeping procedures were in terms of Lightspeed, ShopKeep and, in general, applied to all employees at all locations?

A. Yes.

Q. And all of the employees at all of the locations were paid in the same manner, correct?

A. You said paid in the same manner?

Q. Yes, meaning Zelle or ACH, as the case may be, and now Gusto. All of them are paid in the same manner?

A. Aside from variations as to who received what. Again, with the reservation that most were Zelle, some were ACH. But otherwise the method of payment may have varied but the method of calculating and computing net pay was the same.

Q. Is it fair to say that any employee can be called upon to from time to time transport materials or merchandise between locations?

JAMES BRINNEN

A. I can't really comment in a sense it's operational.

Q. What would you say is the average number of employees that generally worked for any period of time in a given year, how many?

A. If you want to take it as of January 1 to December 31 average, taking the number per month and dividing by 12 it would probably be five or six. So it's not very high.

Q. What about accounting for turnover, how many live bodies work in a given year?

A. Again, it's a highly-seasonally staffed store. So during the season there could have been across the three locations, you know, 10 or 12, potentially, split across three locations. But that would have been for a short period of time. They're mostly college students or high school students that some would come and go within two weeks. They found out they didn't like working or some would stay for a season. In average it's difficult to come up with.

Q. Isn't it fair to say that during the peak season there were approximately 20 total during that time between all the stores?

JAMES BRINNEN

A. No, that sounds too high, we wouldn't have had 20.

Q. What was the most in any given point in time in any given season?

A. I'd have to look at the records, I can't give you a number.

Q. What records would you have to look at to determine the number of employees?

A. I would look at the clock in/clock out files.

MR. KATAEV: I call for the production of any such documents that could identify the number of employees for any given year from 2019 through the present. We'll follow up in writing.

Q. The automatic breaks that were deducted that applied to all employees, correct?

A. All hourly employees, correct.

Q. And the commission for all commissioned employees was identical, right?

A. Correct.

Q. Every single one of the employees received that compensation acknowledgment form as part of onboarding, correct?

JAMES BRINNEN

A. Correct.

Q. To your knowledge did anyone at the company train the store managers about overtime?

A. Training is throwing me because it can have connotations. Communicate for sure.

Q. Let me ask you this, in connection with anyone's pay were they provided a pay stub?

A. Yes.

Q. In what manner was that provided?

A. E-mail.

Q. What information would be contained in the e-mail pay stub?

A. Summary of gross pay, calculated deductions and net pay plus hours worked and breaks taken.

Q. It's fair to say that there were some documents produced, some e-mails produced from the defendants in this case to us containing examples of those, right?

A. I can't recall everything that we submitted. I'm assuming you're talking about submissions to Mr. Bowles. I believe we submitted samples of those, but I can't say for sure.

JAMES BRINNEN

Q. Was that e-mail made for every single week that Ms. Goncalves and Ms. Ketcham worked?

A. They would receive an e-mail every time I paid them, yes.

Q. To your knowledge did every single e-mail -- did every single such e-mail get produced?

A. When you say produced, can you clarify?

Q. Compiled and given to your attorney for your attorney to compile and send to us?

A. I don't know if every single one was produced.

MR. KATAEV: To the extent that you remain in possession of all such e-mails and to the extent that not all the e-mails were produced, the plaintiffs would call for the production of every single e-mail containing a pay stub of Ms. Goncalves and/or Ms. Ketcham for every week that they worked?

MR. BOWLES: And you'll put it in writing?

MR. KATAEV: Yes. Thank you for

JAMES BRINNEN

reminding me.

Q. To your knowledge whenever an employee, any employee left the one location in the middle of the day to go to another location and either stay there or come back, to your knowledge was that travel time considered part of their hours worked?

A. I'm not aware of a situation like that happening, so I can't comment on that.

Q. To your knowledge, was any wage and hour audit ever conducted at any point in time of the company?

A. Can you clarify if that's different from your question earlier about auditing the time for, I believe, you asked about Ms. Goncalves?

Q. Generally speaking, was any effort made to ascertain whether there was any underpayment of wages at any point in time after the lawsuit, before the lawsuit?

A. Not that I can think of outside someone contacting me and saying, hey, did you see my note last week I forgot to clock out, or I mistakenly didn't clock back in from lunch so it

JAMES BRINNEN

shows me out for the noon. I recall isolated incidents like that where we had gone back and looked at a prior week but, no, outside of that, I can't think of anything.

Q. My question specifically excludes those instances, I'm looking for a broader audit performed and you've answered my question by answering the way you did.

Now the company did change some of its payroll practices following the filing of this complaint, correct. I'm referring to the use of Gusto and the filing of employment returns, quarterly employment returns that were not previously filed, right?

A. No.

Q. You're saying that those changes that were made had nothing to do with this lawsuit?

A. I am saying that those changes were put in place ahead of that.

Q. Those changes were put in place when?

A. The changes that we have made were predicated on us finding out that there were filings problems not on this lawsuit, not predicated on this lawsuit.

JAMES BRINNEN

Q. Were there any changes that were made in payroll practices as a result of the lawsuit?

A. No.

Q. Were there any changes made in connection with payroll practices at the company after the lawsuit although not because of the lawsuit?

A. I'm not clear of what you're asking for.

Q. For example, you're saying that stuff that was implemented not because of this lawsuit but after the lawsuit, right?

A. Yes.

Q. Temporally speaking. So my question is temporally speaking after the lawsuit what other changes in payroll practices were made after at the company conceding or accepting that it's not because of the lawsuit, just after?

A. None other than what you're talking about with Gusto.

Q. Were any changes made in recordkeeping practices after the filing of this lawsuit, again, not because of just after?

A. No.

JAMES BRINNEN

Q. Are you aware of the loss of any time and/or pay records concerning Ms. Goncalves and/or Ms. Ketcham? Were any such records lost?

MR. BOWLES: I'm sorry, I really did not understand that question. Could you repeat it or read it back.

Q. Were any time and/or pay records of either plaintiff ever lost or misplaced?

MR. BOWLES: Thank you.

A. What was the last part you added?

Q. Never mind. What about schedules, were any schedules missing, misplaced or lost?

A. Not that I'm aware.

Q. And would any work application maintain a list of all the schedules?

A. I can't tell you what the maintaining procedures are.

MR. KATAEV: To the extent I didn't ask before, we'll call for the production of all the schedules from when they worked in electronic format and we'll follow up in writing.

Q. Separate and apart from the WhenIWork application, does the company generally maintain

JAMES BRINNEN

any e-mails or other correspondence concerning employees' schedules?

A. I don't know.

Q. Were you asked to perform a search of records in connection with this case by way of plaintiffs' request for the production of documents?

A. I'm not sure how to answer that. Could you be more specific for me, please?

Q. Let's take a step back and break it down. Are you familiar with the fact that the plaintiffs propounded a request for the production of documents to the defendants in this case?

A. Yes, I know that documents were requested. Actually, I believe, I know documents were requested. I know we submitted things to Mr. Bowles.

Q. Were you involved in searching for and producing those documents?

A. I certainly was involved in some of the things sent to Mr. Bowles, yes.

Q. Now, where did you search for responsive documents?

JAMES BRINNEN

A. It would depend on what I was looking for.

Q. Based on everything that you looked for, where did you search?

A. It's a little hard to say because there's been several months that's past since we submitted things to Mr. Bowles, so I'm not sure I remember everything I submitted to them. It's hard to say where it came from.

Q. All right. At least based on what you do remember, where did you search?

A. I believe I sent him exports of -- you know, I have a hard time giving you specifics. I think there were exports of data from Lightspeed, I believe. I believe there were exports from the payroll spreadsheet. I think those are the two that I can think of. I don't recall. Again, it's been quite a while since we sent things to him.

Q. So is it fair to say based on your answer that at a minimum you searched Lightspeed, and the other program that you just discussed?

A. I think that's fair, yes.

Q. Did you search generally your

JAMES BRINNEN

e-mails?

A. We've forwarded him e-mails showing onboarding, and e-mails clarifying commission policies. So I think there are a few e-mails that I shared with him, yes.

Q. Did you search your phone?

A. I don't know if I sent him anything from my phone.

Q. Would you not agree with me that to the extent you exchanged messages with either of the plaintiffs and/or Ms. Sheeler concerning the plaintiffs, that those communications would be responsive to the plaintiffs' requests?

MR. BOWLES: Object to the form.

A. I'm not sure I understand that those communications would be what?

Q. Responsive to our request.

A. I'm still not quite sure how to answer. If you're asking about content on my phone, I don't think I shared anything with him from my phone. I don't recall.

Q. So I understood that you didn't share anything from your phone. My question is, to the extent that any communications about the

plaintiffs were sought by the plaintiffs and their requests, would you not agree with me that any communications you had directly with plaintiffs through text messages and any communications you had with Ms. Sheeler about the plaintiffs, that those text message communications would be responsive to plaintiffs' requests?

MR. BOWLES: Object to the form.

A. I'm kind of struggling to understand the question.

MR. KATAEV: Okay, let me withdraw the question and say I call for the production of any text message communications between you and plaintiff Ms. Goncalves, between you and plaintiff Ms. Ketcham, between you and both of them either in a group text or in a group text consisting of more than the three of you, as well as any communications between you and Ms. Sheeler about Ms. Goncalves and/or Ms. Ketcham. We will follow up in writing.

THE WITNESS: I don't believe there's

JAMES BRINNEN

any way for me to share some of what you asked for on my phone which has a limited space. So I regularly delete text that I don't need to be there any longer. So I don't believe I have any text messages on my phone from Ms. Goncalves or Ms. Ketcham, unless I can go to their contacts which may still be there and hunt backwards. I don't know.

Q. To your knowledge, when was litigation reasonably anticipated in connection with this case?

A. I don't understand that question.

Q. Do you recall ever receiving a demand letter from my office concerning Ms. Goncalves and Ms. Ketcham?

A. I don't.

Q. With respect to Lightspeed, Clover and WhenIWork, is it fair to say that the owner or customer of those subscriptions or services are Kristin Sheeler Designs, LLC?

A. I would not say the owner of the systems because that would imply ownership of those websites. The licensed user primarily

JAMES BRINNEN

would be Kristin Sheeler Designs.

Q. Are you aware of the existence of subpoenas issued to Lightspeed and Clover?

A. Yes.

Q. Are there any documents that are relevant to this case that have not been produced?

MR. BOWLES: Object to the form.

A. I don't know how to answer that.

Q. Let me qualify that. Are there any non-privileged documents concerning the case that have not been produced?

MR. BOWLES: Objection.

A. Again, I don't know how to answer that. I've obviously sent things to my attorney that I believe are important.

Q. Was there anything that you did not send to your attorneys that you did not believe was important but related to this case?

MR. BOWLES: Objection.

A. Not that I'm aware of.

Q. Are you aware of any documents or electronically stored information that was destroyed or changed after the complaint was

JAMES BRINNEN

filed in this case?
A. None that I'm aware of.
Q. Is it fair to say that both Ms. Goncalves and Ms. Ketcham would regularly work with their hands and on their feet in performing their duties?
A. I don't know how to answer that question. They worked in a retail store.
Q. Well, their work did not involve sitting behind a desk for eight hours a day, right?
A. It's hard to say that. If you're talking about October when one customer could walk in the store they could be sitting behind a desk for seven-and-a-half of those hours.
Q. Is it fair to say that when it's slow and when a customer walks in, they nonetheless get up and work on their feet and use their hands to move merchandise, and so on and so forth?
A. My opinion no, it's not fair to say that. I've seen plenty of storekeepers and heard plenty of stories of our own staff saying "Hi, welcome in," and sitting behind a desk and not moving.

JAMES BRINNEN

Q. Did you ever observe Ms. Ketcham or Ms. Goncalves doing just that physically?

A. I don't recall.

Q. Were any deductions other than FICA withholdings made from Ms. Goncalves or Ms. Ketcham's bank?

A. Could you define deduction? Like what type of deduction are you asking about?

Q. Anything other than those, anything?

A. Not that I know of.

Q. Did any individual who worked for the company ever get treated as an independent contractor?

A. I don't know that I could answer that. Since the inception of Kristin Sheeler Designs, I don't know. I don't recall the early structures of how people were hired.

Q. Did Ms. Goncalves and/or Ms. Ketcham ever report anything to you with a concern that something the company was doing was unlawful or illegal?

A. No.

Q. Was it customary for customers to give tips?

JAMES BRINNEN

A. Not that I'm a aware of, we're not a restaurant.

Q. Was there any tip box at the register?

A. No.

Q. Were the employees ever paid in cash, any employees?

A. Not that I'm aware of.

Q. Have you or any of the defendants taken any steps to engage any expert witnesses for this case?

MR. BOWLES: Objection.

A. None that I know of.

MR. KATAEV: If you want to take another break now, we're going to start getting into exhibits with the time we have left.

We can go off the record, and ask the court reporter to give us a sense of the testimony time taken so far so that we can figure out how much time there is left.

(Recess taken from 4:24 to 4:30 p.m.)

MR. KATAEV: We previously marked the Plaintiffs' 1 and 2. We're now going to

mark Plaintiffs' 3. I'll represent to you this is a copy of the complaint in this case dated July 31th, 2025, ECF docket entry number 1.

(Plaintiffs' Exhibit 3, Complaint dated July 31th, 2025, marked for identification, as of this date.)

Q. Mr. Brinnen, are you familiar with this document?

A. Yes.

Q. Have you read it before in detail?

A. Yes.

Q. There's an allegation here in paragraph 8, which I'm highlighting for you and zooming in on, that says "Over the last three years Kristin Sheeler Designs, LLC had gross revenues exceeding $500,000 per year over the last three years." Do you know whether that's true?

A. I would have to go back to our returns to confirm numbers.

Q. Also, is it accurate to state that Ms. Sheeler from time to time in connection with her work is required to travel to the country of

India?

A. Yes.

Q. And when she does travel to India, how long of a time period does she do so for?

A. It varies, depending on her objectives.

Q. And whenever it is that Ms. Sheeler travels to India do you accompany her on each of those trips?

A. No.

Q. Have you ever accompanied her on any such trips?

A. Yes.

Q. If you look at paragraph 12, which I highlighted, it alleges that Ms. Goncalves worked from May of '21 through April of '23. Do you have any reason to dispute that?

A. I believe she quit right before Memorial Day in 2023 but, generally, I believe it's correct.

Q. Same question on paragraph 13 which was Ms. Ketcham's period of employment from September '22 to December of '24. To your knowledge is this accurate?

JAMES BRINNEN

A. Again, I didn't remember when Ms. Ketcham started so it could be.

Q. This does not refresh your recollection, does it?

A. I'm sorry, could you repeat that?

Q. Reviewing this allegation does not refresh your recollection, does it?

A. No, I would have to go back to see when her onboarding materials were sent.

Q. Reviewing paragraphs 36 and 37 and 38 together, can read that and let me know when you're done?

(Pause)

A. Okay, I've read it.

Q. Did Ms. Sheeler ever relate to you anything about this conversation concerning being paid for time spent interviewing applicants?

A. No.

Q. Moving on to Plaintiffs' 4, which I'll represent to you consists of defendants' initial disclosures.

(Plaintiffs' Exhibit 4, Defendants' initial disclosures, marked for identification, as of this date.)

JAMES BRINNEN

Q. Are you familiar with this document?

A. Maybe if I see more of it.

Q. I'll scroll through and sort of guide you as to what it contains. It's a document submitted by defendants. It lists witnesses that may have knowledge about the case, a description of documents, damages and a description of documents, a computation of damages and also a notification about any applicable insurance policy that may cover the claims.

A. Okay.

Q. Did you review this document before it was submitted?

A. I don't recall.

Q. I'm going to at least inform you that we're now looking at defendants' first production of documents, which is Bates stamped D1 through D16. And I want you to read this bottom e-mail in this two e-mail chain first, and then the top part.

MR. BOWLES: I'd ask if you're going to ask the witness questions about it that it be marked as an exhibit first.

MR. KATAEV: So we can mark D1 as

JAMES BRINNEN

Plaintiffs' Exhibit 5.

(Plaintiffs' Exhibit 5, Document Bates stamped D1, marked for identification, as of this date.)

A. So you want me to start reading the highlighted e-mail?

Q. Sure. So I can ask you questions about it.

A. It says "Hello Teresa, so nice of you to come into and start with us at NIBI. Jim, I am e-mailing you and Teresa to let you know she will need her paperwork for NIBI-MTK. Teresa is our new co-manager at Westhampton Beach. Please send her all documents to sign and her first day will be June 7th."

Q. You don't have to read it out loud. I just want you to read it and familiarize yourself with it.

(Pause)

A. Okay.

Q. Starting with the initial e-mail from Ms. Sheeler, you were copied on this e-mail, correct?

A. Yes.

JAMES BRINNEN

Q. And in this e-mail there's a reference to Ms. Goncalves being a co-manager at Westhampton, right?

A. I see that.

Q. To your knowledge who was the other co-manager?

A. I can't recall.

Q. And to your knowledge is that co-manager still employed by the company?

A. No, I believe the situation was coming about because that other person was not doing well.

Q. So reading the tea leaves here Ms. Goncalves was brought in to, quote/unquote, co-manage so she can learn everything from the other co-manager until it was time to let the other co-manager go?

MR. BOWLES: Object to the form.

A. I can't talk to the operational decision. I believe the concern was that the person who was trying to manage the store at that point wasn't keeping up.

Q. Were you involved in the decision to terminate that individual?

JAMES BRINNEN

A. You're making an assumption that the person was terminated. I don't believe anyone was terminated.

Q. I'm just asking, I appreciate you clarifying. Now this e-mail from Ms. Sheeler did not contain these attachments at the time it was sent, correct?

A. Based on the screen, I can't tell. There's no way for me to know that from the screen.

Q. Isn't it true that Ms. Sheeler addresses you in her e-mail letting you know that Ms. Goncalves will need her paperwork?

A. Yes. So on content yes. Based on just what you're showing me on the screen, it's hard -- you can't draw a conclusion based on what you're showing me on the screen, but from content, yes, those were probably be from me.

Q. Going up to the e-mail that you sent in response, you say that "We can talk about logistics like hour and sales tracking this week." Do you see that?

A. Yes.

Q. Did you ever have that conversation

JAMES BRINNEN

with Ms. Goncalves that week or thereafter?

A. I can't recall what we talked about when. I know I talked with her several times as she was beginning.

Q. To your knowledge, what did you say to her and what did she say to you in connection with your discussion about the logistics regarding hours and sales tracking?

A. I can't recall.

Q. Is it fair to say that whenever you have a discussion about logistics like hours and sales tracking that generally speaking it's the same thing you tell every new employee?

A. Yes.

Q. So what is it that you generally say as a matter of practice to every employee when they come in about logistics concerning hours and sales tracking?

A. Primarily this is how you clock in. You need to clock in at the start of every shift. You need to clock out at the end of every shift. If you ever have a problem with that, let me know it right away.

Again, I don't get involved in store

operations so this was early on when I would have had the discussion with Teresa about it. But beyond that, I don't have a typical discussion with anybody. The operations are handled outside of my remit.

Q. And you testified about what you typically say about hours tracking what do you typically say about sales tracking?

A. I can't tell you what that reference is at this point in time. I don't recall what that would have been in reference to. Most likely commission.

Q. So in this e-mail Ms. Sheeler asks you to handle a function of operations of the company, right?

A. I'm not sure how to answer that. She asked me to send her paperwork.

Q. And that's typically what you were asked to do in connection with the company for all employees, isn't it?

A. Yes.

Q. And I think I got a good sense of what it is that you do for the company, can you tell me in relation to what you do what does Ms.

JAMES BRINNEN

Sheeler do for the company?

A. I would send out paperwork like this. I enter people into the systems they need to have access to. I'll answer any questions they might have about -- actually, I really don't answer questions anymore about how they do things. I would send paperwork like this and enter them into systems and get them prepared to be paid.

Q. I'm marking as Plaintiffs' 6, solely the page Bates stamped D11 next to the company name that I've highlighted "Kristin Sheeler Designs, LLC." There's a slash and it says "d/b/a NIBI-MTK" with a trademark symbol.

(Plaintiffs' Exhibit 6, Document Bates stamped D11, marked for identification, as of this date.)

Q. Do you see that?

A. Yes.

Q. Do you have any knowledge as to whether the mark "NIBI-MTK" is something that the company or Ms. Sheeler actually obtained a trademark for?

A. Yes.

MR. KATAEV: Referring to Plaintiffs'

JAMES BRINNEN

7, which is a document Bates stamped D19 through D30.

(Plaintiffs' Exhibit 7, Document Bates stamped D19 through D30, marked for identification, as of this date.)

Q. This is a compilation of electronically-stored information concerning Dina's hours worked, is that right?
A. Yes.
Q. Is this one of the documents that you created after this lawsuit started?
A. No.
Q. Can you describe what that document is?
A. It's an excerpt from the spreadsheet that tracks people's payroll.
Q. When was this first created?
A. Did you say why or when?
Q. When.
A. I don't recall. It was quite a while ago.
Q. So is it fair to say that every green amount under the Paid column represents payments for the hours worked for the preceding week?

JAMES BRINNEN

A. No, it represents calculated gross pay.

Q. What is this negative number under the commission tab?

A. That would be the calculation of deductions with an offset by commission. So let's say in the period you're highlighting, if there was a $200 commission that would say $200 minus $307 and come up with a deduction of $107. So it's effectively rolled commission into compensation.

Q. If no commissions were paid, does the negative number reflects FICA and withholdings, right?

A. Yes.

Q. How do you calculate FICA and withholdings?

A. Based on the downloaded tax payrolls that I got.

Q. Where did you get the tax tables?

A. IRS website, New York State website.

Q. So you just figured out the amount of FICA and withholdings on your own?

A. It's described in those documents.

JAMES BRINNEN

Q. What documents, the ones that you just testified about or this one or something else?

A. No, the downloaded documents from the agencies.

Q. Do you have any accounting background or experience?

A. I have some accounting, yes.

Q. What's your accounting background?

A. Courses in school and the fact that pretty much the last 25 years I've been working with finance teams from a systems perspective and solutioning perspective.

Q. Help me understand this. The first week has 19.25 hours, 5 plus 7 is 12?

A. Did you ask me a question? I didn't quite hear.

Q. No, withdrawn.

So focusing on the second week that Ms. Ketcham worked, focusing on these dates. If you add up the hours which I'm doing on the screen: 7 plus 6 plus 7 plus 6.75 plus 6.75 plus another 6.75 that's 40.2. And looking at the middle of D19 for the week of October 23rd

JAMES BRINNEN

through October 29th, there's a reference under the gross pay and commission tabs that says "MTK hours, BH hours." Do you see that?

A. Yes.

Q. Why do you distinguish between the two?

A. I would have to go back and look at the file.

Q. So you refer to a different file one from Montauk and one from Bridgehampton to determine the hours that are placed on the spreadsheet, correct?

A. No, not correct.

Q. Explain.

A. The hours were downloaded from the system put in here, but that's why I'd have to go back and look, there is another tab that has the detailed information so I'd have to go back and see what that was that I was indicating here. Offhand, I don't recall.

MR. KATAEV: We'll send you an interrogatory asking you about what the circumstances of this was.

It looks to me based on it that

JAMES BRINNEN

there's a deduction of 15.23 hours and then an addition of 15.23 hours. It doesn't make a lot of sense to me, but presumably you will be able to explain it by responding to an interrogatory. So we'll, I'm going to say the words "Call for a production," so that we have a reminder in the transcript to send you that interrogatory, but we'll follow up with that with an interrogatory.

Q. Focusing your attention on the Method column from the beginning of ACH all the way through the middle up to right where we reach this week where there's the Montauk hours and Bridgehampton hours there's an X, what is your explanation for the meaning of X under that column?

A. Without going back to the source file, I can't tell you exactly other than the most likely. Every time, to make sure I kept track of the calculation of this snapshot of a spreadsheet that you have, which is actually dozens of columns-wide with calculations for everybody. Just when I calculated it and then

JAMES BRINNEN

cross-checked it with what I was going to enter to pay, I would put an X next to the name to make sure I knew that I paid them. I probably just copied it across. It became irrelevant at some point to note whether I was paying them the ACH or Zelle. So I'd have to look at the file specifically to tell you, but I'm pretty positive that's what it is. It was just copied across. Just that column. Not of the actual, obviously, pay data.

Q. Now focusing your attention to the time period after this Montauk hours and Bridgehampton hours, is it fair to say that there's no record of the actual clock in and clock out for each day that Ms. Ketcham worked from October 30th through November 21st of 2022?

A. No, it's not fair to say. You'd have to look at the Lightspeed system to see. What this is telling me is that she worked -- what this is telling me is that at some point I stopped entering every single day because I was just rekeying data, and I started entering the gross hours for the week. Actually, you know what, actually no. So I think we can see if I

open up the file I think you would see that that 6.4, the negative 6.4 is actually a formula that says -- let's say it says 6.9 minus .5 because she worked one day that week she worked for 6.9 hours deducted out the half and it does the math. So if you look above say at the last one that has the math in there. So if you look at the math.

Q. Right, I get it. Okay.

A. So that's why the negative number was in there because the first highlighted column 10.15 to the second column 16.45 computed the gross hours. .5 would have been multiplied by the number of shifts, and it would have created the deductions. So when I started just putting in the hours of the week, you put it in as a negative and then it transfers over to the other column as a positive. That's all it is.

Q. So it's fair to say based on your review of this that this is not an accurate and contemporaneous time record, right?

A. It absolutely is an accurate and contemporaneous time record.

Q. Let's set aside accurate. It's not a contemporaneous time record. It's an

JAMES BRINNEN

after-the-fact-time record, right?

A. Maybe I don't understand the use of the word "contemporaneous," can you explain it to me?

Q. Contemporaneous means a record that reflects when the person clocked in and out at the time that it occurred. This document was created after the clock ins and clock outs?

A. This document was created based on the clock ins and clock outs, yes.

Q. So the documents that you used to enter this information of the accurate and contemporaneous record, whereas this is not a contemporaneous record it was created after the fact, right?

A. This record was created after the clock ins and clock outs.

Q. To your knowledge, did you ever produce the actual time records that you reviewed to make this document?

A. I don't recall.

MR. KATAEV: So to the extent you haven't done so, the plaintiffs are calling for the production of all of the

JAMES BRINNEN

actual time records that this spreadsheet is based on. We'll follow up in writing.

