# In the Matter of

Case No. 2:25-cv-04264

GONCALVES, et al.

v.

KRISTIN SHEELER DESIGNS, LLC, et al.

## Deposition of Kristin Sheeler

*Tuesday, September 22, 2026*

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------

TERESA GONCALVES and DINA KETCHAM, on behalf of themselves and all others similarly situated,

Plaintiffs, Case No.: 2:25-cv-04264

- against -

KRISTIN SHEELER DESIGNS, LLC, KRISTIN SHEELER, and JAMES "JIM" BRINNEN,

Defendants.

-------------------------------

September 22, 2026
9:53 a.m.

Remote video-teleconference deposition of KRISTIN SHEELER, taken by Plaintiffs, held at Montauk, New York, pursuant to notice, before Elizabeth F. Tobin, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

(Present via video-teleconference)

On behalf of the Plaintiffs:

SAGE LEGAL, LLC
182-11 Jamaica Avenue
Jamaica, New York 11423-2327
718.412.2421
BY: EMANUEL KATAEV, ESQ.
emanuel@sagelegal.nyc

On behalf of the Defendant:

BOWLES & JOHNSON, PLLC
14 Wall Street, 20th Floor
New York, New York 10005
212.390.8842
BY: DAVID K. BOWLES, ESQ.
david@bojo.law

ALSO PRESENT:

BENJAMIN GRUSHKOVSKIY, PARALEGAL
ALIVIA COONEY, PARALEGAL

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

K. Sheeler

COURT REPORTER: Mr. Bowles, will you be ordering a copy of the transcript.

MR. BOWLES: Yes. Just regular delivery.

COURT REPORTER: Good morning. My name is Elizabeth Tobin. I am a New York State stenographic reporter and a registered professional reporter. Today's date is September 22, 2026 and the time is approximately 9:53 a.m. This is the deposition of Kristin Sheeler in the matter of Goncalves, et al versus Kristin Sheeler Designs, et al. This case is venued in the United States District Court, Eastern District of New York. The case number is 2:25-cv-04264.

At this time I will ask counsel to identify yourself, state whom you represent and agree on the record that there is no objection to this stenographic reporter administering a binding oath to the witness remotely via video-teleconference.

MR. KATAEV: For plaintiff, Emanuel Kataev, Sage Legal, LLC. So stipulated.

MR. BOWLES: David Bowles here for the defendants and no objection to the stipulation.

K R I S T I N S H E E L E R,
of lawful age, called by the Plaintiffs for examination pursuant to the Federal Rules of Civil Procedure, stating an address of 28 Foxboro Road, Montauk, New York 11954, having been first duly sworn remotely upon agreement of all counsel, as hereinafter certified, was examined and testified as follows:

EXAMINATION OF KRISTIN SHEELER

BY MR. KATAEV:

Q. Good morning, Ms. Sheeler. My name is Emanuel Kataev. I represent Teresa Goncalves and Dina Ketcham in this case.

During this deposition, I will refer to the company. If I do that, I refer to Kristin Sheeler Designs, LLC and/or NIBI MTK.

Do you understand that?

A. Yes.

Q. Have you ever had a deposition taken before?

A. No.

Q. Since it's your first time conducting a deposition, I'd like to go over some of the ground rules. First, I want you to confirm that you

understand that the oath you just took has the same force and effect that -- of an oath that you would take in open court in front of a judge.

Do you understand that?

A. Yes, I do.

Q. Throughout your testimony today, while I don't want you to guess at any answers, I want you to confirm that you understand and I'm entitled to your best recollection.

Do you understand that?

A. Yes.

Q. Next, I want you to answer aloud as you've been doing. The court reporter cannot take down body gestures, mumbling, shaking of the head, so on and so forth.

Do you understand that?

A. Yes.

Q. Also, you've been doing a good job at this. Let me finish my question first, even if you know what I'm going to ask so that the court reporter can write down everything both of us say.

Okay?

A. Yes.

Q. If you don't understand a question that

I've asked, tell me and I will rephrase it. However, if you answer the question, I will assume that you understood it.

Do you understand?

A. Yes.

Q. When you're providing testimony, if you don't know something from your own personal knowledge but know it through some other way, I want you to tell me that.

Do you understand that?

A. Yes.

Q. You can take a break at any time for any reason. My only rule is that if a question is pending, you answer that question first.

Do you understand that?

A. Yes.

Q. I generally take the full time for a deposition. Hopefully we'll be able to finish sooner based on Mr. Brinnen's testimony. But I ask that you take breaks sparingly to ensure that we finish everything for the day and not need you to come back.

Is there any reason why you cannot provide truthful answers to my question today?

K. Sheeler

A. Rephrase that. I don't know what you mean by that.

(Benjamin Grushkovskiy entered the video-teleconference.)

MR. KATAEV: Let the record reflect that Benjamin Grushkovskiy just joined. He's a paralegal at my firm.

Q. My question is, is there any reason why you cannot provide truthful answers to my questions today?

A. No.

Q. Do you have any physical or mental condition that will affect your ability to testify truthfully today?

A. No.

Q. Have you taken any drugs, medicine or alcohol that will affect your ability to testify truthfully today?

A. What do you mean? I'm on an antidepressant due to this case.

Q. Will that affect your ability to testify truthfully today? Does it affect your memory or ability to testify truthfully?

A. No.

K. Sheeler

Q. What's your full name for the record?
A. Kristin Marie Sheeler.
Q. And have you ever gone by any other name?
A. No.
Q. What's your present occupation?
A. I own NIBI MTK. I'm a fashion designer.
Q. Are you the sole owner of that entity?
A. Yes.
Q. And is NIBI-MTK an assumed name or doing business as name for Kristin Sheeler Designs, LLC?
A. Explain what you mean by assumed.
Q. Well, a lot of times businesses attain a formal legal name and then attain a doing business as name. I want to understand whether NIBI-MTK is an assumed name or a d/b/a for Kristin Sheeler Designs, LLC.
A. Can you explain d/b/a.
Q. D/b/a stands for doing business as.
A. It is the name of the store and the clothing brand.
Q. Do you have any knowledge of whether you've ever had an attorney fill out a certificate of assumed name designating NIBI-MTK as the business name for Kristin Sheeler Designs, LLC?

A. No, I do not.
Q. Are you the sole member of Kristin Sheeler Designs, LLC?
A. Yes, I am.
Q. Has there ever been any other owner of the LLC?
A. No, there's not.
Q. So it's fair to say you own 100 percent of the company?
A. Yes.
Q. And there are currently two stores that the company has; right, brick and mortar stores?
A. Yes.
Q. That's the Montauk location; correct?
MR. BOWLES: Object to the form.
Q. You can answer.
MR. BOWLES: Let me just the instruct the witness. Ms. Sheeler, you can answer after I object unless I tell you not to answer as a general rule. So I'm just objecting to the form of the question.
THE WITNESS: Okay.
A. Yes, I have a Montauk store.
Q. And there's also the Bridgehampton store;

correct?

A. Correct.

Q. Previously, you also had a Westhampton location, right?

A. Yes.

Q. And that store closed down due to a fire; right?

A. Yes. It burned down.

Q. Other than those three stores, did the company ever have any other location that it operated from physically?

A. Rephrase that. I don't have -- I never had another brick and mortar.

Q. Have you ever had any pop-up stores?

A. Yes. We've done pop-ups.

Q. And how many different locations have you done pop-ups over the years, over the life of the --

A. I cannot recall.

Q. When was the last time you had a pop-up location?

A. Years ago.

Q. Is it fair to say you had pop-up locations before you had a brick and mortar location like you have in Montauk?

A. Yes.

Q. Did either plaintiff -- that is, Ms. Goncalves and/or Ms. Ketcham -- work at any of the pop-up stores?

A. Not that I recall. I didn't know them.

Q. Is it fair to say that you generally operate the business?

MR. BOWLES: Object to the form.

A. There are many employees that help me run my business.

Q. Is it fair to say that although you have employees that you rely on to run your business that you are the final decision-maker?

A. It is a company that is run with many ideas and thoughts and many people work with me to make my decisions.

Q. In terms of making the final decision on something, is it just you or other people as well?

A. I still don't understand what you mean by that.

Q. With respect to any operational issue or concern, when there has to be a final decision made, who makes that decision?

A. Depending on who's working on that

decision.

Q. What are the possible -- who are the possible people that make those decisions with you?

A. It could be many people. It could be my merchandiser. It could be my planner. It could be my operator, financial operator.

Q. Can you identify those individuals by name?

A. Jim Brinnen Natalie Cummings, Kristin Fox.

Q. When did Kristin Fox first begin working with you?

A. Last September.

Q. Earlier this month or last year September?

A. Last year.

Q. Can you briefly describe your educational background?

A. High school, college, Syracuse University. I have a BFA.

Q. Where did you go to high school?

A. Northern Valley Old Tappan, New Jersey.

Q. And in terms of college, the only college you went to is Syracuse University?

K. Sheeler

A. I started at Bridgeport, Connecticut, transferred and graduated with a BFA from Syracuse University.

Q. Did you go straight to college from high school or did you have some time in between?

A. Why -- no. I went right to college.

Q. After you got your bachelor of arts -- is that right?

A. Right. BFA.

Q. Where did you work after that?

A. Schumacher. It's a home furnishings company.

Q. Where was that?

A. New York City.

Q. How long did you work there, approximately?

A. I can't recall.

Q. Do you know if it was longer than a year, less than that?

A. I can't recall.

Q. Where did you work after that?

A. Adrienne Vittadini.

Q. What type of establishment is that?

A. A clothing fashion brand.

K. Sheeler

Q. Where was that?
A. New York City.
Q. How long did you work there?
A. Again, I can't recall. It's been over 30 years.
Q. Where did you work after that?
A. Ralph Lauren.
Q. How long?
A. First time, I think three or four years.
Q. There was a second time?
A. Yep.
Q. How long for that second time?
A. I can't recall.
Q. That was also city of New York?
A. Yes, it was.
Q. Where did you work in between the two stints at Ralph Lauren?
A. Sorry. I was at Ralph, then Adrienne, then Ralph.
Q. After that where did you go work?
A. Victoria's Secret.
Q. How long?
A. Again, I can't recall.
Q. Do you know if you worked there for more

than a year?

A. Yes.

Q. That was also New York City?

A. Yes.

Q. Where did you work after that?

A. Arend Basile.

Q. How long?

A. Again, can't recall. But at least two to three years.

Q. Also New York City?

A. Yes.

Q. Where did you work after that?

A. Oh, sorry. I worked at Abercrombie & Fitch before Arend Basile and that was in Ohio.

Q. Did you move to Ohio to work there?

A. I did.

Q. How long?

A. Again, I can't recall. I'd have to pull up my resume.

Q. Okay.

Do you know if that was longer than a year?

A. Yes.

Q. Where did you work after leaving Ohio?

A. Arend Basile.
Q. After that?
A. Delia's.
Q. How long?
A. Again, I can't recall. Maybe two years.
Q. Where was that, in New York City?
A. Yes.
Q. Where did you work after Delia's?
A. I started my company.
Q. What prompted you to start the company?
A. Always wanted to be my own designer. Wanted --
(Court reporter requested clarification.)
A. Wanted to leave corporate life.
Q. In all of the jobs that you told me about, were you working in an office position or were you in retail on the sales floor?
A. I was in the design office. Never retail.
Q. The work that you were doing in the design office at all of your prior jobs, is that essentially the same type of work you began doing for your own company?
A. Yes.

K. Sheeler

Q. In order to get into the design space to open up your own company, you had to obtain relationships with manufacturers?

A. I'm sorry. Repeat the question.

Q. In order to get into the design business and own your own business in the design industry, you had to obtain relationships with manufacturers; correct?

A. No. Not right away.

Q. Outline that process for me in terms of opening up your own design company. When did you first and when did you get to the point where you were forming relationships with manufacturers?

A. It was a boutique. So it was other clothing and a small private label line of mine.

Q. So you got your foot in the door by selling other clothes that you did not design; correct?

A. Yes.

Q. And tell me about how you ended up creating your own line.

A. Just people working with me or approaching me and asking me to see if I wanted to work in design and manufacture.

K. Sheeler

Q. So although it was something that you always wanted to do, if I understand you correctly, the opportunity presented itself for you to design and sell your own line rather than you actively pursuing it? Am I correct about that?

A. Rephrase that. I don't understand your question.

Q. My question is, did you actively pursue the ability to design your own line of clothing or did the opportunity just present itself after you opened up the store?

A. The opportunity presented itself.

Q. And how did that opportunity come about?

A. I cannot recall the woman that approached me.

Q. You don't work with that woman any longer?

A. No.

Q. When you first started designing your own line, where were the garments of clothing prepared?

A. New York.

Q. And they were manufactured in New York?

A. No.

Q. Where were they manufactured?

K. Sheeler

A. I'm not quite sure. It wasn't my company.

Q. Where are the garments that you currently sell manufactured?

A. They're in India.

Q. How did that relationship come about?

A. I researched and procured manufacturers.

Q. So boots on the ground --

A. Exactly.

Q. Did your working relationship with the manufacturer in India require you to travel to India?

A. Yes.

Q. How often do you travel to India?

A. Depending on season.

Q. What is the purpose of your visits to India?

A. To design.

Q. So when you're in India, you're working with the manufacturers on the clothes that you're designing?

A. Yes.

Q. And how long does your average trip take when you're in India?

A. It can range from five days to three weeks.

Q. How many times a year do you go?

A. Like I said, it's dependent on the season.

Q. One time a year? Can you answer the question?

A. One a year -- one time a year or two times a year.

Q. Do you have any type of licenses or credentials of any type other than a driver's license?

A. A passport.

Q. Anything other than that?

A. No.

Q. Do you have any training in payroll or accounting?

A. No.

Q. What about retail management?

A. No.

Q. Prior to opening up Kristin Sheeler Designs, LLC, did you open up any other company?

A. No.

Q. Other than Kristin Sheeler Designs, LLC,

K. Sheeler

are you the owner of any other company?

A. No.

Q. In the course of performing your work in any of the prior employers you worked for other than Kristin Sheeler Designs, LLC, did you ever have any responsibilities for employees or wages?

A. No.

Q. I know you previously said you never testified at a deposition before.

Have you ever testified anywhere else before, like in open court?

A. No. Not that I recall, no.

Q. Have you ever been a party to any other lawsuit?

A. No.

Q. When you first opened up your business, did you retain an attorney to form the LLC?

A. Yes.

Q. Who was that attorney?

A. I have to look back at that.

MR. KATAEV: We'll submit to you an interrogatory addressing that question after this deposition so your attorney will receive it and you'll be able to respond with a sworn

answer.

Q. Have you ever been charged with any crime before?

A. No.

Q. Have you ever been arrested before?

A. No.

Q. So it's fair to say then that you've never been convicted of any crime; correct?

A. Very fair.

Q. Did you prepare for today's deposition?

A. Explain. Clarify that. I don't know what you mean by prepare.

Q. I'll ask more questions. But generally what I'm looking for right now is, did you meet or discuss with your attorney this deposition? And in providing your answer, don't tell me anything that he said or she said.

A. We spoke.

Q. When did you speak?

A. Yesterday.

Q. In what manner did you speak? That is, by phone, by virtual meeting, in person or otherwise?

A. Virtual meeting.

Q. How long did that meeting last?

A. Half an hour.

Q. Other than the half an hour yesterday by virtual meeting, did you ever meet with your attorney to prepare for this deposition before then?

A. No.

Q. I'll represent to you that Mr. Brinnen testified that he had one virtual meeting and one phone call.

Were you present for those meetings to prepare for his deposition?

A. Yes. But it wasn't about my deposition. So that's what you were asking, about my deposition. If you had said the deposition, yes, of course, I was there.

Q. I agree with you.

(Simultaneous speakers.)

A. Fair to say.

Q. Yes.

To your knowledge, when was Mr. Brinnen deposed?

A. Friday.

Q. And were you present for any portion of that?

K. Sheeler

A. No.

Q. Have you had an opportunity to review any transcript of that deposition?

A. No. We have not received it.

Q. Did you have any discussions with Mr. Brinnen about that deposition?

A. Briefly spoke about what -- you know, about the deposition.

Q. What did he say to you and what did you say to him?

MR. BOWLES: I'll object to that question and instruct the witness not to answer. They have marital privilege.

Q. Other than having a virtual meeting -- withdrawn.

During your virtual meeting to prepare for a deposition yesterday, did you review any documents?

A. Yes.

Q. What documents did you review?

A. The case, your claim and our counterclaim.

Q. When you say the case and your claim, are you referring to the complaint or something else?

K. Sheeler

A. I'm referring to why we're on this deposition.

Q. No. My question is, what documents have you reviewed? Not why we're at this deposition. So can you answer my question?

A. I can't recall the documents. I think it's a court claim. I'm sorry, the suit is what I -- how I'm describing it.

Q. The complaint?

A. Yes.

Q. And then you said the counterclaim.

Other than the claim and the answer, counterclaim, did you review anything else?

A. No.

Q. Who is Orest P. Baransky?

A. The accountant.

Q. How long has Mr. Baransky been your accountant?

A. I would have to refer back to Jim Brinnen on that.

Q. Do you work with Mr. Baransky yourself?

A. No.

Q. Do you recall ever having a different accountant?

K. Sheeler

A. Several, several years ago. Again, I'd have to do some research to find my old accountant.

Q. You first opened Kristin Sheeler Designs, LLC in or about 2009; am I right?

A. Yes.

Q. And you first opened up your brick and mortar store in 2015; right?

A. Correct.

Q. Prior to opening up the brick and mortar store, you had pop-up store locations; right?

A. No. No. My LLC in 2009 was when I first was going to do a store and I did not proceed on that store. I continued to work. The LLC was left to be there for any time if I was going to open a store. There was no brick and mortar in 2009.

Q. So are you saying that you had pop-up stores only after you opened up the Montauk store in 2015?

A. 2014 I did fairs, like pop-ups in Montauk.

Q. Okay.

Prior to 2014, no pop-up locations, though; correct?

A. As I can recall, no.

K. Sheeler

Q. Is it fair to say that Chris Kristin Sheeler Designs, LLC first had employees since in or about 2014 or did you have employees before then?

A. It's fair to say 2014 part-time.

Q. To your knowledge, were the first employees that you ever hired, was their pay handled in the same manner as you're handling it now?

A. I could not answer that question. I do not know. I didn't -- Jim Brinnen handles that.

Q. So if I understand correctly, you have no involvement whatsoever in payroll operations?

A. Exactly.

Q. Who was your accountant before Baransky?

A. As prior to this question, I'd have to look back. I do not recall.

MR. KATAEV: We'll do another interrogatory addressing that question and you can respond under oath to that question.

THE WITNESS: Okay.

Q. Can you describe the business of Kristin Sheeler Designs, LLC?

A. A concept and boutique clothing store selling other brands and then as it came about, selling my own brand.

K. Sheeler

Q. What products does the company sell?

A. Women's clothing.

Q. It's fair to say that the merchandise that you sell is purchased from outside the state of New York?

A. It's New York, California, Texas. It's all around the country.

Q. What percentage of products did you purchase from inside New York?

A. I can't recall. I'd have to, again, go back. It's not much. Most designer clothing is made out of California.

Q. When you say not much, would it be a range of like 5 to 10 percent?

A. Again, I can't give you a solid answer.

Q. Best estimate.

A. Again, I'd have to look back.

Q. Now, does the company accept credit cards?

A. Yes, it does.

Q. It does so both inside the store and on the website; right?

A. Yes.

Q. In terms of online sales, you sell to

people outside the state of New York; correct?

A. Yes.

Q. What would be the ratio between your in-store sales and online sales?

A. 90 to 5.

Q. 90 percent is online and 5 percent is inside the store?

A. Opposite.

Q. Oh, wow. 90 percent inside the state of New York at your store, 5 percent online?

A. Again, I don't -- I'd have to look at the ratio of Shopify. I'm on Shopify.

Q. But you're giving me your testimony based on your best estimate of what you believe it is?

A. I'm giving you testimony that I don't have a charted number in front of me to be able to give you a ratio one way or the other. I can't tell you if it's 40-40, 30-30, 60-60. I don't have the numbers in front of me.

MR. KATAEV: I'll be happy to follow up and get those numbers. We'll call for the production of your Shopify sales analysis to determine what's sold in store versus outside the store and we'll follow up in writing.

K. Sheeler

Q. When you make sales, whether it's inside the store or online, does the company ship the merchandise outside the state of New York if the customer is from outside the state of New York?

A. Yes. It's all done with a shipment process.

Q. The shipping, is it done in-house or do you use some sort of vendor?

A. It is done through Shopify.

Q. How does Shopify go about collecting the merchandise that you ship?

A. Again, what do you mean by collecting the merchandise?

Q. Well, presumably some of the items you're selling inside in the store and some may not be inside the store.

Does Shopify already have possession of the merchandise to be shipped or does someone come and pick it up or does it get dropped off? That's what I'm looking for.

A. Everything comes through our stores.

Q. Can you repeat that? I'm sorry.

A. Merchandise comes through the stores. Shopify is a third party that most boutiques use for

K. Sheeler

their platform.

Q. I still don't understand how Shopify ships the merchandise. Where does it get it from?

A. It gets it from our stores. We ship it.

Q. Now, was your annual gross revenue in 2025 in excess of $500,000? When I say gross revenue, that's the top line number before expenses.

MR. BOWLES: Object to the form.

A. I can't give you that number. I don't do the accounting.

Q. Do you know for any year in the last four or five years whether you've had gross revenue exceeding $500,000?

A. I cannot give you that. I don't do the accounting.

MR. KATAEV: I already asked for this with Mr. Brinnen's deposition. But for the sake of a complete, we'll call for the production of all tax returns from 2025 going back to 2019. We'll follow up in writing.

Q. Is it fair to say that your Shopify account has the complete records of your sales or do you use some other program for your sales?

A. I'm sorry. I don't understand the

question.

Q. Well, you testified that you use Shopify before; right?

A. For our online sales, yes.

Q. You don't use Shopify for the in-store sales; right?

A. No, we do not.

Q. For your in-store sales, you're using Clover?

A. No, that is a computer processing just for credit cards.

Q. What about Lightspeed?

A. That is our form of sales and inventory.

Q. Lightspeed does not have any information about online sales or Shopify sales; correct?

A. No, it does. It also --

(Simultaneous speakers.)

(Court reporter requested clarification.)

A. It all comes -- it pulls out of Lightspeed. It is our inventory system. So if someone purchases online, the piece will be taken and approved on Lightspeed.

Q. Okay.

So it's to say that Lightspeed will have

a complete picture of your sales both online and in-store; correct?

A. Correct.

Q. One of the pop-up stores that you had previously was Atlantic Terrace; right?

A. It is a store. Not a pop-up. My first store. 2014 -- '15, I think we started.

Q. And you opened that at the same time -- you opened up the Montauk location in 2018; correct?

A. Correct.

Q. So the Atlantic Terrace location was opened for years; right?

A. I can't recall, but I think it was three.

Q. What was the reason, if any, that you closed down Atlantic Terrace after opening up Montauk?

A. Expansion.

Q. For what reason did you decide not to keep that Atlantic Terrace location?

A. It was a tucked away hotel and we had just moved into a very big location and did not need that any longer.

Q. And it's fair to say that when you operated from the three locations and now the two

locations, everything was under one umbrella in terms of Lightspeed; correct?

A. Correct.

Q. Generally speaking, you have the authority to hire employees; correct?

MR. BOWLES: Object to the form.

Q. You can answer.

A. It is, again, a decision with the team.

Q. In the beginning when there was no team, you were the exclusive decision-maker on who to hire; correct?

A. I mean, doesn't every employer hire their employees?

Q. I'm just looking for you to confirm that you had the authority to hire employees when you first started the business and hired someone.

A. When I first started, yes.

Q. And is your testimony now that you have managers that you no longer engage in any hiring decisions?

A. I hire as a team. We all have say.

Q. Okay.

Are you part of the interview process?

A. I'm sorry. Say that again.

K. Sheeler

Q. Are you part of the interview process?

A. I am sometimes part of it and sometimes I trust my managers. They manage my location.

Q. What about terminating employees, is that something that you exclusively control or do your managers have the authority to terminate people as well?

A. Again, it is a team and I don't work in every location. So if there is issues, my managers are the ones that are bringing up those issues, and they're the ones that are going to tell me they want to terminate. Which I don't think we've ever terminated anyone. I'm a seasonal business.

Q. It's fair to say that they check in with you before terminating someone; right?

A. Yes. They write me emails. They've texted me. They'll call. They'll say this person is not working out.

Q. Has there ever been an occasion where a manager says, I want to terminate this person and you say, well, let's give them one more chance?

A. I don't recall.

MR. BOWLES: Sorry. Let me get in an objection.

K. Sheeler

Object to the form. You can go.

Q. You said "I don't recall"?

A. I don't think we've -- no. I can't recall that. But, no.

Q. Is it possible that that could happen?

A. I trust my managers. I trust what they are telling me.

Q. What about the authority to -- withdrawn.

Have you ever disciplined any employees?

A. You're going to have to give me more than that.

Q. For example, if someone does that's outside of company protocol, do you take some sort of measure against them? Do you terminate them? Do you suspend them? Do you reduce their pay or commission, anything like that?

A. Again, give me an example of what you're speaking of.

Q. I just did.

(Simultaneous speakers.)

A. Like, I own a boutique. So what would be something that you feel would be the suspension of something that was done wrong?

Q. I mean, it doesn't have to be anything I

feel. Just in general, if someone does something that violates company protocol or does something they shouldn't do, have you ever taken any steps to discipline an employee for that in any way?

A. In what form of discipline? That's what I'm asking. I don't understand the question.

Q. I gave you some examples. I'll repeat them. Suspending an employee, terminating an employee, reducing their pay and/or commission, anything along those lines?

MR. BOWLES: Note my objection.

A. I -- no. We did not -- again, I would have to say I can't recall this because we have not done that. There has been no one that's ever -- it would come in writing. Everything that we do as a policy, everything is done in writing.

(Court reporter requested clarification.)

MR. BOWLES: I'll just caution the witness right now. We're getting a little bit fast and excited so people are stepping on each other's answers. I need a chance to get in an objection sometimes. So just slow down a little bit. Thank you.

THE WITNESS: Okay.

MR. KATAEV: I'll call for the production of any emails disciplining any employees. We'll send over some search terms for your emails to assist you in producing those documents. We'll also follow up in writing.

Q. Let's talk about compensation. Generally speaking, for employees, do you decide their compensation?

A. As a team we do, yes.

Q. Generally speaking, for entry level retail sales employees, what is the compensation?

A. The range can be from 15 to $25.

Q. Okay.

And when you speak to your managers about hiring someone, do you tell them, this is the range that you can choose to hire them for; correct?

A. Based on their experience, yes.

Q. Your team does not have the ability without speaking to you to go above or below that range; correct?

A. Yes. They need to speak to us that to hire someone after knowing their ability, if they're asking for a higher pay.

(Simultaneous speakers.)

K. Sheeler

Q. When you said speak to us, who is us?

A. Myself, Jim Brinnen.

Q. You also determine whether employees can receive commissions; correct?

A. Yes.

Q. And you also determine the actual commissions that are offered; right?

A. What do you mean by determine the commission? Percentage?

Q. Correct.

A. Yes. Managers receive 4 percent. Sales team, depending on their experience, again, receive 1 to 2 percent.

Q. And that's something that you determine; right?

A. Again, we determine it as a team.

Q. You inform your team, these percentages are the commissions to offer to sales staff and managers; right?

A. We send out letters of hire and it will present exactly in terms of salary and commission and time worked.

Q. I appreciate that those things were sent out. My question is whether you determine that and

tell that amount to the managers that are being hired.

A. We send out the letters after someone is hired.

Q. That's not responsive to my question.

My question is, did you tell your manager the percentages to offer when they're hiring?

A. I can't recall. We didn't -- sometimes we're working with somebody and then we're offering -- doing an offer letter.

Q. Has there ever been a circumstance where a manager comes back to you and says, hey, I offered this manager 4 percent commission --

A. No one is hired as a manager.

MR. BOWLES: Make sure not to interrupt Mr. Kataev while he's asking a question, if you could. I know it's hard. That's okay.

Q. When you say no one is hiring a manager, you mean a manager is not hiring a manager; correct?

A. Correct.

Q. You would be hiring the manager?

A. Myself or the management team.

Q. Let me rephrase my question.

If a sales employee is being hired by a

manager and is offered 1 to 2 percent commission and that sales employee says, hey, I appreciate the offer of commission, but I really need it to be 5 percent, does the manager have the authority to decide that or does the manager come speak to you?

A. That would be an email. We have policies and the manager would never do that. Because our policies were always in place. The manager would not do that.

Q. And you created those policies and shared it with the managers who do the hiring?

A. We do. We have emailed out our policy.

MR. KATAEV: We're going to call for the production of all compensation policies to the extent not already produced. We will follow up in writing.

Q. Let's talk about schedules.

Do you determine the schedules for the managers?

A. Depending on store and depending if a manager is not working a schedule properly.

Q. When you're saying a manager is not working the schedule properly, you're referring to the manager's oversight in scheduling everyone;

correct?

A. They are not following our policy and scheduling where we have a policy of the amount of people in a store at a time.

Q. And you set that policy; correct?

A. Again, the team sets the policy. There are emails that have been sent out. They're sent out throughout numerous times.

Q. Just so I'm clear, I'm assuming the team you're referring to consists of yourself, Mr. Brinnen, Ms. Cummings and the manager you hired last year in September; correct?

A. Me and Jim Brinnen. Ms. Cummings would train people.

Q. After an employee is hired, do you direct that employee concerning what work he or she is required to perform?

A. Meaning?

Q. Do you tell the employee what their duties are?

A. We have a manager to do that in each store.

Q. What about when you hire a manager, do you direct that manager concerning what work they're

required to perform?
A. I have myself or we have Natalie Cummings who will train them on the system or train them on a day-to-day of how to sell.
Q. Have you ever assigned an employee who is working at one location to work at a different location?
A. Yes, they have worked other locations.
Q. Do you make decisions about that from time to time?
A. It would be based on, again, where we might need somebody to cover a shift.
Q. You use this application called When I Work to schedule employees; right?
A. Yes.
Q. Have you ever asked an employee to work outside his or her scheduled shift?
A. Not if they couldn't, no. If they wanted to. They have hours. These are --
(Simultaneous speakers.)
Q. In other words, you may offer someone to work outside of their scheduled shift, but if they couldn't, you wouldn't enforce it?
A. No. No one forces anyone ever.

K. Sheeler

Q. But you have offered employees to work outside their scheduled shift; correct?

A. No. We like to stay to a 40-hour week.

Q. Are you able -- withdrawn.

Have you ever rejected an employee's reported hours worked?

A. No.

Q. Is it something a manager would do?

A. No.

Q. Do you have access, generally speaking, to employees' time records?

A. No.

Q. Do you have access, generally speaking, to employees' payroll records?

A. No.

Q. Mr. Brinnen handles time and payroll; right?

A. Exactly, yes.

Q. You don't have any outside payroll process up until this year when you obtained a working relationship with Gusto, G-U-S-T-O?

A. Correct.

Q. Have you ever reviewed payroll before employees were paid together with Mr. Brinnen?

K. Sheeler

A. No. This is his position.

Q. He exclusively handles that; correct?

A. He handles payroll.

Q. But you do have an authority to correct a paycheck if there was an error; correct?

A. I -- no. I don't do that part of the business.

Q. Mr. Brinnen doesn't check with you before fixing something like that or addressing something like that?

A. Our policy is that you report your hours and he checks with them if something is needing to be addressed.

Q. So has an employee ever come to Mr. Brinnen and said, hey, my check doesn't appear to be correct for whatever reason?

A. Yes, there's been texts and emails.

Q. When that happens, does Mr. Brinnen check with you before making a decision on how to handle it?

A. Check with me in what way?

Q. To confirm with you whether the change should be made or denied?

A. Yes. That I didn't realize. But they

K. Sheeler

are communicating as employees to him.

Q. They don't reach out to you but Mr. Brinnen reaches out to you?

A. They do not reach out to me.

Q. But Mr. Brinnen does; right?

A. We're a team. So yes.

Q. Okay. Is it fair to say that you have the final authority concerning the amount an employee is paid?

A. No. It's determined on the season and their documents they received for their pay.

Q. Have you ever personally funded money to the company to make payroll?

A. No.

Q. Is it fair to say that you're the highest-ranking person in the day-to-day retail operations of the company?

A. Day-to-day, each store has a manager.

Q. Did Ms. Goncalves report directly to you?

A. She reported in to Jim and myself.

Q. Same for Ms. Ketcham?

A. Yes.

Q. Did you personally set Ms. Goncalves' $23 hourly rate?

K. Sheeler

A. It was agreed upon with her when hired.

Q. When you say it was agreed upon, was it that she requested that rate and you approved it or that she accepted it or something else?

MR. BOWLES: Object to the form.

Q. You can answer.

A. Can you rephrase that.

Q. My question is, how did you and Ms. Goncalves end up agreeing on $23 an hour as her compensation rate?

A. We interviewed her. We offered her the rate of $23. She agreed. We sent her a package. She signed that package. And that's how the rate was agreed on.

Q. What about Ms. Ketcham, was it similar and you made an offer of a specific amount that she agreed to?

A. Yes.

Q. Do you recall Ms. Ketcham's request for a raise?

A. I -- when she did ask for a raise, we did give her a raise.

Q. And you decided to approve her request for a raise; right?

K. Sheeler

A. Well, she asked for a certain raise and we approved that raise. And we sent the email with that raise.

Q. And when you refer to we, you're referring to yourself and Mr. Brinnen; correct?

A. Mr. Brinnen sent her an email with the rate of the raise by email.

(Court reporter requested clarification.)

