# Exhibit R

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

________________________________

TERESA GONCALVES and DINA KETCHAM, on behalf of themselves and all others similarly situated,

Plaintiffs,

v. Case No.

KRISTIN SHEELER DESIGNS, LLC; KRISTIN SHEELER; and JAMES "JIM" BRINNEN, 2:25-cv-04264-GRB-ST

Defendants.

________________________________

DEPOSITION OF TERESA GONCALVES

DATE: Tuesday, August 18, 2026

TIME: 10:03 a.m.

LOCATION: Remote Proceeding

Shirley, NY 11967

REPORTED BY: James Bekman

JOB NO.: 8386721

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS TERESA GONCALVES AND DINA KETCHAM, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED:

EMANUEL KATAEV, ESQUIRE (by videoconference)
Sage Legal, LLC
18211 Jamaica Avenue
Jamaica, NY 11423
emanuel@sagelegal.nyc
(718) 412-2421

ON BEHALF OF DEFENDANTS KRISTIN SHEELER DESIGNS, LLC; KRISTIN SHEELER; AND JAMES "JIM" BRINNEN:

DAVID K. BOWLES, ESQUIRE (by videoconference)
MAGGIE A. JOHNSON, ESQUIRE (by videoconference)
Bowles & Johnson, PLLC
14 Wall Street, 20th Floor
New York, NY 10005
david@bojo.law
maggie@bojo.law
(212) 390-8842

ALSO PRESENT:

Benjamin Grushkovskiy, Observing Law Clerk -
Sage Legal, LLC (by videoconference)

# I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Bowles | 8 |

# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Complaint Filed 7/31/25 | 43 |
| Exhibit 2 | Email Dated 5/31/21 | 44 |
| Exhibit 3 | Employment Agreement Dated 5/29/23 | 48 |
| Exhibit 4 | Spreadsheet from NIBI Timekeeping System | 77 |
| Exhibit 5 | Email Dated 8/10/21 | 84 |
| Exhibit 6 | Email Dated 8/24/21 | 87 |
| Exhibit 7 | 2021 Records of Zelle Payments to Teresa Goncalves-Sullivan | 105 |
| Exhibit 8 | 2022 Records of Zelle Payments to Teresa Goncalves-Sullivan | 112 |
| Exhibit 9 | 2023 Records of Zelle Payments to Teresa Goncalves-Sullivan | 113 |
| Exhibit 10 | Email Dated 4/1/22 | 115 |
| Exhibit 11 | Agreement Dated 5/23/23 | 149 |

E X H I B I T S (Cont'd)



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Plaintiffs' Supplemental Responses and Objections to Interrogatories | 151 |
| Exhibit 13 | Plaintiffs' Supplemental Responses and Objections to First Request for Production of Documents | 164 |
| Exhibit 14 | IRS Tax Documents | 165 |
| Exhibit 15 | Answer in Counterclaims Dated 7/14 | 181 |
| Exhibit 17 | Email Dated 2/7/22 | 90 |
| Exhibit 18 | Email Dated 5/21/23, Bates D216 | 146 |
| Exhibit 19 | Email Dated 4/5/22 | 93 |
| Exhibit 21 | Text Messages, Bates P844 | 173 |
| Exhibit 22 | Text Messages Including Photo and Receipt | 173 |
| Exhibit 23 | Another Set of Text Messages, Bates D854 | 174 |
| Exhibit 24 | Another Set of Text Messages, Bates P856 | 175 |
| Exhibit 25 | Another Set of Text Messages, Bates P858 | 175 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | Spreadsheet of Hours Worked | 82 |
| Exhibit 27 | Email Dated 5/30/23 | 100 |
| Exhibit 28 | Plaintiffs' First Amended Rule 26 Initial Disclosures | 176 |

QUESTION INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 40 | 8 |

D O C U M E N T S R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Ms. Goncalves' Notes | 31 |
| 2 | Copy of Calendar Reminder Notification on Phone | 74 |

T. GONCALVES

THE REPORTER: All right. Good morning. My name is James Bekman. I'm the reporter assigned by Veritext to take the record of this proceeding. We are on the record -- we're now on the record at 10:03 a.m.

This is the deposition of Teresa Goncalves, taken in the matter of Teresa Goncalves and Dina Ketcham, on behalf of themselves and all others similarly situated vs. Kristin Sheeler Designs, LLC, Kristin Sheeler, and James "Jim" Brinnen, on Tuesday, August 18, 2026, at 52 Tipton Drive, Shirley, New York 11967.

I am a notary authorized to take acknowledgements and administer oaths in New York. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulations of such.

Now, at this time, will everybody in attendance please identify themselves for the record.

MR. KATAEV: For Plaintiff, Emanuel Kataev of Sage Legal, LLC.

MR. BOWLES: This is David Bowles representing the defendants in this matter. I'll be taking the deposition.

MS. JOHNSON: Ms. Margaret Johnson, Bowles & Johnson, representing the defendants.

THE REPORTER: And if the witness could just state first and last name.

MS. GONCALVES: Teresa Goncalves.

THE REPORTER: Thank you.

Okay, hearing no objections, I'll swear in the witness.

T. GONCALVES

If you'd just please raise your right hand and have it show up on the screen. Thank you.

WHEREUPON,

TERESA GONCALVES,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

And thank you, Counsel. Please proceed.

EXAMINATION

BY MR. BOWLES:

Q Good morning, Ms. Goncalves. My name is David Bowles. I'm representing the defendants in this matter.

I'm going to be asking you some questions today, and my first question is, have you ever been deposed before?

A No.

Q All right. Let me walk you through some ground rules that will help this all proceed smoothly, and I'm sure

T. GONCALVES

your counsel has done the same.

First of all, it's very important that we don't speak at the same time. Whenever I finish, you should start talking. Whenever you finish -- I'll wait for you to get done and I start talking. New Yorkers tend to interrupt each other a bunch, and it just doesn't work for the court reporter in this matter. So just let's make sure everybody's finished talking before we talk.

If you don't understand any of my questions, please just let me know that and I'll restate them.

It's very important that you answer all the questions verbally. The head nods and head shakes don't show up. It can't be recorded by the court reporter.

Do you have any questions for me?

A Not right now, no.

Q Okay. Any reason you can't answer questions fully today? For

T. GONCALVES

example, are you on any medications that might impair your answers?

A No.

Q Good. If you want to speak to your attorney, you can certainly do so, but I would ask you, if there's a question pending, that you answer the question first and then you can take a break and speak to your attorney after that. Just let me know. Okay?

A Yes.

Q Okay. And if you need any other kind of a break, if you need, you know, water or anything like that to take, just let me know. We'll finish the question and the answer, and we can take a break when you need it.

How did you prepare for this deposition, Ms. Goncalves?

A I prepared it with my lawyer.

Q All right. Did you sit down and talk with your lawyer?

A That's between my lawyer and I.

Q No, you need to answer that

question.
Did you have a conversation with your lawyer?
A We did have conversation.
Q Who else was there?
A It was Plaintiffs and attorney.
Q So it was Dina Ketcham, yourself, and Mr. Kataev?
A Correct.
Q Very good. How long did it go on?
A I don't recall. I did not time it.
Q Okay. An hour?
A I'm not sure.
Q Did Mr. Kataev show you any documents during that proceeding?
A There's -- he's very communicative, so yes, there was documents shown.
Q Okay. Do you remember which documents he showed you?
A That's between him and I in our meeting.

T. GONCALVES

Q No, that is a question you need to answer.

What documents did you look at to prepare for this deposition?

A What --

MR. KATAEV: You can identify the documents, Teresa.

THE WITNESS: There were counterclaim documents, there were documents of time cards, and responses to motions.

BY MR. BOWLES:

Q The documents that you described as time cards, are those things that have been produced in discovery?

A Yes.

Q Okay. Do they have Bates numbers at the bottom? You know what a Bates number is? The little numbers at the bottom of the pages.

I didn't hear your answer.

A Yes.

Q Okay. That's fine then.

All right. The name of the corporate defendant here is Kristin

Sheeler Designs, LLC, but I'm going to refer to that as NIBI.

Will you understand what I mean when I say NIBI?

A Yes.

Q Okay. NIBI the company, that's the company that you're suing; just another name for it. You understand that; right?

A Technically it's NIBI-MTK if you want to be precise, but yes, I understand.

Q Yeah, just for convenience, we'll call it NIBI.

All right. You are suing NIBI; is that correct?

A Correct.

Q Why are you suing NIBI?

A Because it came to my attention that Social Security was not being taken out of my pay within the three years of being employed under NIBI.

And also, there were no follow-through with pay statements. Pay was very sporadic as far as statements

T. GONCALVES

were concerned, weekly. We had to request W-2s. It was not given to us for tax purposes.

So there was a lot of paper trail missing and a lot of questions. So Social Security came up, and that is the premise of -- that was really the icing of the cake of why I am suing.

Q All right. So Social Security is what gave you the impetus to start the lawsuit?

A Yes.

Q Okay. Sorry, I did forget to ask one other question. Your last name is Goncalves. Am I pronouncing that right?

A Correct. Goncalves.

Q Do you have any prior names?

A I was Goncalves-Sullivan.

Q I understand.

All right. So you said a minute ago when I asked you why you sued NIBI, you said pay was erratic; that was one of the things you said. What did you mean by that?

T. GONCALVES

A There were times where I had to remind them to pay me. There was no payroll company that I can access any sort of pay statements or tax documents; like, for example, ADP. There was no such thing. Everything was through Zelle.

There were times where I had to remind my employer to pay me and it wasn't consistent. Some days it was a Monday, other times it was a Tuesday. Other times it was, oops, I forgot, you'll get it by Thursday.

Q So in theory, when were you supposed to be paid by NIBI? Was it supposed to be weekly, biweekly, monthly?

A From what I recall, I think it was weekly.

Q Okay. So then the records would show that you didn't get paid weekly, but sometimes it was not just on a weekly basis?

A Correct.

Q Example, if you were supposed to be paid on Monday, you might have been

paid on Wednesday or Thursday. That's your complaint; is that right?

A Yes.

Q Okay. Now, was there any instances when you didn't get fully paid for your work?

A Yes.

Q Tell me about that, just generally speaking.

A Generally, commission.

Q Okay. So -- and we'll go over this in more detail, but you were to be paid hourly, plus commissions; is that right?

A Yes.

Q Okay. And you were paid the hourly wages but not the commissions. Is that your complaint?

A I was not even paid -- some holidays I was paid, other holidays I was not paid. There was times where I would do overtime. I was not getting paid overtime. And commission was very unclear. So it was a conglomerate of pay.

T. GONCALVES

Q Okay. All right. We'll examine some of that in more detail.

Do you think NIBI did that on purpose, or were they just clumsy?

A I'm not certain.

Q All right. In terms of you not getting paid for -- let me break this down.

Overtime, holidays, and commissions, what evidence do you have that you weren't paid for those?

A What evidence do I have?

Well, unfortunately there was a life event and I had a divorce. So they -- there was a falling out and papers got scattered. So I had a NIBI file and I don't know what happened to it.

Q All right. So --

A It's an unfortunate life event for myself.

Q The divorce was the life event?

A The -- no, we're not here on my personal -- we're here -- I'm just letting you know that the file was misplaced

T. GONCALVES

during the time of my divorce.

Q All right. So possibly your ex-husband has the file?

A I'm not sure, sir.

Q All right. But you have searched your records and you don't have whatever the NIBI file was?

A I do not.

Q Now, you've sued Jim Brinnen personally. You know who Jim Brinnen is; right?

A Yes.

Q Why did you sue Jim Brinnen?

A Jim would pay. He would do the payroll. He would do everything back of the house. Jim is hand in hand with Kristin. They are both running NIBI-MTK. And at the time, it was Westhampton Beach, Bridgehampton, and Montauk. So that is why.

Q Okay. Let me back up one second. I forgot to ask.

What's your ex-husband's name?

A Brendan Ian Sullivan.

T. GONCALVES

Q Thank you. Do you have his address?

A I'm unsure where he resides.

Q All right. So just so be clear, you don't have his address?

A I do not have his address. We do not stay in communication.

Q I understand.

So Mr. Brinnen, when I asked why you sued him, you said because he operated NIBI along with Kristin Sheeler. Is that right?

A Correct.

Q So it's in his position as manager, is that correct, of NIBI that you sued him?

A Yes. Every situation that would arise as far as a tax statement, a pay statement, any statement, pay question, overtime, store opening, alarm systems, we would go to Jim. We would be asked to go to Jim.

Q All right. So day-to-day stuff, pay reconciliation, stuff like that, Jim

T. GONCALVES

did that; is that correct?

A Yes.

Q All right. You said he worked hand in hand with Ms. Sheeler. Is that right?

A Yes. They're a team. They run a business together. They are married.

Q All right. Why did you sue Ms. Sheeler?

A Why?

Q Yes.

A She runs the business. She hired me.

Q All right. So same answer as for Mr. Brinnen, you sued her in her capacity as manager of NIBI. Is that correct?

A I'm sorry, can you repeat that?

Q Sure. I asked you a minute ago whether you sued Mr. Brinnen because he was manager of NIBI and he was the guy who managed the day-to-day operations.

Now I'm asking the same question as to Ms. Sheeler. Did you sue her

T. GONCALVES

because she's the manager of NIBI and manage the operations?

A Yes. They both manage the operations.

Q And that's the basis of your lawsuit against her?

A Correct. Yes, because there were things at my hiring that, we offer pay, we offer commission, we offer holiday and time off and vacation paid time off, and things seemed to fall through the cracks.

Q These are the same things you mentioned a minute ago. So that would be overtime pay, holiday pay, Social Security?

A Well, when you're hired with an employer, Social Security, federal, state, all of those should be automatically deducted. So there should be no questioning from an employee to an employer, are you taking out my Social Security? Where is my pay statement? There should be no follow up that way. It

T. GONCALVES

should be an automatic if you're running a very well-oiled machine.

Q All right.

A So no, I was not provided any of that information.

Q Sure. My question was -- you said stuff fell through the cracks. I'm just making sure that I got all the stuff that fell through the cracks.

A Yes, that is the basis of it all. Social Security -- we'll review. Social Security, overtime pay, holiday pay, paid vacation, commission.

Q That's it?

A I believe so.

Q Thank you.

All right. When did you first consider suing NIBI for these things?

A Well, let's see. April of 2023, I had gone to Social Security Administration and I had questioned for a printout so I can see my deductions so I can plan going forward for myself. And it just so happened that there was nothing

T. GONCALVES

taken out during my employment time of May 2021 to April 2023, and I had to put a complaint in.

I put a complaint in because during that time span, all my other employers that I had worked for showed deductions except for that time span. So I put a complaint with Social Security.

Q That was April 2023 you said; right?

A Yes.

Q All right. So my question was, when did you first consider suing NIBI? Was it concurrent with your Social Security?

A April 2023 I would say was what made me want to decide to seek legal advice.

Q Did you seek legal advice at that time?

A I sought legal advice as soon as I could.

Q Okay. Was it in April of 2023?

A I want to say it was by June.

T. GONCALVES

Q Of 2023?

A Somewhere between April and June. There were many life events going on with me. So around there tentatively.

Q What were those life events?

A If you don't mind, with due respect, I'd like to keep that personally.

Q Are you declining to answer?

A I'm sorry?

Q Are you declining to answer the question?

A I am declining. That's my personal business.

MR. BOWLES: Mr. Kataev, do you have an instruction on that?

MR. KATAEV: So you don't have to go into a whole lot of detail, and I think you've already provided some answers before, but you are required to answer Mr. Bowles's question. So please answer them.

Mr. Bowles, why don't you repeat the question so --

BY MR. BOWLES:

Q What were the life events you

T. GONCALVES

referred to?

A My divorce. There was a legal situation with that as well.

Q And you said there were other life events besides that?

A Just that. That was --

Q So what was the legal event?

A My divorce.

Q Okay.

A My matrimonial divorce lawyer I was in contact with during that time as well. So yes, there was still other legal situations that I had to wrap up in my life with the divorce.

Q Okay. Who's the divorce lawyer?

A Shimunilyaev.

Q Can you spell that?

A S-H-I-M-U-N-I-L-Y-A-E-V.

Q Thank you.

All right. So is it correct that you quit your job with NIBI in April of 2023?

A I didn't quit. I was driven out of my --

T. GONCALVES

Q Could you explain -- I'm sorry, could you explain that?

A I resigned on my own will, but there was a misunderstanding that happened with a client within the store. And so by choice, I resigned. I was -- I did not quit. I gave resignation. I was not fired, although it was pressed on me to.

Q All right. So you didn't quit but you resigned in April of 2023? I'm right about that?

A Yes.

Q Okay. What was the event that led to that?

A There was a client that came in. And just so you know the rules of NIBI, there was no returns allowed. None whatsoever. So if there was a return to be made, we had to go through all channels of Kristin and Jim.

At the time of this client coming in to the Westhampton Beach location of NIBI-MTK, she had stated that she wanted to return these items. And I

T. GONCALVES

said, unfortunately, we don't usually do returns, but let me get ahold of Kristin or Jim. Okay? So I did proper protocol as the store manager.

And I couldn't reach Kristin. I could not reach Jim. So I said, well, I'm trying to reach them and I can't get ahold of them. She was starting to get irate and upset, the client. She walked out, I'm never shopping here again, everybody is terrible. Terrible things.

She later came in and sent her daughter. Okay? So she came in with her daughter, who is a so-called influencer. I'm not sure if that is -- okay, an influencer. Yes.

So she came in, insisting that this return be done. Still couldn't get ahold of Kristin, couldn't get ahold of Jim. Attempted a couple of times from what I recall.

So the daughter came in, screaming at me and letting me know that, I am going to shut this place down, I'm

T. GONCALVES

going to slam it on social media. I am an influencer of I don't know how many followers, and you can't even do a simple return.

I tried to explain to her my job description, the handbook, and what I need to do for protocol. That was unacceptable. She stormed out.

I finally got a call from Kristin maybe within an hour after she left. And it just so happened that I was screamed at for doing the right thing. I was screamed at because, you should have just done it, now I'm going to get shut down. Do you know who she is? She's a famous influencer. I can't believe this is happening.

So we had a conversation, I believe from what I recall, that evening or the next day. It was between me, Kristin, and Jim. Not in person, via phone.

And it just so happened that Jim was doing most of the conversation and

T. GONCALVES

trying to reason with, okay, well, that happened, you did the right thing, Teresa. And I hear Kristin in the background, I don't want to effing talk to her, I don't effing want her to work here for me anymore. And Jim says, calm down, Kristin, calm down, I'm talking to Teresa.

And I said, why am I being the victim here? I did what I was supposed to do. I took proper protocol. I couldn't get ahold of the both of you. Okay? And I wasn't -- I didn't have leash enough to make that decision on my own, so I couldn't; therefore, concurring this whole story with my family, coming to self-respect and leaving with dignity, I decided I have to give my resignation, hence the reason I resigned.

Q Got it. And again, April of 2023 you said?

A Actually, technically it was May 29 of 2023 I resigned, but April of 2023 was when I put my verbal complaint in to Social Security. So that's when I started

T. GONCALVES

finding things out.

Q You mentioned that the person that you had a conflict with in the store was an influencer. Do you remember the name of that person?

A I don't remember.

Q Okay. And there was a daughter. Do you remember the name of the daughter?

A The daughter was the influencer. The mother was not. I don't remember either of them.

Q Okay, that's fine.

Okay. To set the timeline then. So April of 2023, you went to Social Security. May of 2023, you formally resigned. And by June, you had sought counsel. Do I have that right?

A I believe so. I was employed May of 2021 to April of 2023 with NIBI. So I gave resignation, it must have been in April. I'm trying to track back here my resume.

And so April 2023 is when I gave verbal complaints to Social Security.

Pardon me. Yes,

Q You're looking at a copy of your resume on the computer screen?

A No. I just wrote down when I worked for NIBI. I'm not looking at my resume.

Q So you've got notes in front of you?

A Of just when I worked for NIBI-MTK.

Q Okay. After the deposition, I'd like you to produce a copy of those notes, please.

MR. KATAEV: Please follow up in writing and we'll --

MR. BOWLES: We will.

BY MR. BOWLES:

Q Ms. Goncalves -- sorry, Goncalves, without revealing any conversations you might have had with Counsel, who was the first counsel that you spoke with in or about June of 2023?

A I'm not understanding the question.

T. GONCALVES

Q Well, you just said you consulted with Counsel because you were considering suing NIBI in or about June of 2023. Was it Mr. Kataev or someone else?

A It was Emanuel Kataev.

Q Okay. All right. So it's always been Mr. Kataev?

A Correct.

Q Okay.

A This is in his field and, yes, I had sought legal advice with him.

Q How did you find him?

A He was recommended.

Q Who recommended him?

A My godfather.

Q All right, but you didn't sue in 2023; correct?

A I'm sorry, I don't understand. I didn't sue?

Q Let me -- that's fair. Let me be more specific.

This lawsuit was started in July of 2025; correct?

A It started over a year ago.

T. GONCALVES

Emanuel would definitely have the beginning date.

Q Yeah. So what I'm asking is, if you thought about suing in June of 2023, why did you wait a couple of years?

MR. KATAEV: Objection, assumes facts not in evidence.

BY MR. BOWLES:

Q You can answer the question.

A Why did I wait a couple of years? Because within those couple of years, things started surfacing that was unknown, I was not aware of.

Q What things were those?

A Social Security.

Q All right, but you knew that by June of -- by April of 2023. What else?

A I -- did I?

Q You said you went to Social Security in April of 2023.

A Yes, I did. So I took care of my name. I was doing name changes. I was sorting my world out.

So what took me so long? Legal

T. GONCALVES

advice, life, my family, trying to stabilize my personal life here. Sir, I can't explain my day to day to you.

Q All right, but you said other things surfaced in that period. What else surfaced?

A I don't know.

Q NIBI sued you in 2024; correct?

A They sued me, yes.

Q Yeah. That was for breach of your non-compete agreement; right?

MR. KATAEV: Objection, calls for a legal conclusion.

You can answer.

BY MR. BOWLES:

Q You can answer.

A So what was the question?

Q Was that for breach of the non-compete agreement?

A That's apparently what she sued me for, was I signed a non-compete.

Q Right. Did you sue NIBI because they had sued you for the breach of the non-compete?

A No, sir.
Q Did it make you angry?
A No.
Q Before you sued NIBI, did you speak with any other employees at NIBI about the lawsuit
A Prior to the lawsuit?
Q Yes.
A No. I don't speak to anybody from NIBI.
Q Okay. So you're not in contact with other employees at NIBI these days?
A Who used to work at NIBI? I just -- I just speak to Dina.
Q Okay. So again, you sued -- this lawsuit, I'll represent, was filed in July of 2025. So what I'm asking you is, before you filed the lawsuit, did you talk to any other employees or former employees of NIBI to ask if they wanted to sue as well?
A No, I did not.
Q You spoke to Dina Ketcham, correct, because she's also a plaintiff?

T. GONCALVES

A I speak to her, but I don't make her choices.

Q I understand that, but did you speak to her about suing NIBI before you sued?

A No, sir, I did not. What -- not at all.

Q Are you friends with Dina Ketcham?

A We're friends, acquaintances, however you want to say it. I don't see her every day.

Q Yeah. Have you discussed the lawsuit with her?

A We're in this lawsuit together.

Q Yes. Have you discussed it with her?

A We discuss it with our legal advisor.

Q Do you ever discuss it without your legal advisor?

A I prefer not to.

Q Do you discuss it without your legal advisor?

T. GONCALVES

A What we do is just reiterate conversation of what our attorney has discussed with us. That's it.

Q Do you do that by phone or text or email or what?

A Like I said, we don't consume ourselves with this conversation. If we discuss anything, it is same day of the Zoom just so we're all on the same page.

Q All right. So you've done that. You've discussed with Dina the same day of the Zoom whether you're on the same page?

A Yes.

Q All right. Did you do that by phone, or something else?

A Yeah, in conversation. Very brief phone call.

Q All right. Any text messages?

A No.

Q You've never texted Dina?

A We text each other good morning, have a great day, how's your business, how are you doing.

Sir, no, I don't consume myself

T. GONCALVES

with NIBI texts. I've moved on. I haven't been there in three years.

Q All right. So you're saying you've never texted Dina about the lawsuit?

A I don't -- you know what? Honestly, I'd have to go back into my texts if you really want an answer and see did I mention anything on a lawsuit. I -- for now, from what I recall, I'm going to have to say no.

Q But you haven't looked at your texts to see whether you've had discussions with Dina about the lawsuit?

A No. I don't look back on my texts, no.

Q Okay. How about emails; did you ever discuss it with Dina by email?

A No, we don't email each other.

Q You've never emailed Dina?

A No.

Q Never gotten an email from Dina?

A Not that I recall.

Q When did you first meet Dina

T. GONCALVES

Ketcham?

A Let's see. Maybe ten, 15 years ago, if not 20. Maybe ten, 15 years ago.

Q Did you introduce her to NIBI?

A She -- Kristin needed help and she said, I need somebody to work for us, can you recommend anybody? So I said I might have somebody, and so I suggested Dina.

Q About when was that?

A I don't recall.

Q All right. Dina did go to work for NIBI; is that correct?

A Correct. She did.

Q Did you guys work at the same store?

A I think there was an overlap of a day or a couple of days. I don't recall her really being with me. She was in the Montauk location mostly. Again, I'm not -- I'm unsure.

Q What location were you at?

A Westhampton Beach.

Q Okay. I think I asked this

T. GONCALVES

before, but just to clarify. You didn't speak with Dina Ketcham about the lawsuit before you filed the lawsuit; is that correct?

MR. KATAEV: Objection, common interest privilege.

I instruct the witness not to answer the question.

MR. BOWLES: She can certainly answer whether she's discussed the lawsuit or not.

MR. KATAEV: No. I'm instructing her not to answer. It's under the common interest privilege.

MR. BOWLES: All right. I'm going to ask it again clearly so we get the record clear.

BY MR. BOWLES:

Q I'm asking you, Ms. Goncalves, whether or not you and Dina Ketcham, the other plaintiff that is in this lawsuit, discussed the lawsuit before filing.

MR. BOWLES: Are you instructing her not to answer?

T. GONCALVES

MR. KATAEV: Correct, based on the common interest privilege.

BY MR. BOWLES:

Q Do you know whether anyone else, any other employees at NIBI are planning to join this lawsuit?

A I do not know.

Q And you said you're not currently in touch with any other employees or former employees at NIBI; is that correct?

A No, I am not.

Q Okay. All right. I'm going to share a document on screen. This is the first time we're doing this. Ms. Goncalves, I want to make sure you're able to see everything and it's legible.

MR. KATAEV: We can see it.

BY MR. BOWLES:

Q I'm going to make it a little bigger for you.

How's the legibility, Ms. Goncalves?

MR. KATAEV: If I can make a

suggestion. Hit the green button on the top left to make it a full screen.

MR. BOWLES: This button?

MR. KATAEV: No, top left. The green one, the green circle.

MR. BOWLES: Oh, I see.

THE REPORTER: Counsel -- if I may, Counsel, just the way you're sharing this, everything on your desktop screen will be shown. There's another way to do it. Just want to let you know before you proceed. Okay?

MR. KATAEV: In other words, if you don't want us to see anything other than this, when you're done with this document, stop sharing, and share again when you're ready.

MR. BOWLES: Yeah, no, I understand. I understand. But thank you.

BY MR. BOWLES:

Q Is it legible, Ms. Goncalves?

A Yes.

Q Hang on. I'm just going to make a slight change.

T. GONCALVES

Still legible?

A Yes.

Q Very good. All right.

I'm going to ask that this be introduced as Exhibit 1 to this deposition. As we discussed before we went on the record, I will email around all the exhibits afterwards so everybody's got an electronic copy.

(Exhibit 1 was marked for identification.)

I'll represent for the record that this appears to be the complaint in this matter as filed with the federal court on July 31, 2025, Docket Number 1.

Ms. Goncalves, have you seen this document before?

A Yes.

Q What is it?

A It's obviously us suing Kristin Sheeler.

Q It's a complaint in this matter. Is that right?

A Okay. Yes.

T. GONCALVES

Q Did you see it before it was filed?

A Yes.

Q Did you review all the allegations in it before it was filed?

A Yes.

Q Are all the allegations true?

A Yes.

Q All right. I'm going to scroll down to paragraph 12 of the complaint. Paragraph 12 says that you were employed by Defendants in the state of New York from May 2021 to April 2023. Is that correct?

A Yes, that is correct.

Q So that's about 23 months; is that right? Just under two years?

A Yes.

Q We're going to return to the complaint, but I'm going to put a new document on the screen, and I'll ask this to be marked as Exhibit 2.

(Exhibit 2 was marked for identification.)

T. GONCALVES

For the record, this appears to be an email from Jim Brinnen to Kristin Sheeler, copying I believe you, Ms. Goncalves. It's dated May 31st of 2021. It has a Bates number beginning with D1.

Have you seen this document before?

A Yes, I have seen that.

Q It's an email to you; is that correct?

A A long time ago, yes.

Q In the upper right, more or less, I guess middle of the screen, there is an email address, bcl456@optonline, I guess optonline.net. Do you see that?

A Yes.

Q Is that your email address?

A It was.

Q It's no longer your email address?

A No.

Q Okay. But in May of 2021, that was your email address; right?

A Yes.

T. GONCALVES

Q All right. So is this email attaching a new hire package to you?
A It seems that way, yes.
Q If I scroll down, it appears to be a W-4. Do you see that?
A Yes.
Q All right. Let's scroll down further. Appears to be an employment agreement; is that correct?
A I suppose. I see it.
Q Very good. You saw it in May of 2023; is that right? You recognize this?
A Yes, I recognize this. Yes. This was my offering letter.
Q All right. So you don't dispute receiving this package in May of 2023?
A I'm sorry, can you repeat that?
Q You did receive this package in May of 2023; is that right?
A I guess I did. I ...
Q You don't dispute it? How about that.
A I don't dispute it. No, sir, I don't.

