# Exhibit S

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

___________________________________

TERESA GONCALVES and DINA KETCHAM, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KRISTIN SHEELER DESIGNS, LLC; KRISTIN SHEELER; and JAMES "JIM" BRINNEN,

Defendants.

Case No. 2:25-cv-04264-GRB-ST

___________________________________

DEPOSITION OF DINA KETCHAM

DATE: Thursday, August 27, 2026
TIME: 10:05 a.m.
LOCATION: Remote Proceeding
Westhampton, NY 11977
REPORTED BY: James Bekman
JOB NO.: 8386732

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS TERESA GONCALVES AND DINA KETCHAM:

EMANUEL KATAEV, ESQUIRE (by videoconference)
Sage Legal, LLC
18211 Jamaica Avenue
Jamaica, NY 11423
emanuel@sagelegal.nyc
(718) 412-2421

ON BEHALF OF DEFENDANT:

DAVID K. BOWLES, ESQUIRE (by videoconference)
MAGGIE A. JOHNSON, ESQUIRE (by videoconference)
Bowles & Johnson, PLLC
14 Wall Street, 20th Floor
New York, NY 10005
david@bojo.law
maggie@bojo.law
(212) 390-8842

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Bowles | 11 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Collective Action and Class Action Complaint and Demand for Jury Trial | 42 |
| Exhibit 2 | Email to Dina Ketcham from Jim Brinnen Re: NIBI Pay Summary 9/21/2022 | 52 |
| Exhibit 3 | Clock-In Photo 10:04 a.m. 8/18/2023 | 118 |
| Exhibit 4 | Clock-Out Photo 6:29 p.m. 8/18/2023 | 122 |
| Exhibit 5 | Clock-In Photo 10:21 a.m. 12/28/2023 | 126 |
| Exhibit 6 | Clock-Out Photo 4:19 p.m. 12/28/2023 | 128 |
| Exhibit 7 | Clock-In Photo 9:59 a.m. 12/31/2023 | 129 |
| Exhibit 8 | Clock-Out Photo 4:16 p.m. 12/31/2023 | 130 |

E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Lightspeed POS Clock-In/ Clock-Out Raw Data | 136 |
| Exhibit 10 | Lightspeed Corrected Payroll Hours | 191 |
| Exhibit 11 | Payroll Details by Date, Rounded Hours from Clock Times | 192 |
| Exhibit 12 | Employee ACH Payments for 2022 | 194 |
| Exhibit 13 | Employee ACH Payments for 2023 | 197 |
| Exhibit 14 | Employee ACH Payments for 2024 | 198 |
| Exhibit 15 | Employee ACH Payments for 2025 | 198 |
| Exhibit 16 | W-2 for Tax Year 2022 | 199 |
| Exhibit 17 | W-2 for Tax Year 2023 | 201 |
| Exhibit 18 | W-2 for Tax Year 2025 | 204 |
| Exhibit 19 | W-2 for Tax Year 2024 | 204 |
| Exhibit 20 | Correspondence Between Dina Ketcham, Ms. Washington, IRS | 205 |

E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 21 | Email from Dina Ketcham to Jim Brinnen Re: NIBI Pay Summary 12/13/2022 | 182 |
| Exhibit 22 | Email from Dina Ketcham to Jim Brinnen Re: NIBI Pay Summary 10/9/2022 | 186 |
| Exhibit 23 | Email from Jim Brinnen to Dina Ketcham Re: NIBI Compensation Details 1/12/2024 | 181 |
| Exhibit 24 | Screenshot of Texts with Jim Brinnen 5/29/2024 and 6/14/2024 | 184 |
| Exhibit 25 | Plaintiffs' Supplemental Responses & Objections to Defendants' First Set of Interrogatories | 208 |
| Exhibit 26 | Email from Jim Brinnen to Dina Ketcham Re: NIBI Pay Summary 5/17/2023 | 70 |
| Exhibit 27 | Screenshot of Texts from Kristin Sheeler Re: Flowers, Expenses | 187 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 28 | Screenshot of Text from Dina Ketcham to Kristin Sheeler Re: Requesting Time Off | 178 |
| Exhibit 30 | Screenshot of Texts Between Dina Ketcham and Kristin Sheeler 01/2025 | 104 |
| Exhibit 31 | Screenshot of Texts Between Dina Ketcham and Kristin Sheeler 02/2025 | 106 |
| Exhibit 32 | Screenshot of Dina Ketcham's Reply to Kristin Sheeler | 107 |
| Exhibit 33 | Kristin Sheeler Designs, LLC d/b/a NIBI-MTK Boutiques Vacation & Holiday Policy 11/2023 | 145 |
| Exhibit 34 | Email from Jim Brinnen to Dina Ketcham Re: NIBI Compensation Details 1/9/2024 | 149 |

D O C U M E N T S R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Correspondence with Ms. Washington | 38 |

D O C U M E N T S  R E Q U E S T E D (Cont'd)



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2 | Signed Copy of Exhibit 2 Compensation Agreement | 54 |
| 3 | Emails Related to Litigation | 58 |
| 4 | All Clock-Ins/Clock-Outs | 78 |
| 5 | Records of Unpaid Interviews | 91 |
| 6 | Unemployment Documents | 113 |
| 7 | Witness Copy of Exhibit 33 | 145 |
| 8 | Bank Statements from Teachers FCU from 01/2022 to 12/2025 | 197 |
| 9 | Reply from IRS Advocate Re: NIBI Inaccuracies | 204 |
| 10 | All Documents Complaining to Kristin Sheeler, Jim Brinnen | 225 |
| 11 | All IRS/DOL Complaint Documents | 227 |



I N F O R M A T I O N  R E Q U E S T E D



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Name of Peace Love Hamptons Owner | 67 |
| 2 | Emails Re: Clocked Hours | 151 |
| 3 | Texts with Jim Brinnen Re: Forgetting to Clock Out | 160 |

I N F O R M A T I O N  R E Q U E S T E D (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 4 | Texts with Kate Quimby, Hanna Mancuso | 215 |
| 5 | Photo of "Biohazard" Sign | 220 |
| 6 | Texts with Cathy Marin, Natalie Cummings | 227 |
| 7 | Photo of Holiday Totes | 231 |

D. KETCHAM

THE REPORTER: Good morning. My name is James Bekman. I'm the reporter assigned by Veritext to take the record of this proceeding. We're now on the record at 10:05 a.m.

This is the deposition of Dina Ketcham taken in the matter of Teresa Goncalves and Dina Ketcham, on behalf of themselves and all others similarly situated vs. Kristin Sheeler Designs, LLC; Kristin Sheeler; and James "Jim" Brinnen on Thursday, August 27, 2026, at 10 Park Street, Westhampton, New York 11977.

I'm a notary authorized to take acknowledgments and administer oaths in New York; and parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted

D. KETCHAM

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulations of such.

Now, at this time, will everybody in attendance please identify themselves for the record?

MR. KATAEV: Good morning. I'm Emanuel Kataev of Sage Legal, LLC, for the plaintiffs.

MR. BOWLES: Good morning. David Bowles for the defendant. I have with me here my partner, Maggie Johnson, as well.

THE REPORTER: Thank you. And then, could the witness please state first and last name?

MS. KETCHAM: Good morning. Dina Ketcham.

THE REPORTER: Thank you so much. Okay. Hearing no objections, I'll swear in the witness.

If you could, just please raise your

right hand; and have it show up on the screen.

MS. KETCHAM: Okay.

THE REPORTER: Thank you. Do you swear -- and just hold -- I'm going to swear you in. Just have it raised the whole time.

MS. KETCHAM: Okay. Yes.

THE REPORTER: Thank you.

WHEREUPON,

DINA KETCHAM,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

And, Counsel, please proceed. Thank you.

EXAMINATION

BY MR. BOWLES:

Q Good morning, Ms. Ketcham. My name's David Bowles. We've met very briefly before in court. I represent the defendants in this matter. I'll be asking

D. KETCHAM

you some questions today.
A Okay.
Q And the very first one is: Have you been deposed before?
A No.
Q Okay. So, I want to give you a few instructions to make this go easier. We can't speak at the same time; that's probably the most important rule. That will drive Mr. Bekman crazy.
So, I'm going to be careful to let you finish your answers before I start speaking. I'd ask you to make sure I finish with my questions before you start speaking. It's the most natural thing in the world to jump in, in the middle of a sentence in New York; but for these purposes, let's try to be formal, and just wait till the other person is finished speaking.
Do you understand?
A I -- yep, I understand.
Q Good. And you have to answer verbally for all your answers. Court

D. KETCHAM

reporter can't write down head nods and head shakes and things like that.

A Oh.

Q So, just, again, wait until I'm finished; and then, answer verbally to all the questions. I'll try to remind you if you happen to not do that.

Is there any reason you can't answer questions fully today? For example, are you on any medications that might impair your answers?

A No.

Q Anybody in the room with you? Or are you alone?

A My daughter. She is upstairs in her bedroom.

Q Okay. But not in the room with you?

A No. No. For a brief moment, but -- no. She's not going to be in here.

Q Very good. Very good. As we're moving forward, if you want to speak to your attorney, you certainly can. But I'll ask that if there's a question

D. KETCHAM

pending, you answer the question before we take the break to speak to your attorney.

And if you need to take a break for any other reason -- go to the bathroom, get a drink of water, or whatever -- just let me know. And after you've answered the question, we'll take a break.

Do you understand?

A Yes.

Q Great. What did you do to prepare for this deposition? For example, did you meet with anyone?

A Not "meet," no. I just talked to my lawyer.

Q Okay. So, you spoke with your attorney on the phone; is that right?

A No -- yeah, I guess. Not really. On the phone. No.

Q How did you speak with your attorney?

A Oh, we had a little meeting just to, you know, let us know what was going to be -- to make us aware, you know?

D. KETCHAM

Q Okay. I understand. So, when you say "we," who was at the meeting?
A Teresa.
Q And you?
A Yes.
Q Anybody else?
A Not that I know --
Q I'm sorry?
A No.
Q Okay. So, it was you, Teresa Goncalves, and Mr. Kataev; is that right?
A Kataev? I don't know.
Q I'm sorry, Emanuel Kataev.
A Yes.
Q Okay. Just the three of you?
A Yes.
Q Okay. Thank you. All right. There's a corporate defendant here, and the official name is Kristin Sheeler Designs, LLC. I'm going to refer to that as "NIBI."
Will you understand what I mean if I ask about NIBI?
A Of course.

D. KETCHAM

Q Good. You're suing NIBI; is that correct?

A Well, I mean, as far as I'm concerned, "NIBI" and "Kristin Sheeler Designs" are the same. And whether it be directly to Kristin Sheeler and Jim Brinnen, that could be a possibility.

Q Sure. But I'm right that you're suing NIBI, the company? Am I right?

A Yes.

Q And why are you suing NIBI? What's your understanding?

A Well, I mean, I didn't get paid for hourly work that I've done on and off-the-clock. There were certain things that were asked of me to do where I wasn't clocked in, and I did them. I also come to realize that, over time, that my taxes weren't being reported; and that was a shock. And then, my social security wasn't put in -- my Medicare/Medicaid -- it was quite shocking.

Q Okay --

A But -- but overall -- yeah. I

mean, I worked hours that I didn't get paid for.

Q Okay. So, let me break that down a little bit. You said you didn't get paid for hourly work. That was the first thing you said; correct?

A Mm-hmm.

Q I'm sorry, this is one of those circumstances --

A Yes. Yes.

Q -- yeah. Exactly.

A Yes.

Q So, are you saying that you recorded time that you did not get paid for?

MR. KATAEV: Objection to form.

THE WITNESS: I --

BY MR. BOWLES:

Q You can answer.

A I didn't intentionally do that.

Q No. But let me make sure I'm clear on this, because you said two different things. You said you didn't get paid for hourly work; and then,

D. KETCHAM

separately, you said you didn't get paid for clocking in. So, I'm trying to break these things down.

Was there a time when you clocked in for work, and they didn't pay you for that work that you clocked in for?

MR. KATAEV: Same objection.

THE WITNESS: Lunch was taken out when I didn't take lunch, if that could be clear.

BY MR. BOWLES:

Q Okay. So, did that happen once? Or more than once?

A More than once.

Q How many times?

A Off the top of my head, I can't recall. I just know that a lot of the times, you know, I did have to work during my lunch, especially high season, which is kind of, like, between May and July -- or, August, as -- I should say.

Q So, it happened multiple times that you worked lunch, and you didn't get paid for lunch? Is that what you're

D. KETCHAM

saying?

A Correct.

Q All right. More than five times?

A Yes.

Q More than 50 times?

A Maybe not more than 50.

Q When it happened, did you let anyone know at NIBI that you had worked lunch, and you didn't get paid?

A On occasion, yes.

Q How did you do that?

A Either verbally, or when I -- I was told that they -- I would be, I guess, "fixed," you would say. I would email.

Q So, verbally, to -- who?

A Jim. It's Jim Brinnen.

Q And you said you also emailed. Was that also to Mr. Brinnen?

A Yes.

Q Okay. Was there ever any circumstance where you'd verbally told Mr. Brinnen, but didn't email him?

A Yes.

D. KETCHAM

Q All right. When you informed Mr. Brinnen by voice, or by email, did he fix the problem?

A Not always.

Q Did he sometimes fix the problems, and sometimes not?

A Yes. Yes.

Q All right. So, some of those lunches you got paid for, and some you didn't; correct?

A Correct.

Q Do you have any record of which lunches you didn't get paid for?

A No. I have no -- I have, maybe, a couple; but it would be on the time clock, I would assume.

Q Okay. But the point was, it wouldn't be on the time clock; right? Because they -- you clocked in; you clocked out; they took out a certain amount for lunch. And your argument is that you worked at lunch; right?

So, you were entitled to that extra pay for the lunch; is that correct?

D. KETCHAM

MR. KATAEV: Objection to form.

THE WITNESS: Yes.

BY MR. BOWLES:

Q All right. So, what documentation do you have of which lunches you didn't get paid for?

A You want dates? I don't know the dates offhand.

Q Can you estimate how many times?

A Maybe four.

Q Okay. And for those four dates, do you have any record whatsoever of what dates those were?

A I didn't memorize that, no.

Q Okay. But that wasn't quite --

A I didn't memorize any dates like that, you know? If I could memorize every date in the past two and a half, three years, that would be amazing.

Q I'm with you on that. I can never remember dates, either. But my question was more: Did you have it written down anywhere?

A I think I made a lot of mental

D. KETCHAM

notes; but on occasion, I did. Yes.

Q Okay. Have you given copies of those times you wrote it down to your attorney?

A I think there were a couple of emails.

Q Okay. Everything you've got -- that documents when you didn't get paid for a lunch -- you gave to your attorney; is that right?

A From what I still had. You know, sometimes -- you know, that's a lot of emails to go through, so --

Q Okay. But you went through your emails -- right -- to get ready?

A I did.

Q Okay. All right. And when you found it -- anything that was documentation of this issue -- you gave it to your attorney; is that right?

A Yes.

Q Okay. Okay. You said you didn't get paid for certain lunches. You said you didn't get paid for hourly work;

D. KETCHAM

and when I asked you about that, you said the lunches.

So, was there ever another time when you clocked in/clocked out, and didn't get paid for the work that you clocked?

A Not while clocking in, no.

Q Okay. All right. You said you did work without clocking in. Were you referring to the lunches?

A No. No, I was -- I transported merchandise from one store to another at times, you know? So, that's what I did. Yeah.

Q There were two allegations of that particular thing in the complaint; and I'm going to ask you about those later.

Were there more times when you transported goods without being clocked in?

A Oh, yeah. Quite a few times. Yeah, it was an -- it was regular.

Q Okay. So, there were times when

D. KETCHAM

someone at NIBI asked you to transport something, and you weren't clocked in for that work? Is that what you're saying?
A Right. Yeah.
Q Was there also an ability to text Jim Brinnen for any work that you worked without being clocked in?
A Yes.
Q Did you do that?
A Sometimes.
Q Okay. Was there ever a time when you texted Mr. Brinnen that you had done some work off-the-clock; that you didn't get paid for that work?
A No.
Q Okay. You said sometimes, you didn't text him. Why would you not text him about the work you did?
A Because I would see him and, you know, I mean, we had a relationship where I would be able to talk to him.
Q All right. So, in those circumstances, you told him -- verbally -- about work you had done?

D. KETCHAM

A Yes.

Q And did you get paid for that work after you told him about it?

A I'm sorry, are you referring to the lunches? Or are you referring to the transporting of goods?

Q Now, we're on transporting goods. So --

A Oh, okay.

Q -- you would transport goods, tell Mr. Brinnen you had done the work, and not get paid for that work?

A No, I did not.

Q So, you did get paid for the work after you told Mr. Brinnen about it?

A No, I didn't get paid for the work. It was just, like, for me -- so, the idea was -- and I'm going to sound -- Kristin referred to me as the "pack mule" because I do have a large car.

And if she needed stuff to be transported from where I live -- or to Montauk, or Bridgehampton -- then I would use my car. We had discussions about it:

D. KETCHAM

you know, the gas that I used for my car -- I mean, it is a large car -- and also, you know, everything was promised, but never -- nothing was ever followed through.

And to be honest with you, it's a little awkward to have to go to your employer and say, "Look. I'm doing this, and you're not compensating for me." It's awkward, because you do need the job. You want to be helpful. But at the same time, you're not being, like, "I'm doing this for you, and I should be getting paid for this," and, you know, that's kind of how it went.

So, it was kind of expected. And a lot of the times -- like, when another store needed another size -- if I was going in that direction, I would either drop it off. But even so, I was traveling, doing that as an employee.

Q I understand. And to get back to my question, I had asked about times when you verbally told Mr. Brinnen that

D. KETCHAM

you had done some work for transporting goods, and you didn't get paid for it.

And I think you said, sometimes, you didn't; is that right?

A I never got paid for transporting goods. I never did.

Q Okay. Where were you when you spoke to Mr. Brinnen, personally, and told him about the transport of goods? Were you at the store? Were you at the house?

A I didn't -- it was not really Jim; it was Kristin that she would ask me to do. So, I'm -- I'm sorry. I might have -- like, between the lunch -- because he does the time clock -- and then what was expected of me at work are two different things. Like, Jim took care of the clocking-ins/clocking-outs. If Kristin expected me to do something, or asked me, that was -- I dealt with Kristin.

Q But there were times, you said, when you told Jim Brinnen about work you had done transporting goods, and you

D. KETCHAM

didn't get paid for.
A Maybe I just misunderstood, as far as the lunch and the --
Q Okay. Let me --
A -- the lunch -- I think I might have misunderstood, because we were doing two things at the same time. And I'm probably a little nervous, so --
Q Well, don't be nervous. Don't be nervous. We're just asking and answering questions.
A Right.
Q So, let me try to break it down again. Separate from the lunch thing -- we covered that --
A Okay.
Q -- there were times that you transported goods for NIBI; correct?
A Correct.
Q All right. How many times did that happen?
A There was, like, different time periods. So, when I was going between stores -- working between stores -- it was

D. KETCHAM

probably, like, once a week; because it would be on seasonal merchandise as well.

Q Okay. So, once a week. You worked with the company for two years and three months; is that right?

A [No audible response.]

Q Roughly?

A Honestly, I don't even know where it ended, because I -- yeah. I don't even have a date of when I actually ended with the company, because they never really said I wasn't employed until I realized I wasn't employed.

Q Okay. But let's call it "a couple of years." Is that fair? You worked there a couple years?

A Yeah, I would consider it, like, two and a half, as far as I'm concerned. Yeah.

Q Okay. And you said that you transported things for them weekly; is that right?

A Yes, at the time, when I was working in the three locations -- or, two

D. KETCHAM

locations -- most of the time: Bridgehampton and Montauk.

Q Okay. Were you transporting goods between stores? Is that what was happening?

A Yes.

Q Okay. And you're saying you didn't get paid for the time, sometimes, when you transported goods between stores?

A Yeah. There's nowhere to clock in or clock out when you're not designated in a store.

Q Okay. We'll go over this in more detail later. But you were able to text Mr. Brinnen and say that you worked an extra number of hours, even though you couldn't clock in and clock out; correct?

A But they were aware. It's not like they weren't aware that it was happening.

Q Right. But that wasn't my question. My question was: There was a mechanism that they had set up where you could text Mr. Brinnen and say, "I worked

D. KETCHAM

an extra half an hour today off-the-clock"; correct?

A I could have.

Q Did you ever do that?

A I honestly don't remember if I did or not. You know, I don't remember if I have or not, so I can't really say -- I don't remember if I did or not.

Q Right. Okay --

A But usually, it was Kristin that I dealt with when it came to transporting goods.

Q Was there ever a time when you texted, or emailed someone at NIBI, and said you had worked some extra hours transporting goods that you didn't get paid for?

A I might have text -- definitely verbal -- but I definitely -- I might have text either Cathy or Natalie.

Q Who are Cathy and Natalie?

A Employees of NIBI.

Q So, you texted them that you worked extra time?

D. KETCHAM

A Well, you know, I'm, like, transporting goods. So, I'm like, "Oh, I hope I'm going to get paid for this," you know? Like, you know, just in conversation, is what I'm starting to say.

Q Okay. But did you ever text Mr. Brinnen for --

A I should have.

Q I'm sorry. Let me just finish my question.

Did you ever text Mr. Brinnen and say that "I worked an extra 'X' number of hours, and not get paid for those hours"?

A I don't recall. I -- I don't know if I did or not.

Q Okay. So, maybe, you just didn't text Mr. Brinnen for some of the hours you worked? Is that what you're saying?

A Maybe I didn't. I don't know.

Q All right. Did you receive a periodic statement from Mr. Brinnen, saying, "During this pay period, you

D. KETCHAM

worked 'X' hours, and here's your pay"?

Did you get those?

A The emails of our -- yeah. The hours we worked and the hours we didn't? Yes.

Q Right. Were you able to respond to those and say, "Oh, I worked some extra hours this week"?

A I could have.

Q Did you ever?

A Not that I recall.

Q Okay. Right. Cathy and Natalie -- you mentioned them -- they didn't do billable time, or have anything to do with the payment; right? They were just other employees?

A Correct.

Q Okay. Just making sure I understood.

A Yeah.

Q All right. Going forward, you had given me a list of things that you're suing NIBI fore. You said taxes were not reported.

D. KETCHAM

Just expand on what you mean by that, please.

A Okay. Well, I had issues since I've worked with NIBI with getting my -- my refunds from the IRS; couldn't understand why. I've -- you know, getting letters; I have to show pay stubs; did that. Well, that was asked of me, which I -- and I was not able to.

And it was kind of interesting, like, simultaneously, the NIBI fire happened; and I needed to be able -- which I discussed with Jim and Kristin, because they did want me to continue at NIBI -- that during that time period -- well, at first, she's like, "I don't know what you're going to do," and I'm like, "What do you mean, 'What am I going to do?' Like, I don't have a job the day after," because -- you know? And so, she's like, "Well, we'll have to discuss it."

So, you have to understand when you went to Jim and Kristin, everything was very delayed, or "I'll get back to

D. KETCHAM

you" kind of thing. So, you would always be on that waiting of, "Okay. They're going to get back to me. They're going to" -- and it just doesn't happen unless you bring it up again. And -- yeah, it makes it uncomfortable. So -- so, we did, at one point, talk about me getting the unemployment during the time.

So, when I went to Unemployment, I was having issues with them, simultaneously of me having issues with the IRS. Then, I spoke to someone who said I would need an advocate, you know, when I call -- an advocate from the IRS -- and her name was Ms. Washington; and she was very helpful.

And basically, what I was told from Unemployment was that they didn't have me as an employer, so my unemployment benefits weren't getting met. And then, when I was speaking to the IRS about the issues with that, she'd come to realize that I was not an employee -- or, I wasn't, I guess, filed -- however you do

D. KETCHAM

it -- as an employee of NIBI, and that the pay stubs that I was bringing -- giving them weren't -- in my words -- what I would say is "legitimate pay stubs." They're supposed to look a certain way.

So, that wasn't enough for them. I had to send them all my bank statements and direct deposits. The advocate, you know, was able to give me some of -- get some of my refund done; but that was for twenty -- twenty -- 2023. 2024, I still have not received or heard from the IRS.

Ms. Washington also said, "Let me talk to my boss to report NIBI for this." But they're not allowed -- the advocates aren't allowed -- to report the company; it has to come from me. So, she emailed me the correct paperwork, as did when I went to Unemployment. When they talked to me -- because I was -- went there three different times -- finally got someone on the phone.

I don't know -- I've never done unemployment before, so I had no clue you

D. KETCHAM

have to fill out all this -- you know, all this information on the computer. And then, you need to talk to someone. And it's an all-day project -- literally -- especially if you're not someone who ever did it before.

So, finally, I talked to someone; and they asked for the tax ID number. It wasn't coming up, and it wasn't coming up that I was an employee. So, then -- yeah. I was quite shocked -- and a little distraught -- because I -- you know, I did -- even though we had this issue with me, you know, doing work before and after, you know, it was -- you know, just unbelievable to me, you know, that I'd be working there, and -- and they weren't.

I was like, "Where did the money go that they were taking out," that I was seeing how social security was taken out. State, federal tax was taken out. Medicare and Medicaid was taken out. Where did that money go?

D. KETCHAM

Q Let me interrupt you a little bit, because I just want to make sure. You've given -- you said there was an email from the IRS from Ms. Washington; is that right?

A I spoke to her on the phone.

Q Okay. You did mention that --

A I mean, we did emails. I sent her -- I sent her information through emails. Yes.

Q Okay. So, all the information that you sent, and all the emails that you sent, have you given copies of those to your attorney?

A Yeah, I don't know that I have. I have to look at her emails -- if I have emails -- but I didn't -- I always copied things. So, whatever I gave my attorney is what I had on. I could double-check and see if I have more, but -- yeah.

MR. BOWLES: Well, Mr. Kataev, we'll just call for production of those documents to the extent not already produced. We'll put that in writing after

we get the transcript.

MR. KATAEV: Perfect. Thank you.

MR. BOWLES: Sure.

BY MR. BOWLES:

Q All right. Moving on a little bit, Ms. Ketcham, you understand that you've also sued Kristin Sheeler, personally; correct?

A Well, I'm -- they're part of the company.

Q Do you understand that, separate from the company, you sued her individually?

A Yes.

Q Why have you sued Kristin Sheeler personally?

MR. KATAEV: Objection. To the extent that your answer will involve any discussions you had with any attorneys that you spoke to, don't disclose those conversations. But you can otherwise answer the question based on your own knowledge without disclosing those conversations.

D. KETCHAM

MR. BOWLES: Yeah, I agree with that.

BY MR. BOWLES:

Q Your own understanding of why you sued personally, without disclosing any contents of any conversations with Counsel.

A Okay.

Q Do you know?

A Do I know -- how could I, like, explain that without disclosing any information? I don't --

Q Well, do you know what you sued Ms. Sheeler for?

A To me, they're one in the same. So, I don't -- maybe I don't get the question.

Q Yeah. And I understand it can be confusing. But what I'm looking for is: Are you suing Ms. Sheeler for anything other than what the company did? You said the company didn't pay you; the company didn't report taxes.

Did you sue Ms. Sheeler for anything other than what the company did?

D. KETCHAM

A I'm sorry, I'm not a hundred percent sure.

Q All right. Same question for Mr. Brinnen. Why are you suing Jim Brinnen?

A And then, that would be the same answer: I'm unsure.

Q I understand. All right. I'm going to be showing you some documents, and I'll put them up on the screen. I'm going to, first, make sure the technology works here.

All right. All right. If everything's working, you should see on your screen the complaint in this matter.

Do you see this?

A Yes.

Q Is it legible to you?

A Somewhat. It's a little -- it -- it needs a little bit more focus, but --

Q How about that?

A That's better.

Q Very good.

D. KETCHAM

MR. BOWLES: All right. I'm going to -- I put on the screen a document I'll ask be marked as Exhibit 1 for this deposition.

Again, before we went on the record, I mentioned -- I'm showing these on the screen -- but afterwards, I'll email them around so they can be marked as exhibits; so, everybody will get a copy afterwards.

For the record, this appears to be the complaint in this matter, dated July 31, 2025.

(Exhibit 1 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this document before, Ms. Ketcham?

A Yes.

Q Did you see it before it was filed in court?

A Well, I've had -- yeah.

Q Okay. Are the allegations in it true, to your knowledge?

A Yes. I went over it.

D. KETCHAM

Q I'm sorry. I didn't hear everything you said. "Yes"?

A Yes. Yes.

Q I'm going to scroll down in Exhibit 1 to paragraph 28. Do you see paragraph 28 on the screen?

A Yes.

Q All right. In substance, it says that "Plaintiff Ketcham began working for Defendants in or around September of 2022."

Is that correct?

A Yes.

Q All right. And you're an associate at that time; correct?

A Correct.

Q What was an associate's duties? What did you do?

A I just took care of customers. You know, ring them up -- you know, like, the standard -- help them try on clothes -- like, just regular boutique work. I mean --

Q All right. Were you part-time,

D. KETCHAM

or full-time, when you were an associate?

A I started as full-time. I mean, I was told I was full-time.

Q Okay. So, you were full-time from the very beginning?

A As far as I was concerned, yes.

Q Well, how many hours a week did you work as an associate?

A Well, I mean, given all the going back and forth, it ranged differently from week to week.

Q Okay. Was it about 40? Was it about 20? Do you have an estimate?

A It just -- it ranged, I would say, between -- I don't know -- 35 and whatever. Like, I can't really say every week what it would be. It was definitely different every week.

Q Okay. I understand. It says, in paragraph 28 of Exhibit 1, "Later on, you were designated as an acting manager."

What does "later on" mean? When did that happen?

A Well -- so, when I first

D. KETCHAM

started, I was going from Bridgehampton and working both Bridgehampton and Montauk, from what I remember. And I was being trained, or -- to be the manager of Montauk at the time. And then, during, like -- I believe it was, like, January; maybe February -- you know, it was really inconsistent with hours.

But she kept on -- Kristin was, like, "Oh, I'm going to" -- you know, "You're being trained to be the manager in Montauk. You're going to be the manager in Montauk." I was like, "Okay." And then, come high season -- because I live in Westhampton -- she's like, "You know, you're closer to Westhampton," so I was like -- yeah. And without really telling me, she had found another manager, I guess, for Montauk.

So, when I was working in -- I just want to make sure I have my timeline right -- when I was working in -- then, I started working the hours in Westhampton as the -- as an associate. And then, the

D. KETCHAM

manager there, who is Teresa, had left. So, she asked me to do the same duties as -- the responsibilities that Teresa had; but yet didn't give me the title as "manager." And she asked -- you know? But I was acting manager without actually being a manager, so to speak, and -- yeah. I was at --

Q Okay. Let me --

A -- that's what happened, so -- I don't know. It's like, I didn't get the title; and then, she wanted me to do all the duties as a manager. And then -- go ahead.

Q I'm sorry. Let me break that down a little bit, because my question is really "when"; but let's back up a second.

So, you started in September of 2022 as an associate at -- what store?

A Montauk.

Q Okay. And you were being trained to manage that store, is what you said, at the time?

A Yes.

D. KETCHAM

Q But NIBI hired someone else as the Montauk manager. Who was that?
A I don't -- I have -- I know her name, but I can't think of it offhand --
Q Do you remember --
A -- I know that it's --
Q -- the first name?
A Not offhand. She was only there -- she was only there for that time.
Q Okay. So, once NIBI hired somebody else to be the Montauk manager, you said they were -- well, it says here, in the allegation, that you were designated the acting manager at Westhampton Beach; correct?
A After the manager had left there, yes.
Q Okay. And when did that happen?
A That was 2023. But when I say "acting manager," I wasn't actually titled "manager" yet. It was the next season that I mentioned to her that -- you know, Kristin -- "You gave me all these responsibilities, but you never -- like,

D. KETCHAM

what's going on with that?"

Q Okay. But my question, specifically, is --

A And --

Q -- your allegation is: You were later on designated as an acting manager at Westhampton Beach?

A Yes --

Q About when did that happen?

A 2023. And then, I gave -- got the title as "manager" in twenty -- I guess, 2024.

Q Okay. So, after you were designated acting manager in 2023, did your responsibility change?

A Yes, of course.

Q Sure. And did your hours change?

A I still worked a full day.

Q Did you work more, or less?

A More.

Q Okay. It says here, at the end of the allegation, "approximately 50 hours per week."

D. KETCHAM

So, my question to you is: Does that refer to your time as acting manager, as an associate, or both?

A I guess both.

Q All right. So, we'll pin this down. So, the whole time you worked at NIBI, you were working about 50 hours a week, is your allegation; is that right?

A Yes.

Q Okay. How many days per week did you work?

A I believe it was five. I don't recall if I -- if I worked an extra day; but on the average, it would be five.

Q All right. So, then, you would have been logging ten hours per day; is that right?

A Well, I don't think the time clock reflect that. No.

Q Okay. Did you clock in and clock out yourself?

A Yes.

Q So, why didn't you clock in the whole ten hours?

D. KETCHAM

A If something had to be done before, on my way to work -- I did have to stop at UPS on occasion, which is in the CVS. I did have to interview, going -- you know, interview a few girls for the season. That was usually -- and one was before. Another -- it could be either before or after.

Q Okay. So, occasionally, you had to do work before and after you clocked out? Is that what you're saying?

A Correct.

Q Okay. And in those situations, did you text Jim Brinnen and say, "I did extra work"?

A No.

Q Why not?

A Because it -- they knew I was doing it. It's not like I was asked to do it. So, am I going to say, "Oh, just so you know" -- and not to Jim, but to Kristin -- "I'm doing what you told me to do"? Like --

Q Well, they wouldn't necessarily

D. KETCHAM

know how many hours that took; right?

MR. KATAEV: Objection. Argumentative.

BY MR. BOWLES:

Q You can answer.

A I don't know. They should have.

Q Did you ever text Jim Brinnen and say, "Hey, I worked some extra hours"?

A You're asking me the same question.

Q You can answer.

A I don't think that I text him, because I thought that they already knew.

Q Okay. All right. You thought that they already knew about the extra hours; and therefore, you just didn't tell them about them? Is that fair?

A Well, yeah. I trusted them to do the right thing.

MR. BOWLES: I'm going to put on the screen a document I'll ask be marked as Exhibit 2. For the record, this appears to be an email dated September 21, 2022, from Mr. Brinnen. It is to an email

D. KETCHAM

address that is dinax3@yahoo.com.

(Exhibit 2 was marked for identification.)

BY MR. BOWLES:

Q Ms. Ketcham, is that your email?

A Yes, it is.