Q. Do you see this red rectangle surrounding the bottom of D22. And going all the way down through D23 to the top of D24?

A. Yes.

Q. Do you have any knowledge as to what this red circle represents?

A. I know what the data it's highlighting is. I don't know what your intention with the red square is.

Q. When you submitted this document to your attorney, did this red circle exist? Red rectangle.

A. I can't recall.

Q. Can you at least tell me whether this Bates stamp existed at the time you provided it to your attorney?

A. The date stamp?

Q. It's a Bates stamp, B-A-T-E-S?

A. I don't think a Bates stamp is something I would have generated. So I wouldn't have submitted something to him with a Bates stamp on it.

JAMES BRINNEN

Q. So same question for this red rectangle, was it there when you submitted it to your attorney?

A. I don't know. I can't remember the format of what I sent him.

Q. Do you have any idea what the red rectangle represents?

A. I don't know the intention of the red rectangle. I do recognize the data in it, though.

Q. Focusing your attention to D23, can you explain why there are two separate sets of hours for each week?

A. Yes.

Q. Tell me.

A. These are periods that Ms. Ketcham had requested overtime. So there's a calculation of overtime hours.

Q. So 37.50 represents the 40 regular hours with half hour meal deductions for each day and the .98 represents overtime?

A. Correct.

Q. Looking at the bottom of D26, do you have any idea why in this section there's a red

rectangle around it?

A. It looks like the file is highlighting instances where Ms. Ketcham was getting overtime. Based on the contents that's what it looks like.

Q. But you did not add it, right, you did not place the red rectangle there?

A. I don't recall. I'd have to go back to the file I sent him to see if I put it in there.

Q. Focusing your attention on the middle of D29, for the week of November 3rd through November 10th or at least November 9th of 2024, there's a note here that says "Original paid missing Friday 8th" and there's an X in brackets "but the second ACH could catch this up." Do you see that?

A. Yes.

Q. What does this mean to you, what happened here?

A. It means that there was a miss of time included in the payroll calculation for Friday the 8th, and there was a second separate ACH made to pay it.

JAMES BRINNEN

Q. Friday the 8th refers to November 8th?

A. It looks like it, yes.

Q. Do you know why that occurred?

A. I can't from the content here. No, I have no idea why it occurred, it could be any number of reasons. Actually, there probably is only one or two reasons, but I don't know why it was specifically.

Q. Focusing on closer to the bottom of D29 there's an $800 underneath the total pay for the week of December 14th through December 20th, can you tell me what this $800 refers to?

A. I would have to look at the original file to confirm, but based on timing it is probably a bonus.

Q. A holiday bonus?

A. I don't know if I'll call it a holiday bonus. It's more of an end of the year bonus but, you know, not to nitpick the terms.

Q. I believe that was Plaintiffs' 7, if I'm mistaken, please let me know.

MR. BOWLES: Mr. Kataev, I presume after the exhibits you're going to send

JAMES BRINNEN

out the exhibits after you separate them out?

MR. KATAEV: I'm going to identify the exhibits with the Bates stamp and I'll send them out. I can't promise you it will be today with the late hour on a Friday evening, but I can try to do it on Monday.

MR. BOWLES: As long as someone does, I appreciate it.

MR. KATAEV: Plaintiffs' 8 will be marked with D33 through D35. And my question is going to focus primarily on the chart at the bottom of D35.

(Plaintiffs' Exhibit 8, Document Bates stamped D33 through D35, marked for identification, as of this date.)

Q. These are a bunch of examples concerning how commissions work. I want to focus your attention on the store target with $10,000, can you tell me what time period represents $10,000?

A. No, there is no time period. That's an example.

JAMES BRINNEN

Q. Were you involved in creating this commission?

A. Yes.

Q. Do you know if this is a weekly target, bi-weekly target, or a monthly target?

A. I mean that is not a specific target. It's representative of if there is a target set so it doesn't have a time frame, it's just an example of how a kicker would work.

(Plaintiffs' Exhibit 9, Document Bates stamped D40, marked for identification, as of this date.)

Q. Mr. Brinnen, all I want to know is does this date reflect when you made the switch from individualized commission versus pooled commissions or is it at some other page?

A. No, there was never individualized commissions, it was always pooled. As we discussed earlier I believe there was a one-month period where we attempted to have people track their contributions and it did not go well; so effectively the commissions have always been pooled.

MR. KATAEV: Let's go off the record

for a second.

(Discussion off the record)

MR. KATAEV: During an off the record conversation we briefly discussed the meaning of a term used by plaintiffs at the bottom of D44. I am exercising my discretion not to ask any further questions of the witness about that exhibit.

Let's take a break here. It's now 5:15, and we'll come back at 5:20. I believe I have some more exhibits to go through, but I want to give everyone a break while I pull them.

(Recess taken from 5:15 to 5:20 p.m.)

MR. KATAEV: I believe we're up to Plaintiffs' 10 which is going to be marked as D48 through D52.

(Plaintiffs' Exhibit 10, Document Bates stamped D48 through D52, marked for identification, as of this date.)

Q. Mr. Brinnen, can you describe what this document is?

A. Can you expand it a bit, so I can see

JAMES BRINNEN

what it is?

MR. KATAEV: Let the record reflect that I zoomed in to 200 percent.

A. That is an export from Lightspeed from July 1, 2022 to whatever the date is at the bottom. That is an excerpt of the actual clock in/clock out data that's contained in Lightspeed.

Q. It says "Raw data," do you see that?

A. I do.

Q. What does that mean to you?

A. Meaning it's unfiltered, untouched. The only thing I would have done with this is sorted it, but I didn't change anything for formatting or anything else. It's just literally an export from Lightspeed.

Q. This means that if it was edited this would not contain edits for the time records, right?

A. Can you rephrase that, I'm not quite sure what you're asking me.

Q. So you said it's the actual data that was inputted. My question is given your prior testimony that edits were sometimes made for hours, does this contain the edited hours or the

JAMES BRINNEN

original unedited hours?

A. No, raw. When I would use the term "raw," I mean that this is a direct export that's untouched from Lightspeed. This is what's in Lightspeed. I mean I can export it today and it would show the same way.

Q. Before or after?

A. Before or after what?

Q. Edits.

A. Oh, I see what you're asking. The fact that it still shows 23.46 means that it has not been edited. On the second row there on July 2nd, I would have to go back and look. I can't say there was 100 percent consistency, if I found a problem with someone's time. If I fixed it in Lightspeed and redid it, redownloaded it or if I just adjusted it in the payroll file, I honestly cannot remember and it's possible I did one or both of those things at different times.

Q. But based on your testimony now, is it fair to say that you believe that this is the before edits of raw data of clock ins and clock outs?

A. I'm starting with the before edits.

JAMES BRINNEN

You're indicating that I edited things. But based on what we're saying this is pure data straight out of Lightspeed. That is not touched, not edited or anything.

MR. KATAEV: Going to now, I believe, Plaintiffs' 11.

(Plaintiffs' Exhibit 11, Document Bates stamped D53 through D62, marked for identification, as of this date.)

Q. This document is Bates stamped D53 through D62. This is the same data report for Dina Ketcham, right? Whereas, the prior one was for Ms. Goncalves, right?

A. It looks to be that way, correct.

Q. And under the location tab for both of them, it delineates which location the employee worked for the day, correct?

A. That is a Lightspeed field. I believe that should have been based on where they clocked in, but I'm not 100 percent positive.

Q. Based on everything you know, is it fair to say that the NIBI-MTK location is the flagship location in Montauk?

A. Yes.

JAMES BRINNEN

Q. Based on the same knowledge, is it fair to say that the NIBI-MTK-BH refers to the Bridgehampton location?

A. Yes.

Q. Is if fair to say referring to D54, the time stamp for December 27, 2022, that NIBI-MTK-WH is for the Westhampton location?

A. Yes.

MR. KATAEV: Moving on to Plaintiffs' 12, D63 to D83.

(Plaintiffs' Exhibit 12, Document Bates stamped D63 to D83, marked for identification, as of this date.)

Q. Can you identify what this report is?

A. I would have to go back and look at the production of this, but this looks like it's the same excerpt you were looking at earlier when you had the red rectangle around certain hours that that was an export from the payroll file, because it looks to be an excerpt from the payroll file.

So corrected here refers to the fact that it's, I guess, you're scrolling down you scrolled past the time where -- I'm not sure if

JAMES BRINNEN

it was Dina's or Teresa's hours. It showed 94.26 hours. I obviously didn't pay her for 94 hours in one stretch because that's a mistake. So this would show what was corrected and what was actually paid.

Q. Just looking at the first four dates here from June 7, 2021 to June 10th of '21, it's fair to say that rounding is employed here, because she's consistently marked as coming in at 10 and leaving at 7, right?

A. Yes, I can see that. I see that.

Q. And we can agree that the statistical likelihood that Ms. Sullivan and/or Ms. Goncalves coming in at 10, four days in a row is unlikely, right?

A. It's possible they signed in at exactly the same time the same way a couple of days in a row, but I see what you're asking.

Q. Under the "Commission-withholding tax" on the right there's a number that's in decimal format that says "For the first week of the 23.48567," can you explain what that is?

A. I would have to go back to the file to confirm the calculation there, but it looks

like a commission was -- so that column Commission-Withholding indicating that the column either contains just withholding or contains commission minus withholding. So the $23, obviously, she didn't incur only $23 in withholdings only in that period. That means there was a commission lumped in there. And the next period 205, there was no commission. The negative 205, the following period, there would have been a commission included in there.

Q. It's very similar to that first document we looked at, right, the one that you manually did?

A. You would have to show me the one, when you refer to it as the first document. But there was an excerpt earlier we were looking at, there was an export from the payroll system. This is the same. This is an export also from the payroll system.

Q. Okay. Now going down to D64, you highlighted the 0 to 0 time record, indicating zero hours worked that day for July 28th, 2021, correct?

A. I see the highlights, yes.

JAMES BRINNEN

Q. Did you physically highlight that?

A. I'm the only person to access this file. So if it would have been me, I have no idea what it's indicating at this point in time from that period without looking back.

Q. So let me ask you: Was this export made after this lawsuit was filed?

A. The export, I believe, is part of the discovery that was requested. So I can't tell you specifically when this was done. You'd have to look at the date stamp on the file.

Q. For now my question is, when you exported this for purposes of producing documents in connection with discovery in this case, was the highlight already there in the exported file or did you add this highlight after you exported the file?

A. I have no idea, I cannot recall.

Q. Do you have any idea why you would highlight the five-hour day work on July 31st, 2021?

A. I cannot recall.

Q. We didn't cover this, but just for the sake of the record do you have any knowledge

JAMES BRINNEN

as to why Ms. Goncalves is referred to as Teresa Sullivan in this document as opposed to Teresa Goncalves?

A. She was introduced to me as Teresa Sullivan.

Q. So you don't know her as Teresa Goncalves and you don't know why there was a change, correct?

A. I know now of her as Teresa Goncalves from this proceeding. And my understanding is that the name change -- my assumption is that the name change is related to, I believe, she went through a divorce but specifically why she did it I don't know. You'd have to ask her that.

Q. If you look at D67, all the prior highlighted entries highlighted both the start time and the end time for the particular day. In these entries on D57 from November 6th, 11th and 12th, 2021, it's only the start time is highlighted.

Does that refresh your recollection as to why these particular time entries are highlighted?

A. It does not.

JAMES BRINNEN

Q. Did anyone other than you have any responsibility in exporting these files and/or producing them?

A. No.

Q. Looking at D78, there's a December 4 through 7th, 2022 entry of zero hours worked, because Ms. Goncalves was sick.

My question is is this something that was contained within the exported file when it was exported or was this exported after the fact?

A. I can't answer when information was added without having looked at the file, but I do need to correct you. It was not zero hours because she was sick. If you look at the entire column of data, for several months now it was zero hours because she was moved to an annualized salary.

Q. Oh, I see. So because she was a salaried employee it no longer reported the number of hours worked, correct?

A. Not in this system she still needed to log in and out to compile her number of hours computed for commission.

Q. So there's some other way of

JAMES BRINNEN

obtaining her actual hours worked for these time periods?

A. It's all Lightspeed as we've talked about.

MR. KATAEV: To the extent it was not produced, we are calling for the production of all clock ins and clock outs for the time period that this Plaintiffs' Exhibit 12 does not contain that information. We'll follow up in writing.

Q. Referring to D82, do you have any understanding why there's a dotted line rectangle surrounding the week for the time period between April 16th of 2023 through April 23rd of 2023?

A. I believe it's highlighting the period she was paid for vacation.

Q. Did you make that highlight?

A. I'd have to look back at the original file.

MR. KATAEV: Let's mark this as Plaintiffs' 13.

(Plaintiffs' Exhibit 13, Document Bates stamped D84 through D108, marked for identification, as of this date.)

JAMES BRINNEN

Q. It's the same report for Ms. Ketcham, Bates stamped D84 through D108. Can you identify this document?

A. It's the export we've been looking at, yes.

Q. Just to clarify for both of these reports, 12 and 13, you were the individual who exported it from Lightspeed, correct?

A. This is not an export from Lightspeed. This is an export from the payroll system.

Q. What is the name of the payroll?

A. It's managed by Excel.

Q. So when you have here that it's corrected from Lightspeed clock that's just the title that you gave it?

A. Yes.

Q. I'm sorry, I misunderstood your answer of the name of the payroll system, can you repeat it? It's just an Excel file?

A. Correct.

Q. This is an Excel file that you maintain?

A. Correct.

JAMES BRINNEN

Q. Did you manually enter this information or was there a CSV file or an Excel file that you exported directly from Lightspeed?

A. A CSV file exported for most of it. I believe there was a period when I stopped doing the export and just cross-keyed it, but I couldn't tell you when I started doing which.

Q. Do you know what the term or acronym CSV stands for?

A. If you're asking about CSV?

Q. Yes.

A. It stands for comma separated value.

Q. In other words it is a file that is created by identifying these fields and providing information separated by commas delineating which column it belongs to, correct?

A. From a technology perspective not a hundred percent correct, but close enough.

Q. Okay. I'll accept the kudos in any form, I can get them. It's fair to say that CSV files are not exported in this manner looking like this, correct?

A. Could you clarify "in this manner" and "looking like this"?

JAMES BRINNEN

Q. The blue text with the information aligned the way it is with the time entered and having the blue sheet in the background?

A. CSV files are unformatted, typically. The column format would be the same.

Q. So it's fair to say that after you exported the CSV, file, you modified it as least as to the format, correct?

A. No, I did not modify the CSV file.

Q. How does the blue shade get in there, when based on your testimony the CSV file would not be formatted in that manner?

A. The CSV file was exported the date it was copied across to this Excel file where we're making it easier to read and work with.

Q. But you changed the format, correct?

A. Not in the CSV file. The CSV file remains exactly as it remains. You're not able to save formatting in the CSV file. This is an Excel file you're looking at.

MR. KATAEV: Since the CSV file has not been produced based on my review of the production of documents, we're going to call for the original CSV file without

any formatting on each of these reports. We'll follow up in writing.

Q. Now focusing your attention on the page Bates stamped D92 there are several weeks, three of them starting with the week beginning and ending June 25th of 2023 until July 1st of 2023 and the following two weeks where the Override column is highlighted. Do you see that?

A. Yep.

Q. Explain what the Override column means and why it's highlighted for these particular weeks?

A. I would have to look at the source file to confirm, but I believe you're showing the exact same thing you showed earlier with the red rectangle that this is weeks where overtime pay was calculated.

Q. Generally speaking, what does it mean when there's data in the override file?

A. In this case it's taking that 141 and adding it directly to the pay line.

Q. So in other words this means that additional compensation of $141.45 was paid to Ms. Ketcham, correct?

JAMES BRINNEN

A. It would have been grouped with the $862.50, yes.

Q. And is this additional compensation being paid because it was owed from a prior week and was not timely paid?

A. No, I just said to you this is the same excerpt from earlier that's got the red rectangle. These are overtime hours.

MR. KATAEV: We're done with 13. Plaintiffs' 14, an e-mail exchange which is D156 through D167.

(Plaintiffs' Exhibit 14, Document Bates stamped D156 through D167, marked for identification, as of this date.)

Q. I guess we can start from the earliest e-mail. Please read it and let me know when you're done.

(Pause)

A. Okay.

Q. The second e-mail starts at the top. Let me know when you want me to scroll.

A. Yes.

(Scrolling)

Q. And there's, I guess, an image, an

excerpt from a spreadsheet. I just want to ask you before you continue reading: It is cut off and is not showing the full text as it was in the e-mail when it was sent, correct?

A. It appears so, yes.

MR. KATAEV: We're going to call for the production of a clearer copy of D156 we'll follow up in writing.

Q. But for now, please take the time to read the rest of the e-mail and let me know when you want me to scroll.

(Pause)

A. Okay.

Q. All done?

A. Yes.

(Scrolling)

MR. KATAEV: Let the record reflect I'm scrolling down to D157, and highlighting the remainder of the e-mail.

A. Okay.

Q. So based on these e-mails, the discrepancies in the cash we discussed earlier are quite minimum, weren't they?

A. In this example, the discrepancies

are small, yes.

Q. Are you saying that it was a daily occurrence that there was these $3 and $1 missing from the cash envelopes?

A. No, I don't know that I could qualify it as a particular cadence at this point without going back.

Q. And sometimes the discrepancies were a surplus of monies, correct?

A. I could see that in this instance. I can't say if that's also a typical discrepancy.

Q. Did Ms. Goncalves respond to your e-mail?

A. I do not recall a response from her, but it's possible. I don't remember it, but I don't recall one.

Q. In this e-mail you took the time to calculate the total discrepancy, and it accounted for $37.32 missing, correct?

A. I can see it says that there, yes.

Q. You did, in fact, deduct $37.32 from Ms. Goncalves's final payment, didn't you?

A. That's what it says there, so I wouldn't have said it and not done it.

JAMES BRINNEN

Q. In that regard it's fair to infer that the company has been made whole for any difference in cash at least for this period, correct?

A. In this instance, it looks like a yes.

Q. So I'm not marking it but I want the record to reflect that I'm going through D177 through D184, and you're observing with me that these contain e-mails from yourself and Ms. Ketcham with her weekly compensation?

A. I can't read it because the text is small, but what's that's what it appears to be.

Q. Let the record reflect that I made it bigger so the witness can look at the example.

Can you confirm it?

A. Yes.

Q. My question is, did you find the same weekly e-mails for Ms. Goncalves and/or Ms. Sullivan?

A. I don't recall if those were submitted or not.

MR. KATAEV: So to the extent they have not been produced, I'm going to call

for the production of all weekly, for lack of a better term, pay stub e-mails between the company and Ms. Goncalves also known as Ms. Sullivan. We will follow up in writing.

(Pause)

MR. KATAEV: I think we're up to Plaintiffs' 15, if I'm not mistaken. It's Bates stamped D232 and D233.

(Plaintiffs' Exhibit 15, Document Bates stamped D232 and D233, marked for identification, as of this date.)

Q. Can you identify what these two documents are?

A. Yes.

Q. Go ahead.

A. This is an export from our banking system showing in this case payments made via Zelle to Ms. Goncalves.

Q. What's the name of the banking system?

A. Our bank is Chase.

Q. And it's another CSV file that you exported?

JAMES BRINNEN

A. I believe an export from the bank comes out as a CSV, yes.

MR. KATAEV: Let me check my notes with the few minutes I have left and see if I have anymore questions.

(Pause)

Q. Were you involved in the selection of counsel to defend you in this case?

A. Could you repeat, so I understand what you're asking me?

Q. Were you involved in the selection of who is representing you in this case?

A. And you're referring to Mr. Bowles?

Q. Yes. Well, the law firm.

A. Not specifically, no.

Q. Are you involved in or are you privy to the amount of money spent on legal fees so far?

A. I couldn't give you a grand total. Yes, I know of the fees.

MR. KATAEV: Okay. Mr. Brinnen, I want to thank you for your patience and professionalism today. Depositions are not an easy thing to go through, and you

JAMES BRINNEN

were a complete gentleman. I have no questions.

THE WITNESS: Thank you.

MR. BOWLES: I have no questions for the witness.

MR. KATAEV: So we'll be ordering a regular copy. PDF only.

(Time noted: 5:57 p.m.)

______________________________

JAMES BRINNEN

Sworn and Subscribed

this_____day of _____, 2026.

____________________

Notary Public

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, LISA HIESIGER, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That JAMES BRINNEN, the witness whose deposition is hereinbefore set forth, was sworn and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of September, 2026.

Lisa Hiesiger

LISA HIESIGER

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JAMES BRINNEN | Mr. Kataev | 5 |


E X H I B I T S


| PLAINTIFFS' | | PAGE |
|---|---|---|
| Exhibit 1 | Screenshot image of an application from the app store | 158 |
| Exhibit 2 | Blank notice and acknowledgment of pay rate and pay date form | 159 |
| Exhibit 3 | Complaint dated July 31th, 2025 | 212 |
| Exhibit 4 | Defendants' initial disclosures | 214 |
| Exhibit 5 | Document Bates stamped D1 | 216 |
| Exhibit 6 | Document Bates stamped D11 | 221 |
| Exhibit 7 | Document Bates stamped D19 through D30 | 222 |
| Exhibit 8 | Document Bates stamped D33 through D35 | 234 |

Exhibit 9 Document Bates stamped D40 235
Exhibit 10 Document Bates stamped D48 through D52 236
Exhibit 11 Document Bates stamped D53 through D62 239
Exhibit 12 Document Bates stamped D63 to D83 240
Exhibit 13 Document Bates stamped D84 through D108 246
Exhibit 14 Document Bates stamped D156 through D167 251
Exhibit 15 Document Bates stamped D232 and D233 255


INFORMATION REQUESTED

| PAGE | LINE |
|---|---|
| 43 | 8 |
| 86 | 3 |
| 193 | 24 |
| 196 | 12 |
| 198 | 15 |
| 202 | 19 |
| 225 | 22 |
| 229 | 23 |
| 246 | 6 |
| 249 | 22 |
| 252 | 7 |
| 254 | 24 |

ERRATA SHEET

TERESA GONCALVES DINA KETCHAM v KRISTIN SHEELER
Date of Deposition: September 18, 2026
Name of Deponent: JAMES BRINNEN

| PAGE | LINE(s) | CHANGE | REASON |
|---|---|---|---|
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |
| _______ | ________ | ____________ | _________ |

A
**A-N-J-A** 193:6
**a.m** 1:14 129:2
**ability** 32:13 78:10 78:15,18 80:21 81:5 99:13 191:20
**able** 17:8 54:7 56:10 56:13 131:6 151:4 226:5 249:19
**above-entitled** 1:20
**absent** 54:18
**absolutely** 76:4 84:21 94:24 96:8,12 148:17 228:22
**absorbed** 35:15
**abuse** 184:16
**abusing** 181:13
**accept** 248:20
**acceptable** 182:5
**accepting** 165:25 180:3 201:18
**access** 52:8,8,12 55:19,22 56:15,21 56:22 57:2 78:4,10 97:15 98:21 99:6,18 99:21 158:12 176:20 177:7 221:5 243:3
**accessed** 56:8
**accessories** 37:18
**accidentally** 83:9
**accompanied** 213:12
**accompany** 213:9
**account** 99:24 117:11
**accountant** 27:18 28:5 170:14
**accounted** 253:19
**accounting** 18:19 26:19,20,21 27:3,7 27:10 28:2,5,11,18 28:23 29:5,7,11 44:22 163:3 164:11 164:17,20 165:2 167:4,9 171:24 172:15,17 195:11 224:7,9,10
**accurate** 54:16 212:23 213:25 228:20,22,24 229:13
**accusation** 184:14
**accused** 189:14
**ACH** 169:11,13,14 194:14,19 226:13 227:6 232:17,25
**achieved** 110:8
**acknowledge** 4:4,8 90:15 180:4
**acknowledgment** 124:9 125:23 126:10,13,22 159:5 159:8,12 160:23 161:2,9,20,22 196:24 259:14
**acronym** 248:9
**act** 92:8 178:7
**action** 1:20 258:16
**activity** 122:18 143:2 191:11
**acts** 33:5
**actual** 76:19 98:3,8 227:10,15 229:20 230:2 237:7,22 246:2
**add** 90:2 92:5,22 93:21 184:3 224:22 232:7 243:17
**added** 202:11 245:13
**adding** 250:22
**addition** 39:5 226:3
**additional** 150:19,21 250:24 251:4
**address** 11:23 12:11 41:7 65:22
**addresses** 41:3,10 218:13
**addressing** 23:24
**adjust** 81:15
**adjusted** 100:9 153:8 238:18
**adjustment** 85:4 149:22
**adjustments** 53:23 81:21 106:24 130:21 153:5
**admin** 99:24
**administer** 4:10
**administered** 4:9
**Administration** 173:10,16
**administrative** 56:6 56:15,21 76:8 111:14
**administrator** 55:19 55:22 56:4,23,25
**ADP** 52:20
**advance** 108:2
**after-the-fact-time** 229:2
**AFTERNOON** 120:2
**against-** 1:8
**agencies** 224:6
**aggregated** 44:21
**ago** 27:12 60:6 71:16 109:3 146:21 193:17 222:22
**agree** 4:20 205:10 206:3 241:13
**AGREED** 3:5,11,15
**agreement** 4:14,15 14:23 124:8
**ahead** 14:18 53:6 89:7 107:11 152:22 181:2 200:20 255:17
**air** 76:20
**alerted** 100:7
**alerting** 100:24
**aligned** 249:3
**allegation** 176:2 177:25 193:9 212:14 214:7
**allegations** 146:22 176:8 177:17,22 180:15 181:11,16 185:4
**alleged** 135:2 175:9 177:19,19 179:23 180:14 185:17
**allegedly** 180:23 186:2,10,17
**alleges** 186:14 213:16
**allowed** 183:5
**aloud** 6:23
**Amazon** 39:15
**amount** 51:15 70:25 88:11 109:10,14 111:2 115:24 138:24 139:3,10,21 140:8 162:17,18,20 162:24,25 191:10 222:24 223:23 256:18
**amounted** 191:18
**amounts** 68:3 135:18 139:14 149:14 170:10
**and/or** 5:11 42:23 69:20 74:15,23 75:21 76:2 77:13,21 77:22 78:6 84:7 85:22 86:7,13,15 97:12 99:13 101:3 101:16,21 127:2,3,6 138:20 175:5 177:18 185:5 190:9 190:23 193:10 198:21 202:3,4,8 205:12 206:22 210:19 241:14 245:3 254:20
**Android** 78:6
**Anja** 193:6
**annual** 43:5 165:17 167:16,19
**annualized** 110:22,23 111:7 164:8 245:17
**annually** 163:13
**answer** 6:22 7:6,14 8:5 23:10 24:10