Q. Generally speaking, you have authority to issue checks from the company; correct?

A. To -- again, what do you mean by checks to the company?

Q. Like physical checks to pay vendors or other stuff?

A. We pay by credit card to vendors.

Q. Outside of vendors, have you ever issued a check from the company?

A. Not that I'm aware of.

Q. What about transferring funds through ACH?

A. I'm not aware of that. That's not my position.

Q. Do you participate in deciding which bills will be paid from the company?

K. Sheeler

A. All bills are paid through my company.
Q. I understand.
Do you decide which get paid when?
A. That, again, is not in my -- what I do. If it's not product related.
Q. So you handle payments for merchandise but other stuff Mr. Brinnen handles?
A. Yes.
Q. When you handle payments for merchandise, do you personally process payments or does Mr. Brinnen process it for you?
A. Again, it's through credit cards. So it could be myself, it could be my merchandiser with my credit card. But it's just merchandise through my credit card to pay our vendors to receive our goods.
Q. Are you aware of any occasion when employees were paid late?
A. No, not that I recall.
Q. Do you recall ever having a lack of cash such that you were unable to make payroll?
A. No.
Q. Did you ever decide -- I'm sorry. Did you want to say something?
A. No.

K. Sheeler

Q. Did you ever decide whether payroll was paid before other company expenses --

A. No.

Q. -- or vice versa?

Are you aware of any unpaid utility bills at any company location?

A. To date? No.

Q. Were any utilities ever shut off or unavailable because the company bills had not been paid?

A. I know there was an issue when we first started a new store that the landlord didn't let us know that something had to be connected to our payroll -- our pay -- I'm sorry. I don't really know because really Jim again. I don't know. Jim Brinnen will know.

Q. But you're aware of some issue with the utilities being shut off that had to be taken care of?

A. For a day, maybe.

Q. Was the reason the utilities were shut off because that utility bill was not paid?

A. Again, I -- you'd have to ask Jim Brinnen.

K. Sheeler

Q. Can you describe the timekeeping system you use by the company?

A. Clock in and clock out.

Q. Yes.

A. They clock in and clock out.

Q. What is the system that they use to do that?

A. It's a digital system and it's called Lightspeed.

Q. That's the same system that you use to deal with sales; right?

A. Yes. It is a very detailed retail digital system that I'd say many people use for their boutiques.

Q. Can you describe the process by which an employee clocks in and clocks out using that system? What does the employee do to clock in?

A. They come into the store. They go to our iPad. They put in their code and they clock in. Same when they're leaving at the required hour of their shift. They clock out.

(Simultaneous speakers.)

A. The employee goes on to the system of Lightspeed.

K. Sheeler

Q. And they use the same phone to clock in that they use to clock out; correct?

A. They use our digital system.

Q. When you refer to a code, are you referring to a four digit number or something else?

A. A four-digit code that is given to them on their day of hire.

Q. So you provide the code or the manager provides the code?

A. Jim Brinnen provides that code.

Q. Other than Lightspeed was there ever any other timekeeping system the company used?

A. I cannot recall. We've had Lightspeed for many years.

Q. Do you recall whether Ms. Goncalves and Ms. Ketcham ever used any system other than Lightspeed?

A. No. They were both hired when we were already into Lightspeed.

Q. That's helpful. Thank you.

In terms of the actual time entries once they are clocked in and out, is there any ability to edit those entries?

A. Not to my knowledge.

K. Sheeler

Q. Have you ever edited any time entry?
A. No. Never.
Q. Do you know whether Mr. Brinnen ever edited any employee's time entry?
A. I don't think he's -- he's only -- if they did not clock in and clock out, they emailed or -- they emailed him or texted him to get them clocked out at that time. He did not change anybody's clock in and clock out time.
Q. How do you know that happened?
A. How do I know what happened?
Q. That Mr. Brinnen will be texted or emailed about some correction that needs to be made to the time?
A. He would show me a text and say, I had to speak -- you know, Dina didn't clock out, so I have to clock her out and change the hours. It happened on several occasions.
Q. Are you aware of any audit trail or any other documents showing the hours clocked in versus the hours edited?
A. No, I'm not.
Q. Who reviewed every employee's hours before payroll was processed?

A. Jim Brinnen.

Q. What happened if an employee performed any work before clocking in?

A. There was no policy to come in early or leave late and there was no clocking in or clocking out if you were not working.

Q. Have you ever asked any employee to pick something up anywhere along the way to the store before clocking in?

A. I have asked people to move merchandise if they were working at the store the next day.

(Simultaneous speakers.)

Q. I'm sorry.

A. They clocked in and clocked out on their hours.

Q. So if I understand your testimony correctly, what you're saying is, if an employee, for example, was working at the Bridgehampton location on one day and the following day was working at the Montauk location and you needed something moved from Bridgehampton to Montauk, you could ask that employee to take it home with them and bring it to the Montauk store the next day?

A. I can't recall that. It was very

K. Sheeler

infrequent and very few times that I couldn't tell you when. If something was going to be moved, there was an instruction to text and let me know. And I was not -- if I wasn't told, then I don't know if it wasn't moved.

Q. Are you saying that managers had the ability to ask employees to move merchandise between stores that you were unaware of?

A. Not that I recall.

Q. What happens in terms of timekeeping if an employee performed any work after clocking out for the day?

A. They were instructed to text us and let us know the hours that they worked and if I didn't see that, we didn't -- there were no hours worked.

Q. Okay.

Is it fair to say that an employee may have been asked to do some work after they left and clocked out --

A. No.

Q. Let me finish the question.

-- but they failed to text or email and therefore were not paid for that time?

MR. BOWLES: Object to the form.

K. Sheeler

A. I can't speak --

MR. BOWLES: Sorry. Object to the form. Go ahead. You can answer.

A. I can't speak to an employee not doing that. We had a very foolproof system.

Q. What do you mean it was foolproof?

A. The -- they were to ask if there was a time, if they needed to -- they checked their hours, they were to let us know.

Q. Are you saying that an employee never failed to tell you they did some work after clocking out such that they weren't paid for doing the work after clocking out?

A. No.

MR. BOWLES: Object to the form.

Q. You can answer.

A. No. I'm not saying that.

Q. Are you aware that sometimes retail sales employees and/or managers met with customers after clocking out for the day?

A. That is completely not my company.

Q. I don't understand what you mean that's not your company.

Can you explain?

K. Sheeler

A. Our stores were open from 10:00 to 6:00 p.m.

Q. So are you testifying that none of your employees ever met with a customer after the store closed?

A. Not of my knowledge.

Q. What about an employee answering work-related calls or messages while they were off the clock? Did that ever happen?

A. Not to my knowledge.

Q. What about an employee interviewing job applicants outside his or her hours when they were not clocked in, did that ever happen?

A. Not to my knowledge.

Q. Was any employee ever instructed not to report certain work as time worked?

A. No.

Q. Was any employee ever instructed to clock out and continue working?

A. No.

Q. Was there any system in place for employees to report omitted time?

A. Omitted time? What does that mean?

Q. Time that the employee worked that was

not reflected in the time record.

A. No.

Q. Who, if anyone, was responsible for correcting any time issues?

A. Jim Brinnen.

THE WITNESS: Can we take a break after your next question. I just have to go to the ladies' room.

MR. KATAEV: We can take now. It's 11:15. Is 11:20 sufficient?

THE WITNESS: Yes.

MR. KATAEV: See you in five.

(A recess was taken from 11:15 a.m. to 11:21 a.m.)

MR. KATAEV: We're back from a five-minute break.

BY MR. KATAEV:

Q. Ms. Sheeler, during this break, did you discuss your testimony with your attorney?

MR. BOWLES: Objection. Don't answer that.

MR. KATAEV: That's an improper instruction. I'm not asking for the content of the conversation. I'm asking for whether a

conversation occurred.

MR. BOWLES: You can ask that question and, Ms. Sheeler, you can answer that question yes or no.

A. Yeah.

Q. How long was that conversation?

A. Two minutes.

Q. Do you have any knowledge or understanding that your timekeeping system used rounding to round to --

A. No. Again, Jim Brinnen knows.

Q. You were not involved in any decisions concerning rounding for timekeeping purposes; correct?

A. I don't know what you mean by rounding.

Q. I'll ask you again when I show you the exhibit. I'll withdraw the question.

Tell me about breaks.

How did breaks work at the company?

A. Each employee got a half hour for lunch and 15-minute breaks if needed.

Q. How many 15-minute breaks could an employee potentially have?

A. I don't know -- recall.

K. Sheeler

Q. Were the 15-minute breaks deducted from the employee's hours?

A. Most employees were just -- got half hour lunches.

Q. The half hour lunches, were they deducted from the hours worked for the day?

A. Again, Jim Brinnen did timekeeping. So I would assume yes.

Q. Do you assume the same for the 15-minute breaks?

A. Again, I don't do the timesheets.

Q. So you don't know?

A. Do not know. Sorry.

Q. Are you physically present in the store every day?

A. No. There are different locations.

Q. Are you physically present in a store every day?

A. No.

Q. How often are you present in any of the stores?

A. Depending on the time of year.

Q. But there are occasions when you are physically present in your store while it's

operating and employees are present; correct?

A. Not many.

Q. On the occasion that you are present in the store when an employee is present, do you observe the employees during their meal breaks?

A. Yes.

Q. What do employees typically do for their meal breaks? Do they leave the store to get lunch or do they have it there with them or do they order in?

A. When I'm present, they leave the store and go get lunch.

Q. How long do they typically leave for?

A. Sometimes half hour. Sometimes I've seen them come back at 45 minutes.

Q. Do employees ever pick up lunch nearby and come back before the half hour is up?

A. No.

(Simultaneous speakers.)

Q. Go ahead.

A. There is no places to really eat and it's clothing, so they like to eat outside of the store for their break.

Q. So your testimony is employees never eat

inside the store?

A. Not that I've ever seen.

Q. If an employee leaves for lunch and they're needed because a customer came in and everyone else is busy, have you ever called back that employee to say, I need you back, someone came?

A. No.

Q. Why not?

A. As we just said, I'm not in the stores.

Q. Do you know whether any manager has ever done that?

A. No.

Q. What is the company's policy, generally speaking, concerning overtime?

A. No overtime. We sent out numerous memos to do 40-hour weeks.

Q. Say an employee violates the company policy and works 41 hours in a week, does that employee get paid that one hour overtime?

A. I think you'd have to refer to Jim and ask him, Jim Brinnen.

Q. Do you know?

A. I'm sure they have.

Q. You're sure what?

K. Sheeler

A. I don't know that question because I don't do payroll.

Q. You said I'm sure they have. My question is, I'm sure they have what?

A. I don't do payroll, so I don't know. But I'm sure if -- if they did an hour, which we don't -- we have a strict policy -- I'm sure we paid them.

Q. Do you know if store managers were eligible for overtime?

A. They were not. No one was. Again, not what I do.

Q. Do you know whether any employee was ever classified as exempt from overtime?

A. Do not. No.

Q. If any determination as to overtime exemption was made, who would make that determination?

A. Jim Brinnen.

Q. To your knowledge, did you, Jim Brinnen or anyone else who has authority over the company ever seek guidance with respect to the labor laws, generally, from anyone?

A. Again, no, I do not know that.

K. Sheeler

Q. You never have; right?

A. Not that I recall.

Q. Was a manager ever instructed to prevent employees from working overtime?

A. Again, I didn't do the accounting.

Q. You don't know?

A. Again, we had policies in place and they were emailed out.

Q. Do you know whether a manager was ever instructed from preventing an employee from working overtime?

A. I do not know.

Q. Was there ever any pressure on the managers to keep payroll under any particular number of hours or dollar amount?

A. No, not that I know of.

Q. Is it fair to say that all employees were entitled to some form of commission?

A. No.

Q. Who -- what types of employees were not to be offered any commission?

A. Again, it was based on each experience, hours, for commission. Also, every person received their onboarding which would tell them yes or no.

K. Sheeler

Q. Do you have any knowledge between hourly wages on the one hand and commissions on the other hand, which would be greater on a month --
A. No.
Q. -- monthly basis?
For the merchandise, who sets the prices?
A. Myself and other vendors' price points.
Q. I'm referring to people inside the company.
A. Myself and Natalie Cummings.
Q. What about budgets for purchases?
A. Myself and Natalie Cummings.
Q. And how about staffing levels for the peak season, shoulder season, offseason?
A. The team.
Q. Who does the team consist of in this --
A. Myself and Jim Brinnen and Natalie Cummings.
Q. Probably a silly question to ask but, for the record, do you know who Teresa Goncalves is?
A. Yes. She used to go by Teresa Sullivan.
Q. Do you know why there was a change in her name?
A. No.

K. Sheeler

Q. Who hired Teresa? We'll call her Teresa for --

A. Myself and Jim Brinnen.

Q. When did she first begin working for the company?

A. May of 2021 or '20. I'm not sure.

Q. What position was she hired to perform?

A. Manager.

Q. At which locations did she work?

A. She was hired for Westhampton.

Q. And her hourly rate when she was first hired was $23; correct?

A. I'd have to look back, but I think that's correct.

Q. Was she ever treated as a salaried employee?

A. I think in her third year.

Q. What prompted that change?

A. I would have to refer back to Jim Brinnen.

Q. Do you know the amount of her salary when she changed to salary?

A. I do not.

Q. Do you know whether she was paid the same

K. Sheeler

salary every week regardless of the number of hours she worked once she was put on a salary?

A. I do not.

Q. Did Teresa have the authority to hire and fire employees without your approval?

A. No.

Q. Did Teresa have the ability to establish employee compensation on her own?

A. No.

Q. Did Teresa have any authority to change company policies without discussing it first with you?

A. There would be no -- a manager would not be changing a company policy.

Q. Who supervised Teresa?

A. Teresa. She was a manager.

Q. You didn't supervise her?

A. No, I was not there. I'm an hour and a half away.

Q. What was Teresa's commission percentage?

A. I would have to refer back to Jim Brinnen.

Q. Do you know how often Teresa was paid?

A. I would have to refer back to Jim

Brinnen.

Q. Do you know whether pay was issued weekly, biweekly, monthly or something else?

A. Again, I'd have to refer back to Jim Brinnen.

Q. What were the duties of a manager such as Teresa?

A. She was to manage our Westhampton boutique location.

Q. What actual duties are involved for a manager in that location?

A. Her duties were to run our store, to put clothes out, to steam, to work with the team and sell.

Q. What about opening and closing? Was she responsible for that?

A. She was with the team. There was on season always two people opening and closing.

Q. To your knowledge, who was the second person opening and closing?

A. That was many different people.

Q. It varied?

A. Yes.

Q. Do you recall whether the second person

K. Sheeler

was a salesperson or a co-manager or something else?

A. Always a salesperson.

Q. Do you know who I'm referring to when I refer to a co-manager?

A. No. I don't have co-managers.

Q. Do you recall hiring Teresa or Dina to replace a different manager?

A. No, Teresa was my first manager in Westhampton.

Q. What were the normal operating hours of the Westhampton location?

A. 10:00 to 6:00.

Q. Every day?

A. Every day. In the winter months, Tuesdays and Wednesdays would close down. In the dead of winter, we would close the store and only open on weekends, January Feb. Summer, we were open seven days a week.

Q. Did Teresa have any time off --

A. Yes.

Q. -- during the time you operated seven days a week?

A. Yes.

Q. What day was that?

K. Sheeler

A. It was mostly Tuesdays and Wednesdays.

Q. What --

(Simultaneous speakers.)

Q. What were you saying?

A. Sorry.

Q. What time was Teresa expected to arrive before the store opened?

A. 9:45.

Q. And why was that?

A. To just get the store ready. When I worked, it was always 9:45 to 6:00 p.m.

Q. There were occasions from time to time when a customer comes in at 5:55, isn't there?

A. Yeah. Maybe.

Q. What's the policy when that occurred?

A. I don't have a policy. It's a clothing store. So if a customer came in, they tell them we're closing and we'll be open the following day at 10:00 a.m. That was to say please come back the following day, we're closing.

Q. Even if the customer says, I can't be here tomorrow, it's my last day here?

MR. BOWLES: Objection --

(Simultaneous speakers.)

K. Sheeler

A. I can't talk to that. I wasn't there.

MR. BOWLES: You recorded my objection to the form?

COURT REPORTER: Yes. I heard "objection" but then there was cross talk.

Q. So your testimony is that a customer never came in late and stayed past 6:15?

A. I can't speak to that. I wasn't in the store. If it was, I didn't see it. Our policy was the store was open from 10:00 to 6:00.

Q. After the store closes, no customer coming in late, what steps have to be taken by a manager to close the store?

A. They would be closed at 6:00 and time out.

(Simultaneous speakers.)

A. On my occasions, they were vacuuming, cleaning, counting out the money prior to the 6:00 p.m. every time I was in there.

Q. You never observed any employee working past 6:00 p.m. doing closing duties?

A. No. And if they did, they were clocking out past their closing of cleaning.

Q. What are the summer months where the

K. Sheeler

store is open from 10:00 to 6:00 seven days a week?
A. May until September.
Q. Did you ever contact Teresa after the store closed to ask her anything about anything that occurred at that store, address any questions you had?
A. No. Not that I recall. We respected people's hours of time off.
Q. Did you ever contact Teresa on days she was not scheduled to work to address any questions or issues?
A. Not that I recall.
Q. Does the store have any alarm or security lock?
A. Not that I recall. We didn't set an alarm. Not that I recall.
Q. It was just a lock on the door or it is just a lock on the door?
A. Locks on the door. Yes. Front and back.
Q. Tell me generally the policy about expenses incurred by employees in connection with their work. How did that work?
A. There was petty cash and if they needed something, they would get in touch and then they

would take out of the petty cash and put the receipt in the petty cash.

Q. Were employees ever making purchases for expenses with their own money?

A. That, I do not recall or know. I've never asked them to.

Q. Are you aware of any instance where an employee was requesting that you reimburse them for an expense that they paid out of their own funds?

A. Yes. As you put it on the claim of stool -- actually you're calling it a table. It was a stool. But it wasn't something I asked her to do.

Q. Are you saying she purchased it of her own accord or someone else did?

A. She texted, asked me if she could pick this up. And I said great. And we reimbursed her.

Q. It took some time to reimburse her; correct?

A. I can't speak to that. That is to Jim Brinnen who does expenses.

Q. Tell me a little bit about pre-summer season virtual meetings.

A. We had a virtual meeting just welcoming the new team as we were a seasonal business and had

K. Sheeler

new people every year.

Q. And does that happen only once a year?

A. Once a year.

Q. Other than that preseason meeting, are there ever any other occasions where there are virtual meetings to discuss company issues?

A. Not that I recall.

Q. How long does that once-a-year preseason meeting usually last?

A. I cannot recall an exact time.

Q. Was it more than an hour?

A. Again, I can't recall.

Q. Are employees paid for their time during that meeting?

A. Yes, we did pay them.

Q. How did you keep track of their time?

A. Again, you would have to refer to Jim Brinnen.

Q. The employee would be joining the virtual meeting outside of the store; correct?

A. Again, I think most of them were in-store and we just hooked it up to in stores. Again, I don't recall.

Q. So, if I understand correctly, when

K. Sheeler

you're doing this preseason meeting once a year, you're physically in the store?

A. I don't recall.

Q. You referred to petty cash before; correct?

A. Yes.

Q. Is that something that is kept outside of the cash register or in the cash register?

A. It would be in our -- the money box. It was a box where the managers were able to be able to have that there for them.

Q. Okay.

And just so I understand, is the money box separate from the till?

A. Yes. Completely separate.

Q. Are you aware of any withdrawals taken from the cash register for various expenses at the store?

A. Not that I'm aware of. No.

Q. Was there ever any occasion where the petty cash box did not contain enough to make certain purchases for expenses for the store?

A. Not that I'm aware of.

Q. To your knowledge, was there ever any

K. Sheeler

employee that was overpaid their wages by accident for a week?

A. Not that I'm aware of. Again, you'd have to refer back to Jim Brinnen.

Q. Are you familiar with the summer commission program?

A. Yes.

Q. Tell me what you know about that.

A. The sales teams are given a percentage on the start of their day -- sorry. Email. And they are commissioned from selling for the day. Each day we do it as a pool. We do not do it as individual.

Q. At the end of the day there's a daily cash envelope; correct?

A. Correct.

Q. Tell me the procedure for that. How does that work?

A. The start of the morning they count the register. At the end of the day, they count the register. We leave the register at 350. They put the extra earnings of the day of sales into an envelope. Because the envelopes were running short we started to ask for receipts, the date and the name of the person that counted out the register.

K. Sheeler

Those were then put in a box as cash that was put away for the day. So the register started and ended at 350.

Q. When did the discrepancies in the amounts start such that you requested copies of receipts for expenses?

A. Since Teresa was there.

Q. Since May of '21 or something after May of '21?

A. A little after May of '21.

Q. How soon after? Was it months, weeks?

A. Again, I can't recall the actual months. But because of these discrepancies, we did assert a new policy. Whoever was counting in the register and counting it out had to sign it, sign the receipts and have the money in the envelopes.

Q. To your knowledge, that policy was followed after it was implemented?

A. Yes. It's been followed ever since.

Q. Now, who would pick up the daily cash envelopes or what happened with the daily cash envelopes after they were placed in the box?

A. They were put in a box, a lockbox. And myself or Natalie Cummings would pick them up.

K. Sheeler

Q. What about Mr. Brinnen, did he ever pick them up?

A. I'm sure he did.

Q. The box that they were placed in, is that a box different from the petty cash box or the same?

A. The same one.

Q. If Ms. Cummings picked it up, what would she do it?

A. She would bring it out to us.

Q. When you say out to us, you're referring to the residence of you and Mr. Brinnen?

A. The store in Montauk. Personally deliver.

Q. So from the Westhampton store someone would bring it to you and from the Bridgehampton store someone would bring it to you in Montauk?

A. Yes.

Q. And the Montauk daily cash envelope, was that left and you would pick it up because you were there?

A. Yes.

Q. And what would happen if you were not there at the end of the day?

A. It's locked.

K. Sheeler

Q. So you would just pick it up the next day?

A. All the boxes were locked. The only people who could have it were the managers.

Q. So now when the daily cash envelope from each store was delivered, what do you do with them or what does Mr. Brinnen do with them?

A. I would have to defer to Mr. Brinnen. He counts them, I guess. We --

(Technical difficulty.)

(Court reporter requested clarification.)

A. We counted the cash in. We counted the cash. Each envelope had cash, the name who put the cash in there and the amount for the day with a receipt from the day.

Q. When you refer to the receipt for the day, you're referring to the Lightspeed report?

A. Yes.

Q. Plus any expense receipts after you implemented that policy?

A. Yes. But there was never many expenses receipts.

Q. Once all the cash was counted and/or accounted for, what would happen with the cash next?

K. Sheeler

A. I don't know. That would be Jim Brinnen's question.

Q. Generally speaking, would that cash be deposited in the bank or something else?

A. Again, I don't know. You would have to ask Jim Brinnen.

Q. To your knowledge, did you ever take any cash for yourself before it would be deposited or otherwise something else done with it?

A. No.

Q. Have you ever paid any employee in cash?

A. Not to my knowledge.

Q. Are you familiar with the concept of time and a half for hours worked in excess of 40 hours a week?

A. Yes.

Q. To your knowledge, were employees who worked more than 40 hours in a week paid at time and a half for hours worked in excess of 40 hours?

A. Again, Jim Brinnen would have to answer that question.

Q. You don't know?

A. I don't do payroll.

Q. You don't know whether employees were

K. Sheeler

paid at time and a half if they worked in excess of 40 hours per week; correct?

A. I don't do payroll.

Q. I'm not asking you whether you do payroll, Ms. Sheeler. I'm asking you whether you know if employees are paid at time and a half for hours worked in excess of 40. Either you know or you don't. Which one is it?

A. Yes.

Q. Yes what?

A. Yes. To my knowledge, they were paid. I don't do payroll. I don't know. That is something Jim Brinnen would be able to speak to.

But, yes, I know time and a half and, yes, I know we would pay time and a half. But I don't know because I don't do payroll.

Q. I understand. Your testimony is generally speaking; correct?

A. No. Yes. I don't do payroll.

Q. Did Teresa ever complain that she was missing wages?

A. No.

Q. To your knowledge, have you or Mr. Brinnen ever performed any audit of Teresa's

hours worked and compensation paid?
A. Not to my knowledge.
Q. To your knowledge, did Teresa ever perform work that did not appear on her time records?
A. No.
Q. How do you know that?
A. Because she clocked in and clocked out.
Q. When did Teresa stop working at the company?
A. 2024, '3.
Q. To your knowledge, why did she stop working at the company?
A. She resigned.
Q. Why did she resign?
A. She went for another job.
Q. Did Teresa complain about unpaid wages before she resigned?
A. No, she did not.
Q. Did Teresa make any complaints about her compensation ever?
A. Not to my knowledge.
Q. Was Teresa ever disciplined during her tenure at the company?

K. Sheeler

A. No, not to my knowledge.
Q. Did she ever have any written warning?
A. No.
Q. Did she ever receive any negative performance evaluation?
A. No.
Q. Does the company perform periodic performance evaluations?
A. Yes.
Q. Describe that process to me. How often does it occur and what does it consist of?
A. It was once a year, we did a performance review.
Q. In what manner was the performance review conducted?
A. In person, I think, one year. And I think her last year because we were so busy we did a virtual performance review where she was given a nice raise and she was very happy with her performance review.
Q. Were you present for those performance reviews?
A. Yes.
Q. Is it fair to say you led them?

A. No.
Q. Who led the performance reviews?
A. Jim Brinnen led his part. I led my part.
Q. Did anyone else lead any part of the review?
A. No.
Q. You sued Teresa after she left her employment with you; correct?
A. Correct.
Q. What was the basis of your lawsuit against her?
A. A violation of a noncompete, nondisclosure.
Q. What is it you contend she did to violate the noncompete and/or nondisclosure?
A. She went and worked for a store two doors down from my Bridgehampton store and we -- she was interviewing in my store prior to that.
Q. Interviewing your current employees?
A. Whoever she went to work for.
Q. You're saying while she was working for you, she took an interview with a store two doors down?
A. From my knowledge.

K. Sheeler

Q. Did she cause any current employee to leave their employment from you?

A. Not to my knowledge.

Q. Has any customer stopped shopping at your store as a result of her actions?

A. Yes, I think to my -- yes.

Q. Can you identify any such customer or customers?

A. No.

Q. What is the basis for your knowledge that a customer stopped shopping at your store in particular?

A. Just hearsay from customers and clients.

Q. Are you aware as to the outcome of the lawsuit you filed against Teresa?

MR. BOWLES: I'll instruct the witness not to reveal the content of any conversations with counsel, including me, as to the matter. But you can state your layman's understanding.

Q. So taking his instruction, you can answer the question without saying what you discussed with any attorney.

MR. BOWLES: That's fine.

A. I'm sorry. Repeat the question.

K. Sheeler

Q. What is your knowledge as to the outcome of the lawsuit?

A. New York State changed their noncompete and we lost the case.

Q. How did you feel about that result?

A. It was over. We didn't win.

Q. You didn't take any action to appeal the decision, did you?

A. No, I didn't.

Q. That was your decision, not to appeal it?

MR. BOWLES: Same instruction as before. Don't reveal any conversations with me.

Q. As qualified, you may answer.

A. Can you repeat the question. I'm sorry.

MR. KATAEV: Read it back, Madam Court Reporter, please.

(Record read.)

A. Yes.

Q. After Teresa left her employment with the company, did you ever have any conversations with her, be it in person, by text or otherwise?

A. Not to my knowledge, no.

Q. Let's move on to Ms. Ketcham.

Do you know who Ms. Ketcham is?

K. Sheeler

A. Yes.
Q. Who is she?
A. She worked for us.
Q. Who hired her?
A. Myself and Jim Brinnen.
Q. When did she first begin working at the company?
A. September of '22. I'm sorry. I don't have the dates.
Q. Do you recall whether she was hired before or after Teresa was?
A. She was referred to me by Teresa.
Q. What was Dina's initial position?
A. Part-time sales help.
Q. What was her initial hourly rate?
A. $20.
Q. And later on it was raised to 23?
A. Yes. And she became more of a full-time employee.
Q. Did she become a full-time employee at the same time she received a raise or was she a full-time employee first and then received a raise?
A. I don't recall.
Q. Other than being paid initially at 20 an

hour and then 23, do you know whether she had ever received any other hourly rate for her work performed for the company?

A. No.

Q. Was Dina promised a commission when she was hired?

A. No.

Q. She did not receive any commission when she was initially hired; correct?

A. Correct. It was in her paperwork.

Q. Did that changed at some point in her tenure with the company?

A. Yes. As I remember, yes. When she worked more hours.

Q. And she didn't automatically receive commissions when she worked more hours; right?

A. Honestly, I'd have to refer back to the paperwork.

Q. To your knowledge and recollection, isn't it true that Dina raised the issue as to --

A. No.

Q. -- her not receiving commissions?

A. No.

Q. No, that never happened or no, you don't

recall?

A. No. I do not -- we hired her as a part-time employee in the beginning with no commission.

Q. When did she first receive commissions?

A. Again, I'd have to refer back to the paperwork.

Q. When you refer to paperwork, are you referring to a compensation acknowledgement?

A. I would have to refer back to the email that was sent to her with the raise and when she was eligible for commission.

Q. What determines whether an employee is eligible to receive commission?

A. When they're hired, they were told -- paperwork will tell you if you're getting commissioned or not. And as you progress, hourly can give you more commission or a commission.

Q. Was Dina performing sales work when she worked part-time?

A. Yes. She was a part-time salesperson.

Q. Now, what reason, if any -- withdrawn.

You testified earlier that you did not use an outside payroll provider.

K. Sheeler

My question is, why did you not use an outside payroll provider?

MR. BOWLES: I'm sorry. You broke up a little bit on the last word. Outside payroll what?

MR. KATAEV: Provider.

MR. BOWLES: Thank you.

A. You'd have to refer back to Jim Brinnen.

Q. So you have no knowledge of the manner in which -- withdrawn.

So you have no knowledge as to why the company did not use an outside payroll provider; correct?

A. Correct.

Q. Now, Mr. Brinnen was working full-time elsewhere; right?

A. Yes.

Q. How was he able to manage handling payroll for the company while working full-time elsewhere?

A. Again, you'd have to ask Jim Brinnen that question.

Q. You don't know how he was able to do it?

A. It's not a question to ask me. I didn't

do it.

Q. Don't you live with Mr. Brinnen?

A. Yes.

Q. Do you observe when he performs his work for the company?

A. He does his work when he needs to do his work.

Q. Did you ever observe Mr. Brinnen perform work for the company in your presence?

A. Yes.

Q. When would Mr. Brinnen typically handle payroll functions?

A. Again, I didn't perform payroll functions. So you'd have to ask Jim Brinnen.

Q. I'm not saying you performed payroll functions. I'm asking you when you observed Mr. Brinnen working for the company, when did you observe him performing that work?

A. I don't recall.

Q. Is it fair to say that he typically performed this work in the evenings?

A. No, it's not fair to say that.

Q. Did you ever observe Mr. Brinnen performing work for the company during the day?

K. Sheeler

A. Again, I don't recall.

Q. Is Mr. Brinnen's current employer aware that he performs work for the company?

A. I couldn't answer that. That's not my question to know.

Q. Do you know whether Mr. Brinnen's job requires him to be fully committed for that job but not any other job?

A. Again, it is not a question for me. I don't -- I'm not Jim Brinnen.

Q. Are you saying you don't know?

A. It's not my job to know.

Q. I'm not saying it's your job. I'm saying, regardless of whether it's your job, do you know whether Jim Brinnen, Mr. Brinnen, was permitted to perform work for another company while he has a full-time job?

A. I do not know.

Q. Thank you for answering the question.

Now, Dina lived in your Montauk home from time to time; correct?

A. Correct. Not lived. Spent a few days.

Q. Can you explain that arrangement, how it came about and what the arrangement was?

K. Sheeler

A. Dina came to us desperately wanting a job. I didn't really have a lot of jobs in my stores. I said she could come to work in the Montauk store as a part-time person and if she did not like to drive all the way back to Westhampton, she could stay in my home the days she worked, and she agreed to that.

Q. Now, when you say stay in your home, she wasn't staying inside your actual home where you resided; correct?

A. Yeah, she did.

Q. She stayed in a section of your home that had a separate entrance; correct?

A. Yes. Yes.

Q. Does that section of the home which has a separate entrance have the ability to enter where you live?

A. Yes.

Q. Was that access locked or otherwise blocked off?

A. There was two doors to get upstairs.

Q. Were they locked?

A. It's a separate entrance and a separate room.

K. Sheeler

Q. Was the access between the two sections of the house locked?

A. I don't recall. I'm sure we did.

Q. If I understand your testimony correctly, you're saying there is a lock between the two doors, you just don't remember whether it was actually locked or not locked during the time she was residing there?

A. I mean, I don't recall. I'm sure we lock it every night. We lock it every day. It was a section of the house and we keep the door locked.

Q. Did you take any deductions from Dina's pay for lodging in your home on the days that she did so?

A. No, we did not.

Q. Was Dina required to stay in the home in order to work?

A. No, was not.

Q. How far was the location from where Dina lived?

A. About two hours. One-and-a-half hours. I mean, I'm not a Google map, but an hour and a half, two hours.

Q. I'm just skipping through some questions.

K. Sheeler

I'm hoping to speed the process up.