T. GONCALVES

Q Good. On the page marked D7 of the exhibit, it appears that your compensation was going to be an hourly rate of $23 per hour. Is that right?

A Correct.

Q And a commission rate of 4 percent of eligible sales; is that right?

A Yes.

Q So that was your compensation at first; right?

A Yes.

Q And then later, you got certain raises; is that correct?

A There was a shift from hourly to salary. I don't remember the raises.

Q Okay. All right. The shift from hourly to salary, did that include more money for you, or did it not?

A Technically, no. They -- it was made to seem that it was but was not.

Q Okay. Did you sign this agreement?

A I'm not sure.

Q All right. I'm going to put on

T. GONCALVES

the screen a document I'll ask to be marked as Exhibit 3.

(Exhibit 3 was marked for identification.)

This appears to be a copy of the agreement that we were just looking at. No, I'm sorry, strike that.

This appears to be a general agreement, an employment agreement, and it's dated -- reconfirmed as May 29, 2023. Sorry. It bears Bates numbers D155 through 158. Sorry about all the scrolling around.

Have you seen this document before?

A Yes, I believe I did.

Q All right. Is this an employment agreement that you signed?

A Unsure.

Q I've scrolled down to page marked D158, which appears to bear signatures. Is that your signature there?

A The T.S. at the time was.

Q All right. So that is your

T. GONCALVES

signature?

A It's initials. I wouldn't say it's a signature, but yes, if you consider it.

Q Okay. Did you mark down those initials on the page?

A Yes.

Q Thank you.

All right. I'm returning to the complaint, which is Exhibit 1.

A Excuse me, may I please take a moment?

Q You want to --

A Just take a break for --

Q Sure. Of course. We can take a break. How long do you need?

A Five minutes, please.

MR. BOWLES: That's fine.

THE REPORTER: All right. It's 10:47 a.m. Off the record.

(Off the record.)

THE REPORTER: All right. The time is 10:54 a.m. On the record.

//

T. GONCALVES

BY MR. BOWLES:

Q All right. Ms. Goncalves, we just took a break at your request. Did you have a conversation with your attorney during the break?

A Yes.

Q All right. Is that why you took the break?

A No. I needed water too.

Q That's just fine. Any time you need something like that, you just let me know.

A Thank you.

Q All right. We are back in the deposition after the break. We are still looking at Exhibit 1 which is on the screen. I'm going to ask you a few more questions about the complaint.

The complaint, paragraph 19 of the complaint is on the screen now. If you could just read that. Not out loud, just read it to yourself.

All right. In substance, it says that you began working in around May

T. GONCALVES

of 2021. Is that correct?
A Yes.
Q And you were a store branch manager; is that right?
A Yes. I was the store manager for Westhampton Beach.
Q All right. Yeah, to be clear, NIBI has multiple stores or had multiple stores at that time. And so you were the manager of the entire store at Westhampton Beach; is that right?
A Yes.
Q So you managed the employees at Westhampton Beach?
A Yes, I did.
Q How many employees were there?
A When I first started, or midway, or toward the end, or in total? Because it fluctuated always. There was a lot of turnover. I'm not sure what the question is then.
Q That is a fair request for clarification.
So during the course of your

T. GONCALVES

employment, which we worked out was about 23 months, what was the high point and low point of employees working at the Westhampton store of NIBI?

A I would say the highest was between, from what I remember, seven to nine, and probably the lowest of employees, maybe three to five.

Q Okay. So at a low point then, it would be three employees. At a high point, nine. Is that fair?

A Fair. But there were variables. There was colleges starting. There were -- it's really timing, honestly. It wasn't consistent, I should say.

Q Was the store seasonal, as in it'd have a high season and a low season?

A Yes.

Q High season I guess was summer?

A Yes. Memorial to Labor.

Q Would the number of employees fluctuate with the season as well?

A Yes.

Q So in a high season, you'd have

T. GONCALVES

more employees?

A In season, we would have more employees, yes.

Q And you said "in season." So in high season, you'd have more employees?

A Yes.

Q All right. And you said you were the manager of those employees. So those employees reported to you?

A Somewhat reported to me, yes, for what was in my control.

Q So what did that entail? How did you manage them?

A Schedules, breaks. That's really it. Every other question, if they had a concern with pay statements, commission, they would bring it to my attention and I would take protocol and go to Jim and Kristin.

Q All right. So you managed their schedules?

A Yes, I had to schedule them for the business days of the week. Yes.

Q All right. So you'd tell them

T. GONCALVES

when to come in and when they got off and that sort of thing?

A For the most part. Whatever the needs of the business were.

Q Okay. And would they clock in and clock out?

A Sometimes it worked, sometimes it didn't.

Q Okay. But was it --

A So, yes, I believe they were clocking in and out on a system; on an iPad it was, I think.

Q Yeah, I was going to ask you about that.

So what was the system for clocking in and out? It was an iPad at the store?

A It was the actual POS system. So it was the register, and there was a clock in and clock out. I think it just said the times -- I'm not sure, actually, but I believe it was by Clover or Lightspeed, if you need to know who created it. It was one of those.

T. GONCALVES

Q Okay. Let me break that down a little bit. You mentioned a POS system. Is that point of sale system?

A Point of sale. Yes.

Q And was that the iPad?

A It was like a standup like iPad. It wasn't quite an iPad. It was not an Apple device, but it was a touch screen.

Q Okay. It was a device that is made for keeping time, is that fair, as opposed to an iPad that had been repurposed?

A Technically it was not to keep time. It was really ringing up sales. It had other management sort of function that I didn't even explore and know how to use.

So we were able to clock in and clock out, again, when the systems were up and running. There was a lot of technical difficulty there.

Q Okay. You mentioned as well a register. Is a register the same POS system, or is it something different?

A It was on the same device.

T. GONCALVES

Q All right. So there was one device on -- I'm generally trying to understand. There was one device on which sales were rung up as a register, but also employees clocked in and clocked out?

A Correct. There was a separate menu, I believe, for doing that.

Q All right, got you.

And I suppose this was at the counter in the store in Westhampton; is that right?

A Yes.

Q All right. Did you have a higher level of access than the other employees to that system?

A No, I actually did not.

Q Okay.

A There were no special perks for me.

Q All right. Could you, for example, look at the time sheets for the people you were employing?

A No. I was not able to do that.

Q All right. Okay.

T. GONCALVES

So in terms of how it would work, an employee would come in, they would touch the point of sales system in order to clock in, and at the end of the day, they would clock out?

A Yes. And I'm not sure if they had to clock in for lunch. I don't recall that. But they did have to clock in at the start of their shift and at the end.

Q All right. Did you supervise that at all?

A I would see the employee do that, yes.

Q All right.

A I would not hover over them. That's kind of a --

Q Sure. But was it part of your job to try to make sure that people clocked in and clocked out at the right times?

A Absolutely. I tried to, yes --

Q Okay.

A -- just because that's payroll for them.

T. GONCALVES

Q I understand.
And you as well, did you clock in and clock out on the same system?
A I believe I did for a shorter time before I went into salary mode.
Q All right. We'll get to the date of that in a little while, but there was a point at which you became a salaried employee; is that right?
A Yes.
Q Okay. We'll explore that later. We don't have to pin down the date now.
But before that time, you're saying you clocked in and clocked out; correct?
A Yes.
Q And you did that with your own hands?
A Yes.
Q Okay. And then after you became salaried, you no longer clocked in and clocked out, or did you?
A I believe I did not because at that point, I was salary. When you're on

T. GONCALVES

salary, you don't have to clock in and clock out usually. But I don't recall clocking in and out on salary.

Q All right. So, so far we've talked about you managing and working physically at the Westhampton store.

Did you ever work at any other stores for NIBI?

A Yes.

Q What other stores?

A Bridgehampton and Montauk.

Q All right. Is that all the stores NIBI had?

A Yes.

Q All right. So you worked at every store. How often did you work at the other stores?

A Randomly. I might've had to cover for vacations or lack of help, coverage, that sort of a thing.

Q The majority of your time was spent at the North Hamptons -- sorry, at the Westhampton store?

A The majority of my time, yes,

T. GONCALVES

was Westhampton Beach.

Q Okay. How would you know that you'd have to cover at another store?

A I would be asked by Kristin.

Q All right. Not by Jim but by Kristin in this situation?

A In this situation, yes.

Q Okay.

A She might have had a wedding. I need Montauk covered, can you do that?

Q Okay. All right. Returning to paragraph 19 of the complaint, which is Exhibit 1. It says that you worked approximately 60 to 70 hours per week.

Do you see that?

A Yes, I do see that.

Q Yeah. Is that accurate?

A There were times of 60 hours for sure. I would meet with clients prior to work. I still keep in contact as friends with my clients. I would do a lot of running errands, buying flowers for the outdoor pod -- the front pods.

Standards were very high when I

T. GONCALVES

was there, and I kept a tight ship for her.

Q Okay. How often did you work 60 to 70 hours per week?

A I don't recall.

Q All right. Did you clock in and out for those hours?

A Yes. Again, there were many times where I was unable to clock in or out due to system errors. Even just ringing up sales, we had a lot of system error.

Q Okay. So there were times you couldn't clock in and clock out?

A Yes.

Q And --

A So we would text Jim --

Q Okay.

A -- and we would let him know, because that's what we were told to do. So all the employees knew, text Jim, let him know that you're in.

Q Okay. So let me make sure I understand the system here.

T. GONCALVES

So there -- you would clock in and clock out when you were able to; is that right?

A Yes.

Q Okay. But there were times that the POS system wasn't working, and in those situations, the backup was that you would text Jim Brinnen. Is that right?

A Yes, because we had to let him know that we were in for the day. He was the only one in control of the hours. We -- myself as a store manager, was not able to make corrections.

Q Okay. But Jim could make corrections; is that right?

A Yes.

Q Okay. You said that you and the other employees would sometimes have to text Jim when the POS system was down. Would the other employees text him directly, or would you text on their behalf?

A They would text him. We were all -- we would all do our thing that way,

T. GONCALVES

unless it was a very large store situation where I had to reach out to him, which there were times where the systems were completely down and the line was out the door where the systems were not working. It depended on the situation. Many variables.

Q All right. Did you produce -- well, okay, strike that.

So there would be text messages between you and Jim Brinnen about hours that you worked that weren't on the clock; is that right?

A I believe so. I would have to let him know if I couldn't clock in or clock out. I needed to know that my hours were going to be recorded.

Q Sure.

A I was very dependent on my payroll.

Q Okay. So you still have copies of all those text messages?

A No, sir, I don't.

Q Why is that?

T. GONCALVES

A Well, I don't have my email anymore. I don't have my old cell phone number anymore. That's what was. I'm --

Q Okay. So your cell phone changed between 2021 and now?

A Yes.

Q And you don't have access to the old text messages?

A No. I don't have access to anything.

Q Okay. What was your phone number at the time?

A (631) 820-1616.

Q That would've been in 2021; is that right?

A Yes.

Q Okay. Directing your attention to paragraph 27 of Exhibit 1. It says, "During the relevant period, Plaintiff Goncalves worked approximately 60 hours per week."

Do you see that so far?

A Yes, I do.

Q All right. So when I asked you

T. GONCALVES

before when you worked 60 hours, did you work 60 hours every week, or just every now and then?

A To know the nature of the beast, the business, in season, there were times where you did 60 hours every day. It could be -- preparatory to season, you could be doing 60 hours per week every other week.

Q Okay.

A It depended what was coming in; a shipment from India, how much steaming you had to do, setting up schedules and putting your people in place, floor moves. There's tremendous that goes behind it.

Q Sure. So to be clear, are you saying that you would sometimes work 60 hours in the high season but not in a low season, or did I get that wrong?

A I would do it perhaps in both, preparatory to season and thereafter season, because you still have a still big influx of clients in the fall.

Q And in the wintertime, would it

T. GONCALVES

be lower than 60 hours?

A Usually.

Q All right. What would it be in the wintertime --

A Unless there were -- unless there was something happening as far as shipments or movements or inventory. Again, it depends, and I don't have the schedule layout on all of that.

Q Okay. But in the wintertime, what would you expect to be working per week?

A I had to work 40 hours and that was made very clear. I needed that. So I always communicated that with Kristin and Jim.

Q Okay. So in the high season, then, when you were working 60 hours a week, you would clock in and clock out?

A I'd have to clock in and clock out high or low season.

Q Okay. So all of the time, you clocked in and clocked out. Is that fair?

A That's part of the job. You

T. GONCALVES

have to clock in and clock out.

Q Got it. And if your system wasn't working, you would text Jim, and that's the way that she would record your time. Is that right?

A If the system did not work, yes, you had to contact Jim.

Q Okay. Now, you said that you would sometimes meet clients or run errands. Would you clock in before you did those things and then clock out?

A I would try. Again, there were variables and times where the system did not work or it lagged or it was down. So there were times where I could not.

Q Sure. And in those situations, you would text Jim; is that right?

A Correct. That was what I was supposed to do.

Q Okay. So one way or the other, you were able to convey the time that you were working to NIBI by way of Jim?

MR. KATAEV: Objection, argumentative.

T. GONCALVES

You can answer the question.

THE WITNESS: I can answer it, Emanuel?

MR. KATAEV: Yes.

THE WITNESS: So can you repeat the question?

BY MR. BOWLES:

Q Yeah. One way or the other, whether by the POS or by text message, you were able to convey the time that you were working to the company?

A Yes. If I could get the text through, yes. And if it was read, yes, that's what I had to do.

Q All right. Returning your attention to Exhibit 1, paragraph 27. That paragraph says that you were not paid for all the hours work that you rendered for the benefit of the defendants.

What did you mean by that?

A What line are you looking at?

Q It's paragraph 27. Here, I'll kind of try to highlight it. Do you see that?

T. GONCALVES

A Okay, I see it.

Q Yeah. You said you worked 60 hours per week, but you weren't paid for all the hours. What did you mean by that?

A Because there were weeks, many a weeks where, again, the systems were down and the hours were incorrect. So I'm not sure, honestly, if the texts were even viewed, if the hours were corrected.

Q Well, wasn't there an opportunity at the end of every pay period to go over your hours with Mr. Brinnen?

A No.

Q Okay. So you're not sure whether or not you were paid for all the time you worked. Is that accurate?

A Yes.

Q Okay. But you don't know that you weren't paid for all the hours you worked?

A Well, at the time, the figures were not adding up. So there was a lot of question as far as my time.

Q Okay. And contemporaneously, at

T. GONCALVES

the time, was there ever a time that you complained that you didn't get paid for all your hours and they didn't pay you?

A Yes.

Q Let's be clear about that. Tell me about that.

A There were times where I would see my Zelle payment go through or my direct deposit, and I would ask, is that correct? Yes. So I would always -- I would do that a few times. I would reach out. Yes.

Q How did you do that?

A Via text. That was the only way of correspondence unless he was able to have contact with you via phone.

Q All right.

A He also had a full-time job, I believe, marketing in the city.

Q All right. It was always to Jim Brinnen; is that right?

A If we went to Kristin, any of us have a question for Kristin, it would always be directed, that's Jim's

T. GONCALVES

department.

Q Okay.

A Jim will take care of it.

Q All right.

A So we had to go through Jim, to answer your question.

Q Got it. All right.

So you would communicate with Jim either by text or by phone and say you had a problem with the pay, you didn't get paid enough. Is that right?

A Yes.

Q Okay. But you don't have copies of those texts because you lost your phone number?

A Yes.

Q All right.

MR. KATAEV: Object to form on that.

BY MR. BOWLES:

Q Do you have any other evidence that you actually reached out to NIBI and asked to get paid for pay that they didn't pay you?

A As a matter of fact, I do. I

T. GONCALVES

actually ran into something. I backtracked on my phone, my existing phone number, and oddly enough, there was, on February 6th of 2023, a Zelle reminder to Jim at 5:05 p.m. I had to Zelle remind him to pay me, which was ...

Q Okay. Is that a text, or is that a email, or what?

A That was on my calendar. And I don't know how it got to my calendar. I don't know, because I have a new phone line, but -- I don't know.

Q So this is some sort of electronic calendar?

A You know your calendar that you have on your Apple or Android?

Q Right.

A Yeah. So I just so happened to be looking and scrolling through the months prior to the time that I was employed there, and this was the one and only event that very interestingly came up to remind Jim for my Zelle payment, because I did have to remind him.

T. GONCALVES

Q Okay. So this was a reminder on your phone to yourself to remind Mr. Brinnen to pay you?

A Yes.

Q Okay, got it. And that popped up on your calendar; is that right?

A It did, but it was faded. So I don't know if it was from transferring my old line because I didn't -- it's very complicated to explain this to you.

THE WITNESS: Emanuel, should I say this about my phones?

MR. KATAEV: You have to answer truthfully, whatever the questions are. So if it's part of your answer, go ahead.

THE WITNESS: The question is -- answering on this, do you want to know -- should I elaborate on this?

BY MR. BOWLES:

Q Yeah. Tell me what you're looking at. I'm trying to figure out what you're seeing.

A Okay. So when my old phone line, the 820-1616, was closed -- not by

T. GONCALVES

my liking, it was closed. I had to reopen a new line.

So I had gone to my carrier and I said, I need a new phone line for me and my family. And so I guess what was transposed from my old to my new, that was still lingering, if that makes any sense, because nothing else was saved. I have no texts that were saved. I have nothing; no contacts, nothing.

MR. BOWLES: Okay. After the deposition, we'll call for a copy of that calendar. And Mr. Kataev, I'll put that in writing as we had discussed before.

MR. KATAEV: Thank you.

BY MR. BOWLES:

Q All right. So you found this one text from February 6th of 2023, a Zelle reminder to yourself to remind Mr. Brinnen to pay you. Is that right?

A Correction. It was not a text. It was a calendar reminder.

Q Right. Sorry if I misspoke.

A No, that's okay.

T. GONCALVES

I didn't text myself. It was just a reminder to myself to reach out to Jim to remind him to pay me through Zelle because that was the only form of payment.

Q Okay. Did they pay?

A I believe so. I'm uncertain. I'm sure they did, or --

Q Okay. My question to you before, which led us down this path was, do you have any evidence that they didn't pay you anything that you were owed after you asked for it?

A I would not get pay statements to do a comparison. I don't have anything right now. I have no documentation to answer your question, but in the past, I didn't have documentation either unless I specifically asked for it.

Q Okay. You did email back and forth with Mr. Brinnen, though; correct?

A Email him?

Q Yeah.

A For what?

Q Well, in general, you were able

T. GONCALVES

to communicate with Mr. Brinnen by email; right?

A That was an option; an email or text.

Q Okay. And --

A But not just for myself. That was for everybody.

Q Of course, of course.

And we looked back and you'd received your initial hire, new hire package by email; right? We read off your email address; correct?

A That was an old email. Yes.

Q Okay. Do you still have access to that email address?

A No, I do not.

Q Okay. So I guess you did not -- were not able to search that email address to produce documents; is that right?

A I tried to search. I reached out to Optimum [ph], and there was nothing available at that point. They don't save certain documentation after a certain

T. GONCALVES

amount of time.

Q Okay. All right. I'm going to introduce a new exhibit. I'm going to ask that this be marked as Exhibit 4.

(Exhibit 4 was marked for identification.)

And I'll represent for the record that this is a spreadsheet produced from the NIBI timekeeping system, and it was produced in discovery. It begins with Bates number D48. Appears to be just a spreadsheet of hours worked.

Have you ever seen this before, Ms. Goncalves?

A Jim never showed me this, no --

Q Okay.

A -- or Kristin. And if this is a clock in, clock out, where is my times?

Q Okay. But to be clear, what I'm asking for now is just, have you ever seen this document before this moment?

A I've seen it -- I've seen it with my attorney.

Q Okay. Yeah, and that's what I

T. GONCALVES

was getting at.

Had you ever seen it before this lawsuit started, for example?

A I -- yes, I answered the question.

Q Yeah. Okay. I asked you a different question.

Have you ever seen this before this lawsuit started? Answer's no?

A Oh, no.

Q Okay. Did you ever see timesheet records like this from NIBI's systems?

A No.

Q Were you able to go into the POS system and produce these sorts of spreadsheets?

A No. I was not allowed to. I didn't know how to access it. Again, this was Jim's. He would run this.

Q Okay. So for example, you couldn't go into the POS system and look at the record of your own hours?

A No.

T. GONCALVES

Q Okay.

A I never recalled going back into the system for that. No.

Q All right. Did you review this document after it was given to you by your attorney?

A Did I review it?

Q Yes.

A No. I was shown it. I did not study it.

Q Okay. So did you go -- you didn't look through it to see if the hours looked accurate then?

A This was, again, three years ago that I was with them. I did not calculate. No, I did not.

Q All right. I understand.

Okay. There are some things on this that appear to be errors. The second entry shows you working for 23 hours on July 3rd of 2022.

You didn't work for 23 hours, ever. Is that right?

MR. KATAEV: Objection to form.

T. GONCALVES

BY MR. BOWLES:

Q You can answer.

A I don't recall.

Q Do you recall ever working for 24 hours, or almost 24 hours for NIBI?

A Not that I recall, no. Not for 23 straight hours.

Q Sure. Well, let's look down the entry for September 22, 2022. I'll just highlight it. It appears to be 94 hours.

You never worked 94 hours in a day. Is that right?

A There aren't 94 hours in a day.

Q Exactly. So my question is, were there times that you clocked in but forgot to clock out?

A And there could have been times where I could have clocked in and not clocked out because of the system errors.

Q Okay. So there were times that you clocked in and didn't clock out. Do you recall that?

A Perhaps. I'm human. I --

Q Okay.

T. GONCALVES

A -- am not perfect.

Q No doubt about it.

In that situation, how was it corrected?

A Jim was supposed to correct it. That was not for me to correct. I didn't know how to correct it. I was not shown to.

Q And would you correct it with Jim via email?

A I don't recall if it was via text or via email. That's I suppose a question for Jim.

Q Okay. You just don't recall how -- okay, let me strike that. Let me start over.

Where there's an error, for example, clocking in and not clocking out, it was corrected via Jim, but you don't recall how it was corrected, whether it was by email or some other form. Is that right?

A I had to communicate if there was an error in clocking in or clocking

T. GONCALVES

out to Jim. What Jim did with adjusting the error was on Jim.

Q Would he give you a chance to verify the timesheets?

A No.

Q He never communicated with you about that?

A No. I never saw timesheets.

Q Okay. I'm going to show you an exhibit; will be asked to be marked as Exhibit 26. As I said before, sometimes I go out of order.

(Exhibit 26 was marked for identification.)

Same sort of question. Have you ever seen this document before this lawsuit?

A What is this?

Q For the record, it appears to be a spreadsheet of hours that you worked.

A Okay. I believe Emanuel shared this with me --

Q Right.

A -- with the time clock. Yes.

T. GONCALVES

Q Okay. And this is not something you had seen before Emanuel showed it to you; is that right?

A No.

Q And in your work at the company, I gather you could not see timesheets or records or spreadsheets like this of time worked. Is that right?

A No.

Q All right. Did you review this during this lawsuit to determine whether it was accurate?

A No, I did not study this as well.

Q Okay. This appears to be your clock in and clock out times on a daily basis for the period you worked there. If I asked you whether you could verify whether these were accurate, could you do so?

A I'm not sure.

Q Would you have a way to verify these hours?

A No. I don't have any

T. GONCALVES

documentation to verify. I never saw this before, prior to today, or the other day with Emanuel, and so no. I was never given copies when I was employed to verify, are these correct, these are your hours.

Q Okay. So Mr. Brinnen never, for example, sent you an email, saying, these are your hours for this time period, can you verify?

A Not that I recall, no.

Q Okay. I put an exhibit on the screen that I'll ask be marked as Exhibit 5 for the purposes of this deposition.

(Exhibit 5 was marked for identification.)

For the record, this appears to be a single-page email from Mr. Brinnen to Ms. Goncalves, dated August 10th of 2021. It bears Bates stamp D229.

I'll ask you, have you seen this before?

A Yes, I have seen this.

Q What is it?

T. GONCALVES

A I was not always able to see this. This was a here-or-there document.

Q What does that mean?

A It means I didn't always -- I didn't always get one of these. I feel like I didn't always have one of these per pay statement.

Q All right. But Mr. Brinnen would send you emails and say, here's your payroll for this period, please verify. Is that right?

A Please verify.

Q Well, isn't that the purpose of these emails, where you could check your hours?

A This, I believe, was submitted at the same day as the pay. So whether there was discrepancy or not, then he would make the adjustment. But he wasn't waiting for verification or approval from any employee prior to Zelle'ing [ph] anyone.

Q All right. So let me work out what you're saying. You're saying that he

T. GONCALVES

would send this email and then would Zelle, which means pay by the bank system; is that right?

A Yeah, it would be the same day. It wasn't like, okay, yes, that looks great, confirmed. It was not that sort of system.

Q All right. What if you were under or overpaid; would you respond to an email like this?

A If I got one of these -- I believe I was getting more of these documents when I had first started with NIBI-MTK versus as I became more seasoned with the company.

So then when I felt, where are my hours, where's the breakdown -- and why does it show the Social Security when it was not implemented?

Q Well, okay, I'm just focusing on whether you got these or not. Are you saying you got them, but irregularly?

A Yes, it was irregular, to answer your question.

T. GONCALVES

Q How often were you paid?

A Once either a week or biweekly. I believe it was weekly pay. I believe we established that earlier.

Q Okay. I'm just trying to pin it down.

A Okay.

Q So you get paid weekly, but your testimony is you wouldn't always get these emails saying, here's your payroll?

A Correct.

Q Okay.

A I feel this was more when I first started versus as the time went on.

Q You more often got these at the beginning of your employment?

A Yes, because --

Q All right.

A Yeah. Yes.

Q All right. I'm going to put on the screen a document I'll ask to be marked as Exhibit 6.

(Exhibit 6 was marked for identification.)

T. GONCALVES

For the record, it appears to be an August 24, 2021 email from Mr. Brinnen to Ms. Goncalves. It bears Bates number D230. It appears to be another email saying, here's your payroll details. Do you see that?

A Yes, I see that.

Q And do you see at the bottom, there's a note with an asterisk that said, this includes four hours missing from prior pay period? And so he added hours because they had been missed before because of a clock in, clock out.

Do you see that?

A Yes.

Q So NIBI would go back and correct when you were underpaid; is that right?

MR. KATAEV: Objection.

BY MR. BOWLES:

Q You can answer.

MR. KATAEV: You can answer, yes.

THE WITNESS: They would pay when they had -- when -- yes, when there was

T. GONCALVES

fault, of course, but it wasn't for holiday.

I know you're saying with payroll only, so yes. To answer your question, yes.

BY MR. BOWLES:

Q Okay. And by the way, just generally speaking, Mr. Kataev will tell you when not to answer. He's objecting to preserve the record. That's fine. But unless he tells you to not answer, you can go ahead and answer.

MR. BOWLES: Is that fair, Mr. Kataev?

MR. KATAEV: Yes.

MR. BOWLES: Okay.

THE WITNESS: Emanuel, you're echoing where you are. That's why sometimes I don't hear the response very clear.

MR. KATAEV: Okay.

BY MR. BOWLES:

Q All right. Just to get these on the record, this is Exhibit 17.

//

T. GONCALVES

(Exhibit 17 was marked for identification.)

For the record, it appears to be a February 7, 2022 email from Mr. Brinnen to Ms. Goncalves. It bears Bates numbers D214.

Have you seen this document before, Ms. Goncalves?

A Well, I just saw one prior to this that was similar.

Q Sure. Have you seen this before?

A I don't remember.

Q Okay.

A I don't have documentation to verify that I have it and I have seen it.

Q That looks like your email, doesn't it?

A It does look like my email that did exist.

Q Okay. I just want to call your attention to the fact that there's a $17.35 expense reimbursement for lights.

Do you know what that was about?

T. GONCALVES

A I don't recall.
Q All right. Would they sometimes reimburse you for expenses?
A Yes.
Q How did that system work?
A Not timely.
Q Okay. But I mean in terms of nuts and bolts, would you submit a receipt for lights, whatever those were?
A Absolutely. I had the receipts of everything that was purchased.
Q Okay. So you would buy something for the store, and you would send a receipt to Jim; is that right?
A Yes. I would send him a picture of it, send him the receipt.
Q Okay. How did you do that, email or text?
A I don't recall. It was one or the other.
Q All right. And you don't have copies of the emails or texts because you lost your phone --
A No.

T. GONCALVES

Q -- and email; right? Okay.

A I didn't lose my phone. I lost that number. So I do not have that number any longer.

Q I understand. I understand, yeah.

Underneath the block in the middle of the screen, there's a notation that says, four hours for snow day.

Do you see that?

A Yes, I see that.

Q What was that about?

A I'm assuming an early closure.

Q So they paid you when the store closed because of snow?

A I don't remember what snow day it was or if I had to drive to Bridgehampton in the snow or Montauk. I'm not sure. I don't remember that date.

Q Okay. But as a general practice, if there was a snow day, when the store was closed, would you get paid?

A If I believe had gone in to open for business and the snowstorm

T. GONCALVES

progressed -- so yes, I think it was a regular business day to get paid for, from what I remember.

Q You don't remember this particular snow day. It was a long time ago. Is that fair?

A I do not remember that.

Q I understand.

For the record, there's an exhibit I'll ask be numbered 19.

(Exhibit 19 was marked for identification.)

This appears to be an email dated April 5th of 2022 for Mr. Brinnen to Ms. Goncalves. Similar to the ones we were looking at, it bears Bates numbers D218.

Is this another one of these emails where Mr. Brinnen is sending you a record of your hours for the time?

A Looks that way.