MR. BOWLES: All right. For the record, the document has Bates numbers beginning in D-12; appears to be five pages long.

BY MR. BOWLES:

Q And if you scroll down, it also appears to attach a compensation agreement. So, I'm at the top of the screen now.

Have you seen this document before?

A Yes, I believe.

Q This is an email that you received on or about September 16, 2022; is that right?

A Mm-hmm.

THE REPORTER: Is that "yes," or "no"?

D. KETCHAM

THE WITNESS: Yes. Yes.
BY MR. BOWLES:
Q Sorry, I know it's hard to remember.
Is this one of these emails that we talked about before, where Mr. Brinnen wrote you an email and said, "This is how many hours you worked"?
A Yes.
Q Did you have an opportunity to respond to this email, and say you worked extra hours?
A I did. But I mostly worked -- as I said before, that was in September, the high season. The high season is May to, maybe, August -- or June to August.
Q Sure. But my question is: You could have responded to this email; correct?
A I could have.
Q All right. Scrolling down on the second page of Exhibit 2, there is a compensation agreement; and it says your hourly rate is $20 per hour.

D. KETCHAM

Do you see that?

A Yes.

Q Do you remember getting this document at the time?

A Yes.

Q Do you remember if you signed it?

A No.

Q You don't remember signing it?

A I don't remember if I signed it. I might have -- I don't remember if I actually signed it.

Q Okay. You don't remember, one way or the other, whether you ever signed it?

A No. I don't know.

Q All right. Do you have a copy of a signed version of this agreement?

A I might.

MR. BOWLES: Okay. I'll call for production of that document, if you have it. And again, for all of these things, Mr. Kataev, I'll put that in writing after the deposition.

D. KETCHAM

MR. KATAEV: Thank you.

BY MR. BOWLES:

Q Scrolling down on the third page of the Exhibit 2, there is a document -- starting at the top, it says "General Agreement and Release," and it appears to be an agreement between you and NIBI.

Have you seen this before?

A I have to read it. I don't -- maybe.

Q Okay. It appears to have been attached to the email that is at the top of this document.

A Okay.

Q Because Mr. Brinnen says, "I've attached some paperwork for you to complete as soon as possible: a work agreement outlining expectations, a compensation agreement, and a tax form."

A Okay.

Q So, do you recall, now, whether you received this along with that email, at the time?

A I might have.

D. KETCHAM

Q Okay. Do you recall whether you signed this agreement and sent it back?

A I recall -- I don't recall signing it, no.

Q Okay. This is always tricky to ask. But do you recall not signing it? Or you just don't recall, one way or the other, whether you signed it?

A Well, I just remember a W-4 that I -- a W-4 that I had signed.

Q Okay. This email at the top -- it's dinax3@yahoo.com -- do you still have access to that email?

A "Dinax3," yes.

Q Okay. Did you search it for purposes of this litigation?

A I did. But I -- you know, there was a lot, so -- as you know. I mean, you received a lot from me.

Q Sure. Did you give everything that you found to your attorney?

A Yes. But some attachments -- like, when you -- when you were showing, like, a double email -- sometimes, it

D. KETCHAM

might not -- but I will definitely look.
Q Okay. Did you search for emails between yourself and Mr. Brinnen?
A Some, I did. Mostly, this is what came up when you search on it. You know, it's a very long time ago --
Q Sure --
A -- so, I -- I have, like, 400,000 emails that I have to delete stuff, so -- not everything comes up.
Q Okay. Are you saying you deleted some emails from this time period?
A No. No. I said, I have a lot of emails, personally. Yeah.
Q So, did you search those emails for purposes of this litigation and give --
A Of course.
Q -- the results of the search to Mr. Kataev?
A Of course I did. Yeah.
Q Okay. Very good. You had said a minute ago that you "will take a look."
A Yes.

D. KETCHAM

Q Are you implying that you'll take another look for emails?

A Yes.

Q Okay. Very good.

MR. BOWLES: And, Mr. Kataev -- we'll put it in writing -- I'll call for production of whatever she finds.

MR. KATAEV: Okay.

BY MR. BOWLES:

Q Scrolling back down to page 2 of Exhibit 2, which is the compensation agreement, it says that your compensation is $20 per hour at the time.

Do you see that?

A Yes.

Q All right. This is an agreement -- this is not an agreement for commissions; right?

Did you understand that at the time?

A No, I did not, because I was -- I was told during the interview that I would be getting commission.

Q During the interview with who?

D. KETCHAM

A Kristin Sheeler. She had -- because, obviously, that was -- you know, that was the attractive part of it -- was getting commission -- which was still unclear the whole time I was employed as far as how they came across the idea of what commission was, and how they figured it out. We never saw a document with numbers when it came to -- to commission. And I did point out, when I didn't receive commission, that I was told that I would be receiving commission.

Q You were told --

A And I did -- you know, I was told. Yes.

Q You were told by Ms. Sheeler during the interview that you were to be receiving commission?

A Correct.

Q Did you read this compensation agreement at the time that you received it?

A I didn't receive this at that time yet.

D. KETCHAM

Q Okay. We had asked before whether you received this on or about September 21, 2022, because it appears to have been attached to this email from Mr. Brinnen.

Are you saying you didn't receive it at -- what time?

A That, obviously, I received it after my interview.

Q Okay. That's -- I understand. So, when --

A I received it after.

Q When was your -- that makes sense. When was your interview with Ms. Sheeler?

THE REPORTER: I'm sorry, Counsel --

THE WITNESS: I knew it's --

THE REPORTER: -- could you repeat that?

THE WITNESS: -- it was --

MR. BOWLES: I'm sorry. We were speaking over each other.

THE REPORTER: Yeah, I -- I --

MR. BOWLES: I apologize. I'll ask

D. KETCHAM

again.

THE REPORTER: Thank you.

BY MR. BOWLES:

Q I asked: When was your interview with Ms. Sheeler?

A I would say the beginning of September. It was maybe the first week, sometime, in September.

Q Okay. So, two or three weeks before this email; is that right?

A Yes.

Q All right. When you got this email with the compensation agreement attached, did you read the compensation agreement at that time?

A I might have, but maybe that's why I questioned it.

Q Well, did you write back and question it?

A No. Later on, I did -- yes -- when I was noticing, because commission is every month. So, I was still waiting. So, it wasn't like -- you don't get commission every week -- so, when I

D. KETCHAM

expected to get it, and I didn't get it, that's when I did mention --
Q What were you told --
A -- I don't recall how long that was. I don't recall.
Q My apologies. I interrupted you.
What were you told about commissions? What did you understand the commissions to be?
A I don't recall her giving -- she would just say I would get commission. It wasn't discussed -- that part -- yet, so --
Q So, it was just a vague idea of getting commissions? You didn't have a curve?
A Right. Correct. I didn't really have, you know --
Q How did you first come to know about NIBI?
A Well, I was working in -- you know, I was managing another boutique on Main Street. And the ironic part is -- is

D. KETCHAM

that -- that was -- you know, it was a 1099 job, so I was looking for something to be on-the-books with benefits, ironically.

And so, Teresa -- you know, she was a couple doors down; and she mentioned it to me that they were looking for help and -- you know, in the Montauk store. So, it was set up where I had an interview. I went to Montauk. I went to their -- to Kristin's home, and I met her there; and we had the interview, and that's how I came across it.

Q So, you mentioned Teresa. That's Teresa Goncalves?

A Yes. Sorry, I know her as a -- as "Sullivan," so -- yeah. She -- yeah.

Q She changed her name at some point; is that right?

A Correct.

Q Right. So, it was Ms. -- I'll refer to her as "Ms. Goncalves," if you don't mind.

A Yes. No, of course. Of course.

D. KETCHAM

Q Yeah. It was Ms. Goncalves that introduced you to the concept of a job at NIBI; is that correct?

A Yes.

Q And she introduced you to Ms. Sheeler?

A Yes.

Q At that time, what did Ms. Goncalves tell you about working at NIBI?

A Well, from -- I mean, I don't know how long she was there prior to -- to that, to -- but she said that, you know, she knew what I was looking for and, you know, I might be interested in. So, I gave it a shot.

She really didn't say here or there, like -- it was just an opportunity, originally, you know -- you know, something that I -- I was looking for. I had just gotten divorced, and I was looking for -- to get back into the workforce. And it was, like, a step-up from where I was, because there was really no growth there; because I did want to be

D. KETCHAM

on the books with benefits -- which was very important to me -- which is really why this hurts so much.

Q Where did you work before you went to NIBI?

A If you could give me a moment, please.

MR. BOWLES: Sure. Why don't we take a break? Five minutes?

MR. KATAEV: That works. Thank you.

MR. BOWLES: 11:55.

THE REPORTER: All right. So, it's 10:59 a.m. Off the record.

(Off the record.)

THE REPORTER: It's 11:05 a.m. On the record.

MR. BOWLES: Thank you.

BY MR. BOWLES:

Q Ms. Ketcham, you doing all right?

A Okay. Thanks. Yep, I'm good. Yes.

Q Good. All right. I had asked you, before you went to work for NIBI --

D. KETCHAM

which we've established was in September of 2022 -- where were you working?

A Peace, Love, and Hamptons. It's a -- it's a lingerie/pajama boutique in Westhampton Beach.

Q What a cool name.

A Yeah.

Q How long did you work there?

A Oh, geez. Maybe a year.

Q All right. Did you leave on good terms?

A Oh, yeah. She was sad for me to go.

Q Who is the "she" you just referred to?

A The owner.

Q And what's her name?

A Annie.

Q What's her last name?

A Is that relevant?

Q Yeah, I get to ask things like that. What's her last name?

A I don't know. It's -- you know, she's from Czech Republic, so I would have

D. KETCHAM

to look into my phone to tell you how to say it.

Q Do you know how to spell it?

A No, not really.

Q Okay. I'll call for production --

A It was a while ago. I mean, that was --

Q I understand. I'll call for production of that name after the deposition.

A Okay.

Q All right. So, you said that when you started working in September of '22, you were working at the Montauk store; is that right?

A Between Montauk, and I was covering in Bridgehampton as well.

Q Okay. Where did you live at that time?

A Westhampton.

Q Okay. Did you ever live at Ms. Sheeler's home in Montauk?

A Did I ever -- I'm sorry?

D. KETCHAM

Q Did you ever live at Ms. Sheeler's home in Montauk?

A Live?

Q Yes.

A No.

Q Did you ever use that home for any purpose?

A She told me that I was welcome to -- and I did, a couple times, for the drive -- but it wasn't very suitable for -- you know, I had -- it wasn't suitable for me.

Q Okay. Did you stay there sometimes?

A A couple times, I did. Yes.

Q Just twice?

A I don't really recall if it was more than that. I couldn't say that it was more than twice. The WiFi wasn't -- wasn't very good. It just wasn't -- it's not something I would have done anyway. So, I just did it just, you know, for the travel, but it didn't work.

Q Okay. I understand. I am going

D. KETCHAM

to turn to -- sorry, I'm going to return to Exhibit 1, which is the complaint in this matter; and I'm going to walk you through some questions about the complaint.

Paragraph 29 says you "were assigned by Defendants to their stores in Montauk and Bridgehampton." So, that's consistent with what you just told me; correct?

A Yes.

Q And your agreed-upon wage was $20 an hour; correct?

A Yes, at the time.

Q Yeah. And then, paragraph 30 says, during your interview -- which we've established was with Ms. Sheeler -- you were "informed by Defendants that you would receive a commission," but you "didn't begin receiving it until Plaintiff Ketcham brought it to the defendants' attention."

Do you see that?

A Yes.

D. KETCHAM

Q When did you bring it to their attention?

A Don't really remember. I mean, I probably -- if it was a month or two months, maybe. I'm not sure, a hundred percent.

MR. BOWLES: I'm going to put on the screen a document I'll ask be marked as Exhibit 26. For the record, this appears to be a two-page document. It appears to be an email for Mr. Brinnen to Ms. Ketcham, and it bears Bates numbers starting with D-164.

(Exhibit 26 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this document before?

A Yes.

Q Did you receive it at the time? May 17th of 2023?

A Yes. Because after -- yeah. They agreed that, I guess, I wasn't getting commission.

D. KETCHAM

Q Right. And so, just to be clear, the name is Dina Ketcham-LaRocca at the top?

A Well, it's -- yes, I use both.

Q Okay. I understand. But that is you? That's a reference to you; is that right?

A Yes.

Q Okay. Scrolling down to the second email in the string, this is an email from you, dated May 16th of 2023. And it says "When I was hired, I was told I was getting commission."

Do you see that?

A Mm-hmm.

Q Was that a "yes"?

A Yes. I see it. Yes.

Q Yeah. So, is this when you raised the issue that you weren't getting commissions?

A Probably. I guess, if that's what it says. I mean, I just couldn't -- I don't recall, like, how long it was before -- or after -- because I started in

D. KETCHAM

September; and then, as time went on, like, we weren't very busy. So, it wasn't, like, you know --

Q Well, he says, in his response email, "This year, you are definitely in the commission program and should start getting commissions at the end of each month, based on your utilization category."

Do you see that?

A Yes.

Q All right. Did you start getting commissions after getting this email?

A I believe so.

Q Okay. So, I'd asked before about how the commission structure worked. And you said, at the time of the interview, it was vague. You just had commissions, but didn't understand exactly what.

So, how did the commission structure ultimately work?

A I have no idea. I still don't

D. KETCHAM

know. I don't know. As -- though, I don't think anybody at NIBI knows -- only because there's no percentage. There's no -- there's a percentage that they say; but based on the numbers, I couldn't tell you.

Q Okay. But you did get some money from commissions; is that right?

A Yes.

Q Okay. Returning your attention to Exhibit 1, which is the complaint, and scrolling back -- we're just setting the timeline here -- paragraph 13 says you were "employed by Defendants in the State of New York from September of 2022 to December 31, 2024."

Do you see that?

A Yes.

Q Is that accurate?

A Well, that was the last time I worked -- or, that was the last time I worked. But there was nothing where -- like, I wasn't terminated. Like, we were still in the agreement that Westhampton

D. KETCHAM

Beach was going to reopen; so that was the last date that I actually worked, I think.

And then, I was still employed by them. I was just -- like we -- like I said before, we had the discussion about what we were going to do move forward. And they wanted me to stay on; and we agreed that I would go to unemployment -- which they kind of looked at me a little odd, like that.

But that was the agreement; so I was never really terminated, and I never really quit, so -- if that makes sense. And -- but that was my last day actually working there.

Q December 31, 2024, is the last day you worked there? That's fair; right?

A Around or about. Maybe it was January 1st. I don't know, but -- yes, I mean --

Q Okay. I mean, this is your allegation in the complaint.

A No, I know. I know.

Q You're not disagreeing with it;

D. KETCHAM

right?
A No.
Q Okay. Okay. Returning to paragraph 28, you said you worked about 50 hours per week; right?
A Mm-hmm.
Q Is that a "yes"?
A Yes, in high season. Yes. But it varied, you know, like I said. Approximately. It varied, so I couldn't --
Q Sure. Paragraph 33 of the complaints says that you "observed that your overtime pay was not being accurately computed and took screenshots of your clock-ins."
Do you see that?
A Yes.
Q So, tell me what's going on there.
A So, you know, I was leaving at, like, eight o'clock at night sometimes. And then, I -- I'm like, "This can't possibly be." So, I had, like, a

D. KETCHAM

suspicion. Like, I generally -- I mean, as you saw, all of those clock-in/clock-outs, like, I -- I couldn't understand, because I was -- you know?

So, basically, yeah. I -- I took some of the screenshots just so I had a record, which I really haven't -- you know, I don't know -- like, he did -- yeah. I -- that's why. I -- I don't know what else to say, other than I had a suspicion that I didn't feel like it was accurate.

Q Okay. So, let me make sure I understand your suspicion. Did you think that you weren't getting paid for the time you clocked?

MR. KATAEV: Objection to form.

You can answer.

THE WITNESS: It -- I was -- I wanted to keep track, and -- yeah. I mean, I -- I was, yeah. I -- it was just so many hours that I just couldn't understand. And also, like, if I did go over, and it -- if I did go over, because there was,

D. KETCHAM

like I said, times where I didn't have lunch -- whether or not I told Jim or not, I don't quite recall -- but it just didn't add up to me.

BY MR. BOWLES:

Q When did you start taking pictures of your clock-ins?

A About -- I don't know. It was mainly when I was, more or less, in Westhampton -- when I was working in Westhampton Beach.

Q All right. Do you know about what month and year that was?

A No. It must have been, like, this -- sometime in the summer of 2023 or something like that, maybe --

Q Let me just ask this differently. So, you took pictures of your clock-ins and clock-outs from time to time; is that right?

A Yes.

Q All right. And I will represent --

A Not every --

D. KETCHAM

Q I'm sorry?

A Not every time, but -- yes.

Q I understand.

I will represent, for the record, that your counsel has produced a bunch of these pictures of a computer screen to us. We'll look at a few of them later.

Have you produced all of the clock-ins/clock-outs that you took pictures of to your attorney?

A There was so many. I don't even know if -- like, if it -- I would assume so. But there were so many that -- yeah, I would assume that he received all of them. The intention was to send him all of them; but like I said, it was such a large document that I hope he did receive all of them.

MR. BOWLES: Okay. To the extent they haven't been produced to us, I'll call for their production.

BY MR. BOWLES:

Q All right. So, you started

D. KETCHAM

taking pictures of your clock-in and clock-out time. Did you compare those to your pay statements?

A I was so busy, I really, honestly, didn't. It was just, like, in the back of my head. At some point, I would have, but --

Q Okay. Do you recall if you did, or did not?

A No. My intention was to, but I did not. No.

Q Okay. So, you took the pictures. Did you do anything with them besides ultimately give them to your attorney?

A It was just -- no, it was for my records.

Q Did you take the pictures because you planned on suing NIBI, or just to check?

A No, it was just to check to see if it was accurate.

Q All right. You said you didn't take them every day; is that right?

D. KETCHAM

A Correct. I would -- yeah. It wasn't intentional, it was just -- yeah. I didn't do it every day.

Q Okay. Did you complain to anyone about not getting paid for all your hours worked?

A Yes, I had mentioned.

Q To whom?

A I definitely mentioned it to Natalie and Cathy. Yeah, I --

Q Did you complain to anybody --

A -- and maybe Hanna. What?

Q I'm sorry. Go ahead.

A Maybe Hanna.

Q Okay. Did you complain to anyone in management at NIBI about not getting paid?

A Well, Cathy is a manager, but it wasn't -- it was just a discussion. And the same thing with Natalie: It was just a discussion.

Q Okay. Did you have regular days of the week off?

A Yes.

D. KETCHAM

Q What days?

A I believe there were mostly -- you know, when I was in Westhampton Beach, I believe they were Tuesday and Wednesday. But when I was working in Montauk and Bridgehampton, I would cover Cathy's days off; and those were Tuesday and Wednesday. So, I don't really recall what my days off were. I don't recall.

Q What work did you do at the store? And let me divide this up.

So, when you said you were an associate, you said you just did retail work. You worked with customers; is that right?

A Yeah. I mean, I cleaned. I had to do inventory; prep the clothes before we opened; and -- and when we closed, I had to stay after and do that; steaming. It's all prep work. It's not just -- you know, it -- the hours just don't fall in when the store opens and when the store store closes. You're prepping before you open and making sure all the sizes are

D. KETCHAM

out, and -- and the same thing when you're closed.

Q Okay. Did you work there at the store with other people? Or were you by yourself?

A At Montauk and Bridgehampton, by myself, usually; occasionally, Natalie. I would be working with Natalie in Montauk, and I did inventory with Natalie in Montauk.

Q Tell me about the inventory. What was involved in keeping inventory?

A Just scanning; you know, getting all the merchandise. Kristin has, you know, the basement where she stores all her inventory that goes to the other -- you know, to Westhampton and -- and Bridgehampton or whatever. So, I just basically -- yeah. Just, you do the inventory where you count each piece -- each collection -- and you make a count.

Q Was there one inventory for all three stores?

A No, I believe everyone did it

D. KETCHAM

separately.

Q Okay. So, you were just responsible for the inventory for -- which store?

A Well, when I was in Montauk, I helped do the one in Montauk. And then, even -- and then, Bridgehampton, I -- that was Cathy. And then, I don't recall having to do Westhampton. I don't know that -- I don't remember that. I can't say that I remember if I did the inventory there. I might have did the counts, but I might have -- I don't remember about that.

Q Was there ever a complaint from NIBI that inventory was missing?

A The inventory was always off, in general; and it had a lot to do with their computer system. So, it was -- it would be, like, you know, between the stores -- "Who has what?" -- and that's why a lot of the transporting went to the stores. "Oh, I don't have this size"; "A customer needs that size."

So, it had to do a lot of --

D. KETCHAM

whatever was going on with their computer system, because inventory was always, always off; and we couldn't figure it out, and we didn't know why.

Q I understand. All right. Returning your attention to Exhibit 1, which is the complaint, paragraph 34 says "In the summer of 2023, Plaintiff Ketcham complained to Defendants for not getting paid for several weeks."

Tell me about that.

A Okay. So, that was -- I would assume that was on the off-season. Like, all of a sudden, you know, they weren't as busy. She did say my hours would go down a bit; but to the point where she told me, "Oh, are you sure you don't want to take a vacation?" "Why don't you take vacation," or "this or that," which is -- I didn't get paid for.

I went several -- I went weeks without getting hours; and I -- she knew I needed hours. Like, I wasn't -- I wasn't hired as a seasonal. I was hired all-

D. KETCHAM

year-round.

Q What was the low season, and the high season, for NIBI?

A I would say, like, after -- like, after New Year's -- like, January, February-ish -- and then, I mean -- the low season, March -- not until -- the high season didn't really start until after the holiday in May.

So, it was a long gap in between. She tried to fulfill it, but I was like, "I need hours," you know? I mean, I wasn't hired seasonally -- I never was, so -- yeah. That was a little bit of an issue.

Q Okay. To make it clear about the allegation now, what you're saying is: They weren't giving you enough work to satisfy you; is that right?

MR. KATAEV: Objection to form.

THE WITNESS: Well, I would complain that I don't have enough hours, and --

BY MR. BOWLES:

Q Okay. But your allegation in

D. KETCHAM

paragraph 34 is not that you worked several weeks and didn't get paid; it's that you weren't working for several weeks.

A That, and -- well, the beginning, when I first started -- yeah, that might have been it -- but in the beginning, when I first started in 2022, I didn't get my paycheck right away, no. That was a couple of weeks.

Q Okay. But I'm focusing on summer of 2023.

A Yeah.

Q You complained to Defendants for not getting paid for several weeks. What you're saying there, is that you didn't get to work for several weeks; is that right?

A I don't recall.

Q You don't recall what this allegation means?

A No, I do. I'm trying to -- in my head, I might have been thinking about May -- I don't know -- of the summer of

2023.

Q Okay. But I'm just trying to pin this down.

A No, I get it.

Q Paragraph 34, you say you "didn't get paid for several weeks." And then, I asked you about that; and you said they weren't giving you enough hours.

Was that your complaint? They weren't giving you enough hours?

A Yes.

Q Okay. Thank you. Paragraph 36 of Exhibit 1 says "In 2024, you interviewed applicants for the Defendants," but, in substance, you "weren't paid for your time spent interviewing the applicants."

Do you see that?

A Yes.

Q Tell me about that.

A Well, I had to meet before the store opened, which didn't allow me to clock in, so -- yes. I met this girl, Maria, which by the way -- well, I won't

D. KETCHAM

get into that.

Maria, I met her at a coffee shop to interview with her. Yes. And then, there were a few others that I had to -- but, Maria, I was there with her to interview before work. Yes.

Q Okay. Do you -- so, you didn't clock in for that time; is that right?

A No. The store -- I wasn't working. I wasn't in the store yet.

Q Yeah. And let me just make sure --

A I was --

Q I think I understand how this works, but I want to make sure.

So, there was an actual POS system in the store that you would clock in and clock out; is that right?

A Yes.

Q So, you didn't do it on your phone or something like that? There was a physical station in the store that you walked to, and you clocked in and clocked out?

D. KETCHAM

A Right. Yes.

Q Okay. So, when you were doing something before your clock-in that day, how would you record your hours?

A I just took a mental note. And I knew that I was meeting someone at this time -- which Kristin was updated on what time I was meeting this person -- and she knew when the interviews were happening.

Q Okay. And then, after the interview, did you tell somebody at NIBI that you worked an extra half-hour, for example?

A Well, she knew where I was and what I was doing.

Q So, is that "no," you didn't?

A Not specifically, because she had known I was already there.

Q Okay. Did you email, or text that you worked the extra amount of time that the interview took in each of these cases?

A No.

Q Okay. Do you know, sitting here

D. KETCHAM

today, how many hours you didn't get paid for because you were interviewing applicants?

A I don't recall how many there was. You know, during the summer months, we -- you know, there was girls that came by that I spoke with, or I talked to. I don't recall how many hours. No.

Q Okay. Do you have any records of those meetings and interviews?

A Just, like, Maria, I do. And then, there was another woman that I met. She lived in Manorville, so I had to meet with her at a -- you know, I met with her at a coffee shop and did that interview.

I was in communication with Kristin during that interview, so -- you know, I had to go the next town over -- you know, travel a little bit -- to go to that interview, because that's where she lived; and she didn't have a car --

Q I'm sorry to interrupt you, Ms. Ketcham, but my question, very specifically, was: Did you keep any

D. KETCHAM

records of those interviews?

A The record would be -- if I text Kristin -- I don't -- if I text Kristin that I was going here, or there, or whatever, that would be my record.

Q Okay. Did you produce all the copies of those records to your attorney?

A I -- I -- for those two. The others, I -- actually were along Main Street, so I didn't really keep a record of that. No.

Q Okay. To the extent you have records of those interviews for which you didn't get paid, did you produce those records to your attorney?

A Whatever I had, I did.

Q Very good. Thank you.

MR. BOWLES: And again, I'll call for production to the extent they haven't been produced already.

BY MR. BOWLES:

Q All right. I'm going to direct your attention to paragraph 49 of Exhibit 1, which is the complaint. The allegation

D. KETCHAM

is "In retaliation for Plaintiff Ketcham's complaints concerning wages, Defendants reduced her hours of work, resulting in her constructive discharge."

Do you see that?

A Yeah.

Q Tell me what that means.

A Well, I -- you know, I had let them know that I needed the hours. I mean, they -- and they just didn't give them to me. And that was after -- after the fire. And --

Q What's --

A -- I was supposed to go to, you know, Unemployment. But Kristin knew that I was having a hard time getting unemployment; and it was very strange, because she didn't contact Unemployment.

So, when I told her that "I need these hours; I can't do it," you know, she not only didn't, like, contact Unemployment to make sure that I got that time, but then she didn't give me the hours, either.

D. KETCHAM

Q Okay. But let me try to break this down. First of all, you mentioned a fire. Tell me about the fire.

A So, I was home; and I got a friend of mine who's in -- you know, I guess he gets the alerts because he's a retired fireman -- showed me that the store was on fire, and --

Q Which store was that?

A The one in Westhampton. It came through, and it had to be, like, five o'clock in -- or six in the morning -- very early in the morning -- and I was, like, obviously startled. And I called Jim right away, and there was no answer.

And then, finally, I guess I got in touch with him and I went down there. He asked if I could go down there and meet with the commissioner -- or meet with people -- because he wasn't there yet. And I was like, "Of course, I will," and I went down there. And I was told -- you know, the -- they were, it was a fire. They were putting the fire out.

D. KETCHAM

It was a little bit of mayhem. There was, like, an insurance person there, and -- I don't know if, like, he was a broker -- and he's like, "Oh, don't worry about it," you know, "they'll -- they'll have insurance," because they thought I was the owner, because they weren't available. Kristin was away; Jim was in the city or something.

And then, they asked me to just go down there, see if everything was okay; take pictures; that kind of thing -- and I did -- and obviously, that was -- I couldn't clock in on that day, and --

Q Sorry.

A -- but -- so, I did what I was told. And I had them on FaceTime so they -- they could see the damage and all. And like I said, I spoke to an insurance broker, because they thought that I was the owner -- and I was not; I was the manager -- and they're like, "Ph, don't worry about it. The insurance should take care of all of this," and -- you know, it

D. KETCHAM

was kind of, like, a little alarming, you know? And --

Q Okay. I understand --

A -- and so --

Q I understand that was --

A Yeah. And so, they finally did come. And we were talking about it and, you know, it's just like I said. You know, whatever they needed me to do at the time, I did. And Kristin looked at me; and she goes, "Oh, I don't know what you're going to do." And I'm like, "All right. That's a really odd thing to say. Your store's on fire, and you're telling your manager that 'I don't know what you're going to do'" --

Q Well, let me --

A -- I found that very odd.

Q Let me ask some specific questions about this.

A All right.

Q So, this was October 25th of 2024. Does that sound right?

A Yes.

D. KETCHAM

Q Okay. And this is at a time when you were a manager of that store; is that right?

A Yes.

Q Okay. Now, are you saying that after that time, they didn't give you sufficient hours to work at NIBI?

A Correct.

Q And when you say that you had a complaint in paragraph 49 of the complaint -- Exhibit 1 -- "retaliation for Plaintiff Ketcham's complaints concerning wages," was your complaint that you weren't getting sufficient hours?

A Well, yeah.

Q Yeah. You didn't have a store to manage after that; is that right?

A No, but in -- I've always worked in all stores, you know? I've always worked in the Bridgehampton and Montauk as well, so --

Q Okay. So --

A -- it's not like I was -- you know?

D. KETCHAM

Q So, it says here that "Defendants reduced your hours of work." Your hours of work were reduced because the store burned down. Isn't that right?
A I was -- I went into Montauk, and I went into Bridgehampton as well.
Q Right. But after the store burned down, you had fewer hours to work; correct?
A If the store wasn't there. But like I said before, I've always worked in other locations.
Q Sure. But you didn't have a store to manage at that point; right?
A No, but that didn't --
Q You were manager of Westhampton, and the store burned down. Isn't that why your hours were reduced?
A I don't see why -- I could have worked in the other locations.
Q Okay. Is your --
A That's my point: I could have worked in other locations.
Q Is your testimony, under oath,

that you can't see any relationship between the store you were managing burning down, and your hours being reduced?

A After the store burnt down, I was working in both Bridgehampton and Montauk.

Q Yeah. Those places already had managers, didn't they?

A Yes, but I didn't have to be a manager.

Q Okay. All right. So, you didn't get enough hours after the store burned down? That's your testimony; correct?

A Yes.

Q And you complained about that; right?

A I did, but I also complained about hours that I didn't get on the off seasons. So, it wasn't just about the store being burnt down; I also complained about not getting hours during the off season.

D. KETCHAM

Q But your complaint was that you weren't getting enough hours; is that right?
A Yes, but not designated to the fire. It was designated also to the off season --
Q I want to --
A -- which I was an associate.
Q Sorry to interrupt. But we did lose your camera.
MR. BOWLES: Can we get that back?
THE WITNESS: Oh, how do I get that back? I don't know.
MR. BOWLES: We'll go --
THE WITNESS: It just went off on its own?
THE REPORTER: I'm going to send something. It'll say "yes" to start video. And then --
MR. BOWLES: Yeah. Can we go off the record for a second while we fix it?
THE REPORTER: Yeah.
(Discussion held off the record.)

D. KETCHAM

THE WITNESS: Okay. So, the complaint is not just designated for the fire. The complaint is also designated to the -- to the time of the off season, where I didn't get hours.

BY MR. BOWLES:

Q Okay. But again, your complaint in paragraph 49 that you refer to -- you refer to "Plaintiff Ketcham's complaints concerning wages" -- your complaint was that you weren't getting assigned enough hours; is that right?

A Yes.

Q Okay. And then, you say Defendants "reduced your hours of work, resulting in constructive discharge."

Do you know what is meant by that sentence?

A Yes, I do know what that -- is meant by that sentence; but it wasn't just because of that situation, is my point.

Q Okay. All right. I think we've got it. Thank you.

Did anyone at NIBI ever tell you

D. KETCHAM

that you were terminated from your job?
A No.
Q Okay. Is it fair to say that your work just trailed off until you stopped working?
A I didn't -- no. I mean, to be honest with you, I still have the keys to the stores. They never asked for them back.
Q I think I should ask for those back now.
A I'll -- I'll give them.
Q Thank you. All right. You worked until -- well, strike that.
Your last day was December 31st of 2024; right?
A Yes.
Q Okay. At that time, where were you living?
A Westhampton Beach.
Q Do you still live in Westhampton Beach?
A I mean, Westhampton. Westhampton, sorry.

D. KETCHAM

Q That's all right. Do you still live in Westhampton?

A Yes.

Q Okay. All right. Did you take any documents from NIBI with you when you left the company?

A No.

Q Did you make copies of any internal documents?

A No.

Q You took with you, at least, your screenshots -- right -- of your time; right?

MR. KATAEV: Objection.

THE WITNESS: Well, that was on my phone.

BY MR. BOWLES:

Q Sure. Did you have anything else on your phone that were copies of company documents?

A Other than what you presented to me of their emails of my employment? No.

Q All right. Did there ever come a time when Kristin Sheeler contacted you

D. KETCHAM

about more work at NIBI?

A She asked me to cover Cathy.

Q When was that?

A Cathy goes away in March. And that was of -- that was after the fire -- of 2024, I guess.

Q So -- let me see -- your last day -- well, strike that.

So, that was in 2024 she asked you to do more work. Did you do the "more work"?

A Well, there was a confusion, because Cathy had told me she wasn't going away. So, I responded to Kristin, because I was -- I was Upstate. I don't know -- my daughter went -- was in college in West Palm.

So, I was there, and I think -- I don't know if she contacted me then, or it was in March -- but I responded that I could do the last couple of weeks in March, because I was Upstate New York, because I have property there; and I was having my trees harvested.

D. KETCHAM

So, I mean, I wasn't working all that time; but now, it was convenient for her to ask me to work, even though I went two months without working because of the fire --

Q I'm going to put on the screen --

A -- or whatever that was.

Q I'm sorry to interrupt you.

MR. BOWLES: I'm going to put on the screen document I'll ask be marked as Exhibit 30 for this deposition. For the record, this appears to be a one-page text document that bears Bates numbers D-225.

(Exhibit 30 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this document before?

A Yes.

Q This is a text exchange between you and Kristin Sheeler; is that right?

A Yes.

Q "Yes"?

D. KETCHAM

A Sorry, I don't -- yeah. I'm trying to remember.

Q Yeah. So, this is after your last day of work, because you -- we established your last day of actual work was December 31st of 2024; right?

A Mm-hmm.

Q Is that a "yes"?

A Yes. Yes.