30:12,17,20,22 31:24 35:20 39:9 42:7 45:20 48:20 49:15 50:12,17,22 51:12,21 56:10 64:19 66:3,12,16 80:13 81:4 90:13 91:5,8,14 99:19 122:15 125:20 126:2 127:9,15 129:17 130:3,13 142:18 165:19 175:19,22 178:15 180:9 181:3,21 187:10 190:21 191:24 192:18 193:13 203:9 204:22 205:20 208:10,15 209:8 210:15 220:17 221:5,6 245:12 247:20
**answered** 200:8
**answering** 7:18 29:17 29:25 66:11 80:5 200:9
**answers** 6:18 92:19 165:22
**anticipated** 140:22 207:12
**anybody** 91:11 99:25 151:4 220:5
**anymore** 221:7 256:6
**anyone's** 197:8
**anyplace** 88:19
**anytime** 10:9 95:11
**anyways** 171:17
**apart** 24:13 74:22 104:15 133:19 202:24
**apartment** 138:23 147:11
**Apologies** 32:18
**app** 78:23,23 79:23 79:25 80:7,13,16,18 92:3,5 158:19,23 259:11
**appear** 143:6 151:2
**appears** 252:6 254:14
**Apple** 78:23 79:19
**applicable** 215:10
**applicants** 150:25 214:18
**application** 78:3,6 79:11,15,19,22,24 84:8,11 93:2 96:24 97:16 98:17,21 158:18,23 173:19 174:3 202:15,25 259:11
**applied** 71:5,7 194:7 196:18
**appreciate** 105:20 156:13 218:5 234:11
**appropriate** 170:10 170:11
**approval** 107:12 183:8,9,11,16,20,21
**approvals** 68:6,7
**approve** 51:11,13
**approved** 108:19 149:15
**approving** 46:3 67:19 67:21 68:4
**approximate** 61:19
**approximately** 10:6 13:15,18 20:21 22:5 59:7 130:25 195:24
**April** 141:21 213:17 246:15,15
**area** 136:12 147:12 148:11
**arm's** 38:20
**Aronbayev** 2:24 65:11
**arose** 83:4 99:7
**arrangement** 4:12
**arrested** 19:17
**arrive** 129:4
**arrived** 136:16
**ascertain** 199:19
**aside** 29:4 194:17 228:24
**asked** 24:3 49:8,10 73:2,17 75:20,24 89:3,19 92:11 125:23 146:4,5 158:6 181:22 193:14 199:16 203:5 207:3 220:18 220:20
**asking** 11:11 15:6,25 16:12 30:20 86:4 87:14 108:23 126:6 131:22 134:17 139:15 148:18 185:21 187:8,12 189:9,10,16 201:9 205:20 210:9 218:5 225:23 237:21 238:11 241:19 248:11 256:11
**asks** 48:8 220:14
**aspect** 37:24 151:22 167:5 182:9 193:15
**aspects** 113:11
**aspires** 25:14
**assert** 175:13
**asserting** 178:19 180:13
**assign** 51:2
**assistance** 26:15 33:14
**assisted** 28:18 29:6 48:5
**assisting** 10:22 11:2 33:23 186:25 187:2
**associated** 134:23
**associates** 141:11,13
**assume** 7:15
**assumed** 182:7
**assuming** 149:6 197:22
**assumption** 151:6 182:10 218:2 244:12
**assumptions** 175:20
**Atlantic** 41:20 43:22 43:25 44:8
**atmosphere** 191:13
**attachments** 218:7
**attempt** 178:21 179:12,18
**attempted** 235:21
**attended** 141:24
**attention** 186:24 226:12 227:12 231:12 232:12 234:21 250:4
**attest** 45:3 46:6 72:5 86:17 94:17 102:6 102:16 105:17 106:19 122:23 132:4 134:14 137:7 139:2 142:24 178:6 178:13,24 179:24
**attorney** 20:4,7,11,16 20:22 21:22,25 31:14 85:14,17 86:5 111:20 112:5 198:11,12 208:16 230:14,19 231:4
**attorneys** 2:5,10 4:2 31:5,18 85:24 208:19
**attribute** 187:6,15
**attributed** 193:18
**audio** 6:5
**audit** 86:10,14,17 142:8,11,16 199:12 200:7
**audited** 142:25
**auditing** 199:15
**authorities** 167:12 170:11,17
**authority** 46:14,16 47:3,9 48:7 49:22 50:5,11 53:15,21,22 68:8,11,17,21

166:20
**authorization** 107:16 107:25
**authorizations** 56:18 134:14
**authorized** 90:17 108:16 115:3 134:13
**autogenerated** 100:18
**automatic** 87:23 196:17
**automatically** 84:2,4 87:16,19 109:20 140:2,4
**autonomous** 134:23
**autonomy** 64:14,15 65:18 104:23 105:5 105:8
**autopay** 73:5,8
**availability** 77:3 137:19
**available** 79:19 80:12 148:15 155:4 177:13,15
**avenue** 2:5 12:2
**Avenue/Street** 11:25
**average** 138:24 139:3 176:14 195:4,8,22
**aware** 28:2 38:22 41:23 43:21 71:22 72:14 93:12,16 94:20 100:3 101:15 101:18 109:24 122:17 127:21,24 128:5,8,12 130:24 134:20 137:14 143:25 144:3 147:17,19 150:16 150:22 151:16 152:4,6,9 153:15 158:14 160:6,9 164:10 166:19,22 166:25 168:14,18 168:19,23,24 169:5 173:8,19,23 175:6 176:2,5 177:17,21 178:7 181:11 183:22 185:4 186:2 186:8,10 187:3 188:22 190:8 191:12 193:9,12,13 193:14 199:9 202:2 202:14 208:3,22,23 209:3 211:2,9
**awareness** 178:9

**B**

**B** 4:21 120:4 131:8 155:20 259:8
**B-A-R-A-N-S-K-Y** 27:17
**B-A-T-E-S** 230:21
**bachelor's** 18:8
**back** 17:5,11 21:21 55:17 72:7 75:13 76:25 87:13 94:7 103:18,19 126:8 127:18 135:13,18 144:2 153:9 157:2 166:2 172:9 176:9 184:25 199:6,25 200:3 202:7 203:11 212:21 214:9 225:8 225:18,19 226:19 232:9 236:12 238:14 240:16 241:24 243:6 246:19 253:8
**back-end** 76:9
**backfill** 45:24 155:25
**background** 18:7 224:7,10 249:4
**backwards** 207:10
**bank** 55:6,10,11,11 55:13 137:19,25 138:7,12 210:7 255:23 256:2
**banking** 255:18,21
**Baransky** 27:4,17,19 27:21 28:4,23 163:3 164:11,16,19,25 165:7 166:16 167:15,18 168:5,7 171:23 172:3,9,20 172:24
**base** 109:15 117:2,7 117:14
**based** 38:8 51:18 79:5 116:10 130:15 137:20 149:2 165:22 170:5 172:6 172:7 177:25 178:19 179:10 180:14 204:4,11,21 218:9,15,17 223:19 225:25 228:19 229:10 230:3 232:5 233:16 238:21 239:3,20,22 240:2 249:12,23 252:22
**basement** 148:12
**basically** 178:10
**basis** 7:19 104:4 110:16,16,19,19 145:20 163:13 175:24 176:22 178:14 179:21 181:16
**Bates** 215:18 216:4 221:11,16 222:2,5 230:18,21,22,24 234:5,17 235:12 236:21 239:9,11 240:13 246:24 247:3 250:5 251:14 255:10,12 259:20 259:21,22,24 260:2 260:3,5,7,9,11,13
**Beach** 12:12 187:25 216:14
**began** 144:14 166:6
**beginning** 44:2 76:18 113:20 140:6 145:23 150:2 161:15 219:5 226:13 250:6
**behalf** 1:5 171:8
**believe** 10:8,18,21 21:20 22:5 36:9 41:10 44:12,15,19 45:22 51:16 58:13 59:9 61:25 64:15 65:7,17,23 66:3,8 67:4 71:15 73:12 76:10 80:11 86:2 89:12 90:19 97:14 100:6,22 103:9,13 103:21 104:2 109:19,20 110:3,6 110:13,20,20 113:6 114:25 116:19,22 118:15 120:12,14 120:21 121:3 122:5 126:12 128:3,16,19 132:16 134:24 137:10 141:10,22 141:23 146:4 147:7 149:17 155:24 156:10,25 157:12 157:21 159:17 164:6 171:9,13,16 172:9,20 174:22,24 182:18 183:14,14 183:20 184:5,9 185:21 187:25 188:5,17,24 189:17 191:11,16 192:7 197:23 199:16 203:17 204:13,16 204:16 206:25 207:6 208:17,19 213:19,20 217:11 217:21 218:3 233:22 235:20 236:13,17 238:22 239:6,20 243:9 244:13 246:16 248:6 250:15 256:2
**believed** 127:2

**bell** 121:18 145:7 146:14,16 193:20
**belongs** 248:17
**benefit** 14:14 83:11 83:17
**benefits** 168:22 169:4 173:20 174:3
**Benjamin** 2:21 25:11
**best** 6:19 13:10 32:12 60:10 104:25
**better** 37:21 255:3
**beyond** 109:22 175:20 220:4
**BH** 225:4
**bi-weekly** 235:6
**big** 122:5
**bigger** 254:16
**bills** 68:15,23 72:25 73:3,6,21
**bit** 5:24 90:7 149:3 191:14 236:25
**blank** 159:4,7 259:13
**blend** 16:5
**blood** 258:16
**blue** 249:2,4,11
**bodies** 195:12
**Body** 6:24
**bonus** 233:17,18,20 233:21
**bonuses** 148:23
**bookkeeper** 25:21,22 25:23 26:19,21
**bookkeeping** 26:6
**Boris** 27:21,21,25
**bottom** 215:19 230:5 231:24 233:11 234:15 236:7 237:7
**bought** 35:14,24 182:24
**boutique** 44:5
**Boutiques** 41:14
**Bowles** 2:10,12 4:19 4:19,19,25 5:4 14:17 15:4 16:4 21:22 22:2 25:8 31:23 43:12 45:21 57:10 64:8 82:5 89:6 93:4,11,15 95:7 96:2 107:18 115:16 117:16 139:22 152:21 160:8 166:24 173:12 174:8 179:15 180:8,25 192:8,10 197:23 198:23 202:5,10 203:19,23 204:8 205:15 206:10 208:9,14,21 211:13 215:22 217:19 233:24 234:10 256:14 257:5
**box** 89:20 136:8,10 136:11,11 211:4
**brackets** 232:16
**branch** 124:4 125:16
**break** 7:24 8:4,6 88:6 88:8 102:9,11,13,17 102:24 103:16 104:15,20,21,22 105:4,9,22 156:3 169:18 203:11 211:16 236:11,15
**breaking** 5:23
**breaks** 87:17 88:5 104:14 105:3,9,21 105:23 196:17 197:16
**brick-and-mortar** 11:21 35:3,5 39:5 40:25 41:2 42:14 113:22 118:14
**Bridgehampton** 12:5 16:21 17:14 44:13 58:7 89:18 92:12,13 155:11,13,14 225:11 226:16 227:14 240:4
**Bridget** 62:13
**brief** 70:20 87:10
**briefly** 236:5
**bring** 89:20
**Brinnen** 1:10,19 4:1 5:1,6 6:1 7:1 8:1,9 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,4 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1,9 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1,14 236:1,23 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1,22 257:1,11 258:11 259:4 261:3
**broad** 15:23,24,25 50:18 54:20 57:14 94:5 101:24 132:12 149:5 151:12 175:16
**broader** 142:15 200:7
**broadly** 32:2 142:19

175:17
**broke** 18:25 23:2 55:8 57:19 59:21 85:16 177:20
**broken** 23:23 101:21
**brought** 135:7,18 136:22 161:5 186:24 217:15
**browser** 78:10
**buck** 106:20,22
**building** 158:12
**bulk** 32:18
**bunch** 234:19
**burn** 107:21
**burned** 154:8 155:3
**business** 18:24,25 19:2,6 26:11 37:2,5 37:25 43:20 80:8 101:25 172:3,8
**busy** 103:13
**buy** 17:8 183:12
**buying** 181:18

**C**

**C** 2:2 258:2,2
**C-L-A-R-K-E** 63:10
**C-U-M-M-I-N-G-S** 119:6
**cadence** 253:7
**calculate** 223:17 253:19
**calculated** 197:14 223:2 226:25 250:18
**calculating** 194:21
**calculation** 101:6 223:6 226:22 231:18 232:23 241:25
**calculations** 164:8 226:24
**call** 20:25 21:14,17 22:4,8,21 43:8 83:6 114:6 127:10 140:13 147:11 162:9 184:11 193:24 196:12 198:18 202:20 206:14 226:7 233:19 249:25 252:7 254:25
**called** 4:23 30:22 78:7,24 96:24 112:13,15,20,23 114:3,5,9,10,12 141:12 194:24
**calling** 86:5 112:17 113:3 229:25 246:7
**calls** 141:20 142:2 165:9
**candles** 37:19
**capability** 56:11 78:17
**card** 75:7
**care** 29:3 166:16
**carry** 11:12
**case** 1:8 24:9,15 25:6 29:18 30:2,10,13 31:2,22 32:6,9 59:15 85:15,19 92:15 98:6 137:5 139:4 154:5 156:12 169:13 177:12 185:19 186:5 194:15 197:19 203:6,15 207:13 208:7,12,20 209:2 211:12 212:4 215:7 243:15 250:21 255:19 256:9,13
**cash** 72:18 133:25 134:6 135:3,6,10,14 135:19,20,21 136:8 136:10,10,11,20,24 137:5 138:25 139:5 139:6,10,11,20 140:7,7,14 176:3,9 176:19,20 177:7,10 211:7 252:23 253:5 254:4
**Catalina** 63:21
**catalyst** 34:12
**catch** 232:17
**cause** 14:8
**caused** 191:14 193:11
**cease** 192:8
**central** 170:24
**certain** 49:8 70:25 80:12 96:7 109:19 115:23 240:19
**certainly** 24:24 35:2 113:24 157:22 165:5 203:22
**certification** 3:7
**certify** 258:10,15
**cetera** 45:25 178:17
**chain** 215:20
**challenges** 191:15
**change** 25:15 84:3 116:2 200:10 237:14 244:9,12,13 261:5
**changed** 70:22 84:9 84:14,19 116:18 161:21 208:25 249:17
**changes** 85:2 110:13 200:17,19,21,22 201:2,5,17,22
**chart** 234:15
**Chase** 55:11 255:23
**chat** 6:6
**check** 6:4 53:20,25 54:4 68:22 256:4
**checks** 68:9
**chose** 178:14
**Christmas** 149:7,7
**circle** 230:9,14
**circumstance** 93:13 95:21 101:19 182:3
**circumstances** 60:16 73:15 89:10 98:16 99:7 102:19,22 179:10 182:14 187:21 189:6
225:24
**claim** 127:6,22,25 128:6 180:4 190:8
**claiming** 82:20
**claims** 175:4 179:22 215:11
**clarify** 11:11 13:5 16:11,13 24:19 27:22 33:16 36:12 39:13 40:15 43:24 45:19 47:22 53:22 69:6,12 84:4 85:9 87:22 99:4 103:10 131:21 155:7 156:8 175:11 187:9 198:10 199:14 247:7 248:24
**clarifying** 47:22 73:3 179:20 205:4 218:6
**Clarke** 63:9 64:5
**classification** 114:18 150:4
**classifications** 111:9 112:7
**classified** 109:17,25
**clear** 15:23 111:11 121:7 130:8 156:7 156:17 201:9
**clearer** 252:8
**clearly** 30:15 49:15 69:10 139:12
**clerical** 140:24 141:2
**client** 77:4,18,19
**clock** 33:5 36:16,17 36:18 76:24 77:21 77:22 78:12,12 81:20,20 87:7,8,12 87:14,14 90:3,3,23 91:18 92:14,25 96:10 98:24 100:8 100:20 101:20 102:6,6 109:3,4 130:22 131:13 178:11 179:3 196:10 199:24,25

219:20,21,22 227:15,16 229:9,9 229:11,11,18,18 237:7 238:23,23 246:8,8 247:16
**clock-out** 85:7
**clocked** 83:9 99:3 178:2,5,11,15 229:7 239:21
**clocking** 88:22,24 93:8,10,16,20 94:25 131:7,7
**close** 13:4,5 16:25 58:13 103:15 130:2 131:24 140:3 248:19
**closed** 12:8 16:18 17:6 95:22 103:18 135:23 155:6 178:16
**closer** 138:12 233:11
**closes** 155:9,25
**closing** 129:16,16,25
**closures** 178:5
**clothes** 11:13 38:2,4
**clothing** 37:17 44:24 45:4,5
**cloud-based** 102:4
**Clover** 74:18,20,22 75:10 96:23 207:19 208:4
**co-manage** 217:16
**co-manager** 216:14 217:3,7,10,17,18
**code** 36:16,16,19
**collect** 136:12,13,16
**collected** 135:7,7,23 135:24
**college** 154:2 195:18
**column** 222:24 226:13,18 227:10 228:11,12,18 242:2 242:3 245:16 248:17 249:6 250:9 250:11
**columns-wide** 226:24
**come** 23:22 36:15 39:14 48:4 51:24 60:4 73:7 107:24 125:12 126:25 132:9 133:16 156:18 157:3 171:11 177:13 195:19,22 199:6 216:11 219:18 223:10 236:12
**comes** 44:25 45:5 69:13 256:3
**coming** 217:12 241:10,15
**comma** 248:13
**commas** 248:16
**comment** 195:2 199:10
**commission** 66:10 70:10,24 71:6 118:9 118:10 123:4,5,8,10 123:13 141:6,7,9,12 141:12,17,18 145:11,13,14 146:9 196:20 205:4 220:13 223:5,7,9,11 225:3 235:3,16 242:2,5,8,9,11 245:24
**Commission-withh...** 241:20 242:3
**commissioned** 123:20,21 196:21
**commissions** 48:13 66:2 69:20,24 70:3 70:15,18 71:9 94:14 116:13,17,24 117:12,15,17 141:10,14,16 145:16 146:2 161:25 191:22 223:13 234:20 235:17,19,23
**commitment** 76:16
77:4 157:23
**common** 23:13,16 95:15,19
**communicate** 52:15 65:4 88:17 95:10 99:2 107:11 152:4 160:9 163:12 197:6
**communicated** 64:25 66:12 93:24 94:15 143:11 182:8
**communicating** 85:5 165:7
**communication** 49:2 84:6 91:4 100:17,24 103:9,21,22,25 104:5 106:10 107:20 139:18 145:9 146:8 153:6,6 165:4 173:25
**communications** 86:6 94:18,25 95:5 107:4 143:12 205:13,17,25 206:4 206:6,8,16,21
**commute** 89:23
**companies** 172:11
**company** 5:10 8:15 8:16,22 9:10 10:23 12:15,19 13:8 14:10 14:14,24 15:2,7,8 15:15 17:22 25:24 25:24 26:3,11,15 29:6 33:9,13 35:12 35:22 36:2 37:9,15 37:17,20 38:2,9,10 38:12,24 39:4,9,12 39:22 40:4,24 41:23 42:2,12,23 43:2,9 44:25 45:9 46:15,18 46:19,20,21,25 47:4 47:7,10,13 48:5 51:10 52:13,20,21 55:6,9,12 57:6,18 57:21 58:4,12 59:4 59:10 60:12,17,22
61:23 62:5,15 64:11 65:16 68:8,24 71:24 72:21,25 73:21,25 74:19 75:15 76:6,12 79:7,12 83:21 90:18 93:10,25 94:10 97:7 97:10,22 102:8,10 108:5 111:19 112:2 112:6 115:3 116:24 118:20 120:18 121:25 123:7 132:11,14 133:5 134:2,7 142:8 143:19 148:22 150:15 159:19 160:3,14,18 163:24 164:13,24 165:18 165:21 167:16 170:16,21 171:3,8 171:24 172:25 173:11,22,24 174:13,20 175:4 176:4 179:22,24 180:13,19,22 184:15 185:5 186:12,22,25 187:3 187:23 190:9,12,24 190:25 191:9 197:4 199:13 200:10 201:6,18 202:25 210:13,21 217:10 220:16,20,24 221:2 221:11,22 254:3 255:4
**company's** 14:23 28:24 55:7 77:11 107:2 180:6
**compels** 23:21
**compensated** 107:13 160:11
**compensation** 47:16 65:21 116:25 124:9 124:21 126:10,13 145:4,13 150:14,17 160:23 161:2,9,19

161:22 196:24 223:12 250:24 251:4 254:12
**competitive** 70:21
**compilation** 222:7
**compilations** 193:25
**compile** 198:12 245:23
**Compiled** 198:11
**complain** 142:5 143:14 145:25 150:14,18 152:10
**complaint** 24:10 72:14 146:3 150:16 152:13 173:9,17 179:17 180:15 185:19 186:5,13 200:12 208:25 212:3,6 259:16
**complaints** 66:15 151:8 152:6,19 153:12 174:12,17
**complete** 257:2
**completed** 124:24 125:4 159:18,21 160:14 167:19
**completeness** 19:21
**component** 129:18
**components** 32:10 123:25 124:2
**computation** 215:9
**computed** 71:4 141:18 228:12 245:24
**computer** 78:2
**computers** 99:23
**computing** 194:21
**conceding** 201:18
**concern** 149:23 176:5 210:20 217:21
**concerned** 139:13 172:19
**concerning** 15:19 32:6 46:11 50:23 60:16 61:14 86:8 101:12 107:2 139:10 152:7 161:8 161:25 167:12 174:12,16 191:25 202:3 203:2 205:12 207:16 208:12 214:17 219:18 222:8 234:20
**conclude** 176:12
**conclusion** 218:17
**concomitant** 94:13
**concurred** 102:5
**concurrently** 171:16
**conducted** 132:11 199:12
**conducting** 5:16
**confidential** 144:4
**confidentiality** 144:7
**confirm** 5:18 13:14 85:11 171:15 172:21 212:22 233:16 241:25 250:15 254:17
**confirmation** 49:2
**confirmed** 49:19
**conjunction** 128:3,6
**connected** 188:22
**connection** 20:12 24:25 25:5 31:22 32:9 57:2 122:12,16 133:13 135:3 143:18 144:20 162:8 163:4 167:6 167:11 173:5,10,16 173:21 174:2,12 184:19 188:9 189:13 193:21 194:3 197:7 201:6 203:6 207:12 212:24 219:7 220:20 243:15
**connotations** 197:6
**consent** 4:11,18
**considered** 110:9 199:7
**consisted** 139:21
**consistency** 238:15
**consistent** 49:11 145:20
**consistently** 23:11 241:10
**consisting** 206:20
**consists** 214:21
**constitute** 122:18
**constitutes** 123:18
**construction** 144:6 180:18 185:22
**consult** 111:20 114:11
**consulted** 111:22
**consulting** 8:15,17,22
**Cont'd** 120:7
**contact** 98:24 131:15 179:2
**contacted** 92:21 93:19 192:8
**contacting** 34:13,18 114:15 199:23
**contacts** 207:8
**contain** 139:25 218:7 237:18,25 246:10 254:11
**contained** 30:8 98:7 139:10 140:13 168:3 197:12 237:8 245:10
**containing** 126:22 160:21 197:19 198:20
**contains** 215:5 242:4 242:4
**contemporaneous** 228:21,23,25 229:4 229:6,14,15
**contend** 122:11
**contending** 131:3 188:8
**content** 192:12 205:20 218:15,19 233:6
**content-wise** 163:18
**contents** 161:13 232:5
**context** 9:2 34:20 80:15,24
**contexts** 57:15
**contingent** 149:8
**continue** 96:10 103:7 154:6,17 157:6 252:3
**contract** 34:14
**contractor** 210:14
**contribution** 71:3,5,7 145:21 146:12
**contributions** 171:19 235:22
**control** 23:25 65:16
**conversation** 100:7 100:12 104:6,7 181:17 182:12,14 182:21,25 192:12 214:17 218:25 236:5
**conversations** 20:6 46:11 91:25
**converse** 95:12
**converted** 111:6
**convicted** 19:21
**Cooney** 2:22 127:11 127:14
**coordinate** 54:14 65:7
**coordination** 104:24
**copied** 216:23 227:5 227:9 249:15
**copies** 85:22
**copy** 5:2 212:3 252:8 257:8
**corporate** 12:20 43:18
**correct** 8:11 10:13,20 10:24 12:9,10,25 13:2 15:9,16 19:23 21:23,24 22:2,3 25:2,3 27:23,24