Did you pay Dina the $23 per hour rate because you were concerned she would quit?

A. No. She was performing her job.

Q. Was she eventually designated as acting manager of the Westhampton location?

A. Yes.

Q. That was after Teresa left; correct?

A. Yes.

Q. Who made the decision to designate her the acting manager of Westhampton?

A. After looking and interviewing many people for quite a while, we decided to make Dina the manager.

Q. We refers to who?

A. Myself and Jim Brinnen.

Q. As part of her duties as an acting manager, did Dina have to interview applicants for positions?

A. It's the duty of every manager, yes.

Q. And, to your knowledge, when were those interviews occur?

A. Those would occur in the store. People would come in. It's the acknowledgement I have.

K. Sheeler

Q. To your knowledge, did interviews ever occur outside before hours?

A. One occurred in the wintertime and I had instructed her to clock in and then go meet the girl at a cafe and to come back in. But she neglected to clock in before that interview.

Q. How would she go about clocking in before that interview if she was doing it outside the store?

A. She'd go into the store. She was going two doors down to have coffee.

Q. To your knowledge, did she do so?

A. To my knowledge, yes.

Q. Regardless of whether she actually clocked in or clocked out, you were aware that she was conducting interviews or this interview two doors down; right?

A. This one interview. Yes. That's the only acknowledgement I have.

Q. Did she -- withdrawn.

Did Dina ever speak to you about being compensated for the interviews?

A. No. I have no written text, nothing.

Q. Did she ever speak to you verbally --

K. Sheeler

A. No.

Q. -- face-to-face, by phone?

Were you aware that Dina was transporting merchandise between locations?

A. Like once or twice, I know she did.

Q. And you know she did because you asked her; right?

A. Yes.

Q. Did you verify whether she was paid for that time?

A. To my knowledge, as our policy, she was to let me know if it took overtime and we would have paid her.

Q. What's the name of the store two doors down, the cafe two doors down, where this interview was performed?

A. The Bake Shoppe, I think.

Q. Have you ever heard of a store named Caffeine?

A. No.

Q. Is there any store named Caffeine a couple doors down from the store?

A. Not to my knowledge, no. Again, I don't -- I go there very infrequently.

K. Sheeler

Q. Have you ever heard of a store named Caffeine or know where it is?

A. I don't. I have not heard of it. Not to say it's not there. But I do not know what store -- what that is.

Q. Did an individual named Cathy, C-A-T-H-Y, Marin, M-A-R-I-N, ever complain about wages?

A. No.

Q. What about Natalie Cummings, did she ever complain about wages?

A. No.

Q. Did Dina ever complain during the summer of 2023 that she had not been paid for several weeks?

A. No.

Q. Did seasonal employees generally complain about missing or late wages?

A. No.

Q. Are you saying that no employee ever complained about wages?

A. Not to my knowledge.

Q. To your knowledge, what is a steaming shift at the company?

A. Say that again. I'm sorry. I didn't

understand that.

Q. What is a steaming shift at the company?

A. I have no knowledge of what a steaming shift is.

Q. Do any employees of the company steam any merchandise?

A. Yes. Everyone does. It's part of the job and they're told when they're hired.

Q. Let's talk about the fire at the Westhampton store.

That fire occurred on October 25, 2024; correct?

A. Correct.

Q. To your knowledge, when did you first learn of the fire?

A. I was in Texas and I was texted in the morning.

Q. By?

A. I got a phone call. I was not in New York.

Q. Who texted you?

A. My husband and Dina.

Q. And who called you?

A. My husband.

K. Sheeler

Q. To your knowledge, what is the cause of the fire?

A. I don't know. You'd have to get the report.

Q. Do you know whether the fire emanated from inside your store or --

A. No.

Q. -- whether it was a neighboring store?

A. It was not inside my store. To my knowledge, it was outside the store. Outside the building. You're saying my store. The stores.

Q. You reported the fire to your insurance company; correct?

A. Correct.

Q. And the insurance company processed a claim because of the fire; correct?

A. Correct.

Q. And the insurance company issued you monies as a result of reporting the claim; correct?

A. Correct.

Q. Were you required to provide any portion of any insurance proceeds to your landlord?

A. No.

Q. Prior to the time that you received the

K. Sheeler

insurance proceeds, had you already decided that you were not going to reopen the Westhampton location?

A. No. We were going to reopen it.

Q. When did you decide not to reopen the location?

A. After it took them almost a year and a half to rebuild the building.

Q. How long after receiving the insurance proceeds did you decide not to reopen the Westhampton location?

A. We received the insurance just recently. So prior to that.

Q. And after the October 25, 2024, fire, did Dina perform work at the Westhampton location?

A. To my recollection, she -- we paid her out the full week of the fire. And I think she helped put things into a pod that the insurance claimers had asked us to do.

Q. You're referring to like a storage pod?

A. Yes.

Q. Where was the storage pod in relation to the Westhampton location?

A. I do not know that. It was Jim Brinnen set it up.

Q. Okay.
What were some of the things that Dina did other than recover merchandise and put it into the storage pod?
A. I don't recall.
Q. Do you recall whether Dina took photographs and videos of the store?
A. I don't really recall. Maybe.
Q. You were the individual asking her to perform that work; correct?
A. I would assume, yes. I was traveling.
Q. After you decided not to reopen the store in Westhampton, what decision did you make concerning Dina's employment, if any?
A. Due to the fire, we as the people wanted to keep her on.
Q. I'm sorry. Can you repeat that?
A. Due to the fire as the people -- we did not have work at that time of year in most of our -- in any of our stores as we were going off season. We had wanted to keep her on. So we found work.
Q. What work did you find for her?
A. She covered my Bridgehampton store on days I did not really need to be open. And then we

asked her to perform inventory in the Montauk store.

THE WITNESS: I'm sorry. Can we take another break soon?

MR. KATAEV: Sure. We can take a break any time. I don't have any question pending. How long of a break do you want?

THE WITNESS: I'd love to grab something to eat. Can we get 20 minutes, 25 minutes.

MR. KATAEV: Let's do 1 o'clock for lunch.

(A recess was taken from 12:30 p.m. to 12:59 p.m.)

BY MR. KATAEV:

Q. Now, generally speaking, how did the separation from Dina's employment with the company come about? What happened that she no longer worked there?

A. I texted her to work and I never heard back. And I phoned her again if she wanted to come in and she didn't call back.

COURT REPORTER: Can we go off the record.

MR. KATAEV: Yes.

(Discussion held off the record.)

K. Sheeler

Q. You spoke before that infrequently, in your words, paraphrasing your words, when Teresa would move -- I'm sorry, when Dina would move merchandise between locations, my question is, when that would happen, how would her time doing that work be recorded?

A. She would email us or text us and let us know her time was being used. That was policy.

Q. And your testimony is she was paid for that time; right?

A. Again, I can't recall because I do not do the payroll.

Q. What about transporting holiday decorations from Bridgehampton to Montauk, do you recall asking her to do that?

A. Yes.

Q. Was she paid for that time?

A. I gave her $25 cash from my pocket because of gas and picking up a couple extra boxes.

Q. Was that the only time you ever paid her in cash?

A. Yes.

Q. If I understand you correctly, you're saying that the time it took Dina to transport that

stuff from Bridgehampton to Montauk took less than an hour?

A. I can't recall and I can't speak to that. I wasn't there.

Q. How long does it take to travel from Bridgehampton to Montauk?

A. 20 minutes, 25 minutes.

Q. And in December there wouldn't really be any traffic, would there?

A. No traffic.

Q. Do you recall having any conversation with Dina about velvet or cosmetic bags?

A. Not that I recall. I have them in the store so I might have spoke to her about cosmetic bags.

Q. Is that something you sell in the store?

A. I do.

Q. You referred to Dina as a pack mule; is that right?

A. No.

(Court reporter requested clarification.)

Q. Do you deny calling her that?

A. I did not call her that. I don't recall calling her that. That is...

K. Sheeler

Q. Did Dina ever complain to you toward the end of her employment she was not getting hours?

A. We gave her what hours we had and what we could. She was our manager in our Westhampton store. Our Westhampton store had burned down. We were waiting for it to be rebuilt.

Q. Isn't it fair to say that as a result of that her hours were reduced?

A. I mean, yeah. I guess -- she worked for me in Westhampton. Her employment was Westhampton manager. I was...

Q. You were?

A. I gave her hours in Montauk to balance out until the Westhampton store was back up and running as I was told by the landlord.

Q. And are you saying that you were fully staffed up at the other two locations such that you didn't need anyone else?

A. It's winter. We don't staff up our stores. Montauk shuts down in the winter.

Q. Did anyone say or mention that Dina was asking too many questions about payroll?

A. No.

Q. Was Dina's performance criticized at any

point?

A. No.

Q. Was anyone hired after Dina left?

A. No.

Q. Have you hired anyone ever after Dina left?

A. Yes. I have two other stores so we hired people for the season to continue. Again, as we spoke, May to September, in season. Westhampton never reopened.

Q. After the fire was Dina and/or any other employee told that they would be paid from insurance proceeds?

A. No.

Q. Were any employees paid wages from the insurance proceeds?

A. No.

Q. Was there ever any discussion about waiting to be paid from insurance proceeds or filing for unemployment instead?

A. No.

Q. Was there any desire for employees not to file for unemployment?

A. No. We didn't terminate anyone.

K. Sheeler

Q. It would be fair to say at a minimum that Teresa, she couldn't work any more, right, at the Westhampton location?

A. Teresa resigned.

Q. Who asked Dina to photograph and/or video the damage in the store?

A. I'm sorry. Rephrase that.

Q. Who asked Dina to photograph and/or video the damage to the Westhampton store?

A. I don't recall. I assume I did as I was out of town.

MR. BOWLES: Can we go off the record.

(Discussion held off the record.)

COURT REPORTER: Excuse me.

MR. BOWLES: Off the record.

(Discussion held off the record.)

BY MR. KATAEV:

Q. Aside from photographing and videoing the damage at the store, you instructed her or caused someone to instruct her to enter the store and move merchandise out; right?

A. No. I did not recall that at all.

Q. Didn't you testify that you needed her to put merchandise in the storage pod for the insurance

company?

A. Oh, yes. After there was a clearance from the fire department, the health department, everybody that it was okay to go in to -- into our store.

Q. How did you receive that okay to go in?

A. I have to go back and review. But we definitely got clearances. We would not go back in without clear answers. We also asked her if she wanted to help because she wanted some time and hours. And she agreed to come in to the store to help.

MR. KATAEV: We're going to call for any writings indicating that individuals were cleared to enter the stage where the fire was. We'll follow up in writing.

Q. To your knowledge, did Dina wear any protective equipment when entering the fire damaged store?

A. To my knowledge, yes.

Q. What is the basis for your knowledge?

A. Because everyone wore protective gear.

Q. Did you ever physically go into the store?

K. Sheeler

A. I was traveling again.

Q. So the answer is no, you did not physically go into the store?

A. I physically was in prior.

Q. Prior is the word?

A. Prior to cleaning it out.

Q. But after the fire?

A. Yes.

Q. Did the company lose revenue as a result of the closing of the Westhampton location?

A. I'd have to review and go back to my -- I'm not quite sure.

Q. Between the three locations, what was the ratio of the revenue that came from the Westhampton location?

A. Again, these are accounting numbers and I don't know offhand.

Q. Whenever an employee first began working for the company, did the employee receive a notice of pay rate and payday?

A. I don't understand the question.

Q. This was previously marked, I believe, as Plaintiffs' 2. I'm going to share my screen and show it to you.

K. Sheeler

MR. BOWLES: By the way, Emanuel, you're going to send this around to us? We didn't get the one are from Mr. Brinnen's yet.

MR. KATAEV: Yes. We're working on it. We're going to need the court reporter's assistance because not all of them were recorded.

MR. BOWLES: You'll email these around to us?

MR. KATAEV: Yes.

Let the record reflect my screen is showing a one-page exhibit marked LS 54 12/25.

Q. Ms. Sheeler, have you familiar with this document, have you ever seen something like this before?

A. No.

Q. This is not a document that you provide employees at the company with; correct?

A. Again, I don't work on the payroll, so I have not seen this.

Q. Do you know whether Mr. Brinnen provided this document to any employees of the company?

A. I do not know.

Q. With an about pay stubs? Are pay stubs

K. Sheeler

provided to employees whenever they get paid?

A. I do not know.

Q. To your knowledge, did the company deduct taxes and other withholdings from employees' wages on a weekly basis?

A. Not to my knowledge.

Q. Not to your knowledge, you don't know or not to your knowledge, you did not make deductions?

A. Not to my knowledge, I didn't do payroll.

Q. So you don't know?

A. I don't do payroll.

Q. Because you don't do payroll, you don't know whether deductions were taken?

A. I don't do that part of the business.

Q. Who was responsible for handling that part of the business?

A. Jim Brinnen.

Q. Is it fair it say that because you don't do anything to do with payroll, that you don't communicate with the company accountants about the company tax returns?

A. Fair to say, yes.

Q. Are you familiar with when, how often, employment tax returns have to be filed?

K. Sheeler

A. No.

Q. Are you aware that employment returns have to be filed with the state and federal government on a quarterly basis?

A. No.

Q. Do you know what a 941 is?

A. No.

Q. Do you know what an NYS-45 is?

A. No.

Q. Did the company ever lack sufficient funds to make payroll and pay employees for their wages?

A. Can you clarify that? I don't understand that question.

Q. Was it ever the case that whenever you had to make payments to employees for their wages that there was not enough money to do so?

A. No.

Q. Same question for payroll taxes.

Did the company ever lack sufficient funds to remit payroll taxes that were deducted from an employee's pay?

A. Not that I know of, no.

Q. Were employees ever delayed because the

company lacked funds?
A. No.
Q. What about payroll tax payments, were they ever paid because the company lacked funds?
A. No. Not that I know.
Q. How do you and/or Mr. Brinnen receive compensation from the company?
A. I don't take a paycheck.
Q. Do you take distributions?
A. I put it all back into the company.
Q. What does that mean?
A. I don't receive a paycheck. I don't actually understand the question.
Q. When you say you don't receive a paycheck, that means you don't pay yourself on a weekly or other basis?
A. No.
Q. Have you ever taken any distributions from the company where you authorize yourself to receive some portion of profit or some other amount?
A. Distribution. Can you explain that?
Q. Distribution is something that a shareholder member of the company can take for him or herself in the discretion of the company,

discretion --

A. I don't have shareholders. So it's -- I just -- I don't take a paycheck. I don't pull money out of the company. It's basically poured back in to keep it running.

Q. So is it fair to say that you pay your living expenses through some other means than the company?

A. It's fair to say that it's paid a lot off -- yes, off of Jim has a full-time job as well.

Q. Do you pay for any personal expenses through the company without paying yourself?

A. I don't -- I don't know.

Q. Is it fair to say that you were responsible for ensuring payroll taxes were remitted?

MR. BOWLES: Object to the form.

A. No. I don't do payroll.

Q. As the sole member of Kristin Sheeler Designs, LLC, is it your understanding that it's your responsibility to ensure that payroll taxes are remitted?

MR. BOWLES: Object to the form.

A. Not that I know of.

K. Sheeler

Q. Did you ever receive any notices from taxing authorities such as the Internal Revenue Service or the New York State Department of Taxation and Finance concerning unpaid payroll taxes?

A. Not to my knowledge.

Q. Were you ever involved in responding to any such notices?

A. No.

Q. Did it come to your attention recently that due to some misunderstanding your accountants never filed payroll tax returns and only recently did so?

A. Yes.

Q. How did that first come to your attention?

A. May of this year. It was brought to my attention by a staff member. And we went right on to it because it was a mistake. We did not know it was happening.

Q. And is it fair to say that this mistake was happening from the very inception of the company?

A. No.

Q. So you're saying --

K. Sheeler

A. Not that I know of. Again, I don't know.

Q. In correcting the mistake, you went back and filed all the required tax returns that were never previously filed; right?

A. To my understanding, yes.

Q. To your knowledge, what is the quarter and year of the first employment tax return that was filed?

A. I don't know.

Q. Who was responsible for handling it?

A. Jim Brinnen.

Q. What do you attribute this mistake to? In other words, what do you think is the cause of this mistake?

A. I could not speak to that. I was not part of the mistake.

Q. It's fair to say that you blame Mr. Brinnen made the mistake?

MR. BOWLES: Object to the form.

A. No.

Q. Who do you blame, if anyone?

A. No one. It was a mistake.

Q. Are you prepared to accept responsibility for this mistake?

K. Sheeler

MR. BOWLES: Object to the form.

Q. Did you answer?

A. Can you say that again.

Q. Are you prepared to accept responsibility for this mistake?

MR. BOWLES: Object to the form.

A. We are cleaning up -- we are in contact and have paid a lot back because of the mistake. It was a mistake.

Q. Who signed the quarterly employment tax returns?

A. I'd have to go back. I don't recall.

Q. Is it fair to say that part of the mistake occurred because the accountant you used prior to Mr. Baransky made a mistake?

A. I couldn't answer that. I don't know.

Q. Did you ever get in contact with the accountant that you used prior to Mr. Baransky to find out what happened?

A. I do not know.

Q. Did you ask Mr. Brinnen to get in contact with the accountant you used prior to Mr. Baransky to find out what happened?

A. No. I did not know.

K. Sheeler

Q. What is the identity of the accountant that you used prior to Mr. Baransky?

A. I don't know the accountant. I will get that information if I have it.

MR. KATAEV: We'll follow up with a written interrogatory for that.

Q. Prior to Mr. Baransky, did you have more than one accountant or just one?

A. I had one accountant, as I recall.

Q. Let me ask you this.

You first opened up the company in 2007, 2009 or some other time?

A. 2009, I recall.

Q. And when did you first get married to Mr. Brinnen?

A. Sadly, I don't know the year. 2007. Sorry. It is a little joke because I never remember.

Q. Hopefully he doesn't request a copy of the transcript.

So is it fair to say that Mr. Brinnen was involved in Kristin Sheeler Designs, LLC from its inception?

A. No.

K. Sheeler

Q. So how did it work in the beginning?

A. He wasn't involved in anything. I -- this was just a dream and I created an LLC. Didn't really use it for years.

Q. If I recall correctly, you said you did use an attorney to open up the LLC; right?

A. Yes.

Q. What was the name of that attorney?

A. Again, I will have to get that information. I cannot recall.

Q. Was it an attorney out in Montauk?

A. No.

Q. When did Mr. Brinnen first become involved in the operation of the company?

A. 2014, I guess, when I began. He would help me pack up things.

Q. Now, you never paid Mr. Brinnen anything for the services he performed for the company; correct?

A. No.

Q. Why did you switch from your prior accountant to Mr. Baransky?

A. Again, I don't have any of this information.

K. Sheeler

Q. Mr. Brinnen handled this completely on his own?

A. Well, I just don't recall. I'd have to go back and get the information.

MR. KATAEV: We'll follow up in an interrogatory about that, too.

Q. Did you not know that you had to file quarterly employment returns?

MR. BOWLES: Object to the form.

A. I don't work on this -- on our finance side.

Q. Are you aware that the filing of the previously never filed employment returns now, so many years later, comes with the advent of penalties, fees and interest?

MR. BOWLES: Object to the form.

A. I am aware now.

Q. How much approximately have you incurred in penalties, interest and fees for filing late?

A. I don't remember the number.

Q. Do you have a range?

A. No.

Q. Have all the penalties, fees and interest been paid off?

K. Sheeler

A. I don't know quite what we have paid off.

Q. Did Dina complain to you that she was unable to secure unemployment insurance benefits because of the failure to accurately timely file unemployment insurance?

A. No.

Q. Are you aware that Dina requested unemployment insurance benefits?

A. No. We never received any letters for files or claims.

Q. Where does the mail for the company go?

A. To -- I'd have to look at where we actually -- I think it goes to 35 West 35th Street.

Q. In Manhattan?

A. Yes.

Q. How often are you in Manhattan?

A. Once every week.

Q. To get the mail?

A. Yes. And to spend some time in the city.

Q. Are you aware that Teresa filed a complaint with the Social Security Administration?

A. No.

Q. Did you ever receive any correspondence from the United States Social Security

Administration?

A. No, we did not.

Q. Do you ever receive mail at the Montauk location?

A. At the store?

Q. Yes.

A. Yes, we have a mailbox.

Q. Were you involved in preparing any response to the New York State Department of Labor concerning any request for unemployment insurance benefits for Dina?

A. I don't understand that. Can you say that again. It was kind of muffled out.

Q. Were you involved in preparing any response to the New York State Department of Labor concerning any application for unemployment insurance benefits for Dina?

A. No. Never received anything.

Q. Is it fair to say that your testimony today has been that you never received any complaints about wages?

A. Yes. I'm sorry. Does that have to do with somebody wanting a raise? I will go on the record, when people ask for a raise, we sit down and

talk about it and we typically give a raise. I don't want to say we don't speak with people when it's time for them to get a raise. I don't want to say, no, no, no one has anyone ever asked for a raise.

Q. No, I want to know --

A. I want that on the record because that's how it would be to ask for a wage increase.

Q. Sure. I appreciate that response. My question was not about a request for wages. My question was directly about complaints concerning wages.

A. Can you clarify that a little more.

Q. Just to clarify, other than requests for raises, is it your testimony that you have never received any complaints concerning wages in any manner?

A. Yes. And I said, so when somebody feels that their wage is not correct, we sit down and talk to them and talk about a wage increase. I've never received a wage complaint where we don't speak to them and work through that wage.

Q. Let's move to the counterclaims.

Are you familiar with the counterclaims

in this case?

A. Yes.

Q. Is it fair to say that the company pursued the counterclaims and not you or Mr. Brinnen individually?

A. To my counterclaim?

Q. In other words, is it the company that's pursuing the counterclaim or is it the company and you and Mr. Brinnen or is it just you and Mr. Brinnen and not the company? Do you know?

A. Well, yes, it's the company -- yes, it's the company for me because I am the company and we are the company.

Q. Is it just the company that's pursuing the counterclaims or is it you and Mr. Brinnen as well?

A. I'd have to talk to my lawyer about that.

Q. You identified at least three types of wrongs that you allege Teresa and Dina committed in your counterclaims; correct?

A. Can you cite them.

Q. My understanding is that your -- the company is claiming it was defamed. The company is claiming that money was stolen, cash directly and

through discounts. And that there was tortious interference with customers and/or employees.

Is that the correct understanding or is there something more than that?

MR. BOWLES: Objection.

A. I have to go back to my lawyer.

MR. BOWLES: Sorry. Object to the form of the question.

Q. When did you first suspect or discover that any wrong was committed by Dina and/or Teresa?

A. I'd have to refer back to my lawyer and look at the time scale.

Q. In other words, you don't know sitting here today; right?

A. I would have to review and see what the dates were, when we started noticing.

Q. You assert that Dina and/or Teresa took cash from the register; correct?

A. Again, I have to look back on the time and look at my books.

Q. Do you know whether it was just Dina, just Teresa or both of them that allegedly took cash?

A. Again, it would have to be looked at of

K. Sheeler

when we did our books.

Q. Do you know how much you're claiming was taken from the cash register?

A. Again, I'd have to refer back to my lawyer on the claim.

Q. Are you aware as to how much is listed in the counterclaim as to monies being taken?

A. Again, I'd have to really have it in front of me and look at it.

Q. If I represented to you that a total exceeding $5,000 in cash was taken, does that refresh your recollection?

A. No.

Q. You don't know how much cash was taken --

A. No.

Q. -- without speaking to your lawyer; correct?

A. We looked at the bills and we have -- we have counted out. Yes, I would refer back to my lawyer.

Q. But you don't know the answer without doing that; correct?

A. I don't have the numbers in front of me from the dates and times that we started recording.

K. Sheeler

Q. Is there any allegation that Dina and/or Teresa inflated their alleged time worked?

A. Yeah. Isn't this what the case is about?

Q. So that's my question.

Is it your understanding --

A. That's your case. Not my case.

Q. I understand. I have a question.

My question is, is it your allegation that the time inflation solely relates to what's written in the complaint or are you also saying that while Dina and Teresa were working at the store they inflated their time worked?

A. I really don't understand this question.

Q. So let me try again.

Your allegation of time was inflated -- time worked by Dina and/or Teresa was inflated was based on what's written in the complaint; correct?

A. Well, looking back, we're doing our research as much as you're doing your research.

Q. Right. But my question is, you're not saying that during the time Dina and Teresa worked there that they claimed they worked more hours than they actually did?

A. I really don't understand this

conversation. I mean, this, what we're talking about. Because you have -- you're asking me something that you're having this case about. So I --

THE WITNESS: David, what --

Q. I'll try to rephrase the question. Let me try to explain.

My understanding is that you're saying based on what's written in the complaint, Dina and Teresa --

A. Your complaint or my complaint? What are we speaking about?

Q. My clients' complaint, the two plaintiffs in this case. In that complaint Dina and Teresa are both inflating the time that they allegedly worked.

That's what you're saying is occurring in the complaint; correct?

A. Correct.

Q. Prior to filing this complaint, before the complaint or this lawsuit ever existed, are you claiming that Dina and/or Teresa inflated their hours worked while they worked with the company?

A. They clocked in on a digital system. They clocked out on a digital system. We took their

hours. It is a digital system. We paid them for every hour they worked for.

As we talked about, we also -- if there was some emails or texts, we paid them. What inflation, I don't know. We have a digital system that clocks all of our staff in and staff out. I did not claim any influx of more hours. I didn't pay them more hours than what they worked.

Q. I think I understand.

So you're only claiming now based on what's written in the complaint that their hours were inflated? You're not making the claim that they did so while working; correct?

A. Again, I don't understand the -- I don't understand the questions.

Q. Okay. I'll move on. I think you answered it. Not directly, but indirectly.

Let me ask you this. You already said this, but just to confirm for the record.

You're not stating that the monies you paid Dina and/or Teresa was based on an inflated time? In other words, that they received more than they should have when you did pay them?

A. We paid them for their time.

K. Sheeler

Q. Can you answer my question directly?

A. Again, we paid them for their time.

MR. KATAEV: Can we read back my question.

(Record read.)

A. They received their wages from their time they worked.

Q. You're also claiming that Dina took advantage of employee discounts; is that right?

A. Yes.

Q. Do you know about that or you need to refer to your lawyer on that, too?

MR. BOWLES: Object to the form.

Go ahead.

A. She definitely -- friends and family were buying on my discount where our policy was employees were purchasing clothing for 30 percent off. She was buying for her friends. She was buying for her daughters. She was buying for -- I think discounting some of her favorite customers.

Q. And if I understand your testimony correctly, you say she can only discount for herself?

A. Yes, as per policy.

K. Sheeler

Q. Do you have that policy in writing?

A. Yes.

MR. KATAEV: We'll call for the production of that policy. We'll follow up in writing.

Q. How did it come to your attention that Dina was discounting merchandise for people other than herself?

A. From other people that I didn't know.

Q. Who are these other people that you just mentioned?

A. I really can't say. I can't recall at this time.

Q. No.

Can you quantify the amount of the discounts that were wrongfully taken?

A. I cannot right now.

Q. Is it possible for you to do so?

A. I'd have to look and review.

Q. Have you taken any steps to do so?

A. We've been working on it.

Q. It's fair to say that you only discovered this after Dina separated from employment with the company?

K. Sheeler

A. No. We had some discussions prior.
Q. And so it's fair to say that you knew about this during the time she worked there?
A. It's fair to say I don't recall the conversations, but we did have to speak about discounts are not for everyone, and family.
Q. In other words, you had to speak to Dina about it?
A. We spoke to everyone about it.
Q. Did Dina respond to whatever you told her about it?
A. I don't think by email. But yes, I spoke to her.
Q. Is it fair to say --
(Simultaneous speakers.)
Q. Is it fair to say -- go ahead, finish.
A. Hmm?
Q. Go ahead. Were you saying something?
A. No. Sorry.
Q. Is it fair to say that when you say you spoke to everyone that you did so via email?
A. I would have to look back on the email.
MR. KATAEV: We'll call for the production of email correspondence concerning

the policy on employee discounts. We'll follow up in writing.

Q. You also claimed that Dina and/or Teresa defamed the company; correct?

A. Correct.

Q. What is it that Dina and/or Teresa stated to defame the company?

A. Hearsay of saying not very nice things about my store, this lawsuit is now where it -- we have been through web, internet, you know. It's not easy to get hires.

Q. So is it fair to say that the statements that you are claiming are defamatory relate solely to this lawsuit?

A. No.

Q. What, if any, statements did Dina and/or Teresa make outside of this lawsuit that you claim are defamatory?

A. I'd have to look back. Right now I don't have it with me.

Q. Do you know when those statements occurred?

A. No. I would have to look back and see.

MR. KATAEV: Okay. We'll follow up with

an interrogatory on that, as well. We'll do so in writing.

Q. What statements did Dina and/or Teresa make that were false?

A. Again, I have to look at everything that we have been talking about on the claim.

Q. Are you aware that you produced a customer review by a Jane W from Yelp dated July 29, 2022?

MR. BOWLES: Object to the form.

A. If it's there.

Q. Do you have any knowledge about Jane W's complaint and how it relates to the plaintiffs?

A. I'd have to look back.

Q. You're also claiming generally that Dina and/or Teresa interfered with your business as it relates to staffing.

Is that fair to say?

A. Yes.

Q. And your basis for that is that this lawsuit's allegations are available publicly online and that prospective employees are seeing it and not applying for positions or walking away from positions offered?

K. Sheeler

MR. BOWLES: Object to the form.

Q. Is that right?

A. Yes.

Q. Other than that, is there any other way that Dina and/or Teresa interfered with your business?

A. I'd have to see and speak to others that they've been speaking to.

Q. In other words, without speaking to others, you can't identify anything else they did wrong?

A. Not today.

Q. What about customer relationships?

How, if in any way, did Dina and/or Teresa interfere with any customer relationships with the company?

A. Well, they've been in contact with customers as they have in their depositions and are saying not very nice things about my corporation and my company.

Q. How do you know about any testimony from their depositions? Were you present during the depositions?

A. No. We got a copy.

K. Sheeler

Q. And you've read their transcripts?
A. Yes, of course.
Q. Who is Linda Pianbino, P-I-A-N-B-I-N-O?
(Simultaneous speakers.)
(Court reporter requested clarification.)
A. I have no idea.
Q. What about Anja Grot? A-N-J-A, last name G-R-O-T.
A. I can't recall her name.
Q. Can you at least tell me whether that's an employee name?
A. I can't recall.
Q. Do you have any knowledge about this claim that you lost $840,000 in revenue based upon the alleged interference and staffing and customer relationships?
A. I'd have to refer back to my lawyer on that. We'll have to look at that.
Q. You can't quantify that for me or explain how you got to that number; right?
A. I can't quantify it at this moment.
Q. Do you have a sense as to how much each plaintiff is allegedly responsible for between the two of them? Like, who caused more damage?

K. Sheeler

A. No.

Q. Is it fair to say that whatever your timekeeping procedures were that it was the same timekeeping procedures at all the stores?

A. Yes.

Q. And the same question for payroll procedures, is it the same for all the stores?

A. Yes.

Q. And it's fair to say whatever the payroll system that you used was, you used the same one at all stores for all the employees?

A. Yes.

Q. Is it fair to say that the same individual did payroll for each store, that is, Jim Brinnen?

A. Yes.

Q. No one else was responsible for approving payroll; correct?

A. No.

Q. In a given year, accounting for turnover, approximately how many employees worked at the company?

A. It's different every year.

Q. Can you give me a range?

K. Sheeler

A. For the whole year?

Q. Yes.

A. With the three stores or now with the two stores?

Q. Give me both.

A. Eight to nine the whole year. Offseason, three.

Q. One for each store?

A. One to two. Usually two. And that's about seven months, six months of the year.

Q. During the peak season, sometimes employees leave in the middle or quit or something like that?

A. No one quit.

(Simultaneous speakers.)

Q. No one ever quit?

A. No.

Q. What about employees that were terminated, did you ever replace them after they were terminated?

A. We did not terminate any employees. We have a very -- summer staff, people come and go, college, high school.

Q. And is it fair to say that every year

K. Sheeler

it's not the same eight to nine people that work?

A. Fair.

Q. How many would you say out of the eight to nine alternate? In other words, which ones are consistent and which ones are not?

A. It's a seasonal business. It's different every year.

Q. Is it fair to say that more often than not maybe 75 percent of the staff is new staff every year?

A. It's a seasonal business. Out here in the Hamptons, it's different every year.

Q. But Teresa worked there for a number of years; right?

A. Yes. So I'd say 20 percent. The managers. That's it.

Q. So 20 percent would be consistent. The 80 percent would not be consistent?

A. I can't really quantify your number. It's not store that's online like a normal store for a year.

Q. In fairness, it's not my numbers, you testified to 20 percent. I'm just clarifying.

A. In fairness, you're asking me a question

that there can't be a quantification of a percentage because it's a different amount of people.

Q. I get it. I'm asking for your best -- it doesn't have to be precise.

I'm just asking for the 20 percent you gave me, 20 percent is the number that remained year over year about while 80 percent is the number that is different; right?

A. I really -- no. I cannot give you a number.

Q. Other than Teresa, who else, if anyone, remained employed for a number of years? Let's say other than Teresa and Dina?

A. My Bridgehampton manager, Cathy Marin.

Q. Anyone else?

A. That's in store? Those are the two. And Dina. The three of them.

(Simultaneous speakers.)