Q All right. Here, there appears to be two notations. One is $277 for makeup from retro raise period back to

March 26, 2022. Do you see that?
A Yes, I see that.
Q What's that about?
A I'm unsure.
Q Did you get a pay raise in March of 2022?
A I don't remember.
Q Okay. But this is not when you went on salary; is that right?
A I don't remember that either. I don't have the dates of when I went into salary.
Q Do you recall if you got any raises before you went into salary?
A I don't recall.
Q Okay. There's a second notation on this document that says $25 for gas stipend to Bridgehampton store. Do you see that?
A Yes, I see that.
Q What's that about?
A I don't know.
Q Did you get a gas stipend from NIBI?

T. GONCALVES

A I don't remember getting a gas stipend. I just remember one time I had to cover Montauk. There was an additional $5. I don't recall Bridgehampton.

So no, I don't recall any of this.

Q Do you know if -- do you recall getting a regular gas stipend from NIBI?

A Not usually.

Q Ever?

A I can't quite answer clearly on that.

Q Okay. Do you deny getting a gas stipend from NIBI?

A I'm not denying anything. I'm just clearly saying I don't recall.

Q Okay, that's fine.

Did you ever take cash from the register for expenses?

A Only if I was asked to. I wouldn't voluntarily do it. If we needed paper towels or any supplies, I would let them know what I was doing. And I always had to show verification that I did that

T. GONCALVES

with receipts.

Q Okay. So if you took cash out to buy paper towels, you would get a receipt for the paper towels and show it to Jim. Is that the way it worked?

A Yes. I'd have to forward the receipt and a reason of what I did to Jim, yes, or Kristin, or both.

Q How was the cash handled? For example, would you take an envelope of cash once a week or once a month and hand it in along with receipts for reimbursement, or how was it handled?

A I would usually let them know, petty cash monthly, what was expensed.

And as far as where it was, it was underneath the register area in an unlocked box. So all employees had access to it. It wasn't just myself.

Q Okay. So there was cash kept in a lockbox under the register. All employees had access to it. Right so far?

A Yes. Where -- it was -- there were bags underneath. Any supplies that

T. GONCALVES

you needed for the business day, the cash box was there.

Q All right. And once a month, would that be reconciled somehow?

A Whenever I would have an expense with petty cash, I would automatically send receipts as far as what was purchased. And then from what I remember, Jim, when he would come to the store, would replenish the petty cash as far as -- let's say 50 out of the 100 was used for supplies, the $50 was then replaced by Jim.

Q Okay. Let me make sure I'm understanding this. So there was $100 generally kept around for petty cash, and that's in the lockbox under the register?

A I gave example. I don't remember how much was in the petty cash. I will say that if $100 was there, and $50 was taken for petty cash reasons with receipts to show the $50 of usage of the petty cash, then it was replenished by Jim when he would come and frequent the store.

T. GONCALVES

Q Okay. And I presume, at least in that day and age in 2021, 2022, people were still buying stuff with cash from the register?

A I don't recall.

Q Like it wasn't one of these places that didn't take cash; right? I could go walk in and buy some clothing with cash?

A I suppose you could.

Q Okay. Did anybody ever do that?

A Some did. Very random. Most Hampton clients pay by card.

Q Sure. And that cash would go into the register, and that's a separate reservoir of cash besides the petty cash; is that right?

A Correct. So your business day cash is separate from your petty cash.

Q Now, what would happen with the business day cash? Would there be a period when that would be reconciled?

A At the end of the day at your closing, yes. And you had to go and

T. GONCALVES

deposit it at the Chase.

Q Oh, okay. So every day, you would take the cash out of the register and deposit it at Chase?

A No. Whatever was out of the bounds of your cash draw -- so let's say your cash for business day was $20 and you had a cash sale of $75. That overflow, 75 minus 20, was taken to Chase with a deposit slip and given to Chase into their account.

Q Okay. All right. To be clear, that was daily?

A If there was a cash sale. I don't know. Whenever there was a cash sale. I mean, if there was no cash sales, you're not doing any deposit; right?

Q Sure.

A Yeah.

Q And you mentioned a cash draw of $20. What does that mean?

A I'm just giving an example.

Q Yeah, but what's a cash draw?

A The cash register draw.

T. GONCALVES

Q I don't understand what you're saying.

A So you know when you go shopping, they ring you up on a cash register and you pay cash. A drawer opens for that cash for the business.

Q I understand.

A Putting your money into that cash drawer for the day. At the end of the day, they have to -- the employees would have to count that money. Right? And then whatever overflow is cash sales, they would have to do the deposit or, you know, a banking -- like armored car has to come pick it up. Depends on whatever business you have and the arrangements you have.

Q Perfect. Okay, now I understand. Sorry to belabor that. I just really wasn't understanding.

I'm going to put on the screen a document I'll ask be marked as Exhibit 27.

(Exhibit 27 was marked for identification.)

T. GONCALVES

For the record, this is an email dated May 30, 2023, Mr. Brinnen to Ms. Goncalves. It bears Bates number starting at D166. And just want to see if you've seen this document before, Ms. Goncalves.
A No, I have not.
Q That's your email address; is that right?
A It was my email address.
Q Sure. So you think you didn't receive it at the time, or you just don't recall?
A I don't recall seeing this.
Q All right. I'm going to scroll down. This appears to be one of those things where Mr. Brinnen is saying what your pay was. Standard weekly pay, partial weekly pay. Do you see that?
A Under April 29, under May 11? Where are you reading off of?
Q I'll highlight it on the screen. It's under the words total gross. Do you see that?
A Oh, yes, I see it.

T. GONCALVES

Q Okay. And below that -- you're reading ahead -- he mentions cash envelopes you gave me on Monday, and then he walks through -- as you said, there's an April 29th envelope, there's a May 8th envelope, there's a May 11th envelope.

Do you see those?

A Yes.

Q So tell me what the process is here. What's going on?

A I don't recall this.

Q Okay. It appears to be that he's asking you about cash envelopes that have been handed in, and he's asking you questions about the envelopes and some of them are short or over.

For example, the April 29th envelope says the envelope is short by a $1.85. Do you see that?

A Yes, I see that.

Q Okay. Do you recall this process at all?

A I don't recall this process.

Q Okay. Are you denying that you

T. GONCALVES

guys worked with the cash envelopes and he would check the results of the envelopes, or you just don't recall?

A I don't recall this to be honest with you.

Q That's fine. I understand.

I'm just going to scroll down. There was an envelope dated May 27, 2023. I presume you don't recall that either?

A No.

Q Okay. Second to the bottom of the --

A Part of my closing -- was it part of closing or opening? I'm not sure. I don't actually remember this.

Q Yeah, and I don't know either. I'm just asking what your recollection is of this. If you don't have any, that's fine.

A I'm sorry. I've moved on on so many levels. I don't recall.

Q I understand.

Second to the last line in the email says, "I've deducted the 37.32 from

T. GONCALVES

your payment, but if you can satisfactorily explain the shortages, I'm happy to reimburse you for that amount."

Was that a process that they went through; if there were shortages, they gave you a chance to explain them?

A I suppose so. I mean, you know, at the time, it wasn't -- didn't seem to have a problem. I mean, we were just always very, okay, this -- I didn't clock in, or this was short -- the drawer was short, whatever, or -- I mean, we had to communicate. That's what you do with your employer.

MR. BOWLES: Sure, I understand.

Okay. I would suggest this is a good spot to take a ten-minute break if you guys are comfortable with that.

THE WITNESS: Yeah.

MR. BOWLES: Yeah? How about back at -- well, back at noon. How about that?

MR. KATAEV: That works. Thank you.

MR. BOWLES: All right. Thanks, guys.

T. GONCALVES

THE REPORTER: It's 11:48 a.m. Off the record.

(Off the record.)

THE REPORTER: The time is 11:59 a.m. On the record.

MR. BOWLES: Great.

BY MR. BOWLES:

Q All right, Ms. Goncalves, we are back from a brief break. This one I asked for.

I'm going to continue walking you through some documents. And we're making good progress, by the way. I appreciate you working with me on this.

I'm going to put on a screen, a document that I'll ask be marked as Exhibit 7.

(Exhibit 7 was marked for identification.)

For the record, this is a single-page document bearing Bates stamp D232. It appears to be records of a series of Zelle payments to Teresa Sullivan from 2021.

T. GONCALVES

And again, Ms. Goncalves, that was your name at the time; is that right?

A I was Goncalves-Sullivan.

Q Okay. Does this appear to be a record of payments, Zelle payments to you from NIBI?

A I don't have this document. I don't -- I don't know. I didn't get this.

Q Have you seen it before?

A No, I have not seen this.

Q Okay. The Bates stamp at the bottom indicates that it was produced in discovery. So your attorney didn't share this with you?

A He may have and I just overlooked it. There were many documents. But I don't recall this one.

Q That's fine. So you don't recall seeing this before now?

A And would this come from my employer to me at the time, or ...

Q Well, we're testing your recollection of things, but as I understand it, this was generated by the

T. GONCALVES

banks for the purposes of this litigation. So you may not have seen it before, is my point.

A Okay. I don't recall.

Q That's fine.

Just looking at it, though, in the right-hand side of Exhibit 7, top, under the word Type, it says CHASE_TO_PARTNERFI. Do you know what that means?

A No.

Q In 2021, what was your bank, do you know?

A It was probably Chase, if not Bank of America.

Q Okay. So --

A I transitioned from one to the other.

Q Okay. So 2021, do you know if it would be Chase or Bank of America?

A I don't recall.

Q The transition you mentioned, was it from Chase to Bank of America?

A No. It was from Bank of America

T. GONCALVES

to Chase. And again, I don't recall.
Q You don't recall the timing of that transfer?
A No, I don't.
Q And to make sure I understand what you're saying, your personal bank account you moved from Chase to Bank of America?
A Incorrect. I moved it from Bank of America to Chase --
Q To Chase. Okay. It was your personal account that you moved from Bank of America to Chase. My apologies.
Okay. To understand how this worked, though, you were paid by Zelle. You already testified to that; correct?
A Yes.
Q All right. Looking at this, it looks as though these payments were weekly debit payments by Zelle to you. Correct?
A There's our answer, the weekly. I didn't recall if it was weekly or biweekly. So --
Q There's our answer.

T. GONCALVES

A -- yes, it was Zelle.
Q Okay. And looking at the amount from 2021, that first payment of $805.49, is that the neighborhood of what you would expect to have been paid at that time?
A No, because I believe I came in the middle of a pay period. So I don't think that that was the full amount, no.
Q Okay. What about the next one, 622; would that be about the amount you'd be paid?
A No.
Q So you don't recall these payments to you?
A No.
Q Okay.
A I'd literally have to go to my bank and dig deep if I had to.
Q All right. So sitting here today, you said you had moved your personal account from Bank of America to Chase, but you don't know when. Is that right?
A I don't know when.

T. GONCALVES

Q Okay. So this could have been either Bank of America or Chase at the time that you were getting paid?

A Well, it says Chase. Why would it say Bank of America if it were --

Q Well, it could be coming from Chase to somewhere else.

A I didn't have Chase. I had Bank of America.

Q Okay.

A And then I closed Bank of America and reopened with Chase. When, I do not know.

Q All right. Do you still have an account with Bank of America?

A No, I do not.

Q All right. Would you have access to bank records from the time you did have an account?

A No, I would not.

Q Do you have an account with Chase now?

A Am I supposed to let you know that?

T. GONCALVES

Q Yes.
A Yes. I do have an account with Chase.
Q All right. Could you get bank records from as far back as you had that account?
A I have a new account. I have a new journey. This is an old account, an old email, and I don't have any recollection of this.
Q Okay. So if I were to ask you for your bank records from the period of 2021 to 2023, could you produce them?
A Probably not, unless I went to the bank, and I wouldn't even know the account number at that point unless they looked me up by Social Security. But it was -- it was a joint account at the time, so ...
Q Oh, I understand.
So do you still have Zelle?
A Yes, I have Zelle.
Q All right. Could you run a records search for transfers on Zelle?

T. GONCALVES

A I couldn't, because, again, I don't have the old account number. So how can I access -- I have a new phone, I have a new bank account. I have -- everything is new. I cannot access what was.

Q I understand.

MR. BOWLES: Mr. Kataev, I won't ask right now, but we're going to consider a request for bank records, and if so, we'll put them in writing.

MR. KATAEV: Thank you.

BY MR. BOWLES:

Q Ms. Goncalves, I'm going to show you a document I'll ask to be marked as Exhibit 8.

(Exhibit 8 was marked for identification.)

It's a similar document. It's for the next year, which is 2022. It bears Bates number D234. And I presume the answers are going to be the same here.

You haven't seen this document before. Is that right, Ms. Goncalves?

A If I did, it was -- I must have

T. GONCALVES

not been paying attention because I have been shared a lot of documents.

Q I understand how that goes.

On the right-hand side, again, it says CHASE_TO_PARTNERFI. Again, you don't know what Partner Fi means in this situation?

A No, but can you clarify?

Q I cannot, but this is your deposition, so I'm asking what your knowledge is. But, in fact, I don't know the answer --

A I do not know. CHASE_TO_PARTNERFI, I do not know.

Q That's fine.

Going to ask this exhibit I put on the screen be marked as Exhibit 9.

(Exhibit 9 was marked for identification.)

It's a similar document. This one is from 2023. It bears Bates numbers D236. And I'll point to the right-hand side of the page. There's a change about five entries down from the

CHASE_TO_PARTNERFI language to QUICKPAY_DEBIT.
Do you know what that's about?
A I do not.
Q Okay. It looks as though that was about January or February of 2023. Do you know whether that's the time that you swapped banks, or do you recall?
A I don't recall at all.
Q That's fine.
Okay. Sitting here and looking at these payments in Exhibit 9, can you say one way or the other whether you actually received all these payments?
A I received payroll, but I can't acknowledge those specific dates or those specific amounts.
Q To do that, you'd have to go back to the bank records, and you say you can't access those; is that right?
A I cannot. We -- it was joint. Just to clarify, it was joint and I'm not joint any longer.
Q Okay. Are you in a position to

T. GONCALVES

deny that you received these payments?
A I'm not denying anything, sir.
Q Okay. I understand.
All right. I think we've established your original rate of pay was $23 an hour from NIBI. Is that right?
A Yes. Originally hired at 23 an hour. Yes.
Q And then at some point -- well, I think you testified you don't recall whether you got a raise before you got changed to salary; is that right?
A It was later on, I don't know when, that it was turned to salary.
Q Okay. I'm going to put on the screen a document I'll ask to be marked as Exhibit 10.
(Exhibit 10 was marked for identification.)
For the record, this appears to be an email dated April 1st of 2022 from Ms. Sullivan, which is you, I understand. Correct?
A Back then.

T. GONCALVES

Q Back then, to Mr. Brinnen, and it bears Bates numbers D221 at the beginning.

Have you ever seen this document before?

A Yeah, I've seen it.

Q Did you receive it at the time contemporaneously in April of 2022?

A I don't remember when I received it.

Q Well, do you think you didn't receive it in April of 2022?

A I don't think I didn't receive it --

Q Okay.

A -- but I can't verify the actual date and year.

Q I understand.

Looking at the second page of the document, it appears to be an email from Mr. Brinnen to you. "Hi, Teresa." And then he goes on, "Thank you for your note." And in the second part of that email, he says, "Here's your salary

T. GONCALVES

breakout. Base, 50,000 per year." Breaks it down weekly, taxes and net.

Do you see all that?

A Yes, I see all of that.

Q Okay. Is this the point at which you went salaried, or is this something else?

A I don't remember.

Q Do you remember if your salary was $50,000 a year when you went salaried?

A I would have to go back on tax documentation and -- I couldn't even answer clearly. I'm not certain.

Q Okay. So you don't recall when you went on salary and you don't recall what your salary was; is that correct?

A Correct. It's quite some time. I don't recall.

Q I understand.

Looking at this email, it appears to say your base is $50,000 a year. Does that sound inaccurate to you?

A No, it doesn't sound inaccurate at the time. I think it was around that.

T. GONCALVES

Q Okay.
A If it was precisely that, but --
Q That's fine.
Scrolling up to the page labeled D221. It appears to be an email from you to Mr. Brinnen that says, also $25 weekly for gas if I cover Bridgehampton, correct, not per day.
What's going on there?
A I'm sorry, what does it say?
Q I was reading this section right here that I've highlighted now.
A I don't recall that.
Q Well, scrolling up, Mr. Brinnen clarifies, "$25 gas stipend is a weekly stipend for any week where you spend time in Bridge."
So did you get a weekly stipend of $25 any time you had to go to Bridgehampton?
A I don't recall that.
Q Okay. You don't deny it either. You just don't recall one way or the other?

T. GONCALVES

A I don't want to say yes or no to it because I'm uncertain of the event itself.
Q Is -- okay.
A I don't recall. I don't know.
Q You don't recall?
A No.
Q I understand.
I'm returning us to Exhibit 1, the complaints. I said we'll go back to this a couple of times.
So we're on Exhibit 1 again; that's on the screen now. And I'm turning your attention to paragraph 20 of the complaint. It says, "Plaintiff Goncalves' first day at work was strange because she observed that the stockroom of Defendants looked like a sweat shop with 17 girls, more or less." Do you see that?
A Yes, I see that.
Q Is that accurate?
A It was accurate, the visual I saw, yes. 17? No. It was maybe roughly 10-ish.

T. GONCALVES

Q Okay. When you testified before --
A I -- a head count, I don't know. Ten to 12 maybe. There were many people back there. The stockroom is literally a sliver of size.
Q All right. Where is this stockroom?
A Well, where was it? It was in the back of the store, attached to the outdoor back door.
Q At Westhampton?
A Pardon me?
Q Which store? Westhampton?
A Yes. Westhampton Beach.
Q Okay. So this is the store you managed?
A Correct.
Q And your testimony is, when you first arrived there, your very first day, you're now saying that it was nine or ten girls in the back room?
A Well, it's more or less of the 17. I didn't do a head count. So there

T. GONCALVES

was a large group of girls back there, yes. Like I said, I didn't do a head count. I don't know precisely. I don't want to answer because I don't know for certain.

Q Okay. You had testified before that the maximum number of people working at the Westhampton Beach store was nine; correct?

A On peak, yes, and this was peak. My first day was peak season. Yes.

Q All right. So --

A Maybe nine to 12. Maybe there were additional from other stores. I don't remember who was there at that time. It was a brand new -- you know, store opening was the year prior, I believe. So this was her second year or second summer I believe that I had taken over.

So I don't remember. I didn't know the players at the time. I don't know if other employees from the other branches of Bridgehampton and Montauk were there. I didn't -- it was day one.

T. GONCALVES

Q Okay. So it was day one and you think there might have been maybe nine or ten girls in the stockroom. Is that right?

A Again, I can't -- I didn't do a head count. It was day one. On your first day of work, you know, you're concerned with, I want to do a good job. There's a lot of people here. Wow, there's a lot of people here, I thought.

Q Okay.

A I didn't do a head count.

Q But by no means 17; is that right?

A Maybe not. Maybe, like I said, ten to maybe maximum 13, 14. There was a lot of girls back there.

Q All right. So why did you put 17 in the complaint?

A More or less.

Q Well, yeah, doing a lot of work there, isn't it?

So this is inaccurate, 17?

A I'm not sure what response

T. GONCALVES

you're looking for. If you're looking for accuracy, I don't have one. I don't recall an exact head count of who and how many people were there.

Q You were the manager --

A I can tell you about the setting. I can tell you about the setting.

Q I'm going to ask you about that.

But you were the manager from day one; right?

A That was day one, yes. My first morning there.

Q As the manager?

A As the manager. And I did not know who my players were until day one, if not day ten.

Q So all these people in the stockroom, were they people who were, at that point, your employees?

A Some yes, some no. Some were new hires, some were -- I don't know who they were. I was getting to know everybody and everything.

T. GONCALVES

I did not meet any of my team members prior to me starting. That was not -- I didn't have the luxury of that. So I did not know who the players were in my team.

Q Did all these people in the stockroom turn out to be on your team?

A I don't recall that either. I don't know if they were summer and they were there helping. It was -- it seemed very chaotic all the time with who was coming and going. I'm not certain, to be honest with you, and I'm being very honest.

Q Okay. I appreciate you being very honest. So --

A You're welcome.

Q -- with these people, however many there were -- it might have been nine, ten, or 12 -- in the stockroom, you don't recall whether they continued on your team after that?

A A few did. I don't remember how many.

T. GONCALVES

Q Okay.
A Again, that's 2021, so five years ago. I'm not sure who remained, who stayed, who was leaving.
Q All right. Are you saying that there were people in the stockroom who turned out to not be working for you later that week, for example?
A No, not later that week. Maybe later that summer.
Q Okay. So the people in the stockroom, all of them continued working for you, for example, the next week. Is that fair?
A From what I recall. For the most part, I believe.
Q Okay. How many names can you name?
A Amanda [ph], Eliana [ph]. There was a Bridget [ph]. There was -- I'm actually terrible with names -- a few more, and I couldn't tell you.
Q Okay. But they all would've been on --

T. GONCALVES

A I can see their face. I don't see their name.
Q I understand.
But they all would've been on payroll at that time; right? They were getting paid?
A I don't know. I didn't do payroll.
Q Okay. You mentioned that there was no air conditioning; is that correct?
A Air conditioning was broken at one point. Yes.
Q Was it broken the first day you were there?
A I don't remember. I know it was -- everybody was sweltering. It was very hot. I don't remember.
Q Okay. Sitting here today, you don't remember whether air conditioning was working that first day or not?
A It might have not. There were a lot of things not working.
Q But you don't remember --
A Could have not been working.

T. GONCALVES

Q You don't remember?

A It was one of -- maybe one of the many days it wasn't working. I don't know if it was the first day or the middle of the day. I don't know.

Q Okay. So you were the manager at that point. Did you find those conditions to be unsafe?

A Yes, absolutely.

Q Did you do something about it?

A I said, why are we steaming in -- all of us back here? These -- first of all, the steamers could cause fires. Everybody's sweating.

Q What did you do --

A They didn't do anything about it.

Q No --

A Let's see. I was -- I believe my first day, Kristin was there. So, you know, your first day at a workplace, you're shown around. So this is the stockroom, this is the bathroom, this is the selling floor, this is what we do

T. GONCALVES

here. So I was given a tour.

Q Okay, but did you protest the conditions?

A I questioned the conditions.

Q To whom?

A I asked the girls, why is it so hot back here and you're steaming clothes?

Q Yeah.

A Because we have to steam the clothes.

Q Okay. And so being the manager, did you change the conditions? Did you make it so they didn't steam the clothes in the back room?

A Well, that was on my list to make changes eventually. I wouldn't let my team be in those conditions. I walked into that.

Q I understand. But you were there for two years. Did you change the conditions?

A Yes. I wouldn't let my team members do that in the sweltering heat.

Q Okay. So what did they do

T. GONCALVES

instead?
A They did it in the air conditioning. We did it where it was air conditioned, where it was cool. And if it wasn't cool, well, we didn't steam that day. It's going to have to wait.
Q Did the stockroom have air conditioning and it just wasn't working, or --
A No, it did not have air conditioning. The only air condition or any sort of vent would be, open the back door. And if we opened the door to the selling floor, there would be a cross draft. But that wasn't even enough when you're literally steaming like these gowns.
Q Okay. So when I asked about it before, you -- the air conditioner was broken on certain days. Did the stockroom have an air conditioner, or not?
A No, the stockroom did not have an air conditioner.
Q Okay. All right. The next

T. GONCALVES

paragraph, paragraph 21, it says, "During the winter season in 2022, Plaintiff Goncalves observed that there was no heater in Defendant's store. She had no choice but to wear extra clothes to keep warm."

Do you see that?

A Yes.

Q Okay. So there was no heater in the store at all?

A No. There was no heat.

Q This was in Westhampton?

A Westhampton Beach.

Q Okay. And what were the hours of the store at that time?

A I don't remember.

Q So there was no heater, or -- and that's why -- strike that.

There was simply no heater in the store?

A There was no heat in the store.

Q Okay. The next paragraph says, "Plaintiff Goncalves learned that Defendants did not pay their bills, which

T. GONCALVES

is the reason no heater was operating."

Do you see that?

A Yes, I do.

Q Is that accurate?

A It is.

Q How did you learn that?

A Well, because I messaged either Kristin or Jim, letting them know there was no heat. I was told to buy a space heater or ask the landlord, maybe there's a problem with the heat. Okay.

So I asked the landlord. He was in town, or I called him, I don't recall. And he came in and he told me there's a lock from National Grid on the tank outside because they haven't paid their bill, their gas bill. So that's why there's no heat. And he was even questioning, how are you even working in these conditions? It's freezing here. I said, I have to work.

Q Who was this that said that?

A I don't remember his name. He was the landlord. I don't remember his

T. GONCALVES

name, but he was -- he managed the buildings.

Q Okay. So you talked to the landlord. Did you talk to Mr. Brinnen?

A Yes. I reached out to them, yes. I believe Jim was not available, and Kristin, I believe, had said to me to buy a space heater.

Q Okay. So the heat was gas. Is that what you said?

A Yeah, there's a gas tank outside, right outside one of the windows of the store. And there were two gas -- multiple gas tanks for apartments I guess upstairs or the adjacent building to us. And it had a lock on the tank, and I saw it, and it was verified by the landlord.

Q Okay. And you don't remember the name of the landlord?

A I don't, no.

Q The building, was it a standalone building, or was it like part of a --

T. GONCALVES

A It was not a -- it was not a -- it was like -- they looked like little houses put together. It was like a strip that was put together.

Q Okay.

A So there were upstairs tenants, next door to us was Palmer & Purchase or another one. I forgot the name of the store. I think those stores changed over now. I don't know.

Q I understand.

Did you get a space heater?

A No, I didn't because I didn't want to wait for reimbursement. And at the time, I was unable to pay out of my own pocket.

Q So they told you to get a space heater but you didn't get one; is that right?

A No, I didn't get one. That was not my responsibility to get one. That's -- I would think that the employer would provide for the employee. But I did not get one.

T. GONCALVES

Q Okay. Even though you were the manager of the store?
A Yes, I was the manager to the store.
Q Okay.
A But I was not the owner of the store.
Q Returning your attention to Exhibit 1, paragraph 25. You have the language, during the course of your employment, "Plaintiff Goncalves was directed and controlled by the defendants."
Do you see that?
A Yes.
Q What did you mean about that?
MR. KATAEV: My apologies. At the appropriate time, I was hoping we could take a lunch break for 30 minutes. I wanted to ask for 12:30, but I didn't ask early enough. So if we could do it when you're ready.
MR. BOWLES: Let me finish this sequence and we can do it.

T. GONCALVES

MR. KATAEV: Sure. Thank you. Sorry to interrupt.

MR. BOWLES: That's okay.

BY MR. BOWLES:

Q Paragraph 25, it says you were directed and controlled by the defendants. Do you see that?

A Yes.

Q Explain what you mean by that.

A I couldn't be a store manager. Everything I had to do, I was micromanaged with.

Q By whom?

A Everything I had to purchase or I needed for the store, or pay out of pocket, Teresa, just show me the receipt, and I wasn't going to do that because I did that once and it took a few months to get reimbursed just for a fitting room little chair, table.

So yes, it was very controlling. The setting was very controlling.

Q Okay, but which defendants controlled you?

T. GONCALVES

A I would say both.

Q So you mean Mr. Brinnen and Ms. Sheeler?

A Correct.

Q Now, you have already testified Mr. Brinnen was the person who was in charge of pay and payroll; correct?

A Payroll, systems, tax forms, pay statements. If we needed to, we should have -- you know, anything we needed back of the house.

But there were things that he was very involved with, too, as far as sidewalk sales that we'd have. He would help set up. He was visibly there. He wasn't just like this behind-the-scene person. He was in front of the scenes many a times as well.

Q Okay.

A When the store needed it, actually, when we needed extra hands.

Q Okay, I understand. Thank you for your answer.

A Of course.

T. GONCALVES

MR. BOWLES: I think we can take that break now. Can we go off the record and just discuss?

THE REPORTER: Yep. So it's 12:30 p.m. Off the record.

(Off the record.)

THE REPORTER: All right. It's 12:59 p.m. On the record.

BY MR. BOWLES:

Q Okay. We're back on the record after a lunch break. Ms. Goncalves, thank you for coming back.

We have on the screen, Exhibit 1 again, which is the complaint. I'm going to direct your attention to paragraph 39 of the complaint, which is on the screen. It's right there.

That paragraph says, "Like Plaintiff Goncalves, Plaintiff Ketcham was frequently required to perform work before the start of the shift and after the end of her shift without being paid."

And then Ms. Ketcham gives some examples. But this at least implies that

T. GONCALVES

you also worked before the start of the shift and after the end of your shift without getting paid. Is that true?

A Sometimes, yes.

Q Okay. Tell me about any examples of that you can remember.

A We had to pick up merchandise from other stores, or come in early because of deliveries, or steaming, or putting a new collection out.

Q We had talked before about the fact that you could always either clock in or text Mr. Brinnen with hours that you worked that you didn't clock in; correct?

A Yes.

Q So in these circumstances where you had to pick up decorations or whatever, were you able to clock in or text Mr. Brinnen in those circumstances?

A If the systems worked, I would clock in.

Q And even if it didn't work, you could text him; isn't that right?

A Yes.

T. GONCALVES

Q Okay. Were there examples when you did that and didn't get paid?

A I don't recall.

Q All right. Were there examples where, for some reason, you didn't record your hours one way or the other?

A That could have happened too. There were times where maybe I forgot to clock in or I forgot to clock out.

Q All right. And in those circumstances, did you remind him?

A Usually I would because that is my pay. I wouldn't want to get paid.

Q Any circumstance in which you told him about hours you worked and you didn't get paid?

A I don't have any documentation to back that up right now.

Q I understand. But do have any recollection of any particular incidents in which you --

A Nothing specific.