Q And in the first paragraph --

A Where -- it's --

Q I'm sorry. In the first paragraph, is Ms. Sheeler asking whether you can work at Bridgehampton?

A Yes.

Q And it says --

A In March. In March.

Q In March. Correct; right?

A Yes.

Q Yeah. And you say you're "in Ohio right now. I'll take a look"; right?

A Yes.

Q All right. Did you take her up on the work offer?

D. KETCHAM

A Later on, I had text her and said, "I can do the last two weeks," and she never got back to me.

MR. BOWLES: Okay. I'm going to put up on the screen a document I'll ask be marked as Exhibit 31.

(Exhibit 31 was marked for identification.)

BY MR. BOWLES:

Q All right. This looks as though it's a continuation of the email exchange; correct?

A The "email exchange"? You mean the --

Q Sorry. The -- I said that wrong. We'll strike the question.

This looks as though it's a continuation of the text messages that were Exhibit 30; is that right?

A Yes.

Q And Ms. Sheeler asked, "Wanted to see if you are still coming back once the store opens again. Let me know."

Do you see that?

D. KETCHAM

A Yes, but I did not -- at that time, I did not see it until much later, even though -- so, I'm not sure the date when I saw it is correct. I was in Ohio. It's -- just wasn't -- so, even though she sent it that date, I recall not seeing it until much later; and I did respond.

MR. BOWLES: Okay. I'm going to put on the screen a document I'll ask be marked as Exhibit 32. For the record, this appears to be a continuation of the text exchange, I believe. For the record, it bears Bates numbers D-223.

(Exhibit 32 was marked for identification.)

BY MR. BOWLES:

Q And can you tell me if I'm right? Is this your response to the text exchange?

A Yes. "My one daughter is in Ohio. My other daughter is in Florida." Yep.

Q Okay. And, ultimately, did you do any more work for NIBI after this?

D. KETCHAM

A No. She never responded when I said that; and I told Cathy. I said -- I text Cathy; and I told her, "I responded, but she never got back to me."

Q Did Ms. Sheeler call you to talk about work?

A No. No, I told her I can do the last -- and she never responded to me. And then, that's when I spoke to Cathy; and maybe that was the time they decided not to reopen Westhampton Beach. I don't know. That's not something I can say.

Q I understand. Okay. I'm going to turn your attention back to Exhibit 1, and we're going to go to paragraph 50.

Paragraph 50 says "When Plaintiff Ketcham applied for unemployment, Defendants lied to the State of New York concerning her actual compensation paid in order to reduce her unemployment benefits."

Can you explain that allegation?

A That I wasn't an employer. They never --

D. KETCHAM

Q "That you were not an employer"? Is that what you just said?

A I mean -- yeah, I -- employee. I mean, I wasn't an employee. Like, when I had went to Unemployment, they said I wasn't an employee. So, they lied, saying that I would be able to collect unemployment, when they didn't pay the unemployment benefits.

Q Okay. So, let me break that down. You applied for unemployment; correct?

A Mm-hmm.

Q Is that a "yes"?

A Yes. Yes.

Q Do you have a copy of the application?

A You do it on the computer. There's no application. You have to do it on the computer in the office that's not really the Unemployment office. I don't even -- yeah. It's something that's on their computer.

Q Okay. You went on a website

D. KETCHAM

somewhere, and you applied for unemployment? Is that fair?

A Yes.

Q Do you know what agency it was?

A It was in Patchogue. It -- it's just basically a building you go to that provides you the service of using their computers that sets you up for unemployment. And then, you put all your information in; and then, you're supposed to get -- you get a code. And then, you have to call the next day -- or a couple of days -- and call that number.

And then, every time I did it, it said I wasn't qualified. And I did it three times, and then finally spoke -- when I went there the third time, I had to wait to use the phone -- you sit there; there's a bunch of phones -- and wait for someone to pick up.

Finally, I got someone after waiting, like, an hour -- because you could wait up to two or three hours for someone to get on the phone -- for them to

D. KETCHAM

tell me that I'm not listed as an employee.

So, yes. They did lie. They lied, saying I would be able to collect unemployment; and they never even paid my unemployment benefits for me to do so.

Q I want to understand exactly what you did. So, you said you went to an office in Patchogue?

A Patchogue, New York. They have -- they have a location that you go to.

Q Okay. So, it is an unemployment office that you went to in Patchogue, New York?

A Right.

Q Okay. And do you have any copies of any documents, any records relating to you going there?

A Yeah. I think I provided what they -- what they do is they -- because I wasn't -- I said, "Well, what do I do?" And he says, "Well, you'd need to report them"; and then, they have a fax machine,

D. KETCHAM

or -- that spits out the information for you that you collect, and -- yes, I gave it to my lawyer.

Q Okay. Let me make sure to write this down. So, you did get some records of applying for unemployment at the Patchogue office; correct?

A The records that I have was them giving me a form to fill out that -- to report my employer for not having unemployment benefits.

Q Let me ask it a different one.

A That's what it is. I don't know. That's -- I mean -- I didn't take a screenshot of that. I don't know if it's on a computer.

Q Okay. Let me -- I'm going to ask it a different way.

Do you have any documentation in your possession relating to your application for unemployment?

A The forms that I had, I've already given.

Q And when you say "you've given,"

D. KETCHAM

you gave them to Mr. Kataev?
A Right.
MR. BOWLES: Okay. All right. Good. So, I'll call production of those documents, please.
BY MR. BOWLES:
Q Okay. Very specifically, what is your evidence that "Defendants lied to the State of New York," as you allege in paragraph 50?
A Well, they didn't file me as an employee, so -- that is -- isn't that a lie?
Q Well, what is your evidence of what they told the Department of Labor, for example?
A Ask that question again, please?
Q You say that they lied. I want to know your evidence to support the idea that they lied.
A Well, the evidence is that I wasn't able to collect unemployment, number one. Number two, the evidence is that I have a social security document

D. KETCHAM

that says my social security wasn't paid. And I know that they've known this for a very long time.

So, basically, they're not just lying to me; they're lying to every employee that they've had, because they have not filed them as employees of their company. This is not -- this is -- there is documentation. I mean --

Q What is that documentation?

A I have this social security -- where it says that my social security wasn't paid. I have --

Q Well I'm focusing on unemployment right now, Ms. Ketcham. Is there any other evidence, besides what you've already given to Mr. Kataev, relating to this unemployment issue?

A If you're not filed as an employee of a company, you're not going to be able to collect unemployment. That's not a document. That's --

Q Okay. Did you file a claim --

A -- law.

D. KETCHAM

Q Did you file a claim with the Department of Labor for unemployment?

A Not yet.

Q Not yet?

A Not yet.

Q Okay. Okay. Were you -- did you get employment after you left NIBI?

A Eventually, yes.

Q When did that happen?

A That was the last -- when did I start? I started in May. Last week in May.

Q Of what year?

A What are we at? In twenty-twenty -- God, it's been four -- we're in '26; right? 2025.

Q Okay. So, your last employment with NIBI was December 31st of 2024. And you're employed again in -- did you just say May of 2025?

A Yes.

Q What is your new employment?

A I manage a fine jewelry store.

Q What is the name of that store?

D. KETCHAM

A I'm actually reluctant to say where I work, because -- I'm sorry to say, but -- Kristin has known to be harassing, and -- to the workplace that other people are employed by.
Q Well, just --
A So, I am very reluctant to answer that question.
Q I know. But I'm asking you the question; please answer it. Where do you work?
A Carelle Fine Jewelry.
Q Thank you. And where -- what's the address of that place?
A Bridgehampton.
Q Do you know the address?
A Bridgehampton, New York.
Q Do you know the physical address?
A What is it -- 2121 --
Q I'm sorry?
A 219?
Q I didn't understand you.
A 219.

D. KETCHAM

Q 219 -- what?

A Montauk Highway, Bridgehampton. But like I said before, I am reluctant, because she is known to be harassing.

Q Just aside --

A I'm just putting that on the record.

Q -- since you're making a claim regarding unemployment, these are the kinds of questions I need to ask you.

So, what --

A Okay. Then, it --

Q What is --

A -- not relevant.

Q -- your job there?

THE REPORTER: Could you repeat your question, Counsel?

BY MR. BOWLES:

Q What is your job there?

A I manage the store.

Q All right. And are you salaried, or hours?

A Salary.

Q What's your salary?

D. KETCHAM
A And what is the reason for that?
MR. KATAEV: Objection to relevance.
You are required to answer the question --
THE WITNESS: Okay.
MR. KATAEV: -- even though it's irrelevant, so --
THE WITNESS: Yeah. 1400 a week.
BY MR. BOWLES:
Q All right. Has it been that salary since May of 2025?
A Yes.
Q Okay. All right. Returning to NIBI, I asked you how you keep time there. And we've established that there was a timekeeping system that was a POS -- point-of-sale system -- where you clock in and clock out; correct?
A Correct.
MR. BOWLES: I'm going to put on the screen a document I'll ask to be marked as Exhibit 3.
(Exhibit 3 was marked for identification.)

D. KETCHAM

BY MR. BOWLES:

Q You'll be relieved to know we're not going to go through all of these, but I'm going to ask you a couple of questions about some of these documents.

For the record, this appears to be a photograph of the type that we have discussed before. I believe this is where you were taking pictures of your clock-in and clock-out. This is a single-page document bearing the Bates number P-1 at the bottom.

Have you seen this before?

A Yes.

Q This one of the pictures that you took of your clock-in and clock-out?

A I can't see it fully where it says my name, but --

Q Is that better?

A Okay. It might be one of them.

Q Right. I mean, is it one of them?

A I would assume that it is.

Q You took --

D. KETCHAM

A But I'm not --
Q -- this picture; right?
A Yes.
Q Okay. Does this --
A But usually, on the -- I'm sorry. Go ahead.
Q Go ahead.
A No. Usually, I would see my name on the -- on the very top of it. And I don't see it, so --
Q Okay. In the middle of the screen, under the green "clocked in," three names down, there's Dina Ketcham; right?
A Yes. But there's, like -- I'm referring to something else, but that's okay.
Q Okay. And in the upper left of the screen, it says "10:04 a.m., Friday, August 18th."
Do you see that?
A Yes.
Q All right. So, is this typical of the kind of photos you would take when

D. KETCHAM

you clocked in and clocked out?
A Yes.
Q All right. So, it was your practice to take these pictures when you clocked in and clocked out?
A Not all the time. Not all the time.
Q So, some of the time?
A Some of the time.
Q Right. How did you decide whether to take a photo or not?
A If I remembered; if I didn't -- it was just for my records, that's all.
Q Okay. And you testified before that your intention was to check this against your pay. But you never actually did that; is that right?
A Yes.
MR. KATAEV: Objection.
THE WITNESS: Well -- yes.
MR. BOWLES: I'll put on the screen a document I'll ask be marked as Exhibit 4. For the record, this appears to be a similar document. It bears the Bates

D. KETCHAM

number P-2.

(Exhibit 4 was marked for identification.)

BY MR. BOWLES:

Q At the upper left-hand corner, it says "6:29 p.m., Friday, August 18th." And under "clocked out," you see your name near the bottom of the screen, Dina Ketcham?

Do you see that?

A Yes.

Q And at the top, there's a little ribbon that says "Clocked time was 8:25."

Do you see that?

A I do.

Q Is that the thing you were looking at in the prior picture -- you were looking for in a prior picture?

A Yes. That's what I was looking for.

Q Okay. So, did the POS system then report, on a daily basis when you clocked out, what your clock time was?

A Clock time, but not always. I

D. KETCHAM

mean, obviously, like I said before, things were done before -- or after -- so, it's just when I actually was able to get into the store to clock in, you know?

Q Sure. So, this recorded your clocked-in and clocked-out hours, and that's it; correct?

A Yes.

Q So, if you worked time beyond that, you had an opportunity to inform Mr. Brinnen that you worked extra time; right?

A I mean, it -- I would. And sometimes, it would get ignored, or -- I don't know -- he would check. There's times that, like I said, it was verbal, so --

Q Was it verbal, or a text, or email?

A It was either verbal, or -- if I did -- an email; but I saw him a lot, so --

Q So, was there ever a time when you sent Mr. Brinnen a text or email about your extra time, and you didn't get paid

D. KETCHAM

for that extra time?

A I don't recall.

Q Okay. Is your testimony that there were times that you told Mr. Brinnen that you worked extra hours, and you didn't get paid for those hours?

A Sometimes, when it came to the lunch.

Q So, just with regard to the lunches, then?

A Maybe. I don't really --

Q Okay. But sitting here today, you don't have any records of any time that you informed Mr. Brinnen that you worked extra hours and didn't get paid for those extra hours; is that correct?

A Like I stated before, if I worked before, or after on doing errands, Kristin would be the one that I would talk to. I would assume that Kristin would let Jim know, or -- I mean, like -- like I said before, like, when -- he was -- yes -- in charge of the clock-ins. But if I did it before, or after, Kristin would

D. KETCHAM

be the one I would be talking with -- or texting.

Q Okay. Was Kristin in charge of the payroll, or Jim?

MR. KATAEV: Objection to relevance.

THE WITNESS: That would -- I don't know if it was -- I mean, the emails came in as Jim. But oddly enough, Kristin said that when things come in as Jim, it's sometimes her, so -- I can't really say.

BY MR. BOWLES:

Q Okay. Did there ever come a time that you told Kristin that you worked extra hours and didn't get paid for those?

A Like I said before, I was just under the assumption that she knew, because it would be under her direction to do so.

MR. BOWLES: Okay. Okay. I'm going to put on a screen a document I'll ask be marked as Exhibit 5. For the record, this is another one of these clock-in/clock-out situations. It bears Bates number P-913.

//

D. KETCHAM

(Exhibit 5 was marked for
identification.)

BY MR. BOWLES:

Q Do you recognize this document?

A Yes. I -- could you -- could you, like, just bring it a little closer? Because I don't see --

Q Is that better?

A Okay. Yes. Thank you.

Q All right. So, in this document, it looks as though your name is under the "Clocked In" category; is that right?

A Yes.

Q All right. And this is December 28th at 10:21 a.m.; correct?

A Yes.

Q And you got the green ribbon at the top; is that right?

A Yes.

Q All right. So, does this represent that at 10:21 a.m., on December 28th, that's when you clocked in that day?

A If that's what it says, I

D. KETCHAM

don't -- yes.
Q Well, I'm asking you how the system works, so --
A Yes.
Q -- when you clocked in, in the morning, did it --
A It was -- go ahead.
Q Did it display the little green ribbon that says "Dina Ketcham has been clocked in"?
A Yes. Yes.
Q All right. So, would this be an indication that at 10:21, on December 28th, that's when you clocked in?
A Clocked in. Yes.
Q Okay. And that was the point that you were making; right? You were taking these to show when you clocked in and clocked out?
A Correct.
MR. BOWLES: Okay. I'm going to put on the screen a document I'll ask be marked as Exhibit 6. It bears Bates number's P-914. This is another

D. KETCHAM

screenshot, as we're talking about. This is also December 28th.

(Exhibit 6 was marked for identification.)

BY MR. BOWLES:

Q So, if you refer back to Exhibit 5 -- that was December 28th -- this is the same day, December 28th, 4:19 p.m. And it says at the top, "Dina Ketcham has been clocked out," and the clock time was five hours, 58 minutes, 32 seconds.

Do you see that?

A Yes.

Q All right. So, each day that you clocked out, you get a little green ribbon pop-up that says how many hours you worked; is that right?

A Yes.

Q Okay. Good. And this, again, is a picture that you took; correct?

A Yes.

MR. BOWLES: I'll put on the screen another document that I'll ask be marked as Exhibit 7. For the record, this is

D. KETCHAM

another screenshot. It bears Bates numbers D-553.

(Exhibit 7 was marked for identification.)

BY MR. BOWLES:

Q It bears a date of December 31st, and it says 9:59 a.m. Do you see that?

A No, I -- I'm sorry, you just have to -- yes.

Q Okay. Did I describe that accurately?

A Yes.

Q This is another one of your screenshots; right?

A It is.

Q Okay. Is this a screenshot on your last day of work?

A I don't know what year that is.

Q You don't recall, one way or the other, whether you worked -- you took a picture of the last day you worked?

A I don't -- I don't know.

MR. BOWLES: I'll put on the screen a

D. KETCHAM

document I ask to be marked as Exhibit 8. For the record, this is another screenshot; bears Bates numbers P-555. It appears to have a date of December 31st, at 4:16 p.m., same date as Exhibit 7.

(Exhibit 8 was marked for identification.)

BY MR. BOWLES:

Q It says you clocked out. Do you see that?

A Yes.

Q All right. So, can you tell whether this was the last day you worked?

A There's no year. No. I don't know.

Q Okay. So, you don't know whether this was the last day you worked or not?

A No. You don't have -- if it's -- could be 2022, 2023. I don't know.

Q But it does say --

A I don't know.

Q I understand. But it does say

D. KETCHAM

December 31st and 4:16. So, does this represent you clocking out that particular day, whatever day that was?

A [No audible response.]

Q "Yes"?

A Yes -- which, by the way, I didn't get holiday pay for, probably -- but that's okay.

Q Well, let me ask about that. Do you -- I've asked before, and I want to be specific about this.

Were there days when you clocked in and clocked out, and you didn't get paid for all the hours that you worked? Strike that. Let me ask it again.

Were there days when you clocked in and clocked out, and didn't get paid for all the hours for which you went clocked in and clocked out?

MR. KATAEV: Objection to form.

THE WITNESS: I don't know.

BY MR. BOWLES:

Q Okay. You don't know whether that's true or not?

D. KETCHAM

A I couldn't tell you, because -- like I said, holiday pay -- you didn't clock in and clock out on holiday pay. So, that's kind of my response, so --

Q Okay. Well, this is December 31st, and you clocked in and clocked out; right?

A Yeah.

Q So, what do you mean you didn't clock in and clock out on holiday pay?

A No, I'm saying, like, if I was to get holiday pay, that's not -- it would just come on your -- as "holiday pay." I'm not -- do you understand?

Q I don't. What are you saying about holiday pay?

A Like, I can work a day -- because we got paid holidays, so if I worked the day before, or the day after, I would get holiday pay.

Q Oh --

A So, there's no clock-in and clock-out on -- on that -- on your vacation or holiday pay.

D. KETCHAM

Q So, are you saying --

A But that date, in particular, I see.

Q Are you saying you got paid for a holiday on which you did not work? Or you got paid for a holiday on which you did work?

A No. You can get paid on the holiday day if the store is closed. Like, Christmas, it's closed, but I would get paid if I worked the day before, or the day after. That's my -- that's what I'm trying to say. Same as New Year's.

Q Okay. So, Christmas, I'm pretty confident, is December 25th; right?

A Yeah. I'm just giving it for instance. Yes.

Q Yeah, I know. And I'm trying to work with you on the "for instance."

A Sorry.

Q So, on December 24th, you would work; and you would get paid for the 24th and the 25th? Or just for the 24th?

A I guess -- I'm unsure, because I

D. KETCHAM

didn't always. It was inconsistent, so maybe -- it was inconsistent. Like, sometimes, I did; and sometimes, I didn't, so --

Q Well, I'm trying to understand the concept. This has confused me for a while. So, when you're saying you didn't get paid holiday pay, are you saying you didn't get paid -- for example, for Christmas, December 25th -- when you didn't work that day? Or when you did work that day?

A You -- you don't work on Christmas. Correct. So, I would get -- I was supposed to get Christmas pay if I worked the day before and the day after. So, I -- if you work the day before/the day after, you would get that day --

Q Would you get paid for --

A -- even though you don't work Christmas --

Q -- the 24th --

A -- if you don't work -- I don't know. Like, the 25th is Christmas, so I

D. KETCHAM

guess it would be -- Christmas, is my point, not --

Q Would you get --

A -- Christmas Eve --

Q Would you get paid for the 24th and the 25th?

A If I worked the 24th and the 26th, I would get the 25th.

Q Okay. So, you had to bracket the holiday, and then you would get paid?

A Before and after. Yeah.

Q And then, you would get paid for three days? Or two?

A The three, or I'd get an extra day off --

Q Okay. And is it --

A -- or -- right -- an extra day off or something.

Q And is it your complaint that you didn't get paid for the holiday that was bracketed?

A Well, no, I did not. My last holiday that I worked there, I did not get paid; but previously, I did. So, that was

D. KETCHAM

kind of my complaint, is that I did at one time, and then I didn't at another time. Sorry if that was confusing.

Q It's okay. It is a little confusing but it's okay. So, your allegation is that the policy of the store was to pay you for a holiday, so long as you worked on the day before and the day after; correct?

A I think it was different as it went on for each employee, honestly.

Q Okay. I'll put that aside for now.

A All right.

Q I want to turn --

MR. BOWLES: I'm going to put on the screen a document I'll ask be marked as Exhibit 9. And I'll represent, for the record, that this is a multi-page document beginning with Bates number D-53, and it appears to be a spreadsheet of hours that Ms. Ketcham worked.

(Exhibit 9 was marked for identification.)

D. KETCHAM

BY MR. BOWLES:

Q Have you seen this document before?

A I don't -- somewhat. I don't know.

Q Let me ask it differently. Have you seen this document before this lawsuit started?

A No.

Q So, you've seen it during the course of this lawsuit; is that right?

A The course? No.

Q Well, have you ever seen this document before you're seeing it right now on the screen?

A Yes.

Q When did you see it?

A I don't know. One of the emails, or -- I've gotten so many emails. I don't know. One of the emails that I got.

Q And I don't want to ask you about -- I don't want you to tell me anything about any conversations with Mr.

Kataev.

But am I right that you haven't seen this document outside of communications with him?

A I have not seen this outside of communications with him. No.

Q Okay. When you worked at the store, did you have the ability to look at a document like this, which is a spreadsheet of your hours?

A No.

Q Okay. That's what I was trying to get at. Good. I'll represent for the record that this is a spreadsheet of hours from NIBI's timekeeping system.

I'm just going to direct your attention to the very last entry, where it says "Dina Ketcham; December 31, 2024," which was a Tuesday.

Do you see that?

A I do.

Q And we've established that is consistent with your earlier testimony: that was the last day you worked at the

D. KETCHAM

store; is that right?
A Yeah, I guess.
Q All right. So, I'm going to put back on the screen, simultaneously, Exhibit 5, which we've discussed before was your clock-in --
A Okay.
Q -- and it was on December 31st at 9:59. Do you see that?
A I do.
Q All right. Do you see, that matches the last entry on the other spreadsheet, which is Exhibit 9, that there was a clock-in on December 31st at 9:58? So, it's one minute off.
Do you see that?
A Okay.
Q You do see that; right?
A I do. But, I mean, that could have been done before, or after. I mean, you -- I don't know. I don't know when this spreadsheet was done.
Q Sure. But, again --
A I have no idea.

D. KETCHAM

Q -- my question to you today is: Does it substantially match the information in your clock-in?

A As of right now, yes. As of right -- as you're showing me --

Q Sure.

A -- but I don't know that -- that document was available before this. I have no idea.

Q I agree. And I'm going to show you your clock-out, which was Exhibit 8, was at 4:16 p.m.

Do you see that?

A Mm-hmm.

Q That's Exhibit 8. Do you see that?

A Wait. No. Where are you looking at?

Q Your clock-out on December 31st --

A Okay.

Q -- on Exhibit 8 was at 4:16 p.m.; right?

A Okay.

D. KETCHAM

Q And if you look at the last entry on the spreadsheet, which is Exhibit 9, do you see that the clock-out there is 16:17?

A Okay.

Q All right. So, that is just one minute after your clock-out on your --

A Is that military time?

Q I suppose so.

A Okay. I don't know --

Q Do you --

A Yeah.

Q You understand 16:17 is the same as 4:16 p.m.?

A In the minutes? Yeah.

Q Yeah. Okay. All right. Have you looked at the spreadsheet and compared it to your clock-in/clock-out times?

A No. I didn't have the spreadsheet, so --

Q Well, you've had it during the course of the litigation. Have you compared it to your clock-in/clock-out times?

D. KETCHAM

A I have not, but -- I mean, no, but this is, like -- I don't know where this document came from, so I don't --
Q I understand. But I'm asking whether, during the course of this litigation, have you taken a look at this document to see whether or not it accurately reflects your clock-in and clock-out times?
A I did not.
Q Do you have any basis on which to dispute the clock-in/clock-out times on Exhibit 9?
A Well, you have to realize that Jim is able -- like, if I clocked more hours than I worked -- like, if I miss, or I didn't clock in -- he could go in and change it. So, I have no idea what I'm looking at right now. I don't know if this is coming from the system, or -- I have no idea, so --
Q It shows you haven't gone --
A -- I didn't --
Q You haven't analyzed it? So,

you haven't gone through it?
A No, I -- I haven't analyzed any -- no.
MR. BOWLES: Understood. This might be a good time to take a lunch break. Do you guys want to go off the record and discuss it?
MR. KATAEV: Sure.
THE REPORTER: Okay. It's 12:21 p.m. Off the record.
(Off the record.)
THE REPORTER: It's 1:01 p.m. On the record.
MR. BOWLES: All right. Thank you.
BY MR. BOWLES:
Q Welcome back from lunch, Ms. Ketcham.
A Thank you.
Q Did you ever see a copy of the holiday policy for NIBI?
A Yes, I did. It wasn't -- it was dated for, like, 2024, though. It wasn't dated for 2023, when I started -- or, 2022.

Q Okay. Do you have a copy of that?

A Not in front of me. I don't.

UNIDENTIFIED SPEAKER: And I think that's a valid expense for her RX to go to Sayre, then.

MR. BOWLES: Hang on a second.

UNIDENTIFIED SPEAKER: Can you hear me now?

Great.

MR. BOWLES: Go off the record for a second to --

THE REPORTER: Yes. Yeah. It's 1:02 p.m. Off the record.

(Off the record.)

THE REPORTER: It's 1:02 p.m. On the record.

MR. BOWLES: Sorry, we had a technical problem there.

BY MR. BOWLES:

Q I was asking whether you had a copy of the holiday policy. You said, "not in front of you."

Do you have one in your

D. KETCHAM

possession?

A Yes, I think I do.

MR. BOWLES: Okay. I'll call for a copy of that to be produced.

And I'm going to put on screen a document I'll ask be marked as Exhibit 33. For the record, this appears to be a multi-page document, starting with Bates number D-45.

(Exhibit 33 was marked for identification.)

BY MR. BOWLES:

Q At the top of it, it says "Kristin Sheeler Designs d/b/a NIBI-MTK Boutiques Vacation and Holiday Policy."

Is this the document you were referring to?

A I'm not sure that it's exactly the same one, because the one I have is dated for 2024, so -- it was one that I had to share with the employees that were in the store --

Q Okay. So, you got --

A -- to make sure that everyone

D. KETCHAM

was aware.

Q You got a later version than this one. Is that fair?

A Yes.

Q All right. I'm going to scroll down --

A But I don't know that I saw that one prior --

Q Okay. I understand. I'm scrolling down to where it says "Holidays," which is on the page with the Bates number D-47.

You see, near the top of the screen now, it says "Holidays"?

A Just a little bit -- yeah -- clearer --

Q Oh, --

A -- then, New Year's Day; Thanksgiving; Christmas -- yes.

Q All right. So, is it accurate that the holiday policy for NIBI was that the company recognized three paid holidays per year?

A Yes. I -- prior to that, I feel

D. KETCHAM

like it was something else other than that. But like I said, I had -- the document I have is from 2024, so I'd have to see if it's the same.

Q What's your recollection of the difference before this?

A Not that -- Thanksgiving, Christmas -- I mean, Easter used to be one, so I don't know about -- I don't see that.

Q Okay. The ones that you were --

A Like I said before -- like, it was unclear sometimes: the holidays. So, sometimes, I would be paid; sometimes, not. I really -- you know, I'd have to -- I can't really recall prior to, you know, the one that I saw. I can't really recall.

Q Well, can you tell me which holidays you weren't paid for?

A So, my last week that I was there -- during the end -- you know, I was quite taken back that I wasn't paid for Christmas and New Year's Day, because I

D. KETCHAM

did work, you know, all those hours --
Q Right. So, that was --
A -- so, it was, like, other than that, you know, I know it wasn't consistent. I just don't recall exactly what year and which one at the moment.
Q Okay. So, you recall that you weren't paid for Christmas and New Year's of 2024? Is that your testimony?
A And Thanksgiving as well, I don't think. For twenty -- my last year? Yeah, 2024.
Q Yeah. So, for those three holidays, your testimony is: You weren't paid for Thanksgiving, Christmas, or New Year's in 2024?
A Correct.
Q Any other holidays that you weren't paid for?
A I don't recall. I just -- it -- that was my main focus because, obviously, you know, I wasn't working my normal schedule.
Q Okay. So, sitting here today,

D. KETCHAM

you can't testify as to any other holidays you weren't paid, other than the ones in 2024; is that right?

A Well, off the top of my head, no. I mean, I know that it was varied; but I don't know specifically which one at the moment.

MR. BOWLES: Okay. I'm going to put on the screen a document I'll ask be marked as Exhibit 34, which appears to be a single-page document. It's an email from Mr. Brinnen to Ms. Ketcham, and it's dated January 9th of 2024; so, this would have been for the prior year.

(Exhibit 34 was marked for identification.)

BY MR. BOWLES:

Q It says "Your payroll records for the period: eight hours for the New Year's holiday."

Do you see that?

A I do.

Q All right. So, in this case, at least, it appears that you were paid for

D. KETCHAM

the New Year's holiday which, I guess, would have been New Year's between 2023 and 2024; correct?

A Right. The one that I'm referring to is the end of 2024 to 2025.

Q Okay. After each payroll period, did you get a document like this?

A Yes. I would call it a "document" because it was not a very good breakdown of a document, but -- yeah.

Q Okay. Did you ever dispute the hours in any of these documents?

A I think I -- yeah. If there was, like, an issue, I -- whatever issue I had, I -- I probably did. Yeah.

Q Okay. And would you do that by email, or some other way?

A You know, a lot of the times, I was -- I was more vocal, so I can't -- you know, I didn't always email. And, you know, a lot of the times the emailing is because -- like, if I really -- you know, the emailing -- like, they wouldn't always look at their email, you know? It was --

D. KETCHAM

just wasn't -- it was just better, like, if I was always, like, in-person. It's better for me, you know, in-person.

Q Okay. So --

A But sometimes, I did; and sometimes, I didn't. I don't --

Q All right. To the extent that you responded to anything by email, you produced those documents to your attorney; correct?

A Yes. If I did it through email at -- at a couple of times, or whatever it was, yes.

MR. BOWLES: Okay. All right. To the extent those haven't been produced, I'll call for their production.

BY MR. BOWLES:

Q On Exhibit 34, when I showed it to you, you said this was a document; and I think you said that the "breakdown wasn't complete."

What did you mean by that?

A It's not that it's not -- it's not -- and this isn't just me saying this;

D. KETCHAM

this is the IRS -- that this isn't a pay stub. So, we weren't really given pay stubs. Like, they didn't have a -- I don't know -- it's not, like, usually, each one is year-to-date, you know?

You would have a breakdown of your full hours up until that time period for the year; not just that week. Same with the New York -- you know, the New York State Social Security. You would have a breakdown of what was contributed throughout the year; not just the week.

Q Okay. So, what you wanted here was the cumulative annual pay to be in the document; is that right?

A It's not what I wanted; it's what was supposed to be.

Q How do you conclude that it was supposed to be there?

A Because that's how -- well, number one, you have social security here. That wasn't put into my social security. You have Medicare; wasn't put into my Medicare. You have federal withholdings;

D. KETCHAM

wasn't put into that. None of it is accurate.

Q Well -- okay.

A They're just statements that -- that Jim Brinnen made. Those are his statements. Those are not accurate. I don't know how else to say it. It's the truth. I mean --

Q Well, my question was: Is your complaint just that this doesn't look like the pay stubs that you're used to seeing?

A No, it's not the pay stubs that I'm not used to seeing. Like, it -- no, I've never seen a pay stub like this. Never. Never.

Q All right. We've talked about your hours. And looking at Exhibit 34, it looks like you were being paid hourly at this point. Was there ever a time that you became a salaried employee?

A No.

MR. KATAEV: Objection. Foundation.

BY MR. BOWLES:

Q You never became a salaried

D. KETCHAM

employee?
A No.
Q Okay. Did you ever receive any raises when you worked at NIBI?
A I did.
Q Can you --
A We never had a review. She would just call me and tell me, "Oh, I gave you this raise," or, "Oh, I gave" -- and then, when I presented her with the, you know, management, you know, we never sat down and had a review. I've never had a review with her.
Like, the other employees did. Every year, there would be a review, and you would discuss; and it was basically just kind of, you know, at their discretion. But I was never given a proper review and, you know, worked out pay.
Q But you did get raises from time to time; is that right?
A Yes.
Q All right. Your original hourly

D. KETCHAM

rate was $20 per hour; is that right?
A When I started?
Q Yes. Right. It was $20 an hour when you started; right?
A When I started.
Q And in June 2023, it was raised at $23 an hour. Does that sound right?
A Yes.
Q Okay. And in May of 2024, it was raised to $27 an hour?
A Thereabouts.
Q Okay. Do you recall it being different than $27 an hour?
A No, I'm just kind of -- I just don't remember if it was 26, 27 -- I -- if it was 27. I just don't remember, because it's just been a while.
Q It's been a while. Sure.
A It's been a while.
Q So, do you know if there were any other raises before you left the company?
A Did I have any other -- no.
Q Okay. Did you receive any

D. KETCHAM

bonuses when you worked at NIBI?

A Not that I recall. I think -- well, for the end of the year, I recall, like, a Christmas gift card. I believe it was Amazon or something -- a gift card. I don't recall what the amount -- maybe a hundred bucks. I don't recall the amount. And then, thereafter, I don't remember if it was monetary, or if it was a gift card. I don't remember.

Q Okay. But you occasionally got compensation over and above your hourly pay; is that right?

A It was Christmas holiday. Christmas -- whatever.

Q Yeah. So, you got a Christmas present from the company; is that right?

A Yeah, whatever it was at the time, which was different, so --

Q Okay. Did you get an employee discount when you worked at NIBI?

A We got -- if I can remember -- I think it was 25 percent or 30 percent. Maybe it was 25 or 30 percent discount.

D. KETCHAM

Q Okay. So, did you --

A I don't --

Q -- use that for buying clothing and things?

A Yeah, when I purchased something. Sure.

Q How often did that happen?

A You know, believe it or not, I did like her clothes; and I do have quite a few items.

Q Did you buy clothes for your children with the employee discount, too?

A My kids didn't really wear that style, so --

Q Okay. The closing time for the store was 6 p.m.; is that correct?