28:2 29:11 31:19,20 32:23 35:3,15,25 36:24,25 37:22,23 39:3,6,23 40:5,9 41:5,24,25 43:23 44:3,11,14,18,23 45:2,6,7,18 48:3 49:6 52:10,11,13 53:10,13,14,16,18 53:19 54:5 55:5 58:9,10 60:2,3 63:25 64:7,9 70:2 74:16,17 75:11,12 75:16 76:3,6,9,13 78:13 79:8,12,13 80:9,10 81:13 82:12 84:16 86:23 87:2,6 92:4,8 94:11,12,16 95:6 98:5 99:10 105:11 106:6,9,13 116:14 134:18,19 138:17 142:14 143:4 154:12,15 159:24 160:18 161:16,17 162:14 162:15,24 165:3 167:13 169:16 170:3 175:25 177:16 179:5,8,9,14 180:15 188:19 192:21 194:12 196:18,19,22,25 197:2 200:12 213:21 216:24 218:8 225:13,14 231:23 239:15,18 242:24 244:9 245:14,21 247:9,22 247:25 248:17,19 248:23 249:9,17 250:25 252:5 253:10,20 254:5
**corrected** 240:23 241:5 247:16
**correction** 54:15,16
**corrections** 52:2
**correctly** 10:18 35:21 90:22 107:13 122:24 123:14 181:21
**correspond** 85:11
**correspondence** 170:17 173:15 203:2
**cost** 191:9
**counsel** 3:5 4:11 167:6,11 192:14 256:9
**counted** 135:17 136:23 142:2
**counterclaim** 175:18 180:17 193:18
**counterclaims** 24:11 30:13,17,21,23,25 31:6 174:25 175:12 175:24 193:10,21
**countersuit** 185:21
**counting** 176:24
**country** 212:25
**COUNTY** 258:6
**couple** 73:12 111:5 124:2 153:11 155:25 241:18
**course** 6:16 26:14 51:9 68:7 69:14 71:23 101:25 108:5 111:18 116:18 153:4 186:4,25 187:2 188:4,25 192:11
**Courses** 224:11
**court** 1:2 3:18 4:2,25 5:21 6:23 7:8 19:9 94:6 126:7 127:17 211:20
**covenant** 126:15 127:7
**cover** 8:4 215:11 243:24
**covered** 8:11 99:12
**covering** 147:8
**covers** 98:2,3
**CPA** 27:5,19
**create** 31:21,25 32:3 32:4 124:16,23 125:6 168:8
**created** 32:8 70:20 94:18 125:11 172:19 222:12,18 228:14 229:9,10,15 229:17 248:15
**creating** 37:21 168:6 235:2
**credit** 75:7 169:3
**creditors** 74:2
**crime** 19:18,22
**criteria** 109:25
**cross-checked** 227:2
**cross-keyed** 248:7
**CSV** 248:3,5,10,11 248:21 249:5,8,10 249:12,14,18,18,20 249:22,25 255:24 256:3
**Cummings** 58:25 118:25 152:8
**curious** 56:5 182:11
**current** 78:20 149:9
**currently** 15:20
**customary** 210:24
**customer** 89:4,14 93:25 102:14 103:6 103:8 122:2,6,13,17 190:11,17,20,25 191:6,25 207:21 209:14,18
**customers** 17:8 26:5 39:21 40:8 77:13 90:8,9 94:15 186:23 190:11 210:24
**cut** 252:3

**D**

**D** 259:2
**D-E-B-O-R-A-H** 61:3
**d/b/a** 221:14
**D1** 215:18,25 216:4 259:20
**D108** 246:24 247:3 260:10
**D11** 221:11,16 259:21
**D156** 251:12,14 252:8 260:12
**D157** 252:19
**D16** 215:19
**D167** 251:12,14 260:12
**D177** 254:9
**D184** 254:10
**D19** 222:2,5 224:25 259:22
**D22** 230:5
**D23** 230:6 231:12
**D232** 255:10,12 260:14
**D233** 255:10,12 260:14
**D24** 230:6
**D26** 231:24
**D29** 232:13 233:12
**D30** 222:3,5 259:23
**D33** 234:13,17 259:24
**D35** 234:13,15,17 259:25
**D40** 235:12 260:2
**D44** 236:7
**D48** 236:19,21 260:3
**D52** 236:19,21 260:4
**D53** 239:9,11 260:5
**D54** 240:6
**D57** 244:19
**D62** 239:9,12 260:6
**D63** 240:11,13 260:7
**D64** 242:21
**D67** 244:16
**D78** 245:6
**D82** 246:12

**D83** 240:11,13 260:8
**D84** 246:24 247:3 260:9
**D92** 250:5
**daily** 135:6,14,16 138:25 139:11 140:14 176:15,20 176:22 177:7 253:3
**damage** 158:7
**damages** 215:8,9
**data** 86:11,18 108:10 193:25 204:15 227:11,23 230:10 231:10 237:8,9,22 238:23 239:3,12 245:16 250:20
**date** 1:21 12:7 13:7,8 13:14,17 21:19 33:11 34:5 49:9 59:5 120:19 121:20 121:22 144:15 158:25 159:5,9,10 159:12 212:8 214:25 216:5 221:17 222:6 230:20 234:18 235:13,15 236:22 237:6 239:10 240:14 243:12 246:25 249:14 251:15 255:13 259:15 261:3
**dated** 212:4,7 259:16
**dates** 13:7 60:5,9 61:21 62:8 63:8 113:23 224:21 241:7
**daughter** 181:18
**daughter's** 182:24
**David** 2:12 4:19
**DAVID@BOJO.L...** 2:13
**day** 45:12 58:8 87:21 90:2 95:2 97:7 103:14 105:18 131:9 135:17,25 136:6 142:12,13 153:7 158:10,13 177:14,16 190:6 191:16 199:5 209:11 213:20 216:15 227:16,22 228:5 231:21 239:18 242:23 243:21 244:18 257:19 258:20
**day-end** 135:22
**day-to-day** 64:18,21 65:18 76:6
**days** 55:8 129:22,23 129:24 130:4 131:8 131:16 136:15 139:5 172:2 177:9 177:11 190:4 241:15,19
**deal** 182:10 191:24
**dealing** 40:18 167:11 178:20
**deals** 80:6
**dealt** 190:4
**Dear** 139:20
**Deborah** 60:25 61:2 61:7
**December** 195:8 213:24 233:13,13 240:7 245:6
**decide** 47:18 49:16 137:16
**decided** 60:19
**deciding** 68:14
**decimal** 241:22
**decision** 13:19 16:3 49:25 69:13 72:21 127:5,21 128:20 132:3 149:21 157:4 217:21,24
**decision-maker** 46:2 46:7
**decisionmaking** 49:22 50:2
**decisions** 15:19 16:6 46:7 69:11,12,15 73:5 74:5 91:10 104:24 155:17
**decorations** 148:19
**decrease** 50:5
**decreased** 161:21
**decreasing** 50:15
**deduct** 87:16,20,25 88:3 253:22
**deducted** 196:18 228:6
**deduction** 87:24 118:7 210:8,9 223:10 226:2
**deductions** 147:15 162:21 169:25 170:5,6 197:15 210:5 223:7 228:15 231:21
**defamatory** 185:17 186:3
**defamed** 185:5,8,9
**default** 83:16
**defend** 256:9
**defendant** 1:18 19:13
**defendants** 1:11 2:10 4:20 30:2,9,14,18 30:25 175:2,15,15 188:8 197:19 203:14 211:10 215:6
**defendants'** 24:19 214:21,23 215:17 259:18
**define** 23:19 34:11 45:13 47:17 49:14 49:23,25 51:13 52:23 68:23 69:18 77:10 100:16 113:11 162:19 185:9 186:19 189:5 210:8
**defined** 24:10 76:25 77:3
**definition** 125:19
**definitively** 177:6
**degree** 18:8 50:25 64:15,20 183:6
**delete** 207:4
**delineates** 239:17
**delineating** 248:16
**delivery** 5:4 8:14
**demand** 207:15
**denying** 133:8
**Department** 112:14 112:22 113:4,14,25 114:13,15 117:24 118:3 174:2
**departure** 128:3
**depend** 69:3 81:14 82:8 204:2
**dependent** 77:18
**depending** 48:20 66:6 77:4 118:11 213:6
**depends** 66:4 77:7 133:16
**Deponent** 261:3
**deposed** 5:14
**deposit** 135:19,20 137:9,15,17
**deposited** 137:2,4,6
**deposition** 1:18 3:8 3:15 4:3,5,6 5:13,17 7:2 8:3 19:25 20:13 21:13,16 24:8,14 25:2,15 76:18 146:23 258:12,13 261:3
**depositions** 7:25 256:24
**describe** 37:14 74:24 135:14 183:3 222:14 236:23
**described** 71:11,18 98:12 99:21 100:19 150:5 192:22 223:25
**description** 45:18

76:10 99:20 116:11 215:7,8
**Designs** 1:9 5:10 8:25 9:5,13,23 11:7,10 12:19,22,24 17:20 19:7 23:12 26:7 28:6,12,15,19 33:23 37:3,6 39:18 43:6 43:17 44:7 46:22 52:25 207:22 208:2 210:17 212:17 221:13
**desist** 192:9
**desk** 27:14 209:11,16 209:24
**destroyed** 208:25
**detail** 37:14 76:15 146:21 212:12
**detailed** 159:22 189:18 225:19
**details** 109:23 175:18 175:23,23 189:7
**determination** 119:12 152:24
**determinations** 111:24
**determine** 47:15,17 48:13,16,23 82:3 102:8,11 117:6,21 189:24 196:9 225:12
**determined** 48:19 71:9 116:25 118:13
**determines** 119:17
**developed** 94:14
**device** 36:11,12 75:2 75:4 78:11
**devices** 34:15 101:20 127:12
**difference** 254:4
**different** 18:4 34:8,8 45:22 75:2,2,3,4,5 110:7 113:11 123:10 141:16 153:20 162:4,5,7
199:14 225:10 238:20
**differs** 98:8
**difficult** 195:22
**dig** 56:5
**Dina** 1:4 5:8 16:20 81:3 100:10 105:25 110:4 156:15 158:6 158:10 173:20 239:13 261:2
**Dina's** 222:9 241:2
**direct** 238:4
**directed** 45:15,17 91:16 106:13 170:25
**directive** 90:10
**directly** 25:23 64:25 65:25 66:21,24 67:6 88:17 95:6 104:7 122:3 184:15 206:4 248:4 250:22
**discipline** 47:9
**disciplined** 47:12 143:17
**disclosures** 30:5,9 214:22,24 259:19
**discount** 181:19,20 182:2 183:9,14
**discounts** 181:13 183:4
**discovered** 175:10
**discovery** 24:17,20 243:10,15
**discrepancies** 176:11 252:23,25 253:9
**discrepancy** 54:10 176:14 253:12,19
**discretion** 236:8
**discretionary** 48:7 149:2
**discuss** 58:18,22 69:4 83:7 179:2
**discussed** 20:9 41:4 64:5 65:17 67:16,17 96:15 119:7 130:20
132:15 141:22 161:7 172:14 174:5 189:19 204:23 235:20 236:5 252:23
**discussing** 6:15 160:22,25
**discussion** 6:9 20:6 74:10 118:2 119:24 149:21 157:8 219:8 219:12 220:3,4 236:3
**discussions** 46:12 59:14 61:13 65:21 122:22 146:23 157:4 167:20
**dismissed** 128:19
**disparaging** 185:10
**dispute** 89:2,8 122:13 213:18
**distinguish** 225:6
**distinguished** 97:25
**distracting** 6:3
**distributed** 184:7,8
**distributions** 57:13 57:18,20,24
**DISTRICT** 1:2,2
**dividing** 195:9
**divorce** 244:14
**divulge** 192:12
**docket** 212:4
**document** 30:22 32:4 124:16,18 159:15 159:19,20,24 160:2 160:5,7,17 161:14 161:24 162:4,5,7 184:7 212:10 215:2 215:5,13 216:3 221:15 222:2,4,14 229:8,10,21 230:13 234:16 235:11 236:20,24 239:8,11 240:12 242:13,16 244:3 246:23 247:4 251:13 255:11
259:20,21,22,24 260:2,3,5,7,9,11,13
**documented** 153:13
**documents** 21:5 85:14,18 131:11 160:20 162:10 196:13 197:18 203:8,14,16,17,21 203:25 208:6,12,23 215:8,9,18 216:15 222:11 223:25 224:2,5 229:12 243:14 249:24 255:15
**doing** 7:4 56:13 89:16,20 91:11 93:17 106:9 112:16 113:18,18 115:14 116:18 123:7 150:21 151:25 152:2 166:18 170:14,15 172:4 176:23,24 178:8 210:3,21 217:13 224:22 248:6,8
**dollars** 67:23
**dotted** 246:13
**doubt** 83:12,17 131:17
**Doubtful** 125:14
**download** 33:3 113:13
**downloadable** 80:16
**downloaded** 33:2 223:19 224:5 225:16
**downloads** 32:14 130:22
**dozens** 226:24
**draw** 218:17
**drawer** 135:11,17 140:8
**dress** 183:12,12,15 183:17,18,19
**driftwood** 133:5,20

**driver's** 18:14
**driving** 81:15 89:18
**due** 12:8 17:6 146:18 152:25
**duly** 4:22
**duration** 147:4
**duties** 26:16 51:10 94:13 95:25 108:5 111:19 124:4,7 125:16 150:20,21 209:7

**E**

**E** 2:2,2 4:21,21 120:4 120:4 258:2,2 259:2 259:8
**E-commerce** 39:16
**e-mail** 61:7 78:3 85:6 94:2 95:9 139:20 165:5 197:11,13 198:2,4,7,7,19 215:19,20 216:7,22 216:23 217:2 218:6 218:13,20 220:14 251:11,17,21 252:5 252:11,20 253:14 253:18
**e-mailed** 124:13
**e-mailing** 216:12
**e-mails** 32:15,19 85:22 86:2 153:13 165:3,9 197:18 198:16,17 203:2 205:2,3,4,5 252:22 254:11,20 255:3
**E-series** 78:24 79:3 79:10,20
**earlier** 14:20 27:20 40:23 41:4 65:6 98:12 123:19 141:22 151:20 166:21 172:14 189:19 199:15 235:20 240:18 242:17 250:16 251:8 252:23
**earliest** 251:17
**early** 21:20 28:20 79:21 80:11 89:24 148:3 163:22 171:13,21 172:2 210:17 220:2
**earn** 191:20,21
**easier** 249:16
**EASTERN** 1:2
**easy** 256:25
**Ebay** 39:15
**ECF** 212:4
**eCom** 78:24
**edit** 81:5,8 92:3,5 99:13,18 100:25
**edited** 83:25 84:9,17 100:4,14,15 237:17 237:25 238:13 239:2,5
**editing** 86:15
**edits** 86:8 237:18,24 238:10,23,25
**educational** 18:7
**effect** 3:17 5:20
**effectively** 117:12 223:11 235:23
**effort** 84:18 118:15 142:16 199:18
**eight** 34:5 209:11
**either** 42:3,19 59:8 61:12 82:8 88:5,15 89:25 90:2 107:9 166:17 185:17 186:3,11,18 187:6 188:22 189:14 199:6 202:9 205:11 206:19 242:4
**electronic** 21:10 32:5 84:6 86:11 100:17 202:22
**electronically** 208:24
**electronically-stored** 222:8
**elevated** 110:21
**eligibility** 123:25
**eligible** 108:12,13,15 123:14,15,18,23
**else's** 178:24
**Emanuel** 2:7 4:17 5:7
**EMANUEL@SAG...** 2:7
**emphasis** 123:15
**employed** 25:23 217:10 241:9
**employee** 27:7,8 36:8 46:25 47:4,6,20 48:4,11,14,17,21 50:4 51:2,5,14 54:2 59:2,12,13,24,25 62:4,14 63:7,24 66:4,6,8,17 70:24 75:19,25 76:24 77:21 78:14 80:8 81:23 82:19,20,21 83:16,24 84:2,7,12 84:19 86:7 88:7,21 88:24 92:8,21 93:14 93:18,24 94:24 95:13,20,23 97:5 98:24 100:5 102:8 102:20,23 103:5,7 106:12,16 107:10 107:24 109:5,16 114:21 115:2,14 116:8,23 159:19 160:15,18 161:15 161:18 162:13 165:15 169:12 171:14,16 172:23 174:20 181:13,19 181:20 182:2 183:4 183:7 188:9,19 190:2 194:23 199:4 199:4 219:14,17 239:18 245:20
**employee's** 47:15 50:6,7,16 51:11 53:16 81:6,9 84:18 102:13 174:13
**employees** 19:6 45:10 45:22 46:15,17 47:10,13 49:3 50:23 51:20 52:6 53:12 56:5 57:8 64:4,6,25 65:20 71:24 81:20 85:2 87:7 89:3 90:8 90:11,22 91:7 94:10 96:6,9,14 97:22 98:9 100:8 104:19 104:24 107:2,5,7 109:21 111:21 115:23 116:6,13,16 123:8,11 129:22 132:11,17 140:25 149:9 150:8,10 151:9 153:20 157:11 158:2 160:7 160:10 161:24 169:2,6,8,25 184:4 194:8,10 195:5 196:9,14,18,19,21 196:23 211:7,8 220:21
**employees'** 52:10 65:8 74:16 75:15 86:22 87:5 142:2 157:20 169:25 203:3
**employer** 117:20 160:4
**employment** 58:16 60:17,22 61:20,23 95:3 121:24 143:18 144:21 149:24 157:5 161:16 163:4 163:15 165:24 166:22 167:21 168:2,10,15,20,21 168:25 170:19 171:6,12,15 173:11 173:20 174:13,17 200:13,14 213:23
**en** 151:21
**ended** 182:18

**ends** 76:22
**engage** 211:11
**engaged** 37:6 175:14 181:12
**enjoying** 103:6,8
**ensure** 54:15 143:3
**ensuring** 170:9
**enter** 221:4,8 227:2 229:13 248:2
**entered** 36:19 249:3
**entering** 227:22,23
**enters** 36:14
**entire** 44:8 45:3 71:23 245:15
**entities** 12:20
**entitled** 6:19 183:7
**entity** 38:19,19 43:18 69:3
**entries** 32:15 244:17 244:19,23
**entry** 56:3 81:6,9 212:5 245:7
**envelope** 135:10,14 135:20,20,21 138:25 139:11,20 139:25 140:9 176:15
**envelopes** 135:6 136:9,16,17,20 139:5 140:14 176:9 176:12,19,20 177:3 177:7,14,16 253:5
**environment** 70:21
**equally** 165:9
**Erin** 62:2
**errand** 93:9 105:15
**ERRATA** 261:2
**error** 53:17
**especially** 81:21 177:12
**ESQ** 2:7,12
**establishment** 38:8
**et** 45:25 178:17
**Euclid** 11:25 41:11
**evaluation** 143:24
**evening** 234:8
**event** 53:16 57:6 82:16,25 88:7
**events** 6:15,19 179:11
**everybody** 226:25
**Everyone's** 141:18
**Ex-employee** 63:6,11 63:18
**exact** 41:10 60:5,9 120:19 141:18 182:25 250:16
**exactly** 10:4 13:12 37:15 80:14 91:2,20 226:20 241:18 249:19
**EXAMINATION** 5:5 120:7 259:3
**examined** 120:5
**example** 77:11 95:23 153:6 183:18 201:11 234:25 235:10 252:25 254:16
**examples** 39:14 197:20 234:19
**exceed** 115:23
**exceeding** 212:18
**Excel** 247:14,21,23 248:3 249:15,21
**exception** 169:13
**excerpt** 222:16 237:7 240:18,21 242:17 251:8 252:2
**excess** 109:7 114:23
**exchange** 165:14 251:11
**exchanged** 205:11
**exclude** 107:19
**excludes** 200:6
**exclusive** 28:5 68:17 75:14
**exclusively** 25:24 70:4 106:13,15 111:13 167:5
**Excuse** 5:23 148:5
**executive** 111:15
**exempt** 109:17,20 110:2,9 111:25 114:22
**exemption** 118:6
**exemptions** 111:9,14
**exercise** 50:10 51:17
**exercising** 53:21 236:7
**exhibit** 158:22 159:7 212:6 214:23 215:24 216:2,3 221:15 222:4 234:16 235:11 236:10,20 239:8 240:12 246:10,23 251:13 255:11 259:10,13,16,18,20 259:21,22,24 260:2 260:3,5,7,9,11,13
**exhibits** 8:3 211:17 233:25 234:2,5 236:13
**exist** 15:20 230:14
**existed** 36:3 230:18
**existence** 39:10 52:25 53:3,11 72:24 78:15 86:14 101:15 208:3
**existing** 42:14
**exists** 78:6
**expand** 236:25
**expect** 179:7
**expectation** 106:15
**expected** 76:21 80:25 129:3,20 130:2
**expense** 72:22 74:6
**expenses** 133:22
**experience** 178:19 224:8
**expert** 211:11
**explain** 37:24 76:16 155:18,20 225:15 226:5 229:4 231:13 241:23 250:11
**explained** 123:19
**explanation** 226:17
**explicitly** 106:14,18
**export** 237:5,16 238:4,6 240:20 242:18,19 243:7,9 247:5,10,11 248:7 255:18 256:2
**exported** 243:14,16 243:17 245:10,11 245:11 247:9 248:4 248:5,22 249:8,14 255:25
**exporting** 245:3
**exports** 204:13,15,17
**extent** 72:16 86:3 126:2 162:6 198:15 198:17 202:19 205:11,25 229:23 246:6 254:24

F

**F** 258:2
**facilitated** 89:23
**fact** 8:2 9:21 30:24 51:25 54:8,9 67:22 74:14 80:6 91:14,15 104:8 111:12 117:12 150:19 158:2 172:16 173:8 203:12 224:11 229:16 238:12 240:23 245:11 253:22
**factory** 38:7
**facts** 89:10
**failed** 73:8 85:7 98:24
**failing** 81:20 168:25
**failure** 166:21 167:25 168:15,20 170:18 171:12
**fair** 9:23 12:23 13:6 14:6 15:14 24:5 26:2 36:5 37:2

39:21 44:20,24 54:22 55:18 64:10 64:16,24 65:15 66:20,23 67:14 68:20 71:17 73:7,14 74:24 76:10 77:15 86:21 92:20 95:18 101:2 102:22,25 103:3 106:11,20,21 107:23 111:18 136:14 156:13 163:23 164:2 167:23 169:24 170:4 172:22 173:2 173:5 177:5 179:11 180:11,20 184:18 185:15,16 191:9 194:5,23 195:23 197:17 204:21,24 207:20 209:4,17,21 219:11 222:23 227:14,18 228:19 238:22 239:23 240:3,6 241:9 248:21 249:7 254:2
**fairest** 83:18
**fairly** 40:7
**fall** 123:6
**fallout** 122:10
**false** 186:8,10,17
**familiar** 29:13 30:4 30:12,16,20,24 57:12 67:22 86:10 86:13 96:23 111:8 111:12,15 118:5 123:16 124:8 125:22 126:14,17 163:14,20 186:21 203:12 212:9 215:2
**familiarize** 216:18
**family** 184:5
**fancy** 29:20
**far** 44:9 48:24 49:4 49:18 56:12,24 64:9 84:23 123:11 137:25 138:4 142:4 172:19,22 191:5 211:21 256:19
**faster** 153:18
**favoritism** 191:18
**February** 155:24 157:15
**federal** 163:5 166:19 167:12 170:3 174:6
**feel** 103:15 125:20 180:2
**feels** 179:25
**fees** 166:21 167:13 256:18,21
**feet** 209:6,19
**felt** 107:8
**fewer** 103:11
**FICA** 162:22 210:5 223:14,17,24
**field** 70:8 133:20 239:19
**fields** 248:15
**fight** 122:5
**figure** 14:21 70:4 73:17 211:22
**figured** 223:23
**figures** 166:11
**figuring** 54:10 73:16
**file** 31:6 163:24 166:22 167:25 168:5,11,15,20,25 170:18 171:12 225:9,10 226:20 227:7 228:2 232:3 232:10 233:16 238:18 240:20,22 241:24 243:4,12,16 243:18 245:10,13 246:20 247:21,23 248:3,4,5,14 249:8 249:10,12,14,15,18 249:18,20,21,22,25 250:15,20 255:24
**filed** 30:13,17,25 128:6,9,10 144:2 167:15 171:7 172:10,11,24,24 173:20 174:6,25 200:15 209:2 243:8
**files** 26:21,23 196:11 245:3 248:22 249:5
**filing** 3:6 42:23 163:4 165:24,25 166:3 168:2,4 175:7 200:11,13 201:23
**filings** 166:9 167:21 200:24
**fill-in** 150:6
**filled** 70:8 124:17,21
**filling** 145:18
**final** 13:17,19 15:19 16:3 253:23
**finalizing** 54:11
**finance** 224:13
**find** 254:19
**finding** 200:23
**fine** 169:21
**finish** 7:6
**fire** 12:8 13:4,8,10,20 14:8,12,22 15:9,21 17:6,6 44:17 153:19 154:11,23 155:11 156:14 157:19 158:10
**firm** 25:13 26:20,20 26:21 27:3,7 28:2,5 28:11,18,23,23 29:2 29:5,7,11 65:12 163:3 164:11,17,20 165:2,7,12,15 167:5 167:9,15,18 171:23 172:15,17 256:15
**firm's** 27:11
**first** 4:22 5:16,18 10:2,3 11:23 20:10 28:14 33:9,13,22 34:3,21,25 40:24 44:10 58:11 59:3 72:14 85:5 90:7 92:24 97:9 113:16 113:21 125:8 127:24 128:8 144:22,25 145:11 145:13 146:13,18 150:3 159:23 163:20 164:12 166:12,12,13 167:18 172:18 173:3 175:9 184:19 191:7,23 215:17,20 215:24 216:15 222:18 224:15 228:11 241:7,22 242:12,16
**fit** 109:25
**five** 88:2 164:20 169:18 195:10
**five-hour** 243:21
**fixed** 238:16
**fixtures** 23:25
**flagship** 138:4 239:24
**floor** 2:11 183:13
**focus** 234:14,20
**focusing** 91:5 224:20 224:21 226:12 227:12 231:12 232:12 233:11 250:4
**follow** 43:11,16 86:9 162:11 180:10 184:13 194:4 196:16 202:22 206:23 226:10 230:3 246:11 250:3 252:9 255:5
**follow-up** 191:11
**following** 200:11 242:10 250:8
**follows** 4:24 120:6
**force** 3:17 5:20
**foremost** 191:7
**forgot** 100:8,20 178:11,13 179:3 199:24
**form** 3:12 14:17 15:4