Q. So fair to say everyone else pretty much new employees every year?

A. Yeah.

Q. Are you aware that the half hour meal break is automatically deducted from everyone's pay?

A. It's policy and written in the emails.

K. Sheeler

(Simultaneous speakers.)

A. Everyone takes their lunch break.

Q. But that policy is something that applies to everybody, whether they're managers, regular sales employees --

A. Yes.

MR. BOWLES: I'm sorry to interrupt. Let's make sure he's finished his questions before --

THE WITNESS: I'm sorry. I'm sorry.

A. Yes. Everybody knows there are lunch breaks.

Q. I didn't ask whether everyone knows about lunch breaks. I just asked if everybody has their meal break deducted automatically for a half an hour each day.

A. Yes, they do.

Q. Did the company ever consult an attorney concerning the company's wage payment practices? Again, you don't have to tell me anything that was discussed. But was an attorney ever consulted about that?

A. No.

Q. What about an accountant, did you consult

with any accountant about the wage payment practices?

A. Not to my knowledge.

Q. Payroll company, same question?

A. Not to my knowledge.

Q. Anybody at all, same question?

A. No. Not to my knowledge.

Q. After this complaint came in, was any audit performed on the employees' hours worked and wages paid?

A. I don't know.

Q. Were you responsible for producing information to your attorneys in response to plaintiffs' discovery request?

MR. BOWLES: I'm going to object to the form.

Go ahead.

A. I don't know what that means. Can you put that in a different --

Q. Sure. I'll ask it this way.

Did you receive from plaintiffs any formal requests for the production of documents?

A. After the claim?

Q. After the lawsuit was filed.

K. Sheeler

A. Yes.

Q. What documents, if any, did you produce to your attorneys in response to those requests?

A. Many. I think you have received all.

Q. What documents do you recall finding --

A. I can't recall.

Q. To your knowledge, are any time and/or payroll records missing?

A. No.

MR. BOWLES: It's belated, but I'll object to the form of that question.

MR. KATAEV: I don't understand. What you do you mean belated?

MR. BOWLES: You're saying they're missing. Are they missing from the production or missing from the company? I think it's vague.

MR. KATAEV: Your objection is belated.

MR. BOWLES: My objection is belated is what I said, yeah.

BY MR. KATAEV:

Q. Do you have a copy of all of your text messages with Teresa?

A. No.

K. Sheeler
Q. What happened to them?
A. I don't know.
Q. Did you delete them?
A. No. They're gone.
Q. Do you have a contract with Lightspeed?
A. Do we have a contract with Lightspeed?
Q. Yes.
A. Yes.
Q. Is that contract between Lightspeed and Kristin Sheeler Designs, LLC?
A. I'm not quite sure. I'd have to review that.
Q. Same question for Clover.
A. I'd have to review that as well.
Q. What about When I Work?
A. It's an app, so I think it's under an email address.
Q. Are there any documents that you have in your possession that have not been produced in this case?
A. No.
MR. BOWLES: Object to the form.
Q. When customers pay in cash at the retail locations, is that recorded in Lightspeed?

K. Sheeler

A. Yes. Everything is recorded.

Q. Is there ever any instance in which any cash payment is not recorded in Lightspeed?

A. No.

Q. Is it fair to say that Dina and Teresa both worked with their hands and feet or with their hands and on their feet?

A. No. They were hired for a sales job. That's what they did.

Q. And doing the sales work involved them being on their feet to deal with customers or show them around; right?

A. I don't understand the question.

Q. Well, in order to sell to the customer, Dina or Teresa would have to walk with the customer to look at the merchandise; right?

A. Yes.

Q. Okay.

From time to time, whether a customer was there or not, Dina and Teresa would have to use their hands to move merchandise and set it the right way and so on and so forth; right?

A. Set up the store, yes.

Q. But there were times when Dina and/or

Teresa sometimes sat at the store; right?

A. Yes.

Q. If you had to quantify on an 8-hour basis how much time they sat, how much time would that be?

A. I cannot tell you. I did not work in that store on a regular basis. But definitely, we had a chair and a stool.

Q. When you were present at any of the stores and any employee was present there, how much time did you observe an employee sitting versus standing, dealing with customers or with merchandise? On an 8-hour basis, how much would they sit?

A. I couldn't recall.

Q. Was anyone required to wear uniforms?

A. No. They were not required to wear uniforms.

Q. Are you familiar with what spread of hours compensation is?

MR. BOWLES: I didn't hear that.

Q. I'll repeat it.

Are you aware of what spread of hours compensation is?

MR. BOWLES: Spread of hours?

MR. KATAEV: Yes.

A. No.

Q. I'll represent to you that spread of hours compensation is that whenever an employee works a spread of more than 10 hours in a given day, that they're entitled to an additional hour of compensation.

Have you ever heard of that?

A. Not that I have -- can recall, no.

Q. It's fair to say that since you don't know about it, any employee who worked the spread of hours more in a day did not receive that pay?

MR. BOWLES: Object to the form.

A. No. And there was no more than -- there were no 10-hour days.

Q. Were there any customer tips left to managers such as Dina or Teresa?

A. Not that I'm aware of.

Q. Did salespeople ever receive any tips?

A. Again, no. Not that I'm aware of.

MR. KATAEV: It's 2:15 if anyone wants to take a break. We'll get into exhibits when we're done.

MR. BOWLES: Okay. 2:20.

K. Sheeler

MR. KATAEV: Yes.

(A recess was taken from 2:14 p.m. to 2:23 p.m.)

MR. KATAEV: It looks like the last exhibit we stopped with at Mr. Brinnen's deposition is 28. I'm going to continue from 29 but I'll be using some of the same exhibits.

Let's mark Plaintiffs' 29.

(Plaintiffs' Exhibit 29, defendants' responses to plaintiffs' interrogatories; 21 pages, marked for identification.)

BY MR. KATAEV:

Q. Ms. Sheeler, I have placed in front of you what will be marked as Plaintiffs' 29. I'll represent to you that this is the defendants' response to the plaintiffs' interrogatories.

Are you familiar with this document?

A. Yes.

Q. What can you tell me about this document?

A. It's the -- is it your claims?

Q. I'll represent to you that interrogatories is a fancy way of saying questions and they're formal written questions that we ask be responded to under oath in writing.

Does that refresh your recollection as to what this is?

A. Yes.

Q. Do you recall reviewing this with your attorney?

A. Yes.

Q. I've scrolled all the way down to the last page of this 21-page exhibit. We were previously looking at the first page. And the last page shows a verification signed by you.

Do you see that?

A. Yes.

Q. In this verification page you're basically declaring under penalty of perjury that your responses are true and correct; right?

A. Yes.

Q. And you did, in fact, sign this document; correct?

A. Yes.

Q. That's your signature and you recognize it to be as such?

A. Yes.

Q. And you signed it on April 20th of 2026; correct?

K. Sheeler

A. Correct.

Q. In response to interrogatory number 6, it requests generally that you identify all workplace collaboration tools. Note that I highlighted it on the page.

The company responded that it uses WhenIWork.com as a scheduling and collaboration tool; correct?

A. Correct.

Q. Other than WhenIWork.com, is there any other collaboration tool that employees of the companies use?

A. For scheduling?

Q. Yes.

A. When I Work is for scheduling.

Q. What about any other collaboration tools in general?

A. Meaning text? Everything is through When I Work. All schedules for all stores are When I Work.

Q. When you say text, you're referring to text messages?

A. If somebody called in sick.

Q. You don't use any tools such as Microsoft

K. Sheeler

Teams or Slack or some other tool --
A. No.
Q. -- for your employees?
In response to interrogatory number 7 which asks generally to identify each type of compensation reimbursed for a benefit offer to plaintiffs and other employees, I want to focus your attention to your answer about Teresa where you discuss that she was paid biweekly commission.
Do you see that?
A. Yes.
Q. Was she the only individual paid biweekly for commissions or was everyone else paid biweekly for commissions?
A. I'd have to refer to Jim Brinnen and see that.
Q. Jim Brinnen, to my recollection, testified that commissions were paid on a monthly basis.
Do you have any reason to dispute that?
A. I have no reason to dispute. Again, it might have went biweekly to a monthly and when it was we were unsure. There was an email about it.
Q. Do you have any recollection as to when

that change occurred?
A. No.
Q. Do you know why, if any reason, that change occurred?
A. No.
Q. Have you asked any employee or any other individual for any written statements in connection with this case?
A. No.
Q. The merchandising specialist that you used, the merchandiser, that individual is not an official employee of the company; correct?
A. She's an official employee.
Q. You did not personally craft these responses to the interrogatories; correct?
A. What do you mean by drafted?
THE WITNESS: David?
Q. I'm asking, you did not personally type these responses in; correct?
A. No, I did not personally type them. No.
Q. Let go ahead and look at what has been previously marked as Exhibit 28. I'll represent to you that these are the defendants' initial disclosures.

K. Sheeler

Are you familiar with this document?

A. What is this date?

Q. The date of the document is November 19, 2025.

A. I have seen it, yes.

Q. At the end of section 4 with respect to the insurance policy disclosure, your attorneys answer that there is no insurance policy that would cover this claim; correct?

A. Not that I know of.

Q. Did you make any effort to ask any insurance broker or insurance company about the existence of any policy that would cover these claims --

A. No.

Q. -- after the lawsuit was filed?

A. No.

MR. KATAEV: Let's look at -- if I can figure this out.

Let's mark this Plaintiffs' 30, Bates-stamped D1. I'm going to zoom in on the earlier email. I'm going to highlight it. Please let me know when you're done.

(Plaintiffs' Exhibit 30, email chain; D1,

K. Sheeler

marked for identification.)

A. Yes. That was her pay and her commission.

Q. Scrolling up to the next email in the chain. Please read it and let me know when you're done.

A. Yes.

Q. So in this email to Teresa, you copy Jim on it; correct? Mr. Brinnen.

A. Yes.

Q. And you ask Mr. Brinnen to provide Teresa with the paperwork; correct?

A. Correct.

Q. And you state in here that her pay will consist of an hourly rate of $23 an hour and a commission of 4 percent; correct?

A. Correct.

Q. Based on this email, you decided that; correct?

A. It was just a forwarded email that we both decided. It just came from my email from speaking to Teresa.

Q. You also referred to her as co-manager at Westhampton Beach; correct.

K. Sheeler

A. It must be a typo. She was the manager.

Q. You don't recall anyone else co-managing with her?

A. No.

Q. In this second email that Mr. Brinnen sends, he says, We can talk about logistics like hour and sales tracking this week when you have a moment; right?

A. Yes.

Q. What is he referring to in terms of the logistics for hour, tracking and sales practices?

A. Hours worked, you know, When I Work scheduling and explaining her commission at the 4 percent. That's logistics.

Q. Do you know what Mr. Brinnen says to employees generally when he refers to logistics about sales tracking?

A. No.

Q. How is it that commissions get accounted for in terms of figuring out who made what sale?

A. We don't do it. We do it based on a group. It's been that way since we started. The group on who's in the store that day.

Q. It doesn't matter who did a particular

sale?

A. No. Never has been that way.

Q. In Jim's email --

(Simultaneous speakers.)

Q. Sorry?

A. Every member that joined our team knew the policy.

Q. What is the policy?

A. Who worked that day is commissioned off of the percentage of their day with the group of who's in the store. Manager, 4 percent. Sales could be 1 to 2.

Q. All right.

Now, in the email that Mr. Brinnen sent, he included these attachments; right?

A. Yes.

Q. And are you familiar with this attachment where it says Kristin Sheeler Designs compensation acknowledgement?

A. Yes.

Q. That's the standard compensation acknowledgement form you give to every employee; correct?

A. You can open it and I can look at it to

make sure it is standard.

Q. Do you know, generally speaking, where you got this template from?

A. No.

Q. Did you make it yourself?

A. No.

Q. Did you retain an attorney to do it?

A. No. I don't know.

Q. What about the work agreement, do you know where you got it from?

A. No.

MR. KATAEV: Let's go to Plaintiff's 31 which is marked D7.

(Plaintiffs' Exhibit 31, compensation acknowledgement; D7, marked for identification.)

MR. KATAEV: I'll represent to you this is a document produced by defendants which is labeled compensation acknowledgement.

Q. Do you see that?

A. Yes.

Q. Excuse me, this is a standard form that you complete for every employee by typing in their name, their hourly rate and their compensation

commission; correct?

A. If I can see, yes. At that time.

Q. Now that you've had an opportunity to look at this form, do you have any recollection as to where you obtained it from?

A. No.

Q. Why is Teresa referred to as a stylist in her title?

A. She dressed people, so we -- that was the title at that time. But it says retail sales manager.

Q. So is it fair to say that you don't recall whether an attorney helped you draft this form?

A. No.

Q. Do you still use this form today?

A. I don't know.

MR. KATAEV: Let's mark Plaintiff' 32 Bates-stamped D12.

(Plaintiffs' Exhibit 32, 9/21/22 email; D12, marked for identification.)

Q. I'll represent to you that this is a September 21, 2022, email from Mr. Brinnen to Dina.

Have you ever seen this document before?

K. Sheeler

A. I'm not cc'd on this email, so I can't say that I have.

Q. Is it fair to say that Mr. Brinnen generally would not copy you on these emails to employees with their compensation details?

A. That I have -- no. I don't know.

Q. Other than these emails, are you familiar or do you have knowledge of any other pay stub that is provided to employees?

A. No.

Q. No, you don't know or no, you know for a fact that there's nothing else?

A. No, I don't know.

Q. Who physically issues the payment to the employees of the company?

A. The bank.

Q. So is it fair to say that there's no time when you or Mr. Brinnen or someone else gives money or a check to employees?

A. Not that I can recall.

MR. KATAEV: Let's look at Plaintiffs' 33. A document Bates-stamped D19 through D30.

(Plaintiffs' Exhibit 33, timesheet record; D19-D30, marked for identification.)

K. Sheeler

Q. Are you familiar with this document?
A. No.
Q. Do you know what it is?
A. Looks like timesheet recordings and payments.
Q. Did Mr. Brinnen ever show you these documents?
A. Not that I recall.
Q. Do you know whether this is something he does in the manner of performing his duties or whether this document was created for this case?
A. No, I don't know.
Q. Do you have any idea what these red rectangles represent --
A. No.
Q. -- from the top of bottom of D23 to the top of D24?
A. No.
Q. Did you place them there?
A. No.
Q. What about this one on the bottom of D26?
A. I don't know what that is.
Q. If you look at D29, there's a notation there for the week of November 3rd through

November 9th that ORIG -- O-R-I-G, I think for the word original -- pay missing Friday/8th and then second ACH to catch this up after an X in brackets.

Do you see that?

A. I do see it.

Q. Do you have any idea why the pay for this week was missing?

A. No. It looks like it was paid.

Q. Where do you gather that from?

A. Your document.

Q. To be clear, it's not my document. It's a document that defendants produced.

A. I don't know.

Q. Before I mark this, I just want to ask you, this document called NIBI-MTK summer associate commission program, is this something you created?

A. No.

Q. Who created it?

A. I'm not sure. I think Jim.

Q. Do you see the registered trademark logo next to NIBI-MTK?

A. Yes.

Q. Do you know whether you ever came to form a trademark?

K. Sheeler

A. Yes, I have a trademark.

Q. Is that something Mr. Bowles helped you with?

A. No. No.

Q. Is it fair to say that this commission program was the first time that the team-based commissions was introduced?

A. I don't know the date of this document.

Q. Looks like April of '23, updated 2025.

A. No. Because I had team commissions since 2014 -- sorry, '15.

MR. BOWLES: Can I ask that this be marked as an exhibit, please.

MR. KATAEV: Sure. Sure. Let's mark this Plaintiffs' 34 bearing Bates-stamps D33 through D35.

(Plaintiffs' Exhibit 34, NIBI-MTK summer associate commission program; D33-D35, marked for identification.)

Q. Referring to the next bullet point, it refers to commissions being paid monthly.

Do you know if this is when the change was made?

A. I do not know.

K. Sheeler

Q. Can you explain what the utilization target is?

A. I do not know.

Q. There's a provision here qualifying utilization targets. Summer staff must stay until their committed end date to receive final commission.

Is that final commission for the last month or is it all of the commissions?

A. I do not know.

Q. There's a reference to minimum monthly performance target.

Do you see that?

A. Yes.

Q. To your knowledge, what is the, generally speaking, minimum monthly performance target?

A. Store targets, like every retail store has, for commission-based profits.

(Simultaneous speakers.)

Q. Is it a sales target? In other words, performance target is a sales number?

A. Sales target.

Q. Do you see in this example store target under met target table?

K. Sheeler

A. Yes.
Q. Is that an example of a monthly performance target?
A. I'm not quite sure. I assume.
Q. Do you personally set the monthly performance target?
A. No.
Q. Jim does?
A. Yes.
MR. KATAEV: Let's mark this as Plaintiffs' 35.
(Plaintiffs' Exhibit 35, review; D36, marked for identification.)
MR. KATAEV: It's a document Bates-stamped D36.
Q. Can you read it and let me know when you're done.
A. It's moving, so --
Q. I'm going to stop right now.
A. Yes.
Q. Why did you produce this review?
A. Because we got many reviews from Westhampton that the staff was not performing well. And were very not friendly to our customers.

K. Sheeler

Q. And do you attribute the staff as either Dina or Teresa?

A. I cannot say.

Q. Do you know if Dina or Teresa was even working here at the time?

A. I don't know.

MR. KATAEV: So let's mark this Plaintiffs' 36, a one-page email Bates-stamped D38 on June of 2024 -- June 13, 2024.

(Plaintiffs' Exhibit 36, 6/13/24 email; D38, marked for identification.)

Q. The first question is this email reflects --

A. Sorry. Say that again.

Q. This email reflects a listing of 12 employees; correct?

A. Three stores, yes.

Q. So your testimony about eight to nine before was only two stores; correct?

A. Depending on the year. That's managers and sales staff for three locations. Not on every day.

Q. It's fair to say that the company generally limited the amount of time off that

employees could take during the summer season; correct?

A. No, not fair to say.

MR. KATAEV: Let's mark Plaintiffs' 37, D39, a November 2023, email.

(Plaintiffs' Exhibit 37, November 2023 email; D39, marked for identification.)

Q. Please read it and let me know when you're done.

A. Okay.

Q. Was the time off policy followed after this was sent?

A. I didn't understand you. What policy?

Q. Time off.

A. What?

Q. The paid time off policy, was it followed after this email?

A. For a manager or people that -- I really have to refer back to Jim to let you know that question. But I'm sure most people took their vacations, their bereavements. We paid for bereavements. All of that was given to managers.

Q. It says in here the vacation dates have to be requested in writing and email is sufficient;

right?

A. Yes. Isn't that a typical way of informing -- to tell you're taking a vacation?

Q. My question really is more, do you know whether the email would go to you, Mr. Brinnen or both?

A. I think to both. I needed to know for staffing.

MR. KATAEV: Plaintiffs are going to call for production of any emails from the plaintiffs requesting this issue. We'll follow up in writing. Let's mark this as Plaintiffs' 38. I'll represent to you it's the answer to counterclaims. It's dated July 14, 2026.

(Plaintiffs' Exhibit 38, 7/14/26 answer to counterclaims, marked for identification.)

Q. Are you familiar with this document?

A. Yes.

Q. Did you review it before it was filed?

A. I'm sorry. Are you asking me?

Q. Yes.

A. What was the question?

Q. Did you review it before it was filed?

A. Did I review it?

Q. Yes.
A. Yes.
MR. KATAEV: Let the record reflect that I have gone to page 19 of this document.
Q. Paragraph 174 says that the company made the decision to permanently close the Westhampton store as a result of poor reputation that Teresa and Dina cultivated there.
Do you see that?
A. Yes.
Q. Can you give me more detail about what you mean by the poor reputation that Teresa and Dina cultivated?
A. Conversations with individuals and people I've heard they bad-mouthed my store.
Q. Who are these individuals that you heard about?
A. I'm sorry. Can you speak up. I'm losing you.
Q. Who are these individuals that you heard about?
A. Customers, clients. Don't have names. Just hearing out there on the streets.
Q. Look at the bottom of paragraph 182 on

the bottom of page 20 which I highlighted. You state here, On information and belief Teresa used her special access to the timekeeping systems to manipulate and inflate her time records.

Do you see that?

A. I see that.

Q. What is your basis for making this allegation against Teresa?

A. I'd have to look back at my time clocks.

Q. Paragraph 183 states that Teresa sought out another manager to correct her clock errors.

Who was that individual?

A. A staff member from her first year there, Natalie Cummings.

Q. Paragraph 185 you write that Teresa took money from the store cash register to pay for incidentals she procured for the store.

Do you see that?

A. Yes.

Q. Are you saying that she took money out of the register to buy stuff for the benefit of the store?

A. Yes. Yes. That's what it says.

Q. In other words, she didn't take money out

of the register for herself; correct?

A. No, I --

MR. BOWLES: Objection to the form.

Go ahead.

A. No. We -- our register receipts were short.

Q. You're saying that reconciliation -- in the following paragraph 186, Reconciliation showed that the cash envelopes prepared by her were frequently off by as much as $100 at a time; correct?

A. It could be, yes.

Q. How frequent?

A. Again, I'd have to look at my records.

Q. Paragraph 189 says that she shared confidential store sales data with other staff members even after being asked to cease such activities.

Is that right?

A. This is correct.

Q. Can you give me an example of what confidential sales data she shared with any member?

A. She kept records out on -- right in front of my cash register. And when I came in and saw

that, I was -- I said, you cannot put day-to-day sales for the public to see.

Q. You write in here that she shared it with staff members, not --

A. She did.

Q. -- not the customers; right?

A. Excuse me.

Q. You write in here that she shared the data with other staff members, not the customers; correct?

A. Both.

Q. What is the problem with sharing the store sales data with other staff members?

A. Managers were privy to having the monthly sales, not junior staff members.

Q. Wasn't it necessary for the junior sales members to know the store sales data for their commissions?

A. We could share that with them, yes. Not out in the public.

Q. How would you go about sharing it with the sales members?

A. Again, that was something that was done with commissions. You'd have to ask Jim Brinnen.

K. Sheeler

Q. Referring to paragraphs 207 and 208, can you identify the actual amount of garments that were missing?

A. We have -- we have been working on that and we have to count from that inventory. So there are pieces that, yes, we could say what was missing.

Q. What did you do to account for it?

A. Nothing. It was lost. It was gone.

Q. I'm saying, what did you do to figure out which garments were missing, which were not?

A. Dina was hired to scan and count out every piece of merchandise in my Montauk store.

After we returned from holidays, we did the count and there was merchandise missing from that complete inventory.

Q. What evidence do you have in connection with paragraph 211 that Dina used an employee discount to purchase clothing for others rather than herself?

A. I'd have to look back.

Q. Do you have any video evidence of her doing that?

A. No.

Q. Do you have cameras in the store?

K. Sheeler

A. We do not.

Q. Look at paragraph 226, it basically alleges that Dina and Teresa have repeated false allegations contained in the complaint to current and former employees of the company; correct?

A. Correct.

Q. So other than making those statements, which you contend are false, to current and former employees, is there anything else that Dina and/or Teresa said that you claim was false and inflammatory?

A. Everything about this case is false.

Q. I'm asking anything other than this case.

A. They said many things to many people.

Q. Can you give me an example of any of those things?

A. I cannot at this time.

Q. Can you give me any idea as who they said these other things to?

A. I can't recall at this time.

Q. So in paragraph 246, you say that the company has seen a decrease in business revenue of approximately 840,000; correct?

A. Correct.

K. Sheeler

Q. But despite this the company has been able to meet all its expenses; correct?

A. Correct.

Q. So it's fair to say then that at least for the prior year the company earned more than $500,000 in gross revenues; correct?

A. The company decreased by my mental health from the allegations, the process that, you know, having me and wanting to go to work is very different now. So we decreased a lot from being accused of things that I did not do.

Q. Well, this counterclaim, the screen that we're looking at, does not say anything about your mental health, does it?

A. Not in that sentence.

Q. My question goes back to the $500,000.

Was there at least $500,000 in revenue in 2025 based on your allegation that you lost 840,000 did but you've still been able to meet all of your expenses?

A. Again, I don't have my accounting in front of me.

Q. Let's forget the accounting for a second.

You have more than zero dollars in

K. Sheeler

expenses; correct?

A. I don't know what you mean.

Q. You have more than -- your expenses amount to something more than zero dollars; right?

A. My expenses to maintain the stores?

Q. Yes.

A. Yeah.

Q. So if you take $840,000 in revenue away, you weren't left with zero; right?

A. I don't know. I don't understand your question.

Q. It's simple logic. If you lost $840,000 and you still had money to pay all your expenses, did you have at least $500,000 in revenue in 2025?

A. Okay. The sentence says a decrease in business revenue. It does not say it went down to zero revenue.

Q. I agree with that with you. That's my point.

A. It was a decrease in revenue due to the fact of a lot of these issues.

Q. I understand.

A. So that's the sentence -- that's what that sentence is meaning.

K. Sheeler

Q. I understand the sentence.

A. I don't know what you're asking. Because that's not the sentence.

Q. My question is that even with this decrease in revenue, did you make at least $500,000 in revenue?

A. No, I don't know. I don't know what we made.

MR. KATAEV: -- on discovery.

(Court reporter requested clarification.)

THE WITNESS: I think you should state it for the record.

MR. KATAEV: Why do you think that what you think matters?

MR. BOWLES: Objection. If you have any questions, please ask the witness.

MR. KATAEV: Thank you. That's exactly what I'm going to do.

Plaintiffs' 40 is plaintiffs' complaint, ECF Docket No. 21, dated July 31, 2025.

Q. Do you recognize this document?

A. Yes.

COURT REPORTER: Did you mark something 39?

K. Sheeler

MR. KATAEV: I may not have. If your stenography shows that I did not.

COURT REPORTER: The last one I have is the answer to counterclaims as 38.

MR. KATAEV: So let's mark it 39.

(Plaintiffs' Exhibit 39, 7/31/25 complaint, marked for identification.)

Q. Starting with paragraph 19 on page 4, on what grounds do you deny that Teresa worked 60 to 70 hours a week?

A. On our clock in and clock out, everything is documented, everything -- every hour is documented. We have a digital system. Our stores are open 10:00 to 6:00 and no -- there is no way you could work that amount of hours with two days off. It's all documented.

Q. Paragraph 31 Dina alleges that she used her vehicle on numerous occasions for the benefit of the defendants to transport merchandise to and from work during off hours without getting paid.

Do you see that?

A. I do.

Q. On what basis do you deny that she transported merchandise to and from work during off

hours without getting paid?

A. I don't recall that. There was one or two times that has been documented.

Q. Paragraph 35 states that both Ms. Dario and Ms. Cummings and a couple of seasonal employees also complained about not getting paid.

Do you see that?

A. I do.

Q. Are you denying that those employees complained about not getting wages?

A. I do not recall. No one approached me about this. These people still work for me.

MR. KATAEV: Let's look at Plaintiffs' 40, Bates-stamped D48 to D52. I'll represent to you that this is a document produced in discovery by defendants described as a Lightspeed POS clock-in/clock-out raw data report for Teresa.

(Plaintiffs' Exhibit 40, Lightspeed POS clock-in/clock-out report; D48-D52, marked for identification.)

Q. Do you recognize this document?

A. No.

Q. Have you ever seen any document like this

before?

A. No.

MR. BOWLES: I hate to be the one to ask, but can we get a five-minute bathroom break.

MR. KATAEV: Sure. Let's go off the record 3:25. Come back at 3:30.

MR. BOWLES: 3:30, thanks.

(A recess was taken from 3:25 p.m. to 3:29 p.m.)

BY MR. KATAEV:

Q. Ms. Sheeler, during the break did you speak to your attorney?

A. For one minute.

Q. Referring to the document Bates-stamped D56, Dina's time records reflect on August 31, 2023, that she worked over 10 hours; correct?

A. It appears that way, yes. It's 10 hours and one minute.

Q. Okay.

MR. KATAEV: We're up to Plaintiffs' 41, if I'm not mistaken.

COURT REPORTER: Yes.

MR. KATAEV: Plaintiffs' 41 will be marked as spreadsheet titled Payroll

K. Sheeler

Hours/Corrected from Lightspeed clock for Teresa, a document Bates-stamped D63 through D83.

(Plaintiffs' Exhibit 41, Payroll Hours/Corrected; D63-D83, marked for identification.)

Q. Are you familiar with this document?

A. No.

Q. You've never seen it before?

A. No.

Q. Does it look right to you that the beginning hours for the first four days are exactly 10:00 a.m. to 1900 military time?

MR. BOWLES: Object to the form.

A. Couldn't tell you.

Q. Do you believe these records are accurate and contemporaneous?

A. Yes, they're accurate.

Q. What is your basis for the belief that they are accurate?

A. Again, people clock in and clock out. That is our policy. We have a digital time clock in and clock out.

Q. Do you think it's statistically possible

for a person to come in exactly 10:00 a.m. every day and leave at 7:00 p.m. every day?

A. I'm not a robot. I don't know. Somebody comes and they clock in. They leave and they clock out.

Q. Staying on D63, it says here Teresa clocked in Friday, July 2, 2021, at 7:45 a.m.

Do you see that?

A. I'm sorry. Highlight that again. I do not know why there's a clock in at 7:45 in the morning. I'd have to look back.

Q. What would you look back at?

A. To see why there would be that time. The store opens at 10 o'clock in the morning and closes at 6 o'clock at night.

Q. Do you deny asking Teresa to come in earlier --

A. I'm not denying. I don't recall it. There really would be no reason for somebody to clock in that early.

Q. Going to the next page, D64, there are entries for July 28 of 2021 and July 31, 2021, are both highlighted.

Do you see that?

K. Sheeler

A. Yes.
Q. Do you know why they're highlighted?
A. No.
Q. What about these highlighted entries on D66?
A. No.
Q. And these on D67?
A. Again, no. I don't know.
Q. You did not highlight them, did you?
A. No, I did not.
Q. Referring to D82, there's a red dotted line surrounding the week of April 16th through April 23rd of 2023.
Do you see that?
A. Yes.
Q. Do you have any idea why that is highlighted or there's a dotted red line around it?
A. No. Maybe it's to show PTO which is on the other side of it.
MR. BOWLES: I caution the witness not to guess.
THE WITNESS: Okay.
A. I didn't do it. I've never seen this document.

K. Sheeler

MR. KATAEV: Off the record.

(Discussion held off the record.)

(A recess was taken from 3:36 p.m. to 3:44 p.m.)

MR. KATAEV: We're marking Plaintiff's Exhibit 42, Bates-stamped D164.

(Plaintiffs' Exhibit 42, email; D164, marked for identification.)

Q. I'd like for you to read it and let me know if you ever received an answer from Dina on this question that I highlighted.

Question, who told you you were supposed to be getting commissions?

A. She was not put on commissions when she started. It was a part-time position.

Q. I'm not asking you that. Listen to my question.

My question is, did you ever get an answer from Dina to the following question written in writing. Who told you you were supposed to be getting commissions? Yes or no?

A. I'm sorry. Are you asking me if Dina responded?

Q. Yes. Did you ever get a response from

K. Sheeler

Dina?

A. I'm not on that email.

Q. Did you have any conversation with Mr. Brinnen about that?

A. Yes. When she was hired, she was not commissioned as a part-time employee.

Q. This is not my question.

My question is, do you know who told Dina she was supposed to be getting commission?

A. No one.

MR. KATAEV: Let's mark this Plaintiff's Exhibit 43, Bates-stamped D166 through D167.

(Plaintiffs' Exhibit 43, email chain; D166-D167, marked for identification.)

Q. Starting from the earliest email, on the bottom of the chain dated May 30, 2023, at 12:48 a.m.

Please read that.

A. Yes.

Q. Now, Mr. Brinnen sent this email at 12:48 a.m.; correct?

A. It appears to be.

Q. Is this standard for Mr. Brinnen in terms of performing the duties he did for the company?

K. Sheeler

A. I do not know. I'm -- I don't recall. I'm not on that email.

Q. Starting from the top on the second and only other email on the chain.

Please read it and let me know when I can scroll down.

A. Yes. Yes. I'm not on this email as well.

Q. All right. I didn't ask you if you were.

Top of D167?

A. Yes. It's showing missing money.

Q. To your knowledge, is this the only evidence that the company has about missing money at the hands of Teresa?

A. I don't recall.

Q. On April 29, 2023, this email says that the attached envelope is short by $1.85; correct?

A. That's what it says, yes.

Q. The only other time after that is May 8, 2023 -- withdrawn.

An additional time after April 29, 2023, was on May 8, 2023; correct?

A. To this email, yes.

Q. Those two dates, April 29th and May 8th

of 2023, they're in different weeks; correct?
A. Different what?
Q. Weeks.
A. I'd have to look at the calendar.
Q. Well, there's eight days in May; right?
A. Okay.
Q. And there's 30 days in April; right?
A. Are you asking workweek? Are you asking --
Q. Workweek, yeah.
A. Again, it depends on days people work.
Q. Follow me down the rabbit hole here.
There are 30 days in April; correct?
A. Yes.
Q. Between the 29th and 30th, that's two days; right?
A. Yeah.
Q. And then there's at least eight days in May between May 1st and May 8th; right?
A. Yes.
Q. Eight plus two is ten days; right?
A. Exactly.
Q. Is it possible for the April 29th week to be in the same workweek as the May 8th week?