Q Okay. Just make sure I finish my question, if you recall.

T. GONCALVES

Any instances specific in which you worked hours that you didn't get paid for, even after reminding him?

A Not that I recall.

Q Okay. We've asked about your email and your text. I understand that you lost those into your life events.

Any other contemporaneous notes that you kept?

A I don't recall what was in the file.

Q No, I understand. But -- and that file would be in the possession of your ex-husband; is that right?

A I don't know that for certain.

Q Okay. That's the last known -- that's where you last knew it to be?

A I don't know where it's last known to be, to be honest. There was a lot of moving happening at the time. I don't know. A lot of moving parts. I don't know where it landed.

Q I understand.

T. GONCALVES

Did you keep any journal or diary?

A A journal or diary during my time with NIBI-MTK?

Q Yes.

A No.

Q Okay. Returning your attention to Exhibit 1, which is on the screen. Paragraph 46 says, "Upon information and belief, Defendant at all times during the relevant time period, willfully failed to keep accurate payroll records as required by the FLSA."

What's your basis for that allegation?

A Because there was a lot of overtime. It wasn't just a seven, eight-hour day. There was commissions involved that were inaccurate. There were also holiday pays that one holiday was paid for, another holiday might not have been paid for. Then the rules changed and the commission rules changed.

It seemed very inconsistent. So

T. GONCALVES

I don't think that the pay was consistent.

Q Okay. You don't think the pay was consistent and that's your basis for this allegation?

A Well, when you do more than a 40-hour workweek, you usually get overtime or time and a half.

Q Right. And your position is what; that you didn't get time and a half?

A No, I didn't. I didn't. And there were holidays that I would get paid, and holidays that I wasn't getting paid. And then the holiday pay -- I don't know. Some team members were getting paid holiday, others were not. I'm not sure how, from what I recall, but it was not consistent. That's the best word I can say.

Q Okay. Which holidays did you not get paid for?

A I don't recall that.

Q When you say you didn't get paid for holidays, do you mean holidays that you worked, or you didn't get paid for

T. GONCALVES

paid time off?

A Usually when you work a holiday, you get a comp day and holiday pay. And the holidays, which I don't recall, which I worked -- I usually worked most -- I don't believe I was paid for all holidays because then, again, the rules were changing.

So yes, you'd get paid for holidays, and then next holiday or so came along, and it was like, no, we don't pay holiday anymore. So it was inconsistent.

Q Okay. But let me just make sure I understand the allegation.

Are you saying that, for example, you would work on Thanksgiving as a holiday and not get paid for your time, or that you wouldn't work on Thanksgiving but you wanted to be paid for the holiday anyway?

A I would get paid -- I would work Thanksgiving and not get paid for Thanksgiving.

Q And this is a day of which you

T. GONCALVES

clocked in and clocked out regularly?
A Yes.
Q And you didn't get paid for the time that you clocked in and clocked out?
A Correct. On certain holidays, no. I'm not specifically saying Thanksgiving. That was your example. But I am saying, yes, on some holidays that I did work, I would clock in for the holiday, clock out for the holiday, and there were instances where holiday pay was not specified or, oh, we're changing holidays. So it was very, again, inconsistent.
Q Okay. Can you name me one specific holiday that you worked that you didn't get paid for during your two years there?
A I couldn't tell you. I couldn't remember.
Q Okay. Do you have any records of any specific holiday that you worked that you didn't get paid for?
A No, I do not.

T. GONCALVES

Q And to be clear, you don't have any records whatsoever of having worked and not gotten paid for any specific time period?

A No. I have no records of anything.

Q All right. I'm going to direct your attention to Exhibit 1, paragraph 58. The paragraph says, "While the exact number of the FLSA collective is unknown to Plaintiffs at this time, upon information and belief, there are approximately 20 individuals of the FLSA collective members."

Do you know what that allegation is about?

A I'm sorry, what number are you on? 58?

Q It's paragraph 58. I'll highlight it.

A So what was your question? If you could repeat it.

Q You understand what the collective is?

T. GONCALVES

A Collective, meaning everyone employed under; correct?

Q Well, I'm asking your understanding, if you have one.

A If you can elaborate -- if you could clarify, that would -- I'd appreciate it.

Q Are there 20 other employees that are planning on joining this lawsuit?

A I don't know that.

Q Do you know if there's one other employee planning on joining the lawsuit?

A I don't know that.

Q Okay. Besides Dina, you're not aware of anybody planning on joining this lawsuit?

A Not that I'm aware of. I don't know. I know what I am doing.

Q Understand.

All right. I'm going to put an exhibit I'll ask to be marked as Exhibit 18 on the screen.

(Exhibit 18 was marked for identification.)

T. GONCALVES

For the record, this is an email from Mr. Brinnen to you, dated May 21st of 2023, and it appears to have a Bates number of D216 on it.

Have you seen this email before?

A I don't recall it.

Q At the bottom of the email, there's an email from you to Ms. Sheeler and Mr. Brinnen in which you say you just wanted to thank them for review and meeting with me yesterday.

Is it fair to say at this time you were getting along with them?

A Yes. I always got along with them. There was no animosity between us. If I had to question a situation, then I would go to them, just like any employee to an employer.

Q Okay. So this is about a year after you started working there; is that right? Did you answer?

A May of 2023. I suppose.

Q All right. So about a year in, you still have no animosity.

T. GONCALVES

Have you had any problems at this point with not getting paid for hours you worked?

A I don't recall. There might have been a question here or there. I always have questions. I'm not sure.

Q Actually, I want to correct myself. I said this was about a year, and this was about two years in; right? This is close to when you quit?

A Okay. So it was '23 and I was with them in '21.

Q Yeah, you're right. I'm sorry, I got that wrong.

So at this point, you're still getting an amicable email back and forth. At this point, had you complained to them about not getting paid?

A Whenever an unpaid situation arose, I would address it. I would try and always address things. I wouldn't wait for end of year or end of month. I would try to tackle it right away and have communication.

T. GONCALVES

Q Okay. So you were able contemporaneously with not getting paid -- when you alleged you weren't getting paid, you were able to work it out with them each time?

A I would think so. I would hope so. But I'm not sure if it was thoroughly worked out.

Q Okay. And you can't recall any instance in particular of not getting paid for hours you worked?

A Not specifically. I cannot. I don't have anything.

Q Okay. We're jumping around a little bit, but not a lot. I'm going to put on a screen an exhibit I'll ask to be marked as Exhibit 11.

(Exhibit 11 was marked for identification.)

For the record, this appears to be an agreement dated May 23rd of 2023. It's a three-page document beginning with Bates number D159.

Have you seen this document

before?
A Yes.
Q What is it?
A It's a pay raise. It's -- I believe this was when I was going to salary.
Q Okay. And this was May of 2023. So this is close to when you quit?
A When I resigned, yes. It was closest.
Q Okay. All right. And is that your signature at the bottom?
A Those were my initials, yes.
Q You initialed this document?
A It shows I did.
Q You're not disputing that you initialed the document?
A I don't dispute it. No, not at all.
Q All right. So in May of 2023, you went to an hourly rate of $28.25; is that right?
A I suppose so. I don't remember exactly dollar and cent.

T. GONCALVES

Q I understand.

THE REPORTER: Counsel, can we go off the record for a second?

MR. BOWLES: Sure.

THE REPORTER: It's 11:13 p.m. Off the record.

(Off the record.)

THE REPORTER: It's 1:13 p.m. On the record.

MR. KATAEV: Good afternoon. Sorry for the interruption.

Let the record reflect that Benjamin Grushkovskiy has entered the room. He is a new law clerk at my office who's just observing, wants to go to law school.

MR. BOWLES: Well, no objection from Defendants, and welcome, Mr. Grushkovskiy.

BY MR. BOWLES:

Q Continuing on. I have put on the screen a document I'll ask to be marked as Exhibit 12.

(Exhibit 12 was marked for identification.)

For the record, this appears to

T. GONCALVES

be Plaintiffs' Supplemental Responses and Objections to Interrogatories as produced in discovery.

Ms. Goncalves, have you seen this document before?

A Yes.

Q Did you see it in the course of this litigation?

A Yes, I have seen them.

Q Okay. And did you review them before they were produced to me?

A Yes.

Q Are the answers in these interrogatories accurate?

A As best to my knowledge.

Q All right, I'm going to scroll down to the bottom. There's a verification on page 26 of the PDF document. Have you seen this before?

A Yes.

Q Is that your signature at the bottom?

A Yes.

Q Did you affix that signature

T. GONCALVES

yourself?

A Yes, I did.

Q Okay, very good.

I'm going to scroll down the document to interrogatory number one, which is on page 3 of the document. Interrogatory one asked you to identify persons with personal knowledge of any facts alleged in the pleading. So essentially, it's asking you to identify anybody that knows about the case who can be a witness.

So as we're sitting here today, tell me, if you would, who else besides you and Ms. Ketcham, Mr. Brinnen, and Ms. Sheeler have any information that would be of benefit to us as a witness in the case?

A My sister just knows what's going on.

Q Your sister knows what's going on because you talked to her?

A Yes, I talk to her. She's my sister.

Q Sure. So her only knowledge of

T. GONCALVES

the case would be through conversations with you; is that right?

A That's all.

Q All right. Anybody else?

A No one.

Q All right. Nobody else that you could identify from NIBI, for example, that knows about this?

A Not that I'm aware of.

Q Sure. I'm just asking who you're aware of. Nobody there?

A No. Not that --

Q Okay. I'm forwarding to interrogatory number six in Exhibit 12. This asks essentially whether or not you have complained to anyone, such as human resources or payroll departments, about the claims in the complaint.

So we have talked about you talking to Mr. Brinnen whenever there are problems with the payroll. Any other complaints that you made to anybody else at NIBI about the allegations in the complaint?

T. GONCALVES

A Not that I recall.
Q Did you talk to Kristin about the allegations in the complaint?
A Yes. There was always -- I'd either go to Kristin or Jim or both. Yes, they were the -- they're the owners. So yes, I -- that's protocol to go to the owners.
Q Okay, I understand.
So outside of them, you had said that you contacted the Social Security agency to complain about not getting Social Security; is that right?
A Yes. When I was there, I had put a complaint in, yes. I put a verbal complaint.
Q And that was in April of 2023. Do I remember that right?
A Yes.
Q All right. Did you put any paperwork in with the Social Security agency?
A I did not. I don't know if they put anything as far as on their end. I am

T. GONCALVES

uncertain on that. I don't know how they go about that procedure.

Q Okay. Did you complain verbally, then, to the agency?

A Yes, I did. I was told -- recommended --

THE REPORTER: I'm sorry, can you just pause and start your answer over again? It just got very choppy and broke up.

MR. BOWLES: Yeah, that's my fault.

BY MR. BOWLES:

Q Go ahead, please.

A What was the question you want me to answer that got choppy?

Q My question was, your complaint to the Social Security agency was purely verbal; is that correct?

A It was verbal. I don't know if they had documentation on their end, but mine was just verbal.

Q Right. No letter or anything like that?

A I did not send them a letter,

T. GONCALVES

no. They didn't request one of me.

Q That's fine.

I'll direct your attention to the response to interrogatory 11, which has to do with a certain allegation in the complaint. We don't need to go into that.

The bullet point under the answer says, "Goncalves paid money for the table at Defendants' request, and Defendants failed to reimburse her for a period of approximately two months."

Do you see that?

A Yes, I do.

Q What's that about?

A Pardon me?

Q What is that about?

A Kristin needed a fitting room table. She -- a thing that looked like driftwood. So I had gone to the store -- it was actually a day off -- and I took pictures and I sent them, what do you think of this, what do you think of this? There were options, until she found the one that suited her store the best.

T. GONCALVES

And I said, how would you like me to pay for it? Do I get a corporate card? Is there some sort of -- no, just pay it out of your pocket and I'll reimburse you, which at the time was financially very difficult for me to do. But I did it.

And I submitted my receipt, and I had to follow up a few times with her and Jim as far as reimbursement for this. It was a little embarrassing for myself to do that. And so it was about approximately two months that I finally did, and it wasn't an exuberant [sic] amount of money, but it was an exuberant [sic] amount of money for me.

Q How much money was it?

A Maybe under $50.

Q Okay. And about when did this happen?

A I couldn't tell you.

Q You don't remember if it was in your first year of working there or your second year?

T. GONCALVES
A It was, I think, my first year, if not year and a half.
Q Okay. But you ultimately got paid for the table after you had to follow up?
A I did.
Q All right. Do you know if the reimbursement was in cash or by Zelle?
A Don't remember that either.
Q All right. I'm going to direct your attention to interrogatory 14. And the first bullet point on page 10 says, "Goncalves worked seven days a week on a schedule approximately 10:00 a.m. to 6:00 p.m. except during extended summer hours, when she would work until 8:00 p.m. or 9:00 p.m."
Do you see that?
A Yes, I do.
Q Did the store actually stay open until 8:00 or 9:00 p.m. during the summer?
A Yeah. Sometimes 10:00 because it was a very lively town. There were many activities through town.

T. GONCALVES

Q Okay. But I mean, to be clear, it's not that you were working in the store when it was closed. Your allegation is the store actually stayed open?

A Correct.

MR. KATAEV: Objection to form.

MR. BOWLES: I didn't hear that.

MR. KATAEV: Objection to form.

MR. BOWLES: Okay.

BY MR. BOWLES:

Q Did you clock in and out during those hours?

A If it was a workday, then that was part of my job prerequisite, was to clock in and clock out.

THE REPORTER: I'm sorry, it broke up. So it was clock in and clock out, you said?

THE WITNESS: I had to clock in and clock out every workday that I had, unless I was unable to.

BY MR. BOWLES:

Q Okay. So it's not as though you clocked out at 6:00 and kept working until

T. GONCALVES

9:30. You clocked out at 9:30?

A Whenever I stopped working, yes --

Q Okay.

A -- if I was able to.

Q All right. The fourth bullet point down says you would frequently perform off-the-clock work before and after your shift to pick things up or drop things off for work-related errands.

Do you see that?

A Yes.

Q And that amounted to one or two hours a week. Do you see that?

A Yes.

Q Is that true?

A I'm sorry, can you repeat? I lost you there.

Q I said, is that true?

A That is true.

Q All right. But we just spent several hours with you telling me that you clocked in and clocked out. You clocked in when you started working, you clocked

T. GONCALVES

out when you stopped working, and if you couldn't do that, you texted Mr. Brinnen.

A Well, if I needed to change on my way to work, I wasn't going to go to the store, clock in, go back out, get changed. So yes, there were times where, on my way to work or on my way home, I would pick it up for the following day. There were instances that way. Yes.

Q And did you inform Mr. Brinnen that there were extra hours those days?

A I always communicated everything I did.

Q Okay. So even if you couldn't clock in or clock out, for example, if you're on the way to the store and you couldn't clock in, you nonetheless communicated that you worked an extra certain amount of time. Is that right?

A As much as I tried to, yes, and it was understood and responded to. That's what I tried to do.

Q Okay. And did you get paid for that time?

T. GONCALVES

A I don't remember.

Q All right. Going to turn your attention to interrogatory 17. And the second bullet point down, you say, "The defendants paid Goncalves and other employees by Zelle without taking withholdings."

Do you see that?

A Yes.

Q What do you mean by that?

A There was Zelle being performed, and that was our direct deposit for payroll, but there was no Social Security.

So that question -- so how is it that I was getting a direct deposit or a payroll state -- or a payroll period and the proper withholdings were not being done?

Q And the withholding, you mean Social Security?

A Correct.

Q All right. Do you -- well, strike that.

Okay, I think I understand.

T. GONCALVES

I'm going to put on the screen a document -- strike that.

I'm going to put on the screen a document I'll ask to be marked as Exhibit 13.

(Exhibit 13 was marked for identification.)

For the record, this is Plaintiff's Supplemental Responses and Objections to First Request for Production of Documents. And I believe we have covered this ground before, but I just want to pin it down.

Request number three asked for documents that address the incident alleged in the complaint, in the lawsuit. So we're looking for correspondence such as emails, text messages, and what have you relating to the incidents in the complaint.

Now, I've asked you before about your email system. You said you have no further access to the email you were using at that time. Is that correct?

T. GONCALVES

A Yes, that is correct.

Q And no access to text messages; is that right?

A No access to text messages.

Q All right. So you simply have no access and no ability to produce any written correspondence from this period?

A No, I do not, because of divorce and because everything was falling apart.

Q I understand. So you no longer use the email address bcl456@optonline?

A No, I do not.

Q All right. All right, thank you.

I'm going to put on the screen a document I'll ask to be marked as Exhibit 14.

(Exhibit 14 was marked for identification.)

For the record, this appears to be a set of tax documents, including W-2s for Ms. Goncalves.

Have you seen this document before?

T. GONCALVES

A Yes, I have.

Q You produced this document to your attorney and he produced it to me; is that right?

A I produced it to my attorney.

Q Very good.

A Those were just my notes.

Q Yeah, I was scrolling. There's a -- I'm trying to get the page number.

Yeah. On the page labeled P1003, there's a yellow sticky note. What is that?

A Those are just my notes from where I was to where I was going.

Q Okay. That's your handwriting on that note; is that right?

A Yes, that is mine.

Q I'm on P1005 now. It's another yellow sticky note. It looks similar. That's your --

A Yes.

Q Okay.

THE REPORTER: Counsel, if you could just repeat your question? Because it did

T. GONCALVES

cut out. I don't have it on the record.

MR. BOWLES: I said, on page 1005, there's another yellow sticky note. I asked whether that was her handwriting, and Ms. Goncalves said ...

THE WITNESS: Yes, it is my handwriting.

THE REPORTER: Thank you.

BY MR. BOWLES:

Q Same question for the yellow sticky note on P1008. I presume that's your handwriting there as well?

A Yes.

MR. KATAEV: I'm sorry to interrupt.

Well, finish your question, then I'll say it -- finish your answer.

MR. BOWLES: I asked whether that was her handwriting, and she said yes.

BY MR. BOWLES:

Q Is that correct, Ms. Goncalves?

A Yes.

MR. KATAEV: Okay. I don't know why, but I don't see the exhibit.

MR. BOWLES: You can't see the

T. GONCALVES

screen?

MR. KATAEV: I can only see you. And there's a tab that says David Bowles' screen, but when I go to it, it shows you -- okay, never mind. Now I see it. Sorry about that.

MR. BOWLES: Okay. You got it now?

MR. KATAEV: Yep. Sorry about that.

MR. BOWLES: All right.

BY MR. BOWLES:

Q Just hang on for one second.

Okay. Okay. My apologies.

Couple of questions. I'm returning to page 1002 of the document. Up there at the top, there's two employers, it looks like -- or at least one employer, LTH [ph]. Do you see that?

A Yes.

Q What is that employer?

A Those were my notes. So I was exiting one company and entering NIBI.

Q What was the company you were leaving?

A Theory.

T. GONCALVES
Q The word is theory, T-H-E-O-R-Y?
A Yes.
Q Is that a clothing company?
A Yes, it's a clothing retailer.
Q Okay, thank you.
Scroll down to page P1004. At the top, there is an employer identified as B-L-A-C. What is that?
A That was Blackburn Grill [ph].
Q Is that a different company you were working for in 2022?
A It was a actual pizza bar and grill. I was a hostess for a couple of days a week to supplement what I was making.
Q Okay. This was at the time that you were also working for NIBI; is that right?
A Yes. And, again, I did that a couple of days.
Q Understand. Direct your attention to page P1006. At the top, there's another employer identification number, G-E-O-R. What is that?

T. GONCALVES

A It was another retailer.
Q Who is that?
A Might have been Ranna Gill.
Q Can you spell that?
A R-A-N-N-A, I believe, G-I-L-L.
She's no longer in business.
Q Okay. And you worked for her in 2023?
A When I left NIBI.
Q Now, just from the other lawsuit, I thought you worked for McLaughlin.
A I did work for J. McLaughlin.
Q Okay. And it doesn't show up on your W-2.
A Only because when I left NIBI, I was with Ranna Gill for a little bit -- maybe for a month -- before I interviewed for J. McLaughlin and then went on board with them. So this is only for a certain time span.
Q Okay, but G-E-O-R doesn't refer to McLaughlin somehow?
A Not that I'm aware of.

T. GONCALVES

Q Okay.

A They're usually known as Georgica Pines, but I don't know if that was even listed. According to my notes, that's not what I wrote.

What I was more concerned with was from the start to my finish in Social Security. That is why that was sent to me from the administration office, and that is how I printed it up and made my own notes and produced that to Emanuel.

Q Oh, okay. I understand.

So this is a document that came from Social Security, or a document that you created?

A I didn't create that.

Q It came from the Social Security agency?

A Yes. They told me exactly what to do. I had to go to ID.me and access my own files through the secure website, and they told me step by step what to do and that I had to put a verbal complaint in. So I did. They gave me the steps that I

had to take.
Q Sure. Okay. Now I understand. Thank you.
A You're welcome.
Q Just one last question on this.
On page P1008, at the top of the page in the upper left, there's the abbreviation, R-A-N-N. What is that?
A Maybe that was Ranna Gill. I'm not sure. R-A-N -- maybe it went into Georgica Pines. I'm not sure the sequence. Obviously Georgica Pines was my last employer, probably, on that --
Q Okay.
A -- which was J. McLaughlin.
Q Okay, I appreciate that. Thank you, Ms. Goncalves.
I have several text messages, and the questions for you on these will be just essentially, are they with you. So we can go through these rather quickly.
I'll have on the screen an exhibit I'll ask to be marked as Exhibit 21.

T. GONCALVES

(Exhibit 21 was marked for identification.)

This appears to be a page of text messages. It bears Bates number P844. It appears to be with Kristin, whom I presume to be Kristin Sheeler.

Is this a text message -- are these text messages with you, or do you recognize them?

A I don't recall that. I don't know.

Q Okay. Looking at Exhibit 21, have you ever seen this before?

A Not that it -- not that it brings back any memory.

Q Okay. So you can't tell looking at this whether this is with you or not?

A I could not, no.

Q Okay. I have on the screen a document I'll ask to be marked as Exhibit 22.

(Exhibit 22 was marked for identification.)

This bears Bates number P852.

T. GONCALVES

It's a one-page set of text messages, including a photograph of a receipt.

Are these text messages with you, or can you tell?

A I could not tell.

Q Do you recognize that receipt?

A I do not recognize that. I don't know it.

Q Okay. So you don't recognize these text messages?

A No.

Q Okay. Exhibit 23, another set of text messages bearing Bates numbers P854.

(Exhibit 23 was marked for identification.)

Have you seen these text messages before?

A No.

Q Okay. So you don't recognize this?

A No, I don't recognize this.

Q That's fine.

I have on the screen a document

T. GONCALVES

I'll ask to be marked as Exhibit 24, another set of text messages bearing Bates number P856.

(Exhibit 24 was marked for identification.)

Do you recognize these as whether you texted them or not?

A No, I don't.

Q Do you recognize the photos in them?

A No. I don't know what stockroom that is.

Q Okay, that's fine.

And finally, Exhibit 25, and it bears Bates numbers P858.

(Exhibit 25 was marked for identification.)

Can you tell whether you texted these?

A No.

Q Okay. So you don't recognize any of those sets of text messages?

A I don't recognize any of that.

Q Okay, that's fine.

T. GONCALVES

I'll put on the screen a document I'll ask to be marked as Exhibit 28.

(Exhibit 28 was marked for identification.)

For the record, this is Plaintiffs' First Amended Rule 26 Initial Disclosures. And I'm going to first ask whether you've seen this before.

A Yes.

Q All right. So you saw this before it was produced to me, I presume; correct?

A Yes.

Q Okay. All right. I've scrolled to page 9, and page 9 has a computation of damages and it's got your name at the top, Goncalves. Do you see that?

A Yes.

Q Were you involved in producing these numbers?

A No.

Q Did your attorneys do this?

A We discussed it together.

T. GONCALVES

Q All right.

A But I think that's attorney/client privilege. Is it not?

Q I get to inquire as to your knowledge as to whether these damages are accurate.

A I see.

Q All right. So this says that you typically had a 60-hour workweek. Do you see that?

A Yes.

Q But you had said earlier when you testified that you only worked up to 60 hours during the high season; right?

A Sometimes off season, depended what was happening.

Q Right.

A It was a very busy town with a lot of events.

Q And you clocked in and clocked out or otherwise reported your hours when you worked those hours; correct?

A As best as I could.

Q Okay. In the second paragraph,

T. GONCALVES

you say you estimate that you received no wages at all for two weeks out of every month you worked. Do you see that?

A Yes, I see that.

Q All right. So half the time you worked there, you didn't get paid?

A The pay was inconsistent. So does that include overtime? Does that include the errands that I had to run? Does that include maybe after work what I had to do? Does that include that I had to maybe meet with a client and close the doors just to better the business?

There's many variables that were happening.

Q Sure. And you said that sometimes it was inconsistent in the sense that you didn't get paid on Monday but you got paid on Wednesday, and you had to follow up on the pay. Is that right?

A Yes.

Q But you always got paid, didn't you?

A As best they could. They paid

T. GONCALVES

me, yes.

Q Okay. As best they could. I mean, did you ever send them a bill they didn't pay?

A Did I send a bill?

Q Strike that.

Did you ever report hours they didn't pay?

A Again, I would communicate that -- when I couldn't clock in or if I couldn't clock out or there was some additional that I had no access to input, I would communicate that via phone or via email.

Q Right. And then you got paid?

A I believe so.

Q Okay. The second paragraph said you received no wages at all for two weeks out of every month.

That's not true, is it?

A Like I said, if you break down the overtime, the extras you're doing that I didn't clock out for that, or I did clock out for this -- it's just checks and

T. GONCALVES

balances. Does it balance?

Q Yeah, but that's not no pay at all.

A Well, if you're doing overtime and you're not getting paid for it, there is no pay for it. So you're not getting paid for the additional that you're putting in.

Q Yeah, but that's not no wages at all. You'd still be getting paid for straight time. Right?

A For whatever time I was there, if I was able to clock in and out, but if I did, again, the overtime, and I was not paid the overtime, then I'm not getting the pay.

Q Okay. All right. So what you're saying is, you weren't getting paid for overtime sometimes during that period?

A Correct. So I was getting --

Q Okay.

A But, again, it was inconsistent. Might have not got the overtime, might have not got that holiday, my commission

might have been off, and that's the inconsistency.

THE REPORTER: You said, and that's the inconsistency; correct?

THE WITNESS: Yes, I --

THE REPORTER: Thank you.

BY MR. BOWLES:

Q Okay. I think I understand your position now.

I'm going to put on the screen a document I'll ask to be marked as Exhibit 15.

(Exhibit 15 was marked for identification.)

For the record, this is the answer in counterclaims in this matter as filed with the Court on July 14th.

Ms. Goncalves, have you seen this document before? Sorry, I didn't hear your answer.

A Yes.

Q Okay, thank you.

Have you reviewed it?

A Yes.

T. GONCALVES

Q Okay. I'm going to turn your attention to certain paragraphs of the counterclaims, just ask you about them.

Paragraph 180 says that KSD -- that's in this pleading what we were calling NIBI. KSD hired Goncalves on or around May 30th of 2021.

Do you see that?

A Yes.

Q Is that accurate?

A Yes, around May of 2021. It was actually, I believe, slightly after -- yeah, I think it was the 30th. It was after Memorial weekend.

Q Very good. The next paragraph, paragraph 181, says that you were a manager with special access to NIBI's timekeeping system. Do you see that?

A Yes.

Q Is that accurate?

A I did not have -- the only access I had was to clock in and clock out myself.

Q Okay. You had no access to

T. GONCALVES

other people's timekeeping records. I think we've --
A No, I didn't have control of that.
Q All right. Could you change your own timekeeping records? For example, if you clocked in and clocked out on a Monday, could you go back on Tuesday and change those numbers?
A Not that I was aware of doing.
Q Okay. I just want to be precise about this. Do you know whether you had the ability to do that?
A I do not know if I had the ability to do that.
Q That's fine.
Paragraph 183 says that you had difficulty remembering to clock in and clock out. Do you see that?
A Yes.
Q Was that accurate?
A Difficulty? Sometimes it worked, sometimes it didn't. Again, there were system errors, and I am human. So I

T. GONCALVES

can't say I'm a perfect, well-oiled machine that remembers clock in, clock out, clock in, clock out every single day.

There might be times where I forget to clock in. Maybe a client's walking through the door. She's first over clocking in.

Q Okay. All right. That's a fair answer.

Now, the next sentence of the paragraph says you initially sought out another manager to correct your clock errors. Is that correct?

A I'm sorry, repeat that.

Q The next sentence -- and I'll highlight it now -- says you sought out another manager to correct your clock errors. Do you see that?

A How can I correct clock errors if I didn't have access?

Q Well, it doesn't say that. It says you had another manager do it. Is that accurate?

A No. What other manager?

T. GONCALVES
Q Well, that was going to be my question to you. Did you work with anybody else to correct clock errors besides Mr. Brinnen?
A Sometimes Natalie would show up. I don't think she had access to the clocking in and clocking out and adjusting that. Kristin did not know how to do that. So I'm going to safely say, I don't believe so, unless I didn't know that and she did. I don't know.
Q You mentioned Natalie --
A And when -- not that I recall.
THE REPORTER: Counsel, I couldn't hear what you -- I'm sorry, you're breaking up, Counsel. I didn't hear what you just said. If you can just repeat that.
MR. BOWLES: Sorry. And I interrupted. My apologies. I thought she was finished.
BY MR. BOWLES:
Q My question to you was -- you mentioned Natalie. Who is Natalie?

T. GONCALVES

A She was one of the vendor buyers for Kristin and Jim.

Q Is that an employee of NIBI, or is that somebody outside?

A Yeah, she's an employee. I don't know if she has any -- she had any additional access to things other than me. I don't believe so.

Q Okay. She was not a manager. She was a vendor buyer?