A I think it varied on season.

Q Okay. Tell me about that. When was the usual closing time of the store, depending on the season?

A Well, in the winter -- I don't remember if it was -- maybe it was, like, 5. I think Sundays were different. I know that when I was in Bridgehampton, it

D. KETCHAM

closed earlier than when I was in the other store. Like, they sometimes had different times on Sunday.

And then, sometimes, Kristin, if she felt like the day was slow -- even though I was, you know, there to work a full day -- she would say to close early.

Q Well --

A So, I would close early

Q Well, were there standard hours for the store that you sometimes varied from?

A I think, mainly, it was, like, either 10 to 6; and then -- I don't know if it changed on Sundays to -- 11 to something -- 11 to 4 or 5 -- but usually, it was 10 to 6, I would say.

Q All right. So, did you ever work after-hours in the store?

A Well, yeah. Sometimes, I was there a little bit later cleaning up -- you know, if it gets hectic or whatever -- putting the clothes away --

Q Was that --

D. KETCHAM

A -- and you have to steam. Yeah.

Q Was that because you were instructed to do so? Or did you just do that on your own

A After the store hours? No, that's what we -- we had to clean up after. That was, you know, for the next person coming in, you know? Especially if I wasn't working the next day, I wouldn't leave it a certain way. You know, you have to vacuum.

You know, you just have to make sure everything -- like, me, personally, I did everything where everything was folded perfect. Everything -- made sure all the counts were there, you know? Especially when I managed, because when the girls came in, they were younger; they didn't know. And I just wanted to make sure everything was, you know, the way it should be to make it easier.

Q So, when you worked after-hours in the store, did you clock out when you got done?

D. KETCHAM

A Most of the time, yes. There's times where I forgot -- yeah -- because I was so busy and enthralled in doing what I was doing that I forgot. And I would let Jim know.

Q So, when you -- let me follow up on that, then. So you said you would sometimes forget to clock out, and you'd let Jim know.

Would you write up a note?

A I would either text, or -- yeah. I would usually text him, I think.

Q Okay. All right. And you produced copies of those texts to your attorney; correct?

A I'm not sure, all the texts. But -- I'm not a hundred percent sure if I did or not.

Q All right. I'll call for production of all the texts between yourself and Mr. Brinnen.

MR. BOWLES: And again, between the lawyers, I'll put it in writing.

//

D. KETCHAM

BY MR. BOWLES:

Q So, you would occasionally forget to clock out. But if you didn't forget, you would clock out when you were done working in the store; is that right?

A No. If I forgot, I was already gone.

Q No, I understand that.

A Not if I was already gone.

Q I'm asking about when you didn't forget. If you didn't forget, you would clock out?

A Oh, yeah. Yeah.

Q All right. So, for example, returning to Exhibit 4 -- which you've already looked at -- you've got a clock-out time on Exhibit 4 of 6:29 p.m.; is that right?

A Mm-hmm.

Q Is that "yes"?

A Yes.

Q Okay. All right. So, and that day, that's after-hours, because you closed at 6. So, you worked an extra

D. KETCHAM

half-hour, and you clocked out when you were done; correct?

A Correct.

Q All right. Did you ever work overtime for NIBI?

A Yeah. She would offer me the overtime, yeah.

Q Did you ever ask for overtime?

A It just -- this is what I couldn't understand. It would just be an accumulation of hours of the week, because I was there for that long. It wasn't -- it wasn't that I needed to be asked; it was -- that was the amount of hours that it added up to.

Q Yeah. But I'm asking a different question. Did you ever ask for extra hours specifically so you can get overtime?

A No. No. Why? They -- they wouldn't give me that anyway.

Q All right. If you worked overtime, did you record it in the POS system?

D. KETCHAM

A Well, it would be a -- it would be in my clock-ins and clock-outs --

Q Yes --

A -- unless I had to meet someone after; but that -- you know, I'd come to notice that I felt like I was there longer than what was showing up, and I couldn't understand. And that -- that's why I started -- like I said, I was trying to figure it out.

Q Was there ever a time that you were not paid for overtime that you worked?

A Yeah, that was the other thing, is, like, from my understanding, overtime is time-and-a-half; and then, they were just paying straight time: where I was just paid for my hourly rate rather than the time-and-a-half.

Q And what evidence do you have that they didn't pay you time-and-a half for overtime?

A Well, I mean, you have the stubs, so -- you can see.

D. KETCHAM

Q No, I'm asking you. Do you recall any specific time that you were not paid for overtime?
A I don't have the dates in-hand, but I do recall where I would have more hours; and it was kind of odd, you know? And then, some of the times, I wasn't -- like, he did -- like, if I didn't take a lunch, and -- I don't know the dates. I can't -- you know, I don't have it in front of me, so -- I just don't know the dates.
Q Do you know how many times you weren't paid for overtime?
A Not offhand. No, I do not.
Q How do you define "overtime"?
A Well --
MR. KATAEV: Objection. Form. Calls for a legal conclusion.
You can answer.
BY MR. BOWLES:
Q You can tell me your understanding. What is "overtime"?
A Well, I expected over 40 hours

D. KETCHAM

to be time-and-a-half.
Q 40 hours per week, I presume?
A Yes, which, like I said before -- like, it didn't seem -- it seemed like it should have been more than what it was; and I didn't understand why --
Q Okay. So --
A -- and then --
Q -- your allegation is: There were times that you got one of those pay documents from Mr. Brinnen that said that there were more than 40 hours in a work week that you worked, and you weren't paid time-and-a-half for the additional hours; is that right?
A Yeah. Well, that's what I was -- that's what I believed. Yeah.
Q Okay. Did you have any evidence of that?
A Well, the calculation is -- you have the pay stub, so --
Q Right. But did you do --
A -- I would think that you would

have --

Q Did you do the calculation, yourself, and conclude you weren't getting paid time-and-a-half for overtime?

A I'm sure I did. I'm not exactly sure what the outcome was; but he also didn't break down and show where the time-and-a-half was on the print-out.

Q Was there ever a time that you complained that you weren't getting time-and-a-half for overtime?

A Maybe with one of the girls, like, "Aren't we supposed to get time-and-a-half after," or -- I just recalled working more than just a little bit over 40 hours. And like I said -- like, I was -- yeah. It just didn't seem right.

Q When I ask "if you complained," I mean, did you complain to anybody like Jim, or Kristin about it?

A I don't recall.

Q All right. Do you know how many times it happened that you didn't get paid overtime for a pay period?

D. KETCHAM

A No, I don't.

Q Okay. Do you know what the first day of each work week was? Was it a Monday? Was it a Sunday, or -- do you know?

A That was a little confusing as well, because I -- I think the end was Friday, but I didn't actually get my money into my account on Tuesday or Wednesday, so -- that was a little odd. So, it would take a while before the money was even in my account. Like, I'm pretty sure the -- I'm -- I think the work week went from Saturday to Friday. I'm not a hundred percent sure, but I didn't actually get my paycheck until -- or, I didn't actually get the money in my account until Tuesday or Wednesday.

Q Was there ever a time that you worked extremely long hours -- for example, 24 hours at a time -- that you recall?

A No. And if that happened, then it was, -- didn't clock out.

D. KETCHAM

Q All right. So --
A That, I know.
Q -- if there were 24-plus hours that show up on a time report, it's just that you forgot to clock out; is that right?
A Correct. Yes.
Q Okay. Were you -- you're familiar with what social media is? Instagram, Facebook, Yelp, that sort of thing?
A Of course.
Q Are you aware of any --
A But Yelp? No, I don't know that.
Q I don't blame you.
A But go ahead.
Q Are you aware of any online complaints about NIBI?
A Yeah. Well, I mean, I -- obviously, I looked to make sure all was good. I saw some complaints, but they weren't when I was there, so -- just because I wanted to make sure that all was

D. KETCHAM

good. You know, of course. Like, I don't -- not -- while I was working, I've looked; not after.

Q Sure. Were any of the complaints about you, specifically?

A No, not that I know of. I had a very good rapport with the -- the customers.

Q Did you ever make any complaints about NIBI on social media?

A No.

Q Okay. Have you made any other statements to anyone else that would be derogatory to NIBI?

A Other than the -- I don't know if they would be "derogatory," but -- other than the -- the girls that I worked with, I don't know that it would be "derogatory"; just making statements.

Q So, you're saying you "made statements" to the girls you worked with about NIBI?

A No. We all -- we all had our issues. It wasn't just me.

D. KETCHAM

Q Okay. Are you familiar with any significant disputes between Ms. Goncalves and a customer?

A Yes, I am.

Q There was a particular incident where there was a customer in a store that was a real blow-up; is that right?

Do you know what I'm talking about?

A I do.

Q All right. Tell me what you recall about that.

A I was just working the floor. I do remember the customer coming in -- you know, the mother buying the clothes for her daughter -- and then, her daughter wanted to return them without a receipt.

And Kristin, you know -- Teresa's very much by-the-book, and she followed the protocol of not having a receipt; and the girl didn't like it.

Q So, Teresa Goncalves said that the customer couldn't return the goods, and the customer was upset?

D. KETCHAM

A Yeah. She didn't have a receipt. Like, we needed to have a physical receipt.

Q Okay. I understand. So, you think Teresa acted in accordance with the store's return policy?

A Yes, of course. Yeah, she did.

Q Teresa left NIBI after this incident?

A I wasn't there for what transpired, but I am to believe so.

Q Okay. After she left the store -- after she left employ with NIBI -- did you stay in touch with Teresa?

A Well, that's the weird thing, because she didn't talk to me for a while; and I didn't know why.

Q Did you ever find out why?

A I mean -- I mean, I'd stayed in contact with her, but there was a period of time that I didn't talk to her. And, you know, I finally reached out and asked if she -- everything was okay with her; and that was it.

D. KETCHAM

Q Okay. Did you ever discuss this lawsuit with Teresa before you guys employed an attorney?

A Well, this is -- to be honest with you, I wanted to know if I was the only one where -- when I'd come to find out that my social security wasn't taken care of, and my -- you know, those certain employment benefits that you get when you work for a company and Medicare and Medicaid -- I was -- I wanted to know if I was the only one. And so, I did reach out, because it's a big deal, you know? Maybe they don't think it's a big deal, but it's a big deal.

Q All right. So, you reached out to Teresa to discuss a social security issue? Is that your testimony?

A I asked her -- well, we've had other -- yeah. I -- I mean, I guess, yeah. Sorry, my phone is ringing. I'm putting it aside. Yeah, I wanted -- I was curious to know.

Q All right. Was the idea of

D. KETCHAM

suing NIBI yours, or Teresa's, or somebody else's?

MR. KATAEV: Objection to relevance.

BY MR. BOWLES:

Q You can answer.

A Well, the idea of suing them was, more or less, the idea that -- you know, for a while. It wasn't -- it was a build-up of stuff with the unemployment and all of that, and -- yeah. I wanted to know if I was the only one.

And, come to realize, just about all of who I spoke with -- their social security was not taken care of, their Medicare, Medicaid -- all your employment benefits that you get with an employer -- wasn't done.

Q Who else did you speak to?

A I spoke to Cathy.

Q What's Cathy's last name?

A Marin.

Q Okay. Anybody else?

A Natalie.

Q What's her last name?

D. KETCHAM

A Cummings.

Q Anybody else?

A So, that's where I just started, because -- that's only because -- Kate Wimsey [sic], yes; Kate, I did. Who else? Hanna Mancuso.

Q Okay. Are any of these people -- sorry. Anybody else?

A You know, to be honest, I wanted -- I didn't want to make it a blow-up, just -- you know? I wanted -- I wanted to just confirm that it wasn't just me; and those were, you know, the managers and the people that have been there a very long time: one that has been there since the day she opened the store. So, it was, you know, very shocking. Very shocking.

Q Right. Anybody else planning on joining this lawsuit?

A The opportunity is always there.

Q Say that again?

A I said, "The opportunity for them is always there."

Q And how do you know that --

D. KETCHAM

A I think there's a little fear behind it. There's a --

Q But to your knowledge --

A -- fear behind it.

Q But to your knowledge, right now, are any other employees joining in this lawsuit?

A Not that I know of.

Q Okay. Correct me if I'm wrong, but you weren't observing Teresa's deposition last week; is that right?

A No, I wasn't on.

Q Okay. Have you discussed the deposition with her?

A Just to ask if she was okay, because, you know, it is a bit much; but we have a -- you know, there's no reason, no, as far as --

Q Okay. Did you discuss any of the contents of the deposition with her?

A No. I mean, I -- no. I'm -- I'm sure hers is different than mine.

Q Sure. Have you seen a transcript of it?

D. KETCHAM

A A transcript?

Q Yes.

A No, I don't think so.

Q All right. Are you aware that in the complaint, Teresa alleged that on her first day of work, there were 17 people in the back of the store steaming clothes?

A I recall her saying something like that. I wasn't there, so I couldn't say.

Q I was going to say. Did you ever see anything like that?

A I was not there.

Q Did you ever see anything like that?

A I mean, we've had a lot of girls in the back steaming at the same time; but I wasn't employed by them while that took place. So, I don't know exactly what she saw, so I can't make a comment on that.

Q So, you, yourself, have never observed, for example, 17 employees in a back room steaming clothes together; is

D. KETCHAM

that right?
A Me, personally?
Q Yes.
A No, there's been maybe three -- or two, three.
Q Okay. So --
A Or two.
Q -- maximum, three?
A In my experience. But Teresa had started there when she first opened; and I was only a few doors down, and they were, like, crazy busy. So, would I say that there was not more than three there at that time? Yes. I mean, it's quite possible. It was -- she was extremely busy.
Q Okay. Did you ever ask for -- and take -- time off from working at NIBI?
A Taking time off?
Q Yes.
A What, do you mean other than my -- my personal days, and my days to be off? I don't know.
Q Well, for example, was there

D. KETCHAM

ever a time that you were scheduled to work, and you asked to not work that particular day?

A A sick day, or personal day, yeah.

MR. BOWLES: Okay. I'm going to put on a screen on a document I'll ask be marked as Exhibit 28. For the record, this appears to be a one-page document, a text message. It bears Bates numbers D-263.

(Exhibit 28 was marked for identification.)

BY MR. BOWLES:

Q Just take a look at that, and tell me whether you've seen it before, please.

A Okay. Yeah. Yeah.

Q So, was that a time that you asked to take time off?

A Yeah. And that would have been, like, a personal day, or -- yeah. My daughter was going to college. It's not something I wouldn't have discussed with

D. KETCHAM

her first.

Q Sure. And did you take that time off?

A I don't really remember if it was -- if I had to do those specific days. I really don't remember.

Q Did you ever ask her --

A But a lot of the time --

Q Sorry.

A No, I -- Kristin didn't always use the -- that app correctly. So, sometimes, I would -- she would agree to something; and then, I wouldn't see it on the app. So, that's why I was questioning it.

Q So, what app was that, that you're referring to?

A I don't know. Was it -- whatever they used at the time. I don't remember, because they had one thing; and then, they had something else when I was manager. I don't know the name of it. I forget.

Q So -- but there was some sort of

D. KETCHAM

online app that set the schedule?
A Yeah.
Q Okay. So, just to put it in context, was this something you would see on your phone, or on a computer?
A Yeah, on my phone. Yeah.
Q Okay. So, you could look at your phone, and see what time you were scheduled to work; is that right?
A Yes.
Q Okay. Was there ever a time that you asked for time off, and it was denied?
A Yeah. Well, it wasn't denied. I had to say I couldn't -- well, she gave me a hard time. I was sick. I mean, there was nothing I could do about it. I was sick, and -- yeah.
Q Did you take that time off, or not?
A Yeah, because it was a snowstorm, and I was sick. I mean, I had a fever. Like, I'm not going to go in from here in a -- in -- to Montauk. And

D. KETCHAM

it was during that time -- I -- I believe, if that's what you're referring to -- or, whatever. Yeah.

MR. BOWLES: Okay. I'm going to put on the screen a document I'll ask be marked as Exhibit 23. For the record, this is a one-page document with Bates numbers P-231.

(Exhibit 23 was marked for identification.)

BY MR. BOWLES:

Q I'm just using this as an example. This appears to be an email from Mr. Brinnen to you. It shows "Compensation details for the week ending January 12th of 2024."

Do you see that?

A Yeah. It just has to be a little bit clearer. I can't really --

Q Sorry.

A -- see the numbers. Yeah, January.

Q There. Can you see it now?

A Yeah.

D. KETCHAM

Q All right. So, I'm just using this as an example. Is this typical of an email that you would get from Mr. Brinnen saying what your payroll details were for the work period?

A Yes.

Q Did you have an opportunity to respond to this with any corrections?

A Yes. Whether I did or not, I don't remember.

Q But you did have an opportunity to do so; is that right?

A Anybody has an opportunity. Yeah.

MR. BOWLES: Okay. Sorry, hang on one second. I'm going to put on the screen a document I'll ask be marked as Exhibit 21. For the record, this is a one-page document with Bates numbers P-1041.

(Exhibit 21 was marked for identification.)

BY MR. BOWLES:

Q This appears to be an email --

D. KETCHAM

it's slightly different format, but -- it appears to be an email from you to Mr. Brinnen. And it appears that you are making some corrections to the payroll details.

Do you see that?

A Can you -- no, it's kind of -- it's a little blurred.

Q Do you see it now?

A I do.

Q Okay. So, is this you correcting Mr. Brinnen's payroll details?

A Yeah. Yep. It's everything that I've sent you. Yep.

Q Yeah. All right. So, in this case, you pointed out to Mr. Brinnen that you didn't take a lunch break on certain days.

And did they pay you for that time?

A No, I don't remember if he -- if he changed it or not. Sometimes, he would say, "I'll get it the next time." I don't know if he did or not.

D. KETCHAM

MR. BOWLES: Okay. I'm putting on the screen a document I'll ask be marked as Exhibit 24.

(Exhibit 24 was marked for identification.)

BY MR. BOWLES:

Q This appears to be a single-page text message between you and Jim. Would that be Mr. Brinnen?

A Yes. Can you just make it a little bit clearer, please?

Q Is that better?

A Mm-hmm.

Q Do you see that?

A Yes.

Q Is this a set of text messages between you and Mr. Brinnen?

A Okay.

Q Well, is it?

A Yes, it is.

Q Good. And in this case, you are again saying to Mr. Brinnen that your pay deposit doesn't seem accurate. "Can you please send me my pay stub"; correct?

D. KETCHAM

A Yes.

Q So, you were able to text with Mr. Brinnen whenever you saw something that seemed to be inaccurate; is that right?

A Yeah. At times, I did; and then, at times, I didn't. I mean, it was just whether I saw him, or when I didn't see him. There's times that he was around, and times that he wasn't. It's not -- you know, I didn't -- I didn't go in, thinking, "Oh, I need to make a document about if I need to tell him something."

Q My question was this: You could do this when you wanted to, and you did, sometimes; correct?

A Yes. And other times, I spoke to him. I -- just the way it was.

MR. BOWLES: I understand.

I'm going to put on the screen a document I'll ask be marked as Exhibit 22. For the record, this appears to be a single-page document bearing Bates number

D. KETCHAM

P-1042.

(Exhibit 22 was marked for identification.)

BY MR. BOWLES:

Q It appears to be an email from you to Mr. Brinnen. Again, this is in response to his payroll details; and it's something about, "It's no longer necessary for me to have an extra $150 taken out of my paycheck for taxes."

Can you tell me what that's about?

A When I first started, I asked if -- if they could deduct an extra 150, and -- and they did. And then, I realized, "Maybe I shouldn't do that," and then I asked him not to do it anymore.

Q Okay. All right. So, you wrote him to modify the way your withholding was done? Is that fair?

A Right. Yep. Yes. Yes.

Q Why were you having the extra 150 taken out to begin with?

A Because, like I said before, it

D. KETCHAM

was the first time that I was getting back into the working. I was, you know, new -- going through, like, a divorce, and -- and I just wanted to make sure, which -- what I know now, I would have never done.

I wanted to make sure that -- at the end of the year, that enough taxes were taken out, but -- and I wouldn't have to owe anything. It was recommended from my accountant; but now, that just seems like a joke, so --

MR. BOWLES: I understand.

I'm going to put on the screen, a document I'll ask be marked as Exhibit 27. For the record, this is a one-page document bearing Bates number D-262.

(Exhibit 27 was marked for identification.)

BY MR. BOWLES:

Q It appears to be text messages between you and Kristin Sheeler; is that correct?

A Yes. I like how I provided you with all this information.

D. KETCHAM

Q Well, some of it, we provided. This is -- the "D" number means that we provided this one. There's a question here. "Good morning, Kristin. Can I take money out for flowers in the planters?"

So, when you refer to "taking money out" there, what are you referring to?

A So, there's -- there's a petty cash. So, when you -- when you close the draw, you put the extra cash -- I believe it was, like -- if I can remember correctly, it was, like, a -- maybe a $300 draw. Whatever extra cash, you would put it in a box under the register.

So, that's usually -- like, if we had to get something, we would take money out, and then put a receipt in. And that's -- and she wanted me to get -- well, all the flowers were being done in the fronts of the store at the time. And so, I asked her, "Let me do it."

Q Okay. So, was there a practice under which you'd just take money out of

D. KETCHAM

the cash drawer for expenses?
A Not the cash drawer. It's -- it's petty cash, like -- not petty cash -- or, it's the deposits. "Deposits," I would say, rather, only I didn't make the deposits. Jim used to come and collect all the envelopes, so he came and collect the envelopes.
Q All right. Was there ever a time that you expended any money for NIBI that you weren't reimbursed for?
A There was -- yes. I am -- I -- Kristin asked me to go to Kmart -- this is when I was in Bridgehampton -- to get some Christmas decorations or something. I did that. I wasn't able -- because Cathy has her -- her box that -- she keeps her deposits locked -- rightfully so -- but I can't go in there to get anything for it.
So, I had to use my debit card. And then, you know, I had to ask her, and ask her. "Would she ever" -- "Oh, yeah. I'll give it to you on your paycheck." And I was, like, "My paycheck? Taxes

D. KETCHAM

don't come out on that." Like, I didn't understand what she was saying. I was like -- and so, that was an instance. Yeah.

Q Well, did you ultimately get reimbursed for that?

A Not by her, I don't think. I think I had -- it was either -- I got reimbursed from one of the girls, where I had the receipt and they did it. I don't remember if it was Cathy I gave the receipt to; but not by her. No.

Q Okay. But by NIBI, you were ultimately reimbursed; is that right?

A Maybe. I'm -- I'm thinking that -- yeah, maybe. I don't know.

Q Well, sitting here today --

A One of the girls --

Q -- are you aware of any particular time that you expended some money for the store that you weren't reimbursed for?

A That might have -- that was probably, like, the only time. Anything

else, I just -- you know, I was very proficient at making sure everything was accounted -- accounted for.

MR. BOWLES: I understand. Thank you.

All right. I'll put on the screen a document I'll ask be marked as Exhibit 10. For the record, this appears to be a multi-page spreadsheet starting with Bates number D-84.

(Exhibit 10 was marked for identification.)

BY MR. BOWLES:

Q At the top left, it says "Kristin Sheeler Designs payroll hours corrected from Lightspeed clock; Dina Ketcham."

My question for you is: Have you ever seen this before?

A Like we talked about before, only, like, this way.

Q Only in the court --

A I've never seen it -- I've never seen it before, as far as when I was

D. KETCHAM

employed by them.

Q Okay. So, from the point-of-sale system, could you, yourself, produce a spreadsheet in this form, indicating what your hours were?

A No.

Q And you've never seen one like this before this litigation; is that right?

A Correct.

MR. BOWLES: All right. Exhibit 11. I'll put on the screen a document I'll ask to be marked as Exhibit 11.

(Exhibit 11 was marked for identification.)

BY MR. BOWLES:

Q It is a similar document. Same question to you: Have you ever seen this document before the lawsuit?

A No.

Q Okay. Were you able to generate a document like this?

A Is this the same document you're showing me, or --

D. KETCHAM

Q Slightly different.

A Oh, okay.

Q Were you able to produce any document like this from the POS system at NIBI?

A No.

Q During the course of this lawsuit, have you reviewed the numbers in this document to see whether they're accurate or not?

A No, I never saw it, so -- no.

Q Well, you hadn't seen it before the lawsuit started. I meant during --

A No, but I didn't have it available to me to even do that.

Q Right. But during the course of this lawsuit, have you looked at the document to check the numbers?

A No.

Q All right. How did NIBI pay you?

A I -- they wanted to do Zelle or Venmo. But I wasn't comfortable with that, so I asked them to do automatic

D. KETCHAM

deposit in my bank account.

Q Do you know if that was done by ACH?

A I don't know what it was done. I would just get -- it would just show up that the deposit was made. "Kristin Sheeler Designs," whatever it was.

Q Okay. From your point of view, there would just be a deposit that appeared in your bank statement; is that right?

A Yeah.

MR. BOWLES: I'm going to put on the screen a document I'll ask be marked as Exhibit 12. For the record, this appears to be a one-page document bearing Bates number D-233. It appears to show multiple ACH payments to Ms. Ketcham's account.

(Exhibit 12 was marked for identification.)

BY MR. BOWLES:

Q I'm just going to ask you: Did I describe that correctly?

A No, that's not what it looks

D. KETCHAM

like on my bank statement. That's not what it looks like. No.

Q Right. But does this appear to be a series of deposits to your bank account from 2022?

MR. KATAEV: Objection. Form.

THE WITNESS: I have no idea. It says "debit." I don't know any.

BY MR. BOWLES:

Q Right. And then, on the --

A I have no idea.

Q -- right-hand side, it says "ACH payment." Do you see that?

A Okay. So --

Q Okay. Have you reviewed this document to see whether it accurately reflects what you were paid in 2022?

A No.

Q If I asked you to show me documents showing what you were paid by NIBI in 2022, what documents would you show me?

A My bank statements.

Q Do you have copies of those bank

statements?

A I would have to see if I have what you're -- the dates you're looking for.

Q Well, if I were to ask for bank statements from 2022 to 2025 -- which was the period that you worked with NIBI -- could you produce those bank statements?

A I don't have that account anymore, but I could find out.

Q What bank did you bank with during that period?

A Teachers.

Q The name of the --

A Teachers Federal Credit Union.

Q Sorry? The name of the bank is Teachers Federal Credit Union?

A Correct.

Q And you say you don't have that account anymore?

A No.

Q Do you know whether you have copies of the bank statements?

A Do I know -- excuse me -- when?

D. KETCHAM

Q Do you know whether you have copies of those bank statements?

A I'd have to take a look.

Q All right. All right. I'll ask for production of those bank statements from that period.

MR. BOWLES: I'm going to put on the screen a document I'll ask be marked as Exhibit 13. Just for the record, this appears to be a similar document for 2023. It bears Bates numbers D-235.

(Exhibit 13 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this document before?

A No.

Q Can you tell whether it accurately reflects payments to your bank during this period?

A No.

Q All right. Just for the record, I'm going to show you one more of these.

MR. BOWLES: It's a document I'll ask

D. KETCHAM

be marked as Exhibit 14. For the record, it appears to be a one-page document showing ACH payments during 2024; and it bears Bates numbers D-237.

(Exhibit 14 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this before?

A No.

Q Can you tell whether it accurately reflects payments to your account during 2024?

A No.

Q Okay. And one more. This is for 2025.

MR. BOWLES: I'll ask it to be marked as Exhibit 15. It is a similar document, bearing Bates numbers 250.

(Exhibit 15 was marked for identification.)

BY MR. BOWLES:

Q I presume you've not seen this before, either?

A No.

D. KETCHAM

Q Can you tell whether it reflects the last couple of payments that you got from NIBI in 2025?

A No.

MR. BOWLES: Okay. I'm putting on the screen a document I'll ask be marked as Exhibit 16. This appears to be a set of tax return documents. I believe these are W-2s, and it bears Bates number beginning with D-251.

(Exhibit 16 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this before?

A I don't know exactly, but -- yeah.

Q Does this --

A Yes.

THE REPORTER: I'm sorry, Counsel. This is exhibit 16; correct?

MR. BOWLES: 16, that's right.

THE REPORTER: Thank you.

MR. BOWLES: Sure.

//

D. KETCHAM

BY MR. BOWLES:

Q All right. Can you tell me whether this accurately reflects your W-2s for 2022?

A No, it doesn't.

Q Why not?

A Why not? Because the taxes are not correct. The social security is not correct. You could do the same for '22, '23, '24. It's not correct, and it's not accurate.

Q Okay. So, it does reflect income tax withheld, social security withheld, Medicare tax withheld, and so on; correct?

A So it says.

Q All right. And your allegation is that it's inaccurate?

A Correct.

Q How do you know that?

A Because of the IRS and Unemployment --

Q And --

A -- and Social Security.

D. KETCHAM

Q And those agencies told you that it was incorrect?

A Yes, they did.

Q Okay. And you are going to produce to me any documentation you have of that; correct?

A I -- if you want to see it, that -- I'll -- my lawyer will have what I have; and that's that.

Q Okay. I do want to see it. I'm going to just put these documents on the record. This appears to be --

MR. BOWLES: Sorry. I'll ask this to be marked as Exhibit 17. This appears to be the W-2s for 2023.

(Exhibit 17 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this before?

A The fabrication of it, yes. I've seen the fabrication of it, yes.

Q Are you alleging this is fabricated by my client?

A It's not correct.

D. KETCHAM

Q How is it not correct?
A Like I stated before, the taxes withheld are not accurate; and the social security is not accurate.
Q And the way you know that is from your conversations with the IRS; is that right?
A Yes, and my social security statement.
Q Okay. What is your "social security statement"?
A It's a statement that they tell you what you have in social security; and it says "zero."
Q This is an online thing; is that correct?
A It's not just an online thing. I had it mailed to me from Social Security; and I went over it with my accountant.
Q Okay. Did you produce a copy of that to your attorney for production to me?
A I presume so. But I don't know

D. KETCHAM

exactly if he has it or not, but I have it.

MR. BOWLES: I'll call for production of that, please.

BY MR. BOWLES:

Q And have you looked at a current/recent statement on your social security?

A No, I have not, but --

Q When's the last --

A -- miraculously -- whatever.

Q "Miraculously," what?

A I didn't have a problem this year when I didn't work for them.

Q Okay. But have you looked recently to check whether or not any inaccuracies from NIBI have been reflected?

A I only have until 2024, so -- whatever it says from 2024.

Q When's the last time you looked?

A When I had Ms. Washington as my advocate for the IRS, so -- I'll have to look again.

D. KETCHAM

Q Will you do that?

A Yes, I will.

Q Thank you. And I would like a production of whatever you find, please.

All right. Just to get these in the record, I'm going to show you a document I'll ask be marked as Exhibit 18. This appears to be W-2 for 2025.

If I ask you about this, will you say, as well, that this one is inaccurate?

(Exhibit 18 was marked for identification.)

A Yes, I will.

MR. BOWLES: All right. And I think this may be out of order, but I'll put on the screen a document I'll ask be marked as Exhibit 19. This appears to be 2024 W-2s.

(Exhibit 19 was marked for identification.)

BY MR. BOWLES:

Q Are you alleging that this one is inaccurate as well?

D. KETCHAM

A Yes.

MR. BOWLES: Thank you.

I'm going to put on the screen a document that I'll ask be marked as Exhibit 20. This appears to be a multi-page document beginning with Bates numbers P-1012.

(Exhibit 20 was marked for identification.)

BY MR. BOWLES:

Q The "P" indicates that your side produced this to us. Have you seen this document before?

A Yes.

Q What is it?

A It is my -- you have to make it a little clearer, but -- it's my communication with the IRS when they're asking me for information.

Q Okay. And you mentioned a "Mrs. Washington" before. This is who you were talking about?

A Yep.

Q "Yes"?

D. KETCHAM

A Yes, I am.

Q Okay. All right. Do you have any other documents, besides this one, regarding your conversations with Mrs. Washington?

A Not a hundred percent sure. Whatever I had, I gave. I can see if I have any more.

Q Okay. Could you? And produce those, if you would?

A Sure.

Q All right. And the very first line of the paragraph, beginning with "Mrs. Washington" -- some of it's cut off, but -- it refers to "not hearing back from the IRS about not receiving my tax refund."

Do you see that?

A Yes.

Q All right. Is that the way all this started?

A It started because -- when I spoke to someone at the IRS, they referred me to the advocate, because they didn't --

D. KETCHAM

because I had a deep conversation with him -- and he pointed me in the right direction -- because when you check on your status, it stays there, unless -- like, if it says it's under review, it'll be under review for years. Like, I still haven't had my 2024 given to me. It'll be under review for years, unless you actually go to an advocate and they dispute it.

So, this has been an ongoing, stressful -- I can't even express to you how much I've gone through with this, besides, you know -- obviously, you know I needed the refunds -- not being in work; couldn't get unemployment; and all due to their inefficient way of filing -- or not filing -- their employee, which would be me and, I'm sure, others. So, it was -- I can't even express to you what I went through with this.

Q Did you ultimately get that refund?

A I got partial of it. I didn't

D. KETCHAM

get the whole refund; and I still haven't gotten 2024, because I haven't gone the route of another advocate yet, because it's so stressful.

MR. BOWLES: I understand.

All right. One moment. I'm going to put on the screen a document that I'll ask to be marked as Exhibit 25. This appears to be a multi-page document that is the "Plaintiffs' Supplemental Responses & Objections to Defendants' First Set of Interrogatories."

(Exhibit 25 was marked for identification.)

BY MR. BOWLES:

Q Have you seen this document before?

A I'm sure I have.

Q Well, do you recognize it?

A Yes. Yes.

Q It was sent to me --

A So many times.

Q -- on or about August 7th of 2026. Do you see the date here at the

bottom?
A Yes.
Q Did you review it before it was sent to me?
A I'm sure I did.
Q Scrolling all the way to the very last page of Exhibit 25, it's got your name beneath the verification.
Is that your signature there?
A Yeah. Well it's a computerized signature, but -- yes, I remember.
Q Yeah. But did you, yourself, apply that computerized signature?
A I did. Yes.
Q All right. So, you signed off on this verification? Is that accurate?
A Yes.
Q And you represented that everything in this document is accurate; is that right?
A Yes, as far as I knew -- yes. As far as I know, it's accurate to my recollection.
Q I understand. All right. So,

D. KETCHAM

in your response to Interrogatory number 1 -- this is on page 12 -- Interrogatory number 1 is to "identify persons with personal knowledge of facts alleged in the pleading."

Do you see that?

A I do.

Q All right. So, it's asking you to identify people that know anything about the allegations and the pleading.

You understand that; right?

A Yes.