16:4 29:17 31:23 45:21 57:10 64:8 82:5 89:6 93:4,11 93:15 95:7 96:2,3 107:18 115:16 117:16 139:22 143:18 152:21 159:6,9,12 160:8,14 160:23 161:2,9,20 161:22 162:3 163:18,21 165:4 166:24 168:2,3 173:12 174:6,7,8 179:15 180:25 196:24 205:15 206:10 208:9 217:19 248:21 259:15
**formal** 9:12
**formally** 9:6
**format** 160:19 202:22 231:6 241:22 249:6,9,17
**formatted** 249:13
**formatting** 237:15 249:20 250:2
**formed** 10:5 94:21
**former** 100:23
**forms** 168:5
**formula** 109:10 118:10 228:3
**forth** 34:15 39:15 209:20 258:12
**forward** 166:17
**forwarded** 205:3
**fostered** 191:13
**found** 166:5 195:20 238:15
**four** 87:24 88:2 241:7 241:15
**frame** 15:25 33:16 61:19 128:2 171:17 235:9
**framed** 51:20
**Fredonia** 18:10
**free** 95:10 103:15
**freelanceer** 26:10
**freelancer** 27:9
**frequency** 137:7 176:11
**frequent** 165:10
**frequently** 114:5,6
**Friday** 76:19 232:16 232:24 233:2 234:8
**friendly** 70:21
**friends** 184:4
**front** 5:21 176:17 188:14
**frowned** 107:16,20
**froze** 126:5
**frozen** 125:25
**full** 8:8 88:10 149:8 183:13 252:4
**full-time** 76:13 77:4 109:21
**fully** 102:23 183:8,10
**function** 12:18 33:5 36:11 53:8 220:15
**functional** 50:8
**functions** 54:19 56:6 56:8 98:11
**fund** 57:9
**funding** 73:9
**funds** 57:7 68:12 73:25 171:4
**furniture** 23:25
**further** 3:10,14 4:8 236:8 258:15

**G**

**G-I-S-E-L-A** 62:22 62:25
**G-R-O-T-H** 193:7
**G-R-U-S-H-K-O-...** 25:12
**geared** 188:2,2
**gears** 102:7 128:23
**general** 16:7,10 24:3 125:20 141:3 152:19 186:6,24 187:15 194:7
**generally** 18:6 22:24 23:2,4,7,17 25:4 36:10 42:25 77:15 89:11,12 93:13 105:23 108:4 111:8 150:21 163:15 187:12 189:25 190:25 195:5 199:18 202:25 204:25 213:20 219:13,16 250:19
**generate** 37:15 69:23
**generated** 189:21 230:23
**generation** 189:8
**gentleman** 257:2
**gestures** 6:24
**getting** 34:14,18 47:21 69:14 108:2 109:23 113:18 211:17 232:5
**gifts** 148:23
**Gisela** 62:22,24
**give** 13:7 41:9 57:17 83:11,16 113:17 147:22 175:19 196:7 210:25 211:20 236:14 256:20
**given** 108:25 141:11 145:13 149:19 153:9 156:18 161:14,22,24 183:17,20 195:6,12 196:4,5,15 198:11 237:23 258:14
**giving** 204:14
**go** 7:25 14:15,18 15:11 17:24 25:14 48:10 53:6 57:4 66:5,7,9,17,18 73:13 74:8 76:25 77:11 84:25 89:6 90:17 91:4 95:24 97:17 100:2 106:17 112:16,17 119:23 135:25 136:6 138:23 142:15 152:21 172:8 181:2 191:15 195:20 199:5 207:8 211:19 212:21 214:9 217:18 225:8,17,19 232:9 235:22,25 236:13 238:14 240:16 241:24 255:17 256:25
**goes** 17:22 79:23,24
**going** 6:2,4,15,25 7:7 8:6 13:16 17:5,11 20:5 21:21 24:18 53:17 55:17 75:13 76:15 92:24 113:10 135:4 144:2 145:17 162:9 166:2,20 169:19 176:9,13 180:12 184:2 185:24 186:20 193:24 211:16,25 215:16,22 218:20 226:7,19 227:2 230:5 233:25 234:4 234:14 236:18 239:6 242:21 249:24 252:7 253:8 254:9,25
**Goncalves** 1:4 5:8 42:19 66:21 67:5,6 67:10 80:20 100:4 105:21 108:11 110:18 120:9,17 121:21 126:21 127:2,6 128:24 129:3,19 130:5 131:15 133:4,21 134:9 135:2 142:5 143:5 144:3,23 160:24 161:3,8 162:8 168:16 170:2

173:9 175:13 176:3 177:18 180:22 185:4,18 186:3,11 187:7,16 188:6,23 189:14,20 190:5,9 190:23 191:8,13,16 191:19 193:10 198:3,20 199:17 202:3 206:17,22 207:7,16 209:5 210:3,6,19 213:16 217:3,15 218:14 219:2 239:14 241:14 244:2,4,8,10 245:8 253:13 254:20 255:4,20 261:2
**Goncalves's** 144:21 192:19 253:23
**good** 5:6 7:4 60:22 61:23 62:19 220:23
**goods** 37:18 91:10
**Google** 186:22
**gotten** 161:11 171:14 171:18
**government** 163:5 170:3
**grand** 256:20
**great** 182:23
**greater** 142:23
**green** 222:23
**gross** 43:3,5 162:17 197:14 212:17 223:2 225:3 227:24 228:13
**Groth** 193:6
**ground** 8:10
**group** 94:5 206:19,19
**grouped** 251:2
**GRUSHKOVKIY** 2:21
**Grushovskiy** 25:11
**guess** 6:17 13:7,16,22 16:22 34:23 51:17 60:8 66:4 68:16 69:24 80:5 83:3 85:5 91:3 105:12 108:14 112:3 148:2 148:3,3 163:22 172:7 175:16 185:12 240:24 251:16,25
**guessing** 72:7,8 129:13 172:6
**guidance** 112:5,6,11 113:25 114:11,17
**guide** 215:4
**Gusto** 53:8,11 166:15 166:16,17 169:15 194:15 200:13 201:21

**H**

**H** 259:8
**H-A-N-N-A** 63:5
**H-U-M-A-N** 8:18
**half** 21:12 88:3 138:3 153:9 228:6 231:21
**hand** 258:20
**handbook** 174:21
**handed** 168:4,7
**handing** 164:6
**handle** 28:24 55:4 83:2 114:8 167:5 220:15
**handled** 28:11 171:24 174:17 177:10 220:5
**handling** 54:11 163:9
**hands** 209:6,19
**handy** 24:5
**hanging** 105:12
**Hannah** 63:5
**happen** 82:13,16 88:21 103:10
**happened** 72:3 115:13,19 122:4,7 122:22 146:5 178:25 232:21
**happening** 82:24 176:6 199:10
**happens** 136:24
**happy** 169:19
**hard** 23:19 57:3 64:13 176:21 180:11 181:3 186:19 204:6,10,14 209:13 218:17
**harmed** 175:14
**hate** 138:15
**head** 8:14 191:7
**headquarters** 77:12
**hear** 30:15 119:3 120:13 126:4 147:18 185:6 224:18
**heard** 27:21 189:10 190:15 209:22
**heart** 112:22
**held** 1:20 13:12 140:16
**Hello** 216:10
**help** 24:3 102:14 224:15
**helped** 156:17
**helping** 33:18 164:24
**helps** 6:5
**hereinbefore** 258:12
**hereto** 3:6
**hereunto** 258:19
**hesitation** 80:5,10
**hey** 81:24 83:8 84:13 91:17 92:22 93:19 105:14 179:2 199:23
**Hi** 209:23
**Hiesiger** 1:22 4:23 258:8,23
**high** 181:9 195:10,19 196:2
**higher** 84:20
**highest-ranking** 64:17
**highlight** 243:2,16,17 243:21 246:18
**highlighted** 213:16 216:7 221:12 228:11 242:22 244:17,17,21,24 250:9,12
**highlighting** 212:15 223:8 230:11 232:4 246:16 252:20
**highlights** 242:25
**highly** 77:18
**highly-seasonally** 195:13
**hindsight** 176:10
**hire** 46:14
**hired** 46:17 64:20 120:11,12,14 121:2 121:3,15 124:15 144:12,25 145:11 157:11 210:18
**hires** 157:11
**hiring** 120:15 157:15
**Hoffmann** 61:8
**hold** 173:6 184:22
**holder** 177:2
**holding** 13:13
**holiday** 131:19 148:23 149:5 233:18,20
**holidays** 149:4,6
**home** 37:18 77:17 78:2 136:22 146:24 147:2,3,21 148:4,6 148:9,11
**homes** 90:9
**honestly** 238:18
**hop** 83:6
**horrible** 190:2
**hot** 183:19
**hotel** 41:11,14,15 42:3 43:22,25
**hotels** 41:16,19 42:6 42:13,17
**hour** 21:12 67:11,24 87:25 88:3 90:2 92:22 103:18

121:17 145:6 149:12 153:10 199:12 218:22 231:21 234:7
**hour-and-a-half** 147:14
**hourly** 76:24 110:16 110:17,19,22 111:6 116:14,25 119:8 121:14 145:3 196:19
**hours** 36:8 50:4,6,16 50:21 51:11,15,17 51:22,23,25 52:6 54:3 69:19,25 70:25 70:25 71:2 74:16 77:5,6 81:12,17,25 81:25 82:20 83:24 84:8,13,18,19 86:8 86:15,22 87:5,23,24 88:2 89:15 91:17 93:21 94:2 95:14 98:4,8 99:13,18 101:8 106:12 107:3 107:5,7,22 108:8,13 108:17,22,24,24 109:6,7,12 114:23 115:24 116:9 117:13,18 128:24 130:16,19,23,25 131:4,9,18,21,23,24 132:4,20,21 142:2,9 142:17,25 145:18 147:9 156:21,23 177:19,21,23 178:12,16,21 179:8 179:13,14,18,18,23 180:5,7,14 181:5 191:19 197:15 199:8 209:11,16 219:9,12,18 220:8 222:9,25 224:16,22 225:4,4,12,16 226:2 226:3,15,16 227:13 227:14,24 228:6,13 228:16 231:14,19 231:21 237:25,25 238:2 240:19 241:2 241:3,3 242:23 245:7,14,17,21,23 246:2 251:9
**house** 148:12
**human** 8:18
**hundred** 114:10 248:19
**hunt** 207:9
**hypothesize** 92:15,17
**hypothetical** 83:3
**hypothetically** 83:15

**I**

**idea** 28:3 43:4 98:10 102:18 103:20 105:24 106:2 157:23 231:7,25 233:7 243:5,19,20
**identical** 196:21
**identification** 158:24 159:3,9 212:8 214:25 216:5 221:17 222:6 234:18 235:13 236:22 239:10 240:14 246:25 251:15 255:13
**identified** 40:23 54:16 70:19
**identify** 29:10 32:12 48:22 70:15 71:3 188:18 193:3 196:14 234:4 240:15 247:3 255:14
**identifying** 248:15
**identities** 16:9 41:18
**identity** 38:15
**ignore** 103:8
**illegal** 210:22
**image** 85:7 158:18,23 251:25 259:10
**impacted** 191:20
**implemented** 71:19 101:4 201:12
**implementing** 101:11
**Implicit** 91:14
**implore** 20:8
**imply** 207:24
**important** 208:17,20
**impose** 166:20
**impropriety** 135:2
**in/clock** 33:5 131:14 196:10 237:8
**inappropriate** 95:16 95:17 98:23 115:7,9 130:20
**inappropriately** 190:10,14,19
**inattentive** 190:3
**inception** 23:11 28:6 28:21 34:6 35:2,4 36:6 58:16 210:16
**incidence** 54:14
**incident** 109:2 121:23 122:2 182:13 189:11,18 189:19,21 191:7
**incidents** 200:3
**include** 39:10,22 81:24 91:13
**included** 85:22 117:15 146:9 232:23 242:11
**including** 77:17
**incorporated** 172:18
**incorrect** 52:7 53:2 70:11 82:7
**incorrectly** 122:24
**increase** 50:5
**increased** 81:17 117:13 161:20
**increasing** 50:15
**incur** 169:13 242:6
**incurred** 107:17
**independent** 26:3 210:13
**independently** 150:24
**India** 38:6,8,24 213:2 213:4,9
**indicate** 4:14 182:4
**indicated** 99:4
**indicates** 147:4
**indicating** 225:20 239:2 242:3,22 243:5
**indication** 89:14
**individual** 26:24 38:23 45:14 55:21 56:8,25 70:10 71:10 73:5 76:9 86:22 87:4 99:14 102:8 118:22 134:10,17 134:21 139:9 210:12 217:25 247:8
**individual's** 38:15
**individualized** 235:16,18
**individually** 46:9 57:17 58:22 59:18 175:5
**individuals** 39:22 110:5 165:12
**infer** 40:7 179:11 254:2
**inflate** 179:12,18
**inflated** 177:18 179:22 180:6,23 181:5
**inflating** 177:21,23 180:14
**inform** 50:23 52:6 54:6,7 116:6 132:17 182:3,15 215:16
**information** 14:7 25:9 30:8 31:5,17 32:3,5,6 33:2 39:10 56:9 85:23 98:7 144:4 168:7 176:7 197:12 208:24

222:8 225:19 229:13 245:12 246:11 248:3,16 249:2 260:16
**informed** 47:20 48:2 66:9 78:14 79:21 115:22 124:14 181:25
**infrequent** 102:2
**initial** 27:17 30:5,9 145:3 214:22,24 216:22 259:18
**initiating** 182:15
**inputted** 237:23
**ins** 109:3 229:9,11,18 238:23 246:8
**inside** 41:14 118:6 138:25 140:13
**install** 80:25
**installed** 34:7,25
**instance** 65:24 81:16 85:8 92:7,11 96:19 96:20 100:3 130:24 135:10 153:10 181:4 192:22 253:11 254:6
**instances** 81:19 90:19 91:21 92:10 108:7 135:12 153:11 178:4,18 200:7 232:4
**instant** 182:6
**instituted** 70:23
**instruct** 116:7
**instructed** 96:6,10,17
**instruction** 92:18
**insufficient** 73:25
**insurance** 14:10,15 15:7 157:18,24,25 158:4 168:22 173:20 174:3 215:10
**integrate** 75:8
**intent** 178:23,24
**intention** 230:12
231:9
**inter-location** 90:14
**interact** 26:16
**interest** 11:6 167:2 167:13
**interested** 258:17
**interests** 166:21
**interface** 36:13 80:4 80:22 90:23 91:19 163:2
**interfered** 190:10,14 190:19,23
**interference** 191:5 192:24
**interject** 192:11
**interrogatories** 29:14 29:17,25
**interrogatory** 225:23 226:6,10,11
**interview** 150:8,9
**interviewed** 46:24 151:4
**interviewing** 150:25 214:18
**interviews** 47:23 67:17
**introduced** 244:5
**inventory** 181:12 183:16,19
**investigating** 152:18
**investigation** 82:3 189:24
**invited** 132:18
**invoices** 40:18
**involve** 142:22 180:5 209:10
**involved** 12:24 28:15 29:16,24 30:7 31:4 31:8,10,13,18 34:9 34:18 37:20 39:25 40:13,21 41:24 42:22 43:19 46:3 50:15 64:17 67:19 68:4 76:5,17 85:13 91:9,11 92:16
101:11 116:11 120:15 122:21 127:5 133:3,12 174:23 203:20,22 217:24 219:25 235:2 256:8,12,17
**involvement** 23:12 40:16 71:23 91:6
**IP** 79:20
**iPad** 56:2,11 79:23 79:25 80:16,17 99:23
**iPads** 99:21
**iPhone** 78:6,23 79:15 79:19
**irrelevant** 227:5
**irrespective** 142:15
**IRS** 171:15 223:22
**isolated** 200:2
**issue** 48:8 68:8,11 80:2 106:16 112:12 192:19
**issued** 208:4
**issues** 69:5,6 101:22 106:11,21 146:17 191:25 192:4
**item** 183:19
**items** 37:22 118:13 183:10

**J**

**J** 4:21 120:4
**Jamaica** 2:5,6
**James** 1:9,18 4:1 5:1 6:1 7:1 8:1,9 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 17:25 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1

196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1,11 258:11 259:4 261:3
**January** 195:7
**jeans** 181:18 182:20 182:23
**Jim** 1:10 17:25 139:20 216:11
**job** 7:4 60:19 76:13 76:17,20,22,24 77:2 77:8
**Johnson** 2:10 4:20
**join** 127:9
**joined** 25:11 65:11 127:14
**joint** 49:24 99:20
**jointly** 46:8 99:19
**judge** 5:22
**judging** 172:7
**Juliet** 63:9,14
**July** 212:4,7 237:6 238:13 242:23 243:21 250:7 259:16
**June** 120:24 216:16 241:8,8 250:7

**K**

**K-E-T-C-H-A-M** 5:9
**Kataev** 2:7 4:17,17 5:5,7 25:10 43:8,15 65:10 74:8,13 86:3 94:6 119:23 120:7 125:24 126:7 127:13,17 159:2 162:6 169:17 184:11,22,24 192:16 193:24 196:12 198:15,25 202:19 206:13 211:15,24 215:25 221:25 225:22 229:23 233:24 234:4,12 235:25 236:4,17 237:3 239:6 240:10 246:6 246:21 249:22 251:10 252:7,18 254:24 255:8 256:4 256:22 257:7 259:4
**Kate** 59:20,22 61:6,6 61:6
**Katherine** 16:21,23 17:14
**Kathy** 16:21 58:6,22 152:7
**keep** 15:16 74:16
**keeping** 217:23
**kept** 75:15 115:14 226:21
**Ketcham** 1:5 5:8 16:20 42:19 67:2,4 67:23 68:2 81:3 100:10 105:25 110:4,15 144:9 145:15 147:21 148:18 149:11 150:8,13,18 151:16 152:10 153:22 154:3 157:10 161:10 162:9 168:17 170:2 173:21 175:13 177:18 180:23 181:12 182:15 184:15 185:5,18 186:4,12 187:7,16 188:5,22 189:14 190:5,9,23 193:11 198:3,21 202:4 206:18,23 207:8,17 209:5 210:2,19 214:3 224:21 227:16 231:17 232:4 239:13 247:2 250:25 254:12 261:2
**Ketcham's** 144:24 157:5 210:7 213:23
**key** 136:10,11 176:25
**kicker** 235:10
**kickoff** 132:17 141:20,25
**kind** 18:13 23:25 100:11 132:13,23 139:17 156:2 157:22 177:20 186:19 206:11
**kindly** 126:8
**knew** 51:18,25 91:25 227:4
**know** 5:24 7:7,21 9:15 10:5 13:18,23 14:2,5 25:17 26:8 26:13,18 27:8 28:8 28:13,17,20,22 29:4 29:7 31:15 33:12 34:17 39:15,24 40:4 40:12 41:9,15 42:5 42:9,18,21 43:7 44:9 45:17 46:7 47:14 49:4,23 50:12 50:17,22 51:12 54:20 55:16 56:12 56:24 57:11,23 59:3 59:17,19 60:6,8,20 61:16,18 62:9,17,19 62:23 63:2,12,19 64:2,9,19 65:24 67:25 68:21 73:22 74:3 77:5 79:14,16 79:18 84:10,10 88:16,23 90:12 91:12,24 92:10,17 96:17,18 97:11 101:5,13 102:10 103:24 105:20,22 106:3,3,15 108:3,21 109:18 110:9,13,15 112:4,21 115:8,20 116:3 119:11 120:9 122:25 123:2 125:18 126:5 129:5 129:21,23 130:6,11 130:12,14 132:6,8 132:12 133:10,24 134:22,24 141:5 142:4 143:9 144:7,9 144:12,14 145:2,5,8 145:10 146:10,16 147:2,23 149:14,25 150:4,5,12,23 151:3 151:12,14,15,18,19 152:3,4 153:4,10,16 154:3 156:6,7,8,11 157:9,13,14,21 158:9,13 160:12,13 160:16 161:8 163:17 165:20 168:5,13 172:5,23 174:18 175:17,17 175:22 178:23 180:9,16 182:8,21 184:9,17,21 185:25 186:16,20 187:8,20 187:22 189:10 190:7 191:4,6 192:3 193:3,12,17 195:15 198:13 203:4,16,17 203:18 204:14 205:8 207:10 208:10,15 209:8

210:11,15,17 211:14 212:19 214:12 216:12 218:10,13 219:4,23 227:24 230:10,11 231:5,9 233:5,9,19 233:21,23 235:5,14 239:22 244:7,8,10 244:15 248:9 251:17,22 252:11 253:6 256:21
**knowledge** 7:19,20 7:22 11:5,8,9 12:14 12:16,17 14:7 15:18 17:23 26:9 27:6 28:4 35:13 39:16 45:10 50:14 56:7 57:16 58:21,24 60:15,21,24 61:22 67:7,10 72:9 73:19 73:24 74:4 75:18 77:20 79:5 83:25 85:21 86:14 89:9 93:23 94:24 96:5,9 102:12 104:4 106:25 108:11 109:16 110:12 117:19,23 120:25 123:3 125:15 129:6 129:8,15,19 134:5,9 134:12,25 141:25 143:5,22 145:15 146:25 147:20 148:22 149:15,18 150:7,13 153:12 157:25 158:6 168:9 175:3,8 176:18 178:19 179:21 180:21,22 181:15 184:18 185:16 187:5 188:7 189:3,5 189:6,11,18,23 190:22 192:23 197:3 198:6 199:3,7 199:11 207:11 213:25 215:7 217:6 217:9 219:6 221:20 229:19 230:8 240:2 243:25
**known** 255:4
**Kristin** 1:9,9 5:10 8:25 9:4,12,18,22 10:12,15,22 11:6,10 11:19 12:19,22,24 16:7 17:19,20 19:7 20:25 22:11 23:12 26:6 28:6,12,15,16 28:18 31:10 33:23 34:17 37:3,6 38:13 39:11,17 43:6,17,20 44:6 46:11,21 49:6 52:25 54:5 56:20 57:17,20 58:21 59:17 61:16,20 64:12,16 106:18 120:14 124:14 125:12 133:18 137:10,17 152:3 172:2 207:22 208:2 210:16 212:17 221:12 261:2
**Kristin's** 172:13
**kudos** 248:20

**L**

**L** 3:2
**label** 38:3
**Labor** 112:14,22 113:14 114:2,13,16 117:25 118:3 174:2
**Labor's** 113:5
**lack** 37:21 72:18 171:3 255:2
**landlord** 13:14 14:16 14:21,25 15:12
**late** 16:10,15 23:7 71:24 72:10,17 98:23 151:9,10 171:21 234:7
**latitude** 16:6
**law** 25:14 65:12 256:15
**lawsuit** 19:13 58:18 58:22 61:14 127:25 128:6,9,13,14 144:2 144:7,8 184:20 186:6 192:2,3 199:21,21 200:18 200:24,25 201:3,7,8 201:12,13,16,19,24 222:12 243:8
**leads** 77:13 156:10
**learn** 171:11 217:16
**learning** 65:13
**lease** 13:9,13 14:23
**leave** 13:20 60:22 61:22 62:7 63:7 89:24 92:13 179:4
**leaves** 217:14
**leaving** 189:21 241:11
**led** 121:23 189:8,12
**ledgers** 140:13
**left** 36:18 61:20 62:17,19 63:12,19 64:2 143:15 144:5 191:8 192:2,24 199:4 211:18,22 256:5
**legal** 2:4,21,23,24 4:18 167:6,11 256:18
**length** 38:20
**let's** 13:17 51:14 74:8 90:6 119:23 135:13 140:13,23 149:6 203:11 223:8 228:4 228:24 235:25 236:11 246:21
**letter** 171:14 192:9 207:16
**letters** 27:5
**letting** 218:13
**levels** 119:14
**license** 18:14
**licensed** 207:25
**licenses** 18:13
**lieu** 4:9
**light** 167:25
**lightly** 103:13
**Lightspeed** 33:7,8,10 33:12,24 34:2,7,10 34:13,18,22,25 35:6 35:8,10,13,16,21,23 35:23,24 36:3,7,24 55:17,18 56:16 69:24 70:4,5 73:4 74:15,23 75:8,14 77:22 78:2,7,11,24 79:9,22,24 80:18,18 81:2 84:7 86:15 96:23 98:2,3 99:13 101:3,16,21 140:10 140:20,21 194:7 204:16,22 207:19 208:4 227:19 237:5 237:8,16 238:5,6,17 239:4,19 246:4 247:9,11,16 248:4
**likelihood** 241:14
**limited** 145:18 177:2 207:3
**Linda** 193:4
**line** 37:5 123:6 246:13 250:22 260:17
**LINE(s)** 261:5
**lines** 32:4
**Lisa** 1:21 4:22 258:8 258:23
**list** 40:10 202:16
**listen** 105:14
**lists** 215:6
**literally** 237:15
**litigation** 207:12
**little** 90:6 148:13 149:3 204:6
**live** 195:12
**lived** 147:9
**LLC** 1:9 2:4 5:10

8:17,25 9:5,7,13,23 10:5,10,19 11:7,10 12:20,25 23:13 26:7 28:6,12,15,19 33:24 37:3,6 43:6,18 44:7 46:22 52:25 172:13 172:18 207:22 212:17 221:13
**load** 77:4,19
**loaded** 79:25
**location** 12:21 13:3 17:5 22:16,19,22,25 23:5 43:23,25 44:10 44:13,16,21 45:11 45:11,15,16 49:6,8 72:25 77:12 92:23 92:24 118:11 121:6 121:8 138:5 153:20 154:7,8,10,14,17,18 154:21,22 155:5,7,9 155:10,11,14,15 156:16 170:24 199:4,5 239:16,17 239:23,24 240:4,8
**locations** 11:10,22 17:13 23:9 41:11,13 41:15,22,23 42:14 42:18 45:9,23 87:5 118:10 121:12 139:9 151:17 153:21 194:8,11,25 195:15,17
**lock** 103:15
**lockboxes** 177:4
**lodge** 147:21
**lodging** 147:16
**log** 78:2,11 90:23 97:18 98:25 140:2 140:11 245:23
**logged** 56:3,9,11 99:24
**logging** 86:18
**login** 56:18,22 57:4
**logins** 55:25 99:23
**logistics** 218:22 219:8 219:12,18
**logo** 78:25 79:2,3,5,6 79:9
**long** 7:25 8:3,21 20:19 22:4 27:12 34:2 42:2 60:6 71:8 146:20 151:13 154:19,20 157:23 213:5 234:10
**longer** 13:9 59:25 63:24 157:5 178:2 207:5 245:20
**look** 107:15 113:11 140:19,21 157:2 172:9 196:6,8,10 213:15 225:8,18 227:7,19 228:7,8 233:15 238:14 240:16 243:12 244:16 245:15 246:19 250:14 254:16
**looked** 142:25 200:4 204:4 242:13 245:13
**looking** 200:7 204:2 215:17 224:24 231:24 240:18 241:7 242:17 243:6 245:6 247:5 248:22 248:25 249:21
**looks** 225:25 232:3,6 233:4 239:15 240:17,21 241:25 254:6
**loose** 76:23
**Lopez** 62:13
**loss** 193:11 202:2
**lost** 202:4,9,13
**lot** 5:25 51:19 108:9 175:22 226:4
**loud** 216:17
**low** 183:19
**lower** 84:20
**lumped** 117:17 242:8
**lunch** 87:7,15,17 96:16,16 103:18 104:22 153:7 199:25
**Luncheon** 119:25