K. Sheeler

A. Again, I'd have to look at the exact calendar if you're asking in When I Work if you're asking me if Teresa was working those days.
Q. Okay.
A. What is the question? I don't --
Q. Here is April 29, 2023; right?
A. Yep.
MR. KATAEV: Let the reflect that I've opened up a calendar on the shared screen to show a calendar for April 2023.
Q. And seven days after April 29, 2023, is what, according to this calendar?
A. Eight? I don't -- what are you --
Q. Let the record reflect that my mouse is pointing to the following Saturday after April 29, 2023.
What is that date?
A. April 29th is a Wednesday.
Q. Are we looking at the same calendar?
A. Oh, I'm sorry. Saturday.
Q. And what is seven days after April 29th, what day --
A. The 6th.
Q. 6th of what?

K. Sheeler

A. April -- I'm sorry. May.

Q. Going back to my question, is it possible that May 8th is in the same week as April 29th based on your review of this calendar?

A. No.

Q. So on May 8, 2023, the envelope in the -- the cash in the envelope is $1.02 over; correct?

A. Okay. Yes.

Q. That means that there was more money than there should have been; correct?

A. Yes.

Q. On May 11th, how much cash was missing in 2023?

A. $33.

Q. And?

A. 10 cents.

Q. Are we looking at the same screen here?

A. Yes. You highlighted it. $33.49.

Q. I thought I heard 10.

COURT REPORTER: That's what I heard.

Q. Scrolling down to the top of D167 on May 27, 2023, how much cash is missing?

A. $3.

Q. And then taken together, what is the

total amount of cash missing?

A. $37.32 missing in that time period.

Q. Fair to say that that's for about a month; right?

A. It's fair to say. Again, this is Jim's email.

Q. But it's your counterclaims; right?

A. Right. But this is not counting out weekly cash taken. So I cannot speak to every month.

Q. I understand that. And that's very fair.

But my question is, how do you reconcile this email with the alleged shortage of $100 in your counterclaim?

A. Again, you have to look at our -- look at the counting of the cash.

Q. Well, did you look at the counting of the cash before you filed the counterclaim?

A. Yes. Months and months before. I mean, sorry. Way before. Since she had left the company and we had let it go.

Q. When you did this, did you similarly write it down in this manner or some other way?

A. I can't recall.

K. Sheeler

MR. KATAEV: To the extent that you did any accounting that's in writing, plaintiffs will call for the production of any such accounting. We'll follow up in writing.

We'll mark this as Plaintiffs' 44, single-page email Bates-stamped D175.

(Plaintiffs' Exhibit 44, email; D175, marked for identification.)

Q. I'll set it up so you can read the email starting from this September 24, 2024, email at 12:40 and this 9:15 a.m. response.

A. I'm not on this email.

Q. I didn't ask you that. I'm asking you to please read it and then I'll ask you some questions.

A. I've read it.

Q. So in this email Mr. Brinnen offers to repair some missed hours either by lumping in to the next week's pay or a single day payment; right?

A. Yes.

Q. And Dina responds, I wanted a new single day payment today; correct?

A. Correct.

Q. My question is, did Mr. Brinnen speak to you about this before processing?

K. Sheeler

A. No. I have no recollection of this.

Q. You don't recall one way or another? Maybe he did, maybe he didn't; right?

A. I've never seen this email.

Q. I didn't ask you whether you've seen the email.

I'm asking if you have any recollection one way or another whether Mr. Brinnen discussed this request with you, verbally or otherwise.

A. I don't recall.

Q. One way or the other?

A. I don't recall.

MR. KATAEV: Plaintiffs' 45. This is an email chain Bates-stamped D202 through D206.

(Plaintiffs' Exhibit 45, email chain; D202-D206, marked for identification.)

Q. In this email from Mr. Brinnen to Dina and Cathy in which you are copied, Mr. Brinnen provides a log-in ID and password for WhenIWork.com; correct?

A. Correct.

Q. And the question is, is this a shared user name and password for all the managers to use?

A. I think each manager has their own code.

K. Sheeler

Q. Do you have any idea whose log-in ID email address is Veloskier@yahoo.com?

A. That's Jim Brinnen's.

Q. Is it fair to say that Mr. Brinnen provided his password for WhenIWork.com for others to use?

A. It's fair to say at that time, yes. And, again, I'd have to look back to see if they have their own IDs.

MR. KATAEV: I'm going to take five minutes or three minutes. Come back at 4:10. Six minutes.

MR. BOWLES: Okay.

(A recess was taken from 4:04 p.m. to 4:10 p.m.)

MR. KATAEV: Off the record.

(Discussion held off the record.)

MR. KATAEV: Marking Plaintiffs' 46, a document Bates-stamped P1016.

(Plaintiffs' Exhibit 46, Dina Ketcham W-2; P1016, marked for identification.)

Q. I'll represent to you, Ms. Sheeler, that this is a W-2 form for plaintiff Dina Ketcham issued by the company.

K. Sheeler

Do you see that?
A. Yes.
Q. Who prepared the W-2 forms for the company in 2023?
A. I don't know.
Q. Do you know whether it was Mr. Baransky?
A. I do not know.
Q. Do you know whether it was an accountant or not an accountant?
A. I do not know.
Q. What is this address here on 70th Street?
A. That is my apartment in Manhattan many years ago.
Q. Is it the same apartment that you testified previously about visiting once a week?
A. No.
Q. So you moved?
A. Yes. 20 years ago.
Q. So what was the address again where you currently reside in Manhattan from time to time?
A. 35 West 96th Street.
Q. And you moved to the 96th Street address 20 years ago?
A. I'm not quite sure what year.

K. Sheeler

Q. More than 10 years ago?

A. Yes.

Q. Is it fair to say you were still living at this address at the time you formed Kristin Sheeler Designs, LLC?

A. Yes.

Q. And to this day, at least in 2023, you still have this address listed on the W-2 form; correct?

A. I did not see these forms.

Q. Who does see these forms?

A. I don't know.

Q. Do you know how it is the case that you're able to have W-2 forms ready for the annual wages paid but not have the quarterly employment tax returns done?

A. No.

Q. Do you have any sense of whether you're required to have the quarterly tax returns done in order to have the W-2 forms done?

A. You'd have to ask Jim Brinnen.

Q. Is it possible that you're still receiving mail to this day from the taxing authorities to this old address that you're no

longer at?

A. I don't know.

Q. Have you ever taken any effort to update your address from the 70th Street address to your new address after you moved?

A. I don't recall.

MR. KATAEV: Let's mark this as Plaintiffs' 47, document Bates-stamped P1124.

(Plaintiffs' Exhibit 47, text messages; P1124, marked for identification.)

Q. Just take a moment to read it and let me know when you're done.

A. I've read it.

Q. In this exchange between Cathy and Dina --

MR. KATAEV: For the record, this is a text message exchange between Cathy Marin and Dina Ketcham.

Q. -- is it fair to say they're both discussing working on holidays but not getting paid for it?

MR. BOWLES: Object to the form.

A. Not fair to say. People are paid holidays.

K. Sheeler

Q. In the text message from Cathy in the middle, it says, My first three years working for them, I worked six days per week and never got paid the extra day.

Do you see that?

A. I do.

Q. So am I understanding Cathy's message correctly when she's saying she was only paid for five days instead of six?

MR. BOWLES: Object to the form.

A. I don't know why that's written. I can't speak to Cathy. She's been with me for almost nine years.

Q. Did you ever have any conversation with Cathy after you had received these messages in discovery?

A. I am not speaking to anyone about the case. I have not spoken to Cathy about the case.

Q. Why is that?

A. I was informed not to speak to anybody about this case.

MR. KATAEV: Let's go off the record.

(Discussion held off the record.)

(A recess was taken from 4:22 p.m. to

4:25 p.m.)

MR. KATAEV: I don't have any further questions. Thank you, Ms. Sheeler.

MR. BOWLES: I have no redirect for the witness. And I think Ms. Sheeler is free to go.

(Whereupon, the proceedings were adjourned at 4:25 p.m.)

J U R A T

I do hereby certify that I have read the foregoing transcript of my deposition.

________________________________
KRISTIN SHEELER

Sworn and subscribed
before me
this _____ day of
___________, 2026.
A Notary Public
of the State of _________

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| KRISTIN SHEELER | MR. KATAEV | 5 |

E X H I B I T S

(EXHIBITS RETAINED BY ATTORNEY KATAEV)

| PLAINTIFFS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 29 | defendants' responses to plaintiffs' interrogatories; 21 pages | 150 |
| Exhibit 30 | email chain; D1 | 155 |
| Exhibit 31 | compensation acknowledgement; D7 | 159 |
| Exhibit 32 | 9/21/22 email; D12 | 160 |
| Exhibit 33 | timesheet record; D19-D30 | 161 |
| Exhibit 34 | NIBI-MTK summer associate Commission program; D33-D35 | 164 |
| Exhibit 35 | review; D36 | 166 |
| Exhibit 36 | 6/13/24 email; D38 | 167 |
| Exhibit 37 | November 2023 email; D39 | 168 |
| Exhibit 38 | 7/14/26 answer to counterclaims | 169 |
| Exhibit 39 | 7/31/25 complaint | 179 |

I N D E X (continued)

E X H I B I T S (continued)

| PLAINTIFFS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 40 | Lightspeed POS Clock-in/Clock-out Report; D48-D52 | 180 |
| Exhibit 41 | Payroll Hours/Corrected; D63-D83 | 182 |
| Exhibit 42 | email; D164 | 185 |
| Exhibit 43 | email chain; D166-D167 | 186 |
| Exhibit 44 | email; D175 | 192 |
| Exhibit 45 | email chain; D202-D206 | 193 |
| Exhibit 46 | Dina Ketcham W-2; P1016 | 194 |
| Exhibit 47 | text messages; P1124 | 197 |

I N D E X (continued)


| REQUEST: | PAGE |
| --- | --- |
| Name of attorney used to form LLC | 22 |
| Name of accountant before Baransky | 28 |
| Shopify sales analysis to determine what's sold in store versus outside the store | 30 |
| Tax returns from 2025 going back to 2019 | 32 |
| Production of any emails disciplining any employees | 39 |
| Production of all compensation policies | 42 |
| Any writings indicating that individuals were cleared to enter stage where fire was | 110 |
| Former accountant's contact information | 120 |
| Why did you switch from your prior accountant to Mr. Baransky | 121 |
| Discount policy in writing | 133 |
| Production of email correspondence re policy on employee discounts | 134 |
| What defamatory statements did Dina and/or Teresa make outside of this lawsuit | 135 |
| Production of emails regarding vacation dates | 169 |
| Production of accounting in writing | 192 |

CERTIFICATE

STATE OF NEW YORK )
) ss.
COUNTY OF SUFFOLK)

I, Elizabeth F. Tobin, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That Kristin Sheeler, the witness whose deposition is hereinbefore set forth, was duly sworn by me remotely and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

Elizabeth F. Tobin

ELIZABETH F. TOBIN, RPR

September 22, 2026

ERRATA

PAGE/LINE CHANGE/REASON

_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________
_____________________________________________________________

**A**
**A-N-J-A** 138:8
**a.m** 1:15 4:10 59:14 59:15 71:20 182:14 183:2,8 186:18,22 192:12
**Abercrombie** 16:14
**ability** 8:14,18,22,24 19:10 39:19,23 53:23 56:8 68:8 94:17
**able** 7:19 22:25 30:17 45:5 76:11,11 82:14 91:19,24 176:3,20 196:15
**accept** 29:19 118:24 119:5
**accepted** 48:5
**access** 45:11,14 94:20 95:2 171:4
**accident** 77:2
**accord** 74:15
**account** 32:23 174:8
**accountant** 26:17,19 26:25 27:3 28:14 119:15,19,23 120:2 120:4,9,10 121:23 143:25 144:2 195:9 195:10 202:6,17
**accountant's** 202:15
**accountants** 113:21 117:11
**accounted** 80:25 157:20
**accounting** 21:18 32:11,16 65:6 111:17 139:21 176:22,24 192:3,5 202:24
**accurate** 182:17,19 182:21
**accurately** 123:5
**accused** 176:12
**ACH** 49:21 163:4
**acknowledgement** 90:10 96:25 97:20 158:20,23 159:16 159:20 200:14
**acting** 96:6,12,18
**action** 87:8 203:16
**actions** 86:6
**actively** 19:5,9
**activities** 172:19
**actual** 40:7 53:22 69:11 78:13 94:10 174:3
**additional** 149:7 187:22
**address** 5:5 73:6,11 146:18 194:3 195:12,20,23 196:5 196:9,25 197:5,5,6
**addressed** 46:14
**addressing** 22:23 28:18 46:10
**adjourned** 199:9
**administer** 3:13
**administering** 4:19
**Administration** 123:22 124:2
**Adrienne** 14:23 15:19
**advantage** 132:10
**advent** 122:15
**affect** 8:14,18,22,23
**age** 5:3
**ago** 11:22 27:2 195:14,19,24 196:2
**agree** 4:18 24:17 177:19
**agreed** 3:2,6,10 48:2 48:3,13,15,18 94:8 110:12
**agreeing** 48:10
**agreement** 5:7 159:10
**ahead** 57:4 62:21 132:15 134:17,19 144:18 154:22 172:5
**al** 4:12,12
**alarm** 73:14,17
**alcohol** 8:18
**ALIVIA** 2:24
**allegation** 129:2,9,16 171:9 176:19
**allegations** 136:22 175:5 176:9
**allege** 126:20
**alleged** 129:3 138:16 191:14
**allegedly** 127:23 130:16 138:24
**alleges** 175:4 179:18
**aloud** 6:13
**alternate** 141:5
**amount** 41:2 43:4 47:9 48:17 65:16 67:22 80:15 115:21 133:16 142:3 167:25 174:3 177:5 179:16 191:2
**amounts** 78:5
**analysis** 30:23 202:7
**and/or** 5:17 12:4 38:10 57:20 80:24 85:16 108:12 109:6 109:9 115:7 127:3 127:11,18 129:2,17 130:22 131:22 135:4,7,17 136:4,17 137:6,15 145:8 147:25 175:10 202:22
**Anja** 138:8
**annual** 32:6 196:15
**answer** 6:13 7:3,15 10:17,19,20 21:7 23:2,17 25:13 26:6 26:13 28:9 29:16 35:8 48:7 57:4,17 59:21 60:4 81:21 86:21 87:14 93:5 111:3 119:3,17 128:22 132:2 153:9 155:9 169:14,16 179:5 185:11,20 200:22
**answered** 131:18
**answering** 58:8 93:20
**answers** 6:8 7:25 8:10 38:22 110:10
**antidepressant** 8:21
**anybody** 144:7 198:21
**anybody's** 54:10
**apartment** 195:13,15
**app** 146:17
**appeal** 87:8,11
**appear** 46:16 83:5
**appears** 181:18 186:23
**applicants** 58:13 96:19
**application** 44:14 124:17
**applies** 143:4
**applying** 136:24
**appreciate** 40:24 42:3 125:10
**approached** 19:15 180:12
**approaching** 18:24
**approval** 68:6
**approve** 48:24
**approved** 33:23 48:4 49:3
**approving** 139:18
**approximately** 4:10 14:17 122:19 139:22 175:24
**April** 151:24 164:10 184:13,14 187:17 187:22,25 188:8,14 188:24 189:7,11,12 189:16,19,22 190:2 190:4
**Arend** 16:7,15 17:2
**arrangement** 93:24 93:25

**arrested** 23:6
**arrive** 71:7
**arts** 14:8
**Aside** 109:19
**asked** 7:2 32:17 44:17 49:2 55:8,11 56:19 74:7,13,16 98:7 102:19 104:2 109:6,9 110:10 125:5 143:15 154:7 172:18
**asking** 18:24 24:14 38:7 39:24 41:17 59:24,25 82:5,6 92:17 103:10 105:16 107:23 130:3 141:25 142:4 142:6 154:19 169:21 175:14 178:3 183:17 185:17,23 188:9,10 189:3,4 192:14 193:8
**asks** 153:6
**assert** 78:14 127:18
**assigned** 44:6
**assist** 39:5
**assistance** 112:7
**associate** 163:16 164:19 200:17
**assume** 7:3 61:9,10 103:12 109:11 166:5
**assumed** 9:10,12,16 9:24
**assuming** 43:10
**Atlantic** 34:6,12,16 34:20
**attached** 187:18
**attachment** 158:18
**attachments** 158:16
**attain** 9:13,14
**attention** 117:10,16 117:18 133:7 153:9
**attorney** 9:23 22:18 22:20,24 23:16 24:6 59:20 86:23 121:7,9 121:12 143:19,22 151:6 159:8 160:14 181:13 200:7 202:5
**attorneys** 3:3 144:14 145:4 155:8
**attribute** 118:13 167:2
**audit** 54:20 82:25 144:10
**August** 181:16
**authorities** 117:3 196:25
**authority** 35:6,16 36:7 37:9 42:5 46:5 47:9 49:10 64:22 68:5,11
**authorize** 115:20
**authorized** 3:12
**automatically** 89:16 142:24 143:16
**available** 136:22
**Avenue** 2:7
**average** 20:24
**aware** 49:19,22 50:17 51:6,18 54:20 57:19 74:8 76:17,20,24 77:4 86:15 93:3 97:16 98:4 114:3 122:13,18 123:8,21 128:7 136:8 142:23 148:23 149:19,21

**B**

**B** 200:6 201:4
**bachelor** 14:8
**back** 7:23 22:21 26:20 28:16 29:12 29:18 32:21 41:13 59:16 62:16,18 63:6 63:7 67:14,20 68:22 68:25 69:5 71:20 73:20 77:5 87:16 89:18 90:7,11 91:9 94:6 97:6 104:20,21 107:15 110:8,9 111:12 115:11 116:5 118:3 119:9 119:13 122:5 127:7 127:12,20 128:5,20 129:19 132:4 134:23 135:20,24 136:15 138:18 168:20 171:10 174:21 176:17 181:7 183:12,13 190:3 194:9,12 202:9
**background** 13:19
**bad-mouthed** 170:16
**bags** 106:13,16
**Bake** 98:18
**balance** 107:14
**bank** 81:5 161:17
**Baransky** 26:16,18 26:22 28:14 119:16 119:19,23 120:3,8 121:23 195:7 202:6 202:17
**based** 7:20 30:14 39:18 44:12 65:23 129:18 130:10 131:11,22 138:15 156:19 157:22 176:19 190:4
**basically** 116:5 151:15 175:3
**Basile** 16:7,15 17:2
**basis** 66:6 85:11 86:11 110:22 113:6 114:5 115:17 136:21 148:4,7,13 153:20 171:8 179:24 182:20
**Bates-stamped** 155:22 160:20 161:23 166:16 167:9 180:15 181:15 182:3 185:7 186:13 192:7 193:15 194:20 197:9
**Bates-stamps** 164:16
**bathroom** 181:5
**Beach** 156:25
**bearing** 164:16
**began** 17:23 111:19 121:16
**beginning** 35:10 90:4 121:2 182:13
**behalf** 1:5 2:5,13
**belated** 145:11,14,19 145:20
**belief** 171:3 182:20
**believe** 30:15 111:23 182:17
**benefit** 153:7 171:22 179:19
**benefits** 123:4,9 124:12,18
**Benjamin** 2:23 8:4,7
**bereavements** 168:22 168:23
**best** 6:10 29:17 30:15 142:4
**BFA** 13:21 14:3,10
**big** 34:22
**bill** 51:23
**bills** 49:25 50:2 51:6 51:10 128:19
**binding** 4:20
**bit** 38:20,24 74:22 91:5
**biweekly** 69:4 153:10 153:13,14,23
**blame** 118:18,22
**blocked** 94:21
**blood** 203:16
**body** 6:15
**books** 127:21 128:2
**boots** 20:9
**bottom** 162:17,22 170:25 171:2 186:17

**boutique** 18:15 28:23 37:22 69:10
**boutiques** 31:25 52:15
**Bowles** 2:14,18 4:2,4 4:24,24 10:16,18 12:9 25:12 32:9 35:7 36:24 38:12,19 41:16 48:6 56:25 57:3,16 59:21 60:3 71:24 72:3 86:17,24 87:12 91:4,8 109:13 109:16 112:2,9 116:18,24 118:20 119:2,7 122:10,17 127:6,8 132:14 136:11 137:2 143:8 144:16 145:11,15 145:20 146:23 148:21,25 149:14 149:25 164:3,13 172:4 178:16 181:4 181:8 182:15 184:21 194:14 197:23 198:11 199:5
**box** 76:10,11,15,22 78:2,23,24 79:5,6,6
**boxes** 80:4 105:20
**brackets** 163:4
**brand** 9:21 14:25 28:25
**brands** 28:24
**break** 7:13 59:7,17 59:19 62:24 104:4,5 104:7 142:24 143:3 143:16 149:23 181:5,12
**breaks** 7:21 60:19,20 60:22,23 61:2,11 62:6,9 143:13,15
**brick** 10:13 11:14,24 27:7,10,16
**Bridgehampton** 10:25 55:19,22 79:16 85:18 103:24 105:15 106:2,7 142:15
**Bridgeport** 14:2
**briefly** 13:18 25:8
**bring** 55:24 79:10,16 79:17
**bringing** 36:11
**Brinnen** 1:11 13:10 24:8,21 25:7 26:20 28:10 40:3 43:12,14 45:17,25 46:9,16,19 47:4,6 49:6,7 50:8 50:12 51:17,25 53:11 54:4,13 55:2 59:6 60:12 61:8 63:22 64:20,21 66:18 67:4,21 68:23 69:2,6 74:21 75:19 77:5 79:2,12 80:8,9 81:7,21 82:14,25 85:4 88:6 91:9,16 91:22 92:3,9,12,15 92:18,24 93:11,16 93:16 96:17 102:24 112:22 113:18 115:7 118:12,19 119:22 120:16,22 121:14,18 122:2 126:5,10,11,16 139:16 153:16,18 156:10,12 157:6,16 158:15 160:24 161:4,19 162:7 169:6 173:25 186:5 186:21,24 192:17 192:24 193:9,18,19 194:5 196:22
**Brinnen's** 7:20 32:18 81:3 93:3,7 112:4 150:6 194:4
**broke** 91:4
**broker** 155:13
**brought** 117:17
**budgets** 66:12
**building** 101:12 102:8
**bullet** 164:21
**burned** 11:9 107:6
**business** 9:11,14,19 9:24 12:8,11,13 18:6,7 22:17 28:21 35:17 36:14 46:8 74:25 113:15,17 136:17 137:7 141:7 141:12 175:23 177:17
**businesses** 9:13
**busy** 63:6 84:18
**buy** 171:22
**buying** 132:17,19,19 132:20

**C**

**C** 2:2
**C-A-T-H-Y** 99:7
**cafe** 97:6 98:16
**Caffeine** 98:20,22 99:3
**calendar** 188:5 189:3 189:10,11,13,20 190:5
**California** 29:7,13
**call** 24:10 30:22 32:19 36:18 39:2 42:14 67:2 100:20 104:21 106:24 110:14 133:4 134:24 169:10 192:4
**called** 5:3 44:14 52:9 63:6 100:24 152:24 163:16
**calling** 74:12 106:23 106:25
**calls** 58:9
**cameras** 174:25
**card** 49:16 50:15,16
**cards** 29:20 33:12 50:13
**care** 51:19
**case** 1:7 4:13,15 5:14 8:21 25:22,24 87:5 114:16 126:2 129:4 129:7,7 130:4,15 146:21 154:9 162:12 175:13,14 196:14 198:19,19 198:22
**cash** 50:20 73:24 74:2,3 76:5,9,9,18 76:22 77:15 78:2,21 78:22 79:6,19 80:6 80:13,14,14,15,24 80:25 81:4,9,12 105:19,22 126:25 127:19,24 128:4,12 128:15 146:24 147:4 171:17 172:10,25 190:8,13 190:23 191:2,10,17 191:19
**catch** 163:4
**Cathy** 99:7 142:15 193:19 197:15,18 198:2,13,16,19
**Cathy's** 198:8
**cause** 86:2 101:2 118:14
**caused** 109:20 138:25
**caution** 38:19 184:21
**cc'd** 161:2
**cease** 172:18
**cents** 190:17
**certain** 49:2 58:17 76:23
**certificate** 9:23 203:2
**certified** 5:8
**certify** 199:14 203:10 203:15
**chain** 155:25 156:6 186:14,17 187:5 193:15,16 200:12 201:13,15
**chair** 148:8

**chance** 36:22 38:22
**change** 46:23 54:9,18 66:23 67:19 68:11 154:2,5 164:23
**CHANGE/REASON** 204:6
**changed** 67:23 87:4 89:12
**changing** 68:15
**charged** 23:3
**charted** 30:17
**check** 36:15 46:9,16 46:19,22 49:18 161:20
**checked** 57:9
**checks** 46:13 49:11 49:12,14
**choose** 39:17
**Chris** 28:2
**circumstance** 41:12
**cite** 126:22
**city** 14:15 15:3,15 16:4,11 17:7 123:20
**Civil** 5:4
**claim** 25:22,24 26:8 26:13 74:11 101:17 101:20 128:6 131:8 131:13 135:18 136:7 138:15 144:24 155:10 175:11
**claimed** 129:23 135:4
**claimers** 102:19
**claiming** 126:24,25 128:3 130:22 131:11 132:9 135:14 136:16
**claims** 123:11 150:21 155:15
**clarification** 17:14 33:19 38:18 49:9 80:12 106:22 138:6 178:11
**clarify** 23:12 114:14 125:14,15
**clarifying** 141:24
**classified** 64:15
**cleaning** 72:19,24 111:7 119:8
**clear** 43:10 110:10 163:12
**clearance** 110:3
**clearances** 110:9
**cleared** 110:16 202:14
**clients** 86:14 170:23
**clients'** 130:14
**clock** 52:4,4,6,6,18 52:20,22 53:2,3 54:7,7,10,10,17,18 58:10,19 97:5,7 171:12 179:12,12 182:2,22,22,23,24 183:5,5,11,21
**clock-in/clock-out** 180:18,21 201:8
**clocked** 53:23 54:9 54:21 55:15,15 56:20 58:14 83:9,9 97:16,16 130:24,25 183:8
**clocking** 55:4,6,6,10 56:12 57:12,14,21 72:23 97:8
**clocks** 52:17,17 131:7 171:10
**close** 70:16,17 72:14 170:7
**closed** 11:7 34:16 58:6 72:15 73:5
**closes** 72:12 183:15
**closing** 69:16,19,21 71:19,21 72:22,24 111:11
**clothes** 18:18 20:21 69:14
**clothing** 9:21 14:25 18:16 19:10,21 28:23 29:3,12 62:23 71:17 132:18 174:19
**Clover** 33:10 146:14
**co-manager** 70:2,5 156:24
**co-managers** 70:6
**co-managing** 157:3
**code** 52:20 53:5,7,9 53:10,11 193:25
**coffee** 97:12
**collaboration** 152:5,8 152:12,17
**collecting** 31:11,13
**college** 13:20,24,24 14:5,7 140:24
**come** 7:23 19:14 20:7 31:19 38:16 42:6 46:15 52:19 55:5 62:16,18 71:20 94:4 96:25 97:6 104:17 104:20 110:12 117:10,15 133:7 140:23 181:7 183:2 183:17 194:12
**comes** 31:22,24 33:20 41:13 71:14 122:15 183:5
**coming** 72:13
**commission** 37:17 38:10 40:10,22 41:14 42:2,4 65:19 65:22,24 68:21 77:7 89:6,9 90:5,13,15 90:19,19 153:10 156:4,17 157:14 160:2 163:17 164:6 164:19 165:8,9 186:10 200:18
**commission-based** 165:19
**commissioned** 77:12 90:18 158:10 186:7
**commissions** 40:5,8 40:19 66:3 89:17,23 90:6 153:14,15,19 157:20 164:8,11,22 165:10 173:19,25 185:14,15,22
**committed** 93:8 126:20 127:11 165:7
**communicate** 113:21
**communicating** 47:2
**companies** 152:13
**company** 5:16 10:10 10:13 11:11 12:15 14:13 17:10,11,24 18:3,12 20:3 21:23 22:2 29:2,19 31:3 37:14 38:3 47:14,18 49:11,13,18,25 50:2 51:3,7,10 52:3 53:13 57:22,24 60:20 63:18 64:22 66:10 67:6 68:12,15 75:7 83:11,14,25 84:8 87:21 88:8 89:4,13 91:13,20 92:6,10,18,25 93:4 93:17 99:24 100:3,6 101:14,16,19 104:16 110:2 111:10,20 112:19 112:23 113:4,21,22 114:11,21 115:2,5,8 115:11,20,24,25 116:5,9,13 117:23 120:12 121:15,19 123:12 126:4,8,9,11 126:12,13,13,14,15 126:24,24 130:23 133:25 135:5,8 137:17,21 139:23 143:19 144:5 145:17 152:7 154:13 155:13 161:16 167:24 170:6 175:6,23 176:2,6,8 186:25 187:14 191:21 194:25 195:5

**company's** 63:14 143:20
**compensated** 97:23
**compensation** 39:7,9 39:12 42:15 48:11 68:9 83:2,22 90:10 115:8 148:20,24 149:5,8 153:7 158:19,22 159:15 159:20,25 161:6 200:13 202:12
**complain** 82:21 83:18 99:8,11,13,17 107:2 123:3
**complained** 99:21 180:7,11
**complaint** 25:25 26:10 123:22 125:22 129:11,18 130:10,12,12,14,15 130:18,20,21 131:12 136:14 144:9 175:5 178:20 179:8 200:24
**complaints** 83:21 124:22 125:12,17
**complete** 32:19,23 34:2 159:24 174:16
**completely** 57:22 76:16 122:2
**computer** 33:11
**concept** 28:23 81:14
**concern** 12:23
**concerned** 96:4
**concerning** 43:17,25 47:9 60:14 63:15 103:15 117:5 124:11,17 125:12 125:17 134:25 143:20
**condition** 8:14
**conducted** 84:16
**conducting** 5:23 97:17
**confidential** 172:17 172:23
**confirm** 5:25 6:9 35:15 46:23 131:20
**connected** 51:14
**Connecticut** 14:2
**connection** 73:22 154:8 174:17
**consist** 66:17 84:12 156:16
**consistent** 141:6,18 141:19
**consists** 43:11
**consult** 143:19,25
**consulted** 143:22
**contact** 73:4,10 119:8 119:18,22 137:18 202:15
**contain** 76:22
**contained** 175:5
**contemporaneous** 182:18
**contend** 85:15 175:9
**content** 59:24 86:18
**continue** 58:20 108:9 150:7
**continued** 27:14 201:2,4 202:2
**contract** 146:6,7,10
**control** 36:6
**conversation** 59:25 60:2,7 106:12 130:2 186:4 198:15
**conversations** 86:18 87:13,21 134:6 170:15
**convicted** 23:9
**COONEY** 2:24
**copied** 193:19
**copies** 78:6
**copy** 4:3 120:20 137:25 145:23 156:9 161:5
**corporate** 17:15
**corporation** 137:20
**correct** 10:15 11:2,3 18:9,19 19:6 23:9 27:9,24 30:2 33:16 34:3,4,10,11 35:3,4 35:6,12 39:17,21 40:5,11 41:20,21 43:2,6,13 45:3,23 46:3,5,6,17 49:6,11 53:3 60:15 62:2 67:13,15 74:19 75:21 76:6 77:15,16 82:3,19 85:9,10 89:10,11 91:14,15 93:22,23 94:11,14 96:9 100:13,14 101:14,15,17,18,20 101:21 103:11 112:19 121:20 125:20 126:21 127:4,19 128:18,23 129:18 130:18,19 131:14 135:5,6 139:19 151:16,19 151:25 152:2,9,10 154:13,16,20 155:10 156:10,13 156:14,17,18,20,25 158:24 160:2 167:17,20 168:3 171:12 172:2,12,21 173:11 175:6,7,24 175:25 176:3,4,7 177:2 181:17 186:22 187:18,23 188:2,14 190:8,11 192:22,23 193:21 193:22 196:10
**correcting** 59:5 118:3
**correction** 54:14
**correctly** 19:3 28:11 55:18 75:25 95:5 105:24 121:6 132:23 198:9
**correspondence** 123:24 134:25 202:19
**cosmetic** 106:13,15
**counsel** 4:16 5:7 86:19
**count** 77:19,20 174:6 174:12,15
**counted** 77:25 80:13 80:13,24 128:20
**counterclaim** 25:23 26:12,14 126:7,9 128:8 176:13 191:15,19
**counterclaims** 125:24,25 126:5,16 126:21 169:15,17 179:5 191:8 200:23
**counting** 72:19 78:15 78:16 191:9,17,18
**country** 29:8
**counts** 80:10
**COUNTY** 203:6
**couple** 98:23 105:20 180:6
**course** 22:4 24:15 138:3
**court** 1:2 3:15 4:2,5 4:14 6:4,14,21 17:14 22:12 26:8 33:19 38:18 49:9 72:5 80:12 87:16 104:22 106:22 109:15 112:6 138:6 178:11,24 179:4 181:23 190:21
**cover** 44:13 155:10 155:14
**covered** 103:24
**craft** 154:15
**created** 42:11 121:4 162:12 163:17,19
**creating** 18:22
**credentials** 21:12
**credit** 29:19 33:12 49:16 50:13,15,16
**crime** 23:3,9
**criticized** 107:25

**cross** 72:6
**cultivated** 170:9,14
**Cummings** 13:10 43:12,14 44:3 66:11 66:13,19 78:25 79:8 99:10 171:15 180:6
**current** 85:20 86:2 93:3 175:5,9
**currently** 10:12 20:4 195:21
**customer** 31:5 58:5 63:5 71:14,18,22 72:7,12 86:5,8,12 136:9 137:14,16 138:16 147:15,16 147:20 149:17
**customers** 57:20 86:9 86:14 127:3 132:21 137:19 146:24 147:12 148:12 166:25 170:23 173:7,10