A She worked for NIBI-MTK --

Q Okay.

A -- but I don't know what her limitations -- that's a question actually for her, not quite for me.

Q Okay. All right. Paragraph 185 of the counterclaims, which is Exhibit 15, alleges that you took money from the store cash register to pay for incidentals you procured for the store.

We've covered that. That's accurate; correct?

A Yes. If I needed to buy paper towels or I was out of Lysol wipes, yes.

T. GONCALVES

And I always brought back receipts.

Q Okay. The next paragraph, paragraph 186 said subsequent reconciliations showed that cash envelopes prepared by you were frequently off by as much as $100 per time. Do you see that?

A Yes, I see that.

Q Is that accurate?

A That is inaccurate.

Q All right. We walked through the fact that there were these emails, or at least one email where there were cash reconciliations. Right? So do you recall that there were cash reconciliations?

A Cash reconciliations as far as daily business or petty cash?

Q Well, it just says cash envelopes. So what do you recall about it?

A I don't recall that. That's just that whole segment I don't recall.

Q Okay. But if you don't recall that, how can you tell me it wasn't off by $100 or more?

T. GONCALVES

A Because nothing was ever brought to my attention.

Q Okay. All right. To your recollection, nobody ever brought that to your attention?

A No. I would hope that if I was short somehow, somebody would approach me. My employer would say, Teresa, what's going on, let's talk about this, this is a frequent -- and nobody -- nothing happens. Nobody spoke to me. I was never addressed.

Q Okay. All right. You have no recollection of anybody talking to you about shortfalls in cash?

A No. I don't know that.

Q The next paragraph, 187, says, upon information and belief, that you took money totaling more than $4,000 for your personal use. Is that right?

A $4,000?

Q 5,000.

A 5,000. Upon information and belief, Goncalves took this money. Wow.

T. GONCALVES

No. That's --

Q No?

A That's in -- for personal use?

Q Yes.

A That's not my character.

Q So you're denying that you took money from the cash register and kept it for personal use?

A I never kept any money. I didn't take any money. That's quite --

Q Okay.

A -- a large accusation.

Q Paragraph 188 is an allegation that you had access to NIBI's confidential information, is that accurate, as a manager?

A I'm sorry, what number are you on so I can follow appropriately?

Q 188. I've just highlighted it for you.

A What confidentiality are we talking about?

Q Well, my question to you is, did you have access to confidential

T. GONCALVES

information, information that's not publicly accessible, as a manager of NIBI?

A No. I was hired to run and drive the business, and that's what I did.

Q As part of that, did you have any inside information, for example, on patterns that were purchased for use in the business?

A No. I just know she would go to India and they would create it there. I don't even know what part of India, to be honest with you. And that was irrelevant.

We would talk about her product. That was part of our job description, was to discuss the designer and where the product is from. It's on the label, made in. So there was nothing out of the ordinary or confidential that I was entitled to.

Q Okay. I understand.

A few follow-up questions just to close some loops. You had said that there were extended hours in the summertime because it was an active town.

T. GONCALVES

Is that right?

A It's a very active town, even off of the summertime.

Q Yeah. So off of the summertime, when it's not extended hours, what were the usual hours of the store?

A Sometimes 10:00 to 6:00, sometimes 10:00 to 7:00. Sometimes I'd come in early for a client. It depended.

Q Well, right now I'm just talking about when the doors were open at the store. Did it have set hours?

A Did I have set hours? I don't recall what my set hours were. I don't know if it was 10:00 to 7:00 when I first began, and then we were just having soft closings. So whenever the clients dwindled down, then we would close. I don't remember that minute detail, I really don't. It's kind of tedious to put it in -- to give you an answer with.

Q Okay. But I mean, the store had set hours; right? If I were to look it up on Google at a time, I would know when I

could come buy stuff?

A I believe so. I don't know if it was updated on Google, but I think it was on the front window I want to say. Maybe not.

Q Okay. That was actually going to be my next question. So it had one of the little typical signs in the window, you think, that said what the hours were?

A I believe there was. I could be wrong. I could be thinking of one of her other stores. I'm trying to recollect Westhampton Beach. If there wasn't, then it was definitely one of her other stores.

Q Okay. All right. In terms of the overtime that you're alleging, was there ever a instruction from the management at NIBI to not do overtime?

A For all team members, or just myself as a manager?

Q Let's go with just yourself as a manager.

A I think it was encouraged to not go past 40, but it's virtually impossible

T. GONCALVES

when -- you know, I'm a workaholic, so I work a lot. I give it all I have to, and I don't sometimes look at my clock. So if I spillt over my 40, oops, I'm doing my job.

So I didn't really keep tabs on that as far as how many times. I wouldn't even know how to answer if I had so many overtimes.

But was it encouraged by them? Was that your original question?

Q My question was, was there an instruction from the management at NIBI to not do overtime?

A Not specifically that I could remember, honestly.

Q Okay.

A But I -- I don't ...

Q I didn't hear what you said. Did you say, I don't remember?

A No. That was it, no.

Q Okay. All right. When you needed time off for personal instances, like funeral arrangements for the family

T. GONCALVES

or what have you, did NIBI allow you to take time off?

MR. KATAEV: Objection to form.

THE WITNESS: So should I answer this, Emanuel?

MR. KATAEV: Yes.

THE WITNESS: Okay.

So I would hope, yes, that they would let me take funeral time off.

BY MR. BOWLES:

Q More generally, when you had personal needs and you needed time off for whatever reason -- take the kids to school or anything like that -- were you allowed to take time off?

A I didn't have to take my kids to school, so -- if I did do that, it would be prior to work. I worked my world around my work schedule. So it was minimally that I had to ask for personal time, and if I did, it was of substance.

Q And when you did ask for personal time off for whatever reason, were you allowed to take it?

T. GONCALVES

A Yes. I did.
Q Okay. Did NIBI provide health insurance for employees?
A As far as myself, no.
MR. BOWLES: Okay. All right. I would like to take a five-minute break. I just want to talk to my partner. We may be done, but I just want to make sure we don't have any other questions to tie off any loose ends.
Can we take five, come back at -- well, let's take nine. So we come back at 2:05?
MR. KATAEV: That's fine. Thank you.
THE REPORTER: All right. The time is 1:57 p.m. Off the record.
(Off the record.)
THE REPORTER: It's 2:05 p.m. On the record.
MR. BOWLES: All right, Ms. Goncalves, I really want to thank you for your time. I know these things are difficult and a pain, but you've been great.

T. GONCALVES

We don't have any further questions unless Mr. Kataev has any that I need to follow up on.

MR. KATAEV: I don't have any questions for the witness.

MR. BOWLES: I really appreciate your time, ma'am.

THE WITNESS: Thank you.

THE REPORTER: Okay. The time is -- actually, it's a federal case. I have to take orders on the record for Veritext.

Counsel Bowles, we have your order here on file.

And then Counsel Kataev, are we ordering a copy of the transcript today?

MR. KATAEV: We're just requesting to read and sign pursuant to Rule 30(e)(2) of Federal Rules of Civil Procedure.

THE REPORTER: All right, thank you.

The time is 2:05 p.m. Off the record.

//

//

T. GONCALVES

(Signature reserved.)

(Whereupon, at 2:05 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, JAMES BEKMAN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



JAMES BEKMAN

Notary Public in and for the

State of New York

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, JENNIFER FENIMORE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JENNIFER FENIMORE

Goncalves, Teresa, Et Al. v. Kristin Sheeler Designs, LLC, Et Al.

Teresa Goncalves (#8386721)

E R R A T A   S H E E T

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE____________________________

____________________________________________________________

REASON______________________________________________________

_______________________________________    __________________

Teresa Goncalves                                        Date

Goncalves, Teresa, Et Al. v. Kristin Sheeler Designs, LLC, Et Al.
Teresa Goncalves (#8386721)

ACKNOWLEDGEMENT OF DEPONENT

I, Teresa Goncalves, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_______________________________ __________________

Teresa Goncalves Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:16 7:18 133:8

**0**

**04264** 1:10

**1**

**1** 3:7 5:14 43:6 43:11,16 49:11 50:17 60:14 64:19 68:17 119:10,13 134:10 137:14 141:9 145:9
**1.85.** 102:20
**10** 3:24 115:18 115:19 119:25 159:13
**100** 5:4 97:12 97:16,21 187:7 187:25
**10005** 2:18
**1002** 168:15
**1005** 167:3
**105** 3:17
**10:00** 159:15 159:23 191:8,9 191:16
**10:03** 1:17 6:7
**10:54** 49:24
**10th** 84:20
**11** 3:25 101:20 149:18,19 157:5
**112** 3:20
**113** 3:23
**11423** 2:8
**115** 3:24
**11967** 1:19 6:15
**11:13** 151:6
**11:48** 105:2
**11:59** 105:5
**11th** 102:7
**12** 4:3 44:11,12 120:5 121:14 124:21 151:22 151:23 154:15
**13** 4:6 122:17 164:6,7
**14** 2:17 4:10 122:17 159:12 165:18,19
**146** 4:15
**149** 3:25
**14th** 181:18
**15** 4:11 39:3,4 181:13,14 186:18
**151** 4:5
**158** 48:13
**164** 4:9
**165** 4:10
**17** 4:13 89:24 90:2 119:19,24 120:25 122:14 122:20,24 163:4
**17.35** 90:24
**173** 4:17,19
**174** 4:21
**175** 4:23,25
**176** 5:6
**18** 1:16 4:14 6:14 146:23,24
**180** 182:5
**181** 4:12 182:17
**18211** 2:7
**183** 183:18
**185** 186:17
**186** 187:4
**187** 188:18
**188** 189:14,20
**19** 4:16 50:20 60:13 93:11,12
**1:13** 151:9
**1:57** 195:17
**1st** 115:22

**2**

**2** 3:8 5:15 44:23,24 170:16 196:19
**2/7/22** 4:13
**20** 39:4 99:8,10 99:22 119:15 145:14 146:9 201:15
**2021** 3:15 23:3 30:20 44:14 45:5,23 51:2 64:6,15 84:20 88:3 98:3 105:25 107:13 107:20 109:4 111:14 125:3 182:8,12
**2022** 3:18 79:22 80:10 90:5 93:15 94:2,7 98:3 112:20 115:22 116:9,13 130:3 169:12
**2023** 3:21 22:20 23:3,10 23:17,24 24:2 25:23 26:11 29:21,23,23 30:15,16,20,24 31:23 32:5,18 33:5,18,21 44:14 46:13,17 46:20 48:11 72:5 74:19 101:3 103:9 111:14 113:22 114:7 147:4,23 149:22 150:8 150:21 155:18 170:9
**2024** 34:9
**2025** 32:24 35:18 43:16

**2026** 1:16 6:14
**20th** 2:17
**21** 4:17 130:2 148:13 172:25 173:2,13
**212** 2:21
**21st** 147:3
**22** 4:18 80:10 173:22,23
**23** 4:20 44:17 47:5 52:3 79:21,23 80:8 115:7,8 148:12 174:13,16
**23rd** 149:22
**24** 4:22 80:6,6 88:3 175:2,5
**25** 4:24 94:18 118:7,16,20 134:10 135:6 175:15,17
**26** 5:3,6 82:12 82:14 94:2 152:19 176:8
**26469** 199:13
**27** 5:4 64:19 68:17,23 100:23,24 103:9
**277** 93:24
**28** 5:5 176:4,5
**28.25** 150:22
**29** 29:23 48:11 101:20
**29th** 102:6,18
**2:05** 195:14,19 196:22 197:3
**2:25** 1:10
**2s** 14:3 165:22

**3**

**3** 3:9 48:3,4 153:7
**30** 101:3 134:20 196:19
**30th** 182:8,14
**31** 5:14 43:16
**31st** 45:5
**32606** 198:16
**37.32** 103:25
**39** 137:16
**390-8842** 2:21
**3rd** 79:22

**4**

**4** 3:11 46:6 47:7 77:5,6
**4,000** 188:20,22
**4/1/22** 3:24
**4/5/22** 4:16
**40** 5:10 66:14 142:7 192:25 193:5
**412-2421** 2:10
**43** 3:7
**44** 3:8
**46** 141:10
**48** 3:10

**5**

**5** 3:13 84:15,16 95:5
**5,000** 188:23,24
**5/21/23** 4:14
**5/23/23** 3:25
**5/29/23** 3:10
**5/30/23** 5:4
**5/31/21** 3:8
**50** 97:12,13,21 97:23 158:19
**50,000** 117:2,11 117:22
**52** 6:14
**58** 145:9,19,20
**5:05** 72:6
**5th** 93:15

**6**

**6** 3:14 87:23,24
**60** 60:15,19 61:4 64:21 65:2,3,7,9,18 66:2,19 69:3 177:10,15
**622** 109:11
**631** 64:14
**6th** 72:5 74:19

**7**

**7** 3:15 90:5 105:18,19 107:8
**7/14** 4:12
**7/31/25** 3:7
**70** 60:15 61:5
**718** 2:10
**74** 5:16
**75** 99:9,9
**77** 3:12
**7:00** 191:9,16

**8**

**8** 3:3,18 5:10 112:16,17
**8/10/21** 3:13
**8/24/21** 3:14
**805.49** 109:4
**82** 5:3
**820-1616** 64:14 73:25
**8386721** 1:21 200:2 201:2
**84** 3:13
**87** 3:14
**8:00** 159:17,22
**8th** 102:6

**9**

**9** 3:21 113:18 113:19 114:13 176:17,17
**90** 4:13
**93** 4:16
**94** 80:11,12,14
**9:00** 159:18,22
**9:30** 161:2,2

**a**

**a.m.** 1:17 6:7 49:21,24 105:2 105:5 159:15
**abbreviation** 172:9
**ability** 165:7 183:14,16 198:9 199:6
**able** 41:17 55:18 56:24 62:3,14 67:22 68:11 70:16 75:25 76:19 78:16 85:2 138:19 149:2,5 161:6 180:14
**above** 201:7
**absent** 6:20
**absolutely** 57:22 91:11 127:10
**access** 15:4 56:15 64:8,10 76:15 78:20 96:19,23 110:19 112:4,6 114:21 164:24 165:3,5,7 171:21 179:13 182:18,23,25 184:21 185:7 186:8 189:15 189:25
**accessible** 190:3
**account** 99:12 108:8,13 109:22 110:16 110:20,22 111:3,7,8,9,17 111:19 112:3,5
**accuracy** 123:3
**accurate** 60:18 69:17 79:14 83:13,20 119:22,23 131:5 141:13 152:15 177:7 182:11,21 183:22 184:24 186:23 187:9 189:16 198:8 199:5
**accusation** 189:13
**acknowledge** 114:17
**acknowledge...** 201:3
**acknowledge...** 6:17
**acquaintances** 36:11
**action** 198:11 198:15 199:8 199:11
**active** 190:25 191:3
**activities** 159:25
**actual** 54:19 116:17 169:13
**actually** 29:22 54:22 56:17 71:22 72:2 103:16 114:15 125:22 136:22 148:8 157:21 159:21 160:5 182:13 186:15 192:7 196:11
**added** 88:12
**adding** 69:23
**additional** 95:4 121:15 179:13 180:8 186:8
**additionally** 6:20
**additions** 201:6
**address** 19:3,6 19:7 45:15,18 45:21,24 76:13 76:16,20 101:8 101:10 148:21 148:22 164:16 165:12
**addressed** 188:13
**adjacent** 132:16
**adjusting** 82:2 185:8
**adjustment** 85:20
**administer** 6:17
**administration** 22:22 171:10
**adp** 15:6
**advice** 23:19,20 23:22 32:12 34:2
**advisor** 36:20 36:22,25
**affix** 152:25
**afternoon** 151:11
**age** 98:3
**agency** 155:13 155:23 156:5 156:18 171:19
**ago** 14:22 20:20 21:15 32:25 39:4,4 45:12 79:15 93:7 125:4
**agree** 6:18,23
**agreement** 3:9 3:25 34:12,20 46:10 47:23 48:7,10,10,19 149:22
**ahead** 73:16 89:13 102:3

156:14
**ahold** 27:3,8,20 27:20 29:12
**air** 126:11,12 126:20 129:3,4 129:8,11,12,20 129:22,24
**al** 200:1,1 201:1,1
**alarm** 19:21
**allegation** 141:16 142:5 143:15 145:16 157:6 160:4 189:14
**allegations** 44:6,8 154:24 155:4
**alleged** 149:4 153:10 164:17
**alleges** 186:19
**alleging** 192:17
**allow** 194:2
**allowed** 26:18 78:19 194:15 194:25
**amanda** 125:20
**amended** 5:5 176:8
**america** 107:16 107:21,24,25 108:9,11,14 109:22 110:3,6 110:10,13,16
**amicable** 148:17
**amount** 77:2 104:4 109:3,9 109:11 158:16 158:17 162:20
**amounted** 161:14
**amounts** 114:18
**android** 72:17
**angry** 35:3
**animosity** 147:16,25
**answer** 4:11 5:8 9:17,25 10:8,17,25 12:3,21 20:15 24:9,11,20,21 33:10 34:15,17 38:9 40:8,10 40:14,25 68:2 68:3 71:7 73:14,16 75:17 80:3 86:24 88:22,23 89:5 89:10,12,13 95:12 108:22 108:25 113:13 117:14 121:5 136:24 147:22 156:9,16 157:9 167:17 181:17 181:21 184:10
191:22 193:9 194:5
**answer's** 78:10
**answered** 78:5
**answering** 73:18
**answers** 10:3 24:19 112:22 152:14
**anybody** 35:10 39:8 98:12 146:16 153:12 154:5,23 185:4 188:15
**anymore** 29:7 64:3,4 143:13
**anyway** 143:21
**apart** 165:10
**apartments** 132:15
**apologies** 108:14 134:18 168:13 185:21
**apparently** 34:21
**appear** 79:20 106:5
**appears** 43:14 45:2 46:5,9 47:3 48:6,9,22 77:12 80:11 82:20 83:16 84:18 88:2,5 90:4 93:14,23
101:16 102:13 105:23 115:21 116:21 117:22 118:6 147:4 149:21 151:25 165:21 173:4,6
**appended** 201:7
**apple** 55:9 72:17
**applicable** 7:3
**appreciate** 105:15 124:16 146:8 172:17 196:7
**approach** 188:8
**appropriate** 134:19
**appropriately** 189:19
**approval** 85:21
**approximately** 60:15 64:21 145:14 157:12 158:14 159:15
**april** 22:20 23:3,10,17,24 24:3 25:22 26:11 29:20,23 30:15,20,22,24 33:18,21 44:14 93:15 101:20 102:6,18

115:22 116:9 116:13 155:18
**area** 96:18
**argumentative** 67:25
**armored** 100:15
**arose** 148:21
**arrangements** 100:17 193:25
**arrived** 120:21
**asked** 14:22 19:10,22 20:20 39:25 60:5 64:25 71:23 75:13,19 78:7 82:11 83:19 95:21 105:10 128:7 129:19 131:13 140:6 153:8 164:15 164:22 167:5 167:18
**asking** 8:19 20:24 33:4 35:18 40:20 77:21 102:14 102:15 103:18 113:11 146:4 153:11 154:11
**asks** 154:16
**assigned** 6:4
**assumes** 33:7
**assuming** 92:14
**asterisk** 88:10
**attached** 120:11
**attaching** 46:3
**attempted** 27:21
**attendance** 7:10
**attention** 13:19 53:19 64:18 68:17 90:23 113:2 119:15 134:9 137:16 141:8 145:9 157:4 159:12 163:4 169:23 182:3 188:3,6
**attorney** 10:6 10:10 11:7 37:3 50:5 77:24 79:7 106:14 166:4,6 177:4 198:13 199:9
**attorneys** 176:24
**audio** 198:7 199:3
**august** 1:16 6:14 84:20 88:3
**authorized** 6:16
**automatic** 22:2
**automatically** 21:20 97:7
**available** 76:24 132:7
**avenue** 2:7
**aware** 33:14 146:16,18 154:10,12 170:25 183:11

**b**

**b** 3:5 4:1 5:1 169:9
**back** 18:16,22 30:22 38:8,16 50:15 75:20 76:10 79:3 88:17 93:25 104:21,22 105:10 111:6 114:20 115:25 116:2 117:12 119:11 120:6 120:11,12,23 121:2 122:18 127:13 128:8 128:15 129:13 136:11 137:11 137:13 139:19 148:17 162:6 173:16 183:9 187:2 195:12 195:14
**background** 29:4
**backtracked** 72:3
**backup** 62:8
**bags** 96:25
**balance** 180:2
**balances** 180:2
**bank** 86:3 107:13,16,21 107:24,25 108:7,8,10,13 109:19,22 110:3,6,9,12,16 110:19 111:5 111:13,16 112:5,10 114:20
**banking** 100:15
**banks** 107:2 114:9
**bar** 169:13
**base** 117:2,22
**based** 41:2
**basis** 15:22 21:6 22:11 83:18 141:15 142:4
**bates** 4:14,17 4:21,23,25 12:17,19 45:6 48:12 77:12 84:21 88:4 90:6 93:17

101:4 105:22 106:12 112:21 113:22 116:3 147:4 149:24 173:5,25 174:14 175:3 175:16
**bathroom** 127:24
**bcl456** 45:15 165:12
**beach** 18:19 26:23 39:24 51:7,12,15 60:2 120:16 121:9 130:14 192:14
**bear** 48:22
**bearing** 105:22 174:14 175:3
**bears** 48:12 84:21 88:4 90:6 93:17 101:4 112:21 113:22 116:3 173:5,25 175:16
**beast** 65:5
**began** 50:25 191:17
**beginning** 33:3 45:6 87:17 116:4 149:23
**begins** 77:11
**behalf** 1:5 2:2,3 2:12 6:10 62:23
**bekman** 1:20 6:3 198:2,17
**belabor** 100:20
**belief** 141:11 145:13 188:19 188:25
**believe** 22:16 28:17,20 30:19 45:4 48:17 54:11,23 56:8 58:5,24 63:15 70:20 75:7 82:22 85:17 86:13 87:4,4 92:24 109:7 121:18,20 125:17 127:20 132:7,8 143:7 150:6 164:12 170:6 179:17 182:13 185:11 186:9 192:3,11
**benefit** 68:20 153:18
**benjamin** 2:24 151:13
**best** 142:18 152:16 157:25 177:24 178:25 179:3 198:9
199:5
**better** 178:14
**big** 65:23
**bigger** 41:22
**bill** 131:18,18 179:4,6
**bills** 130:25
**bit** 55:3 149:16 170:19
**biweekly** 15:16 87:3 108:24
**blackburn** 169:10
**block** 92:8
**board** 170:21
**bojo.law** 2:19 2:20
**bolts** 91:9
**bottom** 12:18 12:20 88:9 103:12 106:13 147:8 150:13 152:18,23
**bounds** 99:7
**bowles** 2:14,16 3:3 7:14,14,18 8:15,17 12:12 24:15,22,24 31:17,18 33:9 34:16 40:10,16 40:19,24 41:4 41:20 42:4,7 42:19,21 49:19 50:2 68:8
71:20 73:20 74:12,17 80:2 88:21 89:7,14 89:17,22 104:16,21,24 105:7,8 112:8 112:13 134:24 135:4,5 137:2 137:10 151:5 151:17,19 156:12,13 160:8,10,11,23 167:3,10,18,20 167:25 168:4,8 168:10,11 181:8 185:20 185:23 194:11 195:6,21 196:7 196:14
**bowles's** 24:21
**box** 96:19 97:3
**branch** 51:4
**branches** 121:24
**brand** 121:17
**breach** 34:11 34:19,24
**break** 10:9,14 10:17 17:8 49:15,17 50:4 50:6,9,16 55:2 104:18 105:10 134:20 137:3 137:12 179:22

195:7
**breakdown** 86:18
**breaking** 185:17
**breakout** 117:2
**breaks** 53:15 117:2
**brendan** 18:25
**bridge** 118:18
**bridgehampton** 18:20 59:12 92:19 94:19 95:5 118:8,21 121:24
**bridget** 125:21
**brief** 37:18 105:10
**bring** 53:18
**brings** 173:16
**brinnen** 1:12 2:13 6:13 18:10,11,14 19:10 20:16,21 45:3 62:9 63:12 69:13 70:22 73:4 74:21 75:21 76:2 84:8,19 85:9 88:3 90:5 93:15,20 101:3 101:17 116:2 116:22 118:7 118:15 132:5 136:3,7 138:14 138:20 147:3 147:10 153:16 154:21 162:3 162:11 185:5
**broke** 156:10 160:17
**broken** 126:12 126:14 129:21
**brought** 187:2 188:2,5
**building** 132:16,23,24
**buildings** 132:3
**bullet** 157:8 159:13 161:7 163:5
**bunch** 9:9
**business** 20:8 20:13 24:14 37:23 53:24 54:5 65:6 92:25 93:3 97:2 98:19,22 99:8 100:7,17 170:7 178:14 187:17 190:5,9
**busy** 177:19
**button** 42:2,4
**buy** 91:13 96:4 98:9 131:10 132:8 186:24 192:2
**buyer** 186:11
**buyers** 186:2
**buying** 60:23 98:4

**c**

**c** 2:1 5:12 169:9
**cake** 14:9
**calculate** 79:17
**calendar** 5:15 72:10,11,15,16 73:7 74:14,23
**call** 13:14 28:10 37:18 74:13 90:22
**called** 8:7 27:15 131:14
**calling** 182:7
**calls** 34:13
**calm** 29:7,8
**capacity** 20:17
**car** 100:15
**card** 98:14 158:4
**cards** 12:11,14
**care** 33:22 71:4
**carrier** 74:4
**case** 1:9 153:12 153:18 154:2 196:11
**cash** 95:19 96:3 96:10,12,16,21 97:2,7,11,17,20 97:22,24 98:4 98:8,10,15,17 98:17,20,20,22 99:4,7,8,9,15 99:16,17,21,24 99:25 100:5,6 100:7,10,13 102:3,14 103:2 159:9 186:20 187:5,13,15,16 187:17,18 188:16 189:8
**cause** 127:14
**cell** 64:3,5
**cent** 150:25
**certain** 17:6 47:13 76:25,25 117:14 121:6 124:13 129:21 140:16 144:6 157:6 162:20 170:22 182:3
**certainly** 10:6 40:10
**certificate** 198:1 199:1
**certified** 6:23
**certify** 198:3 199:2
**chair** 135:21
**chance** 82:4 104:7
**change** 42:25 113:24 128:13 128:21 162:4

183:6,10 200:4 200:7,10,13,16 200:19
**changed** 64:6 115:13 133:10 141:23,24 162:7
**changes** 33:23 128:17 201:6
**changing** 143:9 144:13
**channels** 26:20
**chaotic** 124:12
**character** 189:6
**charge** 136:8
**chase** 99:2,5,10 99:11 107:10 107:15,21,24 108:2,8,11,12 108:14 109:23 110:3,5,8,9,13 110:23 111:4 113:6,15 114:2
**check** 85:15 103:3
**checks** 179:25
**choice** 26:7 130:6
**choices** 36:3
**choppy** 156:10 156:16
**circle** 42:6
**circumstance** 139:15
**circumstances** 138:17,20 139:12
**city** 70:20
**civil** 196:20
**claims** 154:19
**clarification** 51:24
**clarifies** 118:16
**clarify** 40:2 113:9 114:23 146:7
**clear** 19:5 40:18 51:8 65:17 66:15 70:6 77:20 89:20 99:13 145:2 160:2
**clearly** 40:17 95:12,17 117:14
**clerk** 2:24 151:15
**client** 26:6,16 26:22 27:10 177:4 178:13 191:10
**client's** 184:6
**clients** 60:20,22 65:24 67:10 98:14 191:18
**clock** 54:6,7,21 54:21 55:18,19 57:5,6,8,9 58:3 58:4 59:2,3 61:7,10,15,15 62:2,3 63:13 63:16,17 66:20 66:20,21,21 67:2,2,11,12 77:19,19 80:17 80:22 82:25 83:17,17 88:14 88:14 104:11 138:13,15,19 138:22 139:10 139:10 144:10 144:11 160:12 160:16,16,18 160:18,20,21 161:9 162:6,16 162:16,18 179:11,12,24 179:25 180:14 182:23,23 183:19,20 184:3,3,4,4,6 184:13,18,20 185:4 193:4
**clocked** 56:6,6 57:20,20 58:15 58:15,22,23 66:24,24 80:16 80:19,20,22 144:2,2,5,5 160:25 161:2 161:24,24,24 161:25 177:21 177:21 183:8,8
**clocking** 54:12 54:17 59:4 81:19,19,25,25 184:8 185:8,8
**close** 148:11 150:9 178:13 190:23 191:19
**closed** 73:25 74:2 92:16,23 110:12 160:4
**closest** 150:11
**closing** 98:25 103:14,15
**closings** 191:18
**closure** 92:14
**clothes** 128:8 128:11,14 130:6
**clothing** 98:9 169:4,5
**clover** 54:23
**clumsy** 17:5
**collection** 138:11
**collective** 145:11,15,25 146:2
**colleges** 52:14
**come** 54:2 57:3 97:10,25