Q You refer to two people in your response: Hanna Mancuso --

A Correct. Yeah.

Q -- and Kate Quimby. Do you see that?

A Yeah.

Q Tell me what information --

A Wait. Where is it? Oh, yes. Now, I see. Yes.

Q Okay. Tell me what information Hanna Mancuso has about the lawsuit.

A I just told her that about the

D. KETCHAM

social security. And I know that she had issues with a few instances, herself, and -- you know, and she -- she was there when I was being used as acting manager without being a manager. And she was a witness to a lot of -- a lot of it. I worked with her, mostly, during that time. And -- and that's --

Q When you say "she was a witness to" --

A -- what she was. She was a --

Q When you say "she was a witness to a lot of it," what do you mean by that?

A Like, she questioned the commission. She questioned a lot of things -- you know, when she didn't receive her commission when she was supposed to -- when I -- and I'm not just saying "witnessed"; she would report it to me, you know? Because I was there, and --

Q Sure. So --

A -- and then -- you know, and then, I also -- after, when this was -- I -- she was one that I inquired to know

D. KETCHAM

about, you know, "was her social security accurate," all of that. And it's the same. It's the same that -- everyone that I spoke with has the same experience, so --

Q Well, specifically, you're saying that Ms. Mancuso did not get her commissions paid?

A There were times where -- when it was different -- or, she didn't. I didn't -- like, I always brought it to the attention -- "Speak to Jim about it, or Kristin about it." So, I didn't know the details, but that was when I was working with her. And then -- you know, and then, like I said, I had also asked her about social security, and her hourly, and stuff like that. Yeah.

Q Okay. All right. But Ms. Mancuso has not joined this lawsuit; correct?

A No. I mean, that doesn't mean that she won't.

Q Well, has she indicated that she

D. KETCHAM

will?

A I haven't spoken to her in a while, because I've been very busy with focusing on this, and my other personal work, and everything else. So, I have a lot going on; and I just didn't touch base or anything like that yet.

Q I understand. All right. Kate Quimby: What does she know about the situation?

A That is the same instance. I -- I asked her if -- you know, the same instance -- "Was your social security taken out," all of that -- just to -- so I knew if I was the only one, like I stated before. I wanted to know if I was the only one that this happened to.

Q All right. And what did she say?

A She looked. She's -- "Nope," and "social security is all zeros." She was there for years as -- I believe she was there for -- mostly summer, but she always came back every summer -- so, she's

D. KETCHAM

been there for years -- or was, I should say.

Q So, her complaint was social security. Anything else?

A Oh, she had other complaints, too, but I'm -- you know, I don't -- I can't speak for her at the moment.

Q Right. So, all you can speak to is what she told you. What were her other complaints?

A I can't really -- I mean, I'd have to look back, you know? There's certain issues: same thing of not being paid. Same thing.

Q So, you'd have to look back at -- what, exactly?

A Basically, not getting paid. And she had other issues with them that weren't -- you know, everyone had a different kind of issue.

Q Okay. But I asked you what her complaints were, and you said you'd have to "look back."

"Look back" at what?

D. KETCHAM

A Oh, because I text -- I text her. When I -- when I spoke to these girls, either I spoke to them on the phone, or we had -- Hanna, not so -- no. Hanna, I didn't, really; but Kate, I text with.

Q Okay. So, you've got copies of text messages with Kate Quimby; is that right?

A I do.

Q Okay. I'll ask for production of those; and I'll also ask for production of any text messages with Ms. Mancuso.

All right. Interrogatory number 4. The request to you is "Describe, in detail, all damages sought by you against each Defendant." There's a bullet point at the very end of your response that says that:

"Ketcham also wishes to add that she was forced to work in biohazard conditions in order to be paid for that day's work. For example, this happened after the fire, when Defendants wanted to

D. KETCHAM

catch him to transport moldy clothes into the storage pod that was placed behind the store."

Can you tell me about this?

A Sure. Basically, after Kristin said, "I don't know what you're going to do" -- she didn't know where she was going to place me -- she said the only -- "If you could, come to the store and help clean up." I mean, at the time, I probably -- I wasn't -- you know, I needed the money. I didn't know when the next time I was going to actually work in one of the other locations. And that's what I did, so that I can get paid for a day.

Q Okay. But you say "the biohazard conditions." What were "the biohazard conditions"?

A Well, we weren't really technically supposed to be in the building. And it would -- it has a -- it had a thing not to enter, and -- yes. It was -- everything was moldy. I got there, and I -- I said to Jim, I said, "Shouldn't

D. KETCHAM

we be wearing something?" He went in there with no mask, no nothing.

And there was construction guys that were trying to, I guess, break down some of the -- you know, the building, and -- you know, he went over to them and asked them, "Can we borrow some of your masks?" Like, it was -- there was no prep. No one cared, you know?

And the other store that was joined to us, that was dealing with it. They weren't in their building taking stuff out --

Q So --

A And let me point out --

Q Go ahead.

A -- that -- that storage unit -- I mean, that storage pod -- I was asked to go to and meet the storage guy there. I don't know if it was, like, eight o'clock in the morning -- whatever, because I lived there and they didn't live there.

So, I was asked to do things because I was closer to the store and they

D. KETCHAM

weren't. So, I had to go and meet the pod guy to place it in the right space, but -- yeah. As far as the biohazard conditions, the sign was on the building "not to enter, biohazard conditions." I -- and it was moldy. Everything was wet still.

Q Well, the fire was on --

A And we --

Q The fire was on October 25th of 2024. We established that; right?

A Yes.

Q So, what day did you go in? How long after October 24th did you go into the store?

A I -- I don't quite remember. I don't know if it was, like -- I don't remember if it was, like, a couple days after, or the week after. I don't remember.

Q Okay. So, within seven days after the fire was when you went to come in?

A Honestly, I don't really recall. It could have been sooner. It could have

D. KETCHAM

been a couple days after. I don't really remember offhand.

Q It was just one day in which you are alleging you were forced to work in "biohazard conditions"?

MR. KATAEV: Objection to form.

You can answer.

THE WITNESS: I was there for more than one day. I'm -- I was there for more than one day.

BY MR. BOWLES:

Q All right. So, I'm specifically asking about these "biohazard conditions" you're alleging.

Did you work in "biohazard conditions" for more than one day?

A Yes, I --

MR. KATAEV: Objection to relevance.

THE WITNESS: -- I --

BY MR. BOWLES:

Q What was that?

A -- believe so.

Q Yeah. How many days?

A I don't know exactly how many

D. KETCHAM

days, from what I can remember; but it was more than one day.

Q Okay. So, you're saying there was a sign on the store, saying that the store was a biohazard?

A Yeah, it was a sign. Yes.

Q Where did the sign come from?

A I don't know. The fire department, or -- or the landlords.

Q And did --

A I don't know. But we weren't technically supposed to be going inside, I don't think.

Q Did you get a picture of the sign?

A I might have one.

Q Call for production of that.

Did anyone tell you that it was hazardous to you to work in those conditions?

A Yes.

Q Who?

A My friend, Anja, was very upset at me for even going in there. She was

very upset. She said, "You shouldn't be in there," you know? So, that's it.

Q Is your friend, Anja, a medical health professional?

MR. KATAEV: Objection. Argumentative.

MR. BOWLES: That's a simple question.

BY MR. BOWLES:

Q Is she?

A No, but -- I mean, it's -- no. You don't have to be medical to know, if everything's covered in mold and smells like mold, that it's not good for you.

Q So, what does your friend, Anja, do?

A She is retired.

Q What did she do before she was retired?

A She worked as administrator of a school.

Q Okay. Did anybody else tell you that these conditions were hazardous to you?

D. KETCHAM

A Well, I mean, rounded about, when I said I was doing it. My parents didn't think it was a good idea, you know? You know, that thing --

Q Any medical professionals tell you that it was dangerous?

A I didn't ask any medical professionals, because I just needed a few hours -- you know, I needed hourly work. Yeah.

Q Yeah. And they paid you for those hours; right?

A I don't know. I -- there was no clock-in and clock-out, so I don't -- I mean, I got paid for something. I don't know exactly what the hours were. I -- and I honestly don't remember.

Q All right. Do you claim that you didn't get paid for the hours of work?

A No. Like I said, I don't know how accurate the hours were, because I was there early with the pod.

Q Yeah. And we've established, at this time, you were seeking hours; right?

D. KETCHAM

You wanted more hours, because you didn't have a store to manage anymore?

A Correct?

MR. BOWLES: Yeah. Can we take a quick five-minute break, back at 2:25? We're just about done here.

MR. KATAEV: Sure.

MR. BOWLES: Thanks.

THE REPORTER: All right. 2:17 p.m. Off the record.

(Off the record.)

THE REPORTER: The time is 2:24 p.m. On the record.

MR. BOWLES: Thank you. I appreciate the small break. I used the time to trim a little bit in the outline so we can get out of here quicker.

BY MR. BOWLES:

Q Just one follow-up on the set of questions about the biohazard conditions: Did you suffer any health conditions after that work?

A Well, other than my throat and everything? I mean, nothing that I can --

D. KETCHAM

I don't know. I never followed through, but -- you know, it wasn't good conditions; and I don't know if something is to come after that. I have no idea.
Q Okay. Good. Sitting here today, are you aware of any health conditions that came from your work there?
A Not at the moment.
Q Okay. So, I presume you didn't see a doctor relating to any health conditions relating to that work?
A No, but I'm kind of anti-doctor, so --
Q Going to turn your attention back to Exhibit 25, which is your responses to interrogatories; and particularly, to your response to Interrogatory number 6.
Interrogatory number 6 asked about if you "complained or reported internally to any defendant about the FLSA claims or New York Labor Law claims," so on and so forth. Your response is that you "complained verbally and in writing to

D. KETCHAM

Defendants Kristin Sheeler and Jim Brinnen orally and via email."

Do you see that?

A I do.

Q All right. This is just to make sure we've got everything. Have you produced all documents in which you've complained to Sheeler or Brinnen? Have you produced those to your attorney?

A I mean, I assume I did.

Q Okay. To the extent you haven't, I'll call for production of those documents.

The next bullet point says you "complained to Natalie and Cathy, both verbally and in writing, via text message."

Do you see that?

A Yes.

Q All right. Who are Natalie and Cathy?

A So, Natalie -- she was basically, I guess, the buyer. So, she would -- she was, like, the buyer of NIBI.

D. KETCHAM

And Cathy was the manager of Bridgehampton --

Q All right. Do you know --

A -- or, she is the -- is the manager of Bridgehampton, I should say.

Q Do you know their last names?

A Yeah. Natalie Cummings and Cathy Marin.

Q Okay. So, you say you complained to them in writing, via text message. Have you produced all those text messages to your attorney?

A Like I said, I -- I would assume so. But had I not, I -- all will be there.

Q You'll -- what?

A I said, all -- I assume that they -- he does have all of those documents. Yes.

Q Okay. And just --

A And if he doesn't, I will make sure he does.

Q Good. You anticipated me. To the extent you have not --

D. KETCHAM

A Yes.

Q -- I'll call for production of those documents.

Going down just one interrogatory on Exhibit 25, Interrogatory number 7 says that "if you complained or reported about the FLSA claims or NYLL claims to any government agency, identify such agency." Your response is that you complained to the IRS and the New York Department of Labor.

Do you see that?

A Yes.

Q All right. I think we've covered this before, but I just want to make sure: Have you produced all documents regarding those complaints to the IRS and the DOL to your attorney?

A Yes.

Q Okay. To the extent you haven't, or to the extent that it hasn't been produced to me, I'll call for its production, please.

A Yes.

D. KETCHAM

Q And, finally, all the way back to the beginning, we are going to Exhibit 1, which is the complaint in this matter. Just two more paragraphs.

So, we're back at Exhibit 1. I'm going to call your attention to paragraph 40 of the complaint, in which you allege that "on December 6, 2024, Plaintiff Ketcham picks up holiday decorations from Bridgehampton to bring the Montauk on the way, but she was not paid by Defendants for that time."

Do you see that?

A Yes.

Q All right. Is that allegation true?

A Yes.

Q All right. Tell me about what happened there.

A Just like I had to do: I had to buy decorations. I had to pick up their Christmas or whatever it was, and then -- yeah -- just like I -- just like it states: load them up into my car and

D. KETCHAM

bring them to Montauk.
Q Okay. But this --
A Leaving from Westhampton.
Q Well, it says Bridgehampton. Were you leaving from Westhampton?
A Well, I live in Westhampton, so I have to drive to Bridgehampton to pick up the decorations to bring to Montauk.
Q I understand. So, is Bridgehampton on the way from Westhampton to Montauk?
A Bridgehampton is on the way, yes.
Q Okay. Did you have to go far out of your way to do this?
A It's on the way. Not that I would have to go far, but the purpose was for me to get the -- the decorations to bring to Montauk.
Q Okay. I mean, how much of a detour was it? Was it 10 minutes? 15 minutes?
A Well, I had to load it in my car, so I couldn't tell you how long that

D. KETCHAM

was. I -- there was, like, a miscommunication if they were the right decorations. I was on the phone, which is -- I don't always take pictures. But the reason why I even have some of that is because of miscommunication. So, I don't always have pictures of my travels, but the reason why is because there was a bit of a miscommunication, so I had to go back.

Q What pictures are you referring to?

A Oh, no. I -- I know the instance, because I -- it's these totes. I -- I don't know. It was, like, maybe six totes or whatever I had to put in my car. I can't tell you. I'm -- I don't know.

Q Well, you just mentioned pictures. My question was: Which pictures are you talking about?

A I provided a picture of the -- what I had -- the holiday decorations that I had to bring.

D. KETCHAM

Q You provided it to -- who? Your attorney?

A Yes.

Q Okay. We may have that -- I'm not sure -- but if not, I'll call for production of that.

So, how much time do you allege you were unpaid for, in paragraph 40?

A Well, with travel time, I mean -- I don't know -- if the traffic is -- is crazy, sometimes, it takes me, like, an hour and a half, two hours to even get out there; and then, to have to stop and do it -- I don't know.

Q Okay. So, you don't know how much time you're asking for there?

A No. I mean, I could guess, but I don't know. I can't remember how the traffic was going there that day.

Q Did you ask for payment at that time?

A No, but I mean, on -- I would ask Kristin about gas money and -- you know, that -- you know, she was aware that

D. KETCHAM

I wasn't clocked in. And they said they would adjust, but I've never -- I never saw it.

Q All right. But in particular, this time, did you ask for payment for your picking up the holiday decorations?

A I don't know. I don't think I verbally asked, but -- you know, I just -- I would assume that because I'm being asked to do it, they would know that it's work, so --

Q Did you ask her to --

A -- that's all I could say.

THE REPORTER: "Ask her" --

THE WITNESS: I asked to be --

THE REPORTER: I'm sorry, Counsel. Could you repeat the question?

BY MR. BOWLES:

Q Did you ask, in writing, for payment?

A Writing? No.

Q All right. The next allegation is paragraph 41. It's similar. It says "On December 13, 2024, you picked up

D. KETCHAM

merchandise from Bridgehampton to go to Montauk on your way to work."

Do you see that?

A Yeah.

Q All right. And it says you "weren't paid by Defendants for that time."

How much time were you unpaid for?

A Again, I don't -- I don't recall, like, how much time it would have been for me to go there with the traffic. I don't know.

Q Okay. But sitting here today, how much time do you think you were not paid for?

A I don't know. Like, I could tell you, me coming -- going from here to Bridgehampton takes me about two hours with the traffic. And then, I have to go into the store. You know, it's like, you go into the store, you find what they're looking for; then, you bring it out to your car, then you go in -- it's just -- I

D. KETCHAM

don't know.

Q Did you ask for payment for that time?

A No. Again, I would assume that I wouldn't have had to ask that. It would -- it's obvious that it -- I'm working.

Q Okay. But you did not ask -- either verbally or in writing -- for pay for that time; is that right?

A No, I did ask Kristin -- I -- about gas money or whatever. And Kristin said -- it's always, "We'll talk about it," and she'll say "yes," but I never seen it.

Q So, your allegation is you asked for gas money, but not for the time?

A No, the time -- I didn't ask. I assume that she realizes that I am working when I -- she's asking me to do something. Whether or not, I said, "Can you pay me for this time," I mean, to me, that's obvious, you know, that I would be paid for that time.

D. KETCHAM

Q And just to be clear: On a normal day, unrelated to picking up items when you're driving from work to NIBI, would you be paid for your time driving?

A Just the drive to work?

Q Sure.

A I would -- no. It was just -- I was doing their errands on the way to work, and I was working. That's -- I was working while I was doing it.

MR. BOWLES: Okay. All right. I don't have any more questions, unless Mr. Kataev is going to do any kind of a redirect.

MR. KATAEV: No. No questions for the witness. Thank you.

MR. BOWLES: Okay. Ms. Ketcham, I want to thank you for your time. I know these things are difficult, so I really appreciate it.

THE WITNESS: Thank you. I appreciate you, too.

THE REPORTER: All right. I'll go off the record. Oh, I'm just -- I have to

D. KETCHAM

take orders on the record for Veritext. It's a federal case; right?

So, Counsel Kataev, are you ordering a copy of the transcript today?

MR. KATAEV: I'm requesting to read and sign pursuant to Rule 32.

THE REPORTER: Yeah. Thank you. All right. The time is 2:35 p.m. We're off the record.

(Signature reserved.)

(Whereupon, at 2:35 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, JAMES BEKMAN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JAMES BEKMAN
Notary Public in and for the
State of New York

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, SHILOH NEVE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SHILOH NEVE

Goncalves, Teresa v. Kristin Sheeler Designs, LLC
Dina Ketcham (#8386732)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON__________________________________________

________________________________   _______________
Dina Ketcham                               Date

Goncalves, Teresa v. Kristin Sheeler Designs, LLC
Dina Ketcham (#8386732)

ACKNOWLEDGEMENT OF DEPONENT

I, Dina Ketcham, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Dina Ketcham Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:14 5:17 6:16 208:11

**0**

**01/2022** 7:11
**01/2025** 6:8
**02/2025** 6:11
**04264** 1:10

**1**

**1** 3:7 6:24 7:21 42:4,14 43:6 44:21 69:3 73:12 84:7 87:14 91:25 96:12 108:15 119:12 210:3,4 228:4,6
**1/12/2024** 5:12
**1/9/2024** 6:20
**10** 4:5 7:14 9:13 158:15,18 191:8,12 229:22
**10/9/2022** 5:8
**10005** 2:16
**1012** 205:8
**104** 6:8
**1041** 182:21
**1042** 186:2
**106** 6:11
**107** 6:13
**1099** 63:3
**10:04** 3:13 120:20
**10:05** 1:17 9:6
**10:21** 3:17 126:17,23 127:14
**10:59** 65:14
**11** 3:3 4:7 7:16 158:16,17 192:12,14,15
**11/2023** 6:17
**113** 7:8
**11423** 2:7
**118** 3:14
**11977** 1:19 9:14
**11:05** 65:16
**11:55** 65:12
**12** 4:10 52:10 194:16,20 210:3
**12/13/2022** 5:5
**12/2025** 7:11
**12/28/2023** 3:18,20
**12/31/2023** 3:22,24
**122** 3:16
**126** 3:18
**128** 3:20
**129** 3:22
**12:21** 143:10
**12th** 181:17
**13** 4:12 73:14 197:10,13 232:25
**130** 3:24
**136** 4:4
**14** 2:15 4:14 198:2,6
**1400** 118:9
**145** 6:17 7:9
**149** 6:20
**15** 4:16 198:18 198:20 229:22
**150** 186:10,15 186:24
**151** 7:23
**16** 4:18 52:21 199:8,12,21,22
**160** 7:25
**164** 70:14
**16:17** 141:5,14
**16th** 71:12
**17** 4:19 176:7 176:24 201:15 201:17
**178** 6:5
**17th** 70:22
**18** 4:20 204:8 204:13
**181** 5:12
**182** 5:5
**18211** 2:6
**184** 5:15
**186** 5:8
**187** 5:25
**18th** 120:21 122:7
**19** 4:21 204:19 204:21
**191** 4:6
**192** 4:9
**194** 4:11
**197** 4:13 7:11
**198** 4:15,17
**199** 4:18
**1:01** 143:13
**1st** 74:20

**2**

**2** 3:10 4:18,19 4:20,21 7:3,3 7:23 51:23 52:3 53:23 55:5 58:11,12 122:2 204:9
**20** 4:22 44:14 53:25 58:14 69:14 155:2,4 205:6,9 240:15
**201** 4:19
**2022** 4:11,18 43:12 46:20 51:24 52:21 60:4 66:3 73:16 86:9 130:21 143:25 195:6,18,22

196:7 200:5
**2023** 4:13,19 36:12 47:20 48:11,15 70:22 71:12 77:16 84:9 86:13 87:2 130:21 143:24 150:3 155:7 197:11 201:16
**2024** 4:15,21 36:12 48:13 73:17 74:17 87:14 95:24 101:17 103:7 103:10 105:7 115:19 138:19 143:23 145:21 147:4 148:10 148:13,17 149:4,14 150:4 150:6 155:10 181:17 198:4 198:13 203:20 203:21 204:19 207:8 208:3 218:11 228:9 232:25
**2025** 4:17,20 42:13 115:17 115:21 118:12 150:6 196:7 198:16 199:4 204:9
**2026** 1:16 9:13 208:25
**204** 4:20,21 7:13
**205** 4:23
**208** 5:19
**20th** 2:15
**21** 5:3 51:24 60:4 182:19,22
**212** 2:19
**2121** 116:21
**215** 8:4
**219** 116:23,25 117:2
**22** 5:6 67:16 185:23 186:3 200:10
**220** 8:5
**223** 107:14
**225** 7:15 104:15
**227** 7:17 8:7
**23** 5:9 155:8 181:7,10 200:11
**231** 8:8 181:9
**233** 194:18
**235** 197:12
**237** 198:5
**24** 5:13 167:22 168:4 184:4,5 200:11
**24th** 133:22,23 133:24 134:23 135:6,8 218:14
**25** 5:16 156:24 156:25 208:9 208:14 209:8 224:16 227:6
**250** 198:19
**251** 199:11
**25th** 95:23 133:16,24 134:11,25 135:7,9 218:10
**26** 5:20 70:10 70:15 115:17 155:16
**262** 187:17
**263** 178:12
**26th** 135:9
**27** 1:16 5:23 9:13 155:11,14 155:16,17 187:15,18
**28** 6:3 43:6,7 44:21 75:5 178:9,13
**28th** 126:17,24 127:15 128:3,8 128:9
**29** 69:7
**2:17** 223:10
**2:24** 223:13
**2:25** 1:10 223:6
**2:35** 236:9,12
**2s** 199:10 200:4 201:16 204:20

**3**

**3** 3:13 7:5,24 118:23,24
**30** 6:6 69:16 104:13,16 106:20 156:24 156:25
**300** 188:14
**31** 6:9 42:13 73:17 74:17 106:7,8 138:19
**31st** 101:16 105:7 115:19 129:8 130:5 131:2 132:7 139:9,15 140:21
**32** 6:12 107:11 107:15 128:12 236:7
**32597** 238:13
**32606** 237:16
**33** 6:14 7:9 75:13 145:7,11
**34** 6:18 84:8 86:2 87:6 149:11,16 151:19 153:18
**35** 44:16
**36** 87:13
**38** 6:25
**390-8842** 2:19

**4**

**4** 3:15 7:6 8:3 56:10,11 121:23 122:3 158:17 161:16 161:18 215:16
**40** 44:13 164:25 165:3 165:14 166:17 228:8 231:9
**400,000** 57:10
**41** 232:24
**412-2421** 2:9
**42** 3:9
**45** 145:10
**47** 146:13
**49** 91:24 96:11 100:9
**4:19** 3:19 128:9

**5**

**5** 3:17 7:7 8:5 125:22 126:2 128:8 139:6 157:24 158:17
**5/17/2023** 5:22
**5/29/2024** 5:14
**50** 19:7,8 48:24 49:8 75:5 108:16,17 113:11
**52** 3:12
**53** 136:21
**54** 7:4
**553** 129:3
**555** 130:4
**58** 7:5 128:12

**6**

**6** 3:19 7:8 8:6 127:24 128:4 157:17 158:15 158:18 161:25 224:19,20 228:9
**6/14/2024** 5:15
**67** 7:22
**6:29** 3:15 122:7 161:18

**7**

**7** 3:21 7:9 8:8 128:25 129:4 130:6 227:7
**70** 5:22
**718** 2:9
**78** 7:6
**7th** 208:24

**8**

**8** 3:23 7:10 130:2,7 140:12 140:16,23
**8/18/2023** 3:14 3:16
**8386732** 1:21 239:2 240:2
**84** 191:11
**8:25** 122:14

**9**

**9** 4:3 7:12 136:19,24 139:14 141:4 142:14
**9/21/2022** 3:12
**91** 7:7
**913** 125:24
**914** 127:25
**9:58** 139:16
**9:59** 3:21 129:8 139:10
**9th** 149:14

**a**

**a.m.** 1:17 3:13 3:17,21 9:6 65:14,16 120:20 126:17 126:23 129:8
**ability** 24:6 138:9 237:9 238:6
**able** 24:22 30:15 33:7 34:10,13 36:10 109:8 111:5 113:23 114:22 123:4 142:16 185:3 189:17 192:22 193:4
**above** 156:13 240:7
**absent** 9:19
**access** 56:14
**accordance** 171:6
**account** 167:10 167:13,18 194:2,19 195:6 196:10,21 198:13
**accountant** 187:11 202:21
**accounted** 191:4,4
**accumulation** 162:12
**accurate** 73:20 76:13 79:23 146:21 153:3,7 184:24 193:11 200:12 202:4,5 209:17,20,23 212:3 222:22 237:8 238:5
**accurately** 75:15 129:13 142:9 195:17 197:20 198:12 200:4
**ach** 4:10,12,14 4:16 194:4,19 195:13 198:4

**acknowledge...** 240:3
**acknowledg...** 9:16
**acted** 171:6
**acting** 44:22 46:7 47:15,21 48:7,15 49:3 211:5
**action** 3:7,8 237:11,15 238:8,11
**actual** 88:17 105:6 108:20
**actually** 29:11 46:7 47:21 54:13 74:3,15 91:10 116:2 121:17 123:4 167:9,16,17 207:10 216:14
**add** 77:5 215:21
**added** 162:16
**additional** 165:16
**additionally** 9:19
**additions** 240:6
**address** 52:2 116:15,17,20
**adjust** 232:3
**administer** 9:16
**administrator** 221:21
**advocate** 7:12 35:14,15 36:9 203:24 206:25 207:10 208:4
**advocates** 36:17
**agencies** 201:2
**agency** 110:5 227:9,10
**ago** 57:7,24 67:8
**agree** 9:17,22 40:2 140:11 179:13
**agreed** 69:13 70:24 74:9
**agreement** 7:4 52:15 53:24 54:19 55:7,8 55:19,20 56:3 58:13,18,18 59:22 61:14,16 73:25 74:12
**ahead** 46:15 80:14 120:7,8 127:8 168:18 217:17
**alarming** 95:2
**alerts** 93:7
**allegation** 47:14 48:6,24 49:9 74:23 85:18,25 86:22 91:25 108:23 136:7 165:11 200:18 228:16 232:23 234:17
**allegations** 23:16 42:23 210:11
**allege** 113:10 228:9 231:8
**alleged** 176:6 210:5
**alleging** 201:23 204:24 219:5 219:15
**allow** 87:23
**allowed** 36:16 36:17
**amazing** 21:20
**amazon** 156:6
**amount** 20:22 89:21 156:8,9 162:15
**analyzed** 142:25 143:3
**anja** 220:24 221:4,16
**annie** 66:19
**annual** 152:15
**answer** 12:24 13:6,10 14:2 17:20 39:19,23 41:8 51:6,12 76:19 93:16 116:9,11 118:4 164:21 173:6 219:8
**answered** 14:8
**answering** 28:12
**answers** 12:13 12:25 13:12
**anti** 224:13
**anticipated** 226:24
**anybody** 13:14 15:7 73:3 80:12 166:20 173:23 174:3,9 174:19 182:14 221:23
**anymore** 186:18 196:11 196:21 223:3
**anyway** 68:22 162:22
**apologies** 62:7
**apologize** 60:25
**app** 179:12,15 179:17 180:2
**appear** 195:4
**appeared** 194:11
**appears** 42:11 51:23 52:10,14 55:7,12 60:4 70:10,11 104:14 107:12

119:7 121:24 130:5 136:22 145:8 149:11 149:25 178:10 181:14 182:25 183:3,4 184:8 185:24 186:6 187:21 191:9 194:16,18 197:11 198:3 199:8 201:13 201:15 204:9 204:19 205:6 208:9
**appended** 240:7
**applicable** 10:2
**applicants** 87:15,18 90:4
**application** 109:18,20 112:22
**applied** 108:18 109:12 110:2
**apply** 209:14
**applying** 112:7
**appreciate** 223:15 235:21 235:23
**approximately** 48:24 75:11
**argument** 20:22
**argumentative** 51:4 221:7
**aside** 117:6 136:13 172:23
**asked** 16:17 23:2 24:2 26:24 27:21 34:9 37:9 46:3 46:6 50:20 60:2 61:5 65:24 72:17 87:8 93:19 94:11 101:9 103:3,10 106:22 118:15 131:11 162:14 171:23 172:20 178:3,21 180:13 186:14 186:18 188:23 189:14 193:25 195:20 212:17 213:13 214:22 217:8,19,24 224:20 232:9 232:11,16 234:17
**asking** 11:25 28:11 51:10 105:14 116:10 127:3 142:5 144:22 161:11 162:17 164:2 205:20 210:9 219:14 231:17 234:21
**assigned** 9:4 69:8 100:12
**associate** 43:16 44:2,9 45:25 46:20 49:4 81:14 99:9
**associate's** 43:18
**assume** 20:17 78:14,16 84:14 119:24 124:21 225:11 226:14 226:18 232:10 234:5,20
**assumption** 125:17
**attach** 52:14
**attached** 55:13 55:17 60:5 61:15
**attachments** 56:23
**attendance** 10:9
**attention** 69:23 70:3 73:11 84:7 91:24 108:15 138:18 212:13 224:15 228:7
**attorney** 13:24 14:3,18,22 22:5,10,21 38:15,19 56:22 78:12 79:16 91:8,16 151:10 160:16 172:4 202:23 225:10 226:13 227:19 231:3 237:13 238:9
**attorneys** 39:20
**attractive** 59:4
**audible** 29:7 131:5
**audio** 237:7 238:3
**august** 1:16 9:13 18:22 53:17,17 120:21 122:7 208:24
**authorized** 9:15
**automatic** 193:25
**available** 94:9 140:9 193:16
**avenue** 2:6
**average** 49:15
**aware** 14:25 30:19,20 146:2 168:14,19 176:5 190:20 224:7 231:25

**awkward** 26:8 26:11

**b**

**b** 3:5 4:1 5:1 6:1,15 145:15
**back** 26:23 34:25 35:4 44:11 46:18 56:3 58:11 61:19 64:22 73:13 79:7 99:12,14 101:10,12 106:4,23 108:5 108:15 128:7 139:5 143:17 147:24 176:8 176:19,25 187:2 206:16 213:25 214:13 214:16,24,25 223:6 224:16 228:2,6 230:11
**bank** 7:10 36:8 194:2,11 195:2 195:5,24,25 196:6,9,12,12 196:17,24 197:3,6,20
**base** 213:7
**based** 39:23 72:9 73:6
**basement** 82:16
**basically** 35:18 76:6 82:20 110:7 114:5 154:17 214:18 216:6 225:24
**basis** 122:23 142:12
**bates** 52:9 70:13 104:15 107:14 119:12 121:25 125:24 127:24 129:2 130:4 136:21 145:9 146:13 178:11 181:8 182:20 185:25 187:17 191:10 194:17 197:12 198:5,19 199:10 205:7
**bathroom** 14:6
**beach** 47:16 48:8 66:6 74:2 77:12 81:4 101:21,23 108:12
**bearing** 119:12 185:25 187:17 194:17 198:19
**bears** 70:13 104:15 107:14 121:25 125:24 127:24 129:2,7 130:4 178:11 197:12 198:5 199:10
**bedroom** 13:17
**began** 43:10
**beginning** 44:6 52:10 61:7 86:7,9 136:21 199:11 205:7 206:14 228:3
**behalf** 1:5 2:2 2:11 9:9
**bekman** 1:20 9:3 12:11 237:2,17
**believe** 45:7 49:13 52:19 72:16 81:3,5 82:25 107:13 119:9 156:6 157:9 171:12 181:2 188:12 199:9 213:23 219:23
**believed** 165:19
**beneath** 209:9
**benefits** 35:21 63:4 65:2 108:22 109:10 111:7 112:12 172:10 173:17
**best** 237:9 238:5
**better** 41:24 119:20 126:9 151:2,4 184:13
**beyond** 123:10
**big** 172:14,15 172:16
**billable** 33:15
**biohazard** 8:5 215:22 216:18 216:19 218:4,6 219:6,14,16 220:6 223:21
**bit** 17:5 38:3 39:7 41:21 46:17 84:17 85:15 90:20 94:2 146:16 158:22 166:16 175:17 181:20 184:12 223:17 230:9
**blame** 168:17
**blow** 170:8 174:11
**blurred** 183:9
**bojo.law** 2:17 2:18
**bonuses** 156:2
**book** 170:20
**books** 63:4 65:2
**borrow** 217:8
**boss** 36:15
**bottom** 119:13 122:9 209:2