**M**

**M** 4:21 120:4
**M-C-N-A-M-A-R-A** 63:15
**Madam** 94:6 126:7 127:17
**mail** 170:22,25
**Main** 12:5,12
**maintain** 202:16,25 247:24
**maintaining** 202:17
**maintenance** 101:22
**majority** 76:14
**making** 6:7 46:3 69:15 70:9 71:10 72:21,22 91:9,25 137:14 175:20 218:2 249:16
**manage** 217:22
**managed** 39:17 247:14
**management** 18:21 192:19
**manager** 16:24 17:2 17:15,17 19:5 49:5 49:7 58:7,8,15 59:12,13 61:9,11 66:9,17,18 67:5 82:9,17 83:6 88:16 88:16 105:5,7 106:17,17,18 115:25 121:4,8 124:5 125:16,21 129:9 136:10 139:19 156:2 176:25 177:6,8 188:4
**manager's** 123:11
**manager/paralegal** 25:13
**managers** 16:6,10 17:12 48:24,25 49:4 49:19 56:4 64:6,14 64:21 65:6,9,18 69:5 99:25 103:14 104:3,19,23 107:6 115:22 116:7,11 123:9 176:23 197:4
**managers'** 17:11
**manages** 11:12
**managing** 55:7
**Mancuso** 63:5 64:5
**mandates** 89:13
**Manhattan** 138:23
**manner** 4:13 20:15 20:17 75:14 95:17 177:24 194:11,13 194:16 197:10 248:22,24 249:13
**manually** 242:14 248:2
**manufacture** 45:4
**manufactured** 38:5
**manufactures** 38:2
**manufacturing** 37:21 38:24
**March** 155:24 157:15
**Marin** 16:21 17:14 58:6,23 152:7
**mark** 158:20 159:2 212:2 215:25 221:21 246:21
**marked** 158:24 159:9 211:24 212:7 214:24 215:24 216:4 221:16 222:5 234:13,17 235:12 236:18,21 239:9 240:13 241:10 246:24 251:14 255:12
**market** 148:10
**marketplace** 39:13
**marketplaces** 39:8

**marking** 221:10 254:8
**marriage** 10:20,23 11:3 28:16 258:17
**married** 10:12,15 33:18
**massive** 189:21 191:8
**materials** 25:7,8 90:20 113:4,11,14 194:25 214:10
**math** 228:6,8,8
**matter** 69:13 172:16 219:17 258:18
**matters** 111:23
**McBride** 63:21 64:5
**McNamara** 63:14,16 64:5
**meal** 102:9,11,13,15 102:24 103:6,8 104:15 105:9 231:21
**mean** 19:12 33:17 72:17 76:23 88:3 100:18 108:4 110:23 116:3 125:16 131:11 134:19 138:9 140:15 141:10 142:11,12 152:15 155:14 162:19 163:18 164:11 181:3 186:19 187:8 232:20 235:7 237:11 238:4,6 250:19
**meaning** 20:16 121:7 194:14 226:17 236:6 237:12
**meaningfully** 15:24
**means** 63:23 126:15 229:6 232:22 237:17 238:12 242:7 250:12,23
**measurable** 145:20
**mechanisms** 90:4
**media** 189:22 191:9
**meet** 89:14 173:3
**meeting** 20:17,18,19 20:24 21:4,7,13,14 21:15,21 22:17 132:10,13,14 141:23 191:17
**meetings** 132:19,24
**member** 9:12,19,22
**members** 119:17
**Memorial** 213:20
**memory** 32:19 60:10 80:2 112:23
**mentioning** 182:20
**merchandise** 40:14 151:17 183:8 194:25 209:20
**merchandiser** 118:16 118:18,24
**message** 206:7,15
**messages** 6:8 85:22 153:14 165:11,13 165:14 205:11 206:5 207:6
**messaging** 5:25 6:6
**met** 21:22 172:18
**method** 165:6 169:7 194:20,21 226:12
**methods** 169:10
**midafternoon** 104:21
**middle** 23:2 27:16 57:19 199:5 224:25 226:14 232:12
**midmorning** 104:20
**midwinter** 156:3
**mile** 138:3,9
**mind** 25:16 33:20 39:14 202:12
**minimum** 34:6 204:22 252:24
**minus** 223:10 228:4 242:5
**minutes** 20:21 22:6 87:21 90:4 92:22 93:20 103:19 105:13,14,15,18 169:18 256:5
**misclock-in** 143:2
**misclock-out** 143:2
**misplaced** 202:9,13
**missed** 190:13
**missing** 142:6 152:25 153:7 202:13 232:16 253:4,20
**mistake** 241:4
**mistaken** 233:23 255:9
**mistakenly** 199:25
**misunderstanding** 153:2 163:11 164:3 164:5 166:6 167:24 170:13 174:10
**misunderstood** 247:19
**mobile** 78:11 80:22 90:23 91:18 93:2
**mode** 157:15
**modified** 100:21 249:8
**modify** 51:17 249:10
**Monday** 76:19 85:9 234:9
**money** 15:2,11,14 134:17 157:18 158:4 179:13 191:10,21 256:18
**monies** 14:25 253:10
**Montauk** 11:16 12:3 16:23 17:15,17 41:21,21 44:10 45:16 49:6 89:20 137:19,21 138:4,6 138:21 146:24 147:9,21 153:22 154:4,14,17,18 155:9 225:11 226:15 227:13 239:24
**month** 120:22 123:21 195:9
**monthly** 116:20 166:11,13 235:6
**months** 13:19,20 14:3,5 204:7 245:16
**morning** 5:6
**move** 140:23 180:20 209:20
**moved** 245:17
**moving** 50:3 144:9 174:25 185:3 209:25 214:20 240:10
**MTK** 172:11 225:3
**multiple** 38:16 89:16 107:4 178:15
**multiplied** 117:14 228:13
**multiplying** 117:6
**mumbling** 6:24

**N**

**N** 2:2 3:2 4:21,21,21 120:4,4,4 259:2
**name** 4:15 5:6 8:8,16 12:19 17:24 18:3,4 25:17 27:2,16 29:5 36:2 61:4 63:3 79:14,18 97:19,23 98:15,22 118:24 119:5 188:11 193:5 221:12 227:3 244:12,13 247:13 247:20 255:21 261:3
**named** 27:25 53:7
**names** 17:21
**narrow** 134:3
**Natalie** 58:25 118:25 152:7
**natural** 146:11
**nature** 24:11
**nearest** 101:8
**necessarily** 80:8 90:22 127:25
**need** 8:4 70:15 81:15

92:22 107:9,16 117:9 167:2 183:11 192:16 207:5 216:13 218:14 219:21,22 221:4 245:14
**needed** 99:8 106:23 107:11 140:11,21 145:18 164:10 168:10 245:22
**needs** 23:24 104:25
**negative** 187:6,15,22 189:9,12,22 223:4 223:14 228:3,10,17 242:10
**negativity** 191:9,13
**negotiating** 34:13
**neither** 106:7
**net** 105:17 123:20 162:17,20,23,24,25 194:21 197:15
**network** 5:24,25
**never** 19:21 57:24 75:24 84:16 86:19 87:11 91:9 92:20,25 100:23 101:10 103:11 116:21 131:3 143:21 160:13,17 174:6 202:12 235:18
**new** 1:2,23 2:6,11,11 12:3,5,13 39:23 40:8 112:13,21 117:2,14 127:9 157:11,11 161:21 173:25 216:14 219:14 223:22 258:4,6,9
**NIBI** 216:11
**NIBI-MTK** 5:11 17:21 38:3 159:25 172:19 216:13 221:14,21 239:23
**NIBI-MTK-BH** 240:3
**NIBI-MTK-WH** 240:8
**nice** 216:10
**night** 83:10 179:7
**nine** 8:23
**nitpick** 233:21
**non-compete** 126:18 126:22
**non-complete** 127:3
**non-discounted** 183:10
**non-manager** 177:10
**non-privileged** 208:12
**non-solicit** 126:18,23 127:3
**noon** 200:2
**normal** 128:23
**Notary** 1:22 3:16 4:23 257:21 258:9
**note** 199:24 227:6 232:15
**noted** 65:6 257:9
**notes** 256:4
**notice** 1:21 101:7 159:4,7,11 259:13
**noticed** 101:10
**notification** 100:16 215:10
**notifications** 86:8 100:13
**notified** 84:2,5,13 88:14 92:21
**notify** 84:11,19 88:15 89:25
**notifying** 84:8,25
**notion** 89:2
**Notwithstanding** 9:21
**November** 227:17 232:13,14,14 233:2 244:19
**nowadays** 22:24 23:4
**nuances** 167:3
**nuisance** 87:13
**number** 6:16 13:18 42:5 50:3 72:5 81:12,17 112:21,25 117:25 147:23,23 162:18 176:16 193:19 195:5,8 196:7,9,14 212:5 223:4,14 228:10,14 233:8 241:21 245:21,23
**numbers** 109:24 212:22
**NYS** 174:7

**O**

**O** 3:2
**o'clock** 83:10
**O'Leary** 25:17 26:3,5 26:9,16 27:6,14
**O-R-E-S-T** 27:16,22
**oath** 4:9,10 5:19
**object** 15:4 16:4 31:23 45:21 57:10 64:8 82:5 89:6 93:4 93:11,15 95:7 96:2 107:18 115:16 117:16 139:22 152:21 160:8 173:12 174:8 179:15 180:25 205:15 206:10 208:9 217:19
**Objection** 14:17 166:24 180:8 208:14,21 211:13
**objections** 3:11 4:13
**objectives** 213:7
**obligation** 14:24
**obligations** 68:24
**observe** 27:13 78:20 108:6 210:2
**observed** 131:12
**observing** 25:13 65:14 254:10
**obtain** 18:11 56:9 168:22
**obtained** 14:7 221:22
**obtaining** 98:21 246:2
**obviously** 83:12 177:9 188:13 208:16 227:10 241:3 242:6
**occasion** 28:17 83:23 88:23 135:8
**occasionally** 45:23 138:23
**occasions** 45:23 71:22 169:11
**occupation** 8:13
**occur** 132:20 182:13 182:14
**occurred** 14:22 17:7 22:21 45:20 46:5 83:2 95:6 115:6 147:6 154:11 156:14 189:20 229:8 233:5,7
**occurrence** 130:23 253:4
**occurring** 83:20 93:13
**October** 13:11,11 44:18 49:9 157:14 209:14 224:25 225:2 227:17
**offer** 147:10
**offered** 155:2,20 156:5,7,9,10,11
**offhand** 32:21 225:21
**office** 25:12 77:12 207:16
**officer** 9:7,22
**offices** 27:11
**officially** 13:4 16:22
**offset** 223:7
**oh** 41:15 55:11 117:10 148:8 181:9 182:22,23 238:11 245:19

**okay** 7:10,22 8:5,6 22:17 45:19 49:21 50:3 52:4 53:6 56:7 90:6 96:5 105:19 107:23 136:14 156:13 163:14 180:3 182:4,11 185:15,25 186:21 192:16,17 206:13 214:15 215:12 216:21 228:9 242:21 248:20 251:20 252:14,21 256:22
**Olivia** 2:22 127:14
**omission** 178:7
**omitted** 96:14
**onboarding** 77:2 124:14 146:19 161:12 196:25 205:4 214:10
**once** 27:12 136:20 188:17
**one-and-a-half** 117:7 117:14
**one-month** 71:13,14 235:20
**ones** 178:10 224:2
**online** 39:4 40:5,19 40:20 97:3 173:4
**oOo** 2:25 3:19
**open** 129:20,22 131:24 154:19,22 154:23 155:22,23 156:24 228:2
**opened** 10:19 40:24 113:21 129:4
**opening** 41:11 58:13 129:7,10,14,24
**operate** 11:20 42:2
**operated** 12:18 41:24 42:6,13 43:23 44:2 45:9
**operates** 39:12 45:9
**operating** 42:18 44:11,14,17 128:24
**operation** 15:19 50:8 174:23
**operational** 65:16 124:6 125:17 129:18 132:3 133:2 143:20 151:22 155:17 157:8 182:9 183:7 195:3 217:20
**operations** 15:23,24 16:2 43:19 64:18,20 65:19 76:6 79:8 132:15 220:2,5,15
**opinion** 209:21
**opposed** 175:4 244:3
**order** 78:11 164:25 168:11 179:13
**ordering** 257:7
**ordinarily** 64:25 130:5
**Orest** 27:4,16,18,22
**organizing** 12:24
**original** 125:2 144:24 232:15 233:15 238:2 246:19 249:25
**originating** 34:9,11
**out-of-pocket** 133:22
**outage** 102:3
**outages** 102:2
**outcome** 128:12,15 128:18 258:18
**outcomes** 137:8
**outline** 8:3
**outrank** 64:22
**outs** 109:4 229:9,11 229:18 238:24 246:8
**outside** 39:22 40:8 51:6 56:17 75:20 89:14 90:9 102:18 118:20 143:13 158:11 160:3 181:19 186:4 199:22 200:4 220:5
**overgeneralizing** 87:11
**overlap** 42:16
**overpayment** 141:2
**overpayments** 140:25 141:3
**override** 250:9,11,20
**oversaw** 19:6
**overseas** 45:2,6
**overtime** 107:15,25 108:12 109:6,11,12 109:17 110:2 111:10,14,25 112:7 114:17,23 115:2 117:2,6,21,22 197:4 231:18,19,22 232:5 250:17 251:9
**overview** 141:11
**owed** 251:5
**owned** 38:9,12 39:17
**owner** 10:10 18:23 19:2 38:19 80:8 207:20,23
**owners** 38:19
**ownership** 11:6 207:24
**owns** 38:23

**P**

**P** 2:2,2 3:2 27:17
**P-A-M-B-I-N-O** 193:4
**p.m** 74:12 95:21,22 119:25 120:3 129:2 169:23 211:23 236:16 257:9
**package** 124:13,14 161:12
**packing** 40:17
**page** 78:23 221:11 235:17 250:5 259:3 259:9 260:17 261:5
**paid** 47:21 53:13 58:3 67:11 68:15 69:20 71:24 73:21 88:10 108:21,24 109:7,13 110:7,16 110:19 114:22 116:13,17,23 117:12,22 133:22 150:20 151:25 152:11,15,16,17 156:20,22,23 169:8 170:7,8 179:8 194:11,13,15 198:5 211:7 214:18 221:9 222:24 223:13 227:4 232:15 241:6 246:17 250:24 251:5,6
**Pambino** 193:4
**paper** 77:2
**paperwork** 216:13 218:14 220:18 221:3,8
**paragraph** 212:15 213:15,22
**paragraphs** 214:11
**paralegal** 2:21,22,24 65:12
**parcel** 184:7
**part** 20:25 26:15 73:2 83:4 89:8 90:13 129:17 130:11,14 134:23 144:6,8 149:20,21 151:23 157:9,19 162:3 168:6 180:17 183:21,25 184:7 185:6,22 191:23 192:18 196:25 199:7 202:11 215:21 243:9
**part-time** 145:22 150:6
**participate** 68:14
**participated** 69:10
**participating** 4:3 123:22,24
**particular** 51:3 56:13

70:16 79:15 92:9 99:24,25 102:20 121:5 142:12,13,17 163:10 177:6 188:19 244:18,23 250:13 253:7
**parties** 3:6 4:11 258:16
**party** 19:12
**pass** 60:4 73:8 138:10
**passage** 179:11
**password** 78:3 97:19 97:23 98:16,22
**patience** 256:23
**pattern** 13:13 83:12
**Pause** 173:7 184:23 214:14 216:20 251:19 252:13 255:7 256:7
**pay** 14:24 57:8 67:15 67:17,20 69:7 70:14 74:2 113:12 115:3,7 119:8 134:6,18 147:16 157:19 158:2 159:5,5,8,8 159:12,12 161:20 162:13,13,17,18 169:25 180:22 194:21 197:8,8,13 197:14,15 198:20 202:3,8 223:3 225:3 227:3,11 232:25 233:12 241:3 250:17,22 255:3 259:14,15
**paycheck** 53:16
**Paychex** 52:21
**paying** 73:3,6 74:6 111:20 115:11 169:6 227:6
**payment** 14:11,15 15:8 72:10,21 73:8 73:13 146:18 178:21 181:4 194:20 253:23
**payments** 72:17 180:6 222:24 255:19
**payroll** 18:17 52:13 52:15,18,19,21 53:4 53:7,12 54:11,19,24 57:7,9 69:10,14,16 69:17 72:22 74:2,6 75:16 86:23 92:6 98:11 99:7 108:6 113:19 115:23 116:2,7,10,12 130:15,22 142:3 151:2,5,7 156:20,22 157:2 162:21 171:4 200:11 201:3,6,17 204:17 222:17 232:23 238:18 240:20,22 242:18 242:20 247:11,13 247:20
**payrolls** 223:19
**pays** 181:7
**PDF** 257:8
**peak** 119:16 131:18 195:24
**penalties** 167:13
**penalty** 166:21 167:3
**pending** 8:6
**people** 36:15 40:10 48:2,22 83:17 87:12 87:14 89:23 90:20 91:20 107:21 153:5 191:20 210:18 221:4 235:21
**people's** 222:17
**percent** 123:4,14 181:7 183:9,13 193:23 237:4 238:15 239:21 248:19
**percentage** 71:3,5
**perform** 10:3 50:24 51:6 54:18 75:20 77:12 93:8,9 142:8 143:6 156:15 203:5
**performance** 143:23
**performed** 9:24 88:22 92:8 129:7,9 129:16 200:8
**performing** 51:9 96:7 98:11 108:5 111:19 150:19 209:6
**period** 16:14 49:8,14 52:9,23 54:17 70:20 70:24 71:4,6,8,13 71:14 85:10 87:10 114:4 116:19 140:16 142:18,22 146:24 151:13 153:23 155:23 156:24 157:13 162:13 170:5 171:22 178:12 181:6,8 195:6,18 213:5,23 223:8 227:13 234:22,24 235:21 242:7,9,10 243:6 246:9,14,17 248:6 254:4
**periodicity** 149:14
**periods** 68:3 171:7 190:4 231:17 246:3
**permanently** 45:12
**permission** 156:18 181:22
**permit** 31:5
**permits** 101:17
**permitted** 99:17,20
**permitting** 187:13
**person** 4:9 20:17 22:12 31:8 56:13 61:7 63:3 64:10,17 77:25 82:8,13 103:12,14 109:20 115:10 153:25 177:9 217:12,22 218:3 229:7 243:3
**personal** 7:20,22 91:6 147:13 181:15
**personally** 50:4 57:9 58:19 67:14 75:24 85:25 131:12 193:2
**personnel** 125:18,19
**perspective** 143:21 179:25 224:13,14 248:18
**pertains** 18:17
**phone** 21:14,17 22:2 22:4,8,21 77:25 80:2,23 81:2 83:6 90:24 93:3 94:2 95:9 112:25 158:19 165:9 205:7,9,21,22 205:24 207:3,7
**photograph** 158:7
**Phyllis** 25:17 26:2,5,9
**physically** 4:4 77:9 77:10 106:4 135:25 210:3 243:2
**pick** 89:3,19 136:20 177:14,15
**pickup** 151:20
**pictures** 158:10,14 158:15
**piece** 32:5
**pin** 36:16,19
**pings** 5:25
**place** 6:16 22:18 74:20 88:9 90:4 96:13 200:20,21 232:8
**placed** 148:9 153:20 225:12
**plaintiff** 19:13 202:9 206:16,17
**plaintiffs** 1:7,19 2:5 4:18 5:7 29:18 30:2 30:10,14,18 31:2 43:8 81:22 85:6 86:6 106:8 162:8 168:16 179:22 198:18 203:13 205:12,13 206:2,2,5 206:7 229:24 236:6

**plaintiffs'** 24:20 158:20,22 159:3,7 203:7 205:14 206:8 211:25 212:2,6 214:20,23 216:2,3 221:10,15,25 222:4 233:22 234:12,16 235:11 236:18,20 239:7,8 240:10,12 246:9,22,23 251:11 251:13 255:9,11 259:9
**plan** 181:19,20 182:2
**pleadings** 24:9,9,15
**please** 4:14 6:22 7:5 33:21 99:4 119:5 126:2,7 127:15,18 163:7 175:11 203:10 216:14 233:23 251:17 252:10
**plenty** 183:16 209:22 209:23
**PLLC** 2:10
**plus** 197:15 224:16 224:23,23,23,23,23
**point** 16:23 17:7 33:4 33:24 35:8,11 49:16 52:24 56:2 60:19 110:21 142:23 146:4 157:3,16 192:10 196:4 199:12,20 217:23 220:11 227:6,21 243:5 253:7
**points** 108:10
**policies** 132:18 184:12 205:5
**policy** 14:11,11 15:2 15:3,8,15 16:7 88:18 107:2,14 123:14 174:11,16 174:18 182:9 183:4 183:24 184:3,9,10 184:16 215:11
**pooled** 235:16,19,24
**pooling** 70:23
**position** 121:2 144:25
**positive** 172:16 181:7 227:8 228:18 239:21
**possession** 140:17 198:16
**possibility** 152:14
**possible** 13:11 72:2 77:20,23,24 83:18 114:5 123:12 131:9 136:3,5 139:7 146:15,16 147:25 151:20 181:10 238:19 241:17 253:16
**possibly** 35:16 53:4 60:13 141:24
**potentially** 66:19 83:5 89:21,24 91:11 105:16 195:16
**power** 51:17
**practice** 219:17
**practices** 200:11 201:3,6,17,23
**preceding** 222:25
**predicated** 200:23,25
**prefer** 175:21
**premise** 90:7 165:25 180:3
**premium** 109:7,11 117:6,21,22
**preparation** 20:12 24:25 42:22
**prepare** 19:24 20:3 21:13,15,16 32:2 163:24
**prepared** 221:9
**preparing** 24:8,13
**preseason** 141:23
**presence** 23:22
**present** 2:19 4:5 8:13 20:23 22:7,10,12,18 22:22,25 23:5,8,13 23:14,18 28:7 58:8 71:20 77:9,10 78:18 78:25 104:11 106:4 114:2 124:12 132:23 136:15 196:16
**presented** 124:10
**presently** 8:23
**president** 9:8,9
**presumably** 70:7,14 178:25 226:5
**presume** 233:24
**pretty** 37:19 94:5 132:12 151:12 224:12 227:8
**previously** 119:8 158:18 174:5 200:15 211:24
**price** 183:13
**priced** 183:8,10
**prices** 118:13 119:10
**primarily** 64:11 169:14 191:6 207:25 219:20 234:14
**primary** 68:21 165:6 165:8
**principal** 165:15
**principals** 165:12
**print** 113:13
**printed** 140:3,12
**printout** 140:2
**prints** 140:4
**prior** 10:19,23 12:7 17:17 21:17 35:10 35:13,22 36:3 41:11 53:9,11 55:18 75:25 113:3 119:15 156:8 163:23 164:22 166:3,4 171:7,23 174:6 176:18 200:4 237:23 239:13 244:16 251:5
**prioritizing** 74:5
**privy** 46:10 129:11 132:3 155:18 256:17
**probably** 80:6 83:5 83:15 120:8 137:3 165:9 172:9 195:9 218:19 227:4 233:8 233:17
**problem** 219:23 238:16
**problems** 191:18 200:24
**procedure** 88:9,13
**procedures** 164:4 194:6 202:18
**proceed** 169:20
**proceeding** 244:11
**proceeds** 158:2
**process** 34:13 54:23 70:23 108:19 157:24 166:6,6,9 183:22,23
**processed** 86:23
**processes** 67:18
**processing** 75:7 164:9
**processor** 52:16,18 53:4,7
**produce** 85:14,18 229:20
**produced** 86:4 162:7 197:18,18 198:8,9 198:14,18 208:8,13 246:7 249:23 254:25
**producing** 85:13 203:21 243:14 245:4
**product** 79:11
**production** 43:9 86:5 162:10 184:12 193:25 196:13 198:19 202:20 203:7,14 206:15 215:17 226:8 229:25 240:17

246:8 249:24 252:8 255:2
**products** 39:9
**professional** 111:15
**professionalism** 256:24
**program** 66:10 141:6 141:7,9,12 204:23
**progression** 146:11
**project** 77:19
**projects** 77:5
**promise** 157:17 234:6
**promised** 145:10
**proper** 117:21
**propounded** 29:18 29:19 203:13
**prospective** 46:25 150:8,9
**prospectively** 166:2
**provide** 148:23 160:7 189:7
**provided** 14:11 29:21 31:17,20 85:23 126:2 160:15 166:11 197:8,10 230:18
**providing** 26:14 30:8 31:5 33:14 191:19 248:15
**Public** 1:23 3:16 4:23 257:21 258:9
**pull** 236:15
**pulled** 51:22,23
**purchase** 40:11 183:8
**purchased** 35:14 133:9 135:9 148:20
**purchases** 133:25
**purchasing** 5:2 133:5
**pure** 239:3
**purported** 51:11 177:19
**purpose** 75:5,6
**purposeful** 178:7,20 179:12
**purposes** 44:21 75:11 75:16 99:6 117:2 142:3 243:14
**pursuant** 1:21
**pursue** 127:6,22
**pursuing** 175:4
**purview** 124:7 130:21
**put** 7:5 43:13 135:19 136:9 177:3 180:11 193:14 198:23 200:20,21 225:17 227:3 228:16 232:10
**putting** 194:2 228:15