**D**

**D** 200:2 201:2 202:2
**d/b/a** 9:16,18,19
**D1** 155:22,25 200:12
**D12** 160:20,22 200:15
**D164** 185:7,8 201:12
**D166** 186:13
**D166-D167** 186:15 201:13
**D167** 186:13 187:11 190:22
**D175** 192:7,8 201:14
**D19** 161:23
**D19-D30** 161:25 200:16
**D202** 193:15
**D202-D206** 193:17 201:15
**D206** 193:15
**D23** 162:17
**D24** 162:18
**D26** 162:22
**D29** 162:24
**D30** 161:23
**D33** 164:16
**D33-D35** 164:19 200:18
**D35** 164:17
**D36** 166:13,16 200:19
**D38** 167:10,12 200:20
**D39** 168:6,8 200:21
**D48** 180:15
**D48-D52** 180:21 201:9
**D52** 180:15
**D56** 181:16
**D63** 182:3 183:7
**D63-D83** 182:6 201:11
**D64** 183:22
**D66** 184:6
**D67** 184:8
**D7** 159:14,16 200:14
**D82** 184:12
**D83** 182:4
**daily** 77:14 78:21,22 79:19 80:6
**damage** 109:7,10,20 138:25
**damaged** 110:19
**Dario** 180:5
**data** 172:17,23 173:10,14,18 180:18
**date** 4:8 51:8 77:24 155:3,4 164:9 165:7 189:18
**dated** 136:9 169:15 178:21 186:17
**dates** 88:10 127:17 128:25 168:24 187:25
**dates169** 202:23
**daughters** 132:20
**David** 2:18 4:24 130:6 154:18
**david@bojo.law** 2:19
**day** 7:22 51:21 53:8 55:12,20,20,24 56:13 57:21 61:7,16 61:19 70:14,15,25 71:19,21,23 77:11 77:12,12,14,20,22 78:3 79:24 80:3,15 80:16,18 92:25 95:11 143:17 149:6 149:13 157:24 158:10,11 167:23 183:2,3 189:23 192:19,22 196:8,24 198:5 199:22
**day-to-day** 44:5 47:17,19 173:2
**days** 21:2 70:19,23 73:2,10 93:23 94:7 95:14 103:25 149:16 179:16 182:13 188:6,8,12 188:14,17,19,22 189:4,12,22 198:4 198:10
**dead** 70:17
**deal** 52:12 147:12
**dealing** 148:12
**December** 106:9
**decide** 34:19 39:8 42:6 50:4,23 51:2 102:5,10
**decided** 48:24 96:14 102:2 103:13 156:19,22
**deciding** 49:24
**decision** 12:18,23,24 13:2 35:9 46:20 87:9,11 96:11 103:14 170:7
**decision-maker** 12:14 35:11
**decisions** 12:17 13:4 35:21 44:10 60:13
**declaring** 151:15
**decorations** 105:15
**decrease** 175:23 177:16,21 178:6
**decreased** 176:8,11
**deduct** 113:4
**deducted** 61:2,6 114:22 142:24 143:16
**deductions** 95:13 113:9,14
**defamatory** 135:14 135:19 202:21
**defame** 135:8
**defamed** 126:24 135:5
**Defendant** 2:13
**defendants** 1:12 4:25 159:19 163:13 179:20 180:17
**defendants'** 150:10 150:16 154:24 200:9
**defer** 80:9
**definitely** 110:9 132:16 148:7
**delayed** 114:25
**delete** 146:4
**Delia's** 17:4,9
**deliver** 79:14
**delivered** 80:7
**delivery** 4:4
**denied** 46:24
**deny** 106:23 179:10 179:24 183:17
**denying** 180:10 183:19
**department** 110:4,4 117:4 124:10,16
**dependent** 21:5
**depending** 12:25 20:16 40:13 42:21 42:21 61:23 167:21

**depends** 188:12
**deposed** 24:22
**deposited** 81:5,9
**deposition** 1:17 3:11 4:10 5:15,20,24 7:19 22:10,24 23:11 23:16 24:6,12,13,14 24:15 25:4,7,9,18 26:3,5 32:18 150:7 199:15 203:12,13
**depositions** 137:19 137:23,24
**describe** 13:18 28:21 52:2,16 84:11
**described** 180:17
**describing** 26:9
**DESCRIPTION** 200:8 201:6
**design** 17:19,22 18:2 18:6,7,12,18,25 19:4,10 20:19
**designate** 96:11
**designated** 96:6
**designating** 9:24
**designer** 9:7 17:12 29:12
**designing** 19:20 20:22
**Designs** 1:10 4:12 5:17 9:11,17,25 10:4 21:23,25 22:6 27:4 28:3,22 116:21 120:23 146:11 158:19 196:6
**desire** 108:23
**desperately** 94:2
**despite** 176:2
**detail** 170:12
**detailed** 52:13
**details** 161:6
**determination** 64:17 64:19
**determine** 30:24 40:4 40:7,9,15,17,25 42:19 202:7
**determined** 47:11
**determines** 90:14
**different** 11:17 26:24 44:7 61:17 69:22 70:8 79:6 139:24 141:7,13 142:3,9 144:20 176:11 188:2,3
**difficulty** 80:11
**digit** 53:6
**digital** 52:9,14 53:4 130:24,25 131:2,6 179:14 182:23
**Dina** 1:5 5:14 54:17 70:7 89:6,21 90:20 93:21 94:2 95:17,20 96:3,14,19 97:22 98:4 99:13 100:23 102:15 103:3,7 105:4,25 106:13,19 107:2,22 108:4,6,12 109:6,9 110:18 123:3,8 124:12,18 126:20 127:11,18 127:22 129:2,12,17 129:22 130:10,15 130:22 131:22 132:9 133:8,24 134:8,11 135:4,7,17 136:4,16 137:6,15 142:14,18 147:6,16 147:21,25 149:18 160:24 167:3,5 170:9,13 174:12,18 175:4,10 179:18 185:11,20,23 186:2 186:9 192:21 193:18 194:21,24 197:16,19 201:16 202:21
**Dina's** 88:14 95:13 103:15 104:16 107:25 181:16
**direct** 43:16,25
**directly** 47:20 125:12 126:25 131:18 132:2
**discipline** 38:5,6
**disciplined** 37:10 83:24
**disciplining** 39:3 202:10
**disclosure** 155:8
**disclosures** 154:25
**discount** 132:17,23 174:19 202:18
**discounting** 132:21 133:8
**discounts** 127:2 132:10 133:17 134:7 135:2 202:20
**discover** 127:10
**discovered** 133:23
**discovery** 144:15 178:10 180:17 198:17
**discrepancies** 78:5 78:14
**discretion** 115:25 116:2
**discuss** 23:16 59:20 75:7 153:10
**discussed** 86:22 143:22 193:9
**discussing** 68:12 197:21
**discussion** 104:25 108:19 109:14,17 185:3 194:18 198:24
**discussions** 25:6 134:2
**dispute** 153:21,22
**Distribution** 115:22 115:23
**distributions** 115:10 115:19
**District** 1:2,3 4:14,14
**Docket** 178:21
**document** 112:15,18 112:23 150:18,20 151:18 155:2,4 159:19 160:25 161:23 162:2,12 163:11,12,13,16 164:9 166:15 169:18 170:5 178:22 180:16,23 180:25 181:15 182:3,8 184:25 194:20 197:9
**documented** 179:13 179:14,17 180:4
**documents** 25:19,21 26:4,7 39:6 47:12 54:21 144:23 145:3 145:6 146:19 162:8
**doing** 6:14,19 9:10,14 9:19 17:21,23 41:11 57:5,13 72:22 76:2 97:9 105:6 128:23 129:19,20 147:11 174:23
**dollar** 65:16
**dollars** 176:25 177:5
**door** 18:17 73:18,19 73:20 95:12
**doors** 85:17,23 94:22 95:6 97:12,18 98:15 98:16,23
**dotted** 184:12,18
**draft** 160:14
**drafted** 154:17
**dream** 121:4
**dressed** 160:10
**drive** 94:6
**driver's** 21:12
**dropped** 31:20
**drugs** 8:17
**due** 8:21 11:7 103:16 103:19 117:11 177:21
**duly** 5:6 203:12
**duties** 43:21 69:7,11 69:13 72:22 96:18

162:11 186:25
**duty** 96:21

**E**

**E** 2:2,2 5:2,2,2 200:2 200:6 201:2,4 202:2
**earlier** 13:15 90:24 155:23 183:18
**earliest** 186:16
**early** 55:5 183:21
**earned** 176:6
**earnings** 77:22
**Eastern** 1:3 4:14
**easy** 135:12
**eat** 62:22,23,25 104:9
**ECF** 178:21
**edit** 53:24
**edited** 54:2,5,22
**educational** 13:18
**effect** 3:14 6:3
**effort** 155:12 197:4
**eight** 140:7 141:2,4 167:19 188:6,19,22 189:14
**either** 12:3 82:8 167:2 192:18
**eligible** 64:11 90:13 90:15
**Elizabeth** 1:20 4:6 203:8,22
**email** 42:7 49:3,7,8 56:23 77:11 90:11 105:8 112:9 134:13 134:22,23,25 146:18 153:24 155:23,25 156:5,9 156:19,21,22 157:6 158:4,15 160:21,24 161:2 167:9,11,13 167:16 168:6,8,18 168:25 169:6 185:8 186:3,14,16,21 187:3,5,8,17,24 191:7,14 192:7,8,10 192:11,13,17 193:5 193:7,15,16,18 194:3 200:12,15,20 200:21 201:12,13 201:14,15 202:19
**emailed** 42:13 54:7,8 54:14 65:9
**emails** 36:17 39:3,5 43:8 46:18 131:5 142:25 161:5,8 169:11 202:10,23
**emanated** 101:6
**Emanuel** 2:10 4:22 5:13 112:2
**emanuel@sagelega...** 2:11
**employed** 142:13
**employee** 38:5,9,10 41:25 42:3 43:16,17 43:20 44:6,17 46:15 47:10 52:17,18,24 55:3,8,18,23 56:12 56:18 57:5,11 58:8 58:12,16,19,25 60:21,24 62:5 63:4 63:7,18,20 64:14 65:11 67:17 68:9 72:21 74:9 75:20 77:2 81:12 86:2 88:20,21,23 90:4,14 99:20 108:13 111:19,20 132:10 135:2 138:12 148:10,11 149:5,12 154:7,13,14 158:23 159:24 174:18 186:7 202:20
**employee's** 45:6 54:5 54:24 61:3 114:23
**employees** 12:10,13 22:7 28:3,4,7 35:6 35:14,16 36:5 37:10 39:3,8,12 40:4 44:15 45:2,25 47:2 50:18 56:8 57:20 58:5,23 61:4 62:2,6 62:8,17,25 65:5,18 65:21 68:6 73:22 74:4 75:14 81:18,25 82:7 85:20 99:17 100:6 108:16,23 112:19,23 113:2 114:12,17,25 127:3 132:17 136:23 139:12,22 140:13 140:19,22 142:21 143:6 152:12 153:4 153:8 157:17 161:6 161:10,16,20 167:17 168:2 175:6 175:10 180:6,10 202:11
**employees'** 45:12,15 113:5 144:10
**employer** 35:13 93:3
**employers** 22:5
**employment** 85:9 86:3 87:20 103:15 104:16 107:3,11 113:25 114:3 118:8 119:11 122:9,14 133:24 196:16
**ended** 18:21 78:3
**enforce** 44:24
**engage** 35:20
**ensure** 7:21 116:22
**ensuring** 116:16
**enter** 94:17 109:21 110:16 202:14
**entered** 8:4
**entering** 110:19
**entitled** 6:9 65:19 149:7
**entity** 9:8
**entrance** 94:14,17,24
**entries** 53:22,24 183:23 184:5
**entry** 39:11 54:2,5
**envelope** 77:15,23 79:19 80:6,14 187:18 190:7,8
**envelopes** 77:23 78:17,22,23 172:10
**equipment** 110:19
**ERRATA** 204:4
**error** 46:6
**errors** 171:12
**ESQ** 2:10,18
**essentially** 17:23
**establish** 68:8
**establishment** 14:24
**estimate** 29:17 30:15
**et** 4:12,12
**evaluation** 84:6
**evaluations** 84:9
**evenings** 92:22
**eventually** 96:6
**everybody** 110:5 143:5,12,15
**everyone's** 142:24
**evidence** 174:17,22 187:14
**exact** 75:11 189:2
**exactly** 20:10 28:13 40:22 45:19 178:18 182:13 183:2 188:23
**examination** 5:4,10 200:3
**examined** 5:8
**example** 37:13,18 55:19 165:24 166:3 172:22 175:16
**examples** 38:8
**exceeding** 32:14 128:12
**excess** 32:7 81:15,20 82:2,8
**exchange** 197:15,18
**excited** 38:21
**exclusive** 35:11
**exclusively** 36:6 46:3
**Excuse** 109:15 159:23 173:8
**exempt** 64:15
**exemption** 64:18

**exhibit** 60:18 112:13 150:6,10 151:9 154:23 155:25 159:15 160:21 161:24 164:14,18 166:13 167:11 168:7 169:16 179:7 180:20 182:5 185:7 185:8 186:13,14 192:8 193:16 194:21 197:10 200:9,12,13,15,16 200:17,19,20,21,22 200:24 201:7,10,12 201:13,14,15,16,17
**exhibits** 149:23 150:8 200:7
**existed** 130:21
**existence** 155:14
**Expansion** 34:18
**expected** 71:7
**expense** 74:10 80:20
**expenses** 32:8 51:3 73:22 74:5,21 76:18 76:23 78:7 80:22 116:8,12 176:3,21 177:2,4,6,14
**experience** 39:18 40:13 65:23
**explain** 9:12,18 23:12 57:25 93:24 115:22 130:8 138:20 165:2
**explaining** 157:14
**extent** 42:16 192:2
**extra** 77:22 105:20 198:5

**F**

**F** 1:20 203:8,22
**face-to-face** 98:3
**fact** 151:18 161:13 177:22
**failed** 56:23 57:12
**failure** 123:5
**fair** 10:9 11:23 12:7 12:12 23:8,10 24:19 28:2,5 29:4 32:22 34:24 36:15 47:8,16 56:18 65:18 84:25 92:21,23 107:8 109:2 113:19,23 116:7,10,15 117:21 118:18 119:14 120:22 124:20 126:4 133:23 134:3 134:5,15,17,21 135:13 136:19 139:3,10,14 140:25 141:3,9 142:20 147:6 149:11 160:13 161:4,18 164:6 167:24 168:4 176:5 191:4,6,12 194:5,8 196:4 197:20,24
**fairness** 141:23,25
**fairs** 27:20
**false** 136:5 175:4,9 175:11,13
**familiar** 77:6 81:14 112:14 113:24 125:25 148:19 150:18 155:2 158:18 161:8 162:2 169:18 182:8
**family** 132:16 134:7
**fancy** 150:23
**far** 95:20
**fashion** 9:7 14:25
**fast** 38:21
**favorite** 132:21
**Feb** 70:18
**federal** 5:4 114:4
**feel** 37:23 38:2 87:6
**feels** 125:19
**fees** 122:16,20,24
**feet** 147:7,8,12
**figure** 155:20 174:10
**figuring** 157:21
**file** 108:24 122:8 123:5
**filed** 86:16 113:25 114:4 117:12 118:4 118:5,9 122:14 123:21 144:25 155:17 169:20,24 191:19
**files** 123:11
**filing** 3:4 108:20 122:13,20 130:20
**fill** 9:23
**final** 12:14,18,23 47:9 165:7,9
**finance** 117:5 122:11
**financial** 13:7
**find** 27:3 103:23 119:20,24
**finding** 145:6
**fine** 86:24
**finish** 6:20 7:19,22 56:22 134:17
**finished** 143:9
**fire** 11:7 68:6 100:10 100:12,16 101:3,6 101:13,17 102:14 102:17 103:16,19 108:12 110:4,16,19 111:8 202:14
**firm** 8:8
**first** 5:6,23,25 6:20 7:15 13:12 15:10 18:13 19:20 22:17 27:4,7,12 28:3,6 34:7 35:17,18 51:12 67:5,12 68:12 70:9 88:7,23 90:6 100:15 111:19 117:15 118:8 120:12,15 121:14 127:10 151:10 164:7 167:13 171:14 182:13 198:3
**Fitch** 16:15
**five** 21:2 32:13 59:13 194:11 198:10
**five-minute** 59:17 181:5
**fixing** 46:10
**floor** 2:15 17:18
**focus** 153:8
**follow** 30:21,25 32:21 39:6 42:16 110:17 120:6 122:6 133:5 135:2,25 169:12 188:13 192:5
**followed** 78:19,20 168:12,17
**following** 43:3 55:20 71:19,21 172:9 185:20 189:16
**follows** 5:9
**foolproof** 57:6,7
**foot** 18:17
**force** 3:13 6:3
**forces** 44:25
**foregoing** 199:15
**forget** 176:24
**form** 3:7 10:16,22 12:9 22:18 32:9 33:14 35:7 37:2 38:6 48:6 56:25 57:3,16 65:19 72:4 116:18,24 118:20 119:2,7 122:10,17 127:8 132:14 136:11 137:2 144:17 145:12 146:23 149:14 158:23 159:23 160:5,15,17 163:24 172:4 182:15 194:24 196:9 197:23 198:11 202:5
**formal** 9:14 144:23 150:24
**formed** 196:5
**former** 175:6,9 202:15
**forming** 18:14

**forms** 195:4 196:11 196:12,15,21
**forth** 6:16 147:23 203:12
**forwarded** 156:21
**found** 103:22
**four** 15:10 32:12 53:6 182:13
**four-digit** 53:7
**Fox** 13:11,12
**Foxboro** 5:5
**free** 199:6
**frequent** 172:14
**frequently** 172:11
**Friday** 24:23 183:8
**Friday/8th** 163:3
**friendly** 166:25
**friends** 132:16,19
**front** 6:4 30:17,20 73:20 128:10,24 150:14 172:24 176:23
**full** 7:18 9:2 102:17
**full-time** 88:19,21,23 91:16,20 93:18 116:11
**fully** 93:8 107:17
**functions** 92:13,15 92:17
**funded** 47:13
**funds** 49:20 74:10 114:12,22 115:2,5
**furnishings** 14:12
**further** 3:6,10 199:3 203:15

**G**

**G-R-O-T** 138:9
**G-U-S-T-O** 45:22
**garments** 19:21 20:4 174:3,11
**gas** 105:20
**gather** 163:10
**gear** 110:23
**general** 10:21 38:2 152:18
**generally** 7:18 12:7 23:14 35:5 39:7,11 45:11,14 49:10 63:14 64:24 73:21 81:4 82:19 99:17 104:15 136:16 152:4 153:6 157:17 159:3 161:5 165:16 167:25
**gestures** 6:15
**getting** 38:20 90:17 107:3 179:21 180:2 180:7,11 185:14,22 186:10 197:21
**girl** 97:5
**give** 29:16 30:18 32:10,15 36:22 37:11,18 48:23 90:19 125:2 139:25 140:6 142:10 158:23 170:12 172:22 175:16,19
**given** 53:7 77:10 84:19 139:21 149:6 168:23 203:14
**gives** 161:19
**giving** 30:14,16
**go** 5:24 13:22 14:5 15:21 21:4 29:11 31:11 37:2 39:20 52:19 57:4 59:8 62:13,21 66:22 97:5 97:8,11 98:25 104:22 109:13 110:5,7,8,9,24 111:4,12 119:13 122:5 123:12 124:24 127:7 132:15 134:17,19 140:23 144:18 154:22 159:13 169:6 172:5 173:22 176:10 181:6 191:22 198:23 199:7
**goes** 52:24 123:14 176:17
**going** 6:21 27:13,15 32:20 36:12 37:11 42:14 56:3 97:11 102:3,4 103:21 110:14 111:24 112:3,6 144:16 150:7 155:22,23 166:20 169:10 178:19 183:22 190:3 194:11 202:9
**Goncalves** 1:5 4:11 5:13 12:4 47:20 48:10 53:16 66:21
**Goncalves'** 47:24
**good** 4:5 5:12 6:19
**goods** 50:16
**Google** 95:23
**government** 114:5
**grab** 104:8
**graduated** 14:3
**great** 74:17
**greater** 66:4
**gross** 32:6,7,13 176:7
**Grot** 138:8
**ground** 5:24 20:9
**grounds** 179:10
**group** 157:23,24 158:11
**Grushkovskiy** 2:23 8:4,7
**guess** 6:8 80:10 107:10 121:16 184:22
**guidance** 64:23
**Gusto** 45:22

**H**

**H** 5:2 200:6 201:4
**half** 24:3,4 60:21 61:4,6 62:15,18 68:20 81:15,20 82:2 82:7,15,16 95:24 102:8 142:23 143:16
**Hamptons** 141:13
**hand** 66:3,4
**handle** 46:20 50:7,10 92:12
**handled** 28:7 122:2
**handles** 28:10 45:17 46:3,4 50:8
**handling** 28:8 91:19 113:16 118:11
**hands** 147:7,8,22 187:15
**happen** 37:6 58:10 58:14 75:3 79:23 80:25 105:6
**happened** 54:11,12 54:18 55:3 78:22 89:25 104:17 119:20,24 146:2
**happening** 117:20,22
**happens** 46:19 56:11
**happy** 30:21 84:20
**hard** 41:18
**hate** 181:4
**head** 6:15
**health** 110:4 176:8 176:15
**hear** 148:21
**heard** 72:5 98:19 99:2,4 104:19 149:9 170:16,17,21 190:20,21
**hearing** 170:24
**hearsay** 86:14 135:9
**held** 1:18 104:25 109:14,17 185:3 194:18 198:24
**help** 12:10 88:15 110:11,13 121:17
**helped** 102:18 160:14 164:3
**helpful** 53:21
**hereinafter** 5:8
**hereinbefore** 203:12

**hey** 41:13 42:3 46:16
**high** 13:20,22 14:5 140:24
**higher** 39:24
**highest-ranking** 47:17
**highlight** 155:23 183:10 184:10
**highlighted** 152:5 171:2 183:24 184:3 184:5,18 185:12 190:19
**hire** 35:6,12,13,16,22 39:17,23 40:21 43:24 53:8 68:5
**hired** 28:7 35:17 41:3 41:5,15,25 43:12,16 48:2 53:19 67:2,8 67:11,13 88:5,11 89:7,10 90:3,16 100:9 108:4,6,8 147:9 174:12 186:6
**hires** 135:12
**hiring** 35:20 39:16 41:8,19,20,22 42:12 70:7
**Hmm** 134:18
**hole** 188:13
**holiday** 105:14
**holidays** 174:14 197:21,25
**home** 14:12 55:23 93:21 94:7,9,10,13 94:16 95:14,17
**Honestly** 89:18
**hooked** 75:23
**Hopefully** 7:19 120:20
**hoping** 96:2
**hotel** 34:21
**hour** 24:3,4 48:10 52:21 60:21 61:4,6 62:15,18 63:20 64:7 68:19 75:12 89:2 95:23 96:3 106:3 131:3 142:23 143:16 149:7 156:16 157:8,12 179:13
**hourly** 47:25 66:2 67:12 88:16 89:3 90:18 156:16 159:25
**hours** 44:20 45:7 46:12 54:18,21,22 54:24 55:16 56:15 56:16 57:9 58:13 61:3,7 63:19 65:16 65:24 68:2 70:11 73:9 81:15,15,19,20 81:20 82:3,8 83:2 89:15,17 95:22,22 95:24 97:3 107:3,4 107:9,14 110:12 129:23 130:23 131:2,8,9,12 144:10 148:20,23,25 149:5 149:6,13 157:13 179:11,16,21 180:2 181:17,18 182:13 192:18
**Hours/Corrected** 182:2,6 201:10
**house** 95:3,12
**husband** 100:23,25

**I**

**ID** 193:20 194:2
**idea** 138:7 162:14 163:7 175:19 184:17 194:2
**ideas** 12:16
**identification** 150:12 156:2 159:17 160:22 161:25 164:20 166:14 167:12 168:8 169:17 179:8 180:22 182:7 185:9 186:15 192:9 193:17 194:22 197:11
**identified** 126:19
**identify** 4:17 13:8 86:8 137:11 152:4 153:6 174:3
**identity** 120:2
**IDs** 194:10
**implemented** 78:19 80:21
**improper** 59:23
**in-house** 31:8
**in-store** 30:5 33:6,9 34:3 75:22
**inception** 117:22 120:24
**incidentals** 171:18
**included** 158:16
**including** 86:19
**increase** 125:9,21
**incurred** 73:22 122:19
**India** 20:6,12,13,15 20:18,20,25
**indicating** 110:15 202:13
**indirectly** 131:18
**individual** 77:13 99:7 103:10 139:15 153:13 154:8,12 171:13
**individually** 126:6
**individuals** 13:8 110:15 170:15,17 170:21 202:13
**industry** 18:7
**inflammatory** 175:12
**inflate** 171:5
**inflated** 129:3,13,16 129:17 130:22 131:13,22
**inflating** 130:16
**inflation** 129:10 131:6
**influx** 131:8
**inform** 40:18
**information** 33:15 120:5 121:11,25 122:5 144:14 171:3 202:15
**informed** 198:21
**informing** 169:4
**infrequent** 56:2
**infrequently** 98:25 105:2
**initial** 88:14,16 154:24
**initially** 88:25 89:10
**inside** 29:10,22 30:8 30:10 31:2,16,17 63:2 66:9 94:10 101:7,10
**instance** 74:8 147:3
**instruct** 10:18 25:13 86:17 109:21
**instructed** 56:14 58:16,19 65:4,11 97:5 109:20
**instruction** 56:4 59:24 86:21 87:12
**insurance** 101:13,16 101:19,23 102:2,9 102:12,18 108:13 108:17,20 109:25 123:4,6,9 124:11,18 155:8,9,13,13
**interest** 122:16,20,24
**interested** 203:17
**interfere** 137:16
**interfered** 136:17 137:6
**interference** 127:3 138:16
**Internal** 117:3
**internet** 135:11
**interrogatories** 150:11,17,23 154:16 200:10
**interrogatory** 22:23 28:18 120:7 122:7

136:2 152:3 153:5
**interrupt** 41:16 143:8
**interview** 35:24 36:2 85:23 96:19 97:7,9 97:17,19 98:16
**interviewed** 48:12
**interviewing** 58:12 85:19,20 96:13
**interviews** 96:23 97:2 97:17,23
**introduced** 164:8
**inventory** 33:14,21 104:2 174:6,16
**involved** 60:13 69:11 117:7 120:23 121:3 121:15 124:9,15 147:11
**involvement** 28:12
**iPad** 52:20
**issue** 12:22 49:11 51:12,18 89:21 169:12
**issued** 49:17 69:3 101:19 194:24
**issues** 36:10,11 59:5 73:12 75:7 161:15 177:22
**items** 31:15

**J**

**J** 199:11
**Jamaica** 2:7,8
**JAMES** 1:11
**Jane** 136:9,13
**January** 70:18
**Jersey** 13:23
**Jim** 1:11 13:10 26:20 28:10 40:3 43:14 47:21 51:16,16,24 53:11 55:2 59:6 60:12 61:8 63:21,22 64:20,21 66:18 67:4 67:20 68:22,25 69:5 74:20 75:18 77:5 81:2,7,21 82:14 85:4 88:6 91:9,22 92:15 93:11,16 96:17 102:24 113:18 116:11 118:12 139:15 153:16,18 156:9 163:20 166:9 168:20 173:25 194:4 196:22
**Jim's** 158:4 191:6
**job** 6:19 58:12 83:17 93:7,8,9,13,14,15 93:18 94:3 96:5 100:9 116:11 147:9
**jobs** 17:16,22 94:3
**JOHNSON** 2:14
**joined** 8:7 158:7
**joining** 75:20
**joke** 120:18
**judge** 6:4
**July** 136:9 169:15 178:21 183:8,23,23
**June** 167:10,10
**junior** 173:16,17

**K**

**K** 2:18 4:1 5:1,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1
**Kataev** 2:10 4:22,23 5:11,13 8:6 22:22 28:17 30:21 32:17 39:2 41:17 42:14 59:10,13,16,18,23 87:16 91:7 104:5,10 104:14,24 109:18 110:14 112:5,11 120:6 122:6 132:4 133:4 134:24 135:25 145:13,19 145:22 149:2,22 150:2,5,13 155:19 159:13,18 160:19 161:22 164:15 166:11,15 167:8 168:5 169:10 170:4 178:10,14,18 179:2 179:6 180:14 181:6 181:11,21,24 185:2 185:6 186:12 189:9 192:2 193:14 194:11,17,19 197:8 197:17 198:23 199:3 200:4,7
**keep** 34:20 65:15 75:17 95:12 103:17 103:22 116:6
**kept** 76:8 172:24
**Ketcham** 1:5 5:14 12:4 47:22 48:16 53:17 87:24,25 194:21,24 197:19 201:16
**Ketcham's** 48:20
**kind** 124:14
**knew** 134:3 158:7
**know** 6:21 7:8,9 8:2 12:6 14:19 15:25 16:22 22:9 23:12 25:8 28:10 32:12 41:18 51:12,14,16 51:16,17 54:4,11,12 54:17 56:4,5,15 57:10 60:16,25 61:13,14 63:11,23 64:2,6,10,14,25 65:7,10,13,17 66:21 66:23 67:22,25 68:24 69:3 70:4

74:6 77:9 81:2,6,23 81:25 82:7,8,13,15 82:16,17 83:8 87:25 89:2 91:24 93:6,7 93:12,13,16,19 98:6 98:7,13 99:3,5 101:4,6 102:24 105:9 111:18 112:22,24 113:3,8 113:11,14 114:7,9 114:24 115:6 116:14,25 117:19 118:2,2,10 119:17 119:21,25 120:4,17 122:8 123:2 125:7 126:11 127:14,22 128:3,15,22 131:6 132:12 133:10 135:11,22 137:22 144:12,19 146:3 149:12 154:4 155:11,24 156:6 157:13,16 159:3,9 159:11 160:18 161:7,12,12,14 162:4,10,13,23 163:14,24 164:9,23 164:25 165:4,11 166:17 167:5,7 168:9,20 169:5,8 173:18 176:9 177:3 177:11 178:3,8,8 183:4,11 184:3,9 185:11 186:9 187:2 187:6 195:6,7,8,9 195:11 196:13,14 197:3,13 198:12
**knowing** 39:23
**knowledge** 7:9 9:22 24:21 28:6 53:25 58:7,11,15 60:9 64:21 66:2 69:20 76:25 78:18 81:8,13 81:18 82:12,24 83:3 83:4,13,23 84:2 85:25 86:4,11 87:2 87:23 89:20 91:10 91:12 96:22 97:2,13 97:14 98:12,24 99:22,23 100:4,15 101:2,11 110:18,21 110:22 113:4,7,8,9 113:10 117:6 118:7 136:13 138:14 144:4,6,8 145:8 161:9 165:16 187:13
**knows** 60:12 143:12 143:14
**Kristin** 1:10,11,18 4:11,12 5:10,16 9:3 9:11,16,25 10:3 13:10,12 21:22,25 22:6 27:4 28:2,21 116:20 120:23 146:11 158:19 196:5 199:18 200:4 203:11

**L**

**L** 5:2
**label** 18:16
**labeled** 159:20
**labor** 64:23 124:10 124:16
**lack** 50:20 114:11,21
**lacked** 115:2,5
**ladies'** 59:9
**landlord** 51:13 101:23 107:16
**late** 50:18 55:6 72:8 72:13 99:18 122:20
**Lauren** 15:8,18
**lawful** 5:3
**laws** 64:23
**lawsuit** 22:15 85:11 86:16 87:3 130:21 135:10,15,18 144:25 155:17 202:22
**lawsuit's** 136:22
**lawyer** 126:18 127:7 127:12 128:6,17,21 132:13 138:18
**layman's** 86:20
**lead** 85:5
**learn** 100:16
**leave** 17:15 55:6 62:9 62:12,14 77:21 86:3 140:13 183:3,5
**leaves** 63:4
**leaving** 16:25 52:21
**led** 84:25 85:3,4,4
**left** 27:14 56:19 79:20 85:8 87:20 96:9 108:4,7 149:17 177:10 191:21
**legal** 2:6 4:23 9:14
**let's** 36:22 39:7 42:18 87:24 100:10 104:10 125:24 142:13 143:9 150:9 155:19,21 159:13 160:19 161:22 164:15 166:11 167:8 168:5 169:13 176:24 179:6 180:14 181:6 186:12 197:8 198:23
**letter** 41:11
**letters** 40:21 41:4 123:10
**level** 39:11
**levels** 66:14
**license** 21:13
**licenses** 21:11
**life** 11:18 17:15
**Lightspeed** 33:13,15 33:21,23,25 35:3 52:10,25 53:12,14 53:18,20 80:18 146:6,7,10,25 147:4 180:18,20 182:2 201:7
**limited** 167:25
**Linda** 138:4
**line** 18:16,22 19:5,10 19:21 32:8 184:13 184:18
**lines** 38:11
**listed** 128:7 196:9
**Listen** 185:17
**listing** 167:16
**little** 38:20,24 74:22 78:11 91:5 120:18 125:14
**live** 92:3 94:18
**lived** 93:21,23 95:21
**living** 116:8 196:4
**LLC** 1:10 2:6 4:23 5:17 9:11,17,25 10:4,7 21:23,25 22:6,18 27:5,12,14 28:3,22 116:21 120:23 121:4,7 146:11 196:6 202:5
**location** 10:15 11:5 11:11,21,24 34:10 34:12,20,22 36:4,10 44:7,8 51:7 55:20 55:21 69:10,12 70:12 95:20 96:7 102:3,6,11,15,23 109:4 111:11,16 124:5
**locations** 11:17,24 27:11,23 34:25 35:2 44:9 61:17 67:10 98:5 105:5 107:18 111:14 146:25 167:22
**lock** 73:15,18,19 95:6 95:10,11
**lockbox** 78:24
**locked** 79:25 80:4 94:20,23 95:3,8,8 95:12
**Locks** 73:20
**lodging** 95:14