100:16 106:21 138:9 191:10 192:2 195:12 195:13
**comfortable** 104:19
**coming** 26:23 29:16 65:12 110:7 124:13 137:13
**commission** 16:11,24 21:10 22:14 47:7 53:18 141:24 180:25
**commissions** 16:14,18 17:11 141:19
**common** 40:6 40:14 41:3
**communicate** 71:9 76:2 81:24 104:14 179:10,14
**communicated** 66:16 82:7 162:13,19
**communication** 19:8 148:25
**communicative** 11:20
**comp** 143:4
**company** 13:7 13:8 15:4 68:12 83:6 86:16 168:22 168:23 169:4 169:11
**comparison** 75:15
**compensation** 47:4,10
**compete** 34:12 34:20,22,25
**complain** 155:13 156:4
**complained** 70:3 148:18 154:17
**complaint** 3:7 16:3,19 23:4,5 23:9 29:24 43:14,23 44:11 44:21 49:11 50:19,20,21 60:13 119:16 122:20 137:15 137:17 154:19 154:25 155:4 155:16,17 156:17 157:7 164:17,21 171:24
**complaints** 30:25 119:11 154:23
**complete** 201:8
**completely** 63:5
**complicated** 73:11
**computation** 176:17
**computer** 31:4
**concern** 53:17
**concerned** 14:2 122:9 171:7
**concluded** 197:4
**conclusion** 34:14
**concurrent** 23:15
**concurring** 29:15
**condition** 129:12
**conditioned** 129:5
**conditioner** 129:20,22,24
**conditioning** 126:11,12,20 129:4,9,12
**conditions** 127:9 128:4,5 128:13,18,22 131:21
**confidential** 189:15,25 190:19
**confidentiality** 189:22
**confirmed** 86:7
**conflict** 30:4
**conglomerate** 16:25
**consider** 22:19 23:14 49:4 112:9
**considering** 32:4
**consistent** 15:10 52:16 142:2,4,18
**constitute** 7:7
**consulted** 32:3
**consume** 37:7 37:25
**cont'd** 4:1 5:1
**contact** 25:12 35:12 60:21 67:8 70:17
**contacted** 155:12
**contacts** 74:11
**contemporan...** 140:9
**contemporan...** 69:25 116:9 149:3
**continue** 105:12
**continued** 124:22 125:13

**continuing** 151:20
**control** 53:12 62:12 183:4
**controlled** 134:13 135:7 135:25
**controlling** 135:22,23
**convenience** 13:13
**conversation** 11:3,5 28:19 28:25 37:3,8 37:17 50:5
**conversations** 31:21 154:2
**convey** 67:22 68:11
**cool** 129:5,6
**copies** 63:22 71:14 84:5 91:23
**copy** 5:15 31:3 31:13 43:10 48:6 74:13 196:17
**copying** 45:4
**corporate** 12:25 158:3
**correct** 11:10 13:16,17 14:17 15:23 19:14,16 20:2,18 21:8 25:21 32:9,18 32:24 34:9 35:25 39:14,15 40:5 41:2,12 44:15,16 45:11 46:10 47:6,14 51:2 56:7 58:16 67:19 70:11 75:21 76:13 81:6,7,8 81:10 84:6 87:12 88:18 98:19 108:17 108:21 115:24 117:17,18 118:8 120:19 121:10 126:11 136:5,8 138:15 144:6 146:3 148:8 156:19 160:6 163:22 164:25 165:2 167:21 176:14 177:23 180:21 181:5 184:13 184:14,18,20 185:4 186:23 201:8
**corrected** 69:10 81:5,20,21
**correction** 74:22
**corrections** 62:14,16 201:6
**corresponden...** 70:16 164:18 165:8
**counsel** 8:12 9:2 30:18 31:22,22 32:3 42:8,9 151:3 166:24 185:15 185:17 196:14 196:16 198:10 198:13 199:6,9
**count** 100:12 120:4,25 121:4 122:7,13 123:4
**counter** 56:11
**counterclaim** 12:9
**counterclaims** 4:11 181:17 182:4 186:18
**couple** 27:21 33:6,11,12 39:19 119:12 168:14 169:14 169:21
**course** 49:16 51:25 76:9,9 89:2 134:11 136:25 152:8
**court** 1:1 9:10 9:19 43:16 181:18
**cover** 59:20 60:4 95:4 118:8
**coverage** 59:21
**covered** 60:11 164:13 186:22
**cracks** 21:13 22:8,10
**create** 171:17 190:11
**created** 54:25 171:16
**cross** 129:15
**currently** 41:10
**cut** 167:2
**cv** 1:10

**d**

**d** 3:1 5:12,12
**d1** 45:6
**d155** 48:12
**d158** 48:22
**d159** 149:24
**d166** 101:5
**d214** 90:7
**d216** 4:15 147:5
**d218** 93:18
**d221** 116:3 118:6
**d229** 84:21
**d230** 88:5
**d232** 105:23
**d234** 112:21
**d236** 113:23

**d48** 77:12
**d7** 47:2
**d854** 4:21
**daily** 83:17 99:14 187:17
**damages** 176:18 177:6
**date** 1:16 33:3 58:8,13 92:20 116:18 200:24 201:12
**dated** 3:8,9,13 3:14,24,25 4:11,13,14,16 5:4 45:5 48:11 84:20 93:15 101:3 103:9 115:22 147:3 149:22
**dates** 94:12 114:17
**daughter** 27:14 27:15,23 30:8 30:9,10
**david** 2:14,19 7:14 8:17 168:4
**day** 19:24,24 20:23,23 28:21 34:4,4 36:13 37:9,12,23 39:19 57:6 62:11 65:7 80:13,14 84:3 85:18 86:5 92:10,17,22 93:3,6 97:2 98:3,19,22,24 99:3,8 100:10 100:11 118:9 119:17 120:21 121:12,25 122:2,7,8 123:12,13,17 123:18 126:14 126:21 127:5,6 127:21,22 129:7 141:19 143:4,25 157:21 162:9 184:4 201:15
**days** 15:10 35:13 39:19 53:24 127:4 129:21 159:14 162:12 169:15 169:21
**debit** 108:21 114:3
**decide** 23:18
**decided** 29:18
**decision** 29:14
**declare** 201:4
**declining** 24:9 24:11,13
**decorations** 138:18
**deducted** 21:21 103:25
**deductions** 22:23 23:8
**deemed** 201:6
**deep** 109:19
**defendant** 12:25 141:11
**defendant's** 130:5
**defendants** 1:13 2:12 7:15 7:19 8:18 44:13 68:20 119:18 130:25 134:14 135:7 135:24 151:18 157:10,11 163:6
**definitely** 33:2 192:15
**deliveries** 138:10
**deny** 95:14 115:2 118:23
**denying** 95:16 102:25 115:3 189:7
**department** 71:2
**departments** 154:18
**depended** 63:7 65:12 177:16 191:10
**dependent** 63:20
**depends** 66:9 100:16
**deponent** 201:3
**deposed** 8:21
**deposit** 70:10 99:2,5,11,18 100:14 163:13 163:16
**deposition** 1:15 6:8 7:5,16 10:20 12:5 31:12 43:7 50:16 74:13 84:15 113:11 198:1
**described** 12:13
**description** 3:6 4:2 5:2,13 28:7 190:15
**designer** 190:16
**designs** 1:10 2:12 6:12 13:2 200:1 201:1
**desktop** 42:10
**detail** 16:13 17:3 24:18 191:20
**details** 88:6

**determine** 83:12
**device** 55:9,10 55:25 56:3,4
**diary** 141:3,4
**different** 55:24 78:8 169:11
**difficult** 158:7 195:24
**difficulty** 55:21 183:19,23
**dig** 109:19
**digital** 198:7 199:3
**dignity** 29:17
**dina** 1:4 2:2 6:10 11:8 35:15,24 36:9 37:12,21 38:5 38:15,19,21,23 38:25 39:10,13 40:3,21 146:15
**direct** 70:10 137:16 145:8 157:4 159:11 163:13,16 169:22
**directed** 70:25 134:13 135:7
**directing** 64:18
**directly** 62:22
**disclosures** 5:6 176:9
**discovery** 12:15 77:11 106:14 152:4
**discrepancy** 85:19
**discuss** 36:19 36:21,24 37:9 38:19 137:4 190:16
**discussed** 36:14 36:17 37:4,12 40:11,23 43:7 74:15 176:25
**discussions** 38:15
**dispute** 46:16 46:22,24 150:19
**disputing** 150:17
**district** 1:1,2
**divorce** 17:15 17:22 18:2 25:3,9,11,15,16 165:9
**docket** 43:16
**document** 41:15 42:16 43:18 44:22 45:7 48:2,15 77:22 79:6 82:17 85:3 87:22 90:8 94:18 100:23 101:6 105:17 105:22 106:8 112:15,19,23 113:21 115:17 116:5,21 149:23,25 150:15,18 151:21 152:6 152:20 153:6,7 164:3,5 165:17 165:24 166:3 168:15 171:14 171:15 173:21 174:25 176:3 181:12,20
**documentation** 75:16,18 76:25 84:2 90:16 117:13 139:18 156:21
**documents** 4:9 4:10 11:18,20 11:23 12:4,8 12:10,10,13 15:5 76:20 86:14 105:13 106:17 113:3 164:12,16 165:22
**doing** 28:13,25 33:23 37:24 41:16 56:8 65:9 95:24 99:18 122:22 146:19 179:23 180:5 183:11 193:5
**dollar** 150:25
**door** 63:6 120:12 129:14 129:14 133:8 184:7
**doors** 178:14 191:12
**doubt** 81:3
**draft** 129:16
**draw** 99:7,21 99:24,25
**drawer** 100:6 100:10 104:12
**driftwood** 157:20
**drive** 6:15 92:18 190:5
**driven** 25:24
**drop** 161:10
**due** 24:7 61:11
**duly** 8:8 198:5
**dwindled** 191:19

**e**

**e** 2:1,1 3:1,5 4:1 5:1,12,12,12,12 25:19 169:2,25 170:23 196:19 200:3,3,3

**earlier** 87:5 177:13
**early** 92:14 134:22 138:9 191:10
**eastern** 1:2
**echoing** 89:18
**effing** 29:5,6
**eight** 141:19
**either** 30:12 71:10 75:18 87:3 94:11 103:10,17 110:3 118:23 124:9 131:8 138:13 155:6 159:10
**elaborate** 73:19 146:6
**electronic** 43:10 72:15
**eliana** 125:20
**eligible** 47:8
**email** 3:8,13,14 3:24 4:13,14 4:16 5:4 37:6 38:19,20,23 43:8 45:3,10 45:15,18,20,24 46:2 64:2 72:9 75:20,22 76:2 76:4,12,13,14 76:16,19 81:11 81:13,22 84:9 84:19 86:2,11 88:3,5 90:5,18 90:20 91:19 92:2 93:14 101:2,8,10 103:25 111:10 115:22 116:21 116:25 117:21 118:6 140:7 147:2,6,8,9 148:17 164:23 164:24 165:12 179:15 187:13
**emailed** 38:21
**emails** 38:18 85:10,15 87:11 91:23 93:20 164:19 187:12
**emanuel** 2:5,9 7:12 32:6 33:2 68:4 73:12 82:22 83:3 84:4 89:18 171:12 194:6
**embarrassing** 158:12
**employed** 13:22 30:19 44:12 72:22 84:5 146:3 198:10,13 199:7,9
**employee** 21:22 57:3,13 58:10 85:22 133:24 146:13 147:18 186:4,6 198:12 199:9
**employees** 35:6 35:13,20,21 41:6,11,11 51:14,17 52:4 52:9,11,22 53:2,4,6,9,10 56:6,16 61:22 62:19,21 96:19 96:23 100:11 121:23 123:21 146:9 163:7 195:4
**employer** 15:9 21:19,23 104:15 106:22 133:23 147:19 168:18,20 169:8,24 172:14 188:9
**employers** 23:7 168:17
**employing** 56:23
**employment** 3:9 23:2 46:9 48:10,19 52:2 87:17 134:12
**encouraged** 192:24 193:11
**ends** 195:11
**entail** 53:13
**entered** 151:14
**entering** 168:22
**entire** 51:11
**entitled** 190:20
**entries** 113:25
**entry** 79:21 80:10
**envelope** 96:11 102:6,7,7,19,19 103:9
**envelopes** 102:4,14,16 103:2,3 187:5 187:19
**errands** 60:23 67:11 161:11 178:10
**erratic** 14:23
**error** 61:13 81:18,25 82:3
**errors** 61:11 79:20 80:20 183:25 184:14 184:19,20 185:4
**es** 198:4
**esquire** 2:5,14 2:15
**essentially** 153:11 154:16 172:21

**established** 87:5 115:6
**estimate** 178:2
**et** 200:1,1 201:1,1
**evening** 28:20
**event** 17:15,20 17:22 25:8 26:14 72:23 119:3
**events** 24:4,6 24:25 25:6 140:8 177:20
**eventually** 128:17
**everybody** 7:9 27:11 76:8 123:25 126:17
**everybody's** 9:11 43:9 127:15
**evidence** 17:11 17:13 33:8 71:21 75:11
**evidentiary** 7:4
**ex** 18:4,24 140:15
**exact** 123:4 145:10
**exactly** 80:15 150:25 171:20
**examination** 3:2 8:14
**examine** 17:2
**examined** 8:10
**example** 10:2 15:6,24 56:22 78:4,22 81:19 84:9 96:11 97:19 99:23 102:18 125:9 125:14 143:17 144:8 154:8 162:16 183:8 190:7
**examples** 137:25 138:7 139:2,5
**except** 23:8 159:16
**excuse** 49:12
**exhibit** 3:7,8,9 3:11,13,14,15 3:18,21,24,25 4:3,6,10,11,13 4:14,16,17,18 4:20,22,24 5:3 5:4,5 43:6,11 44:23,24 47:3 48:3,4 49:11 50:17 60:14 64:19 68:17 77:4,5,6 82:11 82:12,14 84:13 84:14,16 87:23 87:24 89:24 90:2 93:11,12 100:23,24 105:18,19 107:8 112:16 112:17 113:17 113:18,19 114:13 115:18 115:19 119:10 119:13 134:10 137:14 141:9 145:9 146:22 146:22,24 149:17,18,19 151:22,23 154:15 164:5,7 165:17,19 167:24 172:24 172:24 173:2 173:13,21,23 174:13,16 175:2,5,15,17 176:3,5 181:12 181:14 186:18
**exhibits** 43:9
**exist** 90:21
**existing** 72:3
**exiting** 168:22
**expect** 66:12 109:6
**expense** 90:24 97:6
**expensed** 96:16
**expenses** 91:4 95:20
**explain** 26:2,3 28:6 34:4 73:11 104:3,7 135:10
**explore** 55:17 58:12
**extended** 159:16 190:24 191:6
**extra** 130:6 136:22 162:12 162:19
**extras** 179:23
**exuberant** 158:15,16

**f**

**face** 126:2
**fact** 71:25 90:23 113:12 138:13 187:12
**facts** 33:7 153:10
**faded** 73:8
**failed** 141:12 157:11
**fair** 32:21 51:23 52:12,13 55:11 66:24 89:14 93:7 125:15 147:13 184:9
**fall** 21:12 65:24

**falling** 17:16 165:10
**family** 29:16 34:2 74:6 193:25
**famous** 28:17
**far** 13:25 19:19 59:5 64:23 66:7 69:24 96:17,23 97:8 97:11 111:6 136:14 155:25 158:11 187:16 193:8 195:5
**fault** 89:2 156:12
**february** 72:5 74:19 90:5 114:7
**federal** 21:19 43:15 196:11 196:20
**feel** 85:6 87:14
**fell** 22:8,10
**felt** 86:17
**fenimore** 199:2 199:14
**fi** 113:7
**field** 32:11
**figure** 73:22
**figures** 69:22
**file** 17:17,25 18:4,8 140:12 140:14 196:15
**filed** 3:7 35:18 35:19 40:4 43:15 44:3,6 181:18
**files** 171:22
**filing** 40:23
**finally** 28:10 158:14 175:15
**financially** 158:7 198:14 199:10
**find** 32:13 127:8
**finding** 30:2
**fine** 12:23 30:13 49:19 50:11 89:11 95:18 103:7,20 106:19 107:6 113:16 114:11 118:4 157:3 174:24 175:14 175:25 183:17 195:15
**finish** 9:5,6 10:16 134:24 139:24 167:16 167:17 171:8
**finished** 9:11 185:22
**fired** 26:9
**fires** 127:14
**first** 4:8 5:5 7:21 8:7,20 9:3 10:9 22:18 23:14 31:22 38:25 41:16 47:11 51:18 86:14 87:15 109:4 119:17 120:21,21 121:12 122:8 123:13 126:14 126:21 127:5 127:13,21,22 158:24 159:2 159:13 164:11 176:8,9 184:7 191:16
**fitting** 135:20 157:18
**five** 49:18 52:9 113:25 125:3 195:7,12
**floor** 2:17 65:15 127:25 129:15
**flowers** 60:23
**flsa** 141:14 145:11,14
**fluctuate** 52:23
**fluctuated** 51:20
**focusing** 86:21
**follow** 13:24 21:25 31:15 158:10 159:5 178:21 189:19 190:22 196:4
**followers** 28:4
**following** 162:9
**follows** 8:10
**foregoing** 198:3,4 199:4 201:5
**forget** 14:14 184:6
**forgot** 15:12 18:23 80:17 133:9 139:9,10
**form** 71:19 75:5 79:25 81:22 160:7,9 194:4
**formally** 30:16
**former** 35:20 41:11
**forms** 136:9
**forth** 75:21 148:17
**forward** 22:24 96:7
**forwarding** 154:14
**found** 74:18 157:24
**four** 88:11 92:10
**fourth** 161:7
**freezing** 131:21
**frequent** 97:25 188:11

**frequently** 137:21 161:8 187:6
**friends** 36:9,11 60:21
**front** 31:8 60:24 136:18 192:5
**full** 42:3 70:19 109:9
**fully** 9:25 16:6
**function** 55:16
**funeral** 193:25 194:10
**further** 46:9 164:24 196:2 198:12 199:8

**g**

**g** 169:25 170:6 170:23
**gas** 94:18,24 95:2,9,14 118:8,16 131:18 132:10 132:12,15,15
**gather** 83:7
**general** 48:9 75:25 92:21
**generally** 16:10 16:11 56:3 89:9 97:17 194:12
**generated** 106:25
**georgica** 171:4 172:12,13
**getting** 16:23 17:8 78:2 86:13 95:2,9 95:14 110:4 123:24 126:7 138:4 142:13 142:15 147:14 148:3,17,19 149:3,5,11 155:13 163:16 180:6,7,11,16 180:19,21
**gill** 170:4,18 172:10
**girls** 119:19 120:23 121:2 122:4,18 128:7
**give** 29:18 82:4 191:22 193:3
**given** 14:3 79:6 84:5 99:11 128:2 201:9
**gives** 137:24
**giving** 99:23
**go** 11:11 16:12 19:22,22 24:17 26:20 38:8 39:13 53:19 69:13 70:9 71:6 73:16 78:16,23 79:12 82:13 88:17 89:13 98:9,15 98:25 100:4 109:18 114:19 117:12 118:20 119:11 137:3 147:18 151:3 151:16 155:6,8 156:3,14 157:7 162:5,6 168:5 171:21 172:22 183:9 190:10 192:22,25
**godfather** 32:16
**goes** 65:16 113:4 116:23
**going** 8:19 13:2 22:24 24:4 27:25 28:2,15 38:12 40:16 41:14,21 42:24 43:5 44:10,20 44:21 47:4,25 50:18 54:14 63:18 77:3,4 79:3 82:10 87:21 100:22 101:15 102:11 103:8 105:12 105:16 112:9 112:14,22 113:17 115:16 118:10 123:10 124:13 129:7 135:18 137:15 145:8 146:21 149:16 150:6 152:17 153:5 153:20,21 159:11 162:5 163:3 164:2,4 165:16 166:15 176:9 181:11 182:2 185:2,10 188:10 192:7
**goncalves** 1:4 1:15 2:2 3:17 3:20,23 5:14 6:1,9,10 7:1,22 7:22 8:1,6,16 9:1 10:1,20 11:1 12:1 13:1 14:1,16,17,19 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1,19 31:20 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1,20 41:1,17,24 42:1,22 43:1 43:17 44:1

45:1,5 46:1 47:1 48:1 49:1 50:1,3 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1,21 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 77:15 78:1 79:1 80:1 81:1 82:1 83:1 84:1 84:20 85:1 86:1 87:1 88:1 88:4 89:1 90:1 90:6,9 91:1 92:1 93:1,16 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1,4 101:6 102:1 103:1 104:1 105:1,9 106:1 106:2,4 107:1 108:1 109:1 110:1 111:1 112:1,14,24 113:1 114:1 115:1 116:1 117:1 118:1 119:1,16 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,4 130:24 131:1 132:1 133:1 134:1,12 135:1 136:1 137:1,12 137:20 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,5 153:1 154:1 155:1 156:1 157:1,9 158:1 159:1,14 160:1 161:1 162:1 163:1,6 164:1 165:1,23 166:1 167:1,6,21 168:1 169:1 170:1 171:1 172:1,18 173:1 174:1 175:1 176:1,19 177:1 178:1 179:1 180:1 181:1,19 182:1,7 183:1 184:1 185:1 186:1 187:1 188:1,25 189:1 190:1 191:1 192:1 193:1 194:1 195:1,22 196:1 197:1 200:1,2,24 201:1,2,4,12

**good** 6:2 8:16 10:5 11:11 37:22 43:4 46:12 47:2 104:17 105:14 122:9 151:11 153:4 166:7 182:16

**google** 191:25 192:4

**gotten** 38:23 145:4

**gowns** 129:18

**grb** 1:10

**great** 37:23 86:7 105:7 195:25

**green** 42:2,5,6

**grid** 131:16

**grill** 169:10,14

**gross** 101:23

**ground** 8:24 164:13

**group** 121:2

**grushkovskiy** 2:24 151:14,18

**guess** 45:14,16 46:21 52:20 74:6 76:18 132:16

**guy** 20:22

**guys** 39:16 103:2 104:19 104:25

**h**

**h** 3:5 4:1 5:1 25:19 169:2 200:3

**half** 142:8,10 159:3 178:6

**hampton** 98:14

**hamptons** 59:23

**hand** 8:3 18:17 18:17 20:5,5 96:12 107:8 113:5,23

**handbook** 28:7

**handed** 102:15

**handled** 96:10 96:14

**hands** 58:19 136:22

**handwriting** 166:16 167:5,8 167:13,19

**hang** 42:24 168:12

**happen** 98:21 158:21
**happened** 17:18 22:25 26:5 28:12,24 29:3 72:19 139:8
**happening** 28:18 66:7 140:22 177:17 178:16
**happens** 188:11
**happy** 104:4
**head** 9:18,18 120:4,25 121:3 122:7,13 123:4
**health** 195:3
**hear** 12:21 29:4 89:20 160:8 181:21 185:16 185:17 193:20
**hearing** 7:24
**heat** 128:24 130:12,22 131:10,12,19 132:10
**heater** 130:5,10 130:18,20 131:2,11 132:9 133:13,19
**help** 8:24 39:6 59:20 136:16
**helping** 124:11
**hereto** 198:13 199:10 201:7
**hi** 116:22
**high** 52:3,11,18 52:20,25 53:6 60:25 65:19 66:18,22 177:15
**higher** 56:15
**highest** 52:6
**highlight** 68:24 80:11 101:22 145:21 184:17
**highlighted** 118:13 189:20
**hire** 46:3 76:11 76:11
**hired** 20:14 21:18 115:8 182:7 190:4
**hires** 123:23
**hiring** 21:9
**hit** 42:2
**holiday** 21:10 21:16 22:13 89:3 141:21,21 141:22 142:14 142:16 143:3,4 143:11,13,18 143:20 144:11 144:11,12,17 144:23 180:25
**holidays** 16:21 16:21 17:10 142:12,13,20 142:24,24 143:5,7,11 144:6,9,14
**home** 162:8
**honest** 103:5 124:14,15,17 140:21 190:13
**honestly** 38:8 52:15 69:9 193:17
**hope** 149:7 188:7 194:9
**hoping** 134:19
**hostess** 169:14
**hot** 126:18 128:8
**hour** 11:15 28:11 47:5 115:7,9 141:19 142:7 177:10
**hourly** 16:14 16:18 47:4,15 47:18 150:22
**hours** 5:3 60:15 60:19 61:5,8 62:12 63:12,17 64:21 65:2,3,7 65:9,19 66:2 66:14,19 68:19 69:4,5,8,10,13 69:20 70:4 77:13 78:24 79:13,21,23 80:6,6,8,11,12 80:14 82:21 83:24 84:7,10 85:16 86:18 88:11,12 92:10 93:21 130:15 138:14 139:7 139:16 140:3 148:3 149:12 159:16 160:13 161:15,23 162:12 177:15 177:22,23 179:8 190:24 191:6,7,13,14 191:15,24 192:10
**house** 18:17 136:12
**houses** 133:4
**hover** 57:16
**how's** 37:23 41:23
**human** 80:24 154:17 183:25
**husband** 18:4 140:15
**husband's** 18:24

**i**

**ian** 18:25
**icing** 14:8
**id.me** 171:21
**identification** 43:12 44:25 48:5 77:7 82:15 84:17 87:25 90:3 93:13 100:25 105:20 112:18 113:20 115:20 146:25 149:20 151:24 164:8 165:20 169:24 173:3,24 174:17 175:6 175:18 176:6 181:15
**identified** 169:8
**identify** 7:10 12:7 153:8,11 154:8
**impair** 10:3
**impetus** 14:11
**implemented** 86:20
**implies** 137:25
**important** 9:4 9:16
**impossible** 192:25
**inaccurate** 117:23,24 122:24 141:20 187:10
**incident** 164:16
**incidentals** 186:20
**incidents** 139:21 164:20
**include** 47:18 178:9,10,11,12
**includes** 88:11
**including** 4:18 165:22 174:3
**inconsistency** 181:3,5
**inconsistent** 141:25 143:13 144:15 178:8 178:18 180:23
**incorrect** 69:8 108:10
**india** 65:13 190:11,12
**indicates** 106:13
**individuals** 145:14
**influencer** 27:15,17 28:3 28:17 30:5,10
**influx** 65:24
**inform** 162:11
**information** 22:6 141:10 145:13 153:17 188:19,24 189:16 190:2,2 190:7
**initial** 5:6 76:11 176:8
**initialed** 150:15 150:18
**initially** 184:12
**initials** 49:3,7 150:14
**input** 179:13
**inquire** 177:5
**inside** 190:7
**insisting** 27:18
**instance** 149:11
**instances** 16:6 140:2 144:12 162:10 193:24
**instruct** 40:8
**instructed** 5:8
**instructing** 40:13,24
**instruction** 24:16 192:18 193:14
**insurance** 195:4
**intended** 7:2
**interest** 40:7,15 41:3
**interested** 198:14 199:11
**interestingly** 72:23
**interrogatories** 4:5 152:3,15
**interrogatory** 153:6,8 154:15 157:5 159:12 163:4
**interrupt** 9:8 135:3 167:15
**interrupted** 185:21
**interruption** 151:12
**interviewed** 170:20
**introduce** 39:5 77:4
**introduced** 43:6
**inventory** 66:8
**involved** 136:14 141:20 176:21
**ipad** 54:13,17 55:6,7,8,12
**irate** 27:9
**irregular** 86:24
**irregularly** 86:23
**irrelevant** 190:13

**irs** 4:10
**ish** 119:25
**it'd** 52:18
**items** 26:25

**j**

**j** 170:14,20 172:16
**jamaica** 2:7,8
**james** 1:11,20 2:13 6:3,13 198:2,17
**january** 114:7
**jennifer** 199:2 199:14
**jim** 1:11 2:13 6:13 18:10,11 18:14,15,17 19:22,23,25 26:21 27:4,7 27:21 28:22,24 29:7 45:3 53:20 60:6 61:18,22 62:9 62:15,20 63:12 66:17 67:4,8 67:18,23 70:21 71:4,6,10 72:6 72:24 75:4 77:16 81:6,11 81:14,20 82:2 82:2,3 91:15 96:6,8 97:10 97:14,24 131:9 132:7 155:6 158:11 186:3
**jim's** 70:25 78:21
**job** 1:21 25:22 28:6 57:19 66:25 70:19 122:9 160:15 190:15 193:6
**johnson** 2:15 2:16 7:17,17 7:18
**join** 41:7
**joining** 146:10 146:13,16
**joint** 111:19 114:22,23,24
**journal** 141:2,4
**journey** 111:9
**july** 32:23 35:18 43:16 79:22 181:18
**jumping** 149:15
**june** 23:25 24:4 30:17 31:23 32:4 33:5,18 33:7 34:13 40:6,13 41:2 41:19,25 42:5 42:14 67:24 68:5 71:19 73:14 74:14,16 79:25 88:20,23 89:9,15,16,21 104:23 112:8 112:12 134:18 135:2 151:11 160:7,9 167:15 167:23 168:3,9 194:4,7 195:15 196:3,5,16,18

**k**

**k** 2:14
**kataev** 2:5 7:12 7:13 11:9,17 12:7 24:15,17 31:15 32:5,6,8
**keep** 24:8 55:14 60:21 130:6 141:2,13 193:7
**keeping** 55:11
**kept** 61:2 96:21 97:17 140:10 160:25 189:8 189:10
**ketcham** 1:5 2:3 6:10 11:8 35:24 36:10 39:2 40:3,21 137:20,24 153:16
**kids** 194:14,17
**kind** 10:14 57:17 68:24 191:21
**knew** 33:17 61:22 140:18
**know** 9:14 10:11,14,16 12:18 17:18,25 18:11 26:17 27:24 28:3,16 34:8 38:7 41:5 41:8 42:12 50:13 54:24 55:17 60:3 61:20,23 62:11 63:16,17 65:5 69:19 72:11,12 72:13,16 73:9 73:19 78:20 81:8 89:4 90:25 94:23 95:8,24 96:15 99:16 100:4,15 103:17 104:8 106:9 107:10 107:14,20 109:23,25 110:14,24 111:16 113:7 113:12,14,15 114:4,8 115:14 119:6 120:4 121:4,5,17,22 121:23 122:8 123:17,23,24 124:5,10 126:8 126:16 127:5,6