**boutique** 43:23 62:24 66:5
**boutiques** 6:15 145:16
**bowles** 2:12,14 3:3 10:14,15 11:21,23 17:19 18:12 21:4 38:22 39:4,5 40:2,3 42:2,16 51:5,21 52:5,8 52:12 53:3 54:21 55:3 58:6,10 60:22 60:25 61:4 65:9,12,18,19 70:8,17 77:6 78:21,24 85:24 91:19,22 99:12 99:15,21 100:7 102:18 104:11 104:18 106:5 106:10 107:9 107:17 113:4,7 117:19 118:10 118:21 119:2 121:22 122:5 125:12,20 126:4 127:22 128:6,23 129:6 129:25 130:9 131:23 136:17 137:2 143:5,15 143:16 144:8 144:12,19,21 145:4,13 149:9 149:18 151:15 151:18 153:24 160:23 161:2 164:22 173:5 178:7,15 181:5 181:12 182:16 182:24 184:2,7 185:21 186:5 187:13,20 191:5,14 192:12,17 194:14,22 195:10 197:8 197:15,25 198:8,17,22 199:6,14,22,24 200:2 201:14 201:19 203:4,6 204:16,23 205:3,11 208:6 208:16 219:12 219:21 221:8 221:10 223:5,9 223:15,19 232:19 235:12 235:18
**box** 188:16 189:18
**bracket** 135:10
**bracketed** 135:22
**break** 14:3,4,9 17:4 18:3 28:14 46:16 65:10 93:2 109:11 143:6 166:8 183:18 217:5 223:6,16
**breakdown** 150:11 151:21 152:7,12
**bridgehampton** 25:24 30:3 45:2,3 67:19 69:9 81:7 82:7 82:19 83:8 96:21 97:7 98:7 105:15 116:16,18 117:3 157:25 189:15 226:3,6 228:11 229:5,8 229:11,13 233:2,20
**brief** 13:20
**briefly** 11:24
**bring** 35:6 70:2 126:7 228:11 229:2,9,20 230:25 233:24
**bringing** 36:3
**brinnen** 1:12 3:11 5:4,7,9,14 5:20 6:18 7:15 7:24 9:12 16:8 19:18,20,24 20:3 24:7,13 25:12,16 26:25 27:9,24 30:16 30:25 32:8,12 32:19,24 41:5 41:6 50:15 51:8,25 53:7 55:16 57:4 60:6 70:12 123:12,24 124:5,15 149:13 153:6 160:22 165:13 181:15 182:4 183:4,17 184:10,18,23 185:4 186:7 225:2,9
**brinnen's** 183:13
**broker** 94:5,21
**brought** 69:22 212:12
**bucks** 156:8
**build** 173:10
**building** 110:7 216:22 217:6 217:13 218:5
**bullet** 215:18 225:15
**bunch** 78:7 110:20

**burned** 97:5,9 97:18 98:15
**burning** 98:4
**burnt** 98:6,23
**busy** 72:3 79:5 84:16 160:4 177:13,17 213:4
**buy** 157:12 228:22
**buyer** 225:24 225:25
**buying** 157:4 170:16

**c**

**c** 2:1 6:22 7:1
**calculation** 165:22 166:3
**call** 29:15 35:15 38:23 54:21 58:7 67:6,10 78:23 91:19 108:6 110:13,14 113:5 145:4 150:9 151:17 154:9 160:20 203:4 220:18 225:13 227:3 227:23 228:7 231:6
**called** 11:13 93:15
**calls** 164:19
**camera** 99:11
**car** 25:21,25 26:3,3 90:22 228:25 229:25 230:18 233:25
**card** 156:5,7,11 189:21
**care** 27:18 43:20 94:25 172:9 173:15
**cared** 217:10
**careful** 12:12
**carelle** 116:13
**case** 1:9 149:24 183:17 184:22 236:3
**cases** 89:23
**cash** 188:11,12 188:15 189:2,3 189:4,4
**catch** 216:2
**category** 72:10 126:13
**cathy** 8:6 31:21 31:22 33:13 80:11,19 83:9 103:3,5,14 108:3,4,10 173:20 189:17 190:12 225:16 225:22 226:2,9
**cathy's** 81:7 173:21
**certain** 16:16 20:21 22:24 36:6 159:11 172:9 183:18 214:14
**certainly** 13:24
**certificate** 237:1 238:1
**certified** 9:22
**certify** 237:3 238:2
**change** 48:16 48:19 142:19 239:4,7,10,13 239:16,19
**changed** 63:19 158:16 183:23
**changes** 240:6
**charge** 124:24 125:4
**check** 38:20 79:21,22 121:16 123:15 193:19 203:17 207:4
**children** 157:13
**christmas** 133:11,15 134:11,15,16 134:22,25 135:2,5 146:20 147:9,25 148:9 148:16 156:5 156:15,16,17 189:16 228:23
**circumstance** 19:23
**circumstances** 17:10 24:24
**city** 94:10
**claim** 114:24 115:2 117:9 222:19
**claims** 224:23 224:23 227:8,9
**class** 3:7
**clean** 159:7 216:11
**cleaned** 81:17
**cleaning** 158:22
**clear** 17:23 18:11 71:3 85:17 235:2
**clearer** 146:17 181:20 184:12 205:18
**client** 201:24
**clock** 3:13,15 3:17,19,21,23 4:3,4,8 7:6,6,25 16:16 20:17,19 24:14 27:16 30:11,12,18,18 31:3 49:20,21 49:22,24 75:17 76:3,3 77:8,20

77:20 78:11,11 79:2,3 87:24 88:9,18,19 89:4 94:15 118:18,19 119:10,11,17 119:17 122:24 122:25 123:5 124:24 125:23 125:23 128:11 132:4,4,11,11 132:23,24 139:7,15 140:4 140:12,20 141:4,8,19,19 141:24,24 142:9,10,13,13 142:18 159:24 160:9 161:4,5 161:13,17 163:3,3 167:25 168:6 191:17 222:15,15
**clocked** 7:23 16:18 18:6,7 20:20,21 23:5 23:5,7,21 24:3 24:8 50:11 76:17 88:24,24 120:13 121:2,2 121:6,6 122:8 122:14,24 123:7,7 126:13 126:24 127:6 127:11,15,16 127:19,20 128:11,16 130:10 131:13 131:14,17,18 131:20,20 132:7,7 142:16 162:2 232:2
**clocking** 18:3 23:8,10 27:19 27:19 131:3
**close** 158:8,10 188:11
**closed** 81:19 82:3 133:10,11 158:2 161:25
**closer** 45:17 126:7 217:25
**closes** 81:24
**closing** 157:16 157:20
**clothes** 43:23 81:18 157:10 157:12 158:24 170:16 176:9 176:25 216:2
**clothing** 157:4
**clue** 36:25
**code** 110:12
**coffee** 88:3 90:16
**collect** 109:8 111:5 112:3 113:23 114:22 189:7,8
**collection** 82:22
**collective** 3:7
**college** 103:17 178:24
**come** 16:18 35:23 36:18 45:15 62:21 95:8 102:24 125:10,13 132:14 163:6 172:7 173:13 189:7 190:2 216:10 218:22 220:8 224:5
**comes** 57:11
**comfortable** 193:24
**coming** 37:10 37:11 106:23 142:21 159:9 170:15 233:19
**comment** 176:22
**commission** 58:24 59:5,8 59:10,12,13,19 61:22,25 62:13 69:20 70:25 71:14 72:7,18 72:23 211:16 211:18
**commissioner** 93:20
**commissions** 58:19 62:10,11 62:17 71:21 72:8,14,21 73:9 212:9
**communication** 90:17 205:19
**communicati...** 138:5,7
**company** 16:10 29:5,12 36:18 39:11,13 40:21 40:22,23,25 102:7,21 114:9 114:21 146:23 155:23 156:18 172:11
**compare** 79:3
**compared** 141:18,24
**compensating** 26:10
**compensation** 5:11 6:20 7:4 52:14 53:24 55:20 58:12,13 59:21 61:14,15 108:21 156:13 181:16
**complain** 80:5 80:12,16 85:22 166:20

**complained** 84:10 86:15 98:18,20,23 166:11,19 224:21,25 225:9,16 226:11 227:7 227:11
**complaining** 7:14
**complaint** 3:8 7:16 23:17 41:16 42:12 69:3,6 73:12 74:23 83:15 84:8 87:10 91:25 96:11,12 96:14 99:2 100:3,4,8,11 135:20 136:2 153:11 176:6 214:4 228:4,8
**complaints** 75:14 92:3 96:13 100:10 168:20,23 169:6,10 214:6 214:11,23 227:18
**complete** 55:18 151:22 240:8
**computed** 75:16
**computer** 37:3 78:7 83:19 84:2 109:19,21 109:24 112:17 180:6
**computerized** 209:11,14
**computers** 110:9
**concept** 64:3 134:7
**concerned** 16:5 29:19 44:7
**concerning** 92:3 96:13 100:11 108:20
**conclude** 152:19 166:4
**concluded** 236:13
**conclusion** 164:20
**conditions** 215:23 216:18 216:19 218:4,6 219:6,14,17 220:21 221:24 223:21,22 224:4,8,12
**confident** 133:16
**confirm** 174:13
**confused** 134:7
**confusing** 40:19 136:4,6 167:7
**confusion** 103:13
**consider** 29:18
**consistent** 69:10 138:24 148:6
**constitute** 10:6
**construction** 217:4
**constructive** 92:5 100:17
**cont'd** 4:1 5:1 6:1 7:1 8:1
**contact** 92:19 92:22 171:21
**contacted** 102:25 103:20
**contents** 40:6 175:21
**context** 180:5
**continuation** 106:12,19 107:12
**continue** 34:15
**contributed** 152:12
**convenient** 104:3
**conversation** 32:6 207:2
**conversations** 39:22,25 40:6 137:25 202:7 206:5
**cool** 66:7
**copied** 38:18
**copies** 22:3 38:14 91:8 102:9,20 111:19 160:15 195:25 196:24 197:3 215:8
**copy** 7:3,9 42:10 54:18 109:17 143:20 144:2,23 145:5 202:22 236:5
**corner** 122:6
**corporate** 15:19
**correct** 16:3 17:7 19:3 20:11,12,25 28:19,20 30:18 31:3 33:18 36:19 39:9 43:13,16,17 47:16 50:13 53:20 59:20 62:19 63:21 64:4 69:11,14 80:2 96:9 97:10 98:16 105:19 106:13

107:5 109:13 112:8 118:19 118:20 123:8 124:17 126:17 127:21 128:21 134:15 136:10 148:18 150:4 151:11 157:17 160:16 162:3,4 168:8 175:10 184:25 185:18 187:23 192:11 196:19 199:21 200:9,10,11,16 200:20 201:7 201:25 202:2 202:17 210:16 212:22 223:4 240:8
**corrected** 4:5 191:17
**correcting** 183:13
**corrections** 182:9 183:5 240:6
**correctly** 179:12 188:14 194:24
**corresponden...** 4:22 6:24
**counsel** 11:18 40:7 60:17 78:6 117:18 199:20 232:17 236:4 237:10 237:13 238:6,9
**count** 82:21,22
**counts** 83:13 159:17
**couple** 20:16 22:6 29:16,17 63:7 68:10,16 86:11 103:22 110:13 119:5 151:13 199:3 218:18 219:2
**course** 15:25 48:17 57:19,22 63:25,25 93:22 137:12,13 141:23 142:6 168:13 169:2 171:8 193:8,17
**court** 1:1 11:24 12:25 42:21 191:23
**cover** 81:7 103:3
**covered** 28:16 221:14 227:16
**covering** 67:19
**crazy** 12:11 177:13 231:12
**credit** 196:16 196:18
**cummings** 8:7 174:2 226:8
**cumulative** 152:15
**curious** 172:24
**current** 203:8
**curve** 62:18
**customer** 83:23 170:4,7,15,24 170:25
**customers** 43:20 81:15 169:9
**cut** 206:15
**cv** 1:10
**cvs** 50:5
**czech** 66:25

**d**

**d** 3:1 6:15,22 6:22 7:1,1,19 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 52:10 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,14 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1,15 105:1 106:1 107:1,14 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1,3 130:1 131:1 132:1 133:1

134:1 135:1
136:1,21 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1,10
145:15 146:1
146:13 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1,11 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1,17
188:1,3 189:1
190:1 191:1,11
192:1 193:1
194:1,18 195:1
196:1 197:1,12
198:1,5 199:1
199:11 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
**daily** 122:23
**damage** 94:19
**damages** 215:17
**dangerous** 222:7
**data** 4:4
**date** 1:16 4:7 21:19 29:11 74:3 107:4,7 129:7 130:5,6 133:3 152:6 208:25 239:24 240:12
**dated** 42:12 51:24 71:12 143:23,24 145:21 149:14
**dates** 21:8,9,12 21:14,17,22 164:5,10,13 196:4
**daughter** 13:16 103:17 107:21 107:22 170:17 170:17 178:24
**david** 2:12,17 10:14 11:23
**day** 34:20 37:5 48:20 49:14,17 74:15,18 79:25 80:4 89:4 94:15 101:16 103:9 105:5,6 110:13 126:24 128:9,15 129:19,23 130:14,18 131:4,4 132:18 132:20,20 133:10,12,13 134:12,13,17 134:17,18,19 134:19 135:16 135:18 136:9,9 138:25 146:19 147:25 158:6,8 159:10 161:24 167:4 174:17 176:7 178:4,5 178:5,23 216:16 218:13 219:4,10,11,17 220:3 231:20 235:3 240:15
**day's** 215:24
**days** 49:11 80:23 81:2,7,9 110:14 131:13 131:17 135:14 177:23,23 179:6 183:19 218:18,21 219:2,24 220:2
**deal** 172:14,15 172:16
**dealing** 217:12
**dealt** 27:21 31:12
**debit** 189:21 195:9
**december** 73:17 74:17 101:16 105:7 115:19 126:16 126:23 127:14 128:3,8,9 129:7 130:5 131:2 132:6 133:16,22 134:11 138:19 139:9,15

140:20 228:9 232:25
**decide** 121:11
**decided** 108:11
**declare** 240:4
**decorations** 189:16 228:11 228:22 229:9 229:19 230:4 230:24 232:7
**deduct** 186:15
**deemed** 240:6
**deep** 207:2
**defendant** 2:11 10:15 15:19 215:18 224:22
**defendants** 1:13 5:18 11:25 43:11 69:8,19,22 73:15 84:10 86:15 87:16 92:3 97:3 100:16 108:19 113:9 208:12 215:25 225:2 228:13 233:7
**define** 164:17
**definitely** 31:19 31:20 44:18 57:2 72:6 80:10
**delayed** 34:25
**delete** 57:10
**deleted** 57:13
**demand** 3:8
**denied** 180:14 180:15
**department** 113:16 115:3 220:10 227:12
**depending** 157:21
**deponent** 240:3
**deposed** 12:5
**deposit** 184:24 194:2,7,10
**deposition** 1:15 9:7 10:4 14:13 42:5 54:25 67:12 104:13 175:12,15,21 237:1
**deposits** 36:9 189:5,5,7,19 195:5
**derogatory** 169:15,17,20
**describe** 129:12 194:24 215:16
**description** 3:6 4:2 5:2 6:2,23 7:2,20 8:2
**designated** 30:12 44:22 47:15 48:7,15 99:5,6 100:3,4
**designs** 1:10 6:14 9:11 15:21 16:6 145:15 191:16 194:8 239:1 240:1
**detail** 30:15 215:17
**details** 4:7 5:11 6:20 181:16 182:5 183:6,13 186:8 212:15
**detour** 229:22
**difference** 147:7
**different** 17:24 27:18 28:23 36:22 44:19 112:13,19 136:11 155:14 156:20 157:24 158:4 162:18 175:23 183:2 193:2 212:11 214:21
**differently** 44:12 77:19 137:7
**difficult** 235:20
**digital** 237:7 238:3
**dina** 1:4,15 2:2 3:10 4:22 5:3,6 5:10,21 6:3,7 6:10,12,19 9:7 9:9 10:20 11:12 71:3 120:14 122:9 127:10 128:10 138:19 191:17 239:2,24 240:2 240:4,12
**dinax3** 52:2 56:13,15
**direct** 36:9 91:23 138:17
**direction** 26:20 125:18 207:4
**directly** 16:7
**disagreeing** 74:25
**discharge** 92:5 100:17
**disclose** 39:21
**disclosing** 39:24 40:5,11
**discount** 156:22,25 157:13
**discretion** 154:19
**discuss** 34:22 143:8 154:17 172:2,18 175:20
**discussed** 34:14 62:14 119:9

139:6 175:14 178:25
**discussion** 74:6 80:20,22 99:24
**discussions** 25:25 39:20
**display** 127:9
**dispute** 142:13 150:12 207:11
**disputes** 170:3
**distraught** 37:13
**district** 1:1,2
**divide** 81:12
**divorce** 187:4
**divorced** 64:21
**doctor** 224:11 224:13
**document** 42:3 42:17 51:22 52:9,17 54:5 54:22 55:5,14 59:9 70:9,11 70:18 78:19 104:12,15,19 106:6 107:10 113:25 114:23 118:22 119:12 121:23,25 125:21 126:5 126:12 127:23 128:24 130:2 136:18,20 137:3,8,15 138:4,10 140:9 142:4,8 145:7 145:9,17 147:4 149:10,12 150:8,10,11 151:20 152:16 178:8,10 181:6 181:8 182:18 182:20 184:3 185:14,23,25 187:15,17 191:8 192:13 192:18,20,23 192:24 193:5 193:10,19 194:15,17 195:17 197:9 197:11,16,25 198:3,18 199:7 204:8,18 205:5 205:7,14 208:8 208:10,17 209:20
**documentation** 21:6 22:20 112:20 114:10 114:11 201:6
**documents** 7:8 7:14,17 22:9 38:24 41:10 102:6,10,21 111:19 113:6 119:6 150:13 151:10 165:13 195:21,22 199:9 201:12 206:4 225:8,14 226:20 227:4 227:18
**doing** 26:9,13 26:22 28:7 37:15 50:20,23 65:20 89:3,16 124:19 160:4,5 222:3 235:9,11
**dol** 7:16 227:19
**doors** 63:7 177:12
**double** 38:20 56:25
**draw** 188:12,15
**drawer** 189:2,3
**drink** 14:6
**drive** 12:11 68:11 229:8 235:6
**driving** 235:4,5
**drop** 26:21
**due** 207:17
**duly** 11:14 237:5
**duties** 43:18 46:3,14

**e**

**e** 2:1,1 3:1,5 4:1 5:1 6:1,22,22 6:22,22 7:1,1,1 7:1,19,19,19 8:1,1,1 239:3,3 239:3
**earlier** 138:24 158:2
**early** 93:14 158:8,10 222:23
**easier** 12:8 159:22
**easter** 147:9
**eastern** 1:2
**eight** 75:23 149:20 217:21
**either** 19:14 21:22 26:21 31:21 50:8 92:25 123:20 158:15 160:12 190:9 198:24 215:4 234:10
**else's** 173:3
**email** 3:10 5:3 5:6,9,20 6:18 19:16,24 20:3 38:5 42:8 51:24,25 52:6 52:20 53:8,12 53:19 55:13,23 56:12,14,25 60:5 61:11,14 70:12 71:11,12 72:6,15 89:20 106:12,14

123:19,21,24 149:12 150:18 150:21,25 151:9,12 181:14 182:4 182:25 183:3 186:6 225:3
**emailed** 19:19 31:15 36:19
**emailing** 150:22,24
**emails** 7:5,23 22:7,14,16 33:4 38:9,11 38:13,17,18 53:6 57:3,10 57:13,15,16 58:3 102:23 125:8 137:20 137:20,21
**emanuel** 2:4,8 10:12 15:14
**employ** 171:14
**employed** 29:13,14 59:6 73:15 74:4 115:20 116:6 172:4 176:20 192:2 237:10 237:13 238:7,9
**employee** 4:10 4:12,14,16 26:22 35:24 36:2 37:11
109:4,5,7 111:3 113:13 114:7,21 136:12 153:21 154:2 156:21 157:13 207:19 237:12 238:9
**employees** 31:23 33:17 114:8 145:22 154:15 175:7 176:24
**employer** 26:9 35:20 108:24 109:2 112:11 173:17
**employment** 102:23 115:8 115:18,23 172:10 173:16
**ended** 29:10,12
**enter** 216:23 218:6
**enthralled** 160:4
**entitled** 20:24
**entry** 138:18 139:13 141:3
**envelopes** 189:8,9
**errands** 124:19 235:9
**es** 237:4
**especially** 18:20 37:6 159:9,17
**esquire** 2:4,12 2:13
**established** 66:2 69:18 105:6 118:16 138:23 218:11 222:24
**estimate** 21:10 44:14
**eve** 135:5
**eventually** 115:9
**everybody** 10:8 42:10
**everything's** 41:15 221:14
**evidence** 113:9 113:15,20,22 113:24 114:17 163:21 165:20
**evidentiary** 10:3
**exactly** 17:12 72:21 111:8 145:19 148:6 166:6 176:21 199:16 203:2 214:17 219:25 222:17
**examination** 3:2 11:20
**examined** 11:16
**example** 13:11 14:13 89:14 113:17 134:10 161:15 167:22 176:24 177:25 181:14 182:3 215:24
**exchange** 104:22 106:12 106:14 107:13 107:20
**excuse** 196:25
**exhibit** 3:7,10 3:13,15,17,19 3:21,23 4:3,5,7 4:10,12,14,16 4:18,19,20,21 4:22 5:3,6,9,13 5:16,20,23 6:3 6:6,9,12,14,18 7:3,9 42:4,14 43:6 44:21 51:23 52:3 53:23 55:5 58:12 69:3 70:10,15 73:12 84:7 87:14 91:24 96:12 104:13,16 106:7,8,20 107:11,15 108:15 118:23

118:24 121:23 122:3 125:22 126:2 127:24 128:4,7,25 129:4 130:2,6 130:7 136:19 136:24 139:6 139:14 140:12 140:16,23 141:3 142:14 145:7,11 149:11,16 151:19 153:18 161:16,18 178:9,13 181:7 181:10 182:19 182:22 184:4,5 185:23 186:3 187:15,18 191:8,12 192:12,14,15 194:16,20 197:10,13 198:2,6,18,20 199:8,12,21 201:15,17 204:8,13,19,21 205:6,9 208:9 208:14 209:8 224:16 227:6 228:3,6
**exhibits** 42:9
**expand** 34:2
**expectations** 55:19
**expected** 26:17 27:17,20 62:2 164:25
**expended** 189:11 190:21
**expense** 144:6
**expenses** 5:25 189:2
**experience** 177:10 212:5
**explain** 40:11 108:23
**express** 207:13 207:21
**extent** 38:24 39:19 78:21 91:13,20 151:8 151:16 225:12 226:25 227:21 227:22
**extra** 20:25 30:17 31:2,16 31:25 32:13 33:8 49:14 50:16 51:9,16 53:13 89:13,21 123:12,25 124:2,6,16,17 125:15 135:15 135:18 161:25 162:19 186:10 186:15,23
188:12,15
**extremely** 167:21 177:16

**f**

**f** 7:19 8:1
**fabricated** 201:24
**fabrication** 201:21,22
**facebook** 168:11
**facetime** 94:18
**facts** 210:5
**fair** 29:16 51:18 74:18 101:4 110:3 146:4 186:21
**fall** 81:22
**familiar** 168:10 170:2
**far** 16:4 28:4 29:19 44:7 59:7 175:19 191:25 209:22 209:23 218:4 229:15,18
**fax** 111:25
**fcu** 7:11
**fear** 175:2,5
**february** 45:8 85:7
**federal** 37:23 152:25 196:16
196:18 236:3
**feel** 76:12 146:25
**felt** 158:6 163:7
**fever** 180:24
**fewer** 97:9
**figure** 84:4 163:11
**figured** 59:8
**file** 113:12 114:24 115:2
**filed** 35:25 42:21 114:8,20
**filing** 207:18,19
**fill** 37:2 112:10
**finally** 36:22 37:8 93:17 95:7 110:17,22 171:23 228:2
**financially** 237:14 238:10
**find** 171:19 172:7 196:11 204:5 233:23
**finds** 58:8
**fine** 115:24 116:13
**finish** 12:13,15 32:10
**finished** 12:20 13:6
**fire** 34:12 92:13 93:4,4,9,24,25 95:15 99:6

100:4 103:6 104:6 215:25 218:8,10,22 220:9
**fireman** 93:8
**first** 5:18 10:18 11:13 12:4 17:7 34:17 41:12 44:25 47:8 61:8 62:21 86:7,9 93:3 105:11,13 167:4 176:7 177:11 179:2 186:14 187:2 206:13 208:12
**five** 19:4 49:13 49:15 52:10 65:10 93:12 128:11 223:6
**fix** 20:4,6 99:22
**fixed** 19:16
**floor** 2:15 170:14
**florida** 107:22
**flowers** 5:24 188:6,21
**flsa** 224:22 227:8
**focus** 41:21 148:22
**focusing** 86:12 114:15 213:5
**folded** 159:15
**follow** 160:7 223:20
**followed** 26:5 170:21 224:2
**follows** 11:16
**forced** 215:22 219:5
**fore** 33:24
**foregoing** 237:3,4 238:4 240:5
**forget** 160:9 161:4,5,12,12 179:24
**forgetting** 7:25
**forgot** 160:3,5 161:7 168:6
**form** 17:17 21:2 55:20 76:18 85:21 112:10 131:21 164:19 192:5 195:7 219:7
**formal** 12:19
**format** 183:2
**forms** 112:23
**forth** 44:11 224:24
**forward** 13:23 33:22 74:7
**found** 22:19 45:19 56:22 95:19
**foundation** 153:23
**four** 21:11,12 115:16
**friday** 120:20 122:7 167:9,15
**friend** 93:6 220:24 221:4 221:16
**front** 144:4,24 164:12
**fronts** 188:22
**fulfill** 85:12
**full** 44:2,3,4,5 48:20 152:8 158:8
**fully** 13:10 119:18
**further** 237:12 238:8

**g**

**gap** 85:11
**gas** 26:2 231:24 234:13,18
**geez** 66:10
**general** 55:6 83:18
**generally** 76:2
**generate** 192:22
**getting** 26:14 34:5,7 35:8,21 54:4 58:24 59:5 62:17 70:25 71:14,20 72:8,14,14 76:16 80:6,18 82:14 84:10,23 86:16 92:17 96:15 98:24 99:3 100:12 166:4,11 187:2 214:18
**gift** 156:5,7,11
**girl** 87:24 170:22
**girls** 50:6 90:7 159:18 166:13 169:18,22 176:18 190:10 190:19 215:4
**give** 12:7 36:10 46:5 56:21 57:18 65:7 79:15 92:11,24 96:7 101:13 162:22 189:24
**given** 22:3 33:23 38:4,14 44:10 112:24 112:25 114:18 152:3 154:19 207:8 240:9
**giving** 36:3 62:12 85:19 87:9,11 112:10 133:17

**go** 12:8 14:5 22:14 26:8 30:14 37:21,25 46:14 66:14 74:9 76:24,25 80:14 84:16 90:19,20 92:15 93:19 94:12 99:15,21 108:16 110:7 111:12 119:4 120:7,8 127:8 142:18 143:7 144:6,12 168:18 180:24 185:12 189:14 189:20 207:10 217:17,20 218:2,13,14 229:15,18 230:10 233:2 233:13,21,23 233:25 235:24
**god** 115:16
**goes** 82:17 95:12 103:5
**going** 11:6 12:12 13:21 14:24 15:21 23:18 25:19 26:20 28:24 32:4 33:22 34:18,19 35:4 35:4 41:10,12 42:2 43:5 44:11 45:2,11 45:13 48:2 50:5,21 51:21 68:25 69:2,4 70:8 74:2,7 75:20 84:2 91:5,23 95:13 95:17 99:18 103:14 104:7 104:11 106:5 107:9 108:14 108:16 111:20 112:18 114:21 118:21 119:4,5 125:20 127:22 136:17 138:17 139:4 140:11 145:6 146:6 149:9 176:13 178:7,24 180:24 181:5 182:17 185:22 187:4,14 194:14,23 197:8,24 201:5 201:12 204:7 205:4 208:7 213:7 216:7,8 216:14 220:13 220:25 224:15 227:5 228:3,7 231:20 233:19 235:14
**goncalves** 1:4 2:2 9:9 15:12 63:16,23 64:2 64:10 170:3,23 239:1 240:1
**good** 9:2 10:11 10:14,20 11:22 12:24 13:22,22 16:2 41:25 57:23 58:5 65:22,24 66:12 68:21 91:18 113:4 128:20 138:14 143:6 150:10 168:23 169:2,8 184:22 188:5 221:15 222:4 224:3,6 226:24
**goods** 23:21 25:7,9,11 27:3 27:7,10,25 28:19 30:5,10 31:13,17 32:3 170:24
**gotten** 64:21 137:20 208:3
**government** 227:9
**grb** 1:11
**great** 14:12 144:11
**green** 120:13 126:19 127:9 128:16
**growth** 64:25
**guess** 14:19 19:15 35:25 45:20 48:13 49:5 70:24 71:22 93:7,17 103:7 133:25 135:2 139:3 150:2 172:21 217:5 225:24 231:18
**guy** 217:20 218:3
**guys** 143:7 172:3 217:4

**h**

**h** 3:5 4:1 5:1 6:1 239:3
**half** 21:19 29:19 31:2 89:13 162:2 163:17,20,22 165:2,16 166:5 166:9,12,15 231:13
**hamptons** 7:21 66:4
**hand** 11:2 122:6 164:5 195:13
**hang** 144:8 182:16

**hanna** 8:4 80:13,15 174:7 210:15,24 215:5,6
**happen** 13:8 18:13 28:22 35:5 44:24 47:19 48:10 115:10 157:8
**happened** 18:23 19:9 34:13 46:11 166:24 167:24 213:18 215:24 228:20
**happening** 30:6 30:21 89:10
**harassing** 116:4 117:5
**hard** 53:4 92:17 180:17
**harvested** 103:25
**hazardous** 220:20 221:24
**head** 13:2,3 18:17 79:7 86:24 149:5
**health** 221:5 223:22 224:7 224:11
**hear** 43:2 144:9
**heard** 36:13
**hearing** 10:23 206:16
**hectic** 158:23
**held** 99:24
**help** 43:22 63:8 216:10
**helped** 83:7
**helpful** 26:12 35:17
**hereto** 237:13 238:10 240:7
**hey** 51:9
**high** 18:20 45:15 53:16,16 75:9 85:4,8
**highway** 117:3
**hired** 47:2,11 71:13 84:25,25 85:14
**hmm** 17:8 52:23 71:16 75:7 105:8 109:14 140:15 161:20 184:14
**hold** 11:6
**holiday** 6:16 8:8 85:10 131:8 132:3,4 132:11,13,14 132:17,21,25 133:6,7,10 134:9 135:11 135:21,24 136:8 143:21 144:23 145:16 146:22 149:21 150:2 156:15 228:10 230:24 232:7
**holidays** 132:19 146:12 146:15,23 147:14,21 148:15,19 149:2
**home** 63:12 67:24 68:3,7 93:5
**honest** 26:7 101:8 172:5 174:10
**honestly** 29:9 31:6 79:6 136:12 218:24 222:18
**hope** 32:4 78:19
**hour** 31:2 53:25 58:14 69:14 89:13 110:23 155:2,4 155:8,11,14 162:2 231:13
**hourly** 16:15 17:6,25 22:25 53:25 153:19 154:25 156:13 163:19 212:18 222:10
**hours** 4:6,8 7:23 17:2 30:17 31:16 32:14,15,20 33:2,5,5,9 44:8 45:9,24 48:18 48:24 49:8,17 49:25 51:2,9 51:17 53:9,13 75:6 76:23 80:7 81:22 84:16,23,24 85:13,23 87:9 87:11 89:5 90:2,9 92:4,10 92:21,25 96:8 96:15 97:3,4,9 97:19 98:4,14 98:21,24 99:3 100:6,13,16 110:24 117:23 123:7 124:6,7 124:16,17 125:15 128:12 128:17 131:15 131:19 136:22 138:11,15 142:17 148:2 149:20 150:13 152:8 153:18 158:11,20 159:6,23 161:24 162:12

162:15,19 164:7,25 165:3 165:14,16 166:17 167:21 167:22 168:4 191:16 192:6 222:10,13,17 222:20,22,25 223:2 231:13 233:20
**house** 27:11
**hundred** 41:2 70:6 156:8 160:18 167:15 206:7
**hurts** 65:4

**i**

**idea** 25:19 59:7 62:16 72:25 113:20 139:25 140:10 142:19 142:22 172:25 173:7,8 195:8 195:12 222:4 224:5
**identification** 42:15 52:4 70:16 104:17 106:9 107:16 118:25 122:4 126:3 128:5 129:5 130:8 136:25 145:12 149:17 178:14 181:11 182:23 184:6 186:4 187:19 191:13 192:16 194:21 197:14 198:7 198:21 199:13 201:18 204:14 204:22 205:10 208:15
**identify** 10:9 210:4,10 227:9
**ignored** 123:14
**impair** 13:12
**implying** 58:2
**important** 12:10 65:3
**inaccuracies** 7:13 203:18
**inaccurate** 185:5 200:19 204:12,25
**incident** 170:6 171:10
**income** 200:14
**inconsistent** 45:9 134:2,3
**incorrect** 201:3
**indicated** 212:25
**indicates** 205:12
**indicating** 192:5
**indication** 127:14
**individually** 39:14
**inefficient** 207:18
**inform** 123:11
**information** 37:3 38:10,12 40:12 110:11 112:2 140:4 187:25 205:20 210:20,23
**informed** 20:2 69:19 124:15
**inquired** 211:25
**ins** 7:6 27:19 75:17 77:8,20 78:11 124:24 163:3
**inside** 220:13
**instagram** 168:11
**instance** 133:18 133:20 190:4 213:12,14 230:15
**instances** 211:3
**instructed** 159:4
**instructions** 12:8
**insurance** 94:3 94:7,20,24
**intended** 9:25
**intention** 78:17 79:11 121:16
**intentional** 80:3
**intentionally** 17:21
**interested** 64:15 237:14 238:11
**interesting** 34:11
**internal** 102:10
**internally** 224:22
**interrogatories** 5:19 208:13 224:17
**interrogatory** 210:2,3 215:15 224:19,20 227:6,6
**interrupt** 38:2 90:23 99:10 104:10
**interrupted** 62:7
**interview** 50:5 50:6 58:23,25 59:18 60:10,15 61:6 63:11,13 69:17 72:20

88:4,7 89:12 89:22 90:16,18 90:21
**interviewed** 87:15
**interviewing** 87:18 90:3
**interviews** 7:7 89:10 90:11 91:2,14
**introduced** 64:3,6
**inventory** 81:18 82:10,12 82:13,17,21,23 83:4,12,16,17 84:3
**involve** 39:19
**involved** 82:13
**ironic** 62:25
**ironically** 63:5
**irrelevant** 118:8
**irs** 4:23 7:12,16 34:6 35:13,15 35:22 36:13 38:5 152:2 200:22 202:7 203:24 205:19 206:17,24 227:11,19
**ish** 85:7
**issue** 22:20 37:15 71:20 85:16 114:19 150:15,15 172:19 214:21
**issues** 34:4 35:11,12,23 169:25 211:3 214:14,19
**it'll** 99:19 207:6 207:8
**items** 157:11 235:3