**Q**

**Q-u-e-B-I-T** 8:19
**Q1** 166:16
**Q2** 166:16
**qualification** 105:20
**qualify** 185:20 208:11 253:6
**quantified** 147:22
**quantify** 185:20
**quarter** 87:25 101:9 138:9 163:3,6,8,10 166:14,15
**quarterly** 163:12,25 164:10 165:24 167:21,25 168:10 168:15,20,25 170:18 171:12 200:14
**quarters** 166:3,4,12
**QueBIT** 8:17,19
**question** 3:12 7:6,7 7:13,14 8:6 13:6 14:22 15:25 16:15 17:11 20:10 29:23 31:4 33:19,21 51:21 54:3,21 57:16 66:2 66:12,14 67:3 79:17 80:6,11 81:3 89:10 93:7 94:7,9 95:10 95:13,20 96:4 100:10 105:25 110:18 112:19 114:7,11 116:2 117:4,11 118:17 119:4,10 120:8 122:14 126:5 127:15,16 129:25 130:13 134:4 140:22 142:18 151:13 154:9,16 156:10 161:7 174:15 175:11,16 180:10,21 184:25 185:25 187:10,14 199:15 200:6,8 201:15 202:6 205:24 206:12,14 207:14 209:9 213:22 224:17 231:2 234:14 237:23 243:13 245:9 254:19
**questions** 6:23 7:18 20:7 66:11 87:3 135:12 138:15 161:6 165:23 215:23 216:8 221:5 221:7 236:9 256:6 257:3,5
**quickly** 70:22
**Quimby** 59:20,22 60:25 61:2,4
**quit** 149:24 213:19
**quite** 5:23 6:3 71:16 109:3 180:10 190:21 191:14 193:16 204:19 205:19 222:21 224:18 237:20 252:24
**quote** 188:14
**quote/unquote** 100:9 104:22 107:19 176:25 217:15
**quotes** 76:20

**R**

**R** 2:2 4:21 120:4 258:2
**R-E-D-A** 62:2
**Rachel** 61:8
**rack** 23:24
**racks** 23:25
**raise** 48:5,11 149:12 149:16,19
**raised** 118:2 184:19
**raises** 48:8 68:2,5 111:5 149:13,16
**ran** 52:19 80:17
**rang** 83:9
**range** 147:24
**rarely** 23:6,10
**rate** 67:15,20,23 71:6 109:15 110:8,11 116:25 117:2,7,13 117:15 121:14 123:5,6,10,11 145:3 159:5,8,12 259:14
**rates** 67:16 109:19 110:7
**raw** 237:9 238:3,4,23
**reach** 95:19,23 226:14
**reached** 95:13 167:10
**read** 6:10 24:22,24 94:7,8 126:8,9 127:18,19 128:20 184:25 185:2 202:7 212:12 214:12,15 215:19 216:17,18 249:16 251:17 252:11 254:13
**reading** 216:6 217:14 252:3
**real** 175:23
**really** 77:7 145:19 195:2 202:5 221:6
**RealReal** 39:15
**reask** 33:20

**reason** 8:2 15:12 51:16 73:10,12 76:11,14 88:8 98:20 147:6 153:2 154:6 156:4 213:18 261:5
**reasonable** 176:10
**reasonably** 207:12
**reasons** 89:16 233:8 233:9
**reboot** 24:3
**recall** 10:4,18 13:10 13:15,16 17:4 24:22 25:5 27:5 28:9,10 30:3 32:24 33:11 34:7,16,20,21,24,24 42:4,7,15 46:13 48:6 54:13 56:18 59:5,6 60:5,18 61:12,21 62:8,12 63:4,8 67:12 71:12 71:15,25 72:6,11,12 72:16,20,24 78:16 80:14 81:16 82:23 83:19,22 85:25 88:20 91:20,22 93:6 93:22 100:11 104:6 104:12 108:9,18 109:2 110:7 111:22 112:4 113:7,9,10,15 113:18,23 114:14 114:19 115:13,17 118:4 119:7 121:13 121:16,19,22,23 122:2 123:5,24 124:3 125:7,8,10 126:20 128:2,11,21 131:17 132:22 133:4,23 139:17,23 141:4,20 142:7 143:13,16 144:15 144:16 145:12,17 146:3,7,21 148:18 149:11,13 152:5,13 152:18,23 153:3,24 154:3 158:11,16 161:23 164:15,21 165:20 166:8 167:22 171:20 172:2,5 181:17 184:10 188:15,20 192:6 193:16,20 197:21 200:2 204:19 205:22 207:15 210:4,17 215:15 217:8 219:3 219:10 220:11 222:21 225:21 229:22 230:16 232:9 243:19,23 253:15,17 254:22
**receipts** 135:9,11
**receive** 100:13 108:12 123:9 139:8 143:23 151:8 158:4 165:3 169:2 170:16 170:21 173:14,24 178:21 179:13 198:4
**received** 14:25 15:3 67:23 68:2 111:5 148:25 149:9,10,11 149:13 157:18 158:3 161:19 194:18 196:24
**receiving** 123:12 145:16,25 146:18 207:15
**recess** 74:11 119:25 169:23 211:23 236:16
**recognize** 79:2 193:5 193:8 231:10
**recollection** 6:19 54:23 60:11,15,21 72:9 73:19,24 74:4 79:6 120:25 123:3 145:24 214:5,8 244:22
**reconcile** 139:24 140:8 166:7
**reconciled** 136:23
**record** 4:16 6:9,10 7:5 8:8 25:10 65:10 74:8,10 80:21 92:6 94:8 96:6,21 119:23 119:24 120:9 125:24 126:9 127:13,19 138:16 157:2 158:17 185:2 211:19 227:15 228:21,23,25 229:2 229:6,14,15,17 235:25 236:3,4 237:3 242:22 243:25 252:18 254:9,15 258:13
**recordkeeping** 201:23
**records** 31:21 52:10 52:13,19 57:5 131:14 143:7 164:7 172:21 196:6,8 202:3,4,8 203:6 229:20 230:2 237:18
**rectangle** 230:4,15 231:3,8,10 232:2,8 240:19 246:13 250:17 251:9
**red** 230:4,9,12,14,14 231:2,7,9,25 232:8 240:19 250:16 251:8
**Reda** 62:2
**redid** 238:17
**redownloaded** 238:17
**reduce** 81:12
**refer** 5:10 95:18 225:10 242:16
**reference** 144:21 183:2 217:3 220:10 220:12 225:2
**referred** 135:13 244:2
**referring** 11:16 26:24 27:20 40:19 44:6 52:4 80:7 178:10 192:5 200:12 221:25 240:6 246:12 256:14
**refers** 233:2,14 240:3 240:23
**refilings** 166:9
**reflect** 25:10 65:10 125:24 127:13 158:17 235:15 237:3 252:18 254:9 254:15
**reflects** 223:14 229:7
**refresh** 214:4,8 244:22
**regard** 50:9 81:21 113:8 175:7 179:16 254:2
**regarding** 65:2 219:9
**Regardless** 67:13 125:5
**regenerated** 140:20
**register** 133:25 134:6 134:18 135:3,23 140:3 176:24 211:5
**regular** 5:4 26:15 64:6 92:24 117:13 130:23 132:20 141:15 231:20 257:8
**regularly** 45:14 99:6 170:21 207:4 209:5
**reimburse** 14:24
**reimbursed** 133:14 133:16,21
**reimbursement** 133:19 148:19
**reject** 51:11,13
**rekeying** 227:23
**relate** 214:16
**related** 38:25 146:10 164:13 187:24 189:19 191:10

208:20 244:13 258:15
**relation** 189:15 220:25
**relationship** 8:20,24 9:3 38:18 159:25 164:22 190:24,25
**relationships** 94:15 94:17,21 190:11,18 190:20
**relevant** 52:9 208:7
**relieved** 102:23
**rely** 70:3
**relying** 167:4
**remain** 154:22 198:16
**remainder** 252:20
**remained** 154:23 178:11
**remaining** 17:12 178:2
**remains** 36:23 155:12 249:19,19
**remember** 12:2 13:12 22:13,15,16 32:16,21 80:14 84:23 87:12 111:2,6 113:10 114:3 120:19,20,22 125:2 132:25 133:7 144:18 146:8 158:9 160:22,25 161:6 166:13 182:17,20 182:24 183:2 184:6 204:9,12 214:2 231:5 238:19 253:16
**remembered** 87:11 182:18
**reminder** 226:9
**reminding** 199:2
**remit** 171:4 188:4 220:6
**remitted** 170:3,10
**REMOTE** 1:18
**remotely** 4:7,10 77:21,21
**Rent** 68:25
**rental** 148:10
**rentals** 148:16
**reoccupancy** 13:14
**reopen** 17:7
**repayments** 166:25
**repeat** 124:19 126:3 127:16 163:7 202:7 214:6 247:21 256:10
**rephrase** 7:14 30:23 237:20
**report** 88:9 96:14 135:22 171:18 210:20 239:12 240:15 247:2
**reported** 51:25 66:21 66:24 67:6 81:12,18 91:16 100:20 177:23 245:20
**reporter** 1:22 4:2,25 6:23 7:9 94:6 126:8 127:17 211:20 258:8
**reporting** 4:6,13 51:22 80:12
**reports** 51:15 69:17 69:18,23 139:8 247:8 250:2
**represent** 5:7 11:14 78:22 159:4 212:2 214:21
**representative** 235:8
**represented** 121:17
**representing** 256:13
**represents** 222:24 223:2 230:9 231:8 231:20,22 234:22
**request** 50:6,7 107:11 133:14,15 134:21,22 146:10 173:24 203:7,13 205:18
**requested** 54:15 108:19 133:18 134:15 156:15 169:12 203:17,18 231:18 243:10 260:16
**requests** 25:9 43:13 46:3,4 90:15 91:10 133:21 205:14 206:3,9
**require** 77:8
**required** 50:24 102:13 114:22 117:20 132:10 212:25
**requirement** 160:6
**requirements** 111:21
**research** 114:20
**reservation** 194:18
**reserved** 3:12
**reside** 137:21 138:2,5 138:16,20
**resided** 147:3,3
**residence** 138:13,19 138:21
**residing** 146:23 147:2
**resigned** 122:3
**resource** 114:8
**respect** 79:20 90:7 104:13 146:17 160:3,23 207:19
**respective** 3:6
**respond** 179:6 253:13
**responding** 226:6
**response** 218:21 253:15
**responses** 24:17,19
**responsibilities** 77:7 125:18,19 129:12 129:24
**responsibility** 146:12 245:3
**responsible** 64:11,13 73:15 119:20 170:9 194:2
**responsive** 203:25 205:14,18 206:8
**rest** 252:11
**restaurant** 211:3
**restricting** 172:10
**restriction** 95:8
**restrictive** 126:15 127:7
**result** 122:7 157:18 168:14,19,24 201:3
**resulted** 192:2
**retail** 18:21 37:3,7,11 40:20 43:19 64:18 79:7 94:10 118:5 125:21 209:9
**retails** 44:25
**return** 167:16,19
**returns** 42:23 43:9 163:4,15 165:17,24 166:22 168:11,16 168:21 169:2 170:19 171:6,12 172:23 191:10 200:14,14 212:22
**revenue** 37:16 43:3,5 55:7 193:11
**revenues** 193:16 212:18
**review** 21:4 24:8 50:20 69:17 113:4 130:15 187:11,15 187:21 188:10,12 188:13,18,21 189:9 189:12 215:13 228:20 249:23
**reviewed** 21:8 24:14 24:18,20 49:24 50:18,19 53:12 86:22 87:4 229:20
**reviewing** 25:5 51:23 108:6 113:7 214:7 214:11
**reviews** 47:23 186:22

186:22 187:4,6,9,14 187:23 188:15 189:12,17,25 190:3
**right** 9:10 19:22 23:14 35:24 36:20 39:2 44:22 49:13,22 52:5 53:9 54:8 55:4 57:2,25 69:5,11,25 70:10,16 74:23 75:3 77:17 80:19 86:19 87:5 88:4 90:18,25 91:19 93:5 99:5 103:19 104:15 106:5 107:17 116:21 117:7 121:6 125:6 131:12 132:20 154:11,14 167:8 175:24 177:14 178:12,22 179:3 187:14 191:7 191:25 192:25 196:21 197:20 200:15 201:13 204:11 209:12 213:19 217:4 219:24 220:16 222:9 223:15 226:14 228:9,21 229:2,16 232:7 237:19 239:13,14 241:11,16,21 242:13
**ring** 121:18 145:6 146:14,15 193:20
**role** 9:4 23:20 150:2 150:4 151:22
**roles** 9:10
**roll** 116:24
**rolled** 106:23 223:11
**rolls** 106:22
**room** 4:5
**round** 137:23 154:22 155:22
**rounded** 101:8
**rounding** 101:4,12
101:17 241:9
**route** 151:21
**routine** 76:5
**routinely** 130:16,18
**row** 238:13 241:15 241:19
**rude** 188:17
**rule** 6:22 7:12 72:7
**rules** 5:18 8:11 148:2 181:20
**run** 64:21 105:15 134:24
**running** 64:11,14,20 103:14 171:20
**runs** 80:18

**S**

**S** 2:2 3:2,2 4:21 120:4 259:8
**safe** 140:19
**Sage** 2:4,21,23,24 4:17
**sake** 19:21 138:16 243:25
**salaried** 245:20
**salary** 47:16 48:2 67:12 110:24 111:3 245:18
**sale** 35:8,11 70:7,16 71:10 83:9 123:18
**sales** 33:4 37:3,7 39:4 39:25 40:5,8,19 44:20 56:2 71:3,5 79:7 118:6 123:15 123:20,23,23 140:5 193:15 218:22 219:9,13,19 220:9
**salespeople** 94:10
**salesperson** 70:19 118:6
**samples** 197:24
**save** 113:13 147:13 249:20
**saw** 170:20
**saying** 7:10 29:20
47:25 78:8 82:4 91:22,23 93:18,19 95:4 99:5 100:22 103:7 105:7 106:7 113:20,24 133:7,10 139:20 143:13 151:14 171:25 181:22 189:11 199:23 200:17,19 201:11 209:23 239:3 253:3
**says** 16:23 212:16 216:10 221:13 225:3 228:4,4 232:15 237:9 241:22 253:21,24
**scenario** 92:9 100:19 115:17 182:17
**scenarios** 101:24
**schedule** 69:19,20 98:8 107:6 130:7,9 130:13,21 137:20
**scheduled** 51:6 75:21 75:22 76:2,2 131:16 156:25
**schedules** 48:16,19 48:23 49:13,17,19 49:20 50:18,20 65:2 65:7,9 202:12,13,16 202:21 203:3
**scheduling** 49:3 97:3 97:4 98:2 130:12,14
**scheme** 118:9
**school** 25:14 65:13 195:19 224:11
**scope** 134:3
**Scott** 8:9
**screen** 36:20 78:19 78:20 79:2 85:7 158:19,20 159:6,13 218:9,11,16,18 224:23
**Screenshot** 158:22 259:10
**scroll** 215:4 251:22
252:12
**scrolled** 240:25
**scrolling** 240:24 251:24 252:17,19
**sealed** 135:21
**sealing** 3:7
**search** 203:5,24 204:5,12,25 205:7
**searched** 204:22
**searching** 203:20
**season** 16:25 17:3,15 17:18,18 42:10,11 103:10,11 119:16 119:16,16,18 131:19,19,19 132:5 132:7 141:21 147:8 195:14,21,24 196:5
**seasonal** 41:12 132:17
**seasons** 103:12
**second** 12:4 74:9 80:16 90:13 171:16 173:6 192:18 224:20 228:12 232:17,24 236:2 238:13 251:21
**secretary** 9:9
**section** 231:25
**sectioned** 148:13
**Security** 169:3 171:18 173:10,15
**see** 6:5,8 50:21 56:13 98:25 108:23 140:21 153:8 159:11 199:24 214:9 215:3 217:5 218:23 221:18 225:4,20 227:19,25 228:2 230:4 232:10 232:18 236:25 237:9 238:11 241:12,12,19 242:25 245:19 250:9 253:11,21 256:5

**seeing** 131:6
**seek** 112:6 114:17
**seeking** 167:6
**seen** 86:19 131:10,13 159:15,24 160:2,17 178:2 187:23 209:22
**sees** 6:2
**selection** 256:8,12
**self-determine** 48:25
**sell** 39:9 94:14
**sells** 37:17,22
**send** 139:19 145:8 162:12 165:2 198:12 208:19 216:15 220:18 221:3,8 225:22 226:9 233:25 234:6
**sending** 146:8
**sense** 95:15,19 125:20 195:2 211:20 220:23 226:4
**sent** 32:11,14 85:25 86:2 124:24 125:4 158:10 203:23 204:13,20 205:8 208:16 214:10 218:8,20 231:6 232:10 252:5
**separate** 12:20 24:13 38:9,11,12 61:23 74:22 104:15 133:19 136:17 148:7 186:16 202:24 231:13 232:24 234:2
**separated** 147:12 248:13,16
**separation** 60:17 121:24
**September** 1:14 146:14 213:24 258:20 261:3
**series** 20:5
**served** 29:20,25 30:9 58:15
**service** 73:4 169:3 190:2
**services** 207:21
**serving** 39:5 61:10
**SESSION** 120:2
**set** 12:21 16:7 34:19 44:7 45:3 47:23 49:3,19 65:7,9 67:14,17 73:4 101:24 228:24 235:8 258:12,19
**sets** 231:13
**setting** 29:4 101:16 119:10
**settings** 101:12,13
**seven** 129:22,23 131:8 177:8
**seven-and-a-half** 209:16
**shade** 249:11
**shape** 29:16 143:18
**share** 20:8 159:6 205:23 207:2
**shared** 25:7,8 32:15 68:18,19 189:2 205:6,21
**she'll** 65:13
**Sheeler** 1:9,9 5:10 8:25 9:5,13,18,22 10:13,16,23 11:7,10 11:19 12:19,22,24 16:8 17:19,20 19:7 20:25 22:11 23:12 26:7 28:6,12,15,16 28:18 31:10,12,18 33:23 34:17 37:3,6 38:13,20,25 39:11 39:18 43:6,17 44:6 46:11,21 47:24 48:12 49:2,6,9,10 49:20,21 50:10 52:25 54:5 56:20 57:8,17,20 58:21 59:17 61:16,20 64:12,17 65:8,15,22 65:23 66:13,19,24 67:18 68:18 82:9 83:5,6 93:25 96:17 104:2,5,7,11 118:16 120:14 125:13 138:17 149:17 171:10 173:3 175:5 182:8 191:15 192:7 192:13 205:12 206:6,22 207:22 208:2 210:16 212:17,24 213:8 214:16 216:23 218:6,12 220:14 221:2,12,22 261:2
**Sheeler's** 43:20
**sheet** 249:4 261:2
**sheets** 130:16
**shift** 51:7 87:21,22 98:25 99:4 219:21 219:22
**shifted** 116:20
**shifts** 97:5 228:14
**shipping** 40:14,15,17
**ShopKeep** 35:14 36:4 36:6,23 55:18 70:6 74:15,23 75:13 77:22 84:8 86:16 98:3 99:14 101:4,16 101:21 194:7
**short** 195:17
**short-term** 148:9,15
**Shorthand** 258:8
**shortly** 33:19 128:4
**shot** 158:20
**shoulder** 119:16 131:19
**show** 78:19 187:13 238:7 241:5 242:15
**showed** 158:18 171:18 241:2 250:16
**showing** 85:7 205:3 218:16,18 250:15 252:4 255:19
**shown** 78:17
**shows** 85:8 140:4,6,7 200:2 238:12
**shut** 15:21 73:20
**sick** 245:8,15
**side** 174:23
**sign** 103:17 125:23 216:15
**signed** 3:16,17 124:9 126:21 160:20 171:7,9 241:17
**signing** 34:14
**silly** 19:20 120:8 138:15
**similar** 171:17 242:12
**similarly** 1:6
**single** 46:6 105:22 135:25 196:23 198:2,6,7,13,19 227:22
**site** 39:17
**sitting** 27:14 209:11 209:15,24
**situated** 1:6
**situation** 82:23,25 83:4,7,19 107:8,24 115:5,13 160:4 199:9 217:11
**situational** 115:21
**situationally** 81:14
**situations** 142:22
**six** 14:3,4 195:10
**skipping** 99:11 153:17
**slash** 221:13
**slip** 140:9,10
**slow** 209:17
**small** 37:18 136:8 138:6 253:2 254:14
**snapshot** 226:22
**social** 169:3 171:18 173:9,15 189:22

191:8
**sold** 38:2 118:13
**sole** 9:19 41:21 179:21
**solely** 221:10
**solo** 26:10
**solutioning** 224:14
**someone's** 85:4 102:5 102:11 238:16
**somewhat** 70:21
**sorry** 32:17 46:19 59:21 117:10 124:19 127:8 136:4 147:18 155:5 182:13 184:2 187:18 189:10 202:5 214:6 247:19
**sort** 26:10 70:8 76:16 90:7 107:14 122:18 148:13 151:22 191:17 215:4
**sorted** 237:14
**sorts** 43:13
**sought** 82:14,17 112:5,11 113:25 206:2
**sounds** 196:2
**source** 73:9 226:19 250:14
**South** 11:25 41:11
**space** 13:9,20 147:13 148:14 207:4
**speak** 20:11,15 124:6 175:18
**speaker** 7:8
**speaking** 18:6 22:24 23:3,4,7,17 25:4 32:2 36:10 42:25 77:15 89:11,12 93:13 105:23 108:4 111:8 163:15 175:17 191:2 199:18 201:15,16 219:13 250:19
**specific** 21:19 33:11 73:11 83:23 94:4 108:15 109:2 113:17,23 121:22 125:21 144:15,16 146:21 160:19 161:12 187:9 188:11 189:3,5 203:10 235:7
**specifically** 28:25 29:2 34:6 42:4,8 50:2 71:25 72:15 73:23 78:17 80:24 82:21 91:24 109:18 111:4 119:19 120:23 129:23 142:24 165:20 172:5 187:11 188:7 189:16 192:6 193:17 200:6 227:8 233:10 243:11 244:14 256:16
**specificity** 105:13,17
**specifics** 121:13 122:9 124:17,21 151:18 153:3 175:6 182:25 204:15
**speculation** 115:20
**Spell** 119:5
**spending** 145:19
**spent** 92:2,23 150:25 152:2 214:18 256:18
**split** 195:16
**spoke** 21:25 96:22 117:24
**spreadsheet** 32:3 204:17 222:16 225:13 226:23 230:2 252:2
**spreadsheets** 32:19
**square** 35:16,17,21 230:12
**ss** 258:5
**staff** 119:17 149:8 188:3,3,12 190:10 190:17,17,20,24 191:14 192:20,24 209:23
**staffed** 195:14
**staffing** 119:14
**stamp** 230:18,20,21 230:22,25 234:5 240:7 243:12
**stamped** 215:18 216:4 221:11,16 222:2,5 234:17 235:12 236:21 239:9,11 240:13 246:24 247:3 250:5 251:14 255:10,12 259:20,21,22,24 260:2,3,5,7,9,11,13
**Standard** 162:21
**standing** 182:19
**stands** 248:10,13
**start** 33:9 34:3 58:11 75:21 76:2 97:9 172:4,8 211:16 216:6,11 219:21 244:17,20 251:16
**started** 11:2 33:14,18 33:23 34:12 44:11 44:14,17 59:3 67:4 113:18 144:17,19 144:22 150:3 161:18 164:22,23 165:21 166:10 171:19 172:3 214:3 222:12 227:23 228:15 248:8
**starting** 135:18 146:13 160:10 191:23 216:22 238:25 250:6
**starts** 33:19 251:21
**state** 1:23 39:22 40:8 112:13,22 163:5 166:20 167:12 173:25 174:7 177:6 212:23 223:22 258:4,9
**stated** 145:14 170:12 188:16,24
**statement** 104:11 145:14 186:3,8,11 186:17
**statements** 185:10,17
**STATES** 1:2
**stating** 4:15 179:17 186:14
**statistical** 241:13
**stay** 147:4,10 154:18 195:21 199:6
**stayed** 93:8 147:25
**staying** 148:4,5
**Stenographic** 1:22
**step** 135:13 203:11
**steps** 82:10 114:17 151:24 211:11
**stipulated** 3:4,10,14 184:3
**stop** 61:10 89:4,19 90:15 102:13
**stopped** 60:6 87:13 106:20 157:10 227:22 248:6
**store** 16:5,11,17,24 17:7 22:16,18,22,25 23:5,8,14,15,22 36:15 39:5 40:25 41:2,8 44:4 49:13 51:3 55:25 56:12 57:4 58:14 61:9,10 65:8,9,18 66:8 67:5 67:8 69:5 70:22 74:19 78:23 80:3,17 82:9 88:22 89:15,19 89:22 90:9,17 95:22 99:22,25 102:18,18 102:20 103:5,12,13 103:14,15 104:18 104:23 105:5,7 106:5 113:22 119:18 121:4 125:16 128:24