**log-in** 193:20 194:2
**logic** 177:13
**logistics** 157:7,12,15 157:17
**logo** 163:21
**long** 14:16 15:4,9,13 15:23 16:8,18 17:5 20:24 24:2 26:18 60:7 62:14 75:9 102:9 104:7 106:6
**longer** 14:19 16:22 19:18 34:23 35:20 104:17 197:2
**look** 22:21 28:16 29:18 30:12 67:14 123:13 127:13,20 127:21 128:10 133:20 134:23 135:20,24 136:6,15 138:19 147:17 154:22 155:19 158:25 160:5 161:22 162:24 170:25 171:10 172:15 174:21 175:3 180:14 182:12 183:12,13 188:5 189:2 191:16 191:16,18 194:9
**looked** 127:25 128:19
**looking** 23:15 31:21 35:15 96:13 129:19 151:10 176:14 189:20 190:18
**looks** 150:5 162:5 163:9 164:10
**lose** 111:10
**losing** 170:19
**lost** 87:5 138:15 174:9 176:19 177:13
**lot** 9:13 94:3 116:10 119:9 176:11 177:22
**love** 104:8
**LS** 112:13
**lumping** 192:18
**lunch** 60:21 62:9,13 62:17 63:4 104:11 143:3,12,15
**lunches** 61:5,6

**M**

**M-A-R-I-N** 99:8
**Madam** 87:16
**mail** 123:12,19 124:4 196:24
**mailbox** 124:8
**maintain** 177:6
**making** 12:18 46:20 74:4 131:13 171:8 175:8
**manage** 36:4 69:9 91:19
**management** 21:20 41:23
**manager** 36:21 41:7 41:13,14,15,19,20 41:20,22 42:2,5,6,8 42:9,22,23 43:12,22 43:24,25 45:9 47:19 53:9 63:11 65:4,10 67:9 68:14,17 69:7 69:12 70:8,9 72:14 96:7,12,15,19,21 107:5,12 142:15 157:2 158:12 160:12 168:19 171:12 193:25
**manager's** 42:25
**managers** 35:20 36:4 36:7,10 37:7 39:15 40:12,20 41:2 42:12 42:20 56:7 57:20 64:10 65:15 76:11 80:5 141:17 143:5 149:18 167:21 168:23 173:15 193:24
**Manhattan** 123:15 123:17 195:13,21
**manipulate** 171:5
**manner** 23:22 28:8 84:15 91:10 125:18 162:11 191:24
**manufacture** 18:25
**manufactured** 19:23 19:25 20:5
**manufacturer** 20:12
**manufacturers** 18:4 18:8,14 20:8,21
**map** 95:23
**Marie** 9:3
**Marin** 99:8 142:15 197:18
**marital** 25:14
**mark** 150:9 155:21 160:19 163:15 164:15 166:11 167:8 168:5 169:13 178:24 179:6 186:12 192:6 197:8
**marked** 111:23 112:13 150:12,15 154:23 156:2 159:14,16 160:22 161:25 164:14,19 166:14 167:12 168:8 169:17 179:8 180:21 181:25 182:6 185:9 186:15 192:9 193:17 194:22 197:11
**marking** 185:6 194:19
**marriage** 203:17
**married** 120:15
**matter** 4:11 86:19 157:25 203:18
**matters** 178:15
**meal** 62:6,9 142:23 143:16
**mean** 8:3,20 9:12 12:20 23:13 31:13 35:13 37:25 40:9 41:20 49:12 57:7,23 58:24 60:16 95:10 95:23 107:10 115:12 130:2 145:14 154:17 170:13 177:3 191:20
**meaning** 43:19 152:19 177:25
**means** 115:16 116:8 144:19 190:10
**measure** 37:15
**medicine** 8:17
**meet** 23:15 24:5 97:5 176:3,20
**meeting** 23:23,25 24:2,5,9 25:15,17 74:24 75:5,10,15,21 76:2
**meetings** 24:11 74:23 75:7
**member** 10:3 115:24 116:20 117:18 158:7 171:14 172:23
**members** 172:18 173:5,10,14,16,18 173:23
**memory** 8:23
**memos** 63:16
**mental** 8:13 176:8,15
**mention** 107:22
**mentioned** 133:12
**merchandise** 29:4 31:4,12,14,19,24 32:4 50:7,10,15 55:11 56:8 66:7 98:5 100:7 103:4 105:5 109:22,25 133:8 147:17,22 148:13 174:13,15 179:20,25
**merchandiser** 13:6 50:14 154:12
**merchandising**

154:11
**message** 197:18 198:2,8
**messages** 58:9 145:24 152:23 197:10 198:16 201:17
**met** 57:20 58:5 165:25
**Microsoft** 152:25
**middle** 140:13 198:3
**military** 182:14
**mine** 18:16
**minimum** 109:2 165:12,17
**minute** 181:14,19
**minutes** 60:8 62:16 104:9,9 106:8,8 194:12,12,13
**missed** 192:18
**missing** 82:22 99:18 145:9,16,16,17 163:3,8 174:4,7,11 174:15 187:12,14 190:13,23 191:2,3
**mistake** 117:19,21 118:3,13,15,17,19 118:23,25 119:6,9 119:10,15,16
**mistaken** 181:22
**misunderstanding** 117:11
**moment** 138:22 157:9 197:12
**money** 47:13 72:19 74:5 76:10,14 78:17 114:18 116:4 126:25 161:19 171:17,21,25 177:14 187:12,14 190:10
**monies** 101:20 128:8 131:21
**Montauk** 1:19 5:6 10:15,24 11:25 27:18,21 34:10,17 55:21,22,24 79:13 79:17,19 93:21 94:5 104:2 105:15 106:2 106:7 107:14,21 121:12 124:4 174:13
**month** 13:15 66:4 165:10 191:5,11
**monthly** 66:6 69:4 153:19,23 164:22 165:12,17 166:3,6 173:15
**months** 70:15 72:25 78:12,13 140:11,11 191:20,20
**morning** 4:5 5:12 77:19 100:18 183:12,15
**mortar** 10:13 11:14 11:24 27:8,10,16
**mouse** 189:15
**move** 16:16 55:11 56:8 87:24 105:4,4 109:21 125:24 131:17 147:22
**moved** 34:22 55:22 56:3,6 195:18,23 197:6
**moving** 166:19
**MTK** 5:17 9:7
**muffled** 124:14
**mule** 106:19
**mumbling** 6:15

**N**

**N** 2:2 5:2 200:2 201:2 202:2
**name** 4:5 5:12 9:2,4 9:10,11,14,15,16,20 9:24,25 13:9 66:24 77:25 80:14 98:15 121:9 138:8,10,12 159:25 193:24 202:5,6
**named** 98:19,22 99:2 99:7
**names** 170:23
**Natalie** 13:10 44:3 66:11,13,18 78:25 99:10 171:15
**nearby** 62:17
**necessary** 173:17
**need** 7:22 34:22 38:22 39:22 42:4 44:13 63:7 103:25 107:19 112:6 132:12
**needed** 55:21 57:9 60:22 63:5 73:24 109:24 169:8
**needing** 46:13
**needs** 54:14 92:7
**negative** 84:5
**neglected** 97:6
**neighboring** 101:9
**never** 11:13 17:19 22:9 23:9 42:8 54:3 57:11 62:25 65:2 72:8,21 74:7 80:22 89:25 104:19 108:11 117:12 118:5 120:18 121:18 122:14 123:10 124:19,21 125:16,21 158:3 182:10 184:24 193:5 198:4
**new** 1:3,19,21 2:8,16 2:16 4:6,14 5:6 13:23 14:15 15:3,15 16:4,11 17:7 19:22 19:23 29:6,7,10 30:2,11 31:4,5 51:13 74:25 75:2 78:15 87:4 100:21 117:4 124:10,16 141:10 142:21 192:21 197:6 203:4 203:10
**NIBI** 5:17 9:7
**NIBI-MTK** 9:10,15 9:24 163:16,22 164:18 200:17
**nice** 84:20 135:9 137:20
**night** 95:11 183:16
**nine** 140:7 141:2,5 167:19 198:13
**noncompete** 85:13,16 87:4
**nondisclosure** 85:14 85:16
**normal** 70:11 141:21
**Northern** 13:23
**Notary** 1:21 199:24 203:9
**notation** 162:24
**Note** 38:12 152:5
**notice** 1:19 111:20
**notices** 117:2,8
**noticing** 127:17
**November** 155:4 162:25 163:2 168:6 168:7 200:21
**number** 4:15 30:17 32:8,10 53:6 65:15 68:2 122:21 138:21 141:14,20 142:7,8 142:11,13 152:3 153:5 165:22
**numbers** 30:20,22 111:17 128:24 141:23
**numerous** 43:9 63:16 179:19
**NYS-45** 114:9

**O**

**o'clock** 104:10 183:15,16
**O-R-I-G** 163:2
**oath** 3:13 4:20 6:2,3 28:19 150:25
**object** 10:16,20 12:9 25:12 32:9 35:7

57:3,16 116:18,24 118:20 119:2,7 122:10,17 127:8 132:14 136:11 137:2 144:16 145:12 146:23 149:14 182:15 197:23 198:11
**objecting** 10:21
**objection** 4:18,25 36:25 38:12,23 59:21 71:24 72:3,6 127:6 145:19,20 172:4 178:16
**objections** 3:7
**observe** 62:6 92:5,9 92:19,24 148:11
**observed** 72:21 92:17
**obtain** 18:3,8
**obtained** 45:21 160:6
**occasion** 36:20 50:17 62:4 76:21
**occasions** 54:19 61:24 71:13 72:18 75:6 179:19
**occupation** 9:6
**occur** 84:12 96:23,24 97:3
**occurred** 60:2 71:16 73:6 97:4 100:12 119:15 135:23 154:2,5
**occurring** 130:17
**October** 100:12 102:14
**offer** 40:19 41:8,11 42:4 44:22 48:17 153:7
**offered** 40:8 41:13 42:2 45:2 48:12 65:22 136:25
**offering** 41:11
**offers** 192:17
**offhand** 111:18
**office** 17:17,19,22
**officer** 3:12
**official** 154:13,14
**offseason** 66:15 140:7
**Oh** 16:14 30:10 110:3 189:21
**Ohio** 16:15,16,25
**okay** 6:23 10:23 16:21 27:22 28:20 33:24 35:23 38:25 39:14 41:18 47:8 56:17 76:13 103:2 110:5,7 131:17 135:25 147:19 149:25 168:11 177:16 181:20 184:23 188:7 189:5 190:9 194:14
**old** 13:23 27:3 196:25
**omitted** 58:23,24
**onboarding** 65:25
**once** 53:22 68:3 75:3 75:4 76:2 80:24 84:13 98:6 123:18 195:16
**once-a-year** 75:9
**One-and-a-half** 95:22
**one-page** 112:13 167:9
**ones** 36:11,12 141:5,6
**online** 29:25 30:5,7 30:11 31:3 33:5,16 33:22 34:2 136:22 141:21
**oOo** 3:18
**open** 6:4 18:3 21:23 22:12 27:15 58:2 70:18,18 71:19 72:11 73:2 103:25 121:7 158:25 179:15
**opened** 19:12 22:17 27:4,7,18 34:9,10 34:13 71:8 120:12 189:10
**opening** 18:12 21:22 27:10 34:16 69:16 69:19,21
**opens** 183:15
**operate** 12:8
**operated** 11:12 34:25 70:22
**operating** 62:2 70:11
**operation** 121:15
**operational** 12:22
**operations** 28:12 47:18
**operator** 13:7,7
**opportunity** 19:4,11 19:13,14 25:3 160:4
**Opposite** 30:9
**order** 18:2,6 62:10 95:18 147:15 196:21
**ordering** 4:3
**Orest** 26:16
**ORIG** 163:2
**original** 163:3
**other's** 38:22
**outcome** 86:15 87:2 203:18
**Outline** 18:11
**outside** 29:5 30:2,24 31:4,5 37:14 44:18 44:23 45:3,20 49:17 58:13 62:23 75:21 76:8 90:25 91:3,5 91:13 97:3,9 101:11 101:11 135:18 202:8,22
**overpaid** 77:2
**oversight** 42:25
**overtime** 63:15,16,20 64:11,15,17 65:5,12 98:13
**owner** 9:8 10:6 22:2

**P**

**P** 2:2,2 26:16
**P-I-A-N-B-I-N-O** 138:4
**p.m** 58:3 71:12 72:20 72:22 104:12,13 150:3,4 181:9,10 183:3 185:4,5 194:15,16 198:25 199:2,9
**P1016** 194:20,22 201:16
**P1124** 197:9,11 201:17
**pack** 106:19 121:17
**package** 48:13,14
**page** 151:9,10,11,14 152:6 170:5 171:2 179:9 183:22 200:3 200:8 201:6 202:4
**PAGE/LINE** 204:6
**pages** 150:12 200:11
**paid** 45:25 47:10 49:25 50:2,4,18 51:3,11,23 56:24 57:13 63:20 64:8 67:25 68:24 74:10 75:14 81:12,19 82:2 82:7,12 83:2 88:25 98:10,14 99:14 102:16 105:10,18 105:21 108:13,16 108:20 113:2 115:5 116:10 119:9 121:18 122:25 123:2 131:2,5,22,25 132:3 144:11 153:10,13,14,19 163:9 164:22 168:17,22 179:21 180:2,7 196:16 197:21,24 198:4,9
**paperwork** 89:11,19 90:8,9,17 156:13
**paragraph** 170:6,25 171:11,16 172:9,16 174:18 175:3,22

179:9,18 180:5
**paragraphs** 174:2
**paralegal** 2:23,24 8:8
**paraphrasing** 105:3
**part** 35:24 36:2,3 46:7 85:4,4,5 96:18 100:8 113:15,17 118:17 119:14
**part-time** 28:5 88:15 90:4,21,22 94:5 185:16 186:7
**participate** 49:24
**particular** 65:15 86:13 157:25
**parties** 3:4 203:16
**party** 22:14 31:25
**passport** 21:14
**password** 193:20,24 194:6
**pay** 28:7 37:16 38:10 39:24 47:12 49:14 49:16 50:16 51:15 69:3 75:16 82:16 95:14 96:3 111:21 112:25,25 114:12 114:23 115:16 116:7,12 131:9,24 142:24 146:24 149:13 156:3,15 161:9 163:3,7 171:17 177:14 192:19
**paycheck** 46:6 115:9 115:13,16 116:4
**payday** 111:21
**paying** 116:13
**payment** 143:20 144:2 147:4 161:15 192:19,22
**payments** 50:7,10,11 114:17 115:4 162:6
**payroll** 21:17 28:12 45:15,17,20,24 46:4 47:14 50:21 51:2,15 54:25 64:3,6 65:15 81:24 82:4,6,13,17 82:20 90:25 91:3,5 91:13,20 92:13,14 92:16 105:13 107:23 112:20 113:10,12,13,20 114:12,20,22 115:4 116:16,19,22 117:5 117:12 139:7,10,15 139:19 144:5 145:9 181:25 182:5 201:10
**peak** 66:15 140:12
**penalties** 122:16,20 122:24
**penalty** 151:15
**pending** 7:15 104:6
**people** 12:16,19 13:4 13:5 18:23 30:2 36:7 38:21 43:5,15 52:14 55:11 66:9 69:19,22 75:2 80:5 96:14,24 103:16,19 108:9 124:25 125:3 133:8,10,11 140:23 141:2 142:3 160:10 168:19,21 170:15 175:15 180:13 182:22 188:12 197:24
**people's** 73:9
**percent** 10:9 29:15 30:7,7,10,11 40:12 40:14 41:14 42:2,5 132:18 141:10,16 141:18,19,24 142:6 142:7,8 156:17 157:15 158:12
**percentage** 29:9 40:10 68:21 77:10 142:2 158:11
**percentages** 40:18 41:8
**perform** 43:18 44:2 67:8 83:5 84:8 92:9 92:14 93:17 102:15 103:11 104:2
**performance** 84:6,9 84:13,15,19,21,22 85:3 107:25 165:13 165:17,22 166:4,7
**performed** 55:3 56:12 82:25 89:4 92:16,22 98:17 121:19 144:10
**performing** 22:4 90:20 92:19,25 96:5 162:11 166:24 186:25
**performs** 92:5 93:4
**period** 191:3
**periodic** 84:8
**perjury** 151:15
**permanently** 170:7
**permitted** 93:16
**person** 23:23 36:18 36:21 47:17 65:24 69:21,25 77:25 84:17 87:22 94:5 183:2
**personal** 7:8 116:12
**personally** 47:13,24 50:11 79:13 154:15 154:19,21 166:6
**petty** 73:24 74:2,3 76:5,22 79:6
**phone** 23:23 24:10 53:2 98:3 100:20
**phoned** 104:20
**photograph** 109:6,9
**photographing** 109:19
**photographs** 103:8
**physical** 8:13 49:14
**physically** 11:12 61:15,18,25 76:3 110:24 111:4,5 161:15
**Pianbino** 138:4
**pick** 31:20 55:8 62:17 74:16 78:21,25 79:2 79:20 80:2
**picked** 79:8
**picking** 105:20
**picture** 34:2
**piece** 33:22 174:13
**pieces** 174:7
**place** 42:9 58:22 65:8 162:20
**placed** 78:23 79:5 150:14
**places** 62:22
**plaintiff** 4:22 12:3 138:24 194:24
**Plaintiff'** 160:19
**Plaintiff's** 159:13 185:6 186:12
**plaintiffs** 1:7,18 2:5 5:3 130:14 136:14 144:22 153:8 169:10,12 192:3
**plaintiffs'** 111:24 144:15 150:9,10,11 150:15,17 155:21 155:25 159:15 160:21 161:22,24 164:16,18 166:12 166:13 167:9,11 168:5,7 169:13,16 178:20,20 179:7 180:14,20 181:21 181:24 182:5 185:8 186:14 192:6,8 193:14,16 194:19 194:21 197:9,10 200:8,10 201:6
**planner** 13:6
**platform** 32:2
**please** 71:20 87:17 155:24 156:6 164:14 168:9 178:17 186:19 187:6 192:15
**PLLC** 2:14
**plus** 80:20 188:22

**pocket** 105:19
**pod** 102:18,20,22 103:5 109:25
**point** 18:13 89:12 108:2 164:21 177:20
**pointing** 189:16
**points** 66:8
**policies** 42:7,9,11,15 65:8 68:12 202:12
**policy** 38:17 42:13 43:3,4,6,7 46:12 55:5 63:14,19 64:8 68:15 71:16,17 72:10 73:21 78:15 78:18 80:21 98:12 105:9 132:17,25 133:2,5 135:2 142:25 143:4 155:8 155:9,14 158:8,9 168:12,14,17 182:23 202:18,20
**pool** 77:13
**poor** 170:8,13
**pop-up** 11:15,20,23 12:5 27:11,17,23 34:5,7
**pop-ups** 11:16,18 27:20
**portion** 24:24 101:22 115:21
**POS** 180:18,20 201:7
**position** 17:17 46:2 49:23 67:8 88:14 185:16
**positions** 96:20 136:24,25
**possession** 31:18 146:20
**possible** 13:3,4 37:6 133:19 182:25 188:24 190:3 196:23
**potentially** 60:24
**poured** 116:5
**practices** 143:20 144:3 157:12
**pre-summer** 74:22
**precise** 142:5
**prepare** 23:11,13 24:6,12 25:17
**prepared** 19:21 118:24 119:5 172:10 195:4
**preparing** 124:9,15
**preseason** 75:5,9 76:2
**presence** 92:10
**present** 2:3,21 9:6 19:11 24:11,24 40:22 61:15,18,21 61:25 62:2,4,5,12 84:22 137:23 148:9 148:10
**presented** 19:4,13
**pressure** 65:14
**presumably** 31:15
**pretty** 142:20
**prevent** 65:4
**preventing** 65:11
**previously** 11:4 22:9 34:6 111:23 118:5 122:14 151:10 154:23 195:16
**price** 66:8
**prices** 66:7
**prior** 17:22 21:22 22:5 27:10,23 28:15 72:19 85:19 101:25 102:13 111:5,6,7 119:16,19,23 120:3 120:8 121:22 130:20 134:2 176:6 202:16
**private** 18:16
**privilege** 25:14
**privy** 173:15
**Probably** 66:20
**problem** 173:13
**procedure** 5:5 77:17
**procedures** 139:4,5,8
**proceed** 27:13
**proceedings** 199:8
**proceeds** 101:23 102:2,10 108:14,17 108:20
**process** 18:11 31:7 35:24 36:2 45:21 50:11,12 52:16 84:11 96:2 176:9
**processed** 54:25 101:16
**processing** 33:11 192:25
**procured** 20:8 171:18
**produce** 145:3 166:22
**produced** 42:16 136:8 146:20 159:19 163:13 180:16
**producing** 39:5 144:13
**product** 50:6
**production** 30:23 32:20 39:2 42:15 133:5 134:25 144:23 145:16 169:11 192:4 202:10,12,19,23,24
**products** 29:2,9
**professional** 1:20 4:8 203:9
**profit** 115:21
**profits** 165:19
**program** 32:24 77:7 163:17 164:7,19 200:18
**progress** 90:18
**promised** 89:6
**prompted** 17:11 67:19
**properly** 42:22,24
**prospective** 136:23
**protective** 110:19,23
**protocol** 37:14 38:3
**provide** 7:25 8:10 53:9 101:22 112:18 156:12
**provided** 112:22 113:2 161:10 194:6
**provider** 90:25 91:3 91:7,13
**provides** 53:10,11 193:20
**providing** 7:7 23:17
**provision** 165:5
**PTO** 184:19
**public** 1:21 173:3,21 199:24 203:9
**publicly** 136:22
**pull** 16:19 116:4
**pulls** 33:20
**purchase** 29:10 174:19
**purchased** 29:5 74:14
**purchases** 33:22 66:12 74:4 76:23
**purchasing** 132:18
**purpose** 20:17
**purposes** 60:14
**pursuant** 1:19 5:4
**pursue** 19:9
**pursued** 126:5
**pursuing** 19:6 126:9 126:15
**put** 52:20 68:3 69:13 74:2,11 77:21 78:2 78:2,24 80:14 102:18 103:4 109:25 115:11 144:20 173:2 185:15

**Q**

**qualified** 87:14
**qualifying** 165:5
**quantification** 142:2

**quantify** 133:16 138:20,22 141:20 148:4
**quarter** 118:7
**quarterly** 114:5 119:11 122:9 196:16,20
**question** 3:8 6:20,25 7:3,14,15,25 8:9 10:22 18:5 19:8,9 21:8 22:23 25:12 26:4,6 28:9,15,18 28:19 33:2 38:7 40:25 41:6,7,17,24 48:9 56:22 59:8 60:3,4,18 64:2,4 66:20 81:3,22 86:22 86:25 87:15 91:2,23 91:25 93:6,10,20 104:6 105:5 111:22 114:15,20 115:14 125:11,12 127:9 129:5,8,9,14,21 130:7 132:2,5 139:7 141:25 144:5,7 145:12 146:14 147:14 167:13 168:21 169:5,23 176:17 177:12 178:5 185:12,13,18 185:19,20 186:8,9 189:6 190:3 191:13 192:24 193:23
**questions** 8:10 23:14 73:6,11 95:25 107:23 131:16 143:9 150:23,24 178:17 192:15 199:4
**quit** 96:4 140:13,15 140:17
**quite** 20:2 96:14 111:13 123:2 146:12 166:5 195:25

**R**

**R** 2:2 5:2,2 199:11
**rabbit** 188:13
**raise** 48:21,22,23,25 49:2,3,4,8 84:20 88:22,23 90:12 124:24,25 125:2,4,6
**raised** 88:18 89:21
**raises** 125:16
**Ralph** 15:8,18,19,20
**range** 21:2 29:15 39:13,16,21 122:22 139:25
**rate** 47:25 48:4,11,13 48:14 49:8 67:12 88:16 89:3 96:3 111:21 156:16 159:25
**ratio** 30:4,13,18 111:15
**raw** 180:18
**reach** 47:3,5
**reaches** 47:4
**read** 87:16,18 132:4 132:6 138:2 156:6 166:17 168:9 185:10 186:19 187:6 192:10,15,16 197:12,14 199:14
**ready** 71:11 196:15
**realize** 46:25
**really** 42:4 51:15,16 62:22 94:3 103:9,25 106:9 121:5 128:9 129:14,25 133:13 141:20 142:10 168:19 169:5 183:20
**reason** 7:14,24 8:9 34:15,19 46:17 51:22 90:23 153:21 153:22 154:4 183:20
**rebuild** 102:8
**rebuilt** 107:7
**recall** 11:19 12:6 14:18,21 15:5,14,24 16:9,19 17:6 19:15 22:13 26:7,24 27:25 28:16 29:11 34:14 36:23 37:3,5 38:14 41:9 48:20 50:19,20 53:14,16 55:25 56:10 60:25 65:3 69:25 70:7 73:8,13 73:16,17 74:6 75:8 75:11,13,24 76:4 78:13 88:11,24 90:2 92:20 93:2 95:4,10 103:6,7,9 105:12,16 106:4,12,14,24 109:11,23 119:13 120:10,14 121:6,11 122:4 133:13 134:5 138:10,13 145:6,7 148:15 149:10 151:5 157:3 160:14 161:21 162:9 175:21 180:3,12 183:19 187:2,16 191:25 193:3,11,13 197:7
**receipt** 74:2 80:16,17
**receipts** 77:24 78:6 78:17 80:20,23 172:6
**receive** 22:24 40:5,12 40:13 50:16 84:5 89:9,16 90:6,15 110:7 111:20 115:7 115:13,15,21 117:2 123:24 124:4 144:22 149:13,20 165:7
**received** 25:5 47:12 65:24 88:22,23 89:3 101:25 102:12 123:10 124:19,21 125:17,22 131:23 132:7 145:5 185:11 198:16
**receiving** 89:23 102:9 196:24
**recess** 59:14 104:12 150:3 181:9 185:4 194:15 198:25
**recognize** 151:21 178:22 180:23
**recollection** 6:10 89:20 102:16 128:13 151:2 153:18,25 160:5 193:2,8
**reconcile** 191:13
**reconciliation** 172:8 172:9
**record** 4:18 8:6 9:2 59:2 66:21 87:18 104:23,25 109:13 109:14,16,17 112:12 124:25 125:8 131:20 132:6 161:25 170:4 178:13 181:7 185:2 185:3 189:15 194:17,18 197:17 198:23,24 200:16 203:14
**recorded** 72:3 105:7 112:8 146:25 147:2 147:4
**recording** 128:25
**recordings** 162:5
**records** 32:23 45:12 45:15 83:6 145:9 171:5 172:15,24 181:16 182:17
**recover** 103:4
**rectangles** 162:15
**red** 162:14 184:12,18
**redirect** 199:5
**reduce** 37:16
**reduced** 107:9
**reducing** 38:10
**refer** 5:15,16 26:20

49:5 53:5 63:21 67:20 68:22,25 69:5 70:5 75:18 77:5 80:17 89:18 90:7,9 90:11 91:9 127:12 128:5,20 132:13 138:18 153:16 168:20
**reference** 165:12
**referred** 76:5 88:13 106:19 156:24 160:8
**referring** 25:25 26:2 42:24 43:11 49:6 53:6 66:9 70:4 79:11 80:18 90:10 102:20 152:22 157:11 164:21 174:2 181:15 184:12
**refers** 96:16 157:17 164:22
**reflect** 8:6 112:12 170:4 181:16 189:9 189:15
**reflected** 59:2
**reflects** 167:14,16
**refresh** 128:13 151:2
**regarding** 202:23
**regardless** 68:2 93:15 97:15
**register** 76:9,9,18 77:20,21,21,25 78:3 78:15 127:19 128:4 171:17,22 172:2,6 172:25
**registered** 1:20 4:7 163:21 203:8
**regular** 4:4 143:5 148:7
**reimburse** 74:9,18
**reimbursed** 74:17 153:7
**rejected** 45:6
**relate** 135:14
**related** 50:6 203:15
**relates** 129:10 136:14 136:18
**relation** 102:22
**relationship** 20:7,11 45:22
**relationships** 18:4,8 18:14 137:14,16 138:17
**rely** 12:13
**remained** 142:7,13
**remember** 89:14 95:7 120:19 122:21
**remit** 114:22
**remitted** 116:17,23
**Remote** 1:17
**remotely** 4:20 5:7 203:13
**reopen** 102:3,4,5,10 103:13
**reopened** 108:11
**repair** 192:18
**repeat** 18:5 31:23 38:8 86:25 87:15 103:18 148:22
**repeated** 175:4
**rephrase** 7:2 8:2 11:13 19:7 41:24 48:8 109:8 130:7
**replace** 70:8 140:20
**report** 46:12 47:20 58:17,23 80:18 101:5 180:19,21 201:9
**reported** 45:7 47:21 101:13
**reporter** 1:21 4:2,5,7 4:8,19 6:14,22 17:14 33:19 38:18 49:9 72:5 80:12 87:17 104:22 106:22 109:15 138:6 178:11,24 179:4 181:23 190:21 203:9
**reporter's** 112:6
**reporting** 101:20
**represent** 4:17 5:13 24:8 149:4 150:16 150:22 154:23 159:18 160:23 162:15 169:14 180:15 194:23
**represented** 128:11
**reputation** 170:8,13
**request** 48:20,24 120:20 124:11 125:11 144:15 193:10 202:4
**requested** 17:14 33:19 38:18 48:4 49:9 78:6 80:12 106:22 123:8 138:6 168:25 178:11
**requesting** 74:9 169:12
**requests** 125:15 144:23 145:4 152:4
**require** 20:12
**required** 43:18 44:2 52:21 95:17 101:22 118:4 148:16,17 196:20
**requires** 93:8
**research** 27:3 129:20 129:20
**researched** 20:8
**reserved** 3:8
**reside** 195:21
**resided** 94:11
**residence** 79:12
**residing** 95:9
**resign** 83:16
**resigned** 83:15,19 109:5
**respect** 12:22 64:23 155:7
**respected** 73:8
**respective** 3:4
**respond** 22:25 28:19 134:11
**responded** 150:25 152:7 185:24
**responding** 117:7
**responds** 192:21
**response** 124:10,16 125:10 144:14 145:4 150:17 152:3 153:5 185:25 192:12
**responses** 150:11 151:16 154:16,20 200:9
**responsibilities** 22:7
**responsibility** 116:22 118:24 119:5
**responsible** 59:4 69:17 113:16 116:16 118:11 138:24 139:18 144:13
**responsive** 41:6
**result** 86:6 87:6 101:20 107:8 111:10 170:8
**resume** 16:20
**retail** 17:18,20 21:20 39:12 47:17 52:13 57:19 146:24 160:11 165:18
**retain** 22:18 159:8
**RETAINED** 200:7
**return** 118:8
**returned** 174:14
**returns** 32:20 113:22 113:25 114:3 117:12 118:4 119:12 122:9,14 196:17,20 202:9
**reveal** 86:18 87:13
**revenue** 32:6,8,13 111:10,15 117:3 138:15 175:23 176:18 177:9,15,17 177:18,21 178:6,7

**revenues** 176:7
**review** 25:3,18,21 26:14 84:14,15,19 84:21 85:6 110:8 111:12 127:16 133:20 136:9 146:12,15 166:13 166:22 169:20,24 169:25 190:5 200:19
**reviewed** 26:5 45:24 54:24
**reviewing** 151:5
**reviews** 84:23 85:3 166:23
**right** 10:13 11:5,8 14:7,9,10 18:10 23:15 27:5,8,11 29:23 33:4,7 34:6 34:13 36:16 38:20 40:8,16,20 44:15 45:18 47:6 48:25 52:12 65:2 89:17 91:17 97:18 98:8 105:11 106:20 109:3,22 117:18 118:5 121:7 127:15 129:21 132:10 133:18 135:20 137:3 138:21 141:15 142:9 147:13,17,22,23 148:2 151:16 157:9 158:14,16 166:20 169:2 172:20,24 173:7 177:5,10 182:12 187:10 188:6,8,17,20,22 189:7 191:5,8,9 192:19 193:4
**Road** 5:5
**robot** 183:4
**room** 59:9 94:25
**round** 60:11
**rounding** 60:11,14 60:16
**RPR** 203:22
**rule** 7:14 10:21
**rules** 5:4,25
**run** 12:10,13,15 69:13
**running** 77:23 107:16 116:6