127:22 131:9 133:11 136:11 140:16,20,23 140:24 142:14 145:16 146:11 146:12,14,19 146:19 155:24 156:2,20 159:8 167:23 171:4 173:12 174:9 175:12 183:13 183:15 185:9 185:11,12 186:7,14 188:17 190:10 190:12 191:16 191:25 192:3 193:2,9 195:23
**knowledge** 113:12 152:16 153:9,25 177:6 198:9 199:6
**known** 140:18 140:21 171:3
**knows** 153:12 153:19,21 154:9
**kristin** 1:10,11 2:12,13 6:12 6:13 12:25 18:18 19:12 26:21 27:3,6 27:20 28:11,22 29:4,8 39:6 43:21 45:3 53:20 60:5,7 66:16 70:23,24 77:18 96:9 127:21 131:9 132:8 155:3,6 157:18 173:6,7 185:9 186:3 200:1 201:1
**ksd** 182:6,7

**l**

**l** 25:19 169:9 170:6,6
**label** 190:17
**labeled** 118:5 166:11
**labor** 52:21
**lack** 59:20
**lagged** 67:15
**landed** 140:24
**landlord** 131:11,13,25 132:5,19,21
**language** 114:2 134:11
**large** 63:2 121:2 189:13
**law** 2:24 151:15,16
**laws** 7:4
**lawsuit** 14:12 21:7 32:23 35:7,8,17,19 36:15,16 38:6 38:10,15 40:3 40:4,11,22,23 41:7 78:4,10 82:18 83:12 146:10,13,17 164:17 170:12
**lawyer** 10:21 10:23,24 11:4 25:11,16
**layout** 66:10
**learn** 131:7
**learned** 130:24
**leash** 29:13
**leaving** 29:17 125:5 168:24
**led** 26:15 75:10
**left** 28:12 42:3 42:5 170:10,17 172:8
**legal** 2:6,25 7:13 23:18,20 23:22 25:3,8 25:13 32:12 33:25 34:14 36:19,22,25
**legibility** 41:23
**legible** 41:18 42:22 43:2
**letter** 46:15 156:23,25
**letting** 17:24 27:24 131:9
**level** 56:15
**levels** 103:22
**life** 17:15,20,22 24:4,6,25 25:6 25:15 34:2,3 140:8
**lights** 90:24 91:10
**lightspeed** 54:24
**liking** 74:2
**limitations** 186:15
**line** 5:9 63:5 68:22 72:13 73:10,25 74:3 74:5 103:24 200:4,7,10,13 200:16,19
**lingering** 74:8
**list** 128:16
**listed** 171:5
**literally** 109:18 120:6 129:17
**litigation** 107:2 152:9
**little** 12:19 41:21 55:3 58:8 133:4 135:21 149:16 158:12 170:18 192:9
**lively** 159:24

**llc** 1:10 2:6,13 2:25 6:12 7:13 13:2 200:1 201:1
**location** 1:18 26:24 39:21,23
**lock** 131:16 132:17
**lockbox** 96:22 97:18
**long** 11:11 33:25 45:12 49:17 93:6
**longer** 45:20 58:22 92:5 114:24 165:11 170:7
**look** 12:4 38:16 56:22 78:23 79:13 80:9 90:20 191:24 193:4
**looked** 38:13 76:10 79:14 111:18 119:19 133:3 157:19
**looking** 31:3,6 48:7 50:17 68:22 72:20 73:22 93:17 107:7 108:19 109:3 114:12 116:20 117:21 123:2,2 164:18 173:13,17
**looks** 86:6 90:18 93:22 108:20 114:6 166:20 168:17
**loops** 190:23
**loose** 195:11
**lose** 92:3
**lost** 71:15 91:24 92:3 140:8 161:19
**lot** 14:5,6 24:18 51:20 55:20 60:22 61:12 69:23 113:3 122:10,11,18 122:22 126:23 140:22,23 141:17 149:16 177:20 193:3
**loud** 50:22
**low** 52:3,10,18 65:19 66:22
**lower** 66:2
**lowest** 52:8
**lth** 168:18
**lunch** 57:8 134:20 137:12
**luxury** 124:4
**lysol** 186:25

**m**

**m** 5:12 25:19
**ma'am** 196:8
**machine** 22:3 184:3
**made** 23:18 26:20 47:21 55:11 66:15 154:23 171:11 190:17 201:5
**maggie** 2:15,20
**majority** 59:22 59:25
**make** 9:11 29:14 35:3 36:2 41:17,21 41:25 42:3,24 57:19 61:24 62:14,15 85:20 97:15 108:6 128:14,17 139:24 143:14 195:9
**makes** 74:8
**makeup** 93:25
**making** 22:9 105:14 169:16
**manage** 21:3,4 53:14
**managed** 20:23 51:14 53:21 120:18 132:2
**management** 55:16 192:19 193:14
**manager** 19:16 20:17,22 21:2 27:5 51:5,6,11 53:9 62:13 123:6,11,15,16 127:7 128:12 134:3,4 135:11 182:18 184:13 184:18,23,25 186:10 189:17 190:3 192:21 192:23
**managing** 59:6
**manner** 7:5
**march** 94:2,6
**margaret** 7:17
**mark** 49:6
**marked** 43:11 44:23,24 47:2 48:3,4,22 77:5 77:6 82:11,14 84:14,16 87:23 87:24 90:2 93:12 100:23 100:24 105:17 105:19 112:15 112:17 113:18 113:19 115:17 115:19 146:22 146:24 149:18 149:19 151:22 151:23 164:5,7 165:17,19 172:24 173:2

173:21,23 174:16 175:2,5 175:17 176:3,5 181:12,14
**marketing** 70:20
**married** 20:8
**matrimonial** 25:11
**matter** 6:9 7:16 8:18 9:10 43:15,23 71:25 181:17
**maximum** 121:8 122:17
**mclaughlin** 170:13,14,20 170:24 172:16
**mean** 13:4 14:24 68:21 69:5 85:4 91:8 99:17,22 104:8 104:10,13 134:17 135:10 136:3 142:24 160:2 163:11 163:20 179:4 191:23
**meaning** 146:2
**means** 7:6 85:5 86:3 107:11 113:7 122:14
**media** 28:2
**medications** 10:2
**meet** 38:25 60:20 67:10 124:2 178:13
**meeting** 11:25 147:12
**members** 124:3 128:24 142:15 145:15 192:20
**memorial** 52:21 182:15
**memory** 173:16
**mention** 38:10
**mentioned** 21:15 30:3 55:3,22 99:21 107:23 126:10 185:13,25
**mentions** 102:3
**menu** 56:8
**merchandise** 138:8
**message** 68:10 173:8
**messaged** 131:8
**messages** 4:17 4:18,20,22,24 37:19 63:11,23 64:9 164:19 165:3,5 172:19 173:5,9 174:2 174:4,11,14,19 175:3,23
**micromanaged** 135:12
**middle** 45:14 92:9 109:8 127:5
**midway** 51:18
**might've** 59:19
**mind** 24:7 168:6
**mine** 156:22 166:18
**minimally** 194:21
**minus** 99:10
**minute** 14:21 20:20 21:15 104:18 191:20 195:7
**minutes** 49:18 134:20
**misplaced** 17:25
**missed** 88:13
**missing** 14:6 88:11
**misspoke** 74:24
**misunderstan...** 26:5
**mode** 58:6
**moment** 49:13 77:22
**monday** 15:10 15:25 102:4 178:19 183:9
**money** 47:19 100:9,12 157:9 158:16,17,18 186:19 188:20 188:25 189:8 189:10,11
**montauk** 18:20 39:21 59:12 60:11 92:19 95:4 121:24
**month** 96:12 97:4 148:23 170:19 178:4 179:20
**monthly** 15:16 96:16
**months** 44:17 52:3 72:21 135:19 157:12 158:14
**morning** 6:3 8:16 37:22 123:14
**mother** 30:11
**motions** 12:11
**moved** 38:2 103:21 108:8 108:10,13 109:21
**movements** 66:8
**moves** 65:15

**moving** 140:22 140:23
**mtk** 13:11 18:18 26:24 31:11 86:15 141:5 186:12
**multiple** 51:9,9 132:15

**n**

**n** 2:1 3:1 5:12 25:19 170:6,6 172:9,9,11
**name** 6:3 7:21 8:17 12:24 13:9 14:15 18:24 30:6,9 33:23,23 106:3 125:19 126:3 131:24 132:2 132:21 133:9 144:16 176:18
**names** 14:18 125:18,22
**natalie** 185:6 185:13,25,25
**national** 131:16
**nature** 65:5
**necessary** 201:6
**need** 10:13,14 10:18,25 12:2 28:7 39:7 49:17 50:12 54:24 60:11 74:5 157:7 196:3
**needed** 39:6 50:10 63:17 66:15 95:22 97:2 135:16 136:10,11,21 136:22 157:18 162:4 186:24 193:24 194:13
**needs** 54:5 194:13
**neighborhood** 109:5
**neither** 198:10 199:6
**net** 117:3
**never** 27:11 37:21 38:5,21 38:23 77:16 79:3 80:12 82:7,9 84:2,4,8 168:6 188:12 189:10
**new** 1:2 2:18 6:15,18 9:8 44:13,21 46:3 72:12 74:3,5,7 76:11 77:4 111:8,9 112:4 112:5,6 121:17 123:23 138:11 151:15 198:19
**nibi** 3:11 13:3,5 13:7,11,14,15 13:18,22 14:22 15:15 17:4,17 18:8,18 19:12 19:16 20:17,22 21:2 22:19 23:14 25:22 26:17,24 30:20 31:6,11 32:4 34:9,23 35:5,6 35:11,13,14,21 36:5 38:2 39:5 39:14 41:6,11 51:9 52:5 59:9 59:14 67:23 71:22 77:10 80:6 86:15 88:17 94:25 95:9,15 106:7 115:7 141:5 154:8,24 168:22 169:18 170:10,17 182:7 186:4,12 190:3 192:19 193:14 194:2 195:3
**nibi's** 78:13 182:18 189:15
**nine** 52:8,12 120:22 121:9 121:14 122:3 124:21 195:13
**nods** 9:18
**non** 34:12,20 34:22,25
**noon** 104:22
**north** 59:23
**notary** 6:16 198:18 201:13 201:19
**notation** 92:9 94:17
**notations** 93:24
**note** 88:10 116:24 166:12 166:17,20 167:4,12
**noted** 201:7
**notes** 5:14 31:8 31:13 140:9 166:8,14 168:21 171:5 171:12
**notification** 5:16
**number** 12:19 43:16 45:6 52:22 64:4,13 71:16 72:4 77:12 88:4 92:4,4 101:4 111:17 112:3 112:21 121:8 145:11,18 147:5 149:24 153:6 154:15

164:15 166:10 169:25 173:5 173:25 175:4 189:18
**numbered** 93:11
**numbers** 12:18 12:19 48:12 90:6 93:17 113:22 116:3 174:14 175:16 176:22 183:10
**nuts** 91:9
**ny** 1:19 2:8,18

**o**

**o** 5:12 169:2,25 170:23
**oaths** 6:17
**object** 71:19
**objecting** 89:10
**objection** 6:20 33:7 34:13 40:6 67:24 79:25 88:20 151:17 160:7,9 194:4
**objections** 4:4 4:7 7:24 152:3 164:11
**observed** 119:18 130:4
**observing** 2:24 151:16
**obviously** 43:21 172:13
**oddly** 72:4
**offer** 21:9,10 21:10
**offering** 46:15
**office** 151:15 171:10
**officer** 198:1,2
**oh** 42:7 78:11 99:3 101:25 111:21 144:13 171:13
**oiled** 22:3 184:2
**okay** 7:24 9:24 10:11,13 11:15 11:22 12:17,23 13:7 14:14 15:19 16:5,12 16:17 17:2 18:22 23:24 25:10,16 26:14 27:4,14,16 29:2,12 30:8 30:13,14 31:12 32:7,10 35:12 35:16 38:18 39:25 41:14 42:13 43:25 45:23 47:17,22 49:6 52:10 54:6,10 55:2 55:10,22 56:18 56:25 57:23 58:12,21 60:3 60:9,12 61:4 61:14,19,24 62:6,15,18 63:10,22 64:5 64:12,18 65:11 66:11,18,23 67:9,21 69:2 69:15,19,25 71:3,14 72:8 73:2,6,24 74:12,25 75:6 75:9,20 76:6 76:15,18 77:3 77:17,20,25 78:7,12,22 79:2,12,19 80:21,25 81:15 81:16 82:10,22 83:2,16 84:8 84:13 86:6,21 87:6,8,13 89:8 89:17,21 90:15 90:22 91:8,13 91:18 92:2,21 94:9,17 95:14 95:18 96:3,21 97:15 98:2,12 99:3,13 100:19 102:2,13,22,25 103:12 104:11 104:17 106:5 106:12 107:5 107:17,20 108:12,15 109:3,10,17 110:2,11 111:12 114:6 114:12,25 115:4,16 116:16 117:6 117:15 118:2 118:23 119:5 120:2,17 121:7 122:2,12 124:16 125:2 125:12,18,24 126:10,19 127:7 128:3,12 128:25 129:19 129:25 130:10 130:15,23 131:12 132:4 132:10,20 133:6 134:2,6 135:4,24 136:20,23 137:11 138:6 139:2,24 140:6 140:17 141:8 142:3,20 143:14 144:16 144:22 146:15 147:20 148:12 149:2,10,15 150:8,12 152:11 153:4

154:14 155:10 156:4 158:20 159:4 160:2,10 160:24 161:5 162:15,24 163:25 166:16 166:23 167:23 168:6,8,13,13 169:6,17 170:8 170:15,23 171:2,13 172:3 172:15,17 173:13,17,20 174:10,13,21 175:14,22,25 176:16 177:25 179:3,18 180:18,22 181:9,23 182:2 182:25 183:12 184:9 186:10 186:13,17 187:3,23 188:4 188:14 189:12 190:21 191:23 192:7,16 193:18,23 194:8 195:3,6 196:10
**old** 64:3,9 73:10,24 74:7 76:14 111:9,10 112:3
**once** 87:3 96:12 96:12 97:4 135:19
**ones** 93:16
**oops** 15:12 193:5
**open** 92:24 129:13 159:21 160:5 191:12
**opened** 129:14
**opening** 19:21 103:15 121:18
**opens** 100:6
**operated** 19:11
**operating** 131:2
**operations** 20:23 21:3,5
**opportunity** 69:12
**opposed** 55:12
**optimum** 76:23
**option** 76:4
**options** 157:24
**optonline** 45:15 165:12
**optonline.net.** 45:16
**order** 57:5 82:13 196:14
**ordering** 196:17
**orders** 196:12
**ordinary** 190:19
**original** 115:6 193:12
**originally** 115:8
**outcome** 198:14 199:11
**outdoor** 60:24 120:12
**outside** 131:17 132:13,13 155:11 186:5
**overflow** 99:9 100:13
**overlap** 39:18
**overlooked** 106:17
**overpaid** 86:10
**overtime** 16:23 16:24 17:10 19:21 21:16 22:13 141:18 142:7 178:9 179:23 180:5 180:15,16,20 180:24 192:17 192:19 193:15
**overtimes** 193:10
**owed** 75:12
**own** 26:4 29:14 58:18 78:24 133:17 171:11 171:22 183:7
**owner** 134:7
**owners** 155:7,9

**p**

**p** 2:1,1
**p.m.** 72:6 137:6 137:9 151:6,9 159:16,17,18 159:22 195:17 195:19 196:22 197:3
**p1003** 166:12
**p1004** 169:7
**p1005** 166:19
**p1006** 169:23
**p1008** 167:12 172:7
**p844** 4:17 173:6
**p852** 173:25
**p854** 174:15
**p856** 4:23 175:4
**p858** 4:25 175:16
**package** 46:3 46:17,19 76:12
**page** 3:2,6 4:2 5:2,9,13 37:10 37:13 47:2 48:21 49:7 84:19 105:22 113:24 116:20

118:5 149:23 152:19 153:7 159:13 166:10 166:11 167:3 168:15 169:7 169:23 172:7,8 173:4 174:2 176:17,17 200:4,7,10,13 200:16,19
**pages** 12:20
**paid** 15:15,20 15:25 16:2,6 16:14,17,20,21 16:22,23 17:8 17:12 21:11 22:14 68:18 69:4,16,20 70:3 71:12,23 87:2,9 92:15 92:23 93:3 108:16 109:6 109:12 110:4 126:7 131:17 137:23 138:4 139:3,14,17 140:3 141:22 141:23 142:12 142:13,15,21 142:23,25 143:2,7,10,18 143:20,22,23 144:4,18,24 145:4 148:3,19 149:4,5,11 157:9 159:5 162:24 163:6 178:7,19,20,23 178:25 179:16 180:6,8,11,16 180:19
**pain** 195:24
**palmer** 133:8
**paper** 14:5 95:23 96:4,5 186:24
**papers** 17:16
**paperwork** 155:22
**paragraph** 44:11,12 50:20 60:13 64:19 68:17,18,23 119:15 130:2,2 130:23 134:10 135:6 137:16 137:19 141:10 145:9,10,20 177:25 179:18 182:5,16,17 183:18 184:12 186:17 187:3,4 188:18 189:14
**paragraphs** 182:3
**pardon** 31:2 120:14 157:16
**part** 54:4 57:18 66:25 73:16 103:14,15 116:24 125:17 132:24 160:15 190:6,12,15
**partial** 101:19
**particular** 93:6 139:21 149:11
**parties** 6:18,22 198:11,13 199:7,10
**partner** 113:7 195:8
**partnerfi** 107:10 113:6 113:15 114:2
**parts** 140:23
**past** 75:17 192:25
**path** 75:10
**patterns** 190:8
**pause** 156:9
**pay** 13:21,24 13:24 14:23 15:3,5,9 16:25 18:15 19:19,20 19:25 21:10,16 21:16,24 22:13 22:14 53:17 69:12 70:4 71:11,23,24 72:7 73:4 74:21 75:4,6 75:12,14 85:8 85:18 86:3 87:4 88:12,24 94:6 98:14 100:6 101:18 101:18,19 109:8 115:6 130:25 133:16 135:16 136:8,9 139:14 142:2,3 142:14 143:4 143:12 144:12 150:5 158:3,5 178:8,21 179:5 179:9 180:3,7 180:17 186:20
**paying** 113:2
**payment** 70:9 72:24 75:5 104:2 109:4
**payments** 3:16 3:19,22 105:24 106:6,6 108:20 108:21 109:15 114:13,15 115:2
**payroll** 15:4 18:16 57:24 63:21 85:11 87:11 88:6 89:4 114:16 126:6,9 136:8 136:9 141:13 154:18,22

163:14,17,17
**pays** 141:21
**pdf** 152:19
**peak** 121:11,11 121:12
**pending** 10:8
**people** 56:23 57:19 65:15 98:3 120:5 121:8 122:10 122:11 123:5 123:19,20 124:7,19 125:7 125:12
**people's** 183:2
**percent** 47:8
**perfect** 81:2 100:19 184:2
**perform** 137:21 161:9
**performed** 163:12
**period** 34:6 64:20 69:12 83:18 84:10 85:11 88:12 93:25 98:23 109:8 111:13 141:12 145:5 157:12 163:17 165:8 180:20
**perks** 56:19
**permitted** 7:2
**person** 28:22 30:3,6 136:7 136:18
**personal** 17:24 24:14 34:3 108:7,13 109:22 153:9 188:21 189:4,9 193:24 194:13 194:21,24
**personally** 18:11 24:8
**persons** 153:9
**petty** 96:16 97:7,11,17,20 97:22,24 98:17 98:20 187:17
**ph** 76:23 85:22 125:20,20,21 168:18 169:10
**phone** 5:16 28:23 37:5,16 37:18 64:3,5 64:12 70:17 71:10,15 72:3 72:3,12 73:3 73:24 74:5 91:24 92:3 112:4 179:14
**phones** 73:13
**photo** 4:19
**photograph** 174:3
**photos** 175:10
**physically** 59:7
**pick** 100:16 138:8,18 161:10 162:9
**picture** 91:16
**pictures** 157:22
**pin** 58:13 87:6 164:14
**pines** 171:4 172:12,13
**pizza** 169:13
**place** 27:25 65:15
**places** 98:8
**plaintiff** 7:12 35:25 40:22 64:20 119:16 130:3,24 134:12 137:20 137:20
**plaintiff's** 164:10
**plaintiffs** 1:8 2:2 4:3,6 5:5 11:7 145:12 152:2 176:8
**plan** 22:24
**planning** 41:6 146:10,13,16
**players** 121:22 123:17 124:5
**pleading** 153:10 182:6
**please** 7:10 8:2 8:12 9:14 24:21 31:14,15 49:12,18 85:11 85:13 156:14
**pllc** 2:16
**plus** 16:14
**pocket** 133:17 135:17 158:5
**pod** 60:24
**pods** 60:24
**point** 52:3,4,10 52:12 55:4,5 57:4 58:9,25 76:24 107:4 111:17 113:23 115:10 117:6 123:21 126:13 127:8 148:3,16 148:18 157:8 159:13 161:8 163:5
**popped** 73:6
**pos** 54:19 55:3 55:23 62:7,20 68:10 78:16,23
**position** 19:15 114:25 142:9 181:10
**possession** 140:14
**possibly** 18:3
**practice** 92:22

**precise** 13:12 183:12
**precisely** 118:3 121:4
**prefer** 36:23
**premise** 14:8
**preparatory** 65:8,22
**prepare** 10:19 12:5
**prepared** 10:21 187:6 199:3
**prerequisite** 160:15
**present** 2:23
**preserve** 89:11
**pressed** 26:9
**presume** 98:2 103:10 112:21 167:12 173:7 176:13
**printed** 171:11
**printout** 22:23
**prior** 14:18 35:8 60:20 72:21 84:3 85:22 88:12 90:10 121:18 124:3 194:19 198:4
**privilege** 40:7 40:15 41:3 177:4
**probably** 52:8 107:15 111:15 172:14
**problem** 71:11 104:10 131:12
**problems** 148:2 154:22
**procedural** 7:3
**procedure** 156:3 196:20
**proceed** 8:13 8:25 42:13
**proceeding** 1:18 6:5,25 11:18 197:4 199:4
**proceedings** 198:3,4,5,8 199:5
**process** 102:10 102:23,24 104:5
**procured** 186:21
**produce** 31:13 63:10 76:20 78:17 111:14 165:7
**produced** 6:24 12:15 77:9,11 106:13 152:3 152:12 166:3,4 166:6 171:12 176:13
**producing** 176:21
**product** 190:14 190:17
**production** 4:8 164:11
**progress** 105:14
**progressed** 93:2
**pronouncing** 14:16
**proper** 27:4 29:11 163:18
**protest** 128:3
**protocol** 27:4 28:8 29:11 53:19 155:8
**provide** 133:24 195:3
**provided** 22:5 24:19
**public** 198:18 201:19
**publicly** 190:3
**purchase** 133:8 135:15
**purchased** 91:12 97:9 190:8
**purely** 156:18
**purpose** 17:5 85:14
**purposes** 14:4 84:15 107:2
**pursuant** 196:19
**put** 23:3,5,9 29:24 44:21 47:25 74:14 84:13 87:21 100:22 105:16 112:11 113:17 115:16 122:19 133:4,5 146:21 149:17 151:20 155:16,16,21 155:25 164:2,4 165:16 171:24 176:2 181:11 191:21
**putting** 65:15 100:9 138:11 180:9

**q**

**qualified** 198:7
**question** 5:8 8:20 10:7,8,16 11:2 12:2 14:15 19:20 20:24 22:7 23:13 24:12,21 24:23 31:25 33:10 34:18 40:9 51:21 53:16 68:2,7

69:24 70:24 71:7 73:17 75:9,17 78:6,8 80:15 81:14 82:16 86:25 89:5 139:25 145:22 147:17 148:6 156:15 156:17 163:15 166:25 167:11 167:16 172:6 185:3,24 186:15 189:24 192:8 193:12 193:13
**questioned** 22:22 128:5
**questioning** 21:22 131:20
**questions** 8:20 9:14,17,21,25 14:6 50:19 73:15 102:16 148:7 168:14 172:20 190:22 195:10 196:2,6
**quickly** 172:22
**quickpay** 114:3
**quit** 25:22,24 26:8,10 148:11 150:9
**quite** 55:8 95:12 117:18 186:16 189:11

**r**

**r** 2:1 5:12 169:2 169:25 170:6 170:23 172:9 172:11 200:3,3
**raise** 8:2 93:25 94:6 115:12 150:5
**raises** 47:14,16 94:15
**ran** 72:2
**random** 98:13
**randomly** 59:19
**ranna** 170:4,18 172:10
**rate** 47:5,7 115:6 150:22
**rather** 172:22
**reach** 27:6,7,8 63:3 70:12 75:3
**reached** 71:22 76:22 132:6
**read** 50:22,23 68:14 76:12 196:19 201:5
**reading** 101:21 102:3 118:12
**ready** 42:18 134:23
**really** 14:8 38:9 39:20 52:15 53:16 55:15 100:21 191:21 193:7 195:22 196:7
**reason** 9:24 29:2,19 96:8 131:2 139:6 194:14,24 200:6,9,12,15 200:18,21
**reasons** 97:22
**recall** 11:13 15:17 27:22 28:20 38:11,24 39:12,19 57:8 59:3 61:6 80:4 80:5,7,23 81:12,15,21 84:12 91:2,20 94:14,16 95:5 95:6,8,17 98:6 101:13,14 102:12,22,24 103:4,5,10,22 106:18,20 107:5,22 108:2 108:3,23 109:14 114:9 114:10 115:11 117:15,16,19 118:14,22,24 119:6,7 123:4 124:9,22 125:16 131:14 139:4,25 140:5 140:11 142:17 142:22 143:5 147:7 148:5 149:10 155:2 173:11 185:14 187:14,19,21 187:22,23 191:15
**recalled** 79:3
**receipt** 4:19 91:9,15,17 96:5,8 135:17 158:9 174:3,7
**receipts** 91:11 96:2,13 97:8 97:23 187:2
**receive** 46:19 101:12 116:8 116:13,14
**received** 76:11 114:15,16 115:2 116:10 178:2 179:19
**receiving** 46:17
**recognize** 46:13,14 173:10 174:7,8 174:10,21,23 175:7,10,22,24
**recollect** 192:13
**recollection** 103:18 106:24

111:11 139:21 188:5,15
**recommend** 39:8
**recommended** 32:14,15 156:7
**reconciled** 97:5 98:23
**reconciliation** 19:25
**reconciliations** 187:5,14,15,16
**reconfirmed** 48:11
**record** 6:5,6,6 6:21 7:11 40:17 43:8,13 45:2 49:21,22 49:24 67:5 77:9 78:24 82:20 84:18 88:2 89:11,24 90:4 93:10,21 101:2 105:3,4 105:6,21 106:6 115:21 137:3,6 137:7,9,11 139:6 147:2 149:21 151:4,7 151:8,10,13,25 164:9 165:21 167:2 176:7 181:16 195:17 195:18,20 196:12,23 198:9 199:5
**recorded** 7:5 9:19 63:18 198:6
**recording** 6:24 198:8 199:3
**records** 3:15,18 3:21 15:19 18:7 78:13 83:8 105:23 110:19 111:6 111:13,25 112:10 114:20 141:13 144:22 145:3,6 183:2 183:7
**reduced** 198:6
**refer** 13:3 170:23
**referred** 25:2
**reflect** 151:13
**register** 54:20 55:23,23 56:5 95:20 96:18,22 97:18 98:5,16 99:4,25 100:6 186:20 189:8
**regular** 93:3 95:9
**regularly** 144:2
**reimburse** 91:4 104:4 157:11 158:6
**reimbursed** 135:20
**reimbursement** 90:24 96:14 133:15 158:11 159:9
**reiterate** 37:2
**related** 161:11 198:10 199:7
**relating** 164:20
**relative** 198:12 199:9
**relevant** 64:20 141:12
**remained** 125:4
**remember** 11:22 30:5,7,9 30:11 47:16 52:7 90:14 92:17,20 93:4 93:5,8 94:8,11 95:2,3 97:9,20 103:16 116:10 117:9,10 121:16,21 124:24 126:16 126:18,20,24 127:2 130:17 131:24,25 132:20 138:7 144:21 150:24 155:19 158:23 159:10 163:2 191:20 193:17 193:21
**remembering** 183:19
**remembers** 184:3
**remind** 15:3,9 72:6,24,25 73:3 74:20 75:4 139:12
**reminder** 5:15 72:5 73:2 74:20,23 75:3
**reminding** 140:4
**remote** 1:18
**remotely** 6:19
**rendered** 68:19
**reopen** 74:2
**reopened** 110:13
**repeat** 20:19 24:22 46:18 68:6 145:23 161:18 166:25 184:15 185:18
**replaced** 97:13
**replenish** 97:11
**replenished** 97:24
**report** 179:8
**reported** 1:20 53:10,11 177:22