**j**

**jamaica** 2:6,7
**james** 1:11,20 9:3,12 237:2 237:17
**january** 45:7 74:20 85:6 149:14 181:17 181:23
**jewelry** 115:24 116:13
**jim** 1:11 3:11 5:4,7,9,13,20 6:18 7:15,24 9:12 16:7 19:18,18 24:7 27:13,18,24 34:14,24 41:5 50:15,22 51:8 77:3 93:16 94:9 124:22 125:5,9,10 142:16 153:6 160:6,10 166:21 184:9 189:7 212:13 216:25 225:2
**job** 1:21 26:11 34:20 63:3 64:3 101:2 117:16,20
**johnson** 2:13 2:14 10:16
**joined** 212:21 217:12
**joining** 174:20 175:7
**joke** 187:12
**july** 18:21 42:12
**jump** 12:17
**june** 53:17 155:7
**jury** 3:9

**k**

**k** 2:12
**kataev** 2:4 10:11,12 15:12 15:13,14 17:17 18:8 21:2 38:22 39:3,18 51:3 54:24 55:2 57:21 58:6,9 65:11 76:18 85:21 102:15 113:2 114:18 118:3,7 121:20 125:6 131:21 138:2 143:9 153:23 164:19 173:4 195:7 219:7,19 221:6 223:8 235:14,16 236:4,6
**kate** 8:3 174:5 174:6 210:17 213:9 215:6,9
**keep** 76:21 90:25 91:11 118:15
**keeping** 82:13
**keeps** 189:18
**kept** 45:10
**ketcham** 1:5,15 2:3 3:10 4:23 5:3,6,10,21 6:4 6:7,10,19 9:1,8 9:9 10:1,20,21 11:1,4,9,12,22 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1

39:1,7 40:1 41:1 42:1,18 43:1,10 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1,6 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1,20 66:1 67:1 68:1 69:1 69:22 70:1,13 71:1,3 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 84:9 85:1 86:1 87:1 88:1 89:1 90:1,24 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,18 109:1 110:1 111:1 112:1 113:1 114:1,16 115:1 116:1 117:1 118:1 119:1 120:1,14 121:1 122:1,10 123:1 124:1 125:1 126:1 127:1,10 128:1,10 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1,23 137:1 138:1,19 139:1 140:1 141:1 142:1 143:1,18 144:1 145:1 146:1 147:1 148:1 149:1,13 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1,18 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1,21 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1,10 229:1 230:1 231:1 232:1 233:1 234:1 235:1,18 236:1 239:2,24 240:2,4,12

**ketcham's** 6:12 92:2 96:13 100:10 194:19

**keys** 101:8

**kids** 157:14

**kind** 18:21 26:15,17 34:11 35:2 74:10 94:13 95:2 120:25 132:5 136:2 154:18 155:15 164:7 183:8 214:21 224:13 235:14

**kinds** 117:11

**kmart** 189:14

**knew** 50:19 51:14,16 60:18 64:14 84:23 89:7,10,15 92:16 125:17 209:22 213:16

**know** 14:7,24 14:24,25 15:8 15:13 18:18,19 19:10 21:8,18 22:13,13 23:14 24:21 26:2,4 26:15 29:9 31:7 32:2,5,5 32:17,22 34:7 34:17,21 35:14 36:10,24 37:2 37:14,15,16,16 37:17 38:16 40:9,10,13 43:21,21 44:16 45:8,11,16 46:6,12 47:4,7 47:23 50:6,22 51:2,7 53:4 54:17 56:18,19

57:7 59:3,15 62:20,21,24 63:2,6,9,17 64:12,13,15,19 64:19 66:24,24 67:4 68:12,23 72:4 73:2,2 74:20,24,24 75:10,22 76:5 76:9,9,10 77:9 77:13 78:14 81:4,22 82:14 82:16,18 83:10 83:20 84:5,15 85:13 86:25 89:25 90:6,7 90:15,19,20 92:9,10,16,21 93:6,24 94:4,6 94:25 95:3,9 95:10,12,16 96:20,25 99:14 100:18,20 103:16,20 106:24 108:13 110:5 112:15 112:16 113:20 114:3 116:10 116:17,19 119:3 123:5,15 124:22 125:8 129:20,24 130:16,17,22 130:24 131:22 131:24 133:19 134:25 137:6 137:19,21 139:22,22 140:8 141:11 142:3,20 146:8 147:10,16,17 147:23 148:2,5 148:5,23 149:6 149:7 150:19 150:21,22,23 150:25 151:4 152:5,6,10 153:8 154:12 154:12,18,20 155:21 157:9 157:25 158:7 158:15,23 159:8,9,11,13 159:17,20,21 160:6,10 163:6 164:7,10,11,12 164:14 166:23 167:3,6 168:3 168:15 169:2,7 169:16,19 170:9,16,19 171:18,23 172:6,9,12,14 172:24 173:9 173:12 174:10 174:12,14,18 174:25 175:9 175:17,18 176:21 177:24 179:19,23 183:25 185:12 187:3,6 189:22 190:17 191:2 194:3,5 195:9 196:23,25 197:2 199:16 200:21 202:6 202:25 207:15 207:15 209:23 210:10 211:2,4 211:17,21,23 211:25 212:2 212:14,16 213:10,13,17 214:7,13,20 216:7,8,12,13 217:6,7,10,21 218:17 219:25 220:9,12 221:3 221:13 222:4,5 222:10,14,17 222:21 224:2,3 224:4 226:4,7 230:14,16,19 231:11,15,16 231:19,25,25 232:8,9,11 233:14,18,22 234:2,24 235:19

**knowledge** 39:24 42:24 175:4,6 210:5 237:9 238:6

**known** 89:19 114:3 116:4 117:5

**knows** 73:3

**kristin** 1:10,11 5:24 6:4,7,10 6:13,14 7:15 9:11,12 15:20 16:5,7 25:20 27:13,20,22 31:11 34:14,24 39:8,16 45:10 47:24 50:23 59:2 82:15 89:8 90:18 91:4,4 92:16 94:9 95:11 102:25 103:15 104:23 116:4 124:20,21,25 125:4,9,14 145:15 158:5 166:21 170:19 179:11 187:22 188:5 189:14 191:16 194:7 212:14 216:6 225:2 231:24 234:12,13 239:1 240:1

**kristin's** 63:12

**l**

**labor** 113:16 115:3 224:23 227:12
**landlords** 220:10
**large** 25:21 26:3 78:19
**larocca** 71:3
**law** 114:25 224:23
**laws** 10:3
**lawsuit** 137:8 137:12 172:3 174:20 175:8 192:20 193:9 193:14,18 210:24 212:21
**lawyer** 14:16 112:4 201:9
**lawyers** 160:24
**leave** 66:11 159:11
**leaving** 75:22 229:4,6
**left** 46:2 47:17 102:7 115:8 120:19 122:6 155:22 171:9 171:13,14 191:15
**legal** 2:5 10:12 164:20
**legible** 41:19
**legitimate** 36:5
**letters** 34:8
**lie** 111:4 113:14
**lied** 108:19 109:7 111:5 113:9,19,21
**lightspeed** 4:3 4:5 191:17
**line** 206:14 239:4,7,10,13 239:16,19
**lingerie** 66:5
**list** 33:23
**listed** 111:2
**literally** 37:5
**litigation** 7:5 56:17 57:17 141:23 142:7 192:9
**little** 14:23 17:5 26:8 28:9 37:13 38:2 39:6 41:20,21 46:17 74:10 85:15 90:20 94:2 95:2 122:13 126:7 127:9 128:16 136:5 146:16 158:22 166:16 167:7,11 175:2 181:20 183:9 184:12 205:18 223:17
**live** 25:23 45:15 67:20,23 68:2,4 101:22 102:3 217:23 229:7
**lived** 90:14,22 217:23
**living** 101:20
**llc** 1:10 2:5 6:14 9:11 10:12 15:21 239:1 240:1
**load** 228:25 229:24
**location** 1:18 111:12
**locations** 29:25 30:2 97:13,21 97:24 216:15
**locked** 189:19
**logging** 49:17
**long** 52:11 57:7 62:5 64:12 66:9 71:24 85:11 114:4 136:8 162:13 167:21 174:16 218:14 229:25
**longer** 163:7 186:9
**look** 26:9 36:6 38:17 57:2,24 58:3 67:2 78:8 105:22 138:9 141:2 142:7 150:25 153:11 178:16 180:8 197:4 203:25 214:13,16,24 214:25
**looked** 74:10 95:11 141:18 161:17 168:22 169:4 193:18 203:7,16,22 213:21
**looking** 40:19 63:3,8 64:14 64:20,22 122:18,19,20 140:19 142:20 153:18 196:4 233:24
**looks** 106:11,18 126:12 153:19 194:25 195:3
**lose** 99:11
**lot** 18:18 21:25 22:13 26:18 56:19,20 57:14 83:18,21,25 123:21 150:19 150:22 176:18 179:9 211:7,7 211:14,16 213:7

**love** 7:21 66:4
**low** 85:3,8
**lunch** 18:9,10 18:20,24,25 19:11 20:22,23 20:25 22:10 27:15 28:4,6 28:15 77:3 124:9 143:6,17 164:10 183:18
**lunches** 20:10 20:14 21:6 22:24 23:3,11 25:6 124:11
**lying** 114:6,6

**m**

**m** 6:22 7:1,19 8:1
**machine** 111:25
**made** 21:25 153:6 159:16 169:13,21 194:7 240:5
**maggie** 2:13,18 10:16
**mailed** 202:19
**main** 62:25 91:10 148:22
**make** 12:8,14 14:25 17:22 38:3 41:12 45:22 76:14 82:22 85:17 88:12,16 92:23 102:9 112:5 145:25 159:13 159:20,22 168:22,25 169:10 174:11 176:22 184:11 185:13 187:5,7 189:6 205:17 225:6 226:22 227:17
**makes** 35:7 60:14 74:14
**making** 33:19 81:25 117:9 127:18 169:20 183:5 191:3
**manage** 46:23 96:18 97:15 115:24 117:21 223:3
**managed** 159:18
**management** 80:17 154:12
**manager** 44:22 45:5,12,13,19 46:2,6,7,8,14 47:3,12,15,17 47:21,22 48:7 48:12,15 49:3 80:19 94:23 95:16 96:3 97:17 98:12 179:23 211:5,6 226:2,6
**managers** 98:10 174:14
**managing** 62:24 98:3
**mancuso** 8:4 174:7 210:15 210:24 212:8 212:21 215:14
**manner** 10:4
**manorville** 90:14
**march** 85:8 103:5,21,23 105:18,18,19
**maria** 87:25 88:3,6 90:12
**marin** 8:6 173:22 226:9
**marked** 42:4,9 42:14 51:22 52:3 70:9,15 104:12,16 106:7,8 107:11 107:15 118:22 118:24 121:23 122:3 125:22 126:2 127:24 128:4,24 129:4 130:2,7 136:18 136:24 145:7 145:11 149:11 149:16 178:9 178:13 181:7 181:10 182:18 182:22 184:3,5 185:23 186:3 187:15,18 191:8,12 192:14,15 194:15,20 197:9,13 198:2 198:6,17,20 199:7,12 201:15,17 204:8,13,18,21 205:5,9 208:9 208:14
**mask** 217:3
**masks** 217:9
**match** 140:3
**matches** 139:13
**matter** 9:8 11:25 41:16 42:12 69:4 228:4
**maximum** 177:9
**mayhem** 94:2
**mean** 15:23 16:4,14 17:2 24:21 26:3 34:2,19 38:9 43:24 44:3,10 44:23 56:19 64:11 67:8

70:4 71:23 74:21,22 76:2 76:21 81:17 85:7,14 92:11 101:7,24 104:2 106:14 109:4,5 112:15 114:10 119:22 123:2 123:13 124:22 125:8 132:10 139:20,21 142:2 147:9 149:6 151:23 153:9 163:24 166:20 168:21 171:20,20 172:21 175:22 176:18 177:15 177:22 180:17 180:23 185:8 211:14 212:23 212:23 214:12 216:11 217:19 221:12 222:2 222:16 223:25 225:11 229:21 231:11,18,23 234:23
**means** 10:5 86:22 92:8 188:3
**meant** 100:18 100:21 193:14
**mechanism** 30:24
**media** 168:10 169:11
**medicaid** 16:22 37:24 172:12 173:16
**medical** 221:4 221:13 222:6,8
**medicare** 16:22 37:24 152:24 152:25 172:11 173:16 200:15
**medications** 13:11
**meet** 14:14,15 87:22 90:14 93:19,20 163:5 217:20 218:2
**meeting** 14:23 15:3 89:7,9
**meetings** 90:11
**memorize** 21:15,17,18
**mental** 21:25 89:6
**mention** 38:8 62:3
**mentioned** 33:14 42:7 47:23 63:7,15 80:8,10 93:3 205:21 230:20
**merchandise** 23:13 29:3 82:15 233:2
**message** 178:11 184:9 225:18 226:12
**messages** 106:19 184:17 187:21 215:9 215:14 226:13
**met** 11:23 35:21 63:12 87:24 88:3 90:13,15
**middle** 12:17 120:12
**military** 141:9
**mind** 63:24
**mine** 93:6 175:23
**minute** 57:24 139:16 141:8 223:6
**minutes** 65:10 128:12 141:16 229:22,23
**miraculously** 203:12,13
**miscommuni...** 230:3,7,10
**missing** 83:16
**misunderstood** 28:3,7
**mm** 17:8 52:23 71:16 75:7 105:8 109:14 140:15 161:20 184:14
**modify** 186:20
**mold** 221:14,15
**moldy** 216:2,24 218:7
**moment** 13:20 65:7 148:7 149:8 208:7 214:8 224:9
**monday** 167:5
**monetary** 156:10
**money** 37:20 37:25 73:9 167:9,12,18 188:6,8,19,25 189:11 190:22 216:13 231:24 234:13,18
**montauk** 25:24 30:3 45:4,6,13 45:14,20 46:21 47:3,12 63:9 63:11 67:16,18 67:24 68:3 69:9 81:6 82:7 82:9,11 83:6,7 96:21 97:6 98:8 117:3 180:25 228:12

229:2,9,12,20 233:3
**month** 61:23 70:5 72:9 77:14
**months** 29:6 70:6 90:6 104:5
**morning** 9:2 10:11,14,20 11:22 93:13,14 127:7 188:5 217:22
**mother** 170:16
**move** 74:7
**moving** 13:23 39:6
**mtk** 6:15 145:15
**mule** 25:20
**multi** 136:20 145:9 191:10 205:6 208:10
**multiple** 18:23 194:18

**n**

**n** 2:1 3:1 6:22 7:1,19,19 8:1,1
**name** 7:21 9:2 10:19 15:20 35:16 47:5,8 63:19 66:7,18 66:20,23 67:11 71:3 115:25 119:19 120:10 122:8 126:12 173:21,25 179:23 196:15 196:17 209:9
**name's** 11:23
**names** 120:14 226:7
**natalie** 8:7 31:21,22 33:14 80:11,21 82:8 82:9,10 173:24 225:16,21,23 226:8
**natural** 12:16
**near** 122:9 146:14
**necessarily** 50:25
**necessary** 186:9 240:6
**need** 14:4 26:11 35:14 37:4 85:13 92:20 111:24 117:11 185:13,14
**needed** 25:22 26:19 34:13 84:24 92:10 95:10 162:14 171:3 207:16 216:12 222:9 222:10
**needs** 41:21 83:23
**neither** 237:10 238:6
**nervous** 28:9 28:10,11
**neve** 238:2,14
**never** 21:22 26:5 27:6,7 29:12 36:24 47:25 59:9 74:13,13 85:14 101:9 106:4 108:2,5,9,25 111:6 121:17 153:15,16,16 153:25 154:8 154:12,13,19 176:23 187:6 191:24,24 192:8 193:12 224:2 232:3,3 234:15
**new** 1:2 2:16 9:14,17 12:18 73:16 85:6 103:23 108:20 111:11,15 113:10 115:23 116:18 133:14 146:19 147:25 148:9,16 149:20 150:2,3 152:10,10 187:3 224:23 227:11 237:19
**nibi** 3:11 5:4,7 5:10,21 6:15 6:19 7:13 15:22,24 16:2 16:5,10,12 19:10 24:2 28:19 31:15,23 33:24 34:5,12 34:15 36:2,15 47:2,11 49:8 55:8 62:22 64:4,10 65:6 65:25 73:3 79:20 80:17 83:16 85:4 89:12 96:8 100:25 102:6 103:2 107:25 115:8,19 118:15 143:21 145:15 146:22 154:5 156:2,22 162:6 168:20 169:11,15,23 171:9,15 173:2 177:19 189:11 190:14 193:6 193:21 195:22 196:8 199:4 203:18 225:25 235:4

**nibi's** 138:16
**night** 75:23
**nods** 13:2
**nope** 213:21
**normal** 148:24 235:3
**notary** 9:15 237:18 240:13 240:19
**note** 89:6 160:11
**noted** 240:7
**notes** 22:2
**notice** 163:7
**noticing** 61:22
**number** 30:17 32:13 37:10 110:14 113:24 113:24 119:12 122:2 125:24 136:21 145:10 146:13 152:22 185:25 187:17 188:3 191:11 194:18 199:10 210:2,4 215:15 224:19,20 227:7
**number's** 127:25
**numbers** 52:9 59:10 70:13 73:6 104:15 107:14 129:3 130:4 178:11 181:9,22 182:20 193:9 193:19 197:12 198:5,19 205:7
**ny** 1:19 2:7,16
**nyll** 227:8

**o**

**o** 6:22 7:1,19 7:19 8:1,1
**o'clock** 75:23 93:13 217:21
**oath** 97:25
**oaths** 9:16
**objection** 9:19 17:17 18:8 21:2 39:18 51:3 76:18 85:21 102:15 118:3 121:20 125:6 131:21 153:23 164:19 173:4 195:7 219:7,19 221:6
**objections** 5:17 10:23 208:12
**observed** 75:14 176:24
**observing** 175:11
**obvious** 234:7 234:24
**obviously** 59:3 60:9 93:15 94:14 123:2 148:23 168:22 207:15
**occasion** 19:12 22:2 50:4
**occasionally** 50:10 82:8 156:12 161:3
**october** 95:23 218:10,14
**odd** 74:11 95:14,19 164:7 167:11
**oddly** 125:9
**offer** 105:25 162:7
**offhand** 21:9 47:5,9 164:16 219:3
**office** 109:21 109:22 111:10 111:15 112:8
**officer** 237:1,2
**official** 15:20
**oh** 13:4 14:23 23:23 25:10 32:3 33:8 45:11 50:21 66:10,13 83:22 84:18 94:5 95:12 99:13 132:22 146:18 154:9,10 161:14 185:13 189:23 193:3 210:21 214:6 215:2 230:14 235:25
**ohio** 105:22 107:5,22
**okay** 10:23 11:4,9 12:3,7 13:18 14:17 15:2,11,16,18 16:24 17:4 18:13 19:22 20:18 21:12,16 22:3,8,15,18,23 22:23 23:9,25 24:12,17 25:10 27:8 28:5,17 29:4,15,21 30:4,8,14 31:10 32:7,18 33:13,19 34:4 35:3 38:8,12 40:8 42:23 44:5,13,20 45:14 46:10,22 47:11,19 48:3 48:14,23 49:11 49:21 50:10,14 51:15 54:14,21 55:12,15,21 56:2,6,12,16 57:3,12,23

58:5,9 60:2,11 61:10 65:22 67:6,13,20,23 68:14,25 71:6 71:10 72:17 73:8,11 74:22 75:4,4 76:14 78:21 79:9,13 80:5,16,23 82:4 83:3 84:13 85:17,25 86:12 87:3,13 88:8 89:3,11 89:20,25 90:10 91:7,13 93:2 94:12 95:4 96:2,6,23 97:22 98:13 100:2,8,15,23 101:4,19 102:5 106:5 107:9,24 108:14 109:11 109:25 111:14 111:18 112:5 112:18 113:4,8 114:24 115:7,7 115:18 117:13 118:6,14 119:21 120:5 120:12,18,19 121:15 122:22 124:4,13 125:4 125:13,20,20 126:10 127:17 127:22 128:20 129:12,18 130:17 131:9 131:24 132:6 133:15 135:10 135:17 136:5,6 136:13 138:8 138:13 139:8 139:18 140:22 140:25 141:6 141:11,17 143:10 144:2 145:4,24 146:10 147:12 148:8,25 149:9 150:7,12,17 151:5,15 152:14 153:4 154:4 155:10 155:13,25 156:12,21 157:2,16,19 160:14 161:23 165:9,20 167:3 168:9 169:13 170:2 171:5,13 171:24 172:2 173:23 174:8 175:10,14,16 175:20 177:7 177:18 178:7 178:19 180:4,8 180:12 181:5 182:16 183:12 184:2,19 186:19 188:24 190:14 192:3 192:22 193:3 194:9 195:15 195:16 198:15 199:6 200:13 201:5,11 202:11,22 203:16 205:21 206:3,10 210:23 212:20 214:22 215:8 215:12 216:17 218:21 220:4 221:23 224:6 224:10 225:12 226:10,21 227:21 229:3 229:15,21 231:5,16 233:15 234:9 235:12,18

**once** 18:13,14 18:15 29:2,4 47:11 106:23

**ones** 147:12 149:3

**ongoing** 207:12

**online** 168:19 180:2 202:16 202:18

**open** 81:25

**opened** 81:19 87:23 174:17 177:11

**opens** 81:23 106:24

**opportunity** 53:11 64:18 123:11 174:21 174:23 182:8 182:12,14

**orally** 225:3

**order** 108:21 204:17 215:23

**ordering** 236:4

**orders** 236:2

**original** 154:25

**originally** 64:19

**outcome** 166:7 237:14 238:11

**outline** 223:17

**outlining** 55:19

**outs** 7:6 27:19 76:4 77:20 78:11 163:3

**outside** 138:4,6

**overall** 16:25

**overtime** 75:15 162:6,8,9,20,24 163:13,16,23 164:4,15,17,24 166:5,12,25

**owe** 187:10

**own** 39:23 40:4 99:17 159:5
**owner** 7:22 66:17 94:8,22

**p**

**p** 2:1,1 119:12 122:2 125:24 127:25 130:4 181:9 182:20 186:2 205:8,12
**p.m.** 3:15,19,23 122:7 128:9 130:6 140:13 140:24 141:15 143:10,13 144:15,17 157:17 161:18 223:10,13 236:9,12
**pack** 25:20
**page** 3:2,6 4:2 5:2 6:2,23 7:2 7:20 8:2 53:23 55:4 58:11 70:11 104:14 119:11 136:20 145:9 146:12 149:12 178:10 181:8 182:20 184:8 185:25 187:16 191:10 194:17 198:3 205:7 208:10 209:8 210:3 239:4,7,10,13 239:16,19
**pages** 52:11
**paid** 16:14 17:3 17:6,15,25 18:2,25 19:11 20:10,14 21:7 22:9,24,25 23:6 24:15 25:3,13,15,17 26:14 27:3,6 28:2 30:9 31:18 32:4,14 76:16 80:6,18 84:11,21 86:3 86:16 87:7,17 90:2 91:15 108:21 111:6 114:2,14 123:25 124:7 124:16 125:15 131:15,18 132:19 133:5,7 133:9,12,23 134:9,10,20 135:6,11,13,21 135:25 146:23 147:15,21,24 148:9,16,20 149:3,25 153:19 163:13 163:19 164:4 164:15 165:15 166:5,24 195:18,21 212:9 214:15 214:18 215:23 216:16 222:12 222:16,20 228:13 233:7 233:17 234:24 235:5
**pajama** 66:5
**palm** 103:18
**paperwork** 36:19 55:17
**paragraph** 43:6,7 44:21 69:7,16 73:14 75:5,13 84:8 86:2 87:6,13 91:24 96:11 100:9 105:11 105:14 108:16 108:17 113:11 206:14 228:8 231:9 232:24
**paragraphs** 228:5
**parents** 222:3
**park** 9:13
**part** 39:10 43:25 59:4 62:14,25
**partial** 207:25
**particular** 23:17 131:3 133:3 170:6 178:4 190:21 232:5
**particularly** 224:18
**parties** 9:17,21 237:11,13 238:7,10
**partner** 10:16
**past** 21:19
**patchogue** 110:6 111:10 111:11,15 112:8
**pay** 3:11 5:4,7 5:21 18:6 20:25 32:25 33:2 34:8 36:3 36:5 40:22 75:15 79:4 109:9 121:17 131:8 132:3,4 132:11,13,14 132:17,21,25 134:9,16 136:8 152:2,3,15 153:12,13,15 154:21 156:14 163:22 165:12 165:23 166:25 183:20 184:23 184:25 193:21 234:10,22

**paycheck** 86:10 167:17 186:11 189:24,25
**paying** 163:18
**payment** 33:16 195:14 231:21 232:6,21 234:3
**payments** 4:10 4:12,14,16 194:19 197:20 198:4,12 199:3
**payroll** 4:5,7 125:5 149:19 150:7 182:5 183:5,13 186:8 191:16
**peace** 7:21 66:4
**pending** 14:2
**people** 82:5 93:21 116:5 174:9,15 176:8 210:10,14
**percent** 41:3 70:7 156:24,24 156:25 160:18 167:16 206:7
**percentage** 73:4,5
**perfect** 39:3 159:16
**period** 32:25 34:16 57:13 149:20 150:8 152:8 166:25 171:21 182:6 196:8,13 197:7 197:21
**periodic** 32:24
**periods** 28:24
**permitted** 9:25
**person** 12:20 89:9 94:3 151:3,4 159:9
**personal** 177:23 178:5 178:23 210:5 213:5
**personally** 27:9 39:9,17 40:5 57:15 159:14 177:3
**persons** 210:4
**petty** 188:10 189:4,4
**ph** 94:23
**phone** 14:18,20 36:23 38:7 67:2 88:22 102:17,20 110:19,25 172:22 180:6,7 180:9 215:5 230:4
**phones** 110:20
**photo** 3:13,15 3:17,19,21,23 8:5,8 121:12
**photograph** 119:8
**photos** 120:25
**physical** 88:23 116:19 171:4
**pick** 110:21 228:22 229:8
**picked** 232:25
**picking** 232:7 235:3
**picks** 228:10
**picture** 120:3 122:18,19 128:21 129:23 220:15 230:23
**pictures** 77:8 77:19 78:7,12 79:2,14,19 94:13 119:10 119:16 121:5 230:5,8,12,21 230:22
**piece** 82:21
**pin** 49:6 87:4
**place** 116:15 176:21 216:9 218:3
**placed** 216:3
**places** 98:9
**plaintiff** 43:10 69:21 84:9 92:2 96:13 100:10 108:18 228:10
**plaintiffs** 1:8 2:2 5:16 10:13 208:11
**planned** 79:20
**planning** 174:19
**planters** 188:6
**pleading** 210:6 210:11
**please** 10:9,18 10:25 11:18 34:3 65:8 113:6,18 116:11 178:18 184:12,25 203:5 204:5 227:24
**pllc** 2:14
**plus** 168:4
**pod** 216:3 217:19 218:2 222:23
**point** 20:18 35:8 59:11 63:20 79:7 84:17 97:15,23 100:22 118:18 127:17 135:3 153:20 192:3 194:9 215:18 217:16 225:15
**pointed** 183:17 207:3

**policy** 6:16 136:7 143:21 144:23 145:16 146:22 171:7
**pop** 128:17
**pos** 4:3 88:17 118:17 122:22 162:24 193:5
**possession** 112:21 145:2
**possibility** 16:8
**possible** 55:18 177:16
**possibly** 75:25
**practice** 121:5 188:24
**prep** 81:18,21 217:10
**prepare** 14:13
**prepared** 238:3
**prepping** 81:24
**present** 156:18
**presented** 102:22 154:11
**presume** 165:3 198:23 202:25 224:10
**pretty** 133:15 167:13
**previously** 135:25
**print** 166:9
**prior** 64:12 122:18,19 146:9,25 147:17 149:15 237:4
**probably** 12:10 28:9 29:2 70:5 71:22 131:8 150:16 190:25 216:12
**problem** 20:4 144:20 203:14
**problems** 20:7
**procedural** 10:2
**proceed** 11:18
**proceeding** 1:18 9:5,24 236:13 238:4
**proceedings** 237:3,4,5,8 238:5
**produce** 91:7 91:15 192:4 193:4 196:9 201:6 202:22 206:10
**produced** 9:23 38:25 78:6,10 78:22 91:21 145:5 151:10 151:16 160:15 205:13 225:8 225:10 226:12 227:17,23
**production** 38:23 54:22 58:8 67:7,11 78:23 91:20 113:5 151:17 160:21 197:6 202:23 203:4 204:5 215:12 215:13 220:18 225:13 227:3 227:24 231:7
**professional** 221:5
**professionals** 222:6,9
**proficient** 191:3
**program** 72:7
**project** 37:5
**promised** 26:4
**proper** 154:20
**property** 103:24
**protocol** 170:21
**provided** 111:21 187:24 188:2,4 230:23 231:2
**provides** 110:8
**public** 237:18 240:19
**purchased** 157:6
**purpose** 68:8 229:18
**purposes** 12:19 56:17 57:17
**pursuant** 236:7
**put** 16:22 38:25 41:11 42:3 51:21 54:24 58:7 70:8 104:7,11 106:5 107:9 110:10 118:21 121:22 125:21 127:22 128:23 129:25 136:13,17 139:4 145:6 149:9 152:23 152:24 153:2 160:24 178:7 180:4 181:5 182:17 185:22 187:14 188:12 188:15,19 191:7 192:13 194:14 197:8 201:12 204:17 205:4 208:8 230:17
**putting** 93:25 117:7 158:24 172:23 184:2 199:6

**q**

**qualified** 110:16 237:7
**question** 13:25 14:2,8 21:23 26:24 30:23,23 32:11 39:23 40:17 41:4 46:17 48:3 49:2 51:11 53:18 61:20 90:24 106:17 113:18 116:9 116:11 117:18 118:5 140:2 153:10 162:18 185:16 188:4 191:19 192:19 221:9 230:21 232:18
**questioned** 61:18 211:15 211:16
**questioning** 179:15
**questions** 12:2 12:15 13:7,10 28:12 69:5 95:21 117:11 119:5 223:21 235:13,16
**quick** 223:6
**quicker** 223:18
**quimby** 8:3 210:17 213:10 215:9
**quit** 74:14
**quite** 16:23 21:16 23:23 37:12 77:4 147:24 157:10 177:15 218:16

**r**

**r** 2:1 6:22 7:1 7:19,19 8:1,1 239:3,3
**raise** 10:25 154:10
**raised** 11:7 71:20 155:7,11
**raises** 154:5,22 155:22
**ranged** 44:11 44:15
**rapport** 169:8
**rate** 53:25 155:2 163:19
**rather** 163:19 189:6
**raw** 4:4
**reach** 172:13
**reached** 171:23 172:17
**read** 55:10 59:21 61:15 236:6 240:5
**ready** 22:16
**real** 170:8
**realize** 16:19 35:23 142:15 173:13
**realized** 29:14 186:17
**realizes** 234:20
**really** 14:20 27:12 29:13 31:8 44:17 45:8,18 46:18 62:20 64:17,24 65:3 67:5 68:18 70:4 74:13,14 76:8 79:5 81:9 85:9 91:11 95:14 109:22 124:12 125:11 147:16 147:17,18 150:23 152:3 157:14 179:5,7 181:20 214:12 215:6 216:20 218:24 219:2 235:20
**reason** 13:9 14:5 118:2 175:18 230:6,9 239:6,9,12,15 239:18,21
**recall** 18:18 32:16 33:12 49:14 55:22 56:2,4,4,7,8 62:5,6,12 68:18 71:24 77:4 79:9 81:9 81:10 83:9 86:20,21 90:5 90:9 107:7 124:3 129:21 147:17,19 148:6,8,21 155:13 156:3,5 156:7,9 164:3 164:6 166:22 167:23 170:13 176:10 218:24 233:12
**recalled** 166:15
**receipt** 170:18 170:22 171:3,4 188:19 190:11 190:13
**receive** 32:23 59:11,24 60:8 69:20 70:21 78:19 154:4 155:25 211:18
**received** 36:13 52:21 55:23 56:20 59:22 60:3,9,13 78:16

**receiving** 59:13 59:19 69:21 206:17
**recent** 203:8
**recently** 203:17
**recognize** 126:5 208:20
**recognized** 146:23
**recollection** 147:6 209:24
**recommended** 187:10
**record** 9:4,5,20 10:10 20:13 21:13 42:6,11 51:23 52:9 65:14,15,17 70:10 76:8 78:6 89:5 91:3 91:6,11 99:22 99:25 104:14 107:11,13 117:8 119:7 121:24 125:22 128:25 130:3 136:20 138:15 143:7,11,12,14 144:12,15,16 144:18 145:8 162:24 178:9 181:7 182:19 185:24 187:16 191:9 194:16 197:10,23 198:2 201:13 204:7 223:11 223:12,14 235:25 236:2 236:10 237:9 238:5
**recorded** 10:4 17:15 123:6 237:6
**recording** 9:23 237:8 238:3
**records** 7:7 79:18 90:10 91:2,8,14,16 111:19 112:6,9 121:14 124:14 149:19
**redirect** 235:15
**reduce** 108:21
**reduced** 92:4 97:3,4,19 98:5 100:16 237:6
**refer** 15:21 49:3 63:23 100:9,10 128:7 188:7 210:14
**reference** 71:7
**referred** 25:20 66:16 206:24
**referring** 23:11 25:5,6 120:17 145:18 150:6 179:18 181:3 188:8 230:12
**refers** 206:16
**reflect** 49:20 200:13
**reflected** 203:19
**reflects** 142:9 195:18 197:20 198:12 199:2 200:4
**refund** 36:11 206:18 207:24 208:2
**refunds** 34:6 207:16
**regard** 124:10
**regarding** 117:10 206:5 227:18
**register** 188:16
**regular** 23:24 43:23 80:23
**reimbursed** 189:12 190:7 190:10,15,23
**related** 7:5 237:10 238:7
**relating** 111:20 112:21 114:19 224:11,12
**relationship** 24:21 98:2
**relative** 237:12 238:9
**release** 55:7
**relevance** 118:3 125:6 173:4 219:19
**relevant** 66:21 117:15
**relieved** 119:3
**reluctant** 116:2 116:8 117:4
**remember** 21:22 31:6,7,9 45:4 47:6 53:5 54:4,7,10,11,12 54:14 56:10 70:4 83:11,12 83:14 105:3 155:16,17 156:10,11,23 157:23 170:15 179:5,7,21 182:11 183:22 188:13 190:12 209:12 218:16 218:18,20 219:3 220:2 222:18 231:19
**remembered** 121:13
**remind** 13:7
**remote** 1:18
**remotely** 9:18
**reopen** 74:2 108:12

**repeat** 60:19 117:17 232:18
**reply** 6:13 7:12
**report** 36:15,17 40:23 111:24 112:11 122:23 168:5 211:20
**reported** 1:20 16:20 33:25 224:21 227:8
**reporter** 9:2,3 10:17,22 11:5 11:10,17 13:2 52:24 60:17,19 60:24 61:3 65:13,16 99:18 99:23 117:17 143:10,13 144:14,17 199:20,23 223:10,13 232:15,17 235:24 236:8
**represent** 11:24 77:24 78:5 126:23 131:3 136:19 138:14
**represented** 209:19
**republic** 66:25
**request** 215:16
**requested** 237:21
**requesting** 6:5 236:6
**required** 118:4 240:13
**reserved** 236:11
**respond** 33:7 53:12 107:8 182:9
**responded** 53:19 103:15 103:21 108:2,4 108:9 151:9
**response** 29:7 72:5 107:19 131:5 132:5 186:8 210:2,15 215:19 224:18 224:24 227:10
**responses** 5:17 208:11 224:17
**responsibilities** 46:4 47:25
**responsibility** 48:16
**responsible** 83:4
**resulting** 92:4 100:17
**results** 57:20
**retail** 81:14
**retaliation** 92:2 96:12
**retired** 93:8 221:18,20
**return** 69:2 170:18,24 171:7 199:9
**returning** 73:11 75:4 84:7 118:14 161:16
**review** 154:8 154:13,14,16 154:20 207:6,7 207:9 209:4 237:21
**reviewed** 193:9 195:16
**ribbon** 122:14 126:19 127:10 128:17
**right** 11:2 14:18 15:12,18 16:9,10 19:4 20:2,9,19,23 21:5 22:11,16 22:18,21 23:9 24:5,23 27:5 28:13,21 29:6 29:23 30:22 31:10 32:23 33:7,13,16,22 38:6 39:6 41:4 41:9,14,14 42:2 43:9,15 43:25 45:23 49:6,9,16,18 51:2,15,20 52:8,22 53:22 54:18 58:17,19 61:11,13 62:19 63:20,22 65:13 65:21,24 66:11 67:14,17 71:2 71:8 72:13 73:9 74:18 75:2,6 77:13 77:21,23 78:25 79:24,25 81:16 84:6 85:20 86:10,19 88:9 88:19 89:2 91:23 93:16 95:14,22,24 96:4,18 97:5,8 97:15 98:13,19 99:4 100:13,23 101:14,17 102:2,5,13,14 102:24 104:23 105:7,19,22,22 105:24 106:11 106:20 107:19 111:17 113:3,4 114:16 115:17 117:22 118:11 118:14 119:22 120:3,15,24 121:4,11,18 123:12 126:11

126:14,16,20 126:22 127:13 127:18 128:15 128:18 129:16 130:13 132:8 133:16 135:18 136:15 137:12 137:15 138:3 139:2,4,12,19 140:5,6,24 141:7,17 142:20 143:15 146:6,21 148:3 149:4,24 150:5 151:8,15 152:16 153:17 154:23,25 155:2,4,5,8 156:14,18 158:19 160:14 160:20 161:6 161:15,19,23 162:5,23 165:17,24 166:18,23 168:2,7 170:8 170:12 172:17 172:25 174:19 175:6,12 176:5 177:2 180:10 182:2,13 183:16 185:6 186:19,22 189:10 190:15 191:7 192:10 192:12 193:17 193:21 194:12 195:4,11,13 197:5,5,23 199:22 200:3 200:18 202:8 204:6,16 206:3 206:13,21 207:3 208:7 209:16,21,25 210:9,12 212:20 213:9 213:19 214:9 215:10,15 218:3,11 219:13 222:13 222:19,25 223:10 225:6 225:21 226:4 227:15 228:16 228:19 230:3 232:5,23 233:6 234:11 235:12 235:24 236:3,9

**rightfully** 189:19

**ring** 43:21

**ringing** 172:22

**room** 13:14,18 176:25

**roughly** 29:8

**round** 85:2

**rounded** 4:8 222:2

**route** 208:4

**rule** 12:10 236:7

**rules** 10:3

**rx** 144:6

**s**

**s** 2:1 3:5 4:1 5:1 6:1,22,22 7:1,1 7:19 8:1 239:3

**sad** 66:13

**sage** 2:5 10:12

**sagelegal.nyc** 2:8

**salaried** 117:23 153:21,25

**salary** 117:24 117:25 118:12

**sale** 118:18 192:4

**sat** 154:13

**satisfy** 85:20

**saturday** 167:15

**saw** 59:9 76:3 107:5 123:21 146:8 147:18 168:23 176:22 185:4,9 193:12 232:4

**saying** 17:14 19:2 24:4 30:8 32:21,25 50:12 57:12 60:7 85:18 86:17 96:6 109:7 111:5 132:12 132:16 133:2,5 134:8,9 151:25 169:21 176:10 182:5 184:23 190:3 211:20 212:8 220:4,5

**sayre** 144:7

**says** 43:10 44:20 47:13 48:23 53:24 55:6,16 58:13 69:7,17 71:13 71:23 72:5 73:14 75:14 84:8 87:14 97:2 105:17 108:17 111:24 114:2,13 119:19 120:20 122:7,14 126:25 127:10 128:10,17 129:8 130:10 138:19 145:14 146:11,15 149:19 191:15 195:9,13 200:17 202:15 203:21 207:6

215:19 225:15 227:7 229:5 232:24 233:6
**scanning** 82:14
**schedule** 148:24 180:2
**scheduled** 178:2 180:10
**school** 221:22
**screen** 11:3 41:11,16 42:3 42:8 43:7 51:22 52:16 70:9 78:8 104:8,12 106:6 107:10 118:22 120:13,20 121:22 122:9 125:21 127:23 128:23 129:25 136:18 137:16 139:5 145:6 146:15 149:10 178:8 181:6 182:18 184:3 185:22 187:14 191:7 192:13 194:15 197:9 199:7 204:18 205:4 208:8
**screenshot** 5:13 5:23 6:3,6,9,12 112:16 128:2 129:2,18 130:4
**screenshots** 75:16 76:7 102:13 129:16
**scroll** 43:5 52:13 146:6
**scrolling** 53:22 55:4 58:11 71:10 73:13 146:11 209:7
**search** 56:16 57:3,6,16,20
**season** 18:20 45:15 47:22 50:7 53:16,16 75:9 84:14 85:3,4,8,9 98:25 99:7 100:5 157:18 157:21
**seasonal** 29:3 84:25
**seasonally** 85:14
**seasons** 98:22
**second** 46:18 53:23 71:11 99:22 144:8,13 182:17
**seconds** 128:12
**security** 16:21 37:22 113:25 114:2,12,13 152:11,22,23 172:8,18 173:15 200:9 200:14,25 202:5,9,12,14 202:20 203:9 211:2 212:2,18 213:14,22 214:5
**see** 24:20 38:21 41:15,17 42:20 43:6 54:2 58:15 69:24 71:15,18 72:11 73:18 75:18 79:22 87:19 92:6 94:12,19 97:20 98:2 103:8 106:23 106:25 107:3 119:18 120:9 120:11,22 122:8,11,15 126:8 128:13 129:8 130:11 133:4 137:18 138:21 139:10 139:12,17,19 140:14,16 141:4 142:8 143:20 146:14 147:5,10 149:22 163:25 176:14,16 179:14 180:5,9 181:18,22,24 183:7,10 184:15 185:10 193:10 195:14 195:17 196:3 201:8,11 206:8 206:19 208:25 210:7,17,22 224:11 225:4 225:19 227:13 228:14 233:4
**seeing** 37:22 107:7 137:15 153:12,14
**seeking** 222:25
**seem** 165:5 166:18 184:24
**seemed** 165:6 185:5
**seems** 187:11
**seen** 42:17 52:17 55:9 70:18 104:19 119:14 137:3,8 137:11,14 138:4,6 153:15 175:24 178:17 191:20,24,25 192:8,19 193:13 197:16 198:9,23 199:15 201:20 201:22 205:13 208:17 234:16

**send** 36:8 78:17 99:18 184:25
**sense** 60:15 74:14
**sent** 38:9,10,13 38:14 56:3 107:7 123:24 183:15 208:22 209:5
**sentence** 12:18 100:19,21
**separate** 28:15 39:12
**separately** 18:2 83:2
**september** 43:11 46:19 51:24 52:21 53:15 60:4 61:8,9 66:2 67:15 72:2 73:16
**series** 195:5
**service** 110:8
**set** 5:18 30:24 63:10 180:2 184:17 199:8 208:12 223:20
**sets** 110:9
**setting** 73:13
**seven** 218:21
**several** 84:11 84:22 86:3,4 86:16,18 87:7
**shakes** 13:3
**share** 145:22
**she'd** 35:23
**she'll** 234:15
**sheeler** 1:10,11 5:24 6:4,8,11 6:13,14 7:15 9:11,12 15:20 16:5,7 39:8,17 40:14,20,24 59:2,17 60:16 61:6 64:7 69:18 102:25 104:23 105:14 106:22 108:6 145:15 187:22 191:16 194:8 225:2,9 239:1 240:1
**sheeler's** 67:24 68:3
**shiloh** 238:2,14
**shock** 16:21
**shocked** 37:12
**shocking** 16:23 174:18,18
**shop** 88:4 90:16
**shot** 64:16
**show** 11:2 34:8 127:19 140:11 166:8 168:5 194:6,18 195:20,23 197:24 204:7
**showed** 93:8 151:19
**showing** 41:10 42:7 56:24 140:6 163:8 192:25 195:21 198:4
**shows** 142:23 181:15
**sic** 174:6
**sick** 178:5 180:17,19,23
**side** 195:13 205:12
**sign** 8:5 218:5 220:5,7,8,16 236:7
**signature** 209:10,12,14 236:11 237:16 238:13
**signed** 7:3 54:7 54:11,13,15,19 56:3,9,11 209:16
**significant** 170:3
**signing** 54:10 56:5,7
**similar** 121:25 192:18 197:11 198:18 232:24
**similarly** 1:6 9:10
**simple** 221:8
**simultaneously** 34:12 35:12 139:5
**single** 119:11 149:12 184:8 185:25
**sit** 110:19
**sitting** 89:25 124:13 148:25 190:18 224:6 233:15
**situated** 1:7 9:11
**situation** 100:22 213:11
**situations** 50:14 125:24
**six** 93:13 230:17
**size** 26:19 83:23,24
**sizes** 81:25
**skills** 237:9 238:6
**slightly** 183:2 193:2
**slow** 158:6
**small** 223:16
**smells** 221:14
**snowstorm** 180:23

**social** 16:21 37:22 113:25 114:2,12,13 152:11,22,23 168:10 169:11 172:8,18 173:14 200:9 200:14,25 202:4,9,11,14 202:19 203:8 211:2 212:2,18 213:14,22 214:4
**somebody** 47:12 89:12 173:2
**somewhat** 41:20 137:5
**soon** 55:18
**sooner** 218:25
**sorry** 15:9,14 17:9 25:5 27:14 32:10 41:2 43:2 46:16 53:4 60:17,22 63:17 67:25 69:2 78:2 80:14 90:23 94:16 99:10 101:25 104:10 105:2 105:13 106:16 116:3,22 120:7 129:10 133:21 136:4 144:19 172:22 174:9 179:10 181:21 182:16 196:17 199:20 201:14 232:17
**sort** 168:11 179:25
**sought** 215:17
**sound** 25:19 95:24 155:8
**space** 218:3
**speak** 12:9 13:23 14:3,21 46:8 173:19 212:13 214:8,9
**speaker** 144:5 144:9
**speaking** 12:14 12:16,21 35:22 60:23
**specific** 95:20 131:12 164:3 179:6
**specifically** 48:4 89:18 90:25 113:8 149:7 162:19 169:6 212:7 219:13
**spell** 67:4
**spent** 87:17
**spits** 112:2
**spoke** 14:17 27:9 35:13 38:7 39:21 90:8 94:20 108:10 110:17 173:14,20 185:19 206:24 212:5 215:3,4
**spoken** 213:3
**spreadsheet** 136:22 138:11 138:15 139:14 139:23 141:3 141:18,21 191:10 192:5
**st** 1:11
**standard** 43:22 158:11
**start** 12:13,15 72:7,13 77:7 85:9 99:19 115:12
**started** 44:3 45:2,24 46:19 67:15 71:25 78:25 86:7,9 115:12 137:9 143:24 155:3,5 155:6 163:10 174:4 177:11 186:14 193:14 206:22,23
**starting** 32:6 55:6 70:14 145:9 191:10
**startled** 93:15
**state** 10:18 37:23 73:15 108:19 113:10 152:11 237:19
**stated** 124:18 202:3 213:16
**statement** 32:24 194:11 195:2 202:10 202:12,13 203:8
**statements** 7:10 36:8 79:4 153:5,7 169:14 169:20,22 195:24 196:2,7 196:9,24 197:3 197:6
**states** 1:1 228:25
**station** 88:23
**status** 207:5
**stay** 68:14 74:8 81:20 171:15
**stayed** 171:20
**stays** 207:5
**steam** 159:2
**steaming** 81:20 176:8,19,25
**stenographic** 10:5

**step** 64:23
**stipulations** 10:7
**stop** 50:4 231:15
**stopped** 101:6
**storage** 216:3 217:18,19,20
**store** 23:13 26:19 27:11 30:13 46:20,23 63:9 67:17 81:12,23,23,24 82:5 83:5 87:23 88:10,11 88:18,23 93:9 93:10 96:3,17 97:5,8,11,15,18 98:3,6,14,23 106:24 115:24 115:25 117:21 123:5 133:10 136:7 138:9 139:2 145:23 157:17,20 158:3,12,20 159:6,24 161:6 170:7 171:14 174:17 176:8 188:22 190:22 216:4,10 217:11,25 218:15 220:5,6 223:3 233:22 233:23
**store's** 95:15 171:7
**stores** 28:25,25 30:5,10 69:8 82:16,24 83:20 83:22 96:20 101:9
**straight** 163:18
**strange** 92:18
**street** 2:15 9:14 62:25 91:11
**stressful** 207:13 208:5
**strike** 101:15 103:9 106:17 131:16
**string** 71:11
**structure** 72:18 72:24
**stub** 152:3 153:15 165:23 184:25
**stubs** 34:8 36:3 36:5 152:4 153:12,13 163:25
**stuff** 25:22 57:11 173:10 212:18 217:14
**style** 157:15
**subscribed** 240:14
**substance** 43:9 87:16
**substantially** 140:3
**sudden** 84:15
**sue** 40:24
**sued** 39:8,13,16 40:5,13
**suffer** 223:22
**sufficient** 96:8 96:15
**suing** 16:2,10 16:12 33:24 40:20 41:5 79:20 173:2,7
**suitable** 68:11 68:13
**sullivan** 63:18
**summary** 3:12 5:5,8,22
**summer** 77:16 84:9 86:13,25 90:6 213:24,25
**sunday** 158:4 167:5
**sundays** 157:24 158:16
**supplemental** 5:16 208:11
**support** 113:20
**suppose** 141:10
**supposed** 36:6 92:15 110:11 134:16 152:18 152:20 166:14 211:19 216:21 220:13
**sure** 12:14 16:9 17:22 33:19 38:3 39:4 41:3 41:12 45:22 48:18 53:18 56:21 57:8 65:9 70:6 75:13 76:14 81:25 84:18 88:13,16 92:23 97:14 102:19 107:4 112:5 123:6 139:24 140:7 143:9 145:19,25 155:19 157:7 159:14,16,20 160:17,18 166:6,7 167:13 167:16 168:22 168:25 169:5 175:23,24 179:3 187:5,7 191:3 199:24 206:7,12 207:20 208:19 209:6 211:22 216:6 223:8 225:7 226:23 227:17 231:6 235:7

**suspicion** 76:2 76:12,15
**swear** 9:18 10:23 11:6,7
**sworn** 9:20 11:14 237:5 240:14
**system** 83:19 84:3 88:18 118:17,18 122:22 127:4 138:16 142:21 162:25 192:4 193:5

**t**

**t** 3:5 4:1 5:1 6:1 6:22,22 7:1,1 7:19,19 8:1,1 239:3,3
**take** 9:4,15 14:3,4,8 18:10 57:24 58:3 65:9 79:19,25 84:18,19 94:13 94:24 102:5 105:22,24 112:15 120:25 121:5,12 143:6 164:9 167:12 177:19 178:16 178:21 179:3 180:20 183:18 188:5,18,25 197:4 223:5 230:5 236:2
**taken** 9:8 18:9 37:22,23,24 142:7 147:24 172:8 173:15 186:10,24 187:9 213:15 237:3,11 238:8
**takes** 231:12 233:20
**talk** 24:22 35:8 36:15 37:4 108:6 124:20 171:17,22 234:14
**talked** 14:15 36:21 37:8 53:7 90:8 153:17 191:21
**talking** 95:8 125:2 128:2 170:9 205:23 230:22
**tax** 4:18,19,20 4:21 37:9,23 55:20 199:9 200:14,15 206:17
**taxes** 16:19 33:24 40:23 186:11 187:8 189:25 200:8 202:3
**teachers** 7:10 196:14,16,18
**technical** 144:20
**technically** 216:21 220:13
**technology** 41:12
**tell** 11:14 25:12 51:17 64:10 67:2 73:6 75:20 82:12 84:12 87:21 89:12 92:8 93:4 100:25 107:18 111:2 130:13 132:2 137:24 147:20 154:9 157:19 164:23 170:12 178:17 185:14 186:12 197:19 198:11 199:2 200:3 202:13 210:20,23 216:5 220:19 221:23 222:6 228:19 229:25 230:18 233:19
**telling** 45:18 95:15
**ten** 49:17,25
**teresa** 1:4 2:2 9:8 15:4,11 46:2,4 63:6,15 63:16 170:23 171:6,9,15 172:3,18 176:6 177:10 239:1 240:1
**teresa's** 170:20 173:2 175:11
**terminated** 73:24 74:13 101:2
**terms** 66:12
**testified** 11:16 121:15
**testify** 149:2
**testifying** 237:5
**testimony** 97:25 98:15 124:4 138:24 148:10,15 172:19 240:8
**text** 6:3 24:7,18 24:18 30:16,25 31:19,21 32:7 32:12,19 50:15 51:8,13 89:20 91:3,4 104:14 104:22 106:2 106:19 107:13 107:19 108:4 123:18,24 160:12,13 178:11 184:9 184:17 185:3

187:21 215:2,2 215:6,9,14 225:17 226:11 226:12
**texted** 24:13 31:15,24
**texting** 125:3
**texts** 5:13,23 6:6,9 7:24 8:3 8:6 160:15,17 160:21
**thank** 10:17,22 11:5,10,17,18 15:18 39:3 55:2 61:3 65:11,18 87:13 91:18 100:24 101:14 116:14 126:10 143:15 143:19 191:5 199:23 204:4 205:3 223:15 235:17,19,22 236:8
**thanks** 65:22 223:9
**thanksgiving** 146:20 147:8 148:11,16
**thereabouts** 155:12
**thing** 12:16 17:7 23:17 28:15 35:2 51:20 80:21 82:2 94:13 95:14 122:17 163:15 168:12 171:16 179:21 202:16,18 214:14,15 216:23 222:5
**things** 13:3 16:16 17:24 18:4 27:18 28:8 29:22 33:23 38:19 54:23 66:22 123:3 125:10 157:5 211:17 217:24 235:20
**think** 21:25 22:6 27:4 28:6 47:5 49:19 51:13 73:3 74:3 76:15 88:15 100:23 101:11 103:19 111:21 136:11 144:5 145:3 148:12 150:14 151:21 156:4 156:24 157:18 157:24 158:14 160:13 165:25 167:8,14 171:6 172:15 175:2 176:4 190:8,9 204:16 220:14 222:4 227:15 232:8 233:16
**thinking** 86:24 185:13 190:16
**third** 55:4 110:18
**thought** 51:14 51:15 94:8,21
**three** 15:16 21:19 29:6,25 36:22 61:10 82:24 110:17 110:24 120:14 135:14,15 146:23 148:14 177:5,6,9,14
**throat** 223:24
**thursday** 1:16 9:13
**till** 12:20
**time** 1:17 6:5 10:8 11:8 12:9 16:19 17:15 18:5 20:16,19 23:4 24:12 26:12 27:16 28:8,23 29:24 30:2,9 31:14 31:25 33:15 34:16 35:9 43:16,25 44:2 44:3,4,5 45:6 46:24 47:10 49:3,7,19 54:5 55:24 57:7,13 58:14,21 59:6 59:22,25 60:8 61:16 64:9 67:21 69:15 70:21 72:2,19 73:21,22 76:16 77:20,21 78:3 79:3 87:17 88:9 89:8,9,21 92:17,24 95:11 96:2,7 100:5 101:19 102:13 102:25 104:3 107:3 108:11 110:15,18 114:4 118:15 121:7,8,9,10 122:14,24,25 123:10,12,23 123:25 124:2 124:14 125:14 128:11 136:3,3 141:9 143:6 152:8 153:20 154:22,23 156:20 157:16 157:20 160:2 161:18 163:12 163:17,18,20 163:22 164:3 165:2,16 166:5 166:8,10,11,14

167:20,22 168:5 171:22 174:16 176:19 177:15,19,20 178:2,20,21 179:4,9,20 180:9,12,13,17 180:20 181:2 183:21,24 187:2 188:22 189:11 190:21 190:25 203:22 211:8 216:11 216:14 222:25 223:13,16 228:13 231:8 231:10,17,22 232:6 233:8,9 233:12,16 234:4,11,18,19 234:23,25 235:5,19 236:9
**timekeeping** 118:17 138:16
**timeline** 45:22 73:14
**times** 4:9 18:16 18:19,23 19:5 19:7 21:10 22:4 23:14,20 23:23,25 26:18 26:24 27:23 28:18,21 36:22 68:10,16 77:2 110:17 123:16 124:5 141:19 141:25 142:10 142:13 150:19 150:22 151:13 158:4 160:3 164:8,14 165:12 166:24 185:7,8,10,11 185:19 208:23 212:10
**title** 46:5,13 48:12
**titled** 47:21
**today** 12:2 13:10 31:2 90:2 124:13 140:2 148:25 190:18 224:7 233:15 236:5
**together** 176:25
**told** 19:15,23 24:24 25:4,16 26:25 27:9,24 35:18 44:4 50:23 58:23 59:12,14,16,17 62:4,9 68:9 69:10 71:13 77:3 84:17 92:20 93:23 94:18 103:14 108:3,4,8 113:16 124:5 125:14 201:2 210:25 214:10
**took** 20:21 27:18 43:20 51:2 75:16 76:7 77:19 78:11 79:13 89:6,22 102:12 119:17,25 128:21 129:22 176:20
**top** 18:17 52:15 55:6,13 56:12 71:4 120:10 122:13 126:20 128:10 145:14 146:14 149:5 191:15
**totes** 8:8 230:15,17
**touch** 93:18 171:15 213:7
**town** 90:19
**track** 76:21
**traffic** 231:11 231:20 233:13 233:21
**trailed** 101:5
**trained** 45:5,12 46:23
**transcriber** 238:1
**transcript** 9:22 39:2 175:25 176:2 236:5 237:21 238:3,4 240:5,8
**transcriptionist** 237:7
**transpired** 171:12
**transport** 24:2 25:11 27:10 216:2
**transported** 23:12,21 25:23 28:19 29:22 30:10
**transporting** 25:7,8 27:2,7 27:25 30:4 31:12,17 32:3 83:22
**travel** 68:24 90:20 231:10
**traveling** 26:22
**travels** 230:8
**trees** 103:25
**trial** 3:9
**tricky** 56:6
**tried** 85:12
**trim** 223:16
**true** 42:24 131:25 228:17 237:8 238:4 240:8

**trusted** 51:19
**truth** 11:14,15 11:15 153:9
**try** 12:19 13:7 28:14 43:22 93:2
**trying** 18:3 86:23 87:3 105:3 133:14 133:19 134:6 138:13 163:10 217:5
**tuesday** 81:5,8 138:20 167:10 167:18
**turn** 69:2 108:15 136:16 224:15
**twenty** 36:12 36:12 48:12 115:15,16 148:12
**twice** 68:17,20
**two** 17:23 21:19 23:16 27:17 28:8 29:5,19,25 61:10 70:5,11 91:9 104:5 106:3 110:24 113:24 135:14 177:6,8 210:14 228:5 231:13 233:20
**type** 119:8
**typewriting** 237:6
**typical** 120:24 182:3

**u**

**u** 6:22,22 7:1,1 7:19 8:1
**ultimately** 72:24 79:15 107:24 190:6 190:15 207:23
**unbelievable** 37:17
**unclear** 59:6 147:14
**uncomfortable** 35:7
**under** 10:2 97:25 120:13 122:8 125:17 125:18 126:13 188:16,25 207:6,7,9
**understand** 9:21 12:22,23 14:10 15:2,23 26:23 34:7,23 39:7,12 40:18 41:9 44:20 58:20 60:11 62:10 67:10 68:25 71:6 72:21 76:4,15 76:23 78:4 84:6 88:15 95:4,6 108:14 111:8 116:24 130:25 132:15 134:6 141:14 142:5 146:10 161:9 162:11 163:9 165:7 171:5 185:21 187:13 190:3 191:5 208:6 209:25 210:12 213:9 229:10
**understanding** 16:13 40:4 163:16 164:24
**understood** 33:20 143:5
**unemployment** 7:8 35:9,10,19 35:20 36:20,25 74:9 92:16,18 92:19,23 108:19,22 109:6,9,10,12 109:22 110:3 110:10 111:6,7 111:14 112:7 112:12,22 113:23 114:16 114:19,22 115:3 117:10 173:10 200:23 207:17
**unidentified** 144:5,9
**union** 196:16 196:18
**unit** 217:18
**united** 1:1
**unpaid** 7:7 231:9 233:9
**unrelated** 235:3
**unsure** 41:8 133:25
**updated** 89:8
**upper** 120:19 122:6
**ups** 50:4
**upset** 170:25 220:24 221:2
**upstairs** 13:16
**upstate** 103:16 103:23
**use** 25:25 68:7 71:5 110:19 157:4 179:12 189:21
**used** 26:2 147:9 153:12,14 179:20 189:7 211:5 223:16
**uses** 9:25
**using** 110:8 181:13 182:2

**usual** 157:20
**usually** 31:11 50:7 82:8 120:6,9 152:5 158:17 160:13 188:17
**utilization** 72:9

**v**

**v** 1:9 239:1 240:1
**vacation** 6:16 84:19,19 132:25 145:16
**vacuum** 159:12
**vague** 62:16 72:20
**valid** 144:6
**varied** 75:10,11 149:6 157:18 158:12
**venmo** 193:24
**verbal** 31:20 123:16,18,20
**verbally** 12:25 13:6 19:14,17 19:23 24:25 26:25 224:25 225:17 232:9 234:10
**verification** 209:9,17
**veritext** 9:4 236:2
**version** 54:19 146:3
**video** 99:20
**videoconfere...** 2:4,12,13
**view** 194:9
**vocal** 150:20
**voice** 20:3
**vs** 9:11

**w**

**w** 4:18,19,20,21 56:10,11 199:10 200:4 201:16 204:9 204:19
**wage** 69:13
**wages** 92:3 96:14 100:11
**wait** 12:20 13:5 110:19,20,24 140:18 210:21
**waiting** 35:3 61:23 110:23
**walk** 69:4
**walked** 88:24
**wall** 2:15
**want** 12:7 13:23 21:8 26:12 34:15 38:3 45:22 64:25 84:18 88:16 99:8 111:8 113:19 131:11 136:16 137:23,24 143:7 174:11 201:8,11 227:16 235:19
**wanted** 46:13 74:8 76:20 106:22 152:14 152:17 159:20 168:25 170:18 172:6,12,23 173:11 174:11 174:12,13 185:17 187:5,7 188:20 193:23 213:17 215:25 223:2
**washington** 4:23 6:25 35:16 36:14 38:5 203:23 205:22 206:6 206:15
**water** 14:6
**way** 36:6 50:3 54:15 56:8 87:25 112:19 129:21 131:7 150:18 159:11 159:21 185:20 186:20 191:22 202:6 206:21 207:18 209:7 228:2,12 229:11,13,16 229:17 233:3 235:9
**we've** 11:23 66:2 69:17 100:23 118:16 138:23 139:6 153:17 172:20 176:18 222:24 225:7 227:15
**wear** 157:14
**wearing** 217:2
**website** 109:25
**wednesday** 81:5,8 167:10 167:19
**week** 29:2,4 33:9 44:8,12 44:12,18,19 48:25 49:9,11 61:8,25 75:6 80:24 115:12 118:9 147:22 152:9,13 162:12 165:3 165:15 167:4 167:14 175:12 181:16 218:19
**weekly** 29:22
**weeks** 61:10 84:11,22 86:3 86:5,11,16,18 87:7 103:22 106:3

**weird** 171:16
**welcome** 68:9 143:17
**went** 22:15 26:16 34:24 35:10 36:20,21 42:6,25 63:11 63:11 65:6,25 72:2 83:22 84:22,22 93:18 93:23 97:6,7 99:16 103:17 104:4 109:6,25 110:18 111:9 111:15 131:19 136:12 167:14 202:20 207:21 217:2,7 218:22
**west** 103:17
**westhampton** 1:19 9:14 45:16,17,24 47:16 48:8 66:6 67:22 73:25 77:11,12 81:4 82:18 83:10 93:11 97:17 101:21 101:22,24,25 102:3 108:12 229:4,6,7,11
**wet** 218:7
**whatsoever** 21:13
**when's** 203:11 203:22
**wifi** 68:20
**wimsey** 174:6
**winter** 157:22
**wishes** 215:21
**withheld** 200:14,15,15 202:4
**withholding** 186:20
**withholdings** 152:25
**witness** 7:9 9:18,20,21 10:18,24 11:13 17:18 18:9 21:3 53:2 60:18,21 76:20 85:22 99:13,16 100:2 102:16 118:6,9 121:21 125:7 131:22 195:8 211:7,10 211:13 219:9 219:20 232:16 235:17,22 237:4
**witnessed** 211:20
**woman** 90:13
**words** 36:4
**work** 16:15 17:6,25 18:6,7 18:19 22:25 23:6,10 24:4,7 24:14,15,19,25 25:4,12,13,16 25:18 27:2,17 27:24 37:15 43:24 44:9 48:21 49:12 50:3,11,16 55:18 65:5,25 66:9 68:24 72:24 81:11,15 81:21 82:4 85:19 86:18 88:7 92:4 96:8 97:3,4,9 100:16 101:5 103:2,11,12 104:4 105:5,6 105:15,25 107:25 108:7 116:3,12 129:19 132:18 133:6,8,20,23 134:12,13,14 134:18,21,24 148:2 158:7,20 162:5 165:14 167:4,14 172:11 176:7 178:3,3 180:10 182:6 203:15 207:16 213:6 215:22,24 216:14 219:5 219:16 220:20 222:10,20 223:23 224:8 224:12 232:12 233:3 235:4,6 235:10
**worked** 17:2 18:24 19:10 20:23 24:8 29:5,17 30:16 30:25 31:16,25 32:13,20 33:2 33:5,8 34:5 48:20 49:7,14 51:9 53:9,12 53:14 72:18 73:22,23 74:3 74:18 75:5 80:7 81:15 86:2 89:13,21 96:19,21 97:12 97:21,24 101:15 123:10 123:12 124:6 124:16,19 125:14 128:18 129:22,23 130:14,18 131:15 132:20 133:12 134:17 135:8,24 136:9 136:23 138:8 138:25 142:17

154:5,20 156:2 156:22 159:23 161:25 162:23 163:14 165:15 167:21 169:18 169:22 196:8 211:8 221:21
**workforce** 64:23
**working** 28:25 29:25 37:18 41:15 43:10 45:3,21,23,24 49:8 62:23 64:10 66:3 67:15,16 74:16 77:11 81:6 82:9 86:4 88:11 98:7 101:6 104:2,5 148:23 159:10 161:6 166:16 169:3 170:14 177:19 187:3 212:15 234:8 234:20 235:10 235:11
**workplace** 116:5
**works** 41:13 65:11 88:16 127:4
**world** 12:17
**worry** 94:6,24
**write** 13:2 61:19 112:5 160:11
**writing** 38:25 54:24 58:7 160:24 224:25 225:17 226:11 232:20,22 234:10
**written** 10:6 21:24
**wrong** 106:17 175:10
**wrote** 22:4 53:8 186:19

**x**

**x** 3:1,5 4:1 5:1 6:1 32:13 33:2 237:21

**y**

**yahoo.com** 56:13
**yahoo.com.** 52:2
**yeah** 14:19 16:25 17:12 23:15,23,24 24:5 29:10,18 29:20 30:11 33:4,21 35:6 37:12 38:16,21 40:2,18 42:22 45:18 46:8 51:19 57:15,22 60:24 63:18,18 64:2 66:8,13 66:22 69:16 70:23 71:19 76:6,10,21,22 78:15 80:2,3 80:11 81:17 82:20 85:15 86:7,14 88:12 92:7 95:7 96:16,17 98:9 99:21,23 105:2 105:4,21 109:4 109:23 111:21 118:9 132:9 133:17,19 135:12 139:3 141:13,16,17 144:14 146:16 148:13,14 150:11,14,16 156:17,19 157:6 158:21 159:2 160:3,12 161:14,14 162:7,8,17 163:15 165:18 165:19 166:18 168:21 171:2,8 172:21,22,23 173:11 178:6 178:19,19,22 178:23 180:3,7 180:7,15,19,22 181:4,19,22,25 182:15 183:14 183:16 185:7 189:23 190:5 190:17 194:13 199:17 209:11 209:13 210:16 210:19 212:19 218:4 219:24 220:7 222:11 222:12,24 223:5 226:8 228:24 233:5 236:8
**year** 4:18,19,20 4:21 66:10 72:6 77:14 85:2 115:14 129:20 130:15 146:24 148:7 148:12 149:15 152:6,9,13 154:16 156:4 187:8 203:15
**year's** 85:6 133:14 146:19 147:25 148:9 148:17 149:21 150:2,3
**years** 21:20 29:5,16,17 207:7,9 213:23

214:2
**yelp** 168:11,15
**yep** 12:23 65:22 107:23 183:14,15 186:22 205:24
**york** 1:2 2:16 9:14,17 12:18 73:16 103:23 108:20 111:11 111:16 113:10 116:18 152:10 152:11 224:23 227:11 237:19
**younger** 159:19

**z**

**zelle** 193:23
**zero** 202:15
**zeros** 213:22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.