129:4,13,20,21 131:23,24 132:4,14 132:21 134:24 135:25 136:9,15 138:7,12 145:19 147:9 155:3 156:17 156:19,24 158:8,19 158:24 176:3,22 178:6,16 182:19 187:24,25 193:15 195:14 197:4 209:9 209:15 217:22 219:25 234:21 259:12
**stored** 208:24
**storekeepers** 209:22
**stores** 11:9,12,12,15 11:17,18,19 12:15 12:18 15:20 16:7 23:18,20 34:4,10,22 35:3,5 40:22 57:4 64:21 90:14,16 99:22 118:14 136:6 195:25
**stores'** 49:3
**stories** 209:23
**straight** 239:4
**street** 2:11 12:2,5,12
**stretch** 241:4
**structure** 67:12,13 129:12 146:9
**structures** 210:18
**struggling** 108:14 175:19 206:11
**stub** 197:8,13 198:20 255:3
**student** 154:2
**students** 195:18,19
**stuff** 69:8 93:19 99:11 133:3 153:17 156:19 201:11
**subject** 113:5
**submission** 176:19
**submissions** 197:23
**submit** 166:7
**submitted** 166:4,14 197:22,24 203:18 204:8,9 215:6,14 230:13,24 231:3 254:23
**subpoenas** 208:4
**Subscribed** 257:18
**subscriptions** 207:21
**suffered** 13:3
**sufficient** 171:3
**Sullivan** 126:21 127:2,7 241:14 244:3,6 254:21 255:5
**summary** 32:3 193:13 197:14
**summer** 141:6,7,11 141:12,13 149:8 152:11 191:21
**SUNY** 18:10
**superbroad** 69:2
**support** 76:9 176:8
**suppose** 50:25 68:19 79:25 149:3 177:25
**supposed** 36:17 88:14 99:2 115:11 122:19 135:17 136:9 139:25 176:23 183:15
**sure** 5:17 6:2 13:22 14:5,19 15:22 16:19 24:6 29:22 33:22 49:25 50:12 80:3 90:4 91:12,25 110:10 116:8 122:15 139:14 142:13 154:3,8 164:23 174:14 180:9 185:12,14,23 186:7 190:21 197:6 197:25 203:9 204:8 205:16,19 216:8 220:17 226:21 227:4 237:21 240:25
**surplus** 253:10
**surrounding** 89:10 187:21 230:5 246:14
**suspect** 114:4
**suspected** 175:9 181:5
**suspicions** 185:13
**switch** 6:5 235:15
**switched** 127:11
**Switching** 102:7 128:23
**sworn** 3:18 4:22 257:18 258:12
**symbol** 221:14
**system** 21:7,10 33:4 35:6,9 51:22,24 56:6 71:10,18,19 74:18,20 75:3 78:4 81:24 83:13 86:16 96:13 97:2,3,16 100:2,19,24 101:3 102:2,4,4 135:22 225:17 227:19 242:18,20 245:22 247:12,20 255:19 255:22
**systems** 34:8 35:11 207:24 221:4,9 224:13

**T**

**T** 3:2,2 258:2,2 259:8
**tab** 223:5 225:18 239:16
**table** 133:5,20
**tables** 223:21
**tabs** 225:3
**take** 7:24 8:4 57:20 82:2,10 88:4,8 96:16 102:24 103:16 104:20 105:3,15 114:16 134:17 135:13 151:24 153:7 157:24 169:18 195:7 203:11 211:15 236:11 252:10
**taken** 1:19 74:11 119:25 147:15 169:23,25 170:6 197:16 211:11,21 211:23 236:16
**takes** 156:2 166:16
**talk** 122:9 217:20 218:21
**talked** 20:4 56:17 119:8 219:3,4 246:4
**talking** 16:17 69:3 155:8 158:9 180:16 181:6 197:22 201:20 209:14
**Tammy** 2:24 65:11
**target** 234:21 235:6,6 235:6,7,8
**task** 93:9
**tasks** 190:15
**tax** 42:23 43:2,9 163:4,15 164:13 167:16,19,21 168:16,25 172:23 223:19,21 241:21
**taxes** 26:22,23,24 28:11,19,24 29:6 44:22 168:2 170:11 171:4
**taxing** 166:20 167:12 170:17
**tea** 217:14
**team** 118:15
**teams** 224:13
**technology** 248:18
**telephone** 20:16 78:20
**tell** 7:13,21 32:25 41:7 53:3 68:2 70:12,13 72:13 73:11 82:21 89:9,25 90:24 91:2,17 113:7

113:9 135:5 146:20 166:10 179:25 180:18 187:20 191:4 202:17 218:9 219:14 220:10,25 226:20 227:8 230:17 231:16 233:14 234:22 243:10 248:8
**telling** 54:12 78:5,9 227:20,21
**template** 124:18,20 124:22,24 125:3,9
**temporally** 201:15,16
**ten** 114:9 131:9
**tend** 7:25
**tenure** 110:21
**Teresa** 1:4 5:8 80:20 100:4,20 105:21 120:9 126:20,21 216:10,12,13 220:3 244:2,3,5,7,10 261:2
**Teresa's** 241:2
**term** 5:9 27:21 29:13 30:4 35:15 37:21 57:12,14 76:23 86:10 126:14,17 142:16 149:4 236:6 238:3 248:9 255:3
**terminate** 13:17 47:4 217:25
**terminated** 47:6 218:3,4
**terms** 60:23 61:24 62:20 69:7 70:3 90:14 93:7 111:16 123:7,7 125:22 126:12 146:13 169:3 194:6 233:21
**Terrace** 41:20 43:22 44:2,8
**testified** 4:24 14:20 19:9 49:5,7 50:19 74:14 76:17 96:22 104:14 117:5 120:6 160:12 220:7 224:3
**testify** 5:19
**testifying** 5:21 94:23
**testimony** 40:23 90:21 98:13 99:12 119:15 211:21 237:24 238:21 249:12 258:14
**text** 85:6,22 94:2 95:9 153:14 165:11,13 165:14 206:5,7,15 206:19,19 207:4,6 249:2 252:4 254:13
**texts** 86:2
**thank** 43:14 105:19 140:23 179:20 198:25 202:10 256:23 257:4
**theft** 181:12
**thereto** 189:15
**thing** 23:14,16 24:2 83:18 219:14 237:13 250:16 256:25
**things** 24:3,11 32:20 37:18 73:3 122:23 134:6 135:9 149:10 167:5 174:23 186:14,14 203:18 203:23 204:8,20 208:16 221:7 238:20 239:2
**think** 14:4 15:5 16:22 19:15,16 30:19 32:22 57:14 60:13 69:2 71:12 74:24 83:8 92:18 96:20 102:25 103:3 111:5 115:5 117:3 119:2 128:22 140:7 142:10 146:22 151:20 153:24 161:5 167:3 170:4 170:14 173:2 181:4 181:18 183:25 184:6 188:15 190:15 192:7 199:22 200:5 204:15,17,18,24 205:5,21 220:23 227:25 228:2 230:22 255:8
**thinking** 181:9 182:6 187:11
**thinks** 180:19
**third** 6:22 12:8 155:5 155:14
**thought** 80:15 170:6 170:7,14,15 182:11 190:14
**thoughts** 185:13
**three** 11:15,17,18 12:15,17 40:22 41:3 45:8 111:13 136:15 136:17 195:15,16 206:20 212:16,19 250:6
**three-month** 171:22
**three-quarters** 177:20
**threshold** 109:22
**throwing** 197:5
**thrown** 140:16
**tie** 135:8,11 140:10
**time** 1:21 3:13 5:16 7:8,24 8:5 16:13 24:7 27:12 28:14 33:16,22 36:6,14 42:12,17 44:9 45:12 46:4,4 49:12,14,16 51:10,10,24 52:9,10 52:23,24 54:17 56:3 57:5,18,18,22,22 60:11 61:19 68:3 70:20 71:4,8 72:2 75:15,19,19,21,22 76:2,3,16 80:21 81:6,9 83:14,20 85:4,11 87:12 88:11 91:13 92:2,6,23 93:21 95:16 96:7,14 96:21 100:2,4,9,14 100:15,21 101:5 106:5 107:12 113:17 116:19 123:22 126:21,25 128:2 129:3 130:15 132:9 142:12,18,22 143:6 145:19 146:21,24 147:4 149:10 150:25 151:13,25 152:2 153:23 154:2,13,13 155:24 156:23 157:3,10 159:23 162:12,12 163:23 164:9,12 166:2 167:18 169:19 170:5,11 171:17 172:2,6,6 174:6 179:3 180:23 181:4 181:8 184:19 187:13 188:5,25 189:20 190:4 192:20 194:24,24 195:6,18,25 196:5 198:5 199:7,12,16 199:20 202:2,8 204:14 211:17,21 211:22 212:24,24 213:5 214:18 217:17 218:7 220:11 226:21 227:13 228:21,23 228:25 229:8,20 230:2,18 232:23 234:22,24 235:9 237:18 238:16 240:7,25 241:18 242:22 243:5 244:18,18,20,23 246:2,9,14 249:3 252:10 253:18 257:9

**time-and-a-half** 109:13
**timekeeping** 32:14 32:25 36:11 57:2 75:11 78:4 79:7 101:3 194:6
**timelines** 172:7
**timely** 168:15 251:6
**times** 34:8 72:4 73:12 85:10 112:14 114:9 114:10,12 117:14 117:25 129:24 147:5,8,25 153:23 178:8 219:4 238:20
**timing** 54:13 128:11 233:16
**timings** 146:7
**tip** 211:4
**tips** 210:25
**title** 247:17
**today** 6:16 7:25 17:12 35:7,18 98:12 159:16 234:7 238:6 256:24
**today's** 5:13 7:2 12:7 19:24 20:12 21:13 24:14,25 139:20
**told** 80:20 88:3,15 90:22 91:3,6,7,10 91:21 92:25 103:15 106:8 115:15 149:21 171:14 181:24
**top** 116:14 215:20 230:6 251:21
**topic** 118:2 185:3
**total** 71:2 123:20 140:8 195:24 233:12 253:19 256:20
**totaled** 101:8
**touch** 36:20
**touched** 239:4
**track** 74:16 75:15 226:22 235:21
**tracked** 36:8 90:5 107:13
**tracking** 218:22 219:9,13,19 220:8,9
**tracks** 222:17
**trademark** 221:14,23
**trail** 86:11,14,18
**train** 197:4
**training** 18:16,21 197:5
**transaction** 38:21 70:9 140:2,10
**transactions** 140:6
**transcript** 5:3 226:9
**transfer** 45:13 90:20 91:10 92:12
**transferred** 45:11
**transfers** 89:22 90:14 228:17
**transport** 194:24
**transportations** 151:19
**transporting** 151:17
**travel** 199:7 212:25 213:4
**traveling** 92:23
**travels** 213:9
**treasurer** 9:9
**treated** 210:13
**trial** 3:13
**tried** 83:16
**triggering** 189:18
**trip** 136:13 147:14
**trips** 213:10,13
**true** 82:4,19 174:7,9 180:4 185:11 212:20 218:12 258:13
**truthfully** 5:20
**try** 95:15 180:12 191:17 234:8
**trying** 80:14 83:13 142:10 188:14 217:22
**turnover** 195:11
**two** 6:8 10:19 11:21 13:7 15:20 17:13 41:10,13 45:8 72:2 72:4 81:22 85:6 87:23 88:5 100:7 104:13 105:3,8,13 105:23 106:8,8 132:25 137:12 141:24 153:5 166:12 169:11 171:22 195:20 204:18 215:20 225:7 231:13 233:9 250:8 255:14
**type** 79:10 100:17 141:17 210:9
**types** 69:5 140:5,5
**typical** 123:10 130:7 130:9,12 138:24 139:2 220:4 253:12
**typically** 23:23 81:11 82:7 83:11 85:3,12 98:18 111:13 123:9 133:3 220:8,9,19 249:5

**U**

**U** 3:2
**uh-huh** 6:24 117:8
**uh-uhs** 6:25
**ultimate** 49:22
**ultimately** 137:2,4
**um** 23:23 109:18 171:13
**unable** 82:14,18 168:21
**unavailable** 54:18,23 55:2 73:9,20 102:5
**underneath** 233:12
**underpayment** 199:20
**understand** 5:11,17 5:19 6:11,14,18,20 7:2,13,16 8:10 9:2 14:19 15:5,22 29:22 30:19 31:24 48:25 49:18 79:16 82:15 89:17 90:21 112:19 114:21 117:3 119:15 123:13 154:9 174:14 175:12 181:21 190:21 202:6 205:16 206:11 207:14 224:15 229:3 256:10
**understanding** 11:15 33:17 128:17 165:23 244:11 246:13
**understood** 7:15,23 35:20 80:19 124:23 192:15 193:19 205:23
**undertake** 84:18
**undertaken** 82:3
**unedited** 238:2
**unemployment** 168:22 173:21 174:3
**unfiltered** 237:12
**unformatted** 249:5
**unfortunate** 55:24
**Unfortunately** 55:23
**unfriendly** 188:3,12 188:16 190:3
**unhelpful** 188:3,16
**UNITED** 1:2
**unlawful** 210:21
**unpack** 90:6 94:9
**unpackage** 180:12
**unpaid** 72:25 143:14 152:25
**unsure** 66:18
**untouched** 237:12 238:5
**untrue** 186:15
**unworked** 178:21
**upset** 191:19
**use** 5:9 13:9 34:10

35:12 57:4 77:25 95:15 98:17,18 99:9 114:8 169:22 200:13 209:19 229:3 238:3
**useful** 175:20
**user** 56:19 97:19,23 98:15,22 207:25
**uses** 79:7 97:7
**utilities** 73:20
**utility** 72:25 73:3
**utilize** 55:6,9,12 98:13
**utilized** 101:3 105:21 182:2

**V**

**v** 261:2
**vacation** 45:25 246:17
**vague** 122:14
**value** 248:13
**variations** 194:17
**varied** 132:6 194:20
**varies** 213:6
**various** 92:18 140:15
**vary** 48:20 118:11 131:18
**vendors** 68:25 69:8
**Venmo** 169:12
**verbal** 117:9
**verify** 82:11,14,18,18 99:8 142:17 150:24 151:5,24
**versa** 45:16 89:21
**versus** 72:22 104:21 235:16
**vice** 9:8 45:16 89:21
**video** 158:7
**violated** 127:3
**violating** 127:7
**virtual** 20:16,18,19 20:23 21:12,21 22:17
**visit** 27:13 77:13
**visited** 27:10
**visiting** 90:8,9

**W**

**W-2** 16:22 168:4,6,11
**W-2s** 164:8 168:3,8 168:12
**W-3** 168:2,11
**wage** 72:10,17 152:19 199:11
**wages** 57:8 69:20 116:14 140:25 142:6 143:15 146:18 151:9,10 152:7,25 153:13 157:20 179:14 199:20
**waiting** 13:13 14:21
**waive** 4:12
**waived** 3:9
**walk** 17:8 209:15
**walks** 103:6 209:18
**Wall** 2:11
**want** 5:17,18 6:17,18 16:22 27:22 78:25 107:15,21 156:9 159:2 183:11 185:12 195:7 211:15 215:19 216:6,18 234:20 235:14 236:14 251:22 252:2,12 254:8 256:23
**wanted** 65:20 104:20 105:6
**warehouse** 38:7
**warning** 143:23
**wasn't** 35:2 83:12 122:19,21 130:14 132:3 133:2 143:20 151:23 155:19 156:7 176:22 185:22 191:17 217:23
**watch** 115:22 116:7
**watching** 115:25
**water** 169:22
**way** 7:7 21:15 29:16 29:24 30:7 36:8,22 36:23 51:20 53:17 55:25 74:24 84:20 89:4,5 90:16,17 95:11 106:10 110:2 114:16 133:8,10 138:7 143:17 147:14 161:21 166:17 182:4 183:14 200:9 203:6 207:2 218:10 226:13 230:6 238:7 239:15 241:18 245:25 249:3 258:17
**we'll** 43:11,15 162:10 184:11,12 194:4 196:16 202:20,22 225:22 226:7,10 230:3 236:12 246:11 250:3 252:9 257:7
**we're** 6:15 69:3 157:15 162:9 167:8 181:6 193:24 211:2 211:16,25 215:17 236:17 239:3 249:15,24 251:10 252:7 255:8
**we've** 65:17 99:12 169:18 205:3 246:4 247:5
**web** 78:10 90:23 91:18
**website** 39:11,17,19 40:5,7,11 80:22 93:2 97:17 113:2,5 113:10,14 119:11 223:22,22
**websites** 207:25
**Wednesday** 85:9
**week** 21:20 22:2,22 45:12 50:21 69:14 69:16,16 77:6,6 107:3,6,7 108:6,13 108:17,22,25 109:6 109:8 114:24 115:24 116:20 130:4,17,19,23,25 131:4,9 142:13,13 142:21,21,23 153:9 162:13 177:9 198:3 198:21 199:24 200:4 218:23 219:2 222:25 224:16,20 224:25 226:15 227:24 228:5,16 231:14 232:13 233:13 241:22 246:14 250:6 251:5
**weekly** 110:24 111:3 116:21 143:3 181:7 235:5 254:12,20 255:2
**weeks** 131:20 152:12 152:15 156:2 195:20 250:5,8,13 250:17
**weighed** 71:2
**welcome** 209:24
**went** 61:6 93:9 244:13
**weren't** 73:5 90:22 106:4 115:11 116:11 123:19,22 129:22 163:9 252:24
**Westhampton** 12:12 16:18,20 44:16 45:15 92:13,14 147:10 154:21 155:10 156:14,16 157:19 158:7 182:19 187:24,25 216:14 217:4 240:8
**whatsoever** 40:17 68:25

**WhenIWork** 96:24 97:6,9,15,18,20,25 98:2,7,13,16,17,18 98:25 202:24 207:20
**WHEREOF** 258:19
**wholesale** 37:10,12 43:19
**wholesales** 44:25
**wife** 120:12
**WiFi** 24:3 102:2,3
**winter** 155:6,10 157:13
**withdraw** 206:13
**withdrawals** 133:25 134:6 135:3
**withdrawn** 8:21 28:9 80:20 116:6,16 118:17 160:21 186:9 224:19
**withheld** 115:7
**withholding** 162:22 242:4,5
**withholdings** 210:6 223:14,18,24 242:7
**witness** 4:24 120:5 125:25 126:4 127:8 169:21 192:15 206:25 215:23 236:9 254:16 257:4 257:6 258:11,14,19 259:3
**witnesses** 211:11 215:6
**word** 29:20 31:25 82:2 108:14 123:15 188:17 190:13 229:4
**words** 9:8 29:10 31:16 47:25 51:14 57:7 104:10 105:2 108:12 122:25 188:13 226:7 248:14 250:23
**work** 6:25 9:24 10:3 36:11 45:16 50:24 51:3,6 58:4 60:19 67:7 70:18 75:20,25 76:22 77:12,16 80:4 82:19 83:13 88:22 90:5 91:16 93:8,17 94:2 95:14 96:7 98:4 104:19 107:5,9 107:10,21 108:13 108:16,20 109:5 121:11 129:6,8,15 130:5,16 131:16 136:7 143:6,10,13 146:14 152:16 153:21 154:6,17,20 155:2,20 156:5,15 156:25 164:13,16 164:19,25 177:8 183:15 195:12 202:15 209:5,10,19 212:25 234:20 235:10 243:21 249:16
**worked** 8:21 42:20 45:14,23 51:15 55:25 60:12 69:19 70:24 71:2 76:12 80:22 81:25,25 85:10 87:23,24 88:2 88:11,24 93:20 96:7 96:15 98:8 99:18 104:25 106:12 107:3,25 108:7,23 114:23 115:2 116:8 117:13 121:21 128:25 130:10,25 131:4 142:2,9,17 152:17 154:10,14 154:19 156:21,23 161:25 164:12 177:19,21 179:7,13 179:14,17,19,23 180:14,24 195:5 197:15 198:3,22 199:8 202:21 209:9 210:12 213:16 222:9,25 224:21 227:16,20 228:5,5 239:18 242:23 245:7,21 246:2
**working** 33:14 50:21 58:11 59:4,10 60:7 62:5,15 96:11 108:22 117:18 120:17 129:22 130:19 131:12 139:9 144:14,17 154:2 155:21 157:11 161:19 165:21 167:8 172:15,17 178:3 180:5 190:5 191:17 192:21 195:21 224:12
**workplace** 66:14
**works** 25:24 26:10 50:4 63:24 70:13 80:4 86:18 183:5
**wouldn't** 54:25 56:10 69:4 85:3 88:23 92:5,16 95:19 102:6 115:10,25 131:5 133:2 149:7,8,20 151:4 152:14,16 155:19 157:8,22 196:2 230:23 253:25
**write** 6:24 7:9
**writing** 43:11,13,16 86:9 88:18 90:10 103:23 162:11 183:24 184:2,5,13 194:4 196:16 198:24 202:23 206:24 230:3 246:11 250:3 252:9 255:6
**writings** 153:14
**written** 143:23 174:11,18 184:9,10
**wrong** 33:6 52:2 122:12,14 139:14 175:9 188:9
**wrongdoing** 175:14 189:15
**wrongful** 122:18
**Www.NIBIMTK.c...** 39:20

**X**

**x** 1:3,12 51:15 139:21 143:13 226:16,17 227:3 232:16 259:2 259:8

**Y**

**Y** 143:13
**yeah** 76:23 182:23
**year** 13:24,25 42:10 43:2 59:6 61:12 62:9,10 110:14 120:20 137:23 144:16,18 149:10 154:19,22 155:22 158:5 163:22 164:7 164:7,14,17 166:11 195:6,12 196:15 212:18 233:20
**yearlong** 154:24
**years** 6:17 8:23 10:19 34:5 38:17 42:5 54:21 84:24 153:4 164:20 181:6 212:17,19 224:12
**Yep** 250:10
**yesterday** 20:14 22:18
**yo** 52:2
**York** 1:2,23 2:6,11 2:11 12:3,6,13 39:23 40:9 112:13 112:22 173:25 223:22 258:4,6,10

**Z**

**Z** 143:13
**Zelle** 162:13,16 169:7 169:14 194:14,19 227:7 255:20
**zero** 171:19 242:23 245:7,14,17
**zoom** 1:20 132:10,13 132:19
**zoomed** 237:4
**zooming** 212:16

**0**

**0** 242:22,22

**1**

**1** 158:21,22 195:8 211:25 212:5 237:6 253:4 259:10
**1:18** 119:25
**1:40** 120:3
**10** 95:20,22 105:16 129:2 195:16 236:18,20 241:11 241:15 260:3
**10,000** 234:21,23
**10.15** 228:12
**10:06** 1:14
**100** 181:7 193:22 238:15 239:21
**10005** 2:11
**107** 223:10
**10th** 232:14 241:8
**11** 95:20 239:7,8 260:5
**11:50** 74:11
**11423** 2:6
**11th** 244:19
**12** 195:9,16 213:15 224:16 240:11,12 246:10 247:8 260:7 260:19
**12:09** 74:11
**127** 12:12
**12th** 244:20
**13** 213:22 246:22,23 247:8 251:10 260:9
**14** 2:11 251:11,13 260:11
**141** 250:21
**141.45** 250:24
**14th** 233:13
**15** 105:13 255:9,11 260:13,20
**15-minute** 88:5 104:13,20,21 105:3 105:9,23
**15.23** 226:2,3
**158** 259:10
**159** 259:13
**16.45** 228:12
**16th** 246:15
**18** 1:14 261:3
**182-11** 2:5
**19** 260:20
**19.25** 224:16
**193** 260:19
**196** 260:19
**198** 260:20
**1988** 18:12
**1st** 250:7

**2**

**2** 159:3,7 166:15 211:25 259:13
**2:25-cv-04264** 1:8
**20** 105:15 145:6 195:24 196:3
**200** 223:9,9 237:4
**2005** 10:8,19
**2007** 10:17,24 28:16 33:18,19 34:5
**2015** 34:4 40:23 43:23 44:2 113:21
**2018** 44:11
**2019** 43:10 44:14 58:13 196:15
**202** 260:20
**2020** 34:23 43:10 114:2
**2021** 43:10 44:17 59:8 120:21 241:8 242:23 243:22 244:20
**2022** 43:10 59:8 146:14 227:17 237:6 240:7 245:7
**2023** 43:10 60:13 97:12 152:11 213:20 246:15,15 250:7,8
**2024** 13:12 16:10,16 23:7 43:10 60:13,14 62:11 97:13 171:21 232:14
**2025** 43:6,11 171:13 171:21 212:4,7 259:17
**2026** 1:14 53:8 257:19 258:20 261:3
**205** 242:9,10
**20th** 2:11 233:13
**21** 213:17 241:8
**212** 259:16
**214** 259:18
**216** 259:20
**21st** 227:17
**22** 213:24 260:21,22
**221** 259:21
**222** 259:22
**225** 260:21
**229** 260:21
**23** 67:11 121:17 213:17 242:5,6 260:21
**23.46** 238:12
**23.48567** 241:23
**234** 259:24
**235** 260:2
**236** 260:3
**239** 260:5
**23rd** 224:25 246:15
**24** 44:18 62:10 178:12 179:8 213:24 260:19,23
**240** 260:7
**2450** 12:5
**246** 260:9,22
**249** 260:22
**24th** 13:11
**25** 62:10 224:12
**251** 260:11
**252** 260:23
**254** 260:23
**255** 260:13
**25th** 13:11 250:7
**27** 240:7
**28th** 242:23
**29th** 225:2
**2nd** 238:14

**3**

**3** 67:23 149:12 212:2 212:6 253:4 259:16 260:18
**3:03** 169:23
**3:10** 169:23
**30** 20:21 87:21 90:3 92:22 103:19 105:13,17 183:9,13
**30-minute** 88:5 104:22 105:4,9,22
**307** 223:10
**30th** 227:17 258:20
**31** 195:8
**31st** 243:21
**31th** 212:4,7 259:16
**36** 214:11
**37** 214:11
**37.32** 253:20,22
**37.50** 231:20
**38** 214:12
**3rd** 232:13

**4**

**4** 123:4,14 214:20,23 245:6 259:18
**4:24** 211:23
**4:30** 211:23
**40** 77:5 107:3,5,7,10

107:10 108:7,13,17 108:20,22,24,24 109:5,7 114:23 116:8 130:16,19,23 231:20
**40.2** 224:24
**43** 260:18
**45** 22:5 174:7

**5**

**5** 76:19,20,22,23 83:10 216:2,3 224:16 228:4,13 259:4,20
**5:15** 236:12,16
**5:20** 236:12,16
**5:57** 257:9
**500,000** 43:3 212:18

**6**

**6** 77:3 129:2 221:10 221:15 224:23 259:21 260:22
**6.4** 228:3,3
**6.75** 224:23,23,24
**6.9** 228:4,5
**60** 77:6 130:25 131:4 179:17 180:5
**6th** 244:19

**7**

**7** 222:2,4 224:16,23 224:23 233:22 241:8,11 259:22 260:23
**70** 77:6 131:4 179:17 180:5
**7th** 216:16 245:7

**8**

**8** 212:15 234:12,16 259:24 260:18
**8:30** 77:3
**800** 233:12,14
**840,000** 193:11,19
**86** 260:18
**862.50** 251:3
**88** 11:25 41:11
**8th** 232:16,24 233:2,3

**9**

**9** 76:19,20,22,23 235:11 260:2
**94** 241:3
**94.26** 241:2
**941** 163:17,21 174:6
**941s** 163:25
**98** 231:22
**9th** 232:14