**S**

**S** 2:2 5:2,2 200:6 201:4
**Sadly** 120:17
**Sage** 2:6 4:23
**sake** 32:19
**salaried** 67:16
**salary** 40:22 67:22,23 68:2,3
**sale** 157:21 158:2
**sales** 17:18 29:25 30:5,5,23 31:2 32:23,24 33:5,7,9 33:14,16,16 34:2 39:12 40:12,19 41:25 42:3 52:12 57:19 77:10,22 88:15 90:20 143:6 147:9,11 157:8,12 157:18 158:12 160:11 165:21,22 165:23 167:22 172:17,23 173:3,14 173:16,17,18,23 202:7
**salespeople** 149:20
**salesperson** 70:2,3 90:22
**sat** 148:2,5
**Saturday** 189:16,21
**saw** 172:25
**saying** 27:17 42:23 55:18 56:7 57:11,18 71:5 74:14 85:22 86:22 92:16 93:12 93:14,15 95:6 99:20 101:12 105:25 107:17 117:25 129:11,22 130:9,17 134:19 135:9 137:20 145:15 150:23 171:21 172:8 174:10 198:9
**says** 36:21 41:13 42:3 71:22 157:7,16 158:19 160:11 168:24 170:6 171:24 172:16 177:16 183:7 187:17,19 198:3
**scale** 127:13
**scan** 174:12
**schedule** 42:22,24 44:15
**scheduled** 44:18,23 45:3 73:11
**schedules** 42:18,19 152:20
**scheduling** 42:25 43:4 152:8,14,16 157:14
**school** 13:20,22 14:6 140:24
**Schumacher** 14:12
**screen** 111:24 112:12 176:13 189:10 190:18
**scroll** 187:7
**scrolled** 151:8
**Scrolling** 156:5 190:22
**sealing** 3:5
**search** 39:4
**season** 20:16 21:6 47:11 66:15,15 69:19 74:23 103:21 108:9,10 140:12 168:2
**seasonal** 36:14 74:25 99:17 141:7,12 180:6
**second** 15:11,13 69:20,25 157:6 163:4 176:24 187:4
**Secret** 15:22
**section** 94:13,16 95:12 155:7
**sections** 95:2
**secure** 123:4
**security** 73:14 123:22 123:25
**see** 18:24 56:16 59:13 72:10 127:16 135:24 137:8 151:12 153:11,16 159:21 160:3 163:5 163:6,21 165:14,24 170:10 171:6,7,19 173:3 179:22 180:8 183:9,14,25 184:15 194:9 195:2 196:11 196:12 198:6
**seeing** 136:23
**seek** 64:23
**seen** 62:15 63:3 112:15,21 155:6 160:25 175:23 180:25 182:10 184:24 193:5,6
**sell** 19:5 20:5 29:2,5 29:25 44:5 69:15 106:17 147:15
**selling** 18:18 28:24 28:25 31:16 77:12
**send** 39:4 40:21 41:4 112:3
**sends** 157:7
**sense** 138:23 196:19
**sent** 40:24 43:8,8 48:13 49:3,7 63:16 90:12 158:15 168:13 186:21
**sentence** 176:16 177:16,24,25 178:2 178:4
**separate** 76:15,16

94:14,17,24,24
**separated** 133:24
**separation** 104:16
**September** 1:15 4:9 13:14,16 43:13 73:3 88:9 108:10 160:24 192:11 204:2
**Service** 117:4
**services** 121:19
**set** 43:6 47:24 73:16 102:25 147:22,24 166:6 192:10 203:12
**sets** 43:7 66:7
**seven** 70:19,22 73:2 140:11 189:12,22
**shaking** 6:15
**share** 111:24 173:20
**shared** 42:11 172:16 172:23 173:4,9 189:10 193:23
**shareholder** 115:24
**shareholders** 116:3
**sharing** 173:13,22
**She'd** 97:11
**Sheeler** 1:10,11,18 4:1,11,12 5:1,10,12 5:17 6:1 7:1 8:1 9:1 9:3,11,16,25 10:1,4 10:19 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,22,25 22:1,6 23:1 24:1 25:1 26:1 27:1,4 28:1,3,22 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1,19 60:1,4 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 82:6 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 112:14 113:1 114:1 115:1 116:1,20 117:1 118:1 119:1 120:1,23 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,11 147:1 148:1 149:1 150:1 150:14 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 158:19 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 181:12 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1,23 195:1 196:1,6 197:1 198:1 199:1,4,6,18 200:4 203:11
**shift** 44:13,18,23 45:3 52:22 99:24 100:3,5
**ship** 31:3,12 32:5
**shipment** 31:6
**shipped** 31:19
**shipping** 31:8
**ships** 32:4
**Shopify** 30:13,13,23 31:10,11,18,25 32:3 32:22 33:3,6,16 202:7
**Shoppe** 98:18
**shopping** 86:5,12
**short** 77:23 172:7 187:18
**shortage** 191:14
**shoulder** 66:15
**show** 54:16 60:17 111:25 147:12 162:7 184:19 189:11
**showed** 172:9
**showing** 54:21 112:13 187:12
**shows** 151:11 179:3
**shut** 51:9,19,22
**shuts** 107:21
**sick** 152:24
**side** 122:12 184:20
**sign** 78:16,16 151:18
**signature** 151:21
**signed** 3:12,14 48:14 119:11 151:11,24
**silly** 66:20
**similar** 48:16
**similarly** 1:6 191:23
**simple** 177:13
**Simultaneous** 24:18 33:18 37:21 39:25 44:21 52:23 55:13 62:20 71:4,25 72:17 134:16 138:5 140:16 142:19 143:2 158:5 165:20
**single** 192:19,21
**single-page** 192:7
**sit** 124:25 125:20 148:14
**sitting** 127:14 148:11
**situated** 1:6
**six** 140:11 194:13 198:4,10
**skipping** 95:25
**Slack** 153:2
**slow** 38:23
**small** 18:16
**Social** 123:22,25
**sold** 30:24 202:8
**sole** 9:8 10:3 116:20
**solely** 129:10 135:14
**solid** 29:16
**somebody** 41:10 44:13 124:24 125:19 152:24 183:4,20
**soon** 78:12 104:4
**sooner** 7:20
**sorry** 15:19 16:14 18:5 26:8 31:23 32:25 35:25 36:24 50:23 51:15 55:14 57:3 61:14 71:6 77:11 86:25 87:15 88:9 91:4 99:25 103:18 104:3 105:4 109:8 120:18 124:23 127:8 134:20 143:8,11,11 158:6 164:12 167:15 169:21 170:19 183:10 185:23 189:21 190:2 191:21
**sort** 31:9 37:14
**sought** 171:11
**space** 18:2
**sparingly** 7:21
**speak** 23:20,22 39:15 39:22 40:2 42:6

54:17 57:2,5 72:9 74:20 82:14 97:22 97:25 106:4 118:16 125:3,22 134:6,8 137:8 170:19 181:13 191:10 192:24 198:13,21
**speakers** 24:18 33:18 37:21 39:25 44:21 52:23 55:13 62:20 71:4,25 72:17 134:16 138:5 140:16 142:19 143:2 158:5 165:20
**speaking** 35:5 37:19 39:8,11,20 45:11,14 49:10 63:15 81:4 82:19 104:15 128:17 130:13 137:9,10 156:23 159:3 165:17 198:18
**special** 171:4
**specialist** 154:11
**specific** 48:17
**speed** 96:2
**spend** 123:20
**Spent** 93:23
**spoke** 23:19 25:8 105:2 106:15 108:10 134:10,13 134:22
**spoken** 198:19
**spread** 148:19,23,25 149:4,6,12
**spreadsheet** 181:25
**ss** 203:5
**staff** 40:19 107:20 117:18 131:7,7 140:23 141:10,10 165:6 166:24 167:2 167:22 171:14 172:17 173:5,10,14 173:16
**staffed** 107:18
**staffing** 66:14 136:18 138:16 169:9
**stage** 110:16 202:14
**standard** 158:22 159:2,23 186:24
**standing** 148:12
**stands** 9:19
**start** 17:11 77:11,19 78:6
**started** 14:2 17:10 19:20 34:8 35:17,18 51:13 77:24 78:3 127:17 128:25 157:23 185:16
**starting** 179:9 186:16 187:4 192:11
**state** 1:21 4:6,17 29:5 30:2,10 31:4,5 86:20 87:4 114:4 117:4 124:10,16 156:15 171:3 178:12 199:25 203:4,10
**stated** 135:7
**statements** 135:13,17 135:22 136:4 154:8 175:8 202:21
**states** 1:2 4:13 123:25 171:11 180:5
**stating** 5:5 131:21
**statistically** 182:25
**stay** 45:4 94:7,9 95:17 165:6
**stayed** 72:8 94:13
**staying** 94:10 183:7
**steam** 69:14 100:6
**steaming** 99:23 100:3 100:4
**stenographic** 4:7,19
**stenography** 179:3
**stepping** 38:21
**steps** 38:4 72:13 133:21
**stints** 15:18
**stipulated** 3:2,6,10 4:23
**stipulation** 4:25
**stolen** 126:25
**stool** 74:12,13 148:8
**stop** 83:10,13 166:20
**stopped** 86:5,12 150:6
**storage** 102:20,22 103:5 109:25
**store** 9:20 10:24,25 11:7 19:12 27:8,11 27:11,13,14,16,18 28:23 29:22 30:8,11 30:24,25 31:3,16,17 34:7,8 42:21 43:5 43:23 47:19 51:13 52:19 55:9,12,24 58:5 61:15,18,25 62:5,9,12,23 63:2 64:10 69:13 70:17 71:8,11,18 72:10,11 72:12,14 73:2,5,6 73:14 75:21 76:3,19 76:23 79:13,15,17 80:7 85:17,18,19,23 86:6,12 94:5 96:24 97:10,11 98:15,19 98:22,23 99:2,5 100:11 101:7,9,10 101:11,12 103:8,13 103:24 104:2 106:15,17 107:6,6 107:15 109:7,10,20 109:21 110:6,12,20 110:25 111:4 124:6 129:12 135:10 139:15 140:9 141:21,21 142:17 147:24 148:2,7 157:24 158:12 165:18,18,24 170:8 170:16 171:17,18 171:23 172:17 173:14,18 174:13 174:25 183:15 202:8,8
**stores** 10:12,13 11:10 11:15 12:5 27:18 31:22,24 32:5 34:5 56:9 58:2 61:22 63:10 75:23 94:4 101:12 103:21 107:21 108:8 139:5 139:8,12 140:4,5 148:10 152:20 167:18,20 177:6 179:14
**straight** 14:5
**Street** 2:15 123:14 195:12,22,23 197:5
**streets** 170:24
**strict** 64:8
**stub** 161:9
**stubs** 112:25,25
**stuff** 49:15 50:8 106:2 171:22
**stylist** 160:8
**submit** 22:22
**subscribed** 199:20
**sued** 85:8
**sufficient** 59:11 114:11,21 168:25
**SUFFOLK** 203:6
**suit** 26:8
**Sullivan** 66:22
**summer** 70:18 72:25 77:6 99:13 140:23 163:16 164:18 165:6 168:2 200:17
**supervise** 68:18
**supervised** 68:16
**supposed** 185:13,21 186:10
**sure** 20:2 41:16 63:24 63:25 64:4,5,7,8 67:7 79:4 95:4,10 104:5 111:13 125:10 143:9 144:21 146:12

159:2 163:20 164:15,15 166:5 168:21 181:6 195:25
**surrounding** 184:13
**suspect** 127:10
**suspend** 37:16
**Suspending** 38:9
**suspension** 37:23
**switch** 121:22 202:16
**sworn** 3:11,14 5:7 22:25 199:20 203:12
**Syracuse** 13:20,25 14:3
**system** 33:21 44:4 52:2,7,9,11,14,17 52:24 53:4,13,17 57:6 58:22 60:10 130:24,25 131:2,6 139:11 179:14
**systems** 171:4

**T**

**T** 5:2 199:11 200:6 201:4
**table** 74:12 165:25
**take** 6:4,14 7:13,18 7:21 20:24 37:14 55:23 59:7,10 74:2 81:8 87:8 95:13 104:3,5 106:6 115:9 115:10,24 116:4 149:23 168:2 171:25 177:9 194:11 197:12
**taken** 1:18 5:20 8:17 33:22 38:4 51:19 59:14 72:13 76:17 104:12 113:14 115:19 128:4,8,12 128:15 133:17,21 150:3 181:9 185:4 190:25 191:10 194:15 197:4
198:25
**takes** 143:3
**talk** 39:7 42:18 72:2 72:6 100:10 125:2 125:20,21 126:18 157:7
**talked** 131:4
**talking** 130:2 136:7
**Tappan** 13:23
**target** 165:3,13,17,21 165:22,23,24,25 166:4,7
**targets** 165:6,18
**tax** 32:20 113:22,25 115:4 117:12 118:4 118:8 119:11 196:16,20 202:9
**Taxation** 117:4
**taxes** 113:5 114:20 114:22 116:16,22 117:5
**taxing** 117:3 196:24
**team** 35:9,10,22 36:9 39:10,19 40:13,17 40:18 41:23 43:7,10 47:7 66:16,17 69:14 69:18 74:25 158:7 164:11
**team-based** 164:7
**teams** 77:10 153:2
**Technical** 80:11
**tell** 7:2,10 10:20 18:21 23:17 30:18 36:12 39:16 41:2,7 43:20 56:2 57:12 60:19 65:25 71:18 73:21 74:22 77:9,17 90:17 138:11 143:21 148:6 150:20 169:4 182:16
**telling** 37:8
**template** 159:4
**ten** 188:22
**tenure** 83:25 89:13
**Teresa** 1:5 5:13 66:21,22 67:2,2 68:5,8,11,16,17,24 69:8 70:7,9,20 71:7 73:4,10 78:8 82:21 83:4,10,18,21,24 85:8 86:16 87:20 88:12,13 96:9 105:3 109:3,5 123:21 126:20 127:11,18 127:23 129:3,12,17 129:22 130:11,15 130:22 131:22 135:4,7,18 136:4,17 137:6,16 141:14 142:12,14 145:24 147:6,16,21 148:2 149:18 153:9 156:9 156:12,23 160:8 167:3,5 170:8,13 171:3,9,11,16 175:4 175:11 179:10 180:19 182:3 183:7 183:17 187:15 189:4 202:22
**Teresa's** 68:21 82:25
**terminate** 36:7,13,21 37:15 108:25 140:22
**terminated** 36:14 140:20,21
**terminating** 36:5,16 38:9
**terms** 12:18 13:24 18:11 29:25 35:3 39:4 40:22 53:22 56:11 157:11,21 186:24
**Terrace** 34:6,12,16 34:20
**testified** 5:8 22:10,11 24:9 33:3 90:24 141:24 153:19 195:16
**testify** 8:14,18,22,24
109:24
**testifying** 58:4
**testimony** 6:7 7:7,20 30:14,16 35:19 55:17 59:20 62:25 72:7 82:18 95:5 105:10 124:20 125:16 132:22 137:22 167:19 203:14
**Texas** 29:7 100:17
**text** 54:16 56:4,14,23 87:22 97:24 105:8 145:23 152:19,22 152:23 197:10,18 198:2 201:17
**texted** 36:18 54:8,13 74:16 100:17,22 104:19
**texts** 46:18 131:5
**Thank** 38:24 53:21 91:8 93:20 178:18 199:4
**thanks** 181:8
**things** 40:24 102:18 103:3 121:17 135:9 137:20 175:15,17 175:20 176:12
**think** 15:10 26:7 34:8 34:14 36:13 37:4 54:6 63:21 67:14,18 75:22 84:17,18 86:7 98:18 102:17 118:14 123:14 131:10,17 132:20 134:13 145:5,17 146:17 163:2,20 169:8 178:12,14,15 182:25 193:25 199:6
**third** 31:25 67:18
**thought** 190:20
**thoughts** 12:16
**three** 11:10 15:10 16:10 21:2 34:14,25

111:14 126:19 140:4,8 142:18 167:18,22 194:12 198:3
**till** 76:15
**time** 3:9 4:9,16 5:23 7:13,18 11:20 14:6 15:10,11,13 21:7,9 27:15 34:9 40:23 43:5 44:11,11 45:12 45:17 53:22 54:2,5 54:9,10,15 56:24 57:9 58:17,23,24,25 59:2,5 61:23 70:20 70:22 71:7,13,13 72:15,20 73:9 74:18 75:11,14,17 81:14 81:19 82:2,7,15,16 83:5 88:22 93:22,22 95:8 98:11 101:25 103:20 104:6 105:6 105:9,11,18,21,25 110:11 120:13 123:20 125:4 127:13,20 129:3,10 129:13,16,17,22 130:16 131:23,25 132:3,7 133:14 134:4 145:8 147:20 147:20 148:5,5,11 160:3,11 161:18 164:7 167:6,25 168:12,15,17 171:5 171:10 172:11 175:18,21 181:16 182:14,23 183:14 187:20,22 191:3 194:8 195:21,21 196:5
**timekeeping** 52:2 53:13 56:11 60:10 60:14 61:8 139:4,5 171:4
**timely** 123:5
**times** 9:13 21:4,10 43:9 56:2 128:25 147:25 180:4
**timesheet** 161:24 162:5 200:16
**timesheets** 61:12
**tips** 149:17,20
**title** 160:9,11
**titled** 181:25
**Tobin** 1:20 4:6 203:8 203:22
**today** 6:7 7:25 8:11 8:15,19,23 124:21 127:15 137:13 160:17 192:22
**today's** 4:8 23:11
**told** 17:16 56:5 90:16 100:9 107:16 108:13 134:11 185:13,21 186:9
**tomorrow** 71:23
**tool** 152:9,12 153:2
**tools** 152:5,17,25
**top** 32:8 162:17,18 187:4,11 190:22
**tortious** 127:2
**total** 128:11 191:2
**touch** 73:25
**town** 109:12
**track** 75:17
**tracking** 157:8,12,18
**trademark** 163:21,25 164:2
**traffic** 106:10,11
**trail** 54:20
**train** 43:15 44:4,4
**training** 21:17
**transcript** 4:3 25:4 120:21 199:15
**transcripts** 138:2
**transferred** 14:3
**transferring** 49:20
**transport** 105:25 179:20
**transported** 179:25
**transporting** 98:4 105:14
**travel** 20:12,15 106:6
**traveling** 103:12 111:2
**treated** 67:16
**trial** 3:9
**trip** 20:24
**true** 89:21 151:16 203:13
**trust** 36:4 37:7,7
**truthful** 7:25 8:10
**truthfully** 8:15,19,23 8:24
**try** 129:15 130:7,8
**tucked** 34:21
**Tuesdays** 70:16 71:2
**turnover** 139:21
**twice** 98:6
**two** 10:12 15:17 16:9 17:6 21:9 34:25 60:8 69:19 85:17,23 94:22 95:2,6,22,24 97:12,17 98:15,16 107:18 108:8 130:14 138:25 140:4,10,10 142:17 167:20 179:16 180:4 187:25 188:16,22
**type** 14:24 17:23 21:11,12 153:6 154:19,21
**types** 65:21 126:19
**typical** 169:3
**typically** 62:8,14 92:12,21 125:2
**typing** 159:24
**typo** 157:2

**U**

**U** 199:11
**umbrella** 35:2
**unable** 50:21 123:4
**unavailable** 51:10
**unaware** 56:9
**understand** 5:18 6:2 6:5,9,11,17,25 7:5 7:11,16 9:15 12:20 19:3,7 28:11 32:3 32:25 38:7 50:3 55:17 57:23 75:25 76:14 82:18 95:5 100:2 105:24 111:22 114:14 115:14 124:13 129:8,14,25 131:10 131:15,16 132:22 145:13 147:14 168:14 177:11,23 178:2 191:12
**understanding** 60:10 86:20 116:21 118:6 126:23 127:4 129:6 130:9 198:8
**understood** 7:4
**unemployment** 108:21,24 123:4,6,9 124:11,17
**uniforms** 148:16,18
**United** 1:2 4:13 123:25
**University** 13:21,25 14:4
**unpaid** 51:6 83:18 117:5
**unsure** 153:24
**update** 197:4
**updated** 164:10
**upstairs** 94:22
**use** 31:9,25 32:24 33:3,6 44:14 52:3,7 52:11,14 53:2,3,4 90:25 91:2,13 121:5 121:7 147:21 152:13,25 160:17 193:24 194:7
**user** 193:24
**uses** 152:7
**usually** 75:10 140:10
**utilities** 51:9,19,22

**utility** 51:6,23
**utilization** 165:2,6

**V**

**vacation** 168:24 169:4 202:23
**vacations** 168:22
**vacuuming** 72:18
**vague** 145:18
**Valley** 13:23
**varied** 69:23
**various** 76:18
**vehicle** 179:19
**Veloskier@yahoo....** 194:3
**velvet** 106:13
**vendor** 31:9
**vendors** 49:14,16,17 50:16
**vendors'** 66:8
**venued** 4:13
**verbally** 97:25 193:10
**verification** 151:11 151:14
**verify** 98:10
**versa** 51:5
**versus** 4:12 30:24 54:21 148:11 202:8
**vice** 51:5
**Victoria's** 15:22
**video** 109:6,9 174:22
**video-teleconference** 1:17 2:3 4:21 8:5
**videoing** 109:19
**videos** 103:8
**violate** 85:15
**violates** 38:3 63:18
**violation** 85:13
**virtual** 23:23,25 24:5 24:9 25:15,17 74:23 74:24 75:7,20 84:19
**visiting** 195:16
**visits** 20:17
**Vittadini** 14:23

**W**

**W** 136:9
**W's** 136:13
**W-2** 194:22,24 195:4 196:9,15,21 201:16
**wage** 125:9,20,21,22 125:23 143:20 144:2
**wages** 22:7 66:3 77:2 82:22 83:18 99:8,11 99:18,21 108:16 113:5 114:13,17 124:22 125:11,13 125:17 132:7 144:11 180:11 196:16
**waiting** 107:7 108:20
**waived** 3:5
**walk** 147:16
**walking** 136:24
**Wall** 2:15
**want** 5:25 6:8,8,13 7:9 9:15 36:12,21 50:24 104:7 125:3,4 125:7,8 153:8 163:15
**wanted** 17:12,13,15 18:24 19:3 44:19 103:16,22 104:20 110:11,11 192:21
**wanting** 94:2 124:24 176:10
**wants** 149:22
**warning** 84:3
**wasn't** 20:2 24:13 56:5,6 72:2,9 74:13 94:10 106:5 121:3 173:17
**way** 7:9 30:18 38:5 46:22 55:9 94:6 112:2 137:5,15 144:21 147:23 150:23 151:8 157:23 158:3 169:3 179:15 181:18 191:21,24 193:3,9 193:12 203:17
**we'll** 7:19 22:22 28:17 30:22,25 32:19,21 39:4,6 67:2 71:19 110:17 120:6 122:6 133:4,5 134:24 135:2,25 136:2 138:19 149:23 169:12 192:5,6
**we're** 26:2,5 38:20 41:10,10 42:14 47:7 59:16 71:19,21 110:14 112:5,6 129:19 130:2 149:24 176:14 181:21 185:6
**we've** 11:16 36:13 37:4 53:14 133:22
**wear** 110:18 148:16 148:17
**web** 135:11
**website** 29:23
**Wednesday** 189:19
**Wednesdays** 70:16 71:2
**week** 45:4 63:19 68:2 70:19,23 73:2 77:3 81:16,19 82:3 102:17 123:18 157:8 162:25 163:8 179:11 184:13 188:24,25 190:4 195:16 198:4
**week's** 192:19
**weekends** 70:18
**weekly** 69:4 113:6 115:17 191:10
**weeks** 21:3 63:17 78:12 99:15 188:2,4
**welcoming** 74:24
**went** 13:25 14:7 83:17 85:17,21 117:18 118:3 153:23 177:17
**weren't** 57:13 177:10
**West** 123:14 195:22
**Westhampton** 11:4 67:11 69:9 70:10,12 79:15 94:6 96:7,12 100:11 102:3,11,15 102:23 103:14 107:5,6,11,11,15 108:10 109:4,10 111:11,15 156:25 166:24 170:7
**whatsoever** 28:12
**WhenIWork.com** 152:8,11 193:20 194:6
**win** 87:7
**winter** 70:15,17 107:20,21
**wintertime** 97:4
**withdraw** 60:18
**withdrawals** 76:17
**withdrawn** 25:16 37:9 45:5 90:23 91:11 97:21 187:21
**withholdings** 113:5
**witness** 4:20 10:19,23 25:13 28:20 38:20 38:25 59:7,12 86:17 104:3,8 130:6 143:11 154:18 178:12,17 184:21 184:23 199:6 200:3 203:11,14
**woman** 19:15,17
**Women's** 29:3
**word** 91:5 111:6 163:3
**words** 44:22 105:3,3 118:14 126:8 127:14 131:23 134:8 137:10 141:5 165:21 171:25
**wore** 110:23
**work** 12:4,16 14:11

14:16,22 15:4,7,17 15:21 16:6,13,16,25 17:9,21,23 18:25 19:17 22:4 26:22 27:14 36:9 43:17,25 44:7,15,17,23 45:2 55:4 56:12,19 57:12 57:13 58:17 60:20 67:10 69:14 73:11 73:23,23 77:18 83:5 85:21 89:3 90:20 92:5,7,8,10,19,22 92:25 93:4,17 94:4 95:18 102:15 103:11,20,22,23 104:19 105:7 109:3 112:20 121:2 122:11 125:23 141:2 146:16 147:11 148:6 152:16,20,21 157:13 159:10 176:10 179:16,21 179:25 180:13 188:12 189:3
**work-related** 58:9
**worked** 15:25 16:14 22:5 40:23 44:9 45:7 56:15,16 58:17 58:25 61:7 68:3 71:12 81:15,19,20 82:2,8 83:2 85:17 88:4 89:15,17 90:21 94:7 104:17 107:10 129:3,13,17,22,23 130:16,23,23 131:3 131:9 132:8 134:4 139:22 141:14 144:10 147:7 149:12 157:13 158:10 179:10 181:17 198:4
**working** 12:25 13:12 17:17 18:23 20:11 20:20 36:19 41:10 42:22,24 44:7 45:22 55:7,12,19,21 58:20 65:5,11 67:5 72:21 83:10,14 85:22 88:7 91:16,20 92:18 111:19 112:5 129:12 131:14 133:22 167:6 174:5 189:4 197:21 198:3
**workplace** 152:4
**works** 63:19 149:6
**workweek** 188:9,11 188:25
**wouldn't** 44:24 106:9
**wow** 30:10
**write** 6:22 36:17 171:16 173:4,9 191:24
**writing** 30:25 32:21 38:16,17 39:6 42:17 110:17 133:2,6 135:3 136:3 150:25 168:25 169:13 185:21 192:3,5 202:18,24
**writings** 110:15 202:13
**written** 84:3 97:24 120:7 129:11,18 130:10 131:12 142:25 150:24 154:8 185:20 198:12
**wrong** 37:24 127:11 137:12
**wrongfully** 133:17
**wrongs** 126:20

**X**

**X** 163:4 200:2,6 201:2,4 202:2

**Y**

**yeah** 60:6 71:15 94:12 107:10 129:4 142:22 145:21 177:8 188:11,18
**year** 13:15,17 14:19 16:2,23 21:4,7,9,9 21:10 32:12 43:13 45:21 61:23 67:18 75:2,3,4 76:2 84:13 84:17,18 102:7 103:20 117:17 118:8 120:17 139:21,24 140:2,7 140:11,25 141:8,11 141:13,22 142:7,8 142:21 167:21 171:14 176:6 195:25
**years** 11:18,22 15:6 15:10 16:10 17:6 27:2 32:13 34:13 53:15 121:5 122:15 141:15 142:13 195:14,19,24 196:2 198:3,14
**Yelp** 136:9
**Yep** 15:12 189:8
**yesterday** 23:21 24:4 25:18
**York** 1:3,19,22 2:8 2:16,16 4:6,14 5:6 14:15 15:3,15 16:4 16:11 17:7 19:22,23 29:6,7,10 30:2,11 31:4,5 87:4 100:21 117:4 124:10,16 203:4,10

**Z**

**zero** 176:25 177:5,10 177:18
**zoom** 155:22

**0**

**1**

**1** 40:14 42:2 104:10 158:13
**1.02** 190:8
**1.85** 187:18
**10** 29:15 149:6 181:17,18 183:15 190:17,20 196:2
**10-hour** 149:16
**10:00** 58:2 70:13 71:20 72:11 73:2 179:15 182:14 183:2
**100** 10:9 172:11 191:14
**10005** 2:16
**11:15** 59:11,14
**11:20** 59:11
**11:21** 59:15
**110** 202:13
**11423-2327** 2:8
**11954** 5:6
**11th** 190:13
**12** 167:16
**12/25** 112:13
**12:30** 104:12
**12:40** 192:12
**12:48** 186:17,21
**12:59** 104:13
**120** 202:15
**121** 202:16
**13** 167:10
**133** 202:18
**134** 202:19
**135** 202:21
**14** 2:15 169:15
**15** 34:8 39:13 164:12
**15-minute** 60:22,23 61:2,10
**150** 200:9
**155** 200:12
**159** 200:13
**160** 200:15
**161** 200:16
**164** 200:17
**166** 200:19
**167** 200:20

**168** 200:21
**169** 200:22
**16th** 184:13
**174** 170:6
**179** 200:24
**180** 201:7
**182** 170:25 201:10
**182-11** 2:7
**183** 171:11
**185** 171:16 201:12
**186** 172:9 201:13
**189** 172:16
**19** 155:4 170:5 179:9
**1900** 182:14
**192** 201:14 202:24
**193** 201:15
**194** 201:16
**197** 201:17
**1st** 188:20

**2**

**2** 40:14 42:2 111:24 158:13 183:8
**2:14** 150:3
**2:15** 149:22
**2:20** 149:25
**2:23** 150:4
**2:25-cv-04264** 1:8 4:15
**20** 67:7 88:17,25 104:9 106:8 141:16 141:18,24 142:6,7 171:2 195:19,24
**2007** 120:12,17
**2009** 27:5,12,16 120:13,14
**2014** 27:20,23 28:4,5 34:8 121:16 164:12
**2015** 27:8,19
**2018** 34:10
**2019** 32:21 202:9
**2021** 67:7 183:8,23 183:23
**2022** 136:10 160:24
**2023** 99:14 168:6,7 181:16 184:14 186:17 187:17,21 187:22,23 188:2 189:7,11,12,17 190:7,14,23 195:5 196:8 200:21
**2024** 83:12 100:12 102:14 167:10,10 192:11
**2025** 32:7,20 155:5 164:10 176:19 177:15 178:21 202:9
**2026** 1:15 4:9 151:24 169:15 199:23 204:2
**207** 174:2
**208** 174:2
**20th** 2:15 151:24
**21** 78:9,10,11 150:11 160:24 178:21 200:11
**21-page** 151:9
**211** 174:18
**212.390.8842** 2:17
**22** 1:15 4:9 88:9 202:5 204:2
**226** 175:3
**23** 47:24 48:10,13 67:13 88:18 89:2 96:3 156:16 164:10
**23rd** 184:14
**24** 192:11
**246** 175:22
**25** 39:13 100:12 102:14 104:9 105:19 106:8
**27** 190:23
**28** 5:5 150:7 154:23 183:23 202:6
**29** 136:9 150:8,9,10 150:15 187:17,22 189:7,12,16 200:9
**29th** 187:25 188:16 188:24 189:19,22 190:4

**3**

**3** 83:12 190:24
**3:25** 181:7,9
**3:29** 181:10
**3:30** 181:7,8
**3:36** 185:4
**3:44** 185:5
**30** 15:5 132:18 155:21,25 186:17 188:8,14 200:12 202:7
**30-30** 30:19
**30th** 188:16
**31** 159:13,15 178:21 179:18 181:16 183:23 200:13
**32** 160:19,21 200:15 202:9
**33** 161:23,24 190:15 200:16
**33.49** 190:19
**34** 164:16,18 200:17
**35** 123:14 166:12,13 180:5 195:22 200:19
**350** 77:21 78:4
**35th** 123:14
**36** 167:9,11 200:20
**37** 168:5,7 200:21
**37.32** 191:3
**38** 169:14,16 179:5 200:22
**39** 178:25 179:6,7 200:24 202:10
**3rd** 162:25

**4**

**4** 40:12 41:14 155:7 156:17 157:14 158:12 179:9
**4:04** 194:15
**4:10** 194:12,16
**4:22** 198:25
**4:25** 199:2,9
**40** 81:15,19,20 82:3,8 178:20 180:15,20 201:7
**40-40** 30:19
**40-hour** 45:4 63:17
**41** 63:19 181:21,24 182:5 201:10
**42** 185:7,8 201:12 202:12
**43** 186:13,14 201:13
**44** 192:6,8 201:14
**45** 62:16 193:14,16 201:15
**46** 194:19,21 201:16
**47** 197:9,10 201:17

**5**

**5** 29:15 30:6,7,11 42:4 200:4
**5,000** 128:12
**5:55** 71:14
**500,000** 32:7,14 176:7,17,18 177:15 178:6
**54** 112:13

**6**

**6** 152:3 183:16
**6/13/24** 167:11 200:20
**6:00** 58:3 70:13 71:12 72:11,15,20,22 73:2 179:15
**6:15** 72:8
**60** 179:10
**60-60** 30:19
**6th** 189:24,25

**7**

**7** 153:5
**7/14/26** 169:16 200:22
**7/31/25** 179:7 200:24
**7:00** 183:3

**7:45** 183:8,11
**70** 179:10
**70th** 195:12 197:5
**718.412.2421** 2:9
**75** 141:10

**8**

**8** 187:20,23 190:7
**8-hour** 148:4,13
**80** 141:19 142:8
**840,000** 138:15 175:24 176:19 177:9,13
**8th** 187:25 188:20,25 190:4

**9**

**9/21/22** 160:21 200:15
**9:15** 192:12
**9:45** 71:9,12
**9:53** 1:15 4:10
**90** 30:6,7,10
**941** 114:7
**96th** 195:22,23
**9th** 163:2