**reporter** 6:2,4 7:20,23 8:11 9:10,20 42:8 49:20,23 105:2 105:5 137:5,8 151:3,6,9 156:8 160:17 166:24 167:9 181:4,7 185:15 195:16,19 196:10,21
**represent** 35:17 43:13 77:8
**representing** 7:15,18 8:17
**repurposed** 55:13
**request** 4:8 14:2 50:4 51:23 112:10 157:2,10 164:11,15
**requested** 198:21
**requesting** 196:18
**required** 24:20 137:21 141:13 201:13
**reserved** 197:2
**reservoir** 98:17
**resides** 19:4
**resignation** 26:8 29:18 30:21
**resigned** 26:4,7 26:11 29:19,23 30:17 150:10
**resources** 154:18
**respect** 24:8 29:17
**respond** 86:10
**responded** 162:22
**response** 89:20 122:25 157:5
**responses** 4:4,7 12:11 152:2 164:10
**responsibility** 133:22
**restate** 9:15
**results** 103:3
**resume** 30:23 31:4,7
**retailer** 169:5 170:2
**retro** 93:25
**return** 26:19,25 27:19 28:5 44:20
**returning** 49:10 60:12 68:16 119:10 134:9 141:8 168:15
**returns** 26:18 27:3
**revealing** 31:20
**review** 22:12 44:5 79:5,8 83:11 147:11 152:11 198:21
**reviewed** 181:24
**right** 6:2 8:2,23 9:23 10:22 12:24 13:10,15 14:10,16,21 16:3,15 17:2,7 17:19 18:3,6 18:12 19:5,13 19:24 20:4,6,9 20:15 22:4,18 23:11,13 25:21 26:10,12 28:13 29:3 30:18 32:7,17 33:17 34:5,12,23 37:11,15,19 38:4 39:13 40:16 41:14 43:4,24 44:10 44:18 45:13,24 46:2,8,13,16,20 47:5,8,11,17,25 48:18,25 49:10 49:20,23 50:3 50:8,15,24 51:5,8,12 53:8 53:21,25 56:2 56:9,12,14,21 56:25 57:11,15 57:20 58:7,10 59:5,13,16 60:6,12 61:7 62:4,9,16 63:9 63:14 64:16,25 66:4 67:6,18 68:16 70:18,21 70:22 71:5,8 71:12,18 72:18 73:7 74:18,21 74:24 75:16 76:3,12,21 77:3 79:5,18 79:24 80:13 81:23 82:24 83:4,9,11 85:9 85:12,24 86:4 86:9 87:19,21 88:19 89:23 91:3,15,22 92:2 93:23 94:10 96:23 97:4 98:8,18 99:13,18 100:12 101:9 101:15 104:24 105:9 106:3 107:8 108:19 109:20,24 110:15,18

111:5,24 112:9 112:24 113:5 113:23 114:21 115:5,7,13 118:12 120:8 121:13 122:5 122:15,19 123:12 125:6 126:6 129:25 132:13 133:20 137:8,18 138:24 139:5 139:11,19 140:15 142:9 145:8 146:21 147:22,24 148:10,14,24 150:12,21,23 152:17 154:3,5 154:7 155:14 155:19,21 156:23 159:8 159:11 161:7 161:22 162:20 163:3,23 165:4 165:6,14,14 166:5,17 168:10 169:19 176:12,16 177:2,9,15,18 178:6,21 179:16 180:12 180:18 183:6 184:9 186:17 187:11,14 188:4,14,21 191:2,11,24 192:16 193:23 195:6,16,21 196:21

**ring** 100:5

**ringing** 55:15 61:12

**room** 120:23 128:15 135:20 151:14 157:18

**roughly** 119:24

**rule** 5:6 176:8 196:19

**rules** 7:4 8:24 26:17 141:23 141:24 143:8 196:20

**run** 20:7 67:10 78:21 111:24 178:10 190:4

**rung** 56:5

**running** 18:18 22:2 55:20 60:23

**runs** 20:13

**s**

**s** 2:1 3:5 4:1 5:1 5:12,12 25:19 200:3

**safely** 185:10

**sage** 2:6,25 7:13

**sagelegal.nyc** 2:9

**salaried** 58:9 58:22 117:7,11

**salary** 47:16,18 58:6,25 59:2,4 94:10,13,15 115:13,15 116:25 117:10 117:16,17 150:7

**sale** 55:4,5 99:9 99:15,17

**sales** 47:8 55:15 56:5 57:4 61:12 99:17 100:13 136:15

**satisfactorily** 104:3

**save** 76:24

**saved** 74:9,10

**saw** 46:12 82:9 84:2 90:10 119:24 132:18 176:12

**saying** 38:4 58:15 65:18 84:9 85:25,25 86:23 87:11 88:6 89:4 95:17 100:3 101:17 108:7 120:22 125:6 143:16 144:7,9 180:19

**says** 29:7 44:12 50:25 60:14 64:19 68:18 92:10 94:18 102:19 103:25 107:9 110:5 113:6 116:25 118:7 119:16 130:2,23 135:6 137:19 141:10 145:10 157:9 159:13 161:8 168:4 177:9 182:5,17 183:18 184:12 184:17,23 187:18 188:18

**scattered** 17:17

**scene** 136:17

**scenes** 136:18

**schedule** 53:23 66:10 159:15 194:20

**schedules** 53:15,22 65:14

**school** 151:16 194:14,18

**screamed** 28:13 28:14

**screaming** 27:24
**screen** 8:3 31:4 41:15 42:3,10 44:22 45:14 48:2 50:18,21 55:9 84:14 87:22 92:9 100:22 101:22 105:16 113:18 115:17 119:14 137:14,17 141:9 146:23 149:17 151:21 164:2,4 165:16 168:2,5 172:23 173:20 174:25 176:2 181:11
**scroll** 44:10 46:5,8 101:15 103:8 152:17 153:5 169:7
**scrolled** 48:21 176:16
**scrolling** 48:14 72:20 118:5,15 166:9
**search** 76:19,22 111:25
**searched** 18:7
**season** 52:18 52:18,20,23,25 53:3,5,6 65:6,8 65:19,20,22,23 66:18,22 121:12 130:3 177:15,16
**seasonal** 52:17
**seasoned** 86:15
**second** 18:23 79:20 94:17 103:12,24 116:20,24 121:19,19 151:4 158:25 163:5 168:12 177:25 179:18
**section** 118:12
**secure** 171:22
**security** 13:20 14:7,10 21:17 21:19,24 22:12 22:13,21 23:9 23:16 29:25 30:16,25 33:16 33:21 86:19 111:18 155:12 155:14,22 156:18 163:14 163:21 171:9 171:15,18
**see** 22:20,23 36:12 38:9,14 39:3 41:18,19 42:7,15 44:2 45:16 46:6,11 57:13 60:16,17 64:23 68:24 69:2 70:9 78:12 79:13 83:7 85:2 88:7 88:8,9,15 92:11,12 94:2 94:3,20,21 101:5,19,24,25 102:8,20,21 117:4,5 119:20 119:21 126:2,3 127:20 130:8 131:3 134:15 135:8 152:8 157:13 159:19 161:12,15 163:9 167:24 167:25 168:3,6 168:18 176:19 177:8,11 178:4 178:5 182:9,19 183:20 184:19 187:7,8
**seeing** 73:23 101:14 106:20
**seek** 23:18,20
**seem** 47:21 104:9
**seemed** 21:12 124:11 141:25
**seems** 46:4
**seen** 43:17 45:7 45:9 48:15 77:14,21,23,23 78:3,9 82:17 83:3 84:22,24 90:8,12,17 101:6 106:10 106:11 107:3 112:23 116:5,7 147:6 149:25 152:5,10,20 165:24 173:14 174:18 176:10 181:19
**segment** 187:22
**self** 29:17
**selling** 127:25 129:15
**send** 85:10 86:2 91:15,16,17 97:8 156:25 179:4,6
**sending** 93:20
**sense** 74:8 178:18
**sent** 27:13 84:9 157:22 171:9
**sentence** 184:11,16
**separate** 56:7 98:16,20
**september** 80:10
**sequence** 134:25 172:13
**series** 105:24
**set** 4:20,22,24 30:14 136:16

165:22 174:2 174:13 175:3 191:13,14,15 191:24
**sets** 175:23
**setting** 65:14 123:8,9 135:23
**seven** 52:7 141:18 159:14
**several** 161:23 172:19
**shakes** 9:18
**share** 41:15 42:17 106:14
**shared** 82:22 113:3
**sharing** 42:9,17
**sheeler** 1:10,11 2:12,13 6:12 6:13 13:2 19:12 20:5,10 20:25 43:22 45:4 136:4 147:9 153:17 173:7 200:1 201:1
**sheets** 56:22
**shift** 47:15,17 57:10 137:22 137:23 138:3,3 161:10
**shimunilyaev** 25:17
**ship** 61:2
**shipment** 65:13
**shipments** 66:8
**shirley** 1:19 6:15
**shop** 119:19
**shopping** 27:11 100:5
**short** 102:17,19 104:12,13 188:8
**shortages** 104:3,6
**shorter** 58:5
**shortfalls** 188:16
**show** 8:3 9:18 11:17 15:20 82:10 86:19 95:25 96:5 97:23 112:14 135:17 170:15 185:6
**showed** 11:23 23:7 77:16 83:3 187:5
**shown** 11:21 42:11 79:10 81:8 127:23
**shows** 79:21 150:16 168:5
**shut** 27:25 28:15
**sic** 158:15,17
**side** 107:8 113:5,24
**sidewalk** 136:15
**sign** 47:22 196:19
**signature** 48:23 49:2,4 150:13 152:22,25 197:2 198:16 199:13
**signatures** 48:23
**signed** 34:22 48:19
**signs** 192:9
**similar** 90:11 93:16 112:19 113:21 166:20
**similarly** 1:6 2:4 6:11
**simple** 28:4
**simply** 130:20 165:6
**single** 84:19 105:22 184:4
**sir** 18:5 34:3 35:2 36:7 37:25 46:24 63:24 115:3
**sister** 153:19,21 153:24
**sit** 10:22
**sitting** 109:20 114:12 126:19 153:14
**situated** 1:7 2:4 6:12
**situation** 19:18 25:4 60:7,8 63:2,7 81:4 113:8 147:17 148:20
**situations** 25:14 62:8 67:17
**six** 154:15
**size** 120:7
**skills** 198:9 199:6
**slam** 28:2
**slight** 42:25
**slightly** 182:13
**slip** 99:11
**sliver** 120:7
**smoothly** 8:25
**snow** 92:10,16 92:17,19,22 93:6
**snowstorm** 92:25
**social** 13:20 14:7,10 21:16 21:19,23 22:12 22:13,21 23:9 23:15 28:2

29:25 30:15,25 33:16,20 86:19 111:18 155:12 155:14,22 156:18 163:14 163:21 171:8 171:15,18
**soft** 191:17
**somebody** 39:7 39:9 186:5 188:8
**somewhat** 53:11
**soon** 23:22
**sorry** 14:14 20:19 24:10 26:2 31:19 32:19 46:18 48:8,12,13 59:23 74:24 100:20 103:21 118:11 135:2 145:18 148:14 151:11 156:8 160:17 161:18 167:15 168:7,9 181:20 184:15 185:16,20 189:18
**sort** 15:4 54:3 55:16 59:21 72:14 82:16 86:7 129:13 158:4
**sorting** 33:24
**sorts** 78:17
**sought** 23:22 30:17 32:12 184:12,17
**sound** 117:23 117:24
**space** 131:10 132:9 133:13 133:18
**span** 23:6,8 170:22
**speak** 9:4 10:5 10:10 35:6,10 35:15 36:2,5 40:3
**speaking** 16:10 89:9
**special** 56:19 182:18
**specific** 32:22 114:17,18 139:23 140:2 144:17,23 145:4
**specifically** 75:19 144:7 149:13 193:16
**specified** 144:13
**spell** 25:18 170:5
**spend** 118:17
**spent** 59:23 161:22
**spillt** 193:5
**spoke** 31:23 35:24 188:12
**sporadic** 13:25
**spot** 104:18
**spreadsheet** 3:11 5:3 77:9 77:13 82:21
**spreadsheets** 78:18 83:8
**st** 1:10
**stabilize** 34:3
**stamp** 84:21 105:22 106:12
**standalone** 132:24
**standard** 101:18
**standards** 60:25
**standup** 55:7
**start** 9:5,7 14:11 57:10 81:17 137:22 138:2 156:9 171:8
**started** 29:25 32:23,25 33:13 51:18 78:4,10 86:14 87:15 147:21 161:25
**starting** 27:9 52:14 101:4 124:3
**state** 7:21 21:19 44:13 163:17 198:19
**stated** 26:24
**statement** 19:19,20,20 21:24 85:8
**statements** 13:24,25 15:5 53:17 75:14 136:10
**states** 1:1
**stay** 19:8 159:21
**stayed** 125:5 160:5
**steam** 128:10 128:14 129:6
**steamers** 127:14
**steaming** 65:13 127:12 128:8 129:17 138:10
**stenographic** 7:6
**step** 171:23,23
**steps** 171:25
**sticky** 166:12 166:20 167:4 167:12

**stipend** 94:19 94:24 95:3,9 95:15 118:16 118:17,19
**stipulations** 7:8
**stockroom** 119:18 120:6,9 122:4 123:20 124:8,21 125:7 125:13 127:24 129:8,21,23 175:12
**stop** 42:17
**stopped** 161:3 162:2
**store** 19:21 26:6 27:5 30:4 39:17 51:4,6 51:11 52:5,17 54:18 56:11 59:7,17,24 60:4 62:13 63:2 91:14 92:15,23 94:19 97:10,25 120:11,15,17 121:9,17 130:5 130:11,16,21 130:22 132:14 133:10 134:3,5 134:8 135:11 135:16 136:21 157:21,25 159:21 160:4,5 162:6,17 186:19,21 191:7,13,23
**stores** 51:9,10 59:9,11,14,18 121:15 133:10 138:9 192:13 192:15
**stormed** 28:9
**story** 29:16
**straight** 80:8 180:12
**strange** 119:17
**street** 2:17
**strike** 48:8 63:10 81:16 130:19 163:24 164:3 179:7
**strip** 133:5
**study** 79:11 83:14
**stuff** 19:24,25 22:8,9 98:4 192:2
**submit** 91:9
**submitted** 85:17 158:9
**subscribed** 201:14
**subsequent** 187:4
**substance** 50:24 194:22
**sue** 18:14 20:9 20:25 32:17,20 34:23 35:22
**sued** 14:22 18:10 19:11,17 20:16,21 34:9 34:10,21,24 35:5,17 36:6
**suggest** 104:17
**suggested** 39:9
**suggestion** 42:2
**suing** 13:8,15 13:18 14:9 22:19 23:14 32:4 33:5 36:5 43:21
**suited** 157:25
**sullivan** 3:17 3:20,23 14:19 18:25 105:25 106:4 115:23
**summer** 52:20 121:19 124:10 125:11 159:16 159:22
**summertime** 190:25 191:4,5
**supervise** 57:11
**supplement** 169:15
**supplemental** 4:3,6 152:2 164:10
**supplies** 95:23 96:25 97:13
**suppose** 46:11 56:10 81:13 98:11 104:8 147:23 150:24
**supposed** 15:15 15:16,24 29:10 67:20 81:6 110:24
**sure** 8:25 9:11 11:16 18:5 20:20 22:7,9 27:16 41:17 47:24 49:16 51:21 54:22 57:7,18,19 60:20 61:24 63:19 65:17 67:17 69:9,15 75:8 80:9 83:22 90:12 92:20 97:15 98:15 99:19 101:11 103:15 104:16 108:6 122:25 125:4 135:2 139:24 142:16 143:14 148:7 149:8 151:5 153:25 154:11 172:3 172:11,12 178:17 195:9

**surfaced** 34:6,7
**surfacing** 33:13
**swapped** 114:9
**swear** 6:18 7:25
**sweat** 119:19
**sweating** 127:15
**sweltering** 126:17 128:24
**sworn** 6:21 8:8 198:5 201:14
**system** 3:12 54:12,16,19 55:3,4,24 56:16 57:4 58:4 61:11,12 61:25 62:7,20 67:3,7,14 77:10 78:17,23 79:4 80:20 86:3,8 91:6 164:23 182:19 183:25
**systems** 19:21 55:19 63:4,6 69:7 78:14 136:9 138:21

**t**

**t** 3:5 4:1 5:1,12 5:12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1,2 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 200:3,3
**t.s.** 48:24
**tab** 168:4
**table** 135:21 157:10,19 159:5
**tabs** 193:7
**tackle** 148:24
**take** 6:4,16 10:9,15,17 49:12,15,16 53:19 71:4 95:19 96:11 98:8 99:4 104:18 134:20 137:2 172:2 189:11 194:3 194:10,14,16 194:17,25 195:7,12,13 196:12
**taken** 6:9 13:20 23:2 97:22 99:10 121:20

198:3,11 199:8
**talk** 9:12 10:23 29:5 35:20 132:5 153:23 155:3 188:10 190:14 195:8
**talked** 59:6 132:4 138:12 153:22 154:20
**talking** 9:6,7,12 29:8 154:21 188:15 189:23 191:11
**tank** 131:16 132:12,17
**tanks** 132:15
**tax** 4:10 14:3 15:5 19:19 117:12 136:9 165:22
**taxes** 117:3
**team** 20:7 124:2,6,8,23 128:18,23 142:15 192:20
**technical** 55:20
**technically** 13:11 29:22 47:20 55:14
**tedious** 191:21
**tell** 8:8 16:9 53:25 70:6 73:21 89:9 102:10 123:7,8 125:23 138:6 144:20 153:15 158:22 173:17 174:5,6 175:19 187:24
**telling** 161:23
**tells** 89:12
**ten** 39:3,4 104:18 120:5 120:22 122:4 122:17 123:18 124:21
**tenants** 133:7
**tend** 9:8
**tentatively** 24:5
**teresa** 1:4,15 2:2 3:16,19,22 6:8,9 7:22 8:6 12:8 29:3,8 105:24 116:22 135:17 188:9 200:1,2,24 201:1,2,4,12
**terms** 17:7 57:2 91:8 192:16
**terrible** 27:12 27:12 125:22
**testified** 8:10 108:17 115:11 120:2 121:7 136:6 177:14
**testifying** 198:5
**testimony** 87:10 120:20 201:8
**testing** 106:23
**text** 4:17,18,20 4:22,24 37:5 37:19,22 61:18 61:22 62:9,20 62:21,22,24 63:11,23 64:9 67:4,18 68:10 68:13 70:15 71:10 72:8 74:19,22 75:2 76:5 81:13 91:19 138:14 138:20,24 140:7 164:19 165:3,5 172:19 173:5,8,9 174:2,4,11,14 174:18 175:3 175:23
**texted** 37:21 38:5 162:3 175:8,19
**texts** 38:2,9,14 38:17 69:9 71:15 74:10 91:23
**thank** 7:23 8:4 8:11,12 19:2 22:17 25:20 42:20 49:9 50:14 74:16 104:23 112:12 116:23 135:2 136:23 137:12 147:11 165:14 167:9 169:6 172:4,17 181:7 181:23 195:15 195:22 196:9 196:21
**thanks** 104:24
**thanksgiving** 143:17,19,23 143:24 144:8
**theory** 15:14 168:25 169:2
**thing** 15:7 28:13 29:3 54:3 59:21 62:25 157:19
**things** 12:14 14:24 21:9,12 21:14 22:19 27:12 30:2 33:13,15 34:6 67:12 79:19 101:17 106:24 126:23 136:13 148:22 161:10 161:11 186:8 195:23
**think** 15:17 17:4 24:18 39:18,25 54:13 54:21 93:2 101:11 109:9

115:5,11 116:12,14 117:25 122:3 133:10,23 137:2 142:2,3 149:7 157:23 157:23 159:2 163:25 177:3 181:9 182:14 183:3 185:7 192:4,10,24
**thinking** 192:12
**thoroughly** 149:8
**thought** 33:5 122:11 170:12 185:21
**three** 13:21 38:3 52:9,11 79:15 149:23 164:15
**thursday** 15:13 16:2
**tie** 195:10
**tight** 61:2
**time** 1:17 7:9 9:5 11:13 12:10,14 18:2 18:19 21:11,11 23:2,6,8,21 25:12 26:22 41:16 45:12 48:24 49:23 50:11 51:10 55:11,15 56:22 58:6,14 59:22 59:25 64:13 66:23 67:6,22 68:11 69:17,22 69:24 70:2,2 70:19 72:21 77:2 82:25 83:8 84:10 87:15 93:6,21 95:3 101:12 104:9 105:5 106:3,22 109:6 110:4,19 111:19 114:8 116:8 117:18 117:25 118:17 118:20 121:16 121:22 124:12 126:6 130:16 133:16 134:19 140:22 141:5 141:12 142:8 142:10 143:2 143:18 144:5 145:4,12 147:13 149:6 158:6 162:20 162:25 164:25 169:17 170:22 178:6 180:12 180:13 187:7 191:25 193:24 194:3,10,13,16 194:22,24 195:16,23 196:8,10,22
**timekeeping** 3:12 77:10 182:19 183:2,7
**timeline** 30:14
**timely** 91:7
**times** 15:2,8,11 15:11 16:22 27:21 54:22 57:21 60:19 61:10,14 62:6 63:4 65:6 67:14,16 70:8 70:12 77:19 80:16,18,21 83:17 119:12 136:19 139:9 141:11 158:10 162:7 184:5 193:8
**timesheet** 78:13
**timesheets** 82:5 82:9 83:7
**timing** 52:15 108:3
**tipton** 6:14
**today** 8:20 9:25 84:3 109:21 126:19 153:14 196:17
**together** 20:8 36:16 133:4,5 176:25
**told** 61:21 131:10,15 133:18 139:16 156:7 171:20 171:23
**took** 29:11 33:22,25 50:4 50:8 96:3 135:19 157:22 186:19 188:19 188:25 189:7
**top** 42:3,5 107:8 168:16 169:8,23 172:7 176:18
**total** 51:19 101:23
**totaling** 188:20
**touch** 41:10 55:9 57:4
**tour** 128:2
**toward** 51:19
**towels** 95:23 96:4,5 186:25
**town** 131:14 159:24,25 177:19 190:25 191:3
**track** 30:22
**trail** 14:6

**transcriber** 199:1
**transcript** 6:23 196:17 198:21 199:3,4 201:5 201:8
**transcriptionist** 198:7
**transfer** 108:4
**transferring** 73:9
**transfers** 111:25
**transition** 107:23
**transitioned** 107:18
**transposed** 74:7
**tremendous** 65:16
**tried** 28:6 57:22 76:22 162:21,23
**true** 44:8 138:4 161:17,20,21 179:21 198:8 199:4 201:8
**truth** 8:8,9,9
**truthfully** 73:15
**try** 57:19 67:13 68:24 148:21 148:24
**trying** 27:8 29:2 30:22 34:2 56:3 73:22 87:6 166:10 192:13
**tuesday** 1:16 6:14 15:11 183:9
**turn** 124:8 163:3 182:2
**turned** 115:15 125:8
**turning** 119:14
**turnover** 51:21
**two** 44:18 93:24 128:21 132:14 144:18 148:10 157:12 158:14 161:14 168:16 178:3 179:19
**type** 107:9
**typewriting** 198:6
**typical** 192:9
**typically** 177:10

**u**

**u** 5:12,12 25:19
**ultimately** 159:4
**unable** 61:10 133:16 160:22
**unacceptable** 28:9
**uncertain** 75:7 119:3 156:2
**unclear** 16:25
**under** 7:3 13:22 40:14 44:18 86:10 96:22 97:18 101:20,20,23 107:9 146:3 157:8 158:19
**underneath** 92:8 96:18,25
**underpaid** 88:18
**understand** 6:22 9:13 13:4 13:9,12 14:20 19:9 32:19 36:4 42:19,20 56:4 58:2 61:25 79:18 92:6,6 93:9 100:2,8,20 103:7,23 104:16 106:25 108:6,15 111:21 112:7 113:4 115:4,23 116:19 117:20 119:9 126:4 128:20 133:12 136:23 139:20 140:7,13,25 143:15 145:24 146:20 151:2 155:10 163:25 165:11 169:22 171:13 172:3 181:9 190:21
**understanding** 31:24 97:16 100:21 146:5
**understood** 162:22
**unfortunate** 17:20
**unfortunately** 17:14 27:2
**united** 1:1
**unknown** 33:14 145:11
**unlocked** 96:19
**unpaid** 148:20
**unsafe** 127:9
**unsure** 19:4 39:22 48:20 94:5
**updated** 192:4
**upper** 45:13 172:8
**upset** 27:10
**upstairs** 132:16 133:7
**usage** 97:23
**use** 55:17 165:12 188:21

189:4,9 190:8
**used** 35:14 97:12
**uses** 7:2
**using** 164:24
**usual** 191:7
**usually** 27:2 59:3 66:3 95:10 96:15 139:13 142:7 143:3,6 171:3

**v**

**v** 1:9 25:19 200:1 201:1
**vacation** 21:11 22:14
**vacations** 59:20
**variables** 52:13 63:8 67:14 178:15
**vendor** 186:2 186:11
**vent** 129:13
**verbal** 29:24 30:25 155:16 156:19,20,22 171:24
**verbally** 9:17 156:5
**verification** 85:21 95:25 152:19
**verified** 132:18
**verify** 82:5 83:19,23 84:2 84:6,11 85:11 85:13 90:17 116:17
**veritext** 6:4 196:13
**versus** 86:15 87:15
**victim** 29:10
**videoconfere...** 2:5,14,15,25
**viewed** 69:10
**virtually** 192:25
**visibly** 136:16
**visual** 119:23
**voluntarily** 95:22
**vs** 6:12

**w**

**w** 14:3 46:6 165:22 170:16
**wages** 16:18 178:3 179:19 180:10
**wait** 9:6 33:6 33:11 129:7 133:15 148:23
**waiting** 85:21
**walk** 8:23 98:9
**walked** 27:10 128:18 187:11
**walking** 105:12 184:7
**walks** 102:5
**wall** 2:17
**want** 10:5 13:12 23:18,25 29:5,6 36:12 38:9 41:17 42:12,15 49:14 73:18 90:22 101:5 119:2 121:5 122:9 133:15 139:14 148:8 156:15 164:14 183:12 192:5 195:8,9 195:22
**wanted** 26:25 35:21 134:21 143:20 147:11
**wants** 151:16
**warm** 130:7
**water** 10:15 50:10
**way** 21:25 42:9 42:11 46:4 62:25 67:5,21 67:23 68:9 70:15 83:23 89:8 93:22 96:6 105:14 114:14 118:24 139:7 162:5,8 162:8,10,17
**we've** 59:5 115:5 140:6 183:3 186:22
**wear** 130:6
**website** 171:22
**wedding** 60:10
**wednesday** 16:2 178:20
**week** 53:24 60:15 61:5 64:22 65:3,9 65:10 66:13,20 69:4 87:3 96:12 118:17 125:9,10,14 159:14 161:15 169:15
**weekend** 182:15
**weekly** 14:2 15:16,18,20,21 87:4,9 101:18 101:19 108:20 108:22,23 117:3 118:7,16 118:19
**weeks** 69:6,7 178:3 179:19
**welcome** 124:18 151:18 172:5

**went** 30:15 33:20 43:8 58:6 70:23 87:15 94:10,12 94:15 104:6 111:15 117:7 117:11,16 150:22 170:21 172:11
**westhampton** 18:19 26:23 39:24 51:7,11 51:15 52:5 56:11 59:7,24 60:2 120:13,15 120:16 121:9 130:13,14 192:14
**whatsoever** 26:19 145:3
**willfully** 141:12
**window** 192:5 192:9
**windows** 132:13
**winter** 130:3
**wintertime** 65:25 66:5,11
**wipes** 186:25
**withholding** 163:20
**withholdings** 163:8,18
**witness** 6:19,21 6:22 7:20,25 8:7 12:9 40:8 68:3,6 73:12 73:17 88:24 89:18 104:20 153:13,18 160:20 167:7 181:6 194:5,8 196:6,9 198:4
**word** 107:9 142:18 169:2
**words** 42:14 101:23
**work** 9:9 16:7 29:6 35:14 39:7,13,16 57:3 59:8,17 60:21 61:4 65:3,18 66:14 67:7,15 68:19 79:23 83:6 85:24 91:6 119:17 122:8 122:22 131:22 137:21 138:23 143:3,17,19,22 144:10 149:5 159:17 161:9 161:11 162:5,8 170:14 178:11 185:3 193:3 194:19,20
**workaholic** 193:2
**workday** 160:14,21
**worked** 5:3 20:4 23:7 31:6 31:10 52:2 54:8 59:16 60:14 63:13 64:21 65:2 69:3,17,21 77:13 80:12 82:21 83:9,18 96:6 103:2 108:16 138:2 138:15,21 139:16 140:3 142:25 143:6,6 144:17,23 145:3 148:4 149:9,12 159:14 162:19 170:8,12 177:14,23 178:4,7 183:24 186:12 194:19
**working** 50:25 52:4 59:6 62:7 63:6 66:12,19 67:4,23 68:12 79:21 80:5 105:15 121:8 125:8,13 126:21,23,25 127:4 129:9 131:20 147:21 158:24 160:3 160:25 161:3 161:25 162:2 169:12,18
**workplace** 127:22
**works** 104:23
**workweek** 142:7 177:10
**world** 33:24 194:19
**would've** 64:15 125:24 126:5
**wow** 122:10 188:25
**wrap** 25:14
**writing** 31:16 74:15 112:11
**written** 7:7 165:8
**wrong** 65:20 148:15 192:12
**wrote** 31:5 171:6

**x**

**x** 3:1,5 4:1 5:1 198:21

**y**

**y** 25:19 169:2
**yeah** 13:13 33:4 34:11

36:14 37:17 42:19 51:8 54:14 60:18 68:9 69:3 72:19 73:21 75:23 77:25 78:7 86:5 87:20 92:7 99:20,24 103:17 104:20 104:21 116:7 122:22 128:9 132:12 148:14 156:12 159:23 166:9,11 180:3 180:10 182:14 186:6 191:5
**year** 32:25 112:20 116:18 117:2,11,23 121:18,19 147:20,24 148:9,23 158:24,25 159:2,3
**years** 13:21 33:6,12,13 38:3 39:3,4 44:18 79:15 125:4 128:21 144:18 148:10
**yellow** 166:12 166:20 167:4 167:11
**yep** 137:5 168:9
**yesterday** 147:12
**york** 1:2 2:18 6:15,18 44:13 198:19
**yorkers** 9:8

**z**

**zelle** 3:15,18,21 15:7 70:9 72:5 72:6,24 74:20 75:4 86:3 105:24 106:6 108:16,21 109:2 111:22 111:23,25 159:9 163:7,12
**zelle'ing** 85:22
**zoom** 37:10,